APPEAL NO. 24-1942

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

John M. Kluge,
*Plaintiff-Appellant,*

v.

Brownsburg Community School Corporation,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
Case No. 1:19-cv-02462-JMS-KMB
Hon. Jane Magnus-Stinson

## APPELLANT'S OPENING BRIEF

TYSON LANGHOFER
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707–4655
tlanghofer@ADFlegal.org

MICHAEL J. CORK
MICHAEL J. CORK, ESQ.
5754 N. Delaware Street
Indianapolis, IN 46220
(317) 517–4217
cork0@icloud.com

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450–4235
jbursch@ADFlegal.org

DAVID A. CORTMAN
RORY T. GRAY
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339–0774
dcortman@ADFlegal.org
rgray@ADFlegal.org
tbarham@ADFlegal.org

*Counsel for Appellant*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1942

Short Caption: John M. Kluge v. Brownsburg Community School Corporation

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  John M. Kluge

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  Alliance Defending Freedom, Michael J. Cork

(3) If the party, amicus or intervenor is a corporation:

  i) Identify all its parent corporations, if any; and

   N/A

  ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  N/A

Attorney's Signature: s/ David Cortman   Date:  July 10, 2024

Attorney's Printed Name:  David Cortman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address:  1000 Hurricane Shoals Rd., Suite D-1100

   Lawrenceville, GA 30043

Phone Number: 770-339-0774   Fax Number:  770-339-6744

E-Mail Address: dcortman@adflegal.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1942

Short Caption: John M. Kluge v. Brownsburg Community School Corporation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

     John M. Kluge

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

     Alliance Defending Freedom, Michael J. Cork

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

         N/A

     ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     N/A

Attorney's Signature: s/ Rory T. Gray     Date: July 10, 2024

Attorney's Printed Name: Rory T. Gray

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: 1000 Hurricane Shoals Rd., Suite D-1100

     Lawrenceville, GA 30043

Phone Number: 770-339-0774     Fax Number: 770-339-6744

E-Mail Address: rgray@adflegal.org

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1942

Short Caption: John M. Kluge v. Brownsburg Community School Corporation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John M. Kluge

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Alliance Defending Freedom, Michael J. Cork

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Travis C. Barham    Date: July 10, 2024

Attorney's Printed Name:  Travis C. Barham

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address:  1000 Hurricane Shoals Rd., Suite D-1100

Lawrenceville, GA 30043

Phone Number: 770-339-0774    Fax Number:  770-339-6744

E-Mail Address: tbarham@adflegal.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __24-1942__

Short Caption: __John M. Kluge v. Brownsburg Community School Corporation__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    John M. Kluge

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Alliance Defending Freedom, Michael J. Cork

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: __s/ John J. Bursch__    Date: __July 10, 2024__

Attorney's Printed Name: __John J. Bursch__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: __440 First Street NW, Suite 600__

    __Washington, DC 20001__

Phone Number: __616-450-4235__    Fax Number: _____

E-Mail Address: __jbursch@adflegal.org__

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-1942</u>

Short Caption: <u>John M. Kluge v. Brownsburg Community School Corporation</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    John M. Kluge

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Alliance Defending Freedom, Michael J. Cork

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: <u>s/ Tyson Langhofer</u>    Date: <u>July 10, 2024</u>

Attorney's Printed Name: <u>Tyson Langhofer</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: <u>44180 Riverside Pkwy</u>

    <u>Lansdowne, VA 20176</u>

Phone Number: <u>571-707-4655</u>    Fax Number: _____

E-Mail Address: <u>tlanghofer@adflegal.org</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1942

Short Caption: John M. Kluge v. Brownsburg Community School Corporation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

John M. Kluge

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Alliance Defending Freedom, Michael J. Cork

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Michael J. Cork    Date: July 10, 2024

Attorney's Printed Name: Michael J. Cork

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 5754 N. Delaware St.

Indianapolis, IN 46220

Phone Number: 317-517-4217    Fax Number:

E-Mail Address: cork0@icloud.com

rev. 12/19 AK

## CORPORATE DISCLOSURE STATEMENT

No nongovernmental corporation is party to this case.

## REQUEST FOR ORAL ARGUMENT

Oral argument is appropriate because Mr. Kluge's appeal involves nationally important questions related to Title VII's religious-accommodation requirement that this Court has not yet resolved after *Groff v. DeJoy*, 600 U.S. 447 (2023). Given the legal significance of these questions, the potential for circuit conflict, and the fact-bound nature of Title VII's religious-accommodation mandate, oral argument would materially assist the panel in resolving this appeal.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................ i

Request For Oral Argument .................................................................... i

Table of Authorities .............................................................................. vi

Jurisdictional Statement ......................................................................... 1

Statement of the Issues ........................................................................ 2

Introduction ....................................................................................... 3

Statement of the Case ......................................................................... 4

    I.      Mr. Kluge was an excellent teacher. ........................................ 4

    II.     Mr. Kluge is a committed Christian. ........................................ 5

    III.    Brownsburg introduced transgender-terminology rules. ........... 6

    IV.    Mr. Kluge proposed a religious accommodation that
          Brownsburg accepted. ........................................................... 8

    V.     Mr. Kluge's religious accommodation worked. ........................ 10

    VI.    After a few grumblings, Brownsburg pressured Mr. Kluge
          to resign. ............................................................................ 11

    VII.   Brownsburg overhauled its rules: "No exceptions
          allowed." ............................................................................ 13

    VIII. Mr. Kluge followed the accommodation and his
          convictions at the orchestra awards ceremony. ...................... 17

    IX.    Mr. Kluge submitted a conditional resignation and tried
          to revoke it, but Brownsburg pushed it through. ..................... 17

    X.     Mr. Kluge sought legal relief. ............................................... 19

          A. District court history ...................................................... 19

          B. The district court's first summary judgment ruling ........... 19

          C. Appellate history .......................................................... 21

D. The district court's second summary judgment ruling ........22

Summary of Argument....................................................................24

Argument..........................................................................................25

I.     Standard of review....................................................................25

II.    The district court erred in granting Brownsburg summary
       judgment (and denying it to Mr. Kluge) on religious
       discrimination because Brownsburg revoked a reasonable
       accommodation without showing undue hardship. ..................25

       A. Mr. Kluge proved a *prima facie* case of discrimination........26

          1. The district court and Brownsburg largely conceded
             Mr. Kluge's *prima facie* case of discrimination...............26

          2. Mr. Kluge's religious objection is sincere.........................26

             a. Mr. Kluge satisfies this Court's sincerity
                standards....................................................................27

             b. The district court wrongly second-guessed the
                reasonableness of Mr. Kluge's beliefs.........................28

             c. The district court misunderstood the teachings of
                Mr. Kluge's presbytery, teachings he modeled...........29

       B. Brownsburg withdrew a reasonable accommodation
          without the undue hardship Title VII requires...................30

          1. Brownsburg showed no increased costs that are
             substantial in the overall context of its business. ..........32

          2. Brownsburg never showed that letting Mr. Kluge
             remain silent harmed students or disrupted the
             learning environment. ......................................................35

             a. Brownsburg rescinded Mr. Kluge's
                accommodation due to complaints *Groff* sets off-
                limits...........................................................................35

             b. A few third-party grumblings do not create undue
                hardship for Brownsburg as a whole............................39

      c. Students' lack of universal affirmation doesn't qualify as undue hardship. ..........................41

      d. Brownsburg can't rely on information it didn't have or rely on when it forced Mr. Kluge to resign. ...........................................................43

      e. Brownsburg's policy endangers students. ..................45

    3. Brownsburg never showed that letting Mr. Kluge remain silent jeopardized its educational mission. .........49

      a. Brownsburg's redefinition of its educational mission far exceeds Indiana's requirements. ..............49

      b. Brownsburg's redefinition of its mission doesn't preempt federal law. ....................................50

      c. Brownsburg didn't show that Mr. Kluge's accommodation jeopardized its mission. ...................51

      d. The district court relied on inapposite precedent. ......53

    4. Brownsburg never showed that letting Mr. Kluge remain silent created any real risk of legal liability. ......55

III. The district court erred in granting Brownsburg summary judgment (and denying it to Mr. Kluge) on the retaliation claim because Mr. Kluge's protected activities caused Brownsburg's adverse actions. .................................56

  A. Mr. Kluge didn't waive his retaliation claim........................56

  B. *Groff* requires reconsideration of the retaliation claim........57

  C. Mr. Kluge satisfied all elements of Title VII retaliation......58

    1. Mr. Kluge engaged in protected activities. .....................59

    2. Mr. Kluge suffered an adverse action. ............................59

    3. Mr. Kluge showed a but-for causal link between his protected activity and Brownsburg's adverse action. ......60

4. Mr. Kluge doesn't need to show pretext because he relied on direct proof, and Brownsburg had no legitimate reason to force his resignation.........................62

Conclusion ....................................................................63

Certificate of Compliance ...........................................65

Certificate of Service ....................................................66

Seventh Circuit Rule 30(d) Statement...........................67

Addendum ...................................................................68

Required Short Appendix.............................................69

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*A.C. by M.C. v. Metropolitan School District of Martinsville,*
    75 F.4th 760 (7th Cir. 2023)............................................................56

*Adeyeye v. Heartland Sweeteners, LLC,*
    721 F.3d 444 (7th Cir. 2013) .............................................27–29, 31

*Anderson v. Genral Dynamics Convair Aerospace Division,*
    589 F.2d 397 (9th Cir. 1978) ........................................................34

*Anderson v. U.S.F. Logistics (IMC), Inc.*
    274 F.3d 470 (7th Cir. 2001) ........................................................53

*Ansonia Board of Education v. Philbrook,*
    479 U.S. 60 (1986) .............................................................25, 31, 40

*Baz v. Walters,*
    782 F.2d 701 (7th Cir. 1986) ........................................................54

*Bonner ex rel. Bonner v. Daniels,*
    907 N.E.2d 516 (Ind. 2009) ..........................................................49

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ......................................................................56

*Boston v. United States Steel Corp.,*
    816 F.3d 455 (7th Cir. 2016) ........................................................62

*Bradley v. Village of University Park,*
    59 F.4th 887 (7th Cir. 2023)..........................................................57

*Carmody v. Board of Trustees of University of Illinois,*
    893 F.3d 397 (7th Cir. 2018) ........................................................58

*Comcast Corp. v. National Association of African American-Owned
    Media,*
    589 U.S. 327 (2020) ......................................................................62

*Crider v. University of Tennessee, Knoxville,*
    492 F. App'x 609 (6th Cir. 2012) ..................................................34

*Cullen v. Olin Corp.*,
    195 F.3d 317 (7th Cir. 1999) ........................................................ 44

*Draper v. United States Pipe & Foundry Company*,
    527 F.2d 515 (6th Cir. 1975) ........................................................ 34

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
    575 U.S. 768 (2015) ............................................................. 44, 50

*EEOC v. Ilona of Hungary, Inc.*,
    108 F.3d 1569 (7th Cir. 1997) .................................... 29–30, 53

*EEOC v. North Memorial Health Care*,
    908 F.3d 1098 (8th Cir. 2018) .................................... 43, 61

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018) ........................................................ 56

*EEOC v. Sears, Roebuck & Company*,
    417 F.3d 789 (7th Cir. 2005) ........................................................ 58

*Franks v. Bowman Transportation Company*,
    424 U.S. 747 (1976) ........................................................ 36

*Frazee v. Illinois Department of Employment Security*,
    489 U.S. 829 (1989) ........................................................ 30

*Genas v. New York Department of Correctional Services*,
    75 F.3d 825 (2d Cir. 1996) ........................................................ 42

*Giese v. City of Kankakee*,
    71 F.4th 582 (7th Cir. 2023) ........................................................ 59

*Gillette v. United States*,
    401 U.S. 437 (1971) ........................................................ 27

*Grayson v. Schuler*,
    666 F.3d 450 (7th Cir. 2012) ........................................................ 29

*Groff v. DeJoy*,
    35 F.4th 162 (3d Cir. 2022) ........................................................ 35

*Groff v. DeJoy,*
 600 U.S. 447 (2023) ............................................................ passim

*Hebrew v. Texas Department of Criminal Justice,*
 80 F.4th 717 (5th Cir. 2023) ......................................................... 34

*Hedges v. Wauconda Community Unit School District No. 118,*
 9 F.3d 1295 (7th Cir. 1993) ........................................................ 39

*Hunt-Golliday v. Metropolitan Water Reclamation District of*
 *Greater Chicago,*
 104 F.3d 1004 (7th Cir. 1997) ................................................. 59, 61

*Igasaki v. Illinois Department of Financial & Professional*
 *Regulation,*
 988 F.3d 948 (7th Cir. 2021) ........................................................ 62

*Kennedy v. Bremerton School District,*
 597 U.S. 507 (2022) ............................................................ passim

*Korte v. Sebelius,*
 735 F.3d 654 (7th Cir. 2013) .................................................. 27, 30

*Kovacs v. United States,*
 739 F.3d 1020 (7th Cir. 2014) ...................................................... 58

*Linke v. Northwestern School Corp.,*
 763 N.E.2d 972 (Ind. 2002) ......................................................... 50

*Logan v. City of Chicago,*
 4 F.4th 529 (7th Cir. 2021) ......................................................... 62

*Loyd v. Phillips Brothers, Inc.,*
 25 F.3d 518 (7th Cir. 1994) ......................................................... 62

*Mahanoy Area School District v. B.L. ex rel. Levy,*
 594 U.S. 180 (2021) ............................................................... 38, 51

*Markel Insurance Company v. Rau,*
 954 F.3d 1012 (7th Cir. 2020) ...................................................... 25

*Matthews v. Wal-Mart Stores, Inc.*,
    417 F. App'x 552 (7th Cir. 2011) ....................................................55

*McCottrell v. White*,
    933 F.3d 651 (7th Cir. 2019) ........................................................25

*McKennon v. Nashville Banner Publishing Company*,
    513 U.S. 352 (1995) ..............................................................43–44

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ........................................................38

*Miller v. Smith*,
    220 F.3d 491 (7th Cir. 2000) ........................................................25

*Minkus v. Metropolitan Sanitary District of Greater Chicago*,
    600 F.2d 80 (7th Cir. 1979) ..........................................................54

*Morse v. Frederick*,
    551 U.S. 393 (2007) ..............................................................50–51

*Nagy ex rel. Nagy v. Evansville-Vanderburgh School Corp.*,
    844 N.E.2d 481 (Ind. 2006) ..........................................................49

*Porter v. City of Chicago*,
    700 F.3d 944 (7th Cir. 2012) ......................................................59–60

*Reed v. Great Lakes Companies*,
    330 F.3d 931 (7th Cir. 2003) ........................................................29

*Robertson v. Department of Health Services*,
    949 F.3d 371 (7th Cir. 2020) ......................................................61–62

*Rodriguez v. City of Chicago*,
    156 F.3d 771 (7th Cir. 1998) ........................................................59

*Ryan v. United States Department of Justice*,
    950 F.2d 458 (7th Cir. 1991) ......................................................53–54

*Scaife v. Racine County*,
    238 F.3d 906 (7th Cir. 2001) ........................................................25

*Seshadri v. Kasraian,*
    130 F.3d 798 (7th Cir. 1997) .................................................. 30, 53

*Sullivan v. Flora, Inc.,*
    63 F.4th 1130 (7th Cir. 2023) ........................................................ 57

*Thomas v. Review Board of Indiana Employment Security Division,*
    450 U.S. 707 (1981) .............................................................. 27–28

*Tinker v. Des Moines Independent Community School District,*
    393 U.S. 503 (1969) .................................................................... 41

*Trans World Airlines, Inc. v. Hardison,*
    432 U.S. 63 (1977) ...................................................................... 33

*Trans World Airlines, Inc. v. Thurston,*
    469 U.S. 111 (1985) .................................................................... 62

*Turner Broadcasting System, Inc. v. FCC,*
    512 U.S. 622 (1994) .................................................................... 42

*United States v. Varner,*
    948 F.3d 250 (5th Cir. 2020) ...................................................... 41

*Venters v. City of Delphi,*
    123 F.3d 956 (7th Cir. 1997) ...................................................... 43

*Veprinsky v. Fluor Daniel, Inc.,*
    87 F.3d 881 (7th Cir. 1996) ........................................................ 62

*Vlaming v. West Point School Board,*
    895 S.E.2d 705 (Va. 2023) .......................................................... 41

*Walker v. Glickman,*
    241 F.3d 884 (7th Cir. 2001) ...................................................... 62

*Whitaker by Whitaker v. Kenosha Unified School District No. 1,*
    858 F.3d 1034 (7th Cir. 2017) .................................................... 55

*Williams v. Kincaid,*
    45 F.4th 759 (4th Cir. 2022) ...................................................... 56

*Yellowbear v. Lampert,*
    741 F.3d 48 (10th Cir. 2014) ........................................................ 27

*Zamecnik v. Indian Prairie School District No. 204,*
    636 F.3d 874 (7th Cir. 2011) .................................................. 3, 42, 51

## Statutes

42 U.S.C. § 2000e-3(a) ............................................................................ 52

## Other Authorities

Annette L. Cantu, et al., *Changes in Anxiety & Depression from*
    *Intake to First Follow-Up Among Transgender Youth in a*
    *Pediatric Endocrinology Clinic*, 5 TRANSGENDER HEALTH 196
    (2020) .................................................................................................. 47

Brownsburg Cmty. Sch. Corp., *BCSC Welcome* ...................................... 34

*Brownsburg High School*, PUB. SCH. REV. ............................................... 34

*Brownsburg High School*, U.S. NEWS & WORLD REPS. ............................ 34

C.M. Wiepjes, et al., *The Amsterdam Cohort of Gender Dysphoria*
    *Study (1972–2015): Trends in Prevalence, Treatment, and*
    *Regrets*, 15 J. SEX. MED. 582 (Apr. 2018) ........................................ 46

C.M. Wiepjes, et al., *Trends in Suicide Death Risk in Transgender*
    *People: Results from the Amsterdam Cohort of Gender*
    *Dysphoria Study (1972–2017)*, 141 ACTA PSYCHIATRICA
    SCANDINAVICA 486 (2020) ................................................................. 46

Cecilia Dhejne, et al., *Long-Term Follow-Up of Transsexual*
    *Persons Undergoing Sex Reassignment Surgery: Cohort*
    *Study in Sweden*, 6:2 PLOS ONE 1 (2011) ................................. 46, 48

Devita Singh, et al., *A Follow-Up Study of Boys With Gender*
    *Identity Disorder*, FRONTIERS IN PSYCHIATRY (Mar. 28, 2021) ....... 45

Diane Chen, et al., *Consensus Parameter: Research Methodologies to Evaluate Neurodevelopmental Effects of Pubertal Suppression in Transgender Youth*, 5 TRANSGENDER HEALTH 246 (2020) ...................................................................... 47

Elizabeth Hisle-Gorman, et al., *Mental Healthcare Utilization of Transgender Youth Before & After Affirming Treatment*, 18 J. SEXUAL MED. 1444 (2021) ........................................................... 47

*Evidence Review: Gender-Affirming Hormones for Children & Adolescents with Gender Dysphoria*, NICE (2020) .................. 47–48

*Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children & Adolescents with Gender Dysphoria*, NICE (2020) ...................................................................... 47

Henk Asscheman, et al., *A Long-Term Follow-Up Study of Mortality in Transsexuals Receiving Treatment with Cross-Sex Hormones*, 164 EUR. J. ENDOCRINOLOGY 635 (2011) .............. 48

James M. Cantor, *Do Trans Kids Stay Trans When They Grow Up?*, SEXOLOGY TODAY! (Jan. 11, 2016) .................................... 45

Jay McNeil, et al., *Suicide in Trans Populations: A Systematic Review of Prevalence and Correlates*, 4 PSYCH. OF SEXUAL ORIENTATION & GENDER DIVERSITY 341 (2017) ............................ 46

Kellan E. Baker, et al., *Hormone Therapy, Mental Health, & Quality of Life Among Transgender People: A Systematic Review*, 5 J. ENDOCRINE SOC'Y 1 (2021) ......................................... 46

Laura E. Kuper, et al., *Body Dissatisfaction & Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*, 145 PEDIATRICS 1 (2020) .............................................. 46

Matthew McClellan, *Student Says Brownsburg Teacher's Transgender Policy Was Dangerous*, WRTV Indianapolis (June 10, 2018) .............................................................. 38

Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins & Evidence*, 49 J. SEX & MARITAL THERAPY 348 (2022) ..........................................................................48

Polly Carmichael, et al., *Short-Term Outcomes of Pubertal Suppression in a Selected Cohort of 12 to 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16:2 PLOS ONE 1 (Feb. 2, 2021) ......................................45–47

Riittakerttu Kaltiala, et al., *Adolescent Development and Psychosocial Functioning after Starting Cross-Sex Hormones for Gender Dysphoria*, 74 NORDIC J. PSYCHIATRY 213 (2020) ........47

Riittakerttu Kaltiala, *Gender-Affirming Care Is Dangerous. I Know Because I Helped Pioneer It*, FREE PRESS (Oct. 30, 2023)..................6

Tessa Brik, et al., *Trajectories of Adolescents Treated with Gonadotropin Releasing Hormone Analogues for Gender Dysphoria*, 49 ARCH. SEX BEHAV. 2611 (2020) ...............................46

The Cass Review, Final Report – FAQs ..............................................49

Thomas D. Steensma, et al., *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52 J. OF AM. ACAD. OF CHILD & ADOLESCENT PSYCH., June 2013 ....................................45

Walter Bockting, *Transgender Identity Development*, *in* APA HANDBOOK ON SEXUALITY AND PSYCHOLOGY 739 (APA ed., 2014) .....................................................................45

Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLINICAL ENDOCRINAL METAB. 3869 (2017).....................................................48

## **Rules**

FED. R. CIV. P. 56(a)..............................................................................25

## **Constitutional Provisions**

Ind. Const. art. VIII.................................................................................49

U.S. Const. Art. VI ..............................................................................50

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the federal questions presented in this appeal under 28 U.S.C. §§ 1331 & 1343. Those questions arise under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

John Kluge is an individual and citizen of Indiana. Brownsburg Community School Corporation is an Indiana community school corporation in Brownsburg, Indiana.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The district court granted summary judgment to Brownsburg and denied it to Mr. Kluge on April 30, 2024, entering final judgment on the same date. Mr. Kluge filed his Notice of Appeal with the district court on May 29, 2024, within the 30-day period set by 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A).

There are no remaining proceedings in the district court and no motions that would toll the time for appeal. This Court previously remanded this case for reconsideration in light of *Groff v. DeJoy*, 600 U.S. 447 (2023).

## STATEMENT OF THE ISSUES

John Kluge had a sterling record teaching music theory and orchestra at Brownsburg High School—until the school district ordered him to use students' names and pronouns based on their gender identity. Because affirming transgenderism violates Mr. Kluge's Christian faith and harms students, he requested a religious accommodation under Title VII: calling *all* students by their last names, like a coach, and allowing another staff member to hand out gender-specific uniforms.

Brownsburg granted this accommodation, which treated all students the same and allowed Mr. Kluge to remain silent on transgenderism at school, and his classes ran smoothly. But after a few teachers, parents, and students grumbled, Brownsburg decided no exceptions were allowed beginning the next school year, revoked the accommodation, and forced Mr. Kluge to resign, ending his teaching career.

The issues presented on appeal are:

1. Whether the district court erred in granting summary judgment to Brownsburg and denying it to Mr. Kluge on Mr. Kluge's Title VII religious-accommodation claim.

2. Whether the district court erred in granting summary judgment to Brownsburg and denying it to Mr. Kluge on Mr. Kluge's Title VII retaliation claim.

## INTRODUCTION

John Kluge served as Brownsburg's orchestra teacher for four years. He earned a reputation as a fun, engaging teacher who genuinely cared about his students, and his orchestras performed better than ever. Yet these results were not the school's priority; it cared more about forcing Mr. Kluge to use students' transgender names and pronouns. But Mr. Kluge is a devout man who believed district policies required him to tell a lie dangerous to his students and perilous to his soul. So he asked for, and received, a modest Title VII accommodation: using all students' last names, letting him stay silent on transgender-ism and focus on music.

Over 99.9% of students and teachers never commented on this accommodation. But when a few griped, Brownsburg revoked the accommodation, brooked no exception to its speech-compelling rules, and forced Mr. Kluge to resign or be fired. Yet no one can demand affirmation "of their beliefs or even their way of life," *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011), and complaints about a person's religious beliefs, practices, or accomoda-tions are "off the table" when assessing undue hardship under Title VII. *Groff*, 600 U.S. at 472 (quotation omitted).

Because the district court ignored these fundamental principles, this Court should reverse, and judgment should be entered for Mr. Kluge.

## STATEMENT OF THE CASE[1]

### I.    Mr. Kluge was an excellent teacher.

Mr. Kluge has a bachelor's degree in music education and a master's degree in music theory. Brownsburg hired him to teach music and orchestra from 2014 to 2018. Doc.120-2 at 3. He taught music theory classes; conducted the high school's orchestras; assisted with the middle school orchestra's rehearsals; and periodically taught piano lessons. SA.278–79. Brownsburg always gave Mr. Kluge positive written performance evaluations; in fact, he met or exceeded the district's expectations. Doc.113-2 at 2.

Students lauded Mr. Kluge as a "wonderful teacher," who taught with "kindness and fairness," Doc.52-5 at 2, really "care[d] about [them]," Doc.52-4 at 2, and made a "positive influence" on their lives, Doc.120-18 at 11. They praised "the energy he put into conducting [the] orchestra and creating a fun classroom environment." Doc.52-4 at 1.

Mr. Kluge also encouraged students "to make friends and wanted [them] to be included" in extracurricular orchestra trips." Doc.54-2 at 2. He inspired at least one student—who considered Mr. Kluge her "most influential" orchestra teacher and said his efforts really "helped the orchestra program excel"—to pursue a music-education degree in college. Doc.120-18 at 9.

---

[1] All district court record cites indicate the docket number and ECF page number. Internal citations to this statement refer to it as "Facts."

Parents, grandparents, and graduates agreed Mr. Kluge was an "excellent teacher," Doc.120-18 at 9, "who sparks an interest [in] music and the arts" in students, *Id.* at 13. Mr. Kluge "truly cares about kids and wants them to be successful" and was "a huge influence in" some students' lives. *Id.* at 9–10.

## II. Mr. Kluge is a committed Christian.

Mr. Kluge is also a man of deep Christian faith. An ordained elder, Mr. Kluge exercised spiritual oversight over his church and served as the church's worship leader, led its youth ministries, and directed its AWANA Bible program for children. SA.263–64.

The Bible shapes Mr. Kluge's worldview, Docs.113-1 at 6; 113-2 at 2; SA.266, including his religious beliefs about gender dysphoria, Doc.113-2 at 2. Based on Scripture, Mr. Kluge believes God "created us as a man or a woman," it is wrong "to act or dress in the manner of the opposite sex," it would be sinful for him to "encourage[ ] students in transgenderism," and causing children to stumble in this way would subject him to "special punishment" from God." Doc.113-1 at 6–9. Fundamentally, Mr. Kluge believes God ordains "[g]enetic sex" and gender identity, the two "cannot be separated, and they remain bound together throughout one's life." SA.270.

These sincerely-held beliefs prevent Mr. Kluge from using first names and pronouns that conflict with a student's biological sex "during the course of … teaching a class," since doing so "encourages gender

dysphoria." SA.268; *accord id*. SA.271–72 (pioneers of "gender-affirming care" recognize this).[2] Mr. Kluge's faith doesn't preclude him from using students' transgender name in ways that don't encourage gender dysphoria, such as briefly at a formal awards ceremony. SA.267, 292–93.

## III.    Brownsburg introduced transgender-terminology rules.

Mr. Kluge remained a valued teacher until Brownsburg initiated transgender-terminology rules in early 2017 by inviting Mr. Lee (a government teacher and the Equality Alliance Club's advisor) and Ms. Mehrtens (a school counselor) to speak at faculty meetings about endorsing students' transgender identities. SA.243. Alarmed by their suggestion that referring "to a transgender student by their biological sex and not us[ing] the student's preferred pronoun" would be punishable as "harassment," Mr. Kluge wrote a letter expressing concern for transgender students' health and well-being, describing such a policy's adverse effects on Christian students (citing Scripture and explaining the policy's burden on the "consciences of Christian students and faculty members"), and urging Brownsburg to take a different course. Doc.113-1 at 19–25; SA.270.

---

[2] Riittakerttu Kaltiala, *Gender-Affirming Care Is Dangerous. I Know Because I Helped Pioneer It*, FREE PRESS (Oct. 30, 2023), https://bit.ly/49whhcj.

Mr. Kluge and three other teachers signed the letter and scheduled a meeting with Principal Daghe at the end of the school year. Doc.113-1 at 31; SA.270–71. Registering students' transgender names in Brownsburg's student-file database (*i.e.*, PowerSchool) resolved the other teachers' concerns. But after the meeting, Mr. Kluge urged Principal Daghe to keep using students' legal names in PowerSchool. SA.243–44, 271.

Nevertheless, starting in the 2017–18 school year, Brownsburg let transgender-identifying students change their names in PowerSchool with parental permission and a healthcare provider's note. Docs.113-5 at 4; 120-19 at 5. Counselor Mehrtens informed Mr. Kluge and told him to "feel free" to use these student's new names and pronouns. SA.244, 272–72. Interpreting this as an invitation (not a command), Mr. Kluge believed he could continue using student's biology-reflecting names and pronouns in accord with his religious beliefs. Before classes began, he told Principal Daghe of his plans based on his religious beliefs. The principal sent Mr. Kluge to his office and contacted Superintendent Snapp. Doc.113-5 at 6; SA.244, 273.

Later that day, the superintendent and principal told Mr. Kluge— for the first time—that he was prohibited from using students' legal names. SA.273. Brownsburg required teachers to use students' transgender names and pronouns once recorded in PowerSchool. Doc.113-5 at 5. When Mr. Kluge expressed his religious objection and

cited scripture, Superintendent Snapp became "very angry," telling Mr. Kluge that his "beliefs aren't what's in the Bible." SA.278. A theological debate ensued. Superintendent Snapp pronounced Mr. Kluge's beliefs "wrong;" Mr. Kluge responded with supporting scripture. SA.278; *accord* Doc.113-6 at 6.

So the superintendent gave Mr. Kluge an ultimatum: (1) comply with the policy, (2) say he was forced to resign, or (3) be terminated. Doc.120-19 at 6; SA.244, 273–74.[3] Mr. Kluge's religious beliefs forbade following the policy, and he refused to "quit on the students." SA.244, 273; Doc.120-19 at 6. So the superintendent suspended him pending termination and sent him home. SA.273–74.

## IV.  Mr. Kluge proposed a religious accommodation that Brownsburg accepted.

Afterwards, Mr. Kluge's pastor and Superintendent Snapp spoke by phone, and the latter agreed to give Mr. Kluge the weekend to think about matters before terminating him. SA.274–75; Doc.120-19 at 6. The following Monday—after a two-day suspension—Mr. Kluge met with Superintendent Snapp and Ms. Jodi Gordon, Brownsburg's Human Resources Director. SA.276; Doc.120-19 at 6.

At this meeting, the superintendent and HR director presented Mr. Kluge a form stating: "You are directed to recognize and treat

---

[3] Doc.120-19 is a communication Mr. Kluge's counsel sent the EEOC. Mr. Kluge testified to its accuracy. SA.291.

students in a manner using the identity indicated in PowerSchool."
Below were two check boxes where they expected Mr. Kluge to indicate
"Yes" (he would follow the transgender-terminology rules) or "No" (he
would not). SA.241. They reiterated Mr. Kluge could (1) comply and
keep his job or (2) refuse and be fired. SA.276.

Mr. Kluge suggested a third option: an accommodation whereby
he would refer to all students by their last names, like a coach.
Docs.113-4 at 7; 113-6 at 7; 120-19 at 6; SA.245, 276. Thus, he could
avoid the transgender issues and focus on music— "as if we're the
orchestra team." SA.276. Mr. Kluge's continuing students would notice
little change as he previously referred to students by last names—
preceded by honorifics ( "Mr.," "Ms.")—to simulate "a college level class."
Doc.52-1 at 3.

The superintendent agreed to this reasonable accommodation
after Mr. Kluge promised to answer any student questions by referring
to the "orchestra team" and a "sports coach" analogy, not his religious
beliefs. SA.276. He understood Mr. Kluge was making a "sincere effort
to offer up an accommodation that he was [going to] fulfill." Doc.113-6
at 7. The district agreed to designate another employee to distribute
uniforms so Mr. Kluge would not be "directly responsible for giving a
man's clothing item to a female student" or *vice versa*. SA.276.

On the form presented at the meeting's outset, the HR director
wrote and initialed two edits to memorialize the religious accommoda-

tion: (1) "We agree that John may use last name only to address students," and (2) "Angie Boyer will be responsible for distributing uniforms." Mr. Kluge checked the "Yes" box and signed the form. SA.241, 277. Mr. Kluge and Brownsburg understood he would address *all* students by their last names in *all* his classes with no honorifics. Doc.120-2 at 3–4; SA.277.

## V.    Mr. Kluge's religious accommodation worked.

Mr. Kluge returned to teaching and referred to students by their last names without explaining why or drawing attention to himself. SA.279. He "was consistent in using last names only and using it for all students." SA.295.

The district court challenged Mr. Kluge's consistency, citing second-hand info from Mr. Lee and declarations of two transgender-identifying students filed *long after* Mr. Kluge resigned. RSA.10–12. But the court admitted that Mr. Kluge, a contract teacher who worked with him, three students, and a student's parent all provided sworn declarations affirming his consistent use of last names. RSA.13 (referencing Docs.52-1 at 3–4; 52-2 at 3; 52-3 at 2–3; 52-4 at 2; 52-5 at 2). So did two transgender-identifying students: Sucec admitted to the media and school board that Mr. Kluge "treat[ed] all of his students the same" by "calling all of us by our last names," Doc.53 at 18–19, 24 (citing Doc.52-6 at 4); and Willis agreed, Doc.58-1 at 3 ¶ 10.

Only one student asked about Mr. Kluge's use of last names, and he responded: "[W]e're all a team and a sports coach calls their team members by last name only. I wanted to foster that community and we're all working towards one goal." SA.293. For an entire semester, there were no disturbances, canceled classes, student protests, or written complaints about Mr. Kluge using students' last names. Doc.113-2 at 4. He "remain[ed] neutral" on transgenderism and taught music without imposing on others' beliefs or violating his own. SA.267, 283.

Throughout Mr. Kluge's final school year, his classes "perform[ed] very well," and students "respond[ed] well to [his] teaching." SA.282. His orchestras performed "better than ever" in competitions, students excelled on their AP music-theory exams, several students received performance awards, and student participation in extracurricular orchestra activities remained high. Doc.113-2 at 4; SA.282–83. No official ever visited Mr. Kluge's class out of concern that the accommodation was not working or conducted any other classroom-performance review. Doc.120-14 at 12, 17. The accommodation worked for everyone—Brownsburg, Mr. Kluge, and the students.

## VI.   After a few grumblings, Brownsburg pressured Mr. Kluge to resign.

In December, Principal Daghe met with Mr. Kluge to discuss the accommodation. He claimed there were reports "students [were]

uncomfortable in [Mr. Kluge's] class and … having discussions about the uncomfortableness." Doc.113-5 at 7. He alleged transgender-identifying students said they felt "dehumanized" (though all students were treated the same), other students "feel bad for" them, Mr. Kluge was the "topic of much discussion in the Equality Alliance Club meetings," and some teachers avoided him due to his religious beliefs. SA.245. Most complaints came from Mr. Lee, the club's advisor, who spearheaded the transgender-terminology rules, Docs.120-2 at 4; 120-14 at 4, 15–17, and admitted being "very biased" on these issues. Doc.120-15 at 3.

Principal Daghe was also unhappy that one parent complained that Mr. Kluge enforced a department-wide, concert-hair-color policy. He recognized Mr. Kluge's religious beliefs were the only reason that the parent complained, but that made no difference. Doc.113-5 at 7; SA.245–46, 281. Accommodating Mr. Kluge's religious beliefs "creat[ed] tension," SA.282, and Principal Daghe "didn't like things being tense and didn't think things were working out." SA.246. Based on these trifling, biased complaints, Principal Daghe urged Mr. Kluge to resign at the end of the school year. SA.246; Doc.113-5 at 7–8.

This was the first Mr. Kluge heard any complaints about his accommodation. SA.281. He suspected they were "a heckler's veto," not genuine. SA.283–84. Principal Daghe never told him which students or teachers were upset, and he experienced no "animosity" from students

or peers. SA.282. As to students, his "classes were performing very well." *Id.* As to faculty, he rarely interacted with teachers outside his department, continued eating lunch with his music colleagues, and understood everyone to be "get[ting] along great." *Id.*

In January 2018, Principal Daghe met with Mr. Kluge again because he had not been "direct enough" before, and he instructed Mr. Kluge "plainly that he really wanted to see [Mr. Kluge] resign at the end of this school year" and promised a good reference. SA.246; *accord* Doc.120-5 at 9. Mr. Kluge was "distress[ed] to hear" the principal wanted him to leave, SA.284, and recognized that Principal Daghe did not like the "tension and conflict" caused by others' hostility to his religious beliefs. SA.246; *accord* Doc.120-5 at 9. When pressed again to resign, Mr. Kluge indicated he would decide after Brownsburg announced its revamped transgender-terminology rules. SA.246.

## VII.  Brownsburg overhauled its rules: "No exceptions allowed."

Unveiled in January 2018 and entitled *Transgender Questions*, SA.245–46; Doc.113-2 at 4, Brownsburg's new rules sought to *mandate* that transgender-identifying students "receive … affirmation of their preferred identity," Doc.120-1 at 4, no matter their teachers' religious beliefs.

*Transgender Questions* established that students could change their names in PowerSchool "with a letter from the student's parent(s) and a letter from a health care professional." SA.249. After this, "the

name/gender in PowerSchool should be used," including "the pronoun associated with the gender as it appears in PowerSchool." SA.250, 252. If a "transfluid" student requested "they/them," teachers had to use those pronouns, too. SA.252.

Brownsburg would punish teachers for "calling the student the wrong name/pronoun" depending on frequency and the teacher's "intent." SA.250. In response to a question about using last names only—Brownsburg announced that accommodation was effective only for the 2017–18 school year and that "*moving forward it is our expectation the student will be called by the first name listed in PowerSchool.*" SA.257 (emphasis added). No longer could teachers "refuse to call [a transgender-identifying] student by his/her preferred name"; rather, they would "need to call students by [the] name in PowerSchool." *Id.*

Brownsburg left no room for Title VII religious accommodations: "[W]hen you work in a public school, you sign up to follow the law and policies/practices of that organization and that might mean *following practices that are different than your [own] beliefs.*" SA.258 (emphasis added). It praised "teachers who are accepting and supporting of" students' efforts to present as the opposite sex, and condemned those "who continue to use the wrong pronouns or names" or call "students by their last name." *Id.*

Concerned, Mr. Kluge emailed the superintendent and principal, noting the agreement they "signed in July 2017 does not limit itself to the 2017–2018 school year," and reflecting his understanding that he "would be allowed to continue to use last-names-only when addressing students next school year and beyond." SA.297. He asked them to confirm this understanding. *Id.*

In February, Principal Daghe and HR Director Gordon told Mr. Kluge that the next school year, he would be treated "just as everybody else," no accommodation. Doc.113-4 at 24. If he did not use transgender names and pronouns, Brownsburg would fire him. *Id.* at 43. The only reason offered for rescinding the accommodation was that some students were "offended by being called by their last name." *Id.* at 26.

HR Director Gordon clarified that if Mr. Kluge resigned at the end of the school year, he would still be "paid through the summer," *id.* at 33, the clear implication being that if Brownsburg terminated him, he would lose his summer pay. SA.243. Claiming that Brownsburg was not the "right environment" for Mr. Kluge, Principal Daghe again urged him to resign, promising that in a job search Mr. Kluge would have the principal's "word that you will do a good job." Doc.113-4 at 41.

Mr. Kluge (1) reiterated he could not, in good conscience, regularly refer to transgender-identifying students using biologically inaccurate names and pronouns; (2) stressed his accommodation had "[a] religious reason" and was based on "a conviction of faith"; (3) asked how it was

15

"not religious discrimination" for Brownsburg to refuse to accommodate his "religious convictions in the workplace"; (4) contended his accommodation was "reasonable"; and (5) stated "it seems illegal … to not allow that accommodation" next year. *Id.* at 25, 27–32, 43.

HR Director Gordon responded that "calling kids by their last names" is "just not what we do." *Id.* at 27. Principal Daghe was only "willing to accommodate people who follow the policies" and said if using transgender names and pronouns is "what the policy is, we will all follow that policy." *Id.* at 29. There was "no[ ] question of a religious accommodation," *id.* at 47, because using students' last names would be "a policy violation. It's a [district] policy." *Id.* at 43.

Though Mr. Kluge maintained that rescinding his accommodation was unlawful and discriminatory, no one invoked Brownsburg's equal-employment-opportunity policy, which required a "formal investigation." *Id.* at 17. Though she was the compliance officer for staff, HR Director Gordon did nothing. *Id.* at 10, 14. Brownsburg simply wanted Mr. Kluge to resign or "follow the guidelines." *Id.* at 12. HR Director Gordon insisted on a "commitment" from Mr. Kluge to follow the transgender-terminology rules "by the end of the school year," or the district would begin the "termination process." *Id.* at 45. In March 2018, she again gave him an ultimatum, insisting that he submit his resignation letter by May 1 or Brownsburg would start termination proceedings. SA.247.

## VIII. Mr. Kluge followed the accommodation and his convictions at the orchestra awards ceremony.

Near the school year's end, Mr. Kluge presided at an orchestra awards ceremony and, for two reasons, briefly recognized all students by the names in PowerSchool. SA.291–92. First, his accommodation entitled him to use last names like a coach, and a coach wouldn't "address students in such an informal manner at such a formal event." SA.292. It would be "conspicuous" and "unreasonable" to use last names at "a formal event"; so he made "a good faith effort to work within the bounds of [his] accommodation." *Id.*; Doc.120-19 at 7.

Second, Mr. Kluge did not believe using these names at an awards ceremony violated scripture by promoting transgenderism. It was a "special event" that did not reflect his "ordinary behavior," unlike "*regularly* … using transgender names" in the classroom. SA.292–93 (emphasis added). Mr. Kluge's religious beliefs also inspire him to love and have compassion for others. Doc.120-19 at 7; SA.247–48. By using these names briefly at a formal event, Mr. Kluge was exercising his "sincerely-held beliefs," not contradicting them or "agree[ing] with [district] policy." Doc.120-19 at 7.

## IX.  Mr. Kluge submitted a conditional resignation and tried to revoke it, but Brownsburg pushed it through.

Concerned about preserving his summer pay because he had "a family to feed," Doc.113-4 at 51, Mr. Kluge conditionally resigned via email on April 30, 2018, SA.299, unaware he could not rescind it. He did

so because Brownsburg withdrew the accommodation and required him "to refer to transgender students by their 'preferred' name as well as by their 'preferred' pronoun that does not make their legal name and sex," something his "Christian conscience [would] not allow." SA.299. Mr. Kluge requested that HR Director Gordon "not process this letter nor notify, including any[one in the] administration, about its contents before May 29, 2018. *Id*. She agreed. *Id*.

On May 25, Mr. Kluge scheduled a meeting with HR Director Gordon and Principal Daghe, but the principal told him beforehand: "We have everything we need. We don't need to meet. Go back to the high school." SA.242. So Mr. Kluge gave the HR director a letter rescinding his conditional resignation and imploring Brownsburg to let him keep his religious accommodation and his job. SA.242, 248. Brownsburg locked Mr. Kluge out of school buildings and online services and posted his job as "vacant" mere hours later. Doc.113-2 at 7.

Before the school board accepted his rescinded resignation, Mr. Kluge asked for time to speak at a regular meeting. This request was ignored. Briefly, during a public-comment section, Mr. Kluge explained what had happened and pleaded to withdraw his conditional resignation. SA.288; Doc.120-18 at 10. But the board simply accepted his forced resignation without comment. Doc.120-18 at 2, 8–9, 18.

### X.    Mr. Kluge sought legal relief.

#### A.    District court history

Mr. Kluge sued Brownsburg to vindicate his rights under Title VII, requesting declaratory and injunctive relief, reinstatement with back pay and benefits, correction of his employment file; nominal, compensatory, and punitive damages; and prejudgment interest, costs, and attorney fees. Doc.15 at 31–32.

Mr. Kluge pleaded constitutional, state-law, and three Title VII claims: religious discrimination for failure to accommodate, retaliation, and hostile work environment. *Id.* at 17–31. Brownsburg moved to dismiss under FED. R. CIV. P. 12(b)(6). Doc.44 at 1.

The district court dismissed the constitutional and state-law claims, but it allowed Mr. Kluge's Title VII claims for religious discrimination for failure to accommodate and retaliation to proceed. SA.239–40. After the answer, Doc.71, and discovery, the parties filed cross motions for summary judgment.

#### B.    The district court's first summary judgment ruling

The district court granted Brownsburg summary judgment on both Title VII claims (denying it to Mr. Kluge) and entered final judgment in Brownsburg's favor. SA.189. The district court recognized Brownsburg's transgender-terminology rules were designed to provide transgender-identifying students with "a great deal of support and affirmation," SA.138; "forced [Mr. Kluge] to resign" based on "his

religious objections to affirming transgenderism," SA.138; and the "withdrawal of the last names only accommodation and the ultimate end of [Mr. Kluge's] employment"—constitutes an "adverse employment action," SA.175.

Because "Mr. Kluge … established a prima facie case of discrimination based on failure to accommodate," Brownsburg had the burden to prove it couldn't "provide a reasonable accommodation 'without undue hardship on the conduct of its business.'" SA.178 (quoting 42 U.S.C. § 2000e(j)). The court identified "the central issue [as] whether the last names only accommodation—*which presents a sort of middle ground* between the opposing philosophies of Mr. Kluge on the one hand and [Brownsburg] on the other—results in undue hardship." SA.180 (emphasis added).

Primarily based on declarations of two transgender-identifying students filed *long after* Mr. Kluge was forced to resign (supporting a failed motion to intervene), the court found an undue hardship, although Brownsburg did not even have—much less rely on—these accounts in revoking Mr. Kluge's accommodation. SA.180; *accord* SA.240 (denying intervention motion). Brownsburg established undue hardship, in the court's view, merely by "present[ing] evidence that two specific students were affected by Mr. Kluge's [religious] conduct and that other students and teachers complained." SA.182. It rejected Mr. Kluge's argument that "emotional discomfort" alone couldn't establish

undue burden or a "heckler's veto" would doom all religious accommodations under Title VII. SA.182 n.11. Rather, the court said "the reaction of [these] 'hecklers'" was key to the undue-hardship analysis. SA.182 n.11.  Plus, the court said a transgender-identifying student *might* file a Title IX lawsuit and that's an undue hardship. It was immaterial whether such litigation was likely or had merit. SA.183–84.

On retaliation, the district court granted summary judgment to Brownsburg based on the circular logic that no religious accommodation was required because a few complained about the last-names-only accommodation. SA.187–88. It also ruled that Mr. Kluge waived his retaliation claim by failing to argue that Brownsburg's (facially invalid) reliance on third-party grumblings was pretextual, and lost on the merits because "nothing in the record" suggested these "complaints were fabricated or that another motive was possible." SA.188.

## C.  **Appellate history**

A divided panel of this Court affirmed, ruling the last-names accommodation represented an "undue hardship"—using the *de minimis* or "slight burden" standard—because Mr. Kluge's practice "was antithetical to that of the school," "conflicted with the school's philosophy," harmed its "relationship with its students," and allegedly caused "emotional harm." SA.62–63, 67. Judge Brennan dissented in part, concluding no "court has held that mere offense at an employee's religious observance or practice is enough for undue hardship" and the

21

issue of whether Mr. Kluge's "accommodation would result in more than a de minimis cost" should have gone to trial. SA.125, 134. Mr. Kluge sought *en banc* review. CA7 No. 21-2475, Doc. 71.

Two months later, the Supreme Court issued *Groff*, 600 U.S. 447, clarifying Title VII's religious-accommodation requirement and setting forth numerous principles relevant to this case. This Court vacated all prior opinions and remanded this case. SA.1.

**D.    The district court's second summary judgment ruling**

On remand, the evidence remained unchanged. Mr. Kluge and Brownsburg filed cross motions for summary judgment on both Title VII claims. Docs.182 at 1–5; 184 at 1–4. The district court denied Mr. Kluge's motion, granted Brownsburg's, and entered final judgment for Brownsburg again. RSA.1, 23, 45.

Based primarily on the same declarations of two transgender-identifying students—which Brownsburg did not have or rely on when it forced Mr. Kluge to resign—the court ruled that allowing Mr. Kluge to remain silent on the issue of transgenderism imposed an undue hardship. RSA.31–44. Again, the court said Brownsburg showed undue hardship by "present[ing] evidence that two specific students were affected by Mr. Kluge's [religious] conduct and that other students and teachers complained." RSA.38. The court rejected Mr. Kluge's arguments that *Groff* takes such complaints "off the table," RSA.35–36,

ruling they were "key indicators to [Brownsburg] that the Last Names Only Accommodation produced substantial student harm." RSA.39.

For a second time, the court ruled that accommodating Mr. Kluge by allowing him to remain silent on transgenderism was an undue hardship because a student *might* file a Title IX lawsuit. RSA.40–444. Yet none of the cases it cited addressed a teacher treating all students the same. RSA.43–44.

Concerning retaliation, the district court repeated its prior ruling, saying Mr. Kluge waived this claim, it exceeded the scope of the remand, and failed on the merits. RSA.22.

So *Groff* had no impact. The district court simply repeated its prior analysis.

## SUMMARY OF ARGUMENT

Mr. Kluge established a prima facie case of religious discrimination under *Groff*, which Brownsburg can't dispute on sincerity grounds. That claim turns on Brownsburg showing Mr. Kluge's accommodation caused undue hardship. But Brownsburg didn't come close to demonstrating substantial increased costs to its overall business. All it shows are a few third-party complaints grounded in bias or animosity towards Mr. Kluge's religious practice or accommodation. Those don't count, nor do events or litigation arguments Brownsburg didn't consider or credit at the time. Allowing Mr. Kluge to remain silent had no ill effects on Brownsburg's legitimate mission or environment; rather, it is Brownsburg's policies that pose substantial student harm.

Mr. Kluge's retaliation claim isn't waived and nothing bars this Court (or the district court) from resolving it in light of *Groff*'s clarification that dislike of religious practices or accommodations aren't valid considerations. Everyone agrees Mr. Kluge engaged in protected activity and suffered adverse action. Mr. Kluge also showed a causal link and prima facie case, as Brownsburg's only reason for forcing him to resign was his religious objection and insistence on an accommodation. Pretext is irrelevant because Mr. Kluge used direct proof and Brownsburg didn't show a legitimate reason for its actions.

The Court should reverse and remand for entry of judgment in Mr. Kluge's favor on both claims.

# ARGUMENT

## I.  Standard of review

Courts grant summary judgment when no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). This Court reviews such rulings *de novo*, *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020), giving "no deference [to] the district court," *Scaife v. Racine Cnty.*, 238 F.3d 906, 907 (7th Cir. 2001), and resolving all factual disputes in the non-movant's favor, *McCottrell v. White*, 933 F.3d 651, 657–58 (7th Cir. 2019). It will not "assess the credibility of witnesses, choose between competing inferences[,] or balance the relative weight of conflicting evidence, *id.* at 657 (cleaned up), as those decisions are for the jury. *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000).

## II.  The district court erred in granting Brownsburg summary judgment (and denying it to Mr. Kluge) on religious discrimination because Brownsburg revoked a reasonable accommodation without showing undue hardship.

Title VII requires most employers to "reasonably accommodate … an employee's … religious observance or practice" unless "undue hardship" would result. 42 U.S.C. § 2000e(j). A reasonable accommodation is one that "eliminates the conflict between employment requirements and religious practices." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986).

Mr. Kluge received a reasonable accommodation that allowed him to remain silent on transgender issues. Brownsburg revoked it based on

25

complaints from a few people who opposed his religious beliefs or disliked his accommodation. Because these complaints don't qualify as undue hardship, Mr. Kluge deserves summary judgment, and the district court erred in ruling for Brownsburg.

### A.   Mr. Kluge proved a *prima facie* case of discrimination.

#### 1.   The district court and Brownsburg largely conceded Mr. Kluge's *prima facie* case of discrimination.

Aside from sincerity, the "parties do not dispute that Mr. Kluge has otherwise made his prima facie case of religious discrimination," RSA.29, *i.e.*, (1) his objections to using transgender terminology are "religious in nature," (2) they conflicted with an employment requirement, and (3) they caused his termination, SA.46. When reviewing Brownsburg's motion, the district court rightly presumed Mr. Kluge's sincerity. RSA.29.

#### 2.   Mr. Kluge's religious objection is sincere.

The district court wrongly denied Mr. Kluge's motion, citing "a genuine dispute of material fact over whether [his] religious beliefs were sincere." RSA.29; *accord* RSA.25–29. But there's no evidence his religious beliefs are a sham. Indeed, Mr. Kluge remained faithful to his convictions at great personal cost—the very definition of sincerity.

### a.    Mr. Kluge satisfies this Court's sincerity standards.

Sincerity analysis "weed[s] out sham claims," *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013), and focuses on whether a belief is "truly held," *Gillette v. United States*, 401 U.S. 437, 457 (1971) (cleaned up). The question is merely whether Mr. Kluge "actually holds the beliefs he claims." *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014). Courts "tread lightly" in this "sensitive area," don't require "a deep analysis of" Mr. Kluge's "reasons or motives for holding his beliefs," and give "great weight" to his explanation. *Adeyeye v. Heart-land Sweeteners, LLC*, 721 F.3d 444, 448, 452–53 (7th Cir. 2013) (cleaned up).

Mr. Kluge said the Bible prohibits him from "promoting and encouraging transgenderism." SA.292; *accord* SA.266; Doc.113-1 at 21–23. He believes that using transgender terms while regularly "teaching a class … encourages gender dysphoria," SA.267–68, but using trans-gender names once at an awards ceremony doesn't. SA.292–93. Mr. Kluge "drew a line" as to what encourages gender dysphoria and violates his faith, and the district court erred by saying "that the line he drew was … unreasonable." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715 (1981).

Mr. Kluge is a devout man who served as an ordained elder, worship leader, head of youth ministries, and director of a Bible program. SA.263–64. Mr. Kluge consistently explained that he believes

27

God ordained "[g]enetic sex," it "cannot be separated" from gender identity, and the two "remain bound together throughout one's life." SA.270; *accord* SA.244–45, 273–74, 278, 299; Doc.113-4 at 28–32. He withstood substantial pressure to violate those beliefs and lost his teaching career because of them. Doc.113-4 at 24, 43; SA.245–47, 273–74, 278. That's sincerity writ large. *Adeyeye*, 721 F.3d at 454 ("willing[ness] to risk his job" showed sincerity).

> **b.    The district court wrongly second-guessed the reasonableness of Mr. Kluge's beliefs.**

The district court's true objection wasn't to Mr. Kluge's sincerity but to his beliefs' reasonableness. Yet free-exercise protection doesn't turn on whether anyone else finds an employee's beliefs "logical, consistent, or comprehensible." *Thomas*, 450 U.S. at 714. It's for Mr. Kluge, not Brownsburg or courts, to say how his religious beliefs operate at school. *Id.* at 715.

The district court also mischaracterized Mr. Kluge's beliefs. Mr. Kluge never claimed that "his religious beliefs prohibit him from addressing a transgender student by their preferred name." RSA.28; *accord* RSA.26. Instead, his beliefs are against "promoting and encouraging transgenderism." SA.292; *accord* SA.266; Doc.113-1 at 21–23. When using transgender terms has this effect (*e.g.*, regularly using them in class), he objects. SA.267–68. When using transgender names doesn't have this effect (*e.g.*, briefly at an awards ceremony), he has no

objection. SA.292–93. Thus, the district court's hypocrisy charge falls flat. RSA.28. Plus, Title VII "do[es] not require perfect consistency in observance, practice, and interpretation." *Adeyeye*, 721 F.3d at 453; *accord Grayson v. Schuler*, 666 F.3d 450, 454–55 (7th Cir. 2012). This Court has declared even the selectively and "not particularly" religious sincere. *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1573 n.3 (7th Cir. 1997). Mr. Kluge is more so.

Nothing in the record supports the district court's suggestion that Mr. Kluge tried to "redefine a purely personal preference … as a religious belief." RSA.28 (quoting *Reed v. Great Lakes Cos.*, 330 F.3d 931, 935 (7th Cir. 2003)). Mr. Kluge defended his religious beliefs to officials, SA.244–45, 273–75, 278, 299; Doc.113-4 at 28–32; and remained true to them despite ultimatums, Doc.113-4 at 24, 43; SA.245–47, 273–75, 278. The court didn't cite a non-religious motive for his objection because there is none.

### c.    The district court misunderstood the teachings of Mr. Kluge's presbytery, teachings he modeled.

The district court held that alleged differences between Mr. Kluge's beliefs and his presbytery's *Book of Church Order* undermined his sincerity. RSA.28; *accord* RSA.26. That's wrong twice over.

Legally, Title VII religious discrimination plaintiffs need not "be a member of an authorized church or subscribe to its full menu of orthodox beliefs." *Seshadri v. Kasraian*, 130 F.3d 798, 800 (7th Cir.

1997). Mr. Kluge need not "respond[ ] to the commands of a particular religious organization" to claim free-exercise protection. *Frazee v. Ill. Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989). Nor may the courts interpret his church's beliefs without violating the church autonomy doctrine. *Korte*, 735 F.3d at 677–78.

Factually, Mr. Kluge's beliefs parallel his presbytery's. The *Book of Church Order* doesn't allow transgender-identifying individuals to use their chosen restroom. It declares that God created "two and only two sexes, male and female," "[g]enetic sex and sexual identity cannot be separated, and it is sinful to "reject … one's sex and to adopt characteristics of the opposite sex." Doc.120-4 at 9–10. Accordingly, it calls for "pastoral counseling concerning God's call for manhood and womanhood and … Jesus's Lordship over [transgender-identifying persons'] … sexual identity and its public expression." Doc.120-4 at 12. So it mirrors Mr. Kluge's beliefs. RSA.4, 26; SA.270; Doc.113-1 at 6–9.

In sum, there's no genuine dispute that Mr. Kluge's religious beliefs are sincere. Mr. Kluge established a prima facie case of discrimination and the burden shifts to Brownsburg to show undue hardship. *Ilona*, 108 F.3d at 1576.

## B.  Brownsburg withdrew a reasonable accommodation without the undue hardship Title VII requires.

Brownsburg agreed to allow Mr. Kluge to use all students' last names. SA.241. This accommodation was reasonable because it

30

"eliminate[d] the conflict between employment requirements and religious practices," *Philbrook*, 479 U.S. at 70, and let Mr. Kluge take a "middle ground" position, SA.180, remaining neutral on transgenderism, SA.267, 283. His classes excelled. *Supra* Facts V. Title VII had achieved its purpose of ensuring he "would *not* have to sacrifice [his] job[ ] to observe [his] religious practices," *Adeyeye*, 721 F.3d at 456, with no substantial effect on Brownsburg.

This was a Title-VII success story—until those hostile to Mr. Kluge's religious beliefs and accommodation scuttled it. SA.245; Doc. 113-4 at 26. A few students grumbled at Equality Alliance meetings, SA.245; Doc.120-14 at 7–8, 13, even though Mr. Kluge never explained why he used last names, except to liken himself to a sports coach. SA.293. The Equality Alliance's advisor lobbied against accommodating Mr. Kluge, citing these complaints and a few teachers outside his department snubbing him due to his faith. Docs.120-2 at 4; 120-14 at 4, 7–8, 16. One parent targeted Mr. Kluge for a baseless grievance about a neutral, department-wide concert-hair-color policy. Doc.113-5 at 7; SA.245–46, 281. And a few teachers complained about "uncomfortableness," as his accommodation called into question how other students should "behave" towards or "address" their transgender-identifying peers. Doc.113-5 at 8.

Especially after the Supreme Court clarification of Title VII's

religious-accommodation requirement in *Groff*, Brownsburg did not

prove undue hardship, and Mr. Kluge prevails on summary judgment.

### 1. Brownsburg showed no increased costs that are substantial in the overall context of its business.

The district court shortchanged *Groff*, minimizing the definitional

shift of undue hardship from "more than a *de minimis* cost" to "substan-

tial increased costs in relation to the conduct of [the employer's]

business," RSA.30 (quotation omitted), counting ideological

disagreement as valid "non-economic costs," and portraying "substantial

cost[s]" as an ephemeral bar subject to lower courts' context-specific

discretion, RSA.31. In other words, the court said *Groff* was practically

meaningless.

That's wrong. *Groff* held that "more than a *de minimis* cost," the

formerly "favored synonym" for undue hardship, *Groff*, 600 U.S. at 470,

which means "something … very small or trifling," falls well short of

Title VII's accommodation requirement, *id.* at 469 (quotation omitted).

"[H]ardship" indicates "something hard to bear," *id.* at 468, and "undue"

signifies it must "rise to an excessive or unjustifiable level," *id.* at 469

(cleaned up). So Brownsburg must show Mr. Kluge's last-names

accommodation "result[ed] in substantial increased costs in relation to

the conduct of its particular business." *Id.* at 470. Those costs must be

"substantial in the *overall context* of [its] business" (including its

"nature, size[,] and operating cost"), not divided in parts, considered in vignettes, or viewed in isolation. *Id.* at 468, 470–71 (cleaned up; emphasis added).

*Groff*'s description of "costs" applies most directly to economic impacts, such as "administrative costs involved in reworking schedules" and "temporary payment of premium wages for a substitute." *Id.* at 466 (quotations omitted). For instance, the Court depended on the references in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977), to "'substantial additional costs' or 'substantial expenditures,'" *Groff*, 600 U.S. at 469 (quoting *Hardison*, 432 U.S. at 83 n.14), and instructed courts to weigh an accommodation's financial burden against "the nature, size[,] and operating cost of an employer," *id.* at 470–71 (cleaned up); *accord id.* at 466 n.12 (citing Wal-Mart's large size, annual profits).

Other effects may be "relevant" but only to the extent they "go on to affect the conduct of the [overall] business." *Id.* at 472 (cleaned up); *accord id.* at 468. The classic example is seniority systems, which are "afforded special treatment under Title VII itself." *Id.* at 462 (cleaned up). But the fact that undue hardship isn't strictly "limited to consideration of financial costs," RSA.31 (cleaned up), doesn't mean that every impact on a business counts. For example, *Groff* placed an entire category of coworker or customer "bias or hostility to a religious practice or a religious accommodation" off limits. *Id.* at 472.

The district court's ruling ignores *Groff*'s high bar for undue hardship. *Accord Hebrew v. Tex. Dep't of Crim. Just.*, 80 F.4th 717, 721–23 (5th Cir. 2023). Brownsburg has no evidence that allowing one teacher to remain silent on transgenderism imposed *any* additional costs on its overall business—it *disclaimed* reliance even on administrative costs. SA.301. Allowing one teacher—in a school with over 3,000 students and 160 teachers, and a district with over 10,000 students and over 600 teachers[4]—to remain ideologically neutral doesn't impose any relevant costs or have the district-wide significance *Groff* requires.

A few students, parents, and teachers complained about Mr. Kluge's religious accommodation. But this is *all* the evidence of hardship Brownsburg presented. Even under *Hardison* such grumblings, in and of themselves, didn't show undue hardship. *E.g.*, *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978) (employee "grumbl[ing] about a particular accommodation is not enough to establish undue hardship"); *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975) (coworker "'grumbling'" doesn't show undue hardship); *accord Crider v. Univ. of Tenn., Knoxville*, 492 F. App'x 609, 615 (6th Cir. 2012) ("*Draper* … remains good law….").

---

[4] *Brownsburg High School*, PUB. SCH. REV., https://bit.ly/3FNz54F; *Brownsburg High School*, U.S. NEWS & WORLD REPS., https://bit.ly/49gzs5r (3,168 students; 164 teachers); Brownsburg Cmty. Sch. Corp., *BCSC Welcome*, https://bit.ly/3Rt5NyB (10,741 students; 612 certified teachers).

That's doubly true under *Groff*, which requires employers to show "a burden is substantial in the overall context of [their] business." *Groff*, 600 U.S. at 468 (cleaned up).

What's more, the district court said the accommodation imposed "substantially increased cost[s]" without quantifying them or viewing them in a district-wide context. RSA.38. But courts cannot "equate[ ] undue hardship on business with an impact—no matter how small—on coworkers" or clients—here, students. *Groff v. DeJoy*, 35 F.4th 162, 177 (3d Cir. 2022) (Hardiman, J., dissenting), *approved by Groff*, 600 U.S. at 472. A disaffected few among ten thousand students and hundreds of teachers, *cf. id.* at 177–78, cannot show undue hardship on Brownsburg's business "overall," *Groff*, 600 U.S. at 468.

In short, Brownsburg failed to show Mr. Kluge's accommodation imposed "substantial increased costs" "in the overall context of [its] business." *Id.* at 468, 470. So Mr. Kluge is entitled to summary judgment on the discrimination claim.

### 2. Brownsburg never showed that letting Mr. Kluge remain silent harmed students or disrupted the learning environment.

#### a. Brownsburg rescinded Mr. Kluge's accommodation due to complaints *Groff* sets off-limits.

The district court ruled that Mr. Kluge's accommodation resulted in "substantial student harm" and "significant disruption to the learning environment"—all based on "evidence that two specific students

were affected by Mr. Kluge's conduct and that other students and teachers complained," RSA.34, 38, plus an extrapolation to future students. RSA.38. *Groff* negates this conclusion.

The district court focused on *Groff's* language about "shift swapping[ ] or administrative costs." RSA.30. Neither applies here, as the former is factually inapposite and the latter Brownsburg disclaimed. SA.301. What's relevant is *Groff's* rule that "bias or hostility to a religious practice or a religious accommodation" is no "defense to a religious accommodation claim," *Groff*, 600 U.S. at 472, which—astonishingly—the court never mentioned.

After *Groff*, employers (and courts) cannot consider "as hardship adverse customer [including student or parent] reaction from a simple aversion to, or discomfort dealing with," religious people. *Id.* at 473 (cleaned up). Nor can they consider "employee animosity to a particular" religious practice or "to the very notion of accommodating religious practice." *Id.* at 472. Such antagonism is "off the table." *Id.* (quotation omitted). Brownsburg cannot "giv[e] effect to religious hostility" or bias—even if it has a general policy of making students feel supported—lest "Title VII … be at war with itself." *Id.* (citation omitted). For "[i]f relief under Title VII can be denied merely because the majority … will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 775 (1976) (cleaned up).

Brownsburg offers no evidence of harm or disruption except a few complaints of offense, discomfort, awkwardness, or subjective emotional harm—all because Mr. Kluge used last names and remained silent on transgenderism in keeping with his faith. Docs.121 at 13–16, 35–36, 39–41; 150 at 11–14. Indeed, "complain" and its variants appeared 66 times in Brownsburg's initial brief below, Doc.185, and another 66 times in the district court's opinion, RSA.2–46. The district court said ideological complaints "represented key indicators" that accommodating Mr. Kluge "produced substantial student harm," equating them with customer gripes "any other business would be entitled to consider." RSA.39. But after *Groff*, "adverse … reactions" to religious practice or accommodation are "off the table." 600 U.S. at 472–73 (quotation omitted).

The district court implied Mr. Kluge had to show these complaints reflected "religious animus," not "concerns rooted in the merits of inclusion." RSA.39; *accord* RSA.36. Yet *Groff* doesn't require windows into people's hearts or allow employers to bypass Title VII accommodations through linguistic gymnastics. "[A] coworker's dislike of religious practice … *or the mere fact of an accommodation* is not cognizable to factor into the undue hardship inquiry." *Groff*, 600 U.S. at 472 (cleaned up; emphasis added). Here, the complaints targeted Mr. Kluge's religious practice of using last names for all students—deeming it disrespectful, RSA.39 (quoting Doc.120-13 at 2)—and Brownsburg's

37

accommodation of his religious beliefs. *Groff* sweeps both gripes "off the table." 600 U.S. at 472 (quotation omitted).

Additionally, courts must evaluate Title VII claims in a "common-sense manner." *Id.* at 471. Coworkers like Mr. Lee knew Mr. Kluge had a religious accommodation. Students and parents reached the same conclusion, as Mr. Kluge was the only teacher excused from Brownsburg's terminology rules ,and there was no other plausible reason for an exception. Indeed, Sucec accused Mr. Kluge of "trying to enforce his religious beliefs … on students" before the school board accepted his resignation. Matthew McClellan, *Student Says Brownsburg Teacher's Transgender Policy Was Dangerous*, WRTV Indianapolis (June 10, 2018), https://bit.ly/3VJYqEd. So students and parents believed Mr. Kluge's accommodation was religious in nature and opposed it anyway. *Accord* RSA.10–13 (citing Docs.22-3 at 4; 58-1 at 3–4; 58-2 at 2–3).

The district court tried to sideline *Groff* by saying "a public school is not a typical business; a public-school student is not a typical customer." RSA.34. But *Groff* contains no carve-out for public schools, which are major employers in many locales. This factor also cuts against Brownsburg, which—as a public school district—has a duty to teach "tolerance is a two-way street," *Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021) (cleaned up), "protect the 'marketplace of ideas,'" *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021), and teach students "how to live in a pluralistic society," *Kennedy*

*v. Bremerton Sch. Dist.*, 597 U.S. 507, 538 (2022) (cleaned up). Here, Mr. Kluge never expressed his religious views. SA.293. If Brownsburg cannot teach students to tolerate a silent teacher, "one wonders whether [it] can teach anything at all." *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1300 (7th Cir. 1993).

*Groff*'s rule is simple: "bias or hostility to a religious practice or a religious accommodation provide [no] defense to a reasonable accommodation claim." 600 U.S. at 472. That principle applies equally to "adverse customer reaction" by Brownsburg's students or restaurant diners. *Id.* at 473 (cleaned up). For instance, *no employer* could withdraw an accommodation for Orthodox Jews to a no-head-coverings rule based on others' discomfort or purported emotional harm. So too here.

### b.  A few third-party grumblings do not create undue hardship for Brownsburg as a whole.

The district court admitted only a handful of people complained about Mr Kluge's accommodation. RSA.9–14, 37. But the court said numbers don't matter because Brownsburg must "meet the needs of *all* of its students," and so identifying "two specific students [that] were affected" sufficed. RSA.38. That's wrong twice over.

First, allowing one teacher out of dozens to stay silent on transgenderism had no meaningful effect on Brownsburg's effort to create an affirming environment. That's especially true in orchestra, a

large class where Mr. Kluge mostly addressed students collectively by section and rarely individually by last name. Doc.42-3 at 2. Mr. Kluge never shared his beliefs about transgenderism with students. Any subjective effect his neutrality had on students wasn't "substantial" and didn't rise to the level of "hardship." *Groff*, 600 U.S. at 468–69.

Second, numbers matter under *Groff*. Undue hardship exists only if increased costs are "substantial in the *overall context* of [Brownsburg's] business," including its "nature, size[,] and operating cost." *Id.* at 468, 470–71 (emphasis added; cleaned up). Brownsburg has over 10,000 students and over 600 teachers, *supra* p.34 n.4, rendering seven offended students 0.067% of the student body and four upset teachers 0.65% of the faculty. Their ideological complaints are not only (1) unquantifiable, *supra* Argument II.B.1, and (2) irrelevant or "off the table," *supra* Argument II.B.2.a, but also (3) "very small or trifling" in the "overall context of [Brownsburg's] business"—the sort of *de minimis* cost that *Groff* jettisoned and even *Hardison* deemed insufficient, *Groff*, 600 U.S. at 468–69 (cleaned up). A storm in a teacup generated by a small group of complainants doesn't show the business-wide cost *Groff* requires. *Id.* at 468. Otherwise, no religious accommodation could survive opposition of any kind, and Title VII's accommodation requirement would be nullified.

Brownsburg also failed to deal with complaints in the spirit of "bilateral cooperation" Title VII requires. *Philbrook*, 479 U.S. at 69

40

(cleaned up). Officials could have said that Mr. Kluge was treating everyone the same and using last names to foster a team environment for the orchestra—the same message they insisted he give. But they made no effort to teach tolerance or alleviate complainants' negative assumptions. They simply pressured Mr. Kluge to resign.

In short, in a school of thousands, the complaints of 11 people—which Brownsburg likely could have resolved—don't impose additional costs that are substantial in the overall context of its business. Brownsburg failed to show undue hardship.

### c.    Students' lack of universal affirmation doesn't qualify as undue hardship.

Brownsburg adopted its terminology rules so that transgender-identifying students would "receive … affirmation of their preferred identity." RSA.7. That doesn't mean it can force religious objectors to participate. "[N]o authority supports the proposition that [Brownsburg] may require … anyone … to refer to gender-dysphoric [students] with pronouns matching their subjective gender identity." *United States v. Varner*, 948 F.3d 250, 254–55 (5th Cir. 2020); *accord Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 724, 739–40 (Va. 2023).

Public schools aren't "enclaves of totalitarianism." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Teachers and students must decide for themselves what "ideas and beliefs [are] deserving of expression," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622,

641 (1994), even when schools are trying to "protect[ ] the rights of [LGBT] students," because "people in our society do not have a legal right to prevent criticism of"—or neutrality towards—"their beliefs or … way of life," *Zamecnik*, 636 F.3d at 876. Brownsburg is already bound by these requirements. So Mr. Kluge's accommodation imposes no added costs.

The district court's only response was that First Amendment principles "are inapt." RSA.38 n.4. That's wrong three ways. First, undue hardship depends on the employer's "nature" and the accommodation's "practical impact." *Groff*, 600 U.S. at 470. So it's impossible to ignore Brownsburg's public-school nature and lack of authority to require affirmation of students' beliefs or way of life. Second, in addition to the blanket affirmation-rule being invalid, both Title VII and the First Amendment mandate individualized exceptions for religious objectors. Last, courts "look[ ] to Title VII law for help in delineating plaintiffs' rights under" the First Amendment, *Genas v. N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 832 (2d Cir. 1996), and the converse should be true as well. *Accord Kennedy*, 597 U.S. at 571 n.5 (Sotomayor, J., dissenting).

Title VII no more allows ideological opponents to drum Mr. Kluge out of Brownsburg based on his Christian beliefs than it allows conspiracy theorists to expel Sikhs who wear turbans or Muslims who pray five times a day.

### d. Brownsburg can't rely on information it didn't have or rely on when it forced Mr. Kluge to resign.

Brownsburg gave two contemporaneous reasons for withdrawing Mr. Kluge's accommodation and forcing him to resign: transgender-identifying students were "offended," Doc.113-4 at 26, and the terminology rules brooked no exceptions, *id.* at 29. The first rationale relies on after-created evidence that's barred, *Kennedy*, 597 U.S. at 543 n.8, and the second defies Title VII, *EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1103 (8th Cir. 2018).

Brownsburg's defense hinges on *after-created evidence*: two affidavits that Brownsburg didn't even offer. (Instead, an LGBT group trying to intervene filed them.) Docs.22-3; 58-1. The district court relied heavily on these affidavits, citing them 19 times, RSA.10, 12–14, 45, and referring to these students still more, RSA.34, 37–39. But Brownsburg can't demonstrate undue hardship based on evidence it didn't have or rely upon in withdrawing Mr. Kluge's accommodation, including affidavits saying one student left the orchestra and school, and two students legally changed their names—*after* Mr. Kluge's departure.

Title VII's rule is simple: "evidence … gathered after [Mr. Kluge's constructive] discharge … does not bear on the validity of" his termination. *Venters v. City of Delphi*, 123 F.3d 956, 974 (7th Cir. 1997) (citing *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 358–63 (1995)). What matters is what Brownsburg knew and relied on "*at the*

*time [Mr. Kluge] was terminated.*" *Cullen v. Olin Corp.*, 195 F.3d 317, 324 (7th Cir. 1999). Other "evidence is totally irrelevant." *Id.* That's because the essence of a failure-to-accommodate claim is the employer's "motivating factor." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015); *accord id.* at 773–74. And Brownsburg "could not have been motivated by knowledge it did not have" or rely on in forcing Mr. Kluge to resign. *McKennon*, 513 U.S. at 360.

The district court answered with a game of telephone, assuming students complained before Mr. Lee, he relayed their grumblings to Principal Daghe, who presumably relayed them to HR Director Gordon, before they used them to force Mr. Kluge's resignation. RSA.9–11. Yet there's *no evidence* (1) two students made identical complaints in club meetings and in affidavits filed over a year later to intervene in this case, (2) Mr. Lee accurately relayed these comments to officials, or (3) officials rescinded Mr. Kluge's accommodation based on club-meeting comments they didn't reference. What's more, Mr. Lee couldn't attest to students' experience, only their statements, and officials didn't always take students' or parents' complaints seriously. SA.245–46; Doc.52-3 at 4–5.

Brownsburg must substantiate its "concerns" with "contemporaneous" evidence. *Kennedy*, 597 U.S. at 543 n.8. But it failed to do so, citing "justifications … invented *post hoc* in response to litigation." *Id.* (cleaned up). Those excuses can't show undue hardship.

### e.     Brownsburg's policy endangers students.

The district court lionized Brownsburg's interest in avoiding student harm. RSA.34–40. Mr. Kluge shares this desire, though he believes it's "encouraging gender dysphoria [that's] harmful." Doc.113-1 at 21. Recent research shows he's right.

Scientific evidence shows over 80% (and as high as nearly 88%[5]) of minors experiencing gender confusion desist (*i.e.*, naturally align their minds with their biological sex) if left to themselves.[6] But those affirmed continue down that path. One study of adolescent boys with gender dysphoria found that "98% elected to start cross-sex hormones" after six months on puberty blockers.[7] Other studies have confirmed this detrimental result.[8]

---

[5] Devita Singh, et al., *A Follow-Up Study of Boys With Gender Identity Disorder*, FRONTIERS IN PSYCHIATRY (Mar. 28, 2021), https://bit.ly/3Fr55vy.

[6] Walter Bockting, *Transgender Identity Development*, *in* APA HANDBOOK ON SEXUALITY AND PSYCHOLOGY 739, 744 (APA ed., 2014); James M. Cantor, *Do Trans Kids Stay Trans When They Grow Up?*, SEXOLOGY TODAY! (Jan. 11, 2016), https://bit.ly/3xQbrnX; Thomas D. Steensma, et al., *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52 J. OF AM. ACAD. OF CHILD & ADOLESCENT PSYCH., June 2013, at 582, https://bit.ly/3FoXkpJ.

[7] Polly Carmichael, et al., *Short-Term Outcomes of Pubertal Suppression in a Selected Cohort of 12 to 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16:2 PLOS ONE 1 (Feb. 2, 2021), https://bit.ly/3FrBXnQ.

[8] C.M. Wiepjes, et al., *The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in Prevalence, Treatment, and Regrets*, 15 J.

Medical treatments for gender dysphoria aren't proven effective and pose grave risks. No reliable evidence suggests gender transition with drug intervention reduces suicide risk. The World Professional Association for Transgender Health (WPATH)'s own review shows no link between using cross-sex hormones and decreased suicide rates.[9] In fact, multiple studies have found high suicide rates before, during, and after attempted gender transition.[10] One found that rates of suicidal ideation, suicide attempts, and non-suicidal self-harm *increased* after minors began puberty blockers and cross-sex hormones.[11]

Likewise, no reliable evidence shows that drug intervention improves psychosocial outcomes. Studies showing puberty blockers' and

---

SEX. MED. 582 (Apr. 2018); Tessa Brik, et al., *Trajectories of Adolescents Treated with Gonadotropin Releasing Hormone Analogues for Gender Dysphoria*, 49 ARCH. SEX BEHAV. 2611 (2020), https://bit.ly/3OhdXsp; Laura E. Kuper, et al., *Body Dissatisfaction & Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy*, 145 PEDIATRICS 1 (2020), https://bit.ly/4b5XlxD; Carmichael, *supra* note 7.

[9] Kellan E. Baker, et al., *Hormone Therapy, Mental Health, & Quality of Life Among Transgender People: A Systematic Review*, 5 J. ENDOCRINE SOC'Y 1, 12 (2021), https://bit.ly/42dOINf.

[10] C.M. Wiepjes, et al., *Trends in Suicide Death Risk in Transgender People: Results from the Amsterdam Cohort of Gender Dysphoria Study (1972–2017)*, 141 ACTA PSYCHIATRICA SCANDINAVICA 486, 490 (2020); Jay McNeil, et al., *Suicide in Trans Populations: A Systematic Review of Prevalence and Correlates*, 4 PSYCH. OF SEXUAL ORIENTATION & GENDER DIVERSITY 341, 348 (2017); Cecilia Dhejne, et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6:2 PLOS ONE 1, 5 (2011).

[11] Kuper, *supra* note 8, at 8.

cross-sex hormones' effects on mental health suggest little or no change.[12] Many studies report *no* mental health improvement after such intervention.[13] These drug interventions also pose grave risks to children and teens, including: impaired cognitive development,[14]

---

[12] *Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children & Adolescents with Gender Dysphoria*, NICE (2020) (NICE I), at 13; *Evidence Review: Gender-Affirming Hormones for Children & Adolescents with Gender Dysphoria*, NICE (2020) (NICE II), at 50.

[13] Riittakerttu Kaltiala, et al., *Adolescent Development and Psychosocial Functioning after Starting Cross-Sex Hormones for Gender Dysphoria*, 74 NORDIC J. PSYCHIATRY 213, 217 (2020); Annette L. Cantu, et al., *Changes in Anxiety & Depression from Intake to First Follow-Up Among Transgender Youth in a Pediatric Endocrinology Clinic*, 5 TRANSGENDER HEALTH 196, 198 (2020); Carmichael, *supra* note 7; Elizabeth Hisle-Gorman, et al., *Mental Healthcare Utilization of Transgender Youth Before & After Affirming Treatment*, 18 J. SEXUAL MED. 1444, 1447 (2021).

[14] Diane Chen, et al., *Consensus Parameter: Research Methodologies to Evaluate Neurodevelopmental Effects of Pubertal Suppression in Transgender Youth*, 5 TRANSGENDER HEALTH 246, 248–49 (2020).

infertility risk,[15] reduced bone density,[16] cardiovascular decline,[17] and limited sexual function.[18]

Plus, the long-term safety of "treatments in children and adolescents with gender dysphoria" is "largely unknown" as risks manifest years later.[19] One study found suicide rates *over 19 times* the rate of controls in this population, and mortality rates from cardiovascular disease more than doubled.[20] Another found likewise.[21]

Brownsburg's mandate leads students down a path that poses lasting harm for no substantial gain, as there's "relatively weak

---

[15] Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLINICAL ENDOCRINAL METAB. 3869, 3878 (2017).

[16] Hembree, *supra* note 15, at 3882; Submission of Evidentiary Material, Ex. 27, *K.C. v. Indiv. Members of the Med. Licensing Bd. of Ind.*, No. 1:23-cv-00595-JPH-KMB (June 1, 2023), ECF No. 49-10; NICE II, *supra* note 12, at 14.

[17] Hembree, *supra* note 15, at 3891.

[18] Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins & Evidence*, 49 J. SEX & MARITAL THERAPY 348, 360 (2022), https://bit.ly/3SyYjtV.

[19] NICE II, *supra* note 12, at 14.

[20] Dhejne, *supra* note 10, at 5.

[21] Henk Asscheman, et al., *A Long-Term Follow-Up Study of Mortality in Transsexuals Receiving Treatment with Cross-Sex Hormones*, 164 EUR. J. ENDOCRINOLOGY 635, 635–42 (2011).

evidence for any effect of social transition in adolescence."[22] Allowing one teacher to remain silent on transgenderism poses no such risks.

### 3. Brownsburg never showed that letting Mr. Kluge remain silent jeopardized its educational mission.

The district court shelved *Groff's* requirements, claiming Brownsburg "is not a typical business" given its purported state-law mission to provide "a safe, inclusive learning environment for all students." RSA.34. Yet federal law limits what public schools may do. Brownsburg can't redefine its educational mission in ways that violate it.

### a. Brownsburg's redefinition of its educational mission far exceeds Indiana's requirements.

Brownsburg insists its mission, which has "constitutional and statutory dimension," is to "foster a safe, inclusive environment for *all*." RSA.31–32. Yet nothing supported this claimed mission, which Brownsburg has never extended to all students.

The Indiana Constitution requires the state to provide "a general and uniform system of Common Schools[ ] … equally open to all." Ind. Const. art. VIII, § 1. It doesn't "require or prescribe any standard of educational achievement." *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 521 (Ind. 2009). "Common school" simply means schools "open to the children of all inhabitants of a town or district." *Nagy ex rel. Nagy v. Evansville-Vanderburgh Sch. Corp.*, 844 N.E.2d 481, 489 (Ind. 2006).

---

[22] The Cass Review, Final Report – FAQs, https://bit.ly/4cxdLiq.

The district court referenced Brownsburg's "custodial and protective role." RSA.34. Yet that's a basic power to regulate students' "discipline and conduct" in public schools where "compulsory education laws" require them to be. *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002). It's not a guarantee of happiness or ideological affirmation. After all, Brownsburg's policies directly contradict *many* religious students' belief that God ordained humanity male and female, and that sex and gender are inseparable. Doc.113-1 at 19–24.

Letting Mr. Kluge remain silent prevented no one's attendance at school and had no meaningful impact on the learning environment. Brownsburg's "power to conduct [its] educational affairs" doesn't justify redefining its mission, it simply empowers Brownsburg to do it (*i.e.*, run schools open to all). RSA.32–33 (quotation omitted). Nor does this authority trump Title VII, which "requires otherwise-neutral policies to give way to [Mr. Kluge's] need for an accommodation." *Abercrombie*, 575 U.S. at 775; *accord* U.S. Const. Art. VI, cl. 2.

### b.   Brownsburg's redefinition of its mission doesn't preempt federal law.

Justices Alito and Kennedy warned against public schools' "broad" reliance on "interfere[nce] with [their] educational mission" because that "argument can easily be manipulated in dangerous ways." *Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J., concurring). Just so. Brownsburg "defined [its] educational mission[ ] as including the

inculcation of … political and social views" favoring transgenderism, *id.*, and insisted Mr. Kluge participate even though it "mean[t] following practices that are different than [his own] beliefs," SA.258.

Brownsburg abandoned its First Amendment duty to be a "nurser[y] of democracy," safeguard "the 'marketplace of ideas,'" and "protect[ ] [those who hold] unpopular ideas" based on this ideological mission. *Mahanoy*, 594 U.S. at 190. Yet it's Title VII, not Brownsburg, that decides when the effects of Mr. Kluge's religious accommodation are too much to bear (*i.e.*, when they "cross[ ] the line between hurt feelings" and undue hardship). *Zamecnik*, 636 F.3d at 878. Schools can't "suppress" religious views "on political and social issues" based on ideological "disagreement." *Morse*, 551 U.S. at 423 (Alito, J., concurring).

### c.  Brownsburg didn't show that Mr. Kluge's accommodation jeopardized its mission.

The district court said Mr. Kluge's accommodation undermined the school's mission in three ways. None have merit.

First, the court relied on students' subjective complaints that use of their last names made them "feel targeted and uncomfortable." RSA.37–38; *accord* RSA.40. But Mr. Kluge didn't target anyone; he treated all students the same. *Supra* Facts V. A few hurt feelings doesn't show undue hardship. And one departure from orchestra is

51

irrelevant because it occurred *after* Mr. Kluge's resignation and played no role in Brownsburg's decisions. RSA.12 (citing Doc.22-3 at 4).

Second, the district court said Mr. Kluge "believed [the accommodation] would result in disruption and indeed was encouraged by it." RSA.40 (SA.246). That's false. Mr. Kluge saw no ill effects from the accommodation, SA.281–84, and wanted to show he could treat everyone with dignity and respect, Doc.52-1 at 4. Mr. Kluge wished to stay neutral on transgenderism at school and refused to bow to a heckler's veto, which is all the objections were, as evidenced by a parent's complaint about a *department-wide* hair-color policy. *Supra* Facts VI; *accord Kennedy*, 597 U.S. at 543 n.8 ("protected … religious exercise [doesn't] readily give way to a 'heckler's veto'"). And *Groff* confirmed that heckler's vetoes are disallowed. 600 U.S. at 472–73.

Last, the district court faulted Mr. Kluge for urging Brownsburg not to mandate transgender terminology and asking what he could discuss with students. RSA.40; *accord* RSA.5–6, 8. But Title VII protects Mr. Kluge's efforts to eliminate the need for an accommodation by opposing Brownsburg's discrimination against his religious practice. 42 U.S.C. § 2000e-3(a). That can't show undue hardship. Nor does Mr. Kluge's question *to his employer* about what he could say to students. Once Brownsburg answered, Mr. Kluge agreed "not to attempt to counsel or advise students on his/her lifestyle choices," SA.241, and followed that instruction to the letter, Doc.52-1 at 4.

In short, however Brownsburg manipulates its educational mission, Mr. Kluge did nothing to undermine it.

### d. The district court relied on inapposite precedent.

The district court said "an employer can define its own legitimate mission[ ] and that contradictions to [that] legitimate mission are relevant to … undue hardship." RSA.33–34. But the authority it cited favors Mr. Kluge.

*Anderson v. U.S.F. Logistics (IMC), Inc.* 274 F.3d 470 (7th Cir. 2001), says "[a] religious practice … can still be restricted if it impairs an employer's legitimate interests, *as long as it is reasonably accommodated*." *Id.* at 477 (emphasis added). Yet Mr. Kluge's reasonable accommodation didn't impair any valid interests.

*Ilona* deemed an employer citing "legitimate business reasons … a variation [on claiming] undue hardship." 108 F.3d at 1575. But this Court didn't substitute the former for the latter, nor could it after *Groff*.

*Seshadri* says employers can fire employees if the latter "cannot, even with a reasonable accommodation …, or will not, meet the employer's legitimate expectations. *Seshadri*, 130 F.3d at 800. Except Title VII decides whether Brownsburg's terminology expectations were "legitimate," not the other way around.

*Ryan v. United States Department of Justice*, 950 F.2d 458 (7th Cir. 1991), is off base three ways: this Court (1) applied the discarded

"*de minimis* cost" test, *id.* at 461–62; (2) relied on the unique features of a "paramilitary organization," *id.* at 462; and (3) involved an FBI agent who refused to swap shifts to avoid violating his conscience, *id.* at 459. But *Groff* controls this case, schools aren't paramilitary groups, and Mr. Kluge suggested and abided by a reasonable accommodation.

*Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986), also applied the now-discarded "*de minimis* cost" test. *Id.* at 706–07. And unlike the proselytizing chaplain there, *id.* at 703–05 & n.4, Mr. Kluge simply wanted to remain silent on transgenderism. Any claims Brownsburg had to "adopt" Mr. Kluge's views on transgenderism, "check[ ] up on" him, or stop him from "proselytizing" are simply wrong. RSA.39–40, 44.

Last, in *Minkus v. Metro. Sanitary Dist. of Greater Chi.*, 600 F.2d 80, 84 (7th Cir. 1979), the city's "legitimate purpose to make [civil service exams] open to all applicants" didn't necessarily excuse its failure "to schedule examinations on days other than or in addition to Saturdays." This Court reversed and remanded because a "legitimate purpose" didn't erase the city's duty to accommodate religion.

In short, none of the court's cited authorities support its ruling for Brownsburg, especially after *Groff*, and Mr. Kluge deserves summary judgment on the discrimination claim.

### 4. Brownsburg never showed that letting Mr. Kluge remain silent created any real risk of legal liability.

The district court ruled that allowing Mr. Kluge to remain silent on transgenderism by using last names "placed [Brownsburg] at risk of substantial and disruptive litigation." RSA.44. That's unsupportable.

First, Brownsburg didn't cite Title IX litigation as a contemporary justification for withdrawing Mr. Kluge's accommodation, and *post hoc* litigation defenses don't count. *Supra* Part II.B.2.d.

Second, Title VII doesn't allow for heckler's vetoes. *Groff*, 600 U.S. at 472–73. "[A]dverse customer reaction" can't show undue hardship, even if it takes the form of bothersome litigation. *Id.* at 473 (cleaned up).

Third, Brownsburg would only have a potential undue-hardship defense if accommodating Mr. Kluge put Brownsburg "on the 'razor's edge' of liability." RSA.42 (quoting *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552, 554 (7th Cir. 2011)). Title IX *liability* wasn't looming here for a simple reason: the statute bars sex discrimination, and Mr. Kluge's last-names accommodation treated everyone the same.

None of the district court's cited cases are remotely similar to this one. RSA.41–44. Take a few examples, (1) *Whitaker by Whitaker v. Kenosha Unified School District No. 1*, 858 F.3d 1034, 1040 (7th Cir. 2017), faulted a school for mandating transgender-identifying students use a restroom used by no one else (*i.e.*, different treatment); (2) *A.C. by*

*M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023) (emphasis added), condemned school districts for "treating the three plaintiffs *worse* … because of their transgender status"; (3) the employer in *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), waived his RFRA defense, *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020), so the free-exercise issue wasn't finally resolved; and (4) *Williams v. Kincaid*, 45 F.4th 759, 763 (4th Cir. 2022), concerned a gender-dysphoric prisoner's ADA and related claims of "intentional misgendering and harassment," hostile treatment that's the opposite of Mr. Kluge's respectful use of all students' last names.

Brownsburg didn't show allowing one teacher to remain silent on transgenderism created *any* risk of Title IX liability, let alone placed the district "on the razor's edge" of an adverse judgment. RSA.42.

## III. The district court erred in granting Brownsburg summary judgment (and denying it to Mr. Kluge) on the retaliation claim because Mr. Kluge's protected activities caused Brownsburg's adverse actions.

Concerning retaliation, the district court merely incorporated its prior ruling by reference. RSA.23 (citing SA.184–88). It ignored *Groff*'s teaching, repeated the same legal errors, and botched the merits.

### A.    Mr. Kluge didn't waive his retaliation claim.

Previously, the district court said Mr. Kluge waived his retaliation claim because the "briefing … [was] meager." SA.186. This Court disagreed, finding "the argument … not waived." SA.75. On remand,

the district court made the same critique, RSA.23, but nearly eight pages of briefing show it's not credible, Docs.183 at 38–41; 186 at 41–44.

## B. *Groff* requires reconsideration of the retaliation claim.

The district court faulted Mr. Kluge's renewed retaliation claim because "*Groff* does not even mention the word 'retaliation.'" RSA.23. That's irrelevant. The district court's initial discrimination and retaliation decisions were joined at the hip: Mr. Kluge's retaliation claim failed, the court said, based on its prior discrimination ruling that "complaints about the last names only accommodation" proved undue hardship and were a valid and "nondiscriminatory reason" to terminate him. SA.188.

Under *Groff*, complaints about one's religious beliefs, practices, or accommodations are "off the table." *Groff*, 600 U.S. at 472 (quotation omitted); *see supra* Argument II.B.2. They're not a valid reason for Mr. Kluge's ouster. So *Groff* destroyed the foundation of the district court's initial retaliation decision, necessitating a rethink of both claims because they're inextricably intertwined.

The district court feared "exceeding the scope of remand," RSA.23, which depends not on a "formula" but on "inference[s] from the opinion as a whole," *Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1138 (7th Cir. 2023) (cleaned up), and "careful examination of the prior appellate proceedings," *Bradley v. Vill. of Univ. Park*, 59 F.4th 887, 896 (7th Cir. 2023).

Here, the Court (1) said Mr. Kluge preserved his retaliation claim, SA.75; (2) rejected that claim on the merits for largely the same reasons as the district court, and affirmed the summary judgment order *in toto*, SA.77–80; (3) before responding to Mr. Kluge's rehearing petition by vacating its opinion and judgment *in toto*, and remanding for the district court to apply *Groff*'s new standard to the discrimination claim, SA.1.

The Court should decide Mr. Kluge's retaliation claim for three reasons. First, the mandate rule applies to lower courts, not this Court, *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 407 (7th Cir. 2018), which vacated its prior order and judgment, leaving the retaliation claim unresolved. Second, the district court should have ruled on retaliation below, as the issue was "timely raised but … remain[ed] undecided" by this Court. *Kovacs v. United States*, 739 F.3d 1020, 1024 (7th Cir. 2014). Third, district courts may depart even from the law of the case when a "change in the law[ ] or some other special circumstance[ ] warrants reexamin[ation]." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005). *Groff*'s changes and the entwinement of Mr. Kluge's claims require a rethink of the retaliation claim

### C.    Mr. Kluge satisfied all elements of Title VII retaliation.

Mr. Kluge is entitled to summary judgment on his retaliation claim because he proved "(1) [he] engaged in an activity protected by the

statute; (2) [he] suffered an adverse employment action; and (3) there is a causal link between the [two]." *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (quotation omitted).

### 1.    Mr. Kluge engaged in protected activities.

The district court, SA.185–88; this Court, SA.75–80; and Brownsburg, Doc.185 at 49 (challenging only causation) agreed Mr. Kluge engaged in protected activities. Title VII imposes a "duty of reasonable accommodation" on employers, *Rodriguez v. City of Chi.*, 156 F.3d 771, 775 (7th Cir. 1998), and forbids retaliation against those opposing a practice it makes unlawful. *Porter v. City of Chi.*, 700 F.3d 944, 956 (7th Cir. 2012). So Mr. Kluge's opposition to Brownsburg's transgender-terminology rules and appeals for a religious accommodation were statutorily protected. *Cf. Porter*, 700 F.3d at 957. There's no doubt Mr. Kluge had "a sincere and reasonable belief that [he was] challenging conduct that violates Title VII." *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1014 (7th Cir. 1997); *accord* Doc.113-4 at 25, 43.

### 2.    Mr. Kluge suffered an adverse action.

The district court, SA.185–88; this Court, SA.75–80; and Brownsburg, Doc.185 at 49 (challenging only causation) agreed Mr. Kluge suffered an adverse employment action. "[W]ithdrawal of the … accommodation," Mr. Kluge's "forced resignation, and the "end of his employment"—despite an appeal to the school board—are adverse

59

actions, SA.175, that might "dissuade[ ] a reasonable worker from making or supporting" accommodation requests. *Porter*, 700 F.3d at 957 (cleaned up).

Employees who watched how Brownsburg mistreated Mr. Kluge could not help but be deterred from "complaining to" district officials about religious discrimination. *Id.* at 956 (cleaned up). Brownsburg repeatedly forced him to choose between his beliefs and his job. SA.244–47; Doc.113-4 at 43. After granting an accommodation, Brownsburg pressured him to resign because a few third parties disapproved. SA.246. It then adopted a "no exceptions" policy, revoked his accommodation, and demanded he violate his beliefs, resign and keep his summer pay, or face termination and lose that pay. Doc.113-4 at 33, 43. From then on, Brownsburg ignored Mr. Kluge's religious-discrimination claims and its own policy that required a formal investigation. *Id.* at 10, 14, 17. It forced him to resign conditionally to support his family. SA.242–43; Doc.113-4 at 51. Then it pushed Mr. Kluge's coerced resignation through, ignoring his pleas to keep his job. SA.242, 248, 288; Doc.120-18 at 2, 8, 10, 18. That will deter religious-discrimination complaints.

> ### 3. Mr. Kluge showed a but-for causal link between his protected activity and Brownsburg's adverse action.

Mr. Kluge showed "a but-for causal connection" between his protected activity and forced resignation, *Robertson v. Dep't of Health*

*Servs.*, 949 F.3d 371, 378 (7th Cir. 2020); SA.70, 75, especially after *Groff*.

Brownsburg's *only* reason for forcing Mr. Kluge to resign was his religious objection and claim to an accommodation. SA.245–46; Docs.113-4 at 26–27, 29; 113-5 at 7. It wanted Mr. Kluge to forfeit his religious-accommodation right by complying or resigning. Doc.113-4 at 12. When he refused to do either, district officials subjected him to "a pattern of criticism and animosity" and constructively discharged him. *Hunt-Golliday*, 104 F.3d at 1014.

When the conflict between Mr. Kluge's beliefs and district policies first crystalized, Superintendent Snapp became "very angry," declared his religious beliefs "wrong," and issued the ultimatum of comply, resign, or be fired. When Mr. Kluge refused, the Superintendent sent him home pending termination, which only pastoral intervention prevented. *See supra* Facts III. When a few people grumbled about Mr. Kluge's religious practice and the accommodation of it, Principal Daghe faulted him for "creating tension" and pressured him to resign. *See supra* Facts VI. When Brownsburg "foolish[ly]" adopted a "no[ ] accommodati[ons]" policy that violates Title VII, *N. Mem'l Health Care*, 908 F.3d at 1103, officials repeated and enforced the original ultimatum. *Supra* Facts VII, IX.

Brownsburg never produced another reason for forcing Mr Kluge to resign, one unrelated to his accommodation. *See, e.g.*, *Logan v. City of*

*Chi.*, 4 F.4th 529, 537 (7th Cir. 2021); *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 954 (7th Cir. 2021). The best it can do is cite a few grumblings that are now "off the table." *Groff*, 600 U.S. at 472 (quotation omitted). Mr. Kluge has demonstrated but-for causation.

> ### 4. Mr. Kluge doesn't need to show pretext because he relied on direct proof, and Brownsburg had no legitimate reason to force his resignation.

Courts have faulted Mr. Kluge for not showing pretext. SA.77–78, 185–88. But pretext is part of the *McDonnell Douglas* test, which applies only "when the plaintiff relies on *indirect proof* of discrimination" or retaliation. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 340 (2020) (emphasis added). "[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). Here, Mr. Kluge used "the direct method of proof … on [his] retaliation claim," and only the *indirect* method requires showing "pretext[ ]." *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016); *accord Walker v. Glickman*, 241 F.3d 884, 888–89 (7th Cir. 2001); *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 892–93 (7th Cir. 1996); *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994).

Moreover, only "[i]f [Brownsburg] meets [its] burden" of proving "a legitimate non-discriminatory reason for taking the adverse employment action" must Mr. Kluge show pretext. *Robertson*, 949 F.3d at 378. *Groff* established that "bias or hostility to a religious practice or a

religious accommodation" aren't valid reasons for adverse actions. 600 U.S. at 472. Yet such repackaged bias or "dislike," which *Groff* puts "off the table," were Brownsburg's only reasons for revoking Mr. Kluge's accommodation and forcing him to resign. *Id.* at 472 (quotation omitted).

So Mr. Kluge established a *prima facie* case of retaliation, which Brownsburg failed to rebut. He also deserves summary judgment on this claim.

## CONCLUSION

Under *Groff*, Brownsburg cannot show that accommodating Mr. Kluge's religious beliefs caused undue hardship in the overall context of its business. Third-party grumblings—from a miniscule fraction of constituents—don't show "undue hardship" in accommodating him or justify Brownsburg excluding accomodations and forcing him to resign.

This Court should reverse and remand for entry of judgment in Mr. Kluge's favor on his discrimination and retaliation claims.

Respectfully submitted the 10th day of July, 2024.

*/s/ David A. Cortman*

Tyson C. Langhofer
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707–4655
tlanghofer@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (616) 450–4235
jbursch@ADFlegal.org

Michael J. Cork
MICHAEL J. CORK, ESQ.
5754 North Delaware Street
Indianapolis, IN 46220
Telephone: (317) 517–4217
cork0@icloud.com

David A. Cortman
Rory T. Gray
Travis C. Barham
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd.
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339–0774
dcortman@ADFlegal.org
rgray@ADFlegal.org
tbarham@ADFlegal.org

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) and Seventh Circuit Rule 32 because this brief contains 13,793 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) and Seventh Circuit Rule 32 because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook.

Respectfully submitted the 10th day of July, 2024.

*/s/ David A. Cortman*

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd.
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339–0774
dcortman@ADFlegal.org

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

Respectfully submitted the 10th day of July, 2024.

*/s/ David A. Cortman*
David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd.
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339–0774
dcortman@ADFlegal.org

*Counsel for Appellant*

## SEVENTH CIRCUIT RULE 30(d) STATEMENT

Pursuant to Seventh Circuit Rule 30(d), I certify that all material required by Seventh Circuit Rule 30(a) and (b) are included in the attached required short appendix and separate appendix filed concurrently with this brief.

Respectfully submitted the 10th day of July, 2024.

*/s/ David A. Cortman*

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd.
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339–0774
dcortman@ADFlegal.org

*Counsel for Appellant*

# ADDENDUM

42 U.S.C. § 2000e-2(a)(1)

(a) Employer practices

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

42 U.S.C. § 2000e(j)

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e-3(a)

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

## REQUIRED SHORT APPENDIX

District Court Final Judgment, Doc. 192,
        entered April 30, 2024 ......................................................... RSA-001

District Court Summary Judgment Order, Doc. 191,
        dated April 30, 2024 ........................................................... RSA-002

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN M. KLUGE,                          )
                                        )
                    *Plaintiff*,        )
                                        )
        v.                              )        No. 1:19-cv-02462-JMS-KMB
                                        )
BROWNSBURG COMMUNITY SCHOOL             )
CORPORATION,                            )
                                        )
                    *Defendant*.        )

### **FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 58**

For the reasons set forth in the Court's Order entered this day, the Court now enters **FINAL JUDGMENT** against Plaintiff and in favor of Defendant, such that Plaintiff shall take nothing by way of his Complaint.

Date: 4/30/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Roger A.G. Sharpe, Clerk

BY: _____

Deputy Clerk, U.S. District Court

**Distribution via ECF only to all counsel of record**

RSA-001

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-02462-JMS-KMB |
| | ) | |
| BROWNSBURG COMMUNITY SCHOOL | ) | |
| CORPORATION, | ) | |
| | ) | |
| *Defendant*. | ) | |

**<u>ORDER</u>**

In pursuit of its goal to respect and support all students, including transgender students, Brownsburg Community School Corporation ("<u>BCSC</u>"), a public-school corporation, determined that if a student, the student's parents, and a health care provider requested that the student be called by a preferred name, that name would be entered in PowerSchool, the school's official student database. Teachers were then required to call the student by that name. One teacher, John Kluge, objected to that policy on religious grounds, and requested an accommodation so that he could refer to students by last name only. While it initially granted the accommodation, BCSC withdrew it for the ensuing school year, finding that the practice was detrimental not only to transgender students' well-being, but also to the learning environment for other students and faculty. This burden undermined BCSC's business of "fostering a safe, inclusive learning environment for all students."

Transgender issues recently came before the Seventh Circuit in *Parents Protecting our Children, UA v. Eau Claire Area Sch. Dist.*, 95 F.4th 501 (7th Cir. 2024), a case regarding issues

RSA-002

surrounding public school policies and transgender children.  The Seventh Circuit emphasized the

sensitivity of this area of law and of life:

> Everyone reading this opinion will recognize the sensitivity, delicacy, and difficulty
> of the subject matter addressed by the Administrative Guidance. . . .  Today's
> decision affords [the school district] the opportunity to devise responses in each
> individual circumstance as it arises—informed by balanced, inclusive, and
> respectful dialogue.  Will those answers always come easy and satisfy everyone?
> Hardly.  Life often deals challenging, frustrating, and messy hands.  Allowing
> solutions to be sought—or perhaps at times impasses to be reached—student by
> student and circumstance by circumstance most respects the role and position of
> [the school district] and the interests of all involved in and affected by
> implementation of the Administrative Guidance.

*Parents Protecting Our Children*, 95 F.4th at 506.

Unlike that recent case where parents were opposing the school's policy, this case concerns

policies about transgender students which were the result of a collaborative effort between school

officials, students, students' parents, and medical professionals.  It is against this backdrop that,

following the Court's grant of summary judgment in favor of BCSC and a subsequent affirmance

by the Seventh Circuit, then a vacation of its decision, a remand, and a mandate to this Court to

apply new Supreme Court precedent, the Court considers a second round of Cross-Motions for

Summary Judgment, which are ripe for the Court's review.  [Filing No. 182; Filing No. 184.]

## I.
### FACTUAL BACKGROUND[1]

### A.    The Parties

BCSC is a public-school corporation in Brownsburg, Indiana, and is governed by an elected

Board of Trustees ("the Board").  [Filing No. 120-1 at 2.]  At all relevant times, Dr. Jim Snapp was

the Superintendent, [Filing No. 120-1 at 3]; Dr. Kathryn Jessup was the Assistant Superintendent,

---

[1] As neither party sought additional discovery following remand, [Filing No. 178] much of the
factual background is unchanged from the Court's first determination.

RSA-003

[Filing No. 120-1 at 2]; Jodi Gordon was the Human Resources Director, [Filing No. 113-4 at 5]; and Phil Utterback was the President of the Board, [Filing No. 113-3 at 5]. Brownsburg High School ("BHS") is the sole high school within BCSC. [Filing No. 120-2 at 2.] At all relevant times, Dr. Bret Daghe was the principal of BHS. [Filing No. 120-5 at 4.]

Plaintiff John Kluge was hired by BCSC in August 2014 to serve as a Music and Orchestra Teacher at BHS. [Filing No. 113-2 at 2; Filing No. 120-2 at 3.] He was employed in that capacity until the end of the 2017-2018 academic year. [Filing No. 120-2 at 3.] Mr. Kluge taught beginning, intermediate, and advanced orchestra, beginning music theory, and advanced placement music theory, and was the only teacher who taught any sections of those classes during his time at BHS. [Filing No. 120-2 at 3; Filing No. 120-3 at 19-20.] Mr. Kluge also assisted the middle school orchestra teacher in teaching classes at the middle school. [Filing No. 120-3 at 19-20.]

### B.     Mr. Kluge's Religious Beliefs

Mr. Kluge identifies as a Christian and is a member of Clearnote Church, which is part of the Evangel Presbytery. [Filing No. 113-1 at 4.] Mr. Kluge serves as head of his church's youth group ministries, head of a discipleship program for children, and leader of a worship group. [Filing No. 120-3 at 5.] He further serves as a member of his church's board of elders, which is "part of the government of [the] church," over which they "exercise spiritual oversight." [Filing No. 120-3 at 3-4.]

Mr. Kluge's religious beliefs "are drawn from the Bible," and his "Christian faith governs the way he thinks about human nature, marriage, gender, sexuality, morality, politics, and social issues." [Filing No. 15 at 6.] "Mr. Kluge believes that God created mankind as either male or female, that this gender is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." [Filing No. 15 at 6.] He also believes that "he cannot affirm as true ideas and concepts that he deems untrue and sinful." [Filing No. 15

RSA-004

at 7.]   As a result of these principles, Mr. Kluge believes that "it is sinful to promote gender dysphoria." [Filing No. 15 at 5; Filing No. 120-3 at 5.]  Transgenderism, according to Mr. Kluge, "is a boringly old sin that has been repented for thousands of years," and because being transgender is a sin, it is sinful for him to "encourage[] students in transgenderism." [Filing No. 113-1 at 8-9; *see also* Filing No. 120-3 at 10.]

### C.    BCSC's Policies and Practices Regarding Transgender Students

According to Dr. Jessup, BCSC's Assistant Superintendent, prior to the start of the 2017-2018 academic year, "several transgender students were enrolled as high school freshman for that school year," so "the high school community at BCSC began to become more and more aware of the needs of transgender students." [Filing No. 120-1 at 3.]  "Several discussions were held by and between school leadership at both the high school level and the corporation level about addressing these needs." [Filing No. 120-1 at 3.]

BHS Principal Dr. Daghe testified that during the second semester of the 2016-2017 academic year, BHS faculty and staff members approached him seeking direction about how to address transgender students. [Filing No. 113-5 at 4.]  In January 2017, administrators invited Craig Lee, a BHS teacher and faculty advisor of the Equality Alliance Club, to speak about transgenderism at a faculty meeting. [Filing No. 15-3 at 2; Filing No. 58-2 at 1-2.]  At another faculty meeting in February 2017, Mr. Lee and a BHS guidance counselor, Lori Mehrtens, gave a presentation on what it means to be transgender and how teachers can encourage and support transgender students. [Filing No. 15-3 at 2.]  At one of these meetings, Mr. Kluge "asked the question out loud about how the school will handle . . . those who believe transgenderism is sin/sexual immorality." [Filing No. 15-3 at 2.]

In May 2017, Mr. Kluge and three other teachers called a meeting with Dr. Daghe, during which they presented a signed letter expressing their religious objections to transgenderism and

RSA-005

other information supporting their position that BHS should not "promote transgenderism." [Filing No. 113-1 at 19-32; Filing No. 113-5 at 6; Filing No. 120-3 at 11.]  Reading the letter aloud, Mr. Kluge specifically asked that BCSC faculty and staff not be required to refer to transgender students using their preferred pronouns and that transgender students not be permitted to use the restrooms and locker rooms of their choice.  [Filing No. 15-3 at 3; Filing No. 113-1 at 30-31.] Explaining their perspective, Mr. Kluge urged BCSC not to revise its student anti-discrimination and harassment policies to include "transgender, gender identity, and sexual orientation as protected classes."  [Filing No. 112-1 at 21.]  Mr. Kluge worried that it would prevent students from talking to friends with gender dysphoria "about their need for repentance."  [Filing No. 112-1 at 21-22.]  Otherwise, Mr. Kluge claimed, religious observers would shirk their obligation "to discourage the harmful and dangerous lie that transgender students are giving themselves regarding their very existence," would "perpetuat[e] [transgender students'] sexual confusion," and would "push[] them down a harmful and dangerous path."  [Filing No. 112-1 at 22-24.]  Mr. Kluge expressed his belief that requiring teachers to "refer to transgender students by their 'preferred pronoun'" instead of their "sexually correct birthnames" would only be "playing along with their psychiatric disorder" and thereby "encourage transgender students in their folly."  [Filing No. 112-1 at 22-24; Filing No. 15-3 at 3.]  In Mr. Kluge's own words, he "pleaded . . . to not pursue the transgenderism path."  [Filing No. 15-3 at 3.]

In response to these various competing concerns, BCSC implemented a policy ("the Name Policy"), which took effect in May 2017 and required all staff to address students by the name that appears in PowerSchool, a database that BCSC uses to record and store student information, including grades, attendance, and discipline.  [Filing No. 113-3 at 6; Filing No. 113-5 at 4; Filing No. 113-6 at 7.]  Transgender students could change their first names in PowerSchool if they

5

presented a letter from a parent and a letter from a healthcare professional regarding the need for a name change.  [Filing No. 113-5 at 4-5; Filing No. 120-1 at 4-5.]  Through the same process, students could also change their gender marker and the pronouns used to refer to them.  [Filing No. 113-5 at 5.]  In addition to the Name Policy, transgender students were permitted to use the restrooms of their choice and dress according to the gender with which they identified, including wearing school-related uniforms associated with the gender with which they identified.  [Filing No. 113-5 at 5.]  The three other teachers who initially expressed objections to "promot[ing] transgenderism" accepted the Name Policy, while Mr. Kluge did not.  [Filing No. 120-3 at 12.]

BCSC's practices regarding transgender students were based on BCSC's administrators' ultimate conclusion that "transgender students face significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying" and that "these challenges threaten transgender students' classroom experience, academic performance, and overall well-being."  [Filing No. 120-1 at 3.]  Regarding the Name Policy specifically, Dr. Jessup explained:

> The high school and BCSC leadership thought that this practice furthered two primary goals.  First, the practice provided the high school faculty a straightforward rule when addressing students; that is, faculty need and should only call students by the name listed in PowerSchool.  Second, it afforded dignity and showed empathy toward transgender students who were considering or in the process of gender transition.  Stated differently, the administration considered it important for transgender students to receive, like any other student, respect and affirmation of their preferred identity, provided they go through the required and reasonable channels of receiving and providing proof of parental permission and a healthcare professional's approval.

[Filing No. 120-1 at 4.]

### D.    Mr. Kluge's Religious Objections to BCSC Policies and His Initial Accommodations

In July 2017, Mr. Kluge informed Dr. Daghe that he could not follow the Name Policy because he had a religious objection to referring to students using names and pronouns

6

RSA-007

corresponding to the gender with which they identify, rather than the biological sex that they were assigned at birth. [Filing No. 113-2 at 3; Filing No. 113-5 at 5-6.] Dr. Daghe called a meeting with Mr. Kluge and Dr. Snapp to discuss the situation. [Filing No. 120-3 at 14-17; Filing No. 120-5 at 6.] At the meeting, Dr. Daghe gave Mr. Kluge three options: (1) comply with the Name Policy; (2) resign; or (3) be suspended pending termination. [Filing No. 120-3 at 14.] Mr. Kluge refused to either follow the Name Policy or resign, so he was suspended pending termination. [Filing No. 120-3 at 14-17.] During his suspension, Mr. Kluge met with Dr. Daghe and Dr. Snapp, during which time Mr. Kluge requested "the ability to talk directly to students about their eternal destination," which Dr. Snapp told him was not allowed. [Filing No. 112-6 at 6].

The following week, on July 31, 2017, another meeting was held between Dr. Snapp, Ms. Gordon, and Mr. Kluge. [Filing No. 120-3 at 17.] At the July 31 meeting, Mr. Kluge proposed that he be permitted to address all students by their last names only, similar to a sports coach ("the Last Names Only Accommodation"), and the administrators agreed. [Filing No. 113-2 at 3-4; Filing No. 113-6 at 7; Filing No. 120-3 at 17.] Mr. Kluge signed a document that stated the following, including a handwritten notation initialed by Ms. Gordon:

> You are directed to recognize and treat students in a manner using the identity indicated in PowerSchool. This directive is based on the status of a current court decision applicable to Indiana.
>
> We agree that John may use last name only to address students.
>
> You are also directed not to attempt to counsel or advise students on his/her lifestyle choices.

[Filing No. 15-1 at 1.] Another handwritten note, also initialed by Ms. Gordon, further stated: "In addition, Angie Boyer will be responsible for distributing uniforms to students." [Filing No. 15-1 at 1.]

RSA-008

Mr. Kluge understood the Last Names Only Accommodation to mean that he would refer to all students—not just transgender students—by their last names only, not use any honorifics such as "Mr." or "Ms." to refer to any student, and if any student were to directly ask why he used last names only, he would respond that he views the orchestra class like a sports team and was trying to foster a sense of community.  [Filing No. 120-3 at 18.]  He also understood that he would not be required to distribute gender-specific orchestra uniforms to students.  [Filing No. 120-3 at 17-18.]

### E.   BCSC Receives Complaints About Mr. Kluge's Use of Last Names Only

Dr. Daghe "first learned of concerns with Mr. Kluge and how he was addressing students in class" in an August 29, 2017, email from another teacher, Craig Lee, less than one month later.  [Filing No. 120-2 at 4.]  In addition to teaching classes at BHS, Mr. Lee was one of three teachers on the BHS Faculty Advisory Committee and the faculty advisor of the Equality Alliance, a student club that meets on a weekly basis to discuss issues that impact the LGBTQ community and provides a safe space for students who identify as LGBTQ.  [Filing No. 120-2 at 4; Filing No. 120-14 at 6.]  In relevant part, the email stated:

> I wanted to follow up regarding the powerschool/students changed name discussion at the Faculty Advisory [meeting] as some issues have arisen in the last few days that need to be addressed....  There is a student who has had their name changed in powerschool.  They are a freshman who this teacher knew from 8th grade.  The teacher refuses to call the student by their new name.  I see this is a serious issue and the student/parents are not exactly happy about it.

[Filing No. 120-15 at 2.]  Although the email did not mention Mr. Kluge by name, Dr. Daghe believed and was later able to confirm that the teacher discussed in the email was Mr. Kluge.  [Filing No. 120-2 at 4.]

Regarding the Equality Alliance, between twelve and forty students generally attend each meeting, and in 2019 there were at least four transgender students who regularly attended

RSA-009

meetings.  [Filing No. 120-14 at 6-7; *see also* Filing No. 58-1 at 2 (estimating that there are "approximately five to ten transgender students currently in the Equality Alliance").]  Aidyn Sucec and Sam Willis were two transgender students who regularly attended Equality Alliance meetings during the relevant time.  [Filing No. 120-14 at 7.]  According to Mr. Lee, both Aidyn and Sam discussed during Equality Alliance meetings how Mr. Kluge was referring to them by their last names only, and they found that practice to be insulting and disrespectful.  [Filing No. 120-14 at 7.]  Mr. Lee testified that: "It was clearly visible the emotional distress and the harm that was being caused towards them.  It was very, very clear, and, so, that was clear for everyone to see but that is also what they described as well."  [Filing No. 120-14 at 7-8; *see also* Filing No. 120-14 at 8 ("Q: Was it your interpretation that Aidyn and Sam ... felt as if they were being discriminated against by Mr. Kluge? A: I wouldn't describe it so much as an interpretation.  It was just very, very clear at the meetings to see how much emotional harm was being caused towards Sam and Aidyn.  It was clear for everyone at the meetings just to see how much of an impact it was having on them.  So, when I say like I wouldn't call it an interpretation, I mean, it was so clearly visible that I don't feel like there was anything to necessarily interpret.").]

In his declaration, Mr. Lee stated the following:

During Equality Alliance meetings, we have a policy of not using names when discussing offensive or insensitive behavior of other students and faculty.  During the 2017-2018 school year, I heard students discuss how they were being treated "in orchestra class," or "by the orchestra teacher."  I understood these to be references to John Kluge, the orchestra teacher at [BHS].

Mr. Kluge's behavior was a frequent topic of conversation during Equality Alliance meetings.  Students in Mr. Kluge's class said that they found not being called by their first names to be insulting and disrespectful.  Transgender students felt strongly that they wanted others to acknowledge their corrected names, and Mr. Kluge's refusal to do so hurt them.  These students also felt like it was their presence that caused Mr. Kluge's behavior, which made them feel isolated and targeted.  I relayed the students' concerns to the principal of [BHS] and the assistant superintendent of [BCSC].

RSA-010

Multiple times, Equality Alliance members mentioned that Mr. Kluge would occasionally "slip-up," and use first names or gendered honorifics (e.g., "Mr." or "Miss") rather than last names. Some students also expressed that they felt that Mr. Kluge avoided acknowledging transgender students who raised their hands in class.

Mr. Kluge's behavior was also the subject of discussion outside of the Equality Alliance. One student who was not a member of the Equality Alliance, but was in Mr. Kluge's orchestra class, approached me to tell me that Mr. Kluge's use of last names made him feel incredibly uncomfortable, even though he did not identify as LGBTQ. The student said that he found Mr. Kluge's use of last names very awkward because he was fairly certain that all the students knew why Mr. Kluge had switched to using last names, and that it made the transgender students in Mr. Kluge's orchestra class stand out. This student told me that he felt bad for his transgender classmates. He also mentioned that there were other students who felt this way as well.

[Filing No. 58-2 at 2-3.]

Dr. Jessup confirmed that Mr. Kluge's use of last names only was a topic of discussion at

Equality Alliance meetings, stating:

I attended a meeting of the [BHS] Equality Alliance Club in Fall 2017. The purpose for my attending that meeting was concerns that had been shared from counselors of students feeling uncomfortable. Approximately 40 students attended this meeting. During the meeting, approximately four or five students complained specifically about a teacher using last names only to address students and, in my view, the other students in attendance appeared to agree with these complaints. While the students did not identify John Kluge by name in making these complaints, it was certainly implied that he was the teacher in question, and I had no doubt that it was him they were speaking of since he was the only teacher employed by BCSC who had been permitted the accommodation of using last names only instead of using the names stated in PowerSchool.

[Filing No. 120-1 at 4.]

Mr. Lee also testified that three other teachers—Jason Gill, Melinda Lawrie, and Justin

Bretz—approached him during the 2017-2018 school year with concerns that Mr. Kluge's use of

last names only was causing harm to students. [Filing No. 120-14 at 16-17.] In addition, the

Faculty Advisory Committee met with Dr. Daghe approximately twice per month, and during those

meetings, "Mr. Lee continued to relate to [Dr. Daghe] the complaints and concerns he was hearing,

RSA-011

primarily in Equality Alliance Club meetings, ... about Mr. Kluge's use of last-names-only with students." [Filing No. 120-2 at 4.]  Dr. Daghe testified that in addition to receiving information from Mr. Lee, he received complaints from students and teachers, including teachers Tracy Runyon and Melissa Stainbrook, regarding Mr. Kluge referring to his students by last name only.  [Filing No. 113-5 at 8-9; *see also* Filing No. 113-4 at 9 (Ms. Gordon testifying that she "was made aware that there had been complaints made to Dr. Daghe from students and staff that Mr. Kluge wasn't following th[e] guidelines that he had agreed to at the start of the year").]

Aidyn Sucec was a transgender student in Mr. Kluge's orchestra class during the 2017-2018 academic year.  [Filing No. 22-3 at 1.]  Aidyn submitted a declaration in which he stated that after coming out as transgender, "[b]eing addressed and recognized as Aidyn was critical to helping alleviate [his] gender dysphoria," and his "emotional and mental health significantly improved once his family and friends began to recognize [him] as who [he is]."  [Filing No. 22-3 at 3.]  Pursuant to the Name Policy, Aidyn's mother and his therapist submitted letters requesting that his name and gender be updated in PowerSchool.  [Filing No. 22-3 at 3.]  According to Aidyn, Mr. Kluge referred to him by last name only or avoided referring to him by any name, instead simply nodding or waving in Aidyn's direction.  [Filing No. 22-3 at 4.]  However, Aidyn states that Mr. Kluge would sometimes refer to other students using the honorifics "Mr." or "Ms.," or by their first names.  [Filing No. 22-3 at 4.]  Aidyn believes that Mr. Kluge "avoided" him and other transgender students, and stated:

> Mr. Kluge's behavior made me feel alienated, upset, and dehumanized. It made me dread going to orchestra class each day, and I felt uncomfortable every time I had to talk to him one-on-one.  In addition, Mr. Kluge's behavior was noticeable to other students in the class.  At one point, my stand partner asked me why Mr. Kluge wouldn't just say my name.  I felt forced to tell him that it was because I'm transgender....  By the end of the first semester, in December of 2017, I told my mother that I did not want to continue taking orchestra during my sophomore year.

[Filing No. 22-3 at 4.]

RSA-012

Aidyn explains that "[t]he controversy around Mr. Kluge's resignation during the summer of 2018 is why [he] no longer attend[s] Brownsburg High School." [Filing No. 22-3 at 4.] Several students made negative and derogatory remarks to Aidyn, suggesting that he had been responsible for Mr. Kluge leaving the school, and "[t]hese incidents, in combination with [his] ongoing health struggles, made [him] feel that [he] could not return to school" after August 2018. [Filing No. 22-3 at 4-5.]

Sam Willis was another transgender student in one of Mr. Kluge's orchestra classes during the 2017-2018 academic year. [Filing No. 58-1 at 2.] Prior to the start of that year, he decided to publicly transition and use the name "Samuel" or "Sam" and masculine pronouns going forward. [Filing No. 58-1 at 2.] Although Sam's parents emailed the school counselor and Mr. Kluge directly to notify them of this change, Sam did not initially change his information in PowerSchool, because he was not aware of the Name Policy permitting him to do so. [Filing No. 58-1 at 2-3.] According to Sam, before he changed his information in PowerSchool, Mr. Kluge referred to him on several occasions as "Miss Willis," which led to confusion among other students and was "very upsetting" to Sam. [Filing No. 58-1 at 2-3.] Once Sam changed his first name and gender marker in PowerSchool, however, Mr. Kluge stopped referring to him as "Miss Willis," and Sam was permitted to wear the boys' tuxedo uniform for the fall orchestra concert. [Filing No. 58-1 at 3.] Sam states that Mr. Kluge generally used last names only to refer to students, but would occasionally use gendered honorifics or gendered pronouns with non-transgender students. [Filing No. 58-1 at 3.] Sam opines that "Mr. Kluge's use of last names in class made the classroom environment very awkward," and "[m]ost of the students knew why Mr. Kluge had switched to using last names, which contributed to the awkwardness and [Sam's] sense that [he] was being targeted because of [his] transgender identity." [Filing No. 58-1 at 3-4.] Sam states that Mr.

RSA-013

Kluge's actions upset him and his family, and exposed him and other transgender students to "widespread public scrutiny."  [Filing No. 58-1 at 5.]  His declaration ends with the following statement: "I truly believe that if everyone in my life had refused, like Mr. Kluge, to use my corrected name, I would not be here today."  [Filing No. 58-1 at 5.]

Mr. Kluge expressly disputes the allegations in Aidyn's declaration and the other allegations that he did not strictly comply with the Last Names Only Accommodation.  [*See* Filing No. 52-1.]  Natalie Gain, a teacher who led private music lessons for students during the school day, submitted a declaration stating that she never heard Mr. Kluge use gendered language in the classroom and "only heard him use last names with the students."  [Filing No. 52-2 at 3.]  She further stated that she "never heard any of the students discussing the ... use of last names" and "as far as [she] could tell, Mr. Kluge's accommodation was not common knowledge" among students.  [Filing No. 52-2 at 3.]  Three students who were in Mr. Kluge's orchestra class during the 2017-2018 school year also submitted declarations stating that they never heard Mr. Kluge used gendered language, that they observed him using last names only to refer to all students, and that they did not witness him treating transgender students differently than other students.  [Filing No. 52-3; Filing No. 52-4; Filing No. 52-5.]

Dr. Daghe continued to hear complaints about Mr. Kluge throughout the fall 2017 semester, but was hopeful that the issue would resolve itself.  [Filing No. 120-2 at 4.]  It was not until December 2017 that Dr. Daghe determined it was appropriate to address these issues with Mr. Kluge directly.  [Filing No. 120-2 at 4.]  Mr. Kluge testified that he was not aware of any complaints until December 2017, and when Mr. Daghe informed him that complaints had been made, Dr. Daghe did not provide any specific information or disclose the names of people who had allegedly complained.  [Filing No. 120-3 at 21-23.]  Mr. Kluge further testified that he did not personally

RSA-014

witness or experience any tension with his students or other faculty members.  [Filing No. 120-3 at 23-24.]

### F.   Mr. Kluge's Discussions with Administration and Ultimate Resignation

On December 13, 2017, Mr. Kluge met with Dr. Daghe.  [Filing No. 113-2 at 4; Filing No. 120-3 at 22.]  Mr. Kluge's account of this meeting, in relevant part is as follows:

> [Dr.]  Daghe scheduled a meeting with me to ask me how the year was going and to tell me that my last-name-only Accommodation was creating tension in the students and faculty.  He said the transgender students reported feeling "dehumanized" by my calling all students last-name-only.  He said that the transgender students' friends feel bad for the transgender students when I call the transgender students, along with everyone else, by their last-name-only.  He said that I am a topic of much discussion in the Equality Alliance Club meetings.  He said that a number of faculty avoid me and don't hang out with me or include me as much because of my stance on the issue.
>
> ***
>
> I explained to [Dr.]  Daghe that this persecution and unfair treatment I was undergoing was a sign that my faith as witnessed by my using last-names-only to remain neutral was not coming back void, but was being effective. He didn't seem to understand why I was encouraged.  He told me he didn't like things being tense and didn't think things were working out.  He said he thought it might be good for me to resign at the end of the year.  I told [Dr.]  Daghe that I was now encouraged all the more to stay.

[Filing No. 15-3 at 4-5.]  Mr. Kluge later testified that although Dr. Daghe stated during the meeting that the use of last names only was "creating complaints among many students," he would not provide the names of the students who complained.  [Filing No. 120-3 at 23.]  Mr. Kluge further testified that he did not witness any tension or experience any animosity from students or other faculty, and that his students were performing better than ever in their competitions, receiving high scores on their AP exams, and participating voluntarily in extra programs.  [Filing No. 120-3 at 23-24.]

On January 17, 2018, Dr. Daghe scheduled another meeting with Mr. Kluge, because he "didn't think he was direct enough in [the] December 13 meeting."  [Filing No. 15-3 at 5.]  At the

RSA-015

January 17 meeting, Dr. Daghe expressed that, because of complaints about the use of last names only, Mr. Kluge should resign at the end of the school year. [Filing No. 15-3 at 5; Filing No. 120-3 at 25.] Dr. Daghe offered to write Mr. Kluge letters of recommendation to help him find a new job. [Filing No. 15-3 at 5.]

At the BHS faculty meeting on January 22, 2018, Dr. Jessup presented the faculty with a document titled "Transgender Questions." [Filing No. 15-3 at 5.] The document contained a series of questions and answers concerning BCSC policies regarding transgender students and how faculty and staff should handle matters related to transgender students. [See Filing No. 15-4.] In addition to reiterating that the staff and faculty should address students by the names and genders listed in PowerSchool, [Filing No. 15-4 at 6; Filing No. 15-4 at 9], the document contained the following relevant questions and answers:

> **Are we allowed to use the student's last name only?** We have agreed to this for the 2017-2018 school year, but moving forward it is our expectation the student will be called by the first name listed in PowerSchool.
>
> ***
>
> **How do teachers break from their personal biases and beliefs so that we can best serve our students?** We know this is a difficult topic for some staff members, however, when you work in a public school, you sign up to follow the law and the policies/practices of that organization and that might mean following practices that are different than your beliefs.
>
> ***
>
> **What feedback and information has been received from transgender students?** They appreciate teachers who are accepting and supporting of them. They feel dehumanized by teachers they perceive as not being accepting or who continue to use the wrong pronouns or names. Non-transgender students in classrooms with transgender students have stated they feel uncomfortable in classrooms where teachers are not accepting. For example, teachers that call students by their last name, don't use correct pronouns, don't speak to the student or acknowledge them, etc.

[Filing No. 15-4 at 9-10 (numbering omitted).]

RSA-016

Following the faculty meeting, Mr. Kluge sent an email to Dr. Snapp and Dr. Daghe, referring to the "Transgender Questions" document and asking whether he was correct in believing that he would continue to be permitted to follow the Last Names Only Accommodation after the 2017-2018 school year. [Filing No. 120-16 at 2.]  In response to the email, Ms. Gordon and Dr. Daghe scheduled a meeting with Mr. Kluge to take place on February 6, 2018. [Filing No. 15-3 at 6.]

Unbeknownst to the other attendees, Mr. Kluge secretly recorded audio of the February 6 meeting. [Filing No. 113-4 at 20-55; Filing No. 120-3 at 25]  During the meeting, Mr. Kluge was informed that he would not be permitted to continue using last names only after the 2017-2018 school year. [Filing No. 113-4 at 24.]  Ms. Gordon stated that employers are not obligated to accommodate all of their employees' religious beliefs, but instead need only provide reasonable accommodations, and the last names only accommodation was not reasonable. [Filing No. 113-4 at 27.]  Mr. Daghe agreed. [See Filing No. 113-4 at 28 ("Not when it's detrimental to kids it's not reasonable.").]  Ms. Gordon also discussed how Mr. Kluge's pay and other logistical matters would be handled, depending on whether he finished the current school year or resigned mid-year. [Filing No. 113-4 at 33-35.]  Regarding "processing" of a resignation, Ms. Gordon explained the following to Mr. Kluge:

> [S]ometimes people are very sensitive about letting their students know[ ] or even their colleagues knowing ....
>
>         ***
>
> If someone – I've had one for a year now, um, that we – someone submitted a resignation or retirement letter and asked "I'd rather you just hold onto this.  I'm not – I don't want it communicated.  I'd rather, you know, it just wait until the school year is over and then you process it." We honor requests like that.
>
>         ***

RSA-017

How long we hold that can hold us up a little bit on being able to search for a replacement. And obviously a replacement for your position ... is not going to be an easy one. So, you know, if that were to happen, it kind of depends on the position.

*** 

So while we like to honor those, we also like to – to talk about, like, okay, a reasonable amount of time for us to be able to – in order to be able to find – put a – get a posting out and do a good search for someone.

[Filing No. 113-4 at 36-37.] According to Mr. Kluge, this explanation from Ms. Gordon led him

to believe that he was entitled to submit a "conditional resignation." [*See* Filing No. 120-3 at 26

("[Dr. Daghe and Ms. Gordon] said the option was I could give Jodi a conditional resignation that

wouldn't be processed until a date I specified, that she had done that in the past, that she had held

onto resignations and not processed them before and she would honor any such requests.").]

In March 2018, Ms. Gordon scheduled another meeting with Mr. Kluge. [Filing No. 15-3

at 6; Filing No. 113-2 at 6.] At that meeting, she informed Mr. Kluge that he could either follow

the Name Policy and continue his employment, resign, or be terminated. [Filing No. 113-2 at 6.]

She told him that, if he intended to resign, he would need to submit his resignation to her by May

1, 2018, otherwise the termination process would begin on that date. [Filing No. 15-3 at 6.]

On April 30, 2018, Mr. Kluge sent an email to Ms. Gordon with the subject "Request."

[Filing No. 15-2 at 1.] The email stated:

I'm writing you to formally resign from my position as a teacher, effective at the end of the 2017-2018 school year when my contract is finished, i.e., early August 2018.

I'm resigning my position because [BCSC] has directed its employees to call transgender students by a name and sex not matching their legal name and sex. BCSC has directed employees to call these students by a name that encourages the destructive lifestyle and psychological disorder known as gender dysphoria. BCSC has allowed me the accommodation of referring to students by last name only starting in August 2017 so I could maintain a "neutral" position on the issue.

Per our conversation on 3/15/18, [BCSC] is no longer allowing this accommodation. BCSC will require me to refer to transgender students by their

17

"preferred" name as well as by their "preferred" pronoun that does not match their legal name and sex.  BCSC will require this beginning in the 2018-2019 school year.  Because my Christian conscience does not allow me to call transgender students by their "preferred" name and pronoun, you have said I am required to send you a resignation letter by May 1, 2018 or I will be terminated at that time.

Please do not process this letter nor notify anyone, including any administration, about its contents before May 29, 2018.  Please email me to acknowledge that you have received this message and that you will grant this request.

[Filing No. 15-2 at 1.]

On the same day, Ms. Gordon replied to Mr. Kluge's email with the following:

I appreciate hearing from you.

I will honor your request and not process this letter or share with the BHS administration until May 29.

Let me know if you have any questions at all.

[Filing No. 15-2 at 1.]

Ms. Gordon believed that she was honoring Mr. Kluge's request not to "process" his resignation before May 29 by not presenting the resignation to the Board or sharing it with his colleagues and students until after that date.  [Filing No. 113-4 at 12.]  According to Ms. Gordon, submitting a resignation to her is equivalent to submitting a resignation to the superintendent, and the only permissible condition for an employee to include in a resignation is the end date of employment.  [Filing No. 113-4 at 11-12; Filing No. 113-6 at 6.]  However, in his deposition, Mr. Kluge characterized his resignation as a "conditional resignation, the condition being I could take it off [Ms. Gordon's] desk before May 29."  [Filing No. 120-3 at 27.]

Relevant to the issue of resignation, BCSC's Bylaws provide that:

RSA-019

> Pursuant to State law, following submission of a resignation to the Superintendent, the employee may not withdraw or otherwise rescind that resignation.... The Superintendent shall inform the Board of the submission of that resignation at its next meeting. The Board may choose to accept that resignation, deny that resignation or take any other appropriate action relating to the termination, suspension or cancellation or employment of the person submitting the resignation. A resignation, once submitted, may not then be rescinded unless the Board agrees.

[Filing No. 113-6 at 8.] The Bylaws cite Indiana Code § 5-8-4-1, which in turn provides that:

> Whenever any officer, servant or employee of ... any ... school corporation[ ] ... shall submit in writing his or her resignation, whether to take effect at once, when accepted, or at some future fixed date, with the proper officer, person or persons or authority of government to receive such resignation, the person so submitting such written resignation shall have no right to withdraw, rescind, annul or amend such resignation without the consent of the officer, person or persons or authority of government having power by law to fill such vacancy.

In May 2018, Mr. Kluge attended an orchestra awards ceremony. [Filing No. 120-3 at 32.] At the ceremony, he addressed all students by their first and last names, including transgender students, whom Mr. Kluge addressed by their preferred first names. [Filing No. 120-3 at 33.] Mr. Kluge explained that he used first and last names because "it would have been unreasonable and conspicuous" to refer to students by last names only at a formal event. [Filing No. 120-3 at 33.] Mr. Kluge also opined that referring to students by last name only at the awards ceremony would be inconsistent with the Last Names Only Accommodation, because the accommodation was based on the understanding that he would address students like a sports coach would, and a sports coach would likely use first and last names at a formal event. [Filing No. 120-3 at 33.]

On May 25, 2018, Mr. Kluge was scheduled to meet with Ms. Gordon and Dr. Daghe, but when he arrived for the meeting, Mr. Daghe told him that the meeting was cancelled because "We have everything we need." [Filing No. 15-3 at 1.] That same afternoon, Mr. Kluge submitted to Ms. Gordon a document titled "Withdrawal of Intention to Resign and Request for Continuation of Accommodation." [Filing No. 15-3 at 1-7.] In that document, Mr. Kluge explained that he was "confused" as to why Dr. Daghe cancelled the meeting, and asserted that at the meeting he planned

RSA-020

to withdraw his "emailed intention to resign," which he had sent to Ms. Gordon on April 30 along with a request that the email not be processed. [Filing No. 15-3 at 1.] He outlined his version of events leading up to his forced resignation, accused BCSC of discriminating against him based on his religious beliefs, and ultimately asked that he be permitted to continue his employment using the last names only accommodation. [Filing No. 15-3 at 1-7.] Approximately two hours after Mr. Kluge submitted the purported rescission to Ms. Gordon, BCSC "locked [Mr. Kluge] out of the BCSC buildings and internet database, and posted [his] job as vacant." [Filing No. 113-2 at 7.]

At a Board meeting on June 11, 2018, Mr. Kluge asked the Board not to accept his resignation and to reinstate his employment. [Filing No. 113-2 at 7; Filing No. 120-18 at 10.] Various members of the community also spoke at the meeting, some in support of Mr. Kluge's resignation, and others against it. [See Filing No. 120-18 at 9-13.] The Board accepted Mr. Kluge's resignation, thereby ending his employment with BCSC. [Filing No. 113-2 at 7; Filing No. 120-18 at 2.]

## II.
### RELEVANT PROCEDURAL BACKGROUND AND SCOPE OF REMAND

Mr. Kluge later filed this lawsuit, in which his Amended Complaint asserted thirteen claims against BCSC and several of its employees. [Filing No. 15.] Upon Defendants' Motion to Dismiss, [Filing No. 44], the Court dismissed several claims and Defendants, leaving only Mr. Kluge's claims against BCSC for failure to accommodate and retaliation under Title VII, [Filing No. 70]. Mr. Kluge then filed his Motion for Partial Summary Judgment seeking judgment in his favor on his failure to accommodate claim. [Filing No. 112.] In response, BCSC filed its Cross-Motion for Summary Judgment seeking judgment in its favor on the failure to accommodate claim and the retaliation claim. [Filing No. 120.] In addition, the National Association of Social Workers and its Indiana Chapter, the American Academy of Pediatrics and its Indiana Chapter, the American

RSA-021

Medical Association, and Indiana Youth Group (collectively, "Movants") filed a Motion for Leave to File Brief of Amici Curiae, seeking "to offer additional insight regarding the harm of [Mr. Kluge's] proposed accommodation on the health and wellbeing of transgender students that is not discussed in the briefs submitted by the parties to this case." [Filing No. 131 at 1.] Originally, the Court denied Mr. Kluge's Partial Motion for Summary Judgment, [Filing No. 112,] and granted BCSC's First Motion for Summary Judgment, [Filing No. 120.] *Kluge v. Brownsburg Cmty. Sch. Corp.*, 548 F. Supp. 3d 814, 846-49 (S.D. Ind. 2021).

Mr. Kluge appealed, and the Seventh Circuit "affirm[ed] the grant of summary judgment in favor of Brownsburg," including the claim for retaliation. *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 899 (7th Cir. 2023) (*Kluge I*), *vacated by Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023) (*Kluge II*). Judge Brennan "concur[red in] the judgment" in favor of BCSC's claim for retaliation. *Id.* at 926 (Brennan, J., concurring in part and dissenting in part).

Before the mandate in *Kluge I* issued, the Supreme Court decided *Groff v. DeJoy*, 143 S. Ct. 2279 (2023), in which it clarified the standard for undue hardship in Title VII religious accommodation cases. Formerly, it was an undue hardship to require an employer to accommodate an employee's religion, resulting in anything beyond a "de minimis cost." *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). After *Groff*, the standard was clarified; now, it would be an undue hardship if granting the accommodation would result in "substantial increased costs in relation to the conduct of its particular business." *Groff*, 143 S. Ct. at 2295.

After the Supreme Court's decision, the Seventh Circuit vacated its prior opinion and "remanded for [the Court] to apply the clarified standard to the religious accommodation claim." *Kluge II*, 2023 WL 4842324, at * 1. Based on *Kluge II*, the parties filed a second round of Cross-

Motions for Summary Judgment in which they analyze this case under the standard set forth in *Groff*.

At the outset, the Court notes that it will not reevaluate Mr. Kluge's retaliation claim. The Supreme Court's opinion in *Groff* does not even mention the word "retaliation." Likewise, the Seventh Circuit specifically "remanded for [the Court] to apply the clarified standard to the religious accommodation claim." *Kluge II*, 2023 WL 4842324, at *1. To avoid exceeding the scope of remand, but in the interest of completeness, the Court incorporates by reference its discussion and ruling regarding retaliation. *See generally Kluge*, 548 F. Supp. 3d at 846-49 (observing that "Mr. Kluge's briefing on his retaliation claim is meager, totaling less than three pages"). As before, the Court **DENIES** Mr. Kluge's Motion for Summary Judgment, [Filing No. 182], as to his retaliation claim, and **GRANTS** BCSC's Cross-Motion for Summary Judgment, [Filing No. 184], as to Mr. Kluge's retaliation claim.

As ordered by the Seventh Circuit, the Court considers here how the clarified standard in *Groff* applies to the Last Names Only Accommodation.[2]

### III.
#### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the

---

[2] The Court notes that its discussion will at times cite to *Kluge I*, 64 F.4th 861 (7th Cir. 2023). The Court does not seek to inappropriately cite to a vacated opinion. Rather, such citations reflect only convenient references to the record or to lines of reasoning that align with what the Court would already have determined or is now determining in any event. The parties have taken no new discovery and their factual focus has remained largely the same, as reflected in the Court's narration of the factual background.

RSA-023

asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the nonmoving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary

RSA-024

judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010). "To determine whether genuine issues of material fact exist, we ask if 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail" on summary judgment. *Id.* at 648.

## IV.
### MR. KLUGE'S MOTION FOR SUMMARY JUDGMENT

Mr. Kluge seeks summary judgment in his favor on his religious accommodation claim. In reviewing his motion, the Court must consider the evidence in the light most favorable to BCSC. In order to prevail, Mr. Kluge must establish either that the evidence viewed through that lens – or evidence that is undisputed – entitles him to judgment.

RSA-025

In support of his motion, Mr. Kluge emphasizes that "he is a devout man who served as an ordained elder, worship leader, head of youth ministries," and more as part of his evangelical Christian congregation.  [Filing No. 183 at 27 (citing Filing No. 120-3 at 4-5.)]  He believes that "God ordained '[g]enetic sex,'" and it "'cannot be separated' from gender identity, and the two 'remain bound together throughout one's life.'"  [Filing No. 183 at 21 (citing Filing No. 120-3 at 38).]  Mr. Kluge explains that his beliefs correspond with his church's teachings, which admonish adherents that "[a]ny attempt of a man to play the woman or a woman to play the man violates God's decree, attacks His created order, and constitutes sin so serious that God Himself pronounces it an 'abomination.'"  [Filing No. 120-4 at 10.]  These beliefs, Mr. Kluge maintains, inform his desire to avoid referring to students by their preferred names when not in line with their gender assigned at birth.  According to Mr. Kluge, were he to use preferred names, he would be encouraging sin.

In its response, BCSC questions Mr. Kluge's religious sincerity.  BCSC notes that during the orchestra awards ceremony, Mr. Kluge "used the full names for students as listed in PowerSchool to address all students as they received their awards, including transgender students." [Filing No. 185 at 51.]  Consequently, BCSC argues that Mr. Kluge "cannot legitimately reconcile" his in-class use of last names with the awards-ceremony use of full names.  [Filing No. 185 at 51.] BCSC argues that "[Mr.] Kluge acknowledged that by addressing students by their 'transgender names' during the ceremony, he was seeking to avoid the same type of negative consequences that resulted" from using only last names in class.  [Filing No. 185 at 51.]  BCSC also points to Mr. Kluge's Book of Church Order, which explains that "if a female has transitioned to a male in appearance" "until she has been presented with pastoral counsel," "it may be best that she not use the bathroom of her birth sex."  [Filing No. 120-4 at 12.]

25

RSA-026

Mr. Kluge argues in reply that BCSC "has no evidence for doubting Mr. Kluge's sincerity except second-guessing his decision to refer briefly to all students by their names listed in PowerSchool during one awards ceremony. . . . [H]e was endeavoring to comply with his obligation to abide by his religious accommodation and act in a spirit of bilateral cooperation with the district, . . . and this out-of-the-ordinary behavior at a formal ceremony did not violate—but rather furthered—his sincerely held religious beliefs." [Filing No. 183 at 28 (internal citations and emphasis omitted).]   According to Mr. Kluge, to decide otherwise would forgo protection to "nuanced religious beliefs" and allow "skeptics [to] dictate what a religious person must believe and do." [Filing No. 183 at 22.]

Title VII "prohibits employers from discriminating against employees and job applicants based on their religion." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013). To be entitled to protection under Title VII, the employee's religious belief must be sincere. *Id.* One way to evaluate sincerity is to answer whether "a jury could find that for [the employee] to observe his religion appropriately, it was necessary for him to participate" in his religiously motivated conduct. *See Id.* at 452.   In determining "whether a belief is in fact religious for purposes of Title VII," the "belief necessitating the accommodation must actually be religious," and "that religious belief must be sincerely held." *Id.* at 448.   Whether a religious belief is "sincerely held," is a "question of credibility." *Nottelson v. Smith Steel Workers D.A.L.U. 19806*, 643 F.2d 445, 455 (7th Cir. 1981).   Because "assessments of credibility are left to the trier" of fact, *Baz v. Walters*, 782 F.2d 701, 707 (7th Cir. 1986), "credibility assessments are inappropriate at summary judgment," *EEOC v. United Parcel Serv.*, 94 F.3d 314, 419 (7th Cir. 1996).

As the Seventh Circuit has held, religious sincerity is a matter "where the law must tread lightly. . . . 'Courts are not arbiters of scriptural interpretation.'" *Adeyeye*, 721 F.3d at 453 (quoting

RSA-027

*Thomas v. Review Bd. of Indiana Employment Sec. Division*, 450 U.S. 707, 716 (1981)).  It is also true that "an employee is not permitted to redefine a purely personal preference or aversion as a religious belief."  *Reed v. Great Lakes Companies, Inc.*, 330 F.3d 931, 935 (7th Cir. 2003), *abrogated on other grounds by E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 135 S. Ct. 2028 (2015).  "Otherwise he could announce without warning that white walls or venetian blinds offended his 'spirituality,' and the employer would have to scramble to see whether it was feasible to accommodate him by repainting the walls or substituting curtains for venetian blinds."  *Id.*

On one hand, Mr. Kluge has put forth evidence that his religious beliefs prohibit him from addressing a transgender student by their preferred name.  On the other hand, BCSC has put forth evidence undermining the issue of whether "to observe his religion appropriately, it was necessary for him to participate" in his religiously motivated conduct, such as when at the orchestra awards ceremony, Mr. Kluge did indeed refer to transgender students by their preferred names, during an event in which using last names would expose him to more scrutiny than in his classroom.  Further, it is not clear that in order to "observe his religion appropriately, it was necessary for him" to avoid addressing transgender students consistent with their identified gender.  And it appears Mr. Kluge's Book of Church Order would not require as much.  As the Seventh Circuit has observed once before, "[i]n order to consider [Mr.] Kluge's request" to grant "summary judgment in his favor, [the Court] would be required to review the facts in the light most favorable to the defendant," BCSC.  *Kluge I*, 64 F.4th at 879 n.12 (citing *Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005)).  In this case, that means viewing the facts in the light most favorable to BCSC. A reasonable jury could find that Mr. Kluge's religious beliefs were sincere in that he was religiously prohibited from addressing transgender students by their preferred names; alternatively, a reasonable jury could find that Mr. Kluge's religious beliefs were insincere in that avoiding

RSA-028

addressing transgender student by their preferred names was a "purely personal preference." *Great Lakes Companies, Inc.*, 330 F.3d at 934-35. Because there is a genuine dispute of material fact over whether Mr. Kluge's religious beliefs were sincere, Mr. Kluge is not entitled to summary judgment on his failure-to-accommodate claim and the Court need not consider whether BCSC has shown that the accommodation would be an undue hardship. Accordingly, Mr. Kluge's Motion for Summary Judgment, [Filing No. 182], on his failure-to-accommodate claim is **DENIED**.

### V.
### BCSC'S CROSS-MOTION FOR SUMMARY JUDGMENT

The Court now turns to BCSC's Cross-Motion for Summary Judgment. For Mr. Kluge's Cross-Motion, the Court viewed the facts in the light most favorable to the non-movant, BCSC. For BCSC's Cross-Motion, the Court extends that same favorable lens of review to Mr. Kluge, as the non-movant. For this reason, the Court assumes that Mr. Kluge's religious beliefs are sincere. The parties do not dispute that Mr. Kluge has otherwise made his prima facie case of religious discrimination regarding the revocation of the Last Names Only Accommodation. The Court thus focuses primarily on whether there is a genuine dispute over whether BCSC has demonstrated that extending to Mr. Kluge the Last Names Only Accommodation would amount to an undue hardship. Before engaging in that inquiry, the Court recounts the newly clarified "substantial cost" standard for undue hardship, recently established by the Supreme Court in *Groff v. DeJoy*, 143 S. Ct. 2279 (2023).

#### A.      Failure-to-Accommodate under *Groff*

*Groff v. DeJoy* concerned a religious employee who "believe[d] for religious reasons that Sunday should be devoted for worship and rest." 143 S. Ct. at 2281. Consequently, the employee refused to work on Sundays, conduct for which he was progressively disciplined and ultimately resigned. *Id.* at 2282. The employee sued under Title VII, and on appeal the Supreme Court

RSA-029

vacated and remanded, clarifying the standard an employer must meet to prove undue hardship. Before *Groff*, it was considered an undue hardship to require an employer to accommodate an employee's religion if it resulted in any cost beyond a "de minimis cost." *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). In *Groff*, the Supreme Court explained that now, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 143 S. Ct. at 2295. In evaluating whether certain facts meet that clarified standard, the Supreme Court stated that, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.*

In clarifying the standard, the Supreme Court emphasized that certain kinds of costs are irrelevant in evaluating undue hardship. For example, the Supreme Court explained that "not all impacts on coworkers are relevant," but only "worker impacts" that go on to "affec[t] the conduct of the business." *Id.* at 2296. And "it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options, such as voluntary shift swapping, would also be necessary." *Id.* at 2297.[3] "[N]o undue hardship is imposed by temporary costs of voluntary shift swapping, occasional shift swapping, or administrative costs." *Id.* at 2296. The Supreme Court noted that employers might be required to consider other accommodations, "including those involving the cost of incentive pay, or the administrative costs of coordination with other nearby stations with a broader set of

---

[3] In a concurrence, Justice Sotomayor observed that some costs to employees would be indirectly relevant, *Id.* at 2298 (Sotomayor, J., concurring) (stating that "[b]ecause the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees.").

RSA-030

employees." *Id.* at 2297.  Although the Supreme Court removed some costs from consideration, it

left others untouched, including non-economic costs.  *See Id.* at 2290 (citing *Trans World*

*Airlines,* 432 U.S. at 83 n.14 (considering violation of seniority rights, which are non-economic

costs and cited favorably by *Groff*)); *see also V. v. Vilsack*, 2024 WL 1155256 at *9 (E.E.O.C. Mar.

7, 2024) (applying *Groff* to state that "[u]ndue hardship, however, is not limited to considerations

of financial cost.  Indeed, Title VII does not refer to 'cost' at all.").

     The Supreme Court ultimately shunned bright-line rules in evaluating what amounts to a

"substantial cost" under Title VII.  Instead, the Court held that it is "appropriate to leave it to the

lower courts to apply [its] clarified context-specific standard, . . . ." *Groff*, 143 S. Ct. at 2297.  The

Supreme Court stated that "courts should resolve whether a hardship would be substantial in the

context of an employer's business" as a matter of "common sense." *Id.* at 2296.  The Court

therefore proceeds to analyze the nature of BCSC's business before continuing to discuss the

dispute over undue hardship.

### B.   Undue Hardship and the Nature of a School's Business

     BCSC states that the nature of its business is "educating all students," which it achieves by

"fostering a learning environment of respect and affirmation."  [Filing No. 185 at 38.]  BCSC states

that "[t]he value of any student's safety and ability to learn at school is not minimized within larger

school districts."  [Filing No. 185 at 38.]  It states further that because educating students "has

constitutional and statutory dimension," "whether the school has 100 students or 10,000 students,"

when risking "the safety and education of . . . students," the "level of undue hardship . . . is the

same."  [Filing No. 185 at 38.]  BCSC, a public high school, contrasts its "business" to that of

"most employers," which it states are typically for-profit "corporations or non-profits," whose costs

are commonly "operational" or "monetary."  [Filing No. 185 at 38.]  Unlike those kinds of

enterprises, BCSC states that "[i]t does not exist to maximize shareholder investment or raise

RSA-031

money for a cause," but rather to "educat[e] all students and foster[] a safe, inclusive environment for *all* the children it serves." [Filing No. 185 at 38-39 (emphasis in original).]

Mr. Kluge argues that BCSC "ignores the scope of its educational mission." [Filing No. 186 at 35.] Mr. Kluge argues that "missing entirely is any legal support" that BCSC's mission is to "educat[e] all students and foster[] a safe, inclusive learning environment for all the children it serves." [Filing No. 186 at 35.] On the contrary, Mr. Kluge insists that under the Indiana Constitution, BCSC is not held to "any standard of educational achievement that must be attained by the system of common schools." [Filing No. 186 at 35.] Mr. Kluge argues that BCSC need merely make its school "open to the children of all inhabitants of a town or district." [Filing No. 186 at 36.] Such a mandate, Mr. Kluge argues, does not "requir[e] the district to make all students or parents happy," or "mandate[] that all district employees endorse students' beliefs or allow complaints to scuttle a Title VII religious accommodation." [Filing No. 186 at 36.] Mr. Kluge asserts that "[l]etting [him] call all students by last names prevents nobody from attending school." [Filing No. 186 at 36.] Mr. Kluge asserts that "fostering a safe, inclusive learning environment" for all students is not a "legal mandate" but is simply BCSC's "preference." [Filing No. 186 at 27.]

BCSC replies that its mission to "foster[] a safe, inclusive learning environment" is supported by Indiana state law. [Filing No. 187 at 9.] BCSC states that the Indiana Code grants a school corporation "all the powers needed for the effective operation of the school corporation," "even if the power is not granted by statute or rule." [Filing No. 187 at 9.] Among these powers, BCSC states that the Indiana Code "gives a school corporation's board the power to 'conduct the educational affairs of the school corporation.'" [Filing No. 187 at 9.] And specifically, BCSC states that the Indiana Code requires teachers to "receive training on . . . 'instruction in evidence based social emotional learning classroom practices that are conducive to supporting students who

RSA-032

have experienced trauma that may interfere with a student's academic functioning.'" [Filing No. 187 at 9.] BCSC states that the Indiana Code "makes it apparent that fostering a safe and inclusive learning environment for all students is consistent with a school corporation's mission." [Filing No. 187 at 9.]

Indiana state law provides BCSC the power to set its policy, and Seventh Circuit authority determines to what extent that policy complies with Title VII. Even if the Indiana Constitution may well specify only that schools must be "open," Indiana law also grants a school corporation "all . . . powers necessary or desirable in the conduct of the school corporation's affairs, even if the power is not granted by statute or rule," Ind. Code § 20-26-3-3(b)(2), including BCSC's decision to pursue its mission to affirm the well-being of all students. Even as the Supreme Court undid the *de minimis* standard, it left untouched the long line of Seventh Circuit authority squarely holding that an employer can define its own legitimate mission, and that contradictions to its legitimate mission are relevant to analyzing undue hardship. *See, e.g.*, *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 477 (7th Cir. 2001) (holding that "[a] religious practice that does not actually impose religious beliefs upon others can still be restricted if it impairs an employer's legitimate interests"); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (analyzing undue hardship with respect to employer's "legitimate concerns for its business" and "legitimate business reasons"); *Seshadri v. Kasraian*, 130 F.3d 798, 800 (7th Cir. 1997) (analyzing religious accommodation claim with respect to employer's "legitimate expectations"); *Ryan v. Dep't of Just.*, 950 F.2d 458, 426 (7th Cir. 1991) (observing that "[l]egal institutions lack the sense of nuance that will tell . . . how far the rules may be bent without injur[ing]" employer's "mission"); *Baz*, 782 F.2d at 706 (analyzing undue hardship with respect to employer's "established theory and

32

RSA-033

practice"); *Minkus v. Metro. Sanitary Dist. of Greater Chicago (MSD)*, 600 F.2d 80, 84 (7th Cir.

1979) (analyzing undue hardship with respect to employer's "legitimate purpose").

> As the Seventh Circuit earlier observed in *Kluge I*:
>
> Brownsburg's "business" for the purpose of analyzing undue hardship was to provide public education. Unlike a for-profit corporation, Brownsburg's mission of education for all students was mandated by the State's constitution and legislature. In Indiana, public schools play a custodial and protective role in the compulsory education system, and public schools stand in the relation of parents and guardians to the students regarding all matters of discipline and conduct of students. *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002). After conducting its own research, the school reasonably deferred to the judgment of parents and healthcare providers regarding how to meet the specific needs of transgender students.

*Kluge I*, 64 F.4th at 889. All consistent with the Supreme Court's decision in *Groff*, this is simply

"common sense": a public school is not a typical business; a public-school student is not a typical

customer. Far from maximizing shareholder value, the stated nature of BCSC's business is

providing a supportive environment for students and respecting the legitimate expectations of their

parents and medical providers. Ultimately, BCSC is entitled to determine that its legitimate

mission does not stop at whether some students are literally blocked from entering the schoolhouse

gates; rather, that mission can legitimately extend to fostering a safe, inclusive learning

environment for all students and evaluating whether that mission is threatened by substantial

student harm and the potential for liability.

    1.   *Substantial Student Harm*

    In support of its Cross-Motion for Summary Judgment, BCSC states that "the last-name-

only accommodation resulted in 'substantial student harm.'" [Filing No. 185 at 37.] BCSC

observes that students and teachers alike "complained that Mr. Kluge's behavior was insulting[,]

offensive and made his classroom environment unwelcoming and uncomfortable." [Filing No.

185 at 37.] BCSC states that Aidyn was among these students, who "dreaded" attending Mr.

Kluge's orchestra class. [Filing No. 185 at 37.] BCSC notes the Court's prior summary judgment

RSA-034

ruling, which stated "Mr. Kluge does not dispute that refusing to affirm transgender students in their identity can cause emotional harm," "harm [that is] likely to be repeated each time a new transgender student joins Mr. Kluge's class (or, as the case may be, chooses not to enroll . . . solely because of Mr. Kluge's behavior)." [Filing No. 185 at 37.] BCSC states that all of these events memorialized by the designated evidence "establish[] that the last-name-only accommodation disrupted the learning environment." [Filing No. 185 at 37.] BCSC refers to the Court's first summary judgment ruling to say that the accommodation did not merely "tangential[ly] interfere[]" with "some aspect" of its business; rather, it "'actively interfered with BCSC's mission,'" which is "to provide a safe and supportive educational environment." [Filing No. 185 at 39.] BCSC observes that "transgender students . . . have it hard enough . . . moving from childhood to . . . adulthood"; stating that the school should not be compelled to continue the accommodation of a teacher, who is an adult, over the well-being of students, who are children. [Filing No. 185 at 40.]

In his response, Mr. Kluge argues that BCSC "cannot show any increased costs that are substantial in the overall context of its business." [Filing No. 186 at 26.] Mr. Kluge asserts that BCSC "rescinded [his] accommodation due to complaints," but "[a] few third-party grumblings do not create undue hardship." [Filing No. 186 at 28.] Pointing to *Groff*, Mr. Kluge states that "all [BCSC] offers" are complaints from coworkers, animosity to religion, bias against religion, and aversion to dealing with religious people. [Filing No. 186 at 28.] Parents, according to Mr. Kluge, complained both before and after "they changed their children's names in PowerSchool—when no district policy or practice even applied." [Filing No. 186 at 29.] Teachers, according to Mr. Kluge, "felt hurt," "upset," "awkward," or "uncomfortable," but "[n]one of this shows undue hardship." [Filing No. 186 at 29.] Students, according to Mr. Kluge, "experienced no disruptions . . . and . . . excelled. . . . Every teacher has a few unhappy students." [Filing No. 186 at 29.] Mr. Kluge argues

RSA-035

that "no matter how [BCSC] tries to relabel its interests, they all rest on" complaints from parents, teachers, and students, which amount to "grumblings," or hostility to religious practice, all of which are "now definitely 'off the table.'" [Filing No. 186 at 31]

BCSC replies that "the complaints it received from students and others in the high school community evidenced harm to students and disrupted the learning environment. . . . No evidence . . . would allow a reasonable factfinder to conclude those complaints were motivated by religious animosity." [Filing No. 187 at 4.] BCSC refers to the Court's prior summary judgment ruling and argues that "[Mr.] Kluge ignores . . . [BCSC's] particular business of educating all students. This Court recognized as much in its previous summary judgment ruling, reasoning that other students' successes are 'neither dispositive of nor relevant to the undue hardship question.'" [Filing No. 187 at 5.] BCSC states that "the concerns of students, who are children, should weigh heavier than those of co-workers, who are adults, for purposes of Title VII undue hardship analysis, particularly when one considers that a business does not exist to employ workers, whereas a school exists to educate students." [Filing No. 187 at 6.] BCSC states further that "the level of undue hardship caused by putting the safety and education of several students at risk is the same whether the school has 100 students or 10,000 students." [Filing No. 185 at 38.]

As the Supreme Court held in *Groff*, analyzing undue hardship must be done in the context of an employer's particular business. And as the Court has explained, that context is BCSC's mission to foster a supportive learning environment for all students. The Court thus analyzes to what extent the Last Names Only Accommodation so undermined BCSC's legitimate mission as to create a substantial increased cost, and hence an undue hardship.

BCSC's business is "educating all students," which it achieves by "fostering a learning environment of respect and affirmation." [Filing No. 185 at 38.] Part of that is BCSC's mission

RSA-036

to "afford[] dignity and empathy toward transgender students." [Filing No. 120-1 at 4.] Parents, medical professionals, administrators, and many students all agree that pursuing that mission would require transgender students to be addressed by their preferred names and pronouns. For example, one student's parents sent a letter to BCSC stating that their child "is a transgender male. He is currently receiving medical treatment . . . and mental health treatment." [Filing No. 120-12 at 2.] They stated further that "medical providers agree[d] that it is in [their] child's best interest to socially transition as a male," including being referred to by male pronouns. [Filing No. 120-12 at 2.] Aidyn's and Sam's declarations show that Mr. Kluge's use of last names only—assuming only for purposes of this Order that Mr. Kluge strictly complied with the rules of the Last Names Only Accommodation—made them feel targeted and uncomfortable. Aidyn dreaded going to orchestra class and did not feel comfortable speaking to Mr. Kluge directly. Other students and teachers complained that Mr. Kluge's behavior was insulting or offensive and made his classroom environment unwelcoming and uncomfortable. Aidyn quit orchestra entirely. Certainly, this evidence shows that Mr. Kluge's use of the Last Names Only Accommodation burdened BCSC's ability to provide an education to all students and conflicted with its philosophy of creating a safe and supportive environment for all students. BCSC is not required to allow an accommodation that unduly burdened its "business" in this manner. *See Erlach v. New York City Bd. of Educ.*, 1996 WL 705282, at *11 (E.D.N.Y. Nov. 26, 1996), *aff'd*, 129 F.3d 113 (2d Cir. 1997) (holding that "interference with students' learning need not be undertaken because it constitutes 'undue hardship' for the employer").

Mr. Kluge repeatedly emphasizes that many of his orchestra students were successful during the 2017-2018 school year in that they participated in extracurricular activities and won awards for their musical performances. He also submitted declarations from students and another

teacher stating that they did not perceive any problems in Mr. Kluge's classes resulting from the use of last names only. These facts may well be true, and are accepted as such, but they are neither dispositive of nor relevant to the undue hardship question. BCSC is a public-school corporation and as such has an obligation to meet the needs of *all* of its students, not just a majority of students or the students that were unaware of or unbothered by Mr. Kluge's practice of using last names only. BCSC has presented evidence that two specific students were affected by Mr. Kluge's conduct and that other students and teachers complained. And, given that Mr. Kluge does not dispute that refusing to affirm transgender students in their identity can cause emotional harm, this harm is likely to be repeated each time a new transgender student joins Mr. Kluge's class (or, as the case may be, chooses not to enroll in music or orchestra classes solely because of Mr. Kluge's behavior). As a matter of law, this is sufficient to demonstrate undue hardship, because if BCSC is not able to meet the needs of all of its students, it is incurring substantially increased cost to its mission to provide adequate public education that is equally open to all.[4]

Mr. Kluge argues that revoking his accommodation was a result of complaints, in the form of mere "grumblings" or religious animosity. Yet ample evidence shows that far from mere grumblings, the Last Names Only Accommodation resulted in significant disruption to the learning environment. BCSC received "reports from students," "reports from parents," and "reports by

---

[4] It is disappointing that Mr. Kluge has set forth several pages of irrelevant argument in his reply regarding the supposed ills of transgenderism. [Filing No. 186 at 23-26.] Despite the focus of the mandate and the analysis directed, Mr. Kluge improperly seeks to promote his own views and challenges BCSC and the students, parents and treating physicians with his own beliefs on what is best for the students. Likewise, arguments rooted in the First Amendment are inapt and beyond the scope of the mandate on remand. In any event, Mr. Kluge's statements as a public-school teacher are not protected by the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline").

RSA-038

teachers in [Mr. Kluge's] own department that students are uncomfortable in his class and that they are bringing the conversations that occur in his class to other classrooms." [Filing No. 113-5 at 7.] Instead of focusing on learning, BCSC's educators, parents, and students alike were thrust into an otherwise unnecessary controversy.  Far from religious animus, all evidence indicates that BCSC responded to concerns rooted in the merits of inclusion.  As BCSC heard from at least one parent, "My child deserves to be treated with respect"; "I really don't care what [Mr. Kluge] thinks about transgender issues on a personal level." [Filing No. 120-13 at 2.]  Even if Mr. Kluge did not personally hear every complaint, it does not mean that they did not exist. [*See* Filing No. 120-18 at 9-13 (BCSC's Board meeting public testimony surrounding the accommodation and concerns about the Last Names Only Accommodation, including Mr. Kluge's own)]; *see also Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 575 (7th Cir. 2021) (observing that although plaintiff "wasn't informed of each complaint . . . [,] it does not mean they were fictitious.").  Rather, complaints represented key indicators to BCSC that the Last Names Only Accommodation produced substantial student harm.  Put another way, any other business would be entitled to consider complaints of its customers pointing to a problem that undermined its legitimate interests. As revealed by Aidyn's withdrawal from school, complaints "accurately predicted the fallout" of difficulties surrounding the Last Names Only Accommodation. *Kluge I*, 64 F.4th at 872 n.8.

And while Mr. Kluge chides BCSC for not identifying an alternative accommodation, ultimately, students must be addressed by some name, and it was clear that Mr. Kluge would agree to nothing short of using only last names.  Just as in *Baz v. Walters*, where an employer denied an employee a religious accommodation to push his religious ministry, so too has BCSC shown that Mr. Kluge's "philosophy of care . . . is antithetical to that of [BCSC,]" and that "[t]o accommodate [Mr. Kluge's] religious practices, [BCSC] would have to either adopt his philosophy, . . . expend

RSA-039

resources on continually checking up on what [Mr. Kluge] was doing or stand by while he practices his (in their view, damaging)" accommodation in the school. *Baz*, 782 F.2d at 706-07.

Lest there be any doubt about disruption, Mr. Kluge himself believed that the Last Names Only Accommodation would result in disruption and indeed was encouraged by it. He explained to Dr. Daghe that far from resigning, he was "encouraged all the more to stay." [Filing No. 15-3 at 5.] After all, he believed, his "persecution" was "a sign that [his] faith as witnessed by using last-names-only . . . was being effective." [Filing No. 15-3 at 5.] Quoting from scripture, Mr. Kluge said, "a wide door for effective service has opened to [him], and there are many adversaries." [Filing No. 15-3 at 5.] Faced with Mr. Kluge's own statements—"pleading" with the school to avoid going down the "transgender path," seeking to discuss with students their "eternal destination," and hoping to stay because his "persecution" surrounding the Last Names Only Accommodation was being "effective"—complaints from others were hardly necessary. While the Last Names Only Accommodation might have been intended as neutral, it ultimately was perceived as intentional. *See Whitaker ex rel. Whitaker v. Kenosha No. 1 Board of Education*, 858 F.3d 1034, 1050 (7th Cir. 2017) (holding that "gender-neutral alternatives are not true alternatives because of . . . the increased stigmatization."). Amid the disruption, BCSC was legally entitled to prioritize "trying to make sure that education can move forward" and to pursue its mission to foster an inclusive environment for all students. [Filing No. 113-5 at 7.] Because of the substantial harm to students, the Last Names Only Accommodation imposed on BCSC substantially increased costs, amounting to an undue hardship as a matter of law.

### 2.   *The Potential for Liability*

In addition to arguing that the Last Names Only Accommodation resulted in substantial student harm, BCSC tenders an additional, separate reason that the Accommodation imposed an undue hardship, the potential for liability. BCSC argues that "continuing the last-name-only

RSA-040

accommodation would have exposed Brownsburg to an unreasonable risk of liability, thus resulting in undue hardship as a matter of law." [Filing No. 185 at 40.] BCSC points to the Seventh Circuit case of *Whitaker ex rel. Whitaker v. Kenosha No. 1 Board of Education*, 858 F.3d 1034, 1038-39 (7th Cir. 2017), which "recognized that discrimination on the basis of transgender status is actionable under Title IX." [Filing No. 185 at 40.] Because "[t]he evidence has not changed," BCSC argues that the Court "should apply the same reasoning and conclude that Brownsburg has established" an "independent basis for undue hardship." [Filing No. 185 at 41.]

Mr. Kluge responds that "[h]ypothetical litigation does not show undue hardship." [Filing No. 186 at 39.] Mr. Kluge argues that he did not "treat[] students differently based on gender identity"; rather, "[he] treated all students the same. How a few students felt about this no longer matters. . . . And despite the district's claims, 'confusion in [the] classroom' does not violate Title IX." [Filing No. 186 at 40.] Mr. Kluge distinguishes this case from *Whitaker* because *Whitaker* "found disparate treatment because the transgender-identifying student 'was the only student given access'" to a specific bathroom. [Filing No. 186 at 40.] Mr. Kluge argues that BCSC has failed to identify any "prior litigation involv[ing] circumstances similar to this case." [Filing No. 186 at 40 (citation omitted).]

BCSC counters in its reply that "[p]roviding a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates [Title IX.]" [Filing No. 187 at 12 (quoting *Whitaker*, 858 F.3d at 1050.)] BCSC argues that "the common thread between this case and *Whitaker* is that if BCSC let the last-name-only accommodation continue, it would condone a teacher's refusal to call students by their preferred names because they are transgender—that is, because of their sex." [Filing No. 187 at 13.] Additionally, BCSC argues that "[i]t should be enough for this Court to conclude that continuing the last-name-only

RSA-041

accommodation would have placed Brownsburg, as the Seventh Circuit phrased it, on the 'razor's

edge' of liability." [Filing No. 187 at 13 (internal quotation marks omitted).]

On the law, BCSC is correct:  Title VII does not require an employer to grant a religious

accommodation that would place it on the "razor's edge" of liability. *Matthews v. Wal-Mart Stores,

Inc.*, 417 F. App'x 552, 554 (7th Cir. 2011).  Rather, "the threat of . . . disrupting litigation may in

some circumstances constitute undue hardship." *Minkus*, 600 F.2d at 83 (7th Cir. 1979).[5]  As the

Seventh Circuit earlier observed:

> [BCSC] asserts with copious evidence from students, faculty and administrators
> that Kluge sometimes failed to follow the accommodation (a failure which he
> conceded through his lawyer during proceedings before the EEOC), treated
> transgender students differently than non-transgender students, and created what
> can be described at best as a difficult learning environment for the students in his
> class.

*Kluge I*, 64 F.4th at 879 n.12.  Instances of relevant litigation abound.  For example, in *Whitaker*,

the Seventh Circuit considered whether the district court erred in granting preliminary injunctive

relief to a transgender student who brought claims under Title IX of the Education Amendments

Act of 1972 and the Fourteenth Amendment's Equal Protection Clause, alleging that his school

district discriminated against him by not permitting him to use the boys' restroom.  In affirming

the district court's decision, the Seventh Circuit concluded that the student was likely to succeed

on his discrimination claims, recognizing that discrimination on the basis of transgender status is

actionable under Title IX.  *Whitaker*, 858 F.3d at 1047-50.  In this case, continuing to provide Mr.

Kluge with an accommodation that resulted in complaints that transgender students felt targeted

---

[5] At least once Circuit Court of Appeals has held that even under *Groff*, exposure to legal penalties
can be an undue burden.  *See D'Cunha v. Northwell Health Sys.*, 2023 WL 7986441 at *2-3 (2d
Cir. Nov. 17, 2023) (affirming denial of religious accommodation in form of exemption from
COVID vaccine job requirement because "it would have required [the employer] to violate the
New York State Department of Health's State Mandate," "exposing itself to potential penalties, and
thereby suffering an undue hardship," which would be "excessive" and "unjustifiable" under
*Groff*).

RSA-042

and dehumanized could potentially have subjected BCSC to a Title IX discrimination lawsuit brought by a transgender student.

Since the date of decision in *Whitaker*, it has become clear that treating transgender students differently than other students invites litigation under a variety of theories beyond Title IX, many of which have been successfully litigated.  *See, e.g.*, *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), *cert. denied sub nom. Metro. Sch. Dist. of Martinsville v. A. C.*, 144 S. Ct. 683 (2024) (equal protection); *Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 575 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020) (holding that the "EEOC . . .  [had] the better argument" that "discrimination because of an individual's transgender status is always based on gender-stereotypes . . . that individuals will conform their appearance and behavior," including "the name they use"); s*ee also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1782 (2020) (Alito, J., dissenting) (stating that "[a]fter today's decision, plaintiffs may claim that the failure to use their preferred pronoun violates one of the federal laws prohibiting sex discrimination."); *Williams v. Kincaid*, 45 F.4th 759, 770 (4th Cir. 2022) (holding that gender dysphoria is a disability covered by the ADA); *A. C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 601 F. Supp. 3d 345, 348 n.1 (S.D. Ind. 2022), *aff'd*, 75 F.4th 760 (7th Cir. 2023) (observing that student "also brought claims based on staff members and substitutes referring to A.C. with his previous name and using feminine pronouns"); *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d 725, 727 n.1 (S.D. Ind. 2022), *aff'd*, 75 F.4th 760 (7th Cir. 2023) (stating that school ultimately "agreed to refer to [transgender students] by their male names and male pronouns"); *EEOC v. Apple-Metro, Inc., and Hawthorne Apple, LLC* (S.D.N.Y., No. 1:17-cv-04333) ($100,000 settlement: employees referred to Charging Party with male pronouns and called her by her birth name rather than her preferred name); *EEOC v.*

RSA-043

*Deluxe Financial Services Corp.*, (D. Minn., No. 15-cv-02646) (defendant supervisors and coworkers intentionally used the wrong pronoun when referring to Charging Party and made derogatory statements about her female appearance); *cf. Baz*, 782 F.2d at 709 (expressing concern about Establishment Clause issues when "unleashing a government-paid chaplain who sees his primary role as proselytizing upon a captive audience").[6]

The Court finds that the existence of the Last Names Only Accommodation placed BCSC at risk of substantial and disruptive litigation, all the more serious given that Title IX violations place the entire school's funding at risk.   The Court finds that the Last Names Only Accommodation, because of its unreasonable risk for substantial and disruptive litigation, imposed substantial increased costs on BCSC and was hence an undue burden as a matter of law, both independently and when viewed in combination with the harm and disruption to the school's business.

### VI.
### CONCLUSION

The Court understands that Mr. Kluge and BCSC have different visions for the school's mission: BCSC espouses a mission of "fostering a safe, inclusive learning environment," intentionally affirming students; Mr. Kluge argues that "call[ing] . . . students by last names prevents nobody from attending school," merely avoiding opposing students.  [Filing No. 185 at 39; Filing No. 186 at 36.]  BCSC supports a mission of "afford[ing] dignity and . . . empathy towards transgender students"; Mr. Kluge is concerned about "lying to [transgender students] about

---

[6] *Cf. generally* U.S. Equal Employment Opportunity Commission, *Sex Discrimination*, (stating that "[g]ender identity harassment may include repeated, deliberate use of the wrong name or gender pronouns"), https://www.eeoc.gov/laws/guidance/sex-discrimination; *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999) ("[C]ourts agree that an employer is not liable under Title VII when accommodating an employee's religious beliefs would require the employer to violate federal or state law.").

RSA-044

their sex"; BCSC endorses a mission of "fostering a safe, inclusive learning environment for *all* the children it serves," which would include transgender students like Aidyn and Sam; Mr. Kluge emphasizes that BCSC educates roughly 3,000 children, and overall "[h]is orchestras performed 'better than ever'" — even if a student like Aidyn stopped taking orchestra and dropped out of school. [Filing No. 112-1 at 30; Filing No. 120-1 at 4; Filing No. 120-20 at 3; Filing No. 183 at 13; Filing No. 22-3 at 4; Filing No. 22-2 at 4.] But between Mr. Kluge's and BCSC's visions for its mission, the law leaves that decision to the school. *Baz*, 782 F.2d at 707 (affirming denial of religious accommodation where employee's "philosophy of care" was "antithetical" to that of the employer). As the Supreme Court held in *Groff*, undue hardship is to be viewed within the context of a particular business, not a particular employee. The Court compares the cost to BCSC's mission, not Mr. Kluge's. BCSC could either support its transgender students in pursuit of its mission and comply with the law, or accede to Mr. Kluge's accommodation and risk harm to students and the learning environment and/or substantial and disruptive litigation. As BCSC explained to its teachers, its "goal is not to change your personal beliefs"; rather, "when you work in a public school, you sign up to follow the law." [Filing No. 120-20 at 4; Filing No. 120-20 at 10.] The law of Title VII does not require BCSC to continue an accommodation that actually resulted in substantial student harm, and an unreasonable risk of liability, each sharply contradicting the school's legally entitled mission to foster a supportive environment for *all*. The Last Names Only Accommodation was an undue burden to BCSC as a matter of law. Accordingly, the Court makes the following rulings:

- **DENIES** Mr. Kluge's Motion for Summary Judgment, [182]; and

- **GRANTS** BCSC's Cross-Motion for Summary Judgment, [184].

RSA-045

The Court's previous Judgment is **VACATED**, [160], and a new Final Judgment shall enter accordingly.

Date: 4/30/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Travis Christopher Barham
Alliance Defending Freedom
tbarham@adflegal.org

Brent R. Borg
CHURCH CHURCH HITTLE & ANTRIM (Fishers)
bborg@cchalaw.com

Paul D. Castillo
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
pcastillo@lambdalegal.org

Michael J. Cork
MICHAEL J. CORK, ESQ.
cork0@icloud.com

Kevin Edward Green
KEVIN GREEN ASSOCIATES
keglegal@aol.com

Christopher Edward Kozak
PLEWS SHADLEY RACHER & BRAUN LLP
ckozak@psrb.com

Tyson Langhofer
Alliance Defending Freedom
tlanghofer@adflegal.org

RSA-046

Henry Liu
COVINGTON & BURLING LLP
hliu@cov.com

Alexander Phillip Pinegar
CHURCH CHURCH HITTLE & ANTRIM
apinegar@cchalaw.com

Komal Shah
COVINGTON & BURLING, LLP
One CityCenter - 850 Tenth St., N.W.
Washington, DC 20001

Roscoe Stovall, Jr.
ROSCOE STOVALL, JR. & ASSOCIATES
rosstovall@gmail.com

Camilla B. Taylor
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
ctaylor@lambdalegal.org

Kevin Morris Toner
Plews Shadley Racher & Braun LLP
ktoner@psrb.com

D. Jean Veta
COVINGTON & BURLING LLP
jveta@cov.com

RSA-047