APPEAL NO. 24-1942

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

John M. Kluge,

*Plaintiff-Appellant,*

v.

Brownsburg Community School Corporation,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
Honorable Jane Magnus-Stinson
Case No. 1:19-cv-02462-JMS-KMB

## APPELLANT'S SEPARATE APPENDIX

TYSON LANGHOFER
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707–4655
tlanghofer@ADFlegal.org

MICHAEL J. CORK
5754 N. Delaware Street
Indianapolis, IN 46220
(317) 517-4217
cork0@icloud.com

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

DAVID A. CORTMAN
RORY T. GRAY
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFlegal.org
tbarham@ADFlegal.org

*Counsel for Appellant*

# TABLE OF CONTENTS

Seventh Circuit Order Vacating Prior Rulings, Doc. 83,
  dated July 28, 2023 ...................................................................... SA-001

Seventh Circuit Order Holding Proceedings, Doc. 72,
  dated April 25, 2023 .................................................................... SA-002

Seventh Circuit Opinion Affirming District Court, Doc. 66,
  dated April 7, 2023 ...................................................................... SA-003

District Court Final Judgment, Doc. 160,
  entered July 12, 2021 .................................................................. SA-137

District Court Summary Judgment Order, Doc. 159,
  dated July 12, 2021 ...................................................................... SA-138

District Court Order on Motion to Dismiss, Doc. 70,
  dated January 8, 2020 .................................................................. SA-190

Exhibit A to First Amended Complaint – Accommodation Agreement
  dated July 28, 2017, Doc. 15-1 .................................................... SA-241

Exhibit C to First Amended Complaint – Withdrawal of Intention to
  Resign and Request for Continuation of Accommodation, Doc. 15-3 .......... SA-242

Exhibit D to First Amended Complaint – Transgender Questions,
  Doc. 15-4 ...................................................................................... SA-249

Exhibit 3 to Defendant's Cross-Motion for Summary Judgment –
  Deposition Excerpts of John Kluge, Doc 120-3 ........................... SA-260

Exhibit 16 to Defendant's Cross-Motion for Summary Judgment –
  Email from Plaintiff to Dr. Jim Snapp and Dr. Brett Daghe, Doc. 120-16,
  dated February 4, 2018 ................................................................ SA-296

Exhibit 17 to Defendant's Cross-Motion for Summary Judgment –
  Emails between Plaintiff and Jodi Gordon, Doc. 120-17,
  dated April 30, 2018 .................................................................... SA-298

Defendant's Responses to Plaintiff's Second Set of Interrogatories,
  Doc. 182-1 .................................................................................... SA-300

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

July 28, 2023

ILANA DIAMOND ROVNER, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 21-2475

| | |
|---|---|
| JOHN M. KLUGE,<br>     *Plaintiff-Appellant*,<br><br>*v.*<br><br>BROWNSBURG COMMUNITY<br>SCHOOL CORP.,<br>     *Defendant-Appellee*. | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division.<br><br>No. 1:19-CV-02462<br><br>Jane Magnus-Stinson, *Judge*. |

## O R D E R

In light of the Supreme Court's clarification in *Groff v. DeJoy*, 143 S. Ct. 2279 (2023), of the standard to be applied in Title VII cases for religious accommodation, our opinion and judgment in this case are vacated and this case is remanded for the district court to apply the clarified standard to the religious accommodation claim in the first instance. We leave to the district court's discretion whether to reopen discovery on remand.

No judge of the court[1] having called for a vote on the Petition for Rehearing and Rehearing En Banc, filed by Plaintiff-Appellant on April 21, 2023, and all of the judges on the original panel having voted to deny the same,

**IT IS HEREBY ORDERED** that the Petition for Rehearing and Rehearing En Banc is **DENIED.**

---

[1] Circuit Judge Doris L. Pryor did not participate in consideration of this petition.

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

April 25, 2023

*By the Court:*

No. 21-2475

| | |
|---|---|
| JOHN M. KLUGE, | Appeal from the United States District Court |
|     *Plaintiff-Appellant,* | for the Southern District of Indiana, |
| | Indianapolis Division. |
|     *v.* | |
| | No. 1:19-CV-02462 |
| BROWNSBURG COMMUNITY | |
| SCHOOL CORP., | Jane Magnus-Stinson, |
|     *Defendant-Appellee.* |     *Judge.* |

**O R D E R**

Any action on the plaintiff's Petition for Rehearing En Banc, filed on April 21, 2023, will be delayed pending the Supreme Court's resolution of the appeal in *Groff v. DeJoy*, No. 22-174.

SA-002

In the

# United States Court of Appeals

## For the Seventh Circuit

------------------

No. 21-2475

JOHN M. KLUGE,

*Plaintiff-Appellant,*

*v.*

BROWNSBURG COMMUNITY
SCHOOL CORP.,

*Defendant-Appellee.*

------------------

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-CV-02462 — **Jane Magnus-Stinson**, *Judge.*

------------------

ARGUED JANUARY 20, 2022 — DECIDED APRIL 7, 2023

------------------

Before ROVNER, BRENNAN, and ST. EVE, *Circuit Judges.*

ROVNER, *Circuit Judge.* John M. Kluge brought a Title VII
religious discrimination and retaliation suit against Browns-
burg Community School Corporation ("Brownsburg") after
he was terminated from his employment as a teacher for re-
fusing to follow the school's guidelines for addressing stu-
dents. Brownsburg requires its high school teachers to call all
students by the names registered in the school's official

SA-003

student database, and Kluge objected on religious grounds to using the first names of transgender students to the extent that he deemed those names not consistent with their sex recorded at birth. After Brownsburg initially accommodated Kluge's request to call all students by their last names only, the school withdrew the accommodation when it became apparent that the practice was harming students and negatively impacting the learning environment for transgender students, other students both in Kluge's classes and in the school generally, as well as the faculty. The district court granted summary judgment in favor of the school after concluding that the undisputed evidence showed that the school was unable to accommodate Kluge's religious beliefs and practices without imposing an undue hardship on the school's conduct of its business of educating all students that entered its doors. The district court also granted summary judgment in favor of Brownsburg on Kluge's retaliation claim. We agree that the undisputed evidence demonstrates that Kluge's accommodation harmed students and disrupted the learning environment. Because no reasonable jury could conclude that harm to students and disruption to the learning environment are *de minimis* harms to a school's conduct of its business, we affirm. Our dissenting colleague asserts that there are genuine issues of material fact regarding undue hardship but he mischaracterizes the harms claimed by the school and focuses on fact questions that are not legally relevant to the outcome of the discrimination claim, in particular suggesting that a jury should reweigh the harms using information not known to the school at the time of the occurrences in issue, and not relevant to the ultimate question.

## I.

On summary judgment, we must construe the facts in favor of the nonmovant, and may not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCottrell v. White*, 933 F.3d 651, 655 (7th Cir. 2019); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). We therefore construe the facts in favor of Kluge. Brownsburg is a public school corporation in Brownsburg, Indiana. The Indiana Constitution requires the State's General Assembly "to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." Ind. Const. art. VIII, § 1. School attendance is compulsory in the State by statute. Ind. Code § 20-33-2-4. Brownsburg is governed by an elected Board of Trustees. R. 120-1, at 2. At the relevant time, the corporation and school leadership included the Board President, Phil Utterback; the Superintendent, Dr. Jim Snapp; the Assistant Superintendent, Dr. Kathryn Jessup; the Human Resources Director, Jodi Gordon; and the principal, Dr. Bret Daghe. R. 120-1, at 2–3; R. 120-2, at 3; R. 113-3, at 5; R. 113-4, at 5. Brownsburg High School was the sole public high school in the district. R. 120-2, at 2.

Brownsburg hired Kluge in August 2014 to serve as the sole music and orchestra teacher at the high school. R. 113-2, at 2; R. 120-2, at 3. In that capacity, he taught beginning, intermediate, and advanced orchestra; beginning music theory; and advanced placement music theory. He also assisted the middle school orchestra teacher in teaching classes at the middle school. R. 120-3, at 19–20. Kluge remained employed in

SA-005

that capacity until the end of the 2017–2018 academic year. R. 120-2, at 3.

Prior to the start of that school year, officials at Brownsburg became aware that several transgender students were enrolled as freshmen. R. 120-1, at 3. This awareness led to discussions among the Brownsburg leadership to address the needs of these students. Gordon and Drs. Snapp, Jessup, and Daghe reached a "firm consensus" that transgender students "face significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying." R. 120-1, at 3. According to Dr. Jessup, the Brownsburg leaders concluded that "these challenges threaten transgender students' classroom experience, academic performance, and overall well-being." R. 120-1, at 3. The group began to discuss and consider practices and policies that could address these challenges.[1] R. 120-1, at 3–4.

The staff of the school first became aware of these discussions in January 2017, when administrators invited Craig Lee, a Brownsburg teacher and faculty advisor for the high school's Equality Alliance Club, to speak about transgenderism at a faculty meeting.[2] R. 15-3, at 2; R. 58-2, at 1–2. At

---

[1]    The policies and practices eventually adopted by Brownsburg to address concerns about transgender students were not formally ratified by the Board, but they did operate as directives that teachers were required to follow. We refer to them as policies for convenience.

[2]    The Equality Alliance Club is a student club at the school that meets weekly to discuss social and emotional issues affecting all students, including LGBTQ students. R. 58-2, at 2; R. 112-5, at 9. Attendance varied from twelve to forty students at any given meeting, and often included

(continued)

another faculty meeting in February 2017, Lee and guidance counselor Laurie Mehrtens gave a presentation on what it means to be transgender and how teachers can encourage and support transgender students. R. 15-3, at 2.

After these faculty meetings, Kluge and three other teachers approached Dr. Daghe on May 15, 2017, to speak about issues related to transgender students. R. 15-3, at 2; R. 113-5, at 6; R. 120-3, at 11. The four teachers presented Dr. Daghe with a seven-page letter expressing religious objections to transgenderism, taking the position that the school should not treat gender dysphoria as a protected status, and urging the school not to require teachers to refer to transgender students by names or pronouns that the teachers deemed inconsistent with the students' sex recorded at birth. R. 113-1, at 26–32. Kluge identifies as Christian and is a member of Clearnote Church. R. 113-1, at 4. Kluge believes that gender dysphoria "is a type/manifestation of effeminacy, which is sinful." R. 113-1, at 5. Kluge describes "effeminacy" as "for a man to play the part of a woman or a woman to play the part of a man and so that would include acting like/dressing like the opposite sex." R. 120-3, at 6. In addition to believing that gender dysphoria itself is sinful, Kluge believes that it is sinful to "promote gender dysphoria." R. 120-3, at 7. Because the transgender students changed their first names in order to "present[] themselves as the opposite sex," Kluge believes

---

transgender students. R. 120-14, at 6. Dr. Daghe described it more broadly as a club trying to make the culture and climate of the school the best it could be. R. 112-5, at 9.

that calling those students by their preferred names would be "encouraging them in sin." R. 120-3, at 10.

The American Psychiatric Association has a very different view of gender dysphoria for adolescents and adults, which it defines as a "marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months duration," and manifested by at least two of the six listed criteria. Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, 2013 ("DSM-5"), at 452. "The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM-5, at 453. *See also Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019) (describing gender dysphoria as "an acute form of mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity"). Kluge does not agree with the DSM-5 definition of gender dysphoria. R. 120-3, at 5–6.

At the May 15, 2017 meeting, Dr. Daghe discussed what he considered to be an accommodation to these teachers, namely, a policy that all teachers would use the names and pronouns recorded in the school's official student database, "PowerSchool." R. 112-5, at 5–6. The PowerSchool database contained names, gender markers, preferred pronouns and other data for all students at the school. R. 113-3, at 6; R. 113-5, at 4. According to Kluge, Dr. Daghe indicated that he had resisted the pressure to change the students' names in PowerSchool but would make this change if it would resolve the teachers' concerns regarding how to address transgender students. R. 120-3, at 12.

No. 21-2475                                                          7

The three teachers who had signed onto Kluge's letter accepted Dr. Daghe's suggested practice that they would use the PowerSchool names and pronouns, and indicated to Dr. Daghe that they would comply with it going forward. R. 120-3, at 12. Kluge was shocked that the three other teachers "did an about-face" but he said nothing at that time. R. 120-3, at 12. According to Kluge, after the meeting with all four teachers concluded, he went back into Dr. Daghe's office and told him to "keep up the good work" of resisting the pressure of changing the names in PowerSchool. R. 120-3, at 12. Dr. Daghe left these meetings believing that all four teachers had agreed to this practice. R. 112-5, at 5–6. Kluge, however, believed that he and Dr. Daghe were "on the same page," that he could continue to use the students' "legal names," and that "we would not be promoting transgenderism in our school." R. 120-3, at 12.

The Brownsburg leadership settled on the practice of requiring teachers to use the PowerSchool names and pronouns ("Name Policy") as part of the larger plan to address the needs of transgender students. R. 120-1, at 3–4; R. 112-5, at 5. In addition to the Name Policy, transgender students were permitted to use the restrooms of their choice and dress according to the gender with which they identified, wearing school-related uniforms consistent with that gender. R. 112-5, at 5. Transgender students wishing to change their names, gender markers or pronouns in PowerSchool were permitted to do so only if they first presented two letters, one from a parent and one from a healthcare professional regarding the need for the changes. R. 120-1, at 4. Dr. Jessup explained that the Name Policy furthered two primary goals:

> First, the practice provided the high school fac-
> ulty a straightforward rule when addressing
> students; that is, the faculty need and should
> only call students by the name listed in Pow-
> erSchool. Second, it afforded dignity and
> showed empathy toward transgender students
> who were considering or in the process of gen-
> der transition. Stated differently, the admin-
> istration considered it important for
> transgender students to receive, like any other
> student, respect and affirmation of their pre-
> ferred identi[t]y, provided they go through the
> required and reasonable channels of receiving
> and providing proof of parental permission and
> a healthcare professional's approval.

R. 120-1, at 4.

A little more than a week before the start of the 2017–2018
school year, Mehrtens (the guidance counselor) sent emails to
several teachers, including Kluge, informing them that they
would have a transgender student in their classrooms in the
upcoming year. R. 120-3, at 13; R. 15-3, at 3. According to one
email that Kluge received, the student was transitioning from
female to male, and had changed his name and pronouns in
the PowerSchool database. Mehrtens said:

> Parents are supportive and aware—Feel free to
> use "he" and "[student's preferred name]"
> when communicating.

R. 120-11, at 2 (student's name redacted in the record). Kluge
received two such emails, one for each of the transgender

No. 21-2475                                                                  9

students he would have in his classes that year. R. 120-3, at 13.
At first he was shocked that the school was moving in this
direction, but because the email contained the language "feel
free to use," he read the emails as "permissive, not manda-
tory," and planned to use the students' "legal names."[3]
R. 120-3, at 13–14; R. 15-3, at 3.

On July 27, 2017, the first day of classes at Brownsburg,
Kluge met briefly with Dr. Daghe and informed him that he
would not call the transgender students by their PowerSchool
names and pronouns. He reiterated that he had a religious ob-
jection to this practice. Dr. Daghe directed him to stay in his
office and consulted the Superintendent, Dr. Jim Snapp.
R. 120-3, at 14; R. 15-3, at 3. Later that morning, Drs. Daghe
and Snapp met with Kluge to discuss the issue. Dr. Snapp told
Kluge that he was required to use the names recorded in the
PowerSchool database. Kluge explained again that it was
against his sincerely held religious beliefs to use anything
other than the names recorded on the students' original birth
certificates. Dr. Snapp then presented him with three options:

---

[3]     As was the case with the district court, we find Kluge's use of the
terms "transgender names" and "legal names" imprecise. Many transgen-
der people change their legal names and both of the transgender students
in Kluge's classes did so, albeit after the school year in question. There is
no evidence in the record regarding what name Kluge planned to use if
transgender students changed their legal names, although much of his tes-
timony suggests that his religious objections would remain. Although a
person may be transgender, a name may not be, and so we will refer to the
students' new names as their "preferred names" or "PowerSchool names."
This is not to imply that this was a casual preference of the students alone;
as we noted, the students' parents and healthcare providers signed off on
any changes to the names in PowerSchool.

SA-011

comply with the Name Policy; resign; or be suspended pending termination. When Kluge refused to comply or resign, Dr. Snapp suspended him pending termination and told him to go home. R. 120-3, at 14–16; R. 15-3, at 3.

In the course of that July 27 meeting, Kluge told Dr. Snapp the name of his pastor, Dave Abu-Sara. R. 120-3, at 15–16. Kluge did not know who initiated the contact, but soon after the July 27 meeting, Kluge believed that Dr. Snapp and Abu-Sara spoke on the phone. According to Kluge, Abu-Sara told Kluge that he had asked Dr. Snapp to give Kluge the weekend to think about his options, and Dr. Snapp had agreed. R. 120-3, at 15–16. On Monday, July 31, Kluge returned to the school and met with Dr. Snapp and Human Resources Director Jodi Gordon. Dr. Snapp and Gordon reiterated that Kluge had to choose between complying with the Name Policy or termination. R. 120-3, at 17. They presented him with a memo and draft agreement from Dr. Daghe stating:

> You are directed to recognize and treat students in a manner using the identity indicated in PowerSchool. This directive is based on the status of a current court decision applicable to Indiana.
>
> You are also directed to not attempt to counsel or advise students on his/her lifestyle choices.
>
> Please indicate below if you will comply with this directive. This document must be returned to me by noon on Monday, July 31, 2017.
>
> _____ Yes, I will comply with this directive.
>
> _____ No, I will not comply with this directive.

No. 21-2475                                                          11

_____          _____

John Kluge, teacher                    Date

cc: Personnel file

R. 15-1.[4]

Kluge then presented Dr. Snapp and Gordon with two re-
quested accommodations: first, that he be allowed to refer to
all students by their last names only, "like a gym coach;" and
second, that he not be responsible for handing out gender-
specific orchestra uniforms to students. He would treat the
class like an "orchestra team," he proposed. He agreed that, if

---

[4]        Kluge has never objected to the directive that he "not attempt to
counsel or advise students on his/her lifestyle choices." Neither party ad-
dressed this term of the agreement in the briefing, but Dr. Snapp testified
that Kluge requested "the ability to talk directly to students about their
eternal destination," which Dr. Snapp told him was not allowed. R. 112-6,
at 6. This directive is consistent with that conversation. *See also* R. 120-5, at
8 (Dr. Daghe testifying that he included that statement because Kluge's
"job was to teach the students, not to make sure he was letting them know
his opinion one way or the other," and because he "did not want one of
my teachers counseling or advising students on their choices."). The "cur-
rent court decision applicable to Indiana" was likely our decision in *Whit-
aker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d
1034 (7th Cir. 2017), abrogated on other grounds by *Illinois Republican
Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020), which had been issued two
months prior to this meeting. We held there that a transgender student
had a reasonable likelihood of succeeding on the merits of a Title IX sex
discrimination claim based on a theory of sex-stereotyping. 858 F.3d at
1048–50. Although the dissent asserts that nothing in the record indicates
that *Whitaker* was the decision to which the school referred, Kluge never
contested the point and instead simply argued that any suit brought by a
student on these facts under *Whitaker* would be frivolous. Because we de-
cline to address the Title IX issue, we need not address this matter further.

a student asked him why he was using last names only, he would not mention his religious objections to using transgender students' first names and would explain, "I'm using last names only because we're a team, we're an orchestra team, just like a sports coach says, hey, Smith, hey, Jones. We are one orchestra team working towards a common goal." R. 120-3, at 17. Dr. Snapp and Gordon agreed that this was an acceptable arrangement. They also agreed to assign the task of handing out orchestra uniforms to another person so that Kluge would not be required to hand students clothing that he believed was inconsistent with their sex recorded at birth. R. 120-3, at 17. To memorialize this new understanding, Gordon altered the document presented to Kluge: after the first paragraph, she wrote, "We agree that John may use last name only to address students." At the bottom of the page, she wrote, "In addition, Angie Boyer will be responsible for distributing uniforms to students." She initialed both changes. Kluge checked the "I will comply" line, and signed and dated the form. R. 15-1.

Kluge then began to teach his regularly assigned classes which included two transgender students, Aidyn Sucec and Sam Willis.[5] R. 120-3, at 20. Within a month, Dr. Daghe began to hear complaints about Kluge from Lee, the faculty advisor of the Equality Alliance Club. R. 120-2, at 4; R. 58-2, at 2–3; R. 120-14, at 7–8. Lee was also a member of the school's three-

---

[5]   As we note below, Sam Willis did not change his name and gender marker in PowerSchool until the end of September 2017. R. 120-3, at 20.

No. 21-2475                                                13

teacher Faculty Advisory Committee. R. 120-2, at 4. In an August 29, 2017 email to Dr. Daghe, Lee reported:

> I wanted to follow up regarding the powerschool/students changed name discussion at the Faulty Advisory as some issue[s] have arisen in the last few days that need to be addressed. … There is a student who has had their name changed in powerschool. They are a freshman who this teacher knew from 8th grade. The teacher refuses to call the student by their new name. I see this is a serious issue and the student/parents are not exactly happy about it. … As the student said, "what more are we supposed to do?"

R. 120-15, at 2. *See also* R. 120-12 (September 1, 2017 letter to the school from parent of student noting child's transgender status and reporting problems with a teacher who uses incorrect gendered language against the wishes of the parents and medical providers of the child, leading to confusion for other students on how to address the child); R. 120-13 (August 30 through September 21, 2017 email chain between parent and school counselor regarding student's transgender status, updates to PowerSchool database, and repeated problems with Kluge using incorrect gendered language that the parent characterizes as "very disrespectful and hurtful," and which causes the child "a lot of distress."). Lee also described the situation of a student in the process of a PowerSchool name change, whose supportive parent asked the teacher to start using the new name, and the teacher refused, citing the Name

Policy. R. 120-15, at 2. Lee closed his email by turning the problem over to Dr. Daghe:

> I know that this is something that must be hard to deal with from your perspective. You are trying to do the right thing for your employees and students alike. I absolutely do not envy your position and thus far you have been incredibly supportive and it means a lot. However, there is confusion amongst some teachers and students that I think needs clarification and perhaps a teacher or two that needs to know that it is not ok to disobey the powerschool rule.

> I hope this makes sense mate. Maybe me, you and Kat need to sit down and talk about this. I am not totally sure and of course I am very biased. However, I have always admired your leadership and now look to you for the next step.

R. 120-15, at 2–3.

Lee also began to report to Dr. Daghe on comments he was hearing from students who attended the Equality Alliance meetings, where Kluge's behavior became a frequent topic of conversation. R. 58-2, at 2–4; R. 120-14, at 7–14; R. 120-2, at 4. According to Lee, both Aidyn and Sam discussed during those meetings how Kluge was referring to them by their last names only, a practice they found insulting and disrespectful. R. 58-2, at 2; R. 120-14, at 7. Lee confirmed that Aidyn and Sam attributed Kluge's last names practice to their presence in the classroom, and this made them feel isolated and targeted.

SA-016

R. 58-2, at 2–3; R. 120-14, at 7–8. "It was clearly visible the emotional distress and the harm that was being caused towards them. It was very, very clear, and, so, that was clear for everyone to see but that is also what they described as well," Lee testified. R. 120-14, at 7–8. When asked if it was his interpretation that Sam and Aidyn "felt as if they were being discriminated against by Mr. Kluge," Lee replied, "I wouldn't describe it so much as an interpretation. It was just very, very clear at the meetings to see how much emotional harm was being caused towards Sam and Aidyn. It was clear for everyone at the meetings just to see how much of an impact it was having on them. … [I]t was so clearly visible that I don't feel like there was anything necessarily to interpret." R. 120-14, at 8. Lee passed these concerns onto Dr. Jessup as well. R. 120-14, at 8. Although Kluge asserted that he was perfectly compliant in the use of last names only, Lee also reported that students complained that Kluge would occasionally slip up and use first names or gendered honorifics rather than last names only.[6] R. 58-2, at 3; R. 120-14, at 8–9.

---

[6]       In his deposition, Kluge testified, "From Day 1 I was consistent in using last names only and using it for all students. I didn't target students." R. 120-3, at 36. Because we must construe the record in favor of Kluge on summary judgment, we credit his testimony that he was perfectly compliant with the Name Policy and never slipped up. However, in a letter to the Equal Employment Opportunity Commission, Kluge's lawyer stated, "Kluge made a good faith effort to address all students by last names and to never 'misgender' students. He admits that he may have made occasional mistakes in referring to students he formerly called by their first names." R. 120-19, at 7. In any case, we may also credit Lee's statement that he conveyed to administrators that students complained that Kluge did slip up, not for the truth of the matter but to show the state

(continued)

In addition to the complaints of the transgender students, Lee reported that he had been approached by a student who was not in the Equality Alliance but was in Kluge's orchestra class. R. 58-2, at 3; R. 120-14, at 9. That student, who did not identify as LGBTQ, told Lee that Kluge's use of last names made him feel incredibly uncomfortable. The student described Kluge's practice as very awkward because the student was fairly certain that all the students knew why Kluge had switched to using last names, and that it made the transgender students in the orchestra class stand out. The student felt bad for the transgender students, and shared with Lee that other students felt this way as well. R. 58-2, at 3; R. 120-14, at 9. Some students believed that Kluge avoided acknowledging transgender students who raised their hands in class. R. 58-2, at 3; R. 120-14, at 8–9. Kluge denied doing so, but the evidence is undisputed that these sorts of complaints were reported to school administrators.

---

of mind of the school administrators receiving these reports. In addition to Lee's testimony, as we discuss below, two transgender students in Kluge's classes averred that Kluge sometimes used gendered honorifics or first names for non-transgender students. Because Kluge denies this, we assume Kluge's perfect compliance for the purpose of the summary judgment motion. Kluge does not, however, contest that the students conveyed such complaints to teachers and administrators, and this is relevant to the administrators' state of mind. *See Khunger v. Access Cmty. Health Network*, 985 F.3d 565, 575 (7th Cir. 2021) (out-of-court complaints about an employee are admissible when offered not for their truth but to show the employer's state of mind when making a termination recommendation). Moreover, Kluge submitted no evidence that the teachers and administrators did not honestly believe the reports that Kluge was not fully compliant.

No. 21-2475                                                  17

The record also contains sworn statements from Sam Willis and Aidyn Sucec memorializing their experiences in Kluge's class. R. 58-1 (Willis Affidavit); R. 22-3 (Sucec Affidavit). Sam averred that he knew Kluge from his participation in music programs in middle school. After deciding to publicly transition at the start of his sophomore year (2017–2018), Sam emailed the school counselor that he would be using the name "Samuel" and masculine pronouns going forward. His mother emailed Kluge directly about the change because Kluge had known Sam by a different name in middle school. Kluge did not respond to the email and Sam reported that Kluge referred to him as "Miss Willis" on several occasions.[7] This led to other students questioning Sam's sex, which was upsetting to him. In early fall, Sam's mother requested that he be allowed to wear a tuxedo for a fall concert. At that point, the school informed Sam's mother about the new PowerSchool Name Policy. Sam's parents then submitted the required letters from themselves and Sam's healthcare provider, and his name and gender markers were amended in PowerSchool in time to get the tuxedo. According to Sam, Kluge then stopped calling him "Miss Willis," but sometimes used gendered honorifics such as "Miss" or "Mr." and gen-

---

[7]    Although Sam did not change his name and gender markers in PowerSchool until late September 2017, Kluge's use of the term "Miss Willis" would have violated the Name Policy because of the use of the gendered honorific "Miss." Kluge understood that his accommodation required him to use last names only and refrain from using gendered honorifics in all of his classes, whether or not there were transgender students in the class. R. 120-3, at 18. Nevertheless, Kluge denies ever slipping up, and we credit that testimony as we discuss above.

dered pronouns when referring to students who were not transgender. Sam reported that Kluge's last names practice was awkward because most students knew why Kluge had made the switch, contributing to Sam's sense that he was being targeted because of his transgender identity. Sam explained that he felt hurt by Kluge's treatment, and that his family was hurt and angry that Kluge thought he knew better than they did. He averred that Kluge's actions exposed him to widespread public scrutiny in high school. R. 58-1.

Aidyn Sucec, who began high school the same year that the Name Policy went into effect, averred that, after years of struggling with depression and anxiety, he was diagnosed with gender dysphoria in the spring of 2017. While receiving treatment from medical providers for that condition, Aidyn began to take steps to socially transition, including changing his name and asking others to use male pronouns to refer to him. He explained, "Being addressed and recognized as Aidyn was critical to helping alleviate my gender dysphoria. My emotional and mental health significantly improved once my family and friends began to recognize me as who I am." R. 22-3, at 3. Prior to beginning high school, Aidyn's mother spoke to a guidance counselor to discuss steps the school could take to ensure his safety and well-being as a transgender student. Aidyn's mother and therapist subsequently submitted letters to the school requesting changes to Aidyn's name and gender marker in PowerSchool, and the change was in place at the beginning of the academic year. All of Aidyn's teachers except Kluge complied with the Name Policy. On the first day of class, Aidyn received a folder from the substitute teacher covering for Kluge with his former first

No. 21-2475                                                    19

name on it. The substitute also referred to him by his former
first name in front of other students, which he experienced as
"intensely humiliating and traumatizing." Throughout the
fall semester, Kluge refused to call him "Aidyn," instead re-
ferring to him as "Sucec" or avoiding using any name and
simply nodding or waving in his direction. Aidyn averred
that Kluge sometimes used gendered honorifics with other
students in the class, and less frequently called those students
by their first names. Kluge's behavior left Aidyn feeling "al-
ienated, upset, and dehumanized." He dreaded going to class
each day and was uncomfortable each time he had to speak
with Kluge one-on-one. Kluge's behavior was noticeable to
others in the class, and at one point Aidyn's stand partner
asked him why Kluge would not just say his name; Aidyn felt
forced to tell him that it was because he was transgender. Ai-
dyn discussed Kluge's behavior with his therapist as part of
his ongoing treatment for gender dysphoria. He noted that
Kluge's practice was also discussed multiple times at Equality
Alliance meetings. By the end of the first semester, Aidyn told
his mother that he did not want to continue with orchestra in
his sophomore year. He did not in fact continue with orches-
tra the next year, and due to harassment he faced after Kluge
left the school, Aidyn left Brownsburg at the end of his soph-
omore year.[8] R. 22-3.

---

[8]    Kluge characterizes the affidavits of Sam and Aidyn as "after-cre-
ated evidence," which contained information about events that occurred
after Kluge's termination. But both affidavits largely describe events that
occurred before the school made the decision to terminate Kluge, and both
affirm the information that Lee passed on to Dr. Daghe from Equality Al-
liance Meetings. The only exception is that the school was not aware that,

(continued)

Students were not the only source of concern about Kluge's practice. Lee reported that he had been approached by three teachers—Jason Gill, Melinda Lawrie, and Justin Bretz—during that academic year with concerns that Kluge's practice was causing harm to students. R. 120-14, at 16–17 ("they felt very strongly that this was harming students, not just Sam and Aidyn but just students in general who would potentially be in Mr. Kluge's class."). Dr. Daghe was approached by two additional teachers who were also department heads in Fine Arts (the department in which Kluge taught), Tracy Runyon and Melissa Stainbrook. They too conveyed complaints about Kluge's use of last names only. Dr. Daghe explained that teachers within the department who had a complaint about another teacher would convey concerns to the department heads and he was therefore most in contact with those two teachers in Kluge's department. R. 113-5, at 8–9.

After hearing about concerns from counselors that students were uncomfortable in some of their classes with regards to transgender issues, Dr. Jessup attended an Equality Alliance Club meeting to hear from students herself. R. 120-1,

---

midway through the school year, Aidyn told his mother that he did not wish to continue with orchestra the next academic year, and in fact ended up leaving Brownsburg at the end of the following year due to harassment he received from other students. Although Brownsburg did not know that Aidyn would withdraw from orchestra or leave the school, at most the affidavit confirms that the school accurately predicted the fallout from Kluge's failure to follow the Name Policy that was designed to avoid this very harm to the school's mission. We do not rely on any information from the affidavits that post-dates Kluge's termination.

at 4; R. 120-6, at 7. Approximately forty students attended the meeting. Four or five students at the meeting complained about a teacher using last names only to address students.[9] The other students in attendance appeared to agree with the complaints. R. 120-1, at 4. Dr. Jessup also heard from students that they felt singled out by the use of their last names and that "not all students were called by their last name by Mr. Kluge." R. 120-6, at 7. *See also* R. 113-4, at 9 (Gordon testifying that she was "made aware that there had been complaints made to Dr. Daghe from students and staff that Mr. Kluge wasn't following those guidelines that he had agreed to at the start of the year.").

Dr. Daghe continued to hear complaints about Kluge's last-names-only practice throughout the fall semester, but hoped that the issue would resolve itself. R. 120-2, at 4. He therefore did not raise the matter with Kluge until he met with Kluge on December 13, 2017, after it became apparent that the accommodation was not working in practice because students were being harmed, and the learning environment was being disrupted. R. 120-2, at 4; R. 112-5, at 7. Dr. Daghe testified that the purpose of the meeting was to tell Kluge that the last-names-only policy was not working in practice:

---

[9]    The Equality Alliance Club had a policy of not using teachers' names at meetings. R. 120-14, at 11. Nevertheless, because of references to orchestra class and because Kluge was the only teacher at the school who had been permitted the last-names-only accommodation, both Lee and Dr. Jessup understood the students to be referring to Kluge. R. 120-14, at 7; R. 120-1, at 4.

And the purpose of that meeting was to tell him that that's not going well. I'm getting reports from students, I'm getting reports from parents, I'm getting reports from our teams which are done by grade level, I'm getting reports by teachers in his own department that students are uncomfortable in his class and that they are bringing the conversations that occur in his class to other classrooms and having discussions about the uncomfortableness, whether it was dealing with a transgender student and last names only or whether it was times when last names weren't used or it was times when, you know, kids just want it all to go away and act like everything is normal. So I called John down and told him that's what's been given to me. And so, to me, as the high school principal trying to accommodate people and also trying to make sure that education can move forward, I just told him that.

R. 112-5, at 7.

According to Kluge's own description of the meeting:

Daghe scheduled a meeting with me to ask me how the year was going and to tell me that my last-name-only Accommodation was creating tension in the students and faculty. He said the transgender students reported feeling "dehumanized" by my calling all students last-name-only. He said that the transgender students'

friends feel bad for the transgender students when I call transgender students, along with everyone else, by their last-name-only. He said that I am a topic of much discussion in the Equality Alliance Club meetings. He said that a number of faculty avoid me and don't hang out with me as much because of my stance on the issue.

Daghe said that parents complain about me. He stated that a transgender student's mother complained to the principals about my orchestra [hair color] policy, that it was an unfair and unwarranted policy and should be removed. The building principal asked if the other teachers had this same policy. I told him "yes" and sent him their policies and mine. He responded to the parent and the parent backed down. This was a policy by my entire performing arts department that students must have natural-colored hair for performances so they don't distract from the music being played.

Daghe referred to this parent complaint in this meeting as being evidence of me being singled out while other teachers with the same policies did not receive any complaints.

I explained to Daghe that this persecution and unfair treatment I was undergoing was a sign that my faith as witnessed by my using last-names-only to remain neutral was not coming

> back void, but was being effective. He didn't
> seem to understand why I was encouraged. He
> told me he didn't like things being tense and
> didn't think things were working out. He said
> he thought it might be good for me to resign at
> the end of the year. I told Daghe I was now en-
> couraged all the more to stay.

R. 15-3, at 4–5. *See also* R. 120-3, at 21–25. Kluge had not "wit-
ness[ed]" tension, and also had not "witness[ed]" that anyone
was avoiding him. R. 120-3, at 23; R. 112-5, at 7. Although
Kluge believed that he was singled out for complaints about
the department-wide hair color policy because of his religion,
Dr. Daghe concluded that "it was because of the way he was
handling this accommodation." R. 112-5, at 7. Because Dr.
Daghe would not name the students or faculty who com-
plained, Kluge suspected that Dr. Daghe was lying. R. 120-3,
at 23. Kluge left this meeting believing that his use of last
names only was working and that there was no evidence of
"undue hardship" arising from his practice. R. 120-3, at 23–25.

On January 17, 2018, Dr. Daghe held another meeting with
Kluge. According to Kluge's own account of the meeting:

> Daghe scheduled a meeting with me because he
> said he didn't think he was direct enough in our
> December 13 meeting. He told me in this meet-
> ing plainly that he really wanted to see me re-
> sign at the end of the school year. I told him that
> it was simply because he didn't like the tension
> and conflict. But I used examples in scripture to
> point to why this is a sign that I should stay. I

> referenced Acts 19:11-41 with Paul's conflict in
> Ephesus and 1 Corinthians 16:8-9 when Paul
> was encouraged by the opportunity, saying, "a
> wide door for effective service has opened to
> me, and there are many adversaries."

R. 15-3 at 5. Kluge also reported that Dr. Daghe asked him if
he was going to resign and offered to write him letters of rec-
ommendation. Kluge deferred the decision, saying he wanted
to wait until a January 22, 2018 faculty meeting when new
transgender policies would be announced. R. 15-3, at 5.

On January 22, 2018, Dr. Jessup presented the faculty with
a document titled "Transgender Questions." R. 15-4. The doc-
ument provided policies and guidance for faculty in a ques-
tion/answer format regarding issues relevant to transgender
students. Among the questions posed and answers given
were the following:

> **Are we allowed to use the student's last name
> only?** We have agreed to this for the 2017–2018
> school year, but moving forward it is our expec-
> tation the student will be called by the first
> name listed in PowerSchool.

> **How do teachers break from their personal bi-
> ases and beliefs so that we can best serve our
> students?** We know this is a difficult topic for
> some staff members, however, when you work
> in a public school, you sign up to follow the law
> and the policies/practices of that organization
> and that might mean following practices that
> are different than your beliefs.

SA-027

> **What feedback and information has been re-
> ceived from transgender students?** They ap-
> preciate teachers who are accepting and sup-
> porting of them. They feel dehumanized by
> teachers they perceive as not being accepting or
> who continue to use the wrong pronouns or
> names. Non-transgender students in class-
> rooms with transgender students have stated
> they feel uncomfortable in classrooms where
> teachers are not accepting. For example, teach-
> ers that call students by their last name, don't
> use correct pronouns, don't speak to the student
> or acknowledge them, etc.

R. 15-4, at 9–10.

After this faculty meeting, on February 4, 2018, Kluge sent
an email to Drs. Snapp and Daghe quoting the language in the
Transgender Questions document regarding the prohibition
on the use of last names only. R. 120-16; R. 15-3, at 5. He noted
that his agreement with the school was not limited to the
2017–2018 academic year, and asked if he would be allowed
to use last names only going forward. R. 120-16. In response,
Gordon and Dr. Daghe scheduled a meeting with Kluge for
February 6, 2018. R. 15-3, at 6. Kluge secretly recorded the
meeting, and the transcript appears in the record. R. 112-4, at
20–55; R. 120-3, at 25. Gordon and Dr. Daghe informed Kluge
that, after the 2017–2018 school year, all teachers would be re-
quired to address students by the first name recorded in Pow-
erSchool. R. 15-3, at 6; R. 112-4, at 24. Kluge again explained
that his objection to using the PowerSchool names for
transgender students was religious and that he felt this was a

reasonable accommodation. R. 112-4, at 25–32. Gordon and
Dr. Daghe disagreed with him, explaining that he worked in
a public school and that the last-names-only practice was not
reasonable because it was "detrimental to kids." R. 112-4, at
25–28. Kluge said he felt that using the names in PowerSchool
forced him to "encourage" students "in a path that's going to
lead to destruction, to hell, I can't as a Christian be encourag-
ing students to hell." R. 112-4, at 28. He cited a study from a
doctor at Johns Hopkins that likened transgenderism to ano-
rexia. R. 112-4, at 30. Dr. Daghe and Gordon explained to him
that there were doctors on the other side of the issue and that
the administrators had conducted their own extensive re-
search in how to address the issue. R. 112-4, at 30. They held
firm on the school's Name Policy, and the conversation
turned to Kluge's resignation/termination. R. 112-4, at 32.
Gordon explained that some teachers were sensitive about let-
ting colleagues and students know that they were leaving,
and she therefore honored requests to not communicate or
process retirements or resignations until the school year con-
cluded. R. 112-4, at 35–37. She discussed the timing of his de-
parture from the school, explaining that because his position
was difficult to fill, the school would need to begin the search
as soon as possible. R. 112-4, at 35–37. Kluge interpreted this
offer as allowing him to submit a conditional resignation that
he could withdraw before some agreed date. R. 15-3, at 6;
R. 120-3, at 26. Gordon believed she was offering only to delay
notifying anyone of the resignation, not that the resignation
could be withdrawn. R. 120-17, at 2; R. 112-4, at 11–12. In fact,
Indiana law and the school's bylaws do not permit the with-
drawal of a resignation once it has been properly submitted

to the Superintendent, and Gordon was the Superintendent's agent for this purpose. R. 112-4, at 11–12; R. 120-8; R. 120-9.

Gordon met with Kluge again in March 2018 to set a date for his decision. She reiterated that Kluge had three options: comply with the Name Policy; resign; or be terminated. She explained that if he would not comply and did not resign by May 1, 2018, the termination process would begin on that date. R. 15-3, at 6; R. 113-2, at 6.

On April 30, 2018, Kluge submitted his resignation by email. R. 120-17, at 2. In the email, he said he would resign as of early August 2018 when his contract for the academic year finished. He explained that he was resigning because the school required teachers to call transgender students by a name that "encourages the destructive lifestyle and psycho-logical disorder known as gender dysphoria." R. 120-17, at 2. He noted that the school was withdrawing the last-names-only accommodation that allowed him to remain "neutral" on the issue. He was resigning because his Christian conscience "does not allow [him] to call transgender students by their 'preferred' name and pronoun," and the school had directed him to either resign by May 1, or he would be terminated. He concluded:

> Please do not process this letter nor notify any-one, including any administration, about its contents before May 29, 2018. Please email me to acknowledge that you have received this message and that you will grant this request.

R. 120-17, at 2. Gordon replied the same day, telling Kluge, "I will honor your request and not process this letter or share

No. 21-2475                                              29

with BHC administration until May 29." R. 15-2; R. 120-17, at 2.

In May 2018, as part of the curriculum, Kluge participated in an orchestra awards ceremony. R. 120-3, at 32–33. At the ceremony, he addressed the students, including the transgender students, by their first and last names as they appeared in PowerSchool. R. 120-3, at 33; R. 58-1, at 4. Kluge explained that he did this because "it would have been unreasonable and conspicuous to address students in such an informal manner at such a formal event as opposed to the classroom setting where teachers refer to students by last names as a normal form of address." R. 120-3, at 33. In his deposition, Kluge also affirmed the account that his lawyer gave to the EEOC in explaining the exception he made at this event, asserting that he did not wish to "bring into doubt my stated rationale for usage of last names only." R. 120-3, at 32–33; R. 120-19, at 7. Kluge confirmed that his lawyer's statement was an accurate account of what transpired at the orchestra award ceremony, and he adopted some of his lawyer's language as his own statement. R. 120-3, at 32–33. His attorney's statement to the EEOC explained:

> During classes, Kluge addressed students by last names, as a reasonable accommodation for his sincerely held Christian beliefs. But during the orchestra awards ceremony, because of its formal nature, he used the full names for students listed in PowerSchool to address all students as they were receiving their awards—including transgender students—because he was trying to work with the school in only

> requesting what was reasonable. Kluge thought
> it unreasonable and conspicuous to address stu-
> dents in such an informal manner at such a for-
> mal event, as opposed to the classroom setting
> where teachers refer to students by last names
> as a normal form of address. Kluge's Christian
> faith required that he do no harm to his stu-
> dents, and this acquiescence to the administra-
> tion's position was done solely out of sincerely-
> held beliefs, and not in agreement with the pol-
> icy.

R. 120-19, at 7 (Letter of Michael J. Cork, Esq. to David A. Tite, EEOC Investigator). Thus Kluge acknowledged that using last names only in some settings would be unreasonable, con-spicuous, and potentially cause harm to his students contrary to the requirements of his Christian faith.[10] He therefore de-cided to use first and last names, and in keeping with the ac-commodation, he used the first names from PowerSchool ra-ther than the students' former first names.[11] Kluge conceded that a school has an interest in being concerned with the men-tal health of its students. R. 120-3, at 35.

---

[10]    The dissent contends that we are "constru[ing] this statement as a legal concession" that Kluge's practice would potentially harm his stu-dents. No construing is necessary; the statement speaks for itself.

[11]    Brownsburg contends that Kluge's use of the PowerSchool names at this ceremony calls into question the sincerity of his asserted religious beliefs. Because we resolve the case in favor of Brownsburg, we need not address the sincerity of Kluge's beliefs, and we assume his sincerity for summary judgment purposes.

Kluge scheduled a meeting with Dr. Daghe and Gordon on May 25, 2018, at the Brownsburg Central Office. R. 15-3, at 1. When Kluge arrived for the meeting, Gordon was not present, and Dr. Daghe told Kluge, "We have everything we need. We don't need to meet. Go back to the high school." Dr. Daghe also told Kluge not to meet with Gordon that day. R. 15-3, at 1. Kluge instead delivered a letter to Gordon's office, explaining that he had wanted to meet in order to present a written "Withdrawal of Intention to Resign and Request for Continuation of Accom[m]odation." R. 15-3. A few hours later, Brownsburg locked Kluge out of school buildings and online services, and posted his job as vacant. R. 113-2, at 7; R. 120-3, at 29.

At the June 11, 2018 school board meeting where resignations were considered, Kluge was denied a request to speak during the regular part of the meeting, but gave a brief statement during the public-comment section of the meeting. R. 120-3, at 29; R. 120-18, at 10. He explained what had happened, and asked the board to allow him to withdraw his resignation and to reinstate him. R. 120-3, at 29–30; R. 120-18, at 10. The board instead accepted his resignation without comment. R. 113-2, at 7; R. 120-3, at 30; R. 120-18, at 2.

Kluge sued the school, bringing claims under Title VII for religious discrimination/failure to accommodate; retaliation; and hostile work environment. He also brought claims under the First and Fourteenth Amendments and Indiana law. The district court dismissed the claims under the First and Fourteenth Amendments as well as the state law claims, and the Title VII claim for hostile work environment. Kluge does not appeal those dismissals. Kluge's claim for religious

discrimination/failure to accommodate (for the sake of sim-
plicity, we will call this the discrimination claim) and his re-
taliation claim proceeded to discovery. Ultimately, Kluge
filed a motion for partial summary judgment on his discrimi-
nation claim, and the school countered with a cross-motion
for summary judgment on both of the remaining claims.

The district court denied Kluge's motion, and granted
Brownsburg's cross-motion. On the discrimination claim, the
court framed the ultimate issue as "whether, assuming perfect
compliance with the last names only accommodation, that ac-
commodation resulted in undue hardship to" Brownsburg.
*Kluge v. Brownsburg Cmty. Sch. Corp.*, 548 F. Supp. 3d 814, 839
(S.D. Ind. 2021). For summary judgment purposes, the court
treated Kluge's forced resignation as an adverse employment
action. The court also accepted that his religious beliefs and
objections to using the PowerSchool names and pronouns of
transgender students were sincerely held. After finding that
there was an objective conflict between Kluge's sincerely held
religious beliefs and Brownsburg's policies for transgender
students, the court concluded that Kluge's refusal to follow
those policies created an undue hardship on Brownsburg's
mission of educating all of its students. In particular, the court
found that the last-names-only accommodation burdened
Brownsburg's ability to provide an education for all students
and conflicted with the school's philosophy of creating a safe
and supportive environment for all students. In finding that
the accommodation created an undue burden, the court relied
on the reports of Aidyn and Sam as well as those of other stu-
dents and teachers. Aidyn and Sam reported feeling targeted
and uncomfortable, and Aidyn grew to dread going to

Kluge's orchestra class, ultimately quitting orchestra entirely. Other students and teachers complained that Kluge's practice was offensive or insulting and made his classroom environment unwelcome and uncomfortable. The court found that Brownsburg was not required to allow an accommodation that unduly burdened its business of educating all students in a supportive manner. The court found an additional undue burden in that the accommodation opened the school up to the threat of Title IX discrimination lawsuits that could be brought by transgender students who felt targeted and dehumanized by Kluge's practice. The court concluded that Brownsburg had demonstrated as a matter of law that it could not accommodate Kluge's "religious belief against referring to transgender students using their preferred names and pronouns without incurring undue hardship." *Kluge*, 548 F. Supp. 3d at 846.

As for Kluge's retaliation claim, the court found that Kluge's briefing on the matter had been meager, and that he had simply recited his version of the facts without discussing how those facts meet the requirements of a retaliation claim. The court also noted that Kluge failed to address Brownsburg's argument that there is no evidence in the record from which a reasonable fact finder could infer that its non-discriminatory explanation for its action was a pretext for religious discrimination. Without any explanation of his theory of retaliation and without any evidence demonstrating pretext, the court found that Kluge had waived his claim for retaliation. As an alternate basis for granting judgment in favor of the defendant, the court also noted that Kluge failed to present any evidence from which a reasonable fact finder could

conclude that a causal connection exists between Kluge's pro-
tected activity and his resignation, any evidence of pretext, or
any evidence that Brownsburg's action was motivated by dis-
criminatory animus. The court therefore granted summary
judgment in favor of the school on the retaliation claim as
well. Kluge appeals.

## II.

On appeal, Kluge asks the court to reverse the grant of
summary judgment in favor of Brownsburg on both of his
claims. For the discrimination claim, he asks that we remand
to the district court in order to enter summary judgment in
his favor because Brownsburg withdrew a reasonable accom-
modation and forced him to resign without demonstrating
that the accommodation caused undue hardship.[12] Kluge also

---

[12]    Kluge appeals both the grant of summary judgment in favor of
Brownsburg and the denial of summary judgment in his favor. Specifi-
cally, he asks that we reverse and remand for judgment to be entered in
his favor as a matter of law. When the district court considers cross-mo-
tions for summary judgment, granting one and denying the other, the de-
nial of summary judgment "has merged into the final judgment and is
therefore appealable" as part of the appeal from the final judgment grant-
ing the opposing party's motion. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d
456, 461 (7th Cir. 1997). In order to consider Kluge's request that we re-
verse the denial of summary judgment in his favor, we would be required
to review the facts in the light most favorable to the defendant, Browns-
burg, and draw all reasonable inferences in favor of the school. *See Hess v.
Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005) ("With cross-
motions, our review of the record requires that we construe all inferences
in favor of the party against whom the motion under consideration is
made."). As is apparent from our recitation of the undisputed facts, such
a review would demonstrate that Kluge is not entitled to judgment as a
(continued)

urges this court to find that he preserved his retaliation claim and presented sufficient evidence in support of that claim to merit summary judgment in his favor; in the alternative, he seeks a trial on the retaliation claim. Brownsburg asks the court to affirm the district court's judgment in all respects. We review the district court's grant of summary judgment *de novo*, and we examine the record in the light most favorable to the party opposing judgment, in this case Kluge, construing all reasonable inferences from the evidence in his favor. *Anderson*, 477 U.S. at 255; *Horne v. Electric Eel Mfg. Co.*, 987 F.3d 704, 713 (7th Cir. 2021). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 247–48; *Horne*, 987 F.3d at 713. "[S]ince the review of summary judgment is plenary, errors of analysis by the district court are immaterial; we ask whether we would have granted summary judgment on this record." *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 386 (7th Cir. 2000). *See also Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir. 1993) ("The question whether a movant is entitled to summary judgment is one of law—one therefore that we review *de novo*, which is to say without deference for the

---

matter of law: the school asserts with copious evidence from students, faculty and administrators that Kluge sometimes failed to follow the accommodation (a failure which he conceded through his lawyer during proceedings before the EEOC), treated transgender students differently than non-transgender students, and created what can be described at best as a difficult learning environment for the students in his class. He also alienated his colleagues in the Arts Department and offended parents. Construing the record in favor of Brownsburg, Kluge is not entitled to judgment. In considering Kluge's appeal of the grant of summary judgment in favor of Brownsburg, we must construe the record in Kluge's favor.

No. 21-2475

view of the district judge and hence almost as if the motion had been made to us directly.").

## A.

Title VII provides, in relevant part, that "It shall be an un-lawful employment practice for an employer—(1) to fail or re-fuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his com-pensation, terms, conditions, or privileges of employment, be-cause of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). After that provision was enacted, the EEOC issued a guideline that required "that an employer, short of 'undue hardship,' make 'reasonable ac-commodations' to the religious needs of its employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 66 (1977); 29 C.F.R. § 1605.1(b) (1968). Congress later codified that "reasonable ac-commodation" regulation in its definition of the term "reli-gion":

> The term "religion" includes all aspects of reli-gious observance and practice, as well as belief, unless an employer demonstrates that he is un-able to reasonably accommodate to an em-ployee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j). The Supreme Court said that "[t]he intent and effect of this definition was to make it an unlawful em-ployment practice under [sec. 2000e-2(a)(1)] for an employer not to make reasonable accommodations, short of undue

hardship, for the religious practices of his employees and pro-spective employees." *Hardison*, 432 U.S. at 74.

The statute did not, however, provide guidance for deter-mining the degree of accommodation required of an em-ployer, and legislative history was not illuminating. *Hardison*, 432 U.S. at 74–75. In *Hardison*, the Supreme Court set out to determine the reach of the employer's statutory obligation to make reasonable accommodation for the religious obser-vances of its employees, which had not previously been spelled out by Congress or by EEOC guidelines. 432 U.S. at 75. The plaintiff, Hardison, worked at Trans World Airlines ("TWA") in an airplane maintenance department that oper-ated twenty-four hours a day, every day of the year. All em-ployees of the department were subject to the terms of a col-lective bargaining agreement that had a system of bidding for shift assignments based on seniority. Early in his employment at TWA, Hardison began following a religion that required its members to refrain from work from sunset on Friday until sunset on Saturday. But Hardison lacked the seniority to bid for a schedule that accommodated his religious beliefs and the union was unwilling to allow him to bypass the seniority sys-tem. TWA considered other possible solutions, but each had a cost to the employer such as breaching the seniority system, paying premium wages to hire someone to cover the Saturday shift, or leaving the shift uncovered. The company met sev-eral times with Hardison in attempts to find a solution, au-thorized the union steward to search for someone who would voluntarily swap shifts, and attempted without success to find Hardison another job within the company. TWA

eventually discharged Hardison on grounds of insubordination for refusing to work his assigned shift.

In a bench trial, the district court entered judgment in favor of TWA after concluding that the proposed accommodations presented an undue hardship for the company. The court of appeals reversed and found in favor of Hardison, concluding that TWA could have: (1) given Hardison a four-day work-week and used a supervisor or other worker to cover the fifth day; (2) filled Hardison's shift with another employee; or (3) arranged a swap between Hardison and another employee for shifts in the sundown Friday to sundown Saturday period. The Supreme Court rejected all of these options because each would have created "undue hardship" under the statute. In particular, the first option would have caused other shop functions to suffer; the second would have required the company to offer premium overtime pay to the substitute employee; and the third would have violated the seniority system. *Hardison*, 432 U.S. at 77–84.

In considering the "undue hardship" language of the statute, the Court decided that the duty to accommodate did not require a company to take steps inconsistent with a valid collective bargaining agreement or seniority system, noting:

> Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities. … Indeed, the foundation of

SA-040

> Hardison's claim is that TWA and IAM engaged in religious discrimination in violation of [sec. 2000e-2(a)(1)] when they failed to arrange for him to have Saturdays off. It would be anomalous to conclude that by "reasonable accommodation" Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.

*Hardison*, 432 U.S. at 81. The Court relied in part on the statutory preference given to *bona fide* seniority systems, noting that, under section 2000e-2(h), "absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." 432 U.S. at 82.

The Court then considered the other options open to TWA to accommodate Hardison's religious practice, such as replacing Hardison on those shifts with supervisory personnel or personnel from other departments, or replacing him with other available workers by paying premium overtime wages. Both alternatives, the Court noted, involved costs to the company, "either in the form of lost efficiency in other jobs or higher wages." 432 U.S. at 84. The Court found that the employer was not required by the statute to incur either cost, instead holding that, "To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship." 432 U.S. at 84.

> Like abandonment of the seniority system, to re-
> quire TWA to bear additional costs when no
> such costs are incurred to give other employees
> the days off that they want would involve une-
> qual treatment of employees on the basis of
> their religion. By suggesting that TWA should
> incur certain costs in order to give Hardison Sat-
> urdays off the Court of Appeals would in effect
> require TWA to finance an additional Saturday
> off and then to choose the employee who will
> enjoy it on the basis of his religious beliefs.
> While incurring extra costs to secure a replace-
> ment for Hardison might remove the necessity
> of compelling another employee to work invol-
> untarily in Hardison's place, it would not
> change the fact that the privilege of having Sat-
> urdays off would be allocated according to reli-
> gious beliefs.
>
> As we have seen, the paramount concern of
> Congress in enacting Title VII was the elimina-
> tion of discrimination in employment. In the ab-
> sence of clear statutory language or legislative
> history to the contrary, we will not readily con-
> strue the statute to require an employer to dis-
> criminate against some employees in order to
> enable others to observe their Sabbath.

*Hardison*, 432 U.S. at 84–85.

The Supreme Court subsequently spoke on reasonable ac-
commodations for religious practice in the employment

context only two other times. In *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986), the Court clarified that "where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship." The Court thus rejected the claim that the accommodation obligation includes a duty to accept the proposal the employee prefers unless that accommodation causes undue hardship on the employer's conduct of his business. 479 U.S. at 68. Instead, in situations where multiple accommodations are possible, the Court held that an employer has met its statutory obligation "when it demonstrates that it has offered a reasonable accommodation to the employee." 479 U.S. at 69.

In the Court's last and most recent foray into the reasonable accommodation provision of Title VII, the Court considered a case where an employer declined to hire a woman for a sales position in a clothing store because she wore a head scarf, which would violate the store's "Look Policy" that governed employees' dress. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015). At the time the store made the decision, the assistant manager who interviewed the woman found her otherwise qualified to be hired but was concerned that the scarf violated the Look Policy's prohibition on caps. The assistant manager sought guidance from a district manager, informing him that she believed that the prospective employee wore the scarf for religious reasons. The district manager directed the assistant manager not to hire the woman because the scarf would violate the Look Policy as would all other headwear, whether religious or otherwise.

The prospective employee prevailed on a Title VII reasonable accommodation claim in the district court, but the court of appeals reversed, finding that an employer cannot be liable for failing to accommodate a religious practice until the applicant or employee provides the employer with actual knowledge of the need for an accommodation.

The Supreme Court noted that the statute prohibits employers from failing to hire an applicant "because of" her religious practice. The term "because of" imports at a minimum the "but-for" standard of causation. *Abercrombie*, 575 U.S. at 772. Title VII relaxes that standard by providing that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added); *Abercrombie*, 575 U.S. at 773. The statute also does not impose a knowledge requirement, but instead "prohibits certain *motives*, regardless of the state of the actor's knowledge." *Abercrombie* 575 U.S. at 773. Thus:

> An employer who has actual knowledge of the need for an accommodation does not violate Title VII by refusing to hire an applicant if avoiding that accommodation is not his *motive*. Conversely, an employer who acts with the motive of avoiding accommodation may violate Title VII even if he has no more than an unsubstantiated suspicion that accommodation would be needed. … An employer may not make an

applicant's religious practice, confirmed or oth-
erwise, a factor in employment decisions.

*Abercrombie*, 575 U.S. at 773. Finally, the Court rejected the
premise that a neutral employment policy cannot constitute
intentional discrimination, finding:

> Title VII does not demand mere neutrality with
> regard to religious practices—that they be
> treated no worse than other practices. Rather, it
> gives them favored treatment, affirmatively ob-
> ligating employers not "to fail or refuse to hire
> or discharge any individual ... because of such
> individual's" "religious observance and prac-
> tice." An employer is surely entitled to have, for
> example, a no-headwear policy as an ordinary
> matter. But when an applicant requires an ac-
> commodation as an "aspec[t] of religious ...
> practice," it is no response that the subsequent
> "fail[ure] ... to hire" was due to an otherwise-
> neutral policy. Title VII requires otherwise-neu-
> tral policies to give way to the need for an ac-
> commodation.

*Abercrombie*, 575 U.S. at 775.

The Supreme Court did not address the undue hardship
standard in *Philbrook* or *Abercrombie*, leaving in place the
standard it set in *Hardison*, namely, that the employer need
not "bear more than a *de minimis* cost" in making an accom-
modation. *See also E.E.O.C. v. Walmart Stores East, L.P.*, 992
F.3d 656, 658 (7th Cir. 2021) (describing *Hardison*'s *de minimis*
cost as a "slight burden" to avoid the Latin). Our court

established a burden-shifting framework for proof of a Title VII claim for failure to accommodate religion in *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569 (7th Cir. 1997), which must be modified slightly to account for the Supreme Court's opinion in *Abercrombie*. To make out a *prima facie* case, an employee must demonstrate that: (1) an observance or practice that is religious in nature, and (2) that is based on a sincerely held religious belief, (3) conflicted with an employment requirement, and (4) the religious observance or practice was the basis or a motivating factor for the employee's discharge or other discriminatory treatment. *Abercrombie*, 575 U.S. at 772-73; *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013); *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012); *Ilona of Hungary*, 108 F.3d at 1575. "If the employee shows these elements, the burden then shifts to the employer to show that it could not accommodate the employee's religious belief or practice without causing the employer undue hardship." *Adeyeye*, 721 F.3d at 449; *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir. 1986).

The district court determined that Kluge established a *prima facie* case of failure to accommodate a religious practice. The court noted that there were issues of fact as to whether Kluge's religious beliefs were sincerely held, but taking the record in the light most favorable to Kluge for the purposes of summary judgment, there was enough evidence that his refusal to use the preferred names and pronouns of the transgender students was a religious practice based on a

sincerely held belief.[13] Kluge also presented adequate evidence that his practice conflicted with an employment requirement, in particular, the PowerSchool Name Policy. Brownsburg does not dispute that forcing Kluge to either comply with the Name Policy, resign, or be terminated was an adverse employment action, and the school generally concedes that, for the purposes of this appeal, Kluge has established a *prima facie* case of failure to accommodate.

## B.

The burden then shifts to Brownsburg to demonstrate that it could not reasonably accommodate Kluge "without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). "Reasonableness is assessed in context, of course, and this evaluation will turn in part on whether or not the employer can in fact continue to function absent undue hardship if the employee is permitted" the requested accommodation. *Adeyeye*, 721 F.3d at 455. Accordingly, "[t]he issue of undue hardship will depend on close attention to the specific circumstances of the job[.]" *Id*. As a public school, Brownsburg's "business" is its constitutional and statutory charge to educate all students who enter its doors. We have noted that, "pupils are a captive audience. Education is

---

[13]         In his response opposing a motion for leave to file an *amicus* brief in the district court, Kluge described his sincerely held religious belief as "what is best for the eternal *spiritual* well-being of [the transgender students] is to avoid affirming them in a moral error." R. 145, at 7. As we mentioned earlier, Kluge also believed that it would be sinful for him to "promote gender dysphoria" by using the transgender student's PowerSchool names and pronouns. R. 120-3, at 6–10.

compulsory, and children must attend public schools unless their parents are willing to incur the cost of private education or the considerable time commitment of home schooling." *Mayer v. Monroe Cty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007). Because of the compulsory nature of education, we have noted in the First Amendment context:

> Children who attend school because they must ought not to be subject to teachers' idiosyncratic perspectives. Majority rule about what subjects and viewpoints will be expressed in the classroom has the potential to turn into indoctrination; elected school boards are tempted to support majority positions about religious or patriotic subjects especially. But if indoctrination is likely, the power should be reposed in someone the people can vote out of office, rather than tenured teachers. At least the board's views can be debated openly, and the people may choose to elect persons committed to neutrality on contentious issues. … The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials.

474 F.3d at 479–80.[14]

---

[14]    The dissent asserts that under the Indiana Constitution, schools need only admit all children, and that the Constitution does not require or prescribe any specific standard of educational quality. The dissent also cites Indiana case law interpreting the State's education statutes as not requiring "that Indiana school corporations affirm transgender identity."

(continued)

No. 21-2475                                                              47

Brownsburg claims two undue hardships with Kluge's use of students' last names only: first, the school asserts that Kluge's last-names-only practice frustrated its efforts to educate all students because the accommodation negatively impacted students and the learning environment for transgender students and other students as well. Second, Kluge's practice exposed Brownsburg to the risk of Title IX litigation brought by transgender students who claim sex-based discrimination based upon a theory of sex-stereotyping. *See Whitaker*, 858 F.3d at 1047–48.

### 1.

We begin with Brownsburg's claim that the last-names-only practice frustrated the school's effort to educate all students by harming students and negatively affecting student learning. As we discuss below, the only relevant question at this point is whether the school could accommodate Kluge without working an undue hardship on the conduct of its business. We conclude that the undisputed evidence demonstrates that Brownsburg met its burden of establishing undue

---

But Brownsburg never made any claims that the State's Constitution or statutes required it to affirm transgender identity. The school instead consistently relied on its own policy choices about how to run its high school, and how to address the specific challenges faced by a particular group of students. We have cited to the State's Constitution and educational statutes only to provide context and to explain the differences between running schools and managing other kinds of businesses. In addition to the compulsory nature of education, the school stands in for parents and deals with the needs not of adult customers or coworkers (the categories into which the dissent attempts to shoehorn the analysis) but of children.

hardship as a matter of law, and none of the additional evidence cited by the dissent calls that conclusion into question.

It is undisputed that, prior to the start of the 2017–2018 school year, Brownsburg recognized an increase in enrollment of transgender students, and concluded that these students faced "significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying." R. 120-1, at 3. It is also undisputed that Brownsburg administrators determined that "these challenges threaten transgender students' classroom experience, academic performance, and overall well-being." R. 120-1, at 3. They therefore began to develop policies and practices for addressing these challenges.

As Dr. Jessup averred, a "very practical but critical question that arose … is what names staff should use to address transgender students in class." R. 120-1, at 3. Obviously, "a high school classroom cannot function without teachers addressing students directly." R. 120-1, at 3. Brownsburg ultimately adopted the PowerSchool Name Policy as part of its larger plan to address the special needs of these students. The goal of the Name Policy was two-fold: to provide the faculty with a straightforward rule when addressing students; and to afford dignity and empathy towards transgender students because the administration considered it important "for transgender students to receive, like any other student, respect and affirmation of their preferred identity[.]" R. 120-1, at 4. The requirement that students could change their names and pronouns in PowerSchool only with the consent of a parent and the approval of a healthcare professional allayed the religious objections and concerns of three of the four teachers

who signed the seven-page letter and accompanied Kluge to the May 15, 2017 meeting with Dr. Daghe. Kluge alone continued to object. In response to Kluge's continued concerns, the school agreed to allow Kluge two accommodations: first, he would address all students by their last names only; and second, another adult would hand out gendered orchestra uniforms, relieving Kluge of that duty.

The school produced copious evidence that, once these accommodations were in place, Dr. Daghe, teacher Craig Lee, and Dr. Jessup soon began to receive reports and complaints about the harms caused by Kluge's last-names-only practice. In particular, Dr. Daghe received reports that transgender students in Kluge's class felt insulted and disrespected by Kluge's use of last names only. They also felt isolated and targeted. A non-transgender student in Kluge's class reported to Lee that the practice was "incredibly awkward." That student reported that the practice made the transgender students stand out, and that he and others in the school felt bad for the transgender students. Dr. Daghe also received reports that transgender students in Kluge's class felt dehumanized by the last-names-only practice, and Dr. Daghe concluded that the practice was "detrimental to kids."

Dr. Jessup personally attended an Equality Alliance meeting and heard complaints about Kluge's practice from four or five students at the meeting, complaints with which the other thirty-five students in attendance appeared to agree. Dr. Jessup heard from students and faculty that students felt singled out by the use of their last names, and that "not all students were called by their last name by Mr. Kluge." R. 120-6, at 7; R. 120-1, at 4.

Dr. Daghe also received reports that Kluge sometimes slipped up and used first names or gendered honorifics for non-transgender students. Although we credit Kluge's denial that he ever made such mistakes, Kluge has no evidence contradicting assertions by Drs. Daghe and Jessup that they received such reports and needed to address them. As Dr. Daghe testified, Kluge's practice also disrupted the learning environment more broadly because students who were uncomfortable in Kluge's classes brought their "discussions about the uncomfortableness, whether it was dealing with a transgender student and last names only or whether it was times when last names weren't used," to other classrooms.

Lee heard complaints about Kluge's practice from students regularly at Equality Alliance meetings, and personally witnessed the emotional pain suffered by the transgender students when they discussed the environment in Kluge's class. Other faculty in Kluge's own department reported tension among students and faculty created by Kluge's last-names-only practice.

All of this was reported to Kluge, mainly by Dr. Daghe, as Kluge himself acknowledged. *See* R. 15-3, at 3–6; R. 112-2, at 4; R. 112-5, at 7. *See also* R. 120-5, at 9 (where Dr. Daghe testified that he talked to Kluge about the transgender students but also about the entire class of students, "about the uncomfortableness of adults in my building around him with similar students in theater, in band, in choir, and orchestra that those teachers share and it was a concern that kids didn't know how to behave, didn't know how to address. And that was the temperament or the way I was addressing the meetings ahead of time and saying can you follow this second accommodation

because we're going to be changing that, as he heard in January, for the following year and I needed this to move forward as a high school principal in a way that he would follow the accommodations and that my conversation with him was not happening the way it was written."). In describing the January 17, 2018 meeting where Dr. Daghe told Kluge that he should resign at the end of the school year, Kluge told Dr. Daghe that "it was simply because he [Dr. Daghe] didn't like the tension and the conflict." R. 15-3, at 5. Kluge interpreted the tension and conflict that he had caused as a scriptural sign that he should stay at the school. R. 15-3, at 5.

Kluge has produced no evidence to the contrary. That is, he has produced no evidence tending to show that the transgender students were not emotionally harmed by his practice or that the learning environment was not disrupted. A practice that indisputably caused emotional harm to students and disruptions to the learning environment is an undue hardship to a school as a matter of law. As Kluge himself conceded, schools have a legitimate interest in the mental health of their students. R. 120-3, at 35. And as Dr. Daghe explained, his job as principal was to "make sure that education can move forward." R. 112-5, at 7. Education is, indeed, the business of every school. Thus, emotional harm to students and disruptions to the learning environment are objectively more than *de minimis* or slight burdens to schools.

Nor did Kluge produce any evidence that Dr. Daghe, Dr. Jessup, and Lee[15] all lied about receiving these reports and

---

[15]    The dissent points out that Lee described himself as "very biased" on the subject of how the school should handle issues related to
(continued)

SA-053

lied about feeling a need to act on them in order to address the needs of transgender students and the tense educational environment. At most Kluge claims that he did not believe Dr. Daghe on occasion because Dr. Daghe did not give him the names of the students who reported that they were harmed by Kluge's use of last names only. But Kluge's metaphysical doubt about Dr. Daghe's credibility does not create a genuine issue of material fact. "[N]othing requires the district court to disbelieve defendants' proffered evidence simply because [the plaintiff]—without proof—asserts it is false." *Carroll v. Lynch*, 698 F.3d 561, 565 (7th Cir. 2012). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *Barnes v. City of Centralia, IL*, 943 F.3d 826, 832 (7th Cir. 2019) (same). Instead, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita*, 475 U.S. at 587; Fed. R. Civ. P. 56(e). *See also Carroll*, 698 F.3d at 565 (plaintiff cannot rest on "metaphysical doubt" that defendant lied but must produce evidence so showing).

------

transgender students. To his credit, Lee candidly admitted that bias when he made his reports of harm and disruption to school administrators. Dr. Daghe and other administrators were thus aware of that bias when they were assessing the scope and severity of the problem. Although the dissent would have a jury reweigh whether the employer *should have* credited Lee's reports, that is not the relevant question, as we discuss below. *Infra*, at 53-55 (discussing undisputed evidence known to the school at the time of the decision).

Similarly, Kluge testified that he felt no tension from other teachers, was unaware of any problems in his classroom, and felt that his students were not adversely affected by his practice. Kluge believed that his students were performing well and not experiencing any problems. But summary judgment is not defeated by Kluge's perception that all was well. A failure to notice that anything problematic was happening is not evidence that it did not happen; nor is it evidence that Brownsburg did not receive reports from students, teachers, and others that it was happening. Moreover, in employment discrimination cases, the employee's "own opinion about his work performance is irrelevant." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 897 (7th Cir. 2015). *See also Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (a plaintiff's conclusory statements do not create an issue of fact, and an employee's self-serving statements about his ability are insufficient to contradict an employer's negative assessment of that ability). Indeed, Kluge himself acknowledged that using last names only in some settings would be unreasonable, conspicuous, and potentially cause harm to his students, which is why he used the PowerSchool Names at the orchestra award ceremony. Kluge also acknowledged creating tension and conflict at the school. To the extent that Kluge draws a theological distinction between regular use of the first names in a classroom setting versus using them on a one-time basis at a more formal award ceremony, Brownsburg was within its rights to consider the daily harm of the last names practice in the classroom paramount.

Moreover, the evidence that the dissent cites from three students and a contract teacher is not relevant to the question

presented here. First, that these three children and a contract teacher did not experience or notice harm or disruption does not rebut the truth of the reports of harm and disruption experienced by others. It was not necessary for the school to find that Kluge's practice harmed all of the students before the school was justified in addressing the situation.

Second, none of the information from these four affiants is relevant to the question of whether the decision-makers received reports of emotional harm and disruption to the learning environment from other students, teachers and parents. We cannot emphasize strongly enough that Kluge has produced no evidence suggesting that the reported emotional harms to students and disruptions to the learning environment did not occur or that the reports were not made.

Third, to the extent that the dissent relies on this evidence to demonstrate that Kluge complied perfectly with the accommodation, we have already credited his claim of perfect compliance. The reports of emotional harm and disruption came in nevertheless.

Fourth, none of the information from these three students and the contract teacher was known to school administrators at the time they were making the decision to withdraw the accommodation. The dissent contends that evidence from these students and the contract teacher is relevant "whether or not this information was known by the School District at the time of the adverse employment decision." It is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision. The dissent nevertheless poses the puzzling question, "If, by contextual

No. 21-2475                                                55

evidence obtained after discharge, an employee plaintiff is not able to undermine the alleged presence of undue hardship, when, if ever, can the employee prevail?" The answer is simple: by uncovering evidence that was before the employer at the time of the decision, evidence that would contradict the employer's claims that students were emotionally harmed and the learning environment was disrupted. If no one was harmed and there was no disruption, then the burden of allowing the accommodation would be *de minimis*. But in the absence of any evidence known to the employer contradicting the existence of the harms, there is nothing for a jury to decide. The evidence, of course, may be obtained after the discharge, but it must be evidence that the employer knew at the time of the decision to withdraw the accommodation. To suggest that the employer may be held liable for a decision to withdraw an accommodation based on information that did not exist at the time of the decision holds employers to an impossible "crystal ball" standard. The dissent asserts that applying a test that depends on the employer's knowledge would create a perverse incentive for employers to avoid investigating whether hardship would arise from an accommodation. But there is no claim of a faulty investigation here, and the employer actually granted the accommodation and then saw in real time the harms that resulted. If an employer conducted an inadequate investigation, that could be evidence that the withdrawal of the accommodation was based on some discriminatory reason rather than on the undue hardship, but that is simply not the case here.

The dissent would have a jury second guess whether the reported harms occurred and whether the employer received

those reports even in the absence of evidence to the contrary. In particular, the dissent would have a jury decide the credibility of the students who were emotionally harmed and the teachers who saw and reported disruptions to the learning environment when there is no evidence contradicting the reports of harm and educational disruption. Those assessments were for the school to make based on the information available to it at the time. The dissent would also have a jury second guess whether emotional harm to students (in this case, particularly vulnerable students) and disruptions to the learning environment were sufficient to overcome the *de minimis* undue hardship standard when Kluge himself conceded that the school had a legitimate interest in the mental health of its students, and even though learning is the primary purpose for the existence of the school. These harms were far more than a slight burden as a matter of law.

The dissent also contends that the transgender students were offended not because of any discomfort with the last-names practice itself but because of the students' "assumptions and intuitions about why Kluge was using only last names." The dissent maintains that "[t]he alleged offense arose from students' presumptions and guesses as to Kluge's motives for using last names only." There are two problems with this analysis. First, there is no dispute that the school received reports describing emotional harm to students and disruption to the learning environment, not mere offense. These were the very harms that the school sought to avoid when it developed the Name Policy.

Second, Kluge's motives for his practice are irrelevant to the Title VII analysis. The uncontested evidence demonstrates

that Kluge's *practice* caused the harms whether the students correctly understood his subjective *motives* or not. As we have discussed, the school was aware of the issues faced by this group of students and had identified the use of their PowerSchool names and pronouns as an important means of providing dignity, empathy, respect and affirmation for this group of children who faced significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying. Although some of the students appear to have inferred that Kluge's practice was due to the presence of transgender students at the school, the students had no information regarding why Kluge would not use the students' PowerSchool names and pronouns. Whether his motive was religious, ideological, grammatical or otherwise was irrelevant because it was the *practice*, not the unknown *motive* that caused the reported harms. The school stretched to accommodate Kluge with a facially neutral accommodation of using last names only; nonetheless, the undisputed evidence showed that the practice resulted in genuine harm to students and real disruption to the learning environment.

Moreover, Kluge's practice was contrary to the preference of not only the school and the students, but also the students' parents and healthcare providers, who had decided that it was in the best interest of these children to be addressed in a particular manner, with their PowerSchool names and pronouns. Brownsburg's "business" for the purpose of analyzing undue hardship was to provide public education. Unlike a for-profit corporation, Brownsburg's mission of education for all students was mandated by the State's constitution and

legislature. In Indiana, public schools play a custodial and protective role in the compulsory education system, and public schools stand in the relation of parents and guardians to the students regarding all matters of discipline and conduct of students. *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002). After conducting its own research, the school reasonably deferred to the judgment of parents and healthcare providers regarding how to meet the specific needs of transgender students.

Although with corporate defendants, our cases analyze undue hardship by considering financial costs and business interests, the school's "business" here is more analogous to that of the Veterans Administration ("V.A.") in *Baz*. In that case, the V.A. hired a chaplain in a hospital where approximately two thirds of the patients were psychiatric patients. The V.A. saw the position of chaplain as a secular one where proselytizing was prohibited and chaplains were expected to serve as a "quiescent, passive listener and cautious counselor," as part of the hospital's philosophy of total patient care. Baz instead "saw himself as an active, evangelistic, charismatic preacher," and acted accordingly. 782 F.2d at 703–04. When he refused to change his approach, the hospital terminated his employment. After a bench trial, the district court ruled in favor of the hospital.

On appeal, Baz argued that the hospital had failed to prove that the health and welfare of the patients were harmed by his evangelism. We noted that he was confusing "the business necessity defense to a disparate impact cause of action with the 'undue hardship' standard used to measure an employer's duty to accommodate to an employee's religious

observances in a disparate treatment claim of religious discrimination." 782 F.2d at 706. The latter type of case, the same one that Kluge brings here, requires the defendant to provide "evidence to show that accommodation would create a hardship on his business. This hardship has been construed as anything more than a *de minimis* cost to the employer." *Id*. (citing *Hardison*, 432 U.S. at 84).

> The defendants are not required to show that their philosophy of total patient care is objectively better than that espoused by Reverend Baz; they need only show that it would be a hardship to accommodate his theology in view of their established theory and practice.

> The defendants here have met this burden. They have produced evidence tending to show that Reverend Baz's philosophy of the care of psychiatric patients is antithetical to that of the V.A. To accommodate Reverend Baz's religious practices, they would have to either adopt his philosophy of patient care, expend resources on continually checking up on what Reverend Baz was doing or stand by while he practices his (in their view, damaging) ministry in their facility. None of these is an accommodation required by Title VII.

*Baz*, 782 F.2d at 706–07.

Kluge makes a similar mistake of law here. Brownsburg need not show that its philosophy of treating transgender students "like any other student, [with] respect and affirmation

of their preferred identity" was better than that espoused by Kluge. They needed only to show "that it would be a hardship to accommodate his theology in view of their established theory and practice." *Baz*, 782 F.2d at 706. Brownsburg met this burden by producing evidence tending to show that Kluge's last-names-only practice was "antithetical to that of the" school. 782 F.2d at 706–07. It is no answer that Kluge called all students by their last names and was trying to be neutral on the issue of transgenderism. The last-names-only practice conflicted with the school's philosophy of affirming and respecting all students because the undisputed evidence showed that the accommodation resulted in students feeling disrespected, targeted, and dehumanized, and in disruptions to the learning environment. Title VII does not require the school to adopt an accommodation that, although facially neutral, does not work that way in practice. Brownsburg allowed Kluge to employ the practice for an entire school year, counseling him along the way about the problems he was creating and encouraging him to either follow the practice that every other teacher in the school followed or leave his job because he was harming students and the educational environment by failing to follow the school's philosophy of respect and affirmation for all students. Title VII does not require an employer to retain an employee who harms the employer's mission. *Baz*, 782 F.2d at 706–07.

Nor was any other reasonable accommodation available. Kluge was the school's only music teacher, and so students could not, for example, be transferred to another classroom (if we assume that transfer to another classroom would not be equally stigmatizing). There was no other teacher to take

No. 21-2475                                                                61

Kluge's place in the orchestra class. Kluge himself has never suggested any other viable accommodation. *See Ryan v. U.S. Dep't of Justice*, 950 F.2d 458, 461 (7th Cir. 1991) (employers are not required to negotiate with employees about a religious accommodation but only to act on any accommodation that does not work an undue hardship; an employee who neglects multiple opportunities during a lengthy disciplinary process to propose a concrete accommodation makes his own choice). Because no reasonable jury could conclude that a practice that emotionally harms students and disrupts the learning environment is only a slight burden to a school, and because no other accommodations were available, under *Baz*, Brownsburg has proved undue hardship as a matter of law.[16] *See also Walmart Stores East, L.P.*, 992 F.3d at 658–60 (affirming summary judgment where the accommodation of the plaintiff's religious practice created more than a slight burden on the employer because it would have increased the burden on other workers, or resulted in a staffing shortage, or forced the employer to change its preferred rotation system designed to train all assistant managers in all departments); *Adams v.*

---

[16]      Kluge asserts that *Baz* is inapplicable because his religious beliefs did not preclude him from doing his job, as he claims was the case in *Baz*. But the issue in *Baz* was analogous: Baz was performing his job in a manner that conflicted with the hospital's requirement that the chaplain serve as a "quiescent, passive listener and cautious counselor," as part of the hospital's philosophy of total patient care. Kluge was performing his job in a manner that conflicted with the school's mission of educating all students, and its philosophy of treating all students with respect and affirmation for their identity in the service of that goal. Kluge's attempt to characterize the school's goal as somehow "illegitimate" lacks support in Title VII case law.

*Retail Ventures, Inc.*, 325 Fed. App'x 440, 443 (7th Cir. 2009) (affirming summary judgment in favor of employer on religious accommodation claim where accommodation would have increased cost, decreased efficiency, or created a scheduling strain); *Noesen v. Medical Staffing Network, Inc.*, 232 Fed. App'x 581, 584–85 (7th Cir. 2007) (affirming summary judgment in favor of employer when Catholic pharmacist's requested religious accommodation of relief from telephone and counter duties in order to avoid customers requesting birth control would have required other employees to assume a disproportionate share of work, or would have left data input work undone).

Kluge's attempt to characterize the emotional harm expressed by the transgender students as "third party grumblings" or a "heckler's veto" has no basis in the record and no support in Title VII law.[17] The dissent echoes this

---

[17]    The dissent also suggests that the question of whether the accommodation constituted an undue hardship "by way of the School District's clients—the students—should be an open question for the factfinder" because an adverse employment action based on the discriminatory preferences of others, including coworkers and customers, is unlawful. But there is no fact question for a jury here because Kluge presented no evidence that the students, teachers or parents harbored a discriminatory bias against Kluge or that Brownsburg terminated Kluge based on the discriminatory preferences of others. In fact, one of the parents reporting harm to her child from Kluge's practice told the school, "I really don't care what he thinks about transgender issues on a personal level. My child deserves to be treated with respect. His refusal to use [the child's] preferred name and pronouns is very disrespectful and hurtful." R. 120-13, at 2. Acting on such a report cannot reasonably be construed as giving effect to a discriminatory preference.

mischaracterization, reducing the harms claimed to "taking offense," "disgruntlement," "grumblings," and "mere offense," rather than the harms that the school actually claimed to students, the learning environment, and to the school's mission to treat all students respectfully. Kluge's complaint of a "heckler's veto" sounds in the First Amendment. But the district court dismissed Kluge's First Amendment claims, and he has not appealed that dismissal. R. 70. The district court correctly held that when Kluge was addressing students in the classroom, his speech was not protected by the First Amendment. R. 70, at 13 (noting that Kluge conceded that his address of students in his classroom was part of his official duties as a teacher); *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); *Mayer*, 474 F.3d at 479 (citing our well-settled precedent that "public-school teachers must hew to the approach prescribed by principals (and others higher up in the chain of authority)"). Title VII provides more protection for an employee's religious speech than the First Amendment but its protection is limited to accommodations that do not work an undue hardship on the employer. *Ryan*, 950 F.2d at 461. *Cf. Mayer*, 474 F.3d at 480 (noting that "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system"). As we have just held, Kluge's practice resulted in an undue hardship on his employer as a matter of law.

As for "third party grumblings," the case law does not support Kluge in what is essentially a repackaged First Amendment claim of a heckler's veto. For example, in *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470 (7th Cir. 2001), we considered a claim by Elizabeth Anderson, an employee of a shipping company, U.S.F. Logistics, who wished to use the phrase, "Have a Blessed Day," in correspondence with her co-workers and the company's customers. Although her co-workers did not object, an employee of Microsoft, U.S.F. Logistics' largest customer, received this religious greeting and complained that it was unacceptable and must stop. Her employer directed her to stop using the phrase with customers, and in particular with Microsoft. After her employer declined to identify the particular Microsoft contact who had complained, she continued to use the phrase with Microsoft employees and moved for a preliminary and permanent injunction allowing her to use the phrase in her work. 274 F.3d at 473–74.

The district court denied her motion for a preliminary injunction, finding that she did not have a likelihood of success on the merits because her employer reasonably accommodated her by allowing her to use the phrase with persons who were not offended by it. We affirmed, noting first that Title VII requires only reasonable accommodation, not the satisfaction of an employee's every desire. *Anderson*, 274 F.3d at 475. U.S.F. Logistics was legitimately concerned about its relationship with its customers. The company required only that she cease using the phrase with the objecting customer, and we concluded that her employer reasonably accommodated her. 274 F.3d at 476. Because a Microsoft representative had

complained that the use of the phrase was inappropriate, permitting Anderson to continue to use the phrase would impose her religious views on that customer. We concluded that the evidence therefore suggested that Anderson's religious practice could damage her employer's relationship with Microsoft. 274 F.3d at 477. But even if her practice had not imposed her religious beliefs upon others, the employer was still entitled to restrict it if it impaired the employer's legitimate interests, so long as her belief was reasonably accommodated. 274 F.3d at 477.

The same applies here, albeit in the non-profit business setting of a public school engaged in providing compulsory education to high school students. Brownsburg was entitled to require Kluge to use a form of address that did not offend or injure its students or harm the classroom environment. The school had a legitimate interest in its relationship with its students, who together with their parents, are effectively the school's customers. *See Smiley v. Columbia College Chicago*, 714 F.3d 998, 1002 (7th Cir. 2013) ("It is not unreasonable for [a college] to expect that its instructors will teach classes in a professional manner that does not distress students."). Because Kluge's practice harmed that relationship, and because there was no other way to accommodate Kluge's beliefs without harming the school's mission and philosophy for educating all students, his "third party grumblings" claim fails.[18]

---

[18]      In making his "third-party grumblings" argument, Kluge relied on cases that have either been reversed or are factually distinguishable. *See Cummins v. Parker Seal Co.*, 516 F.2d 544 (6th Cir. 1975), vacated by *Parker Seal Co. v. Cummins*, 433 U.S. 903 (1977). The district court's judgment
(continued)

in favor of the employer was eventually summarily affirmed by the Sixth Circuit on remand from the Supreme Court. *Cummins v. Parker Seal Co.*, 561 F.2d 658 (6th Cir. 1977). Kluge's lawyers failed to acknowledge that they were relying on a case that had been overturned, and even failed to acknowledge the error in his reply brief after opposing counsel pointed it out in the response brief. Appellee's Response Brief, at 36 n.4. "Lawyers are not entitled to ignore controlling, adverse precedent. We expect (and are entitled to) better performance by members of the bar." *Jackson v. City of Peoria, Illinois*, 825 F.3d 328, 331 (7th Cir. 2016). *See also* Practitioner's Handbook for Appeals, at 159 (available at www.ca7.uscourts.gov). Nor are the Ninth Circuit cases that Kluge cited applicable here. *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978), merely found that the defendant's asserted basis for undue hardship had no factual basis in the record. The court also noted that, "Even proof that employees would grumble about a particular accommodation is not enough to establish undue hardship." But this is not a case of grumbling by co-workers; Brownsburg's undue burden is to its mission of educating all students and its philosophy of treating all students with respect and affirmation. The Ninth Circuit repeated this formulation the same day in another case, *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 407 (9th Cir. 1978), stating that, "undue hardship requires more than proof of some fellow-worker's grumbling or unhappiness with a particular accommodation to a religious belief. … An employer or union would have to show, as in *Hardison*, actual imposition on co-workers or disruption of the work routine." In the context of a school, where the requested accommodation primarily affects students, disruption to the learning environment meets the *Hardison* standard. The teachers here were not "grumbling" but, as Dr. Daghe testified, were reporting disruptions to the learning environment because "students are uncomfortable in [Kluge's] class and that they are bringing the conversations that occur in his class to other classrooms and having discussions about the uncomfortableness, whether it was dealing with a transgender student and last names only or whether it was times when last names weren't used or it was times when, you know, kids just want it all to go away and act like everything is normal." R. 112-5, at 7. The teachers similarly reported that children did not know how to address each

(continued)

No. 21-2475                                                  67

In sum, the school produced uncontradicted evidence that Kluge's last-names-only practice stigmatized the transgender students and caused them demonstrable emotional harm as reported to the administration by Lee, who personally witnessed it. Kluge was told that students reported feeling disrespected, targeted, isolated, and dehumanized. As Kluge conceded, the school has a legitimate interest in the mental health of its students, and an accommodation is not reasonable, as Dr. Daghe told Kluge, "when it's detrimental to kids." R. 113-4, at 28. Kluge's practice also adversely affected the classroom environment which both transgender and non-transgender students considered tense, awkward and uncomfortable. Dr. Daghe told Kluge, based on reports from students and faculty, that his practice resulted in students being uncertain about how to behave and how to address their transgender classmates. Kluge's practice also disrupted other classrooms when students brought their concerns and discussions about the practice to other teachers in other classrooms. It conflicted with the school's carefully constructed Name Policy that sought to address the special challenges that transgender students face in school, and balanced those concerns with the preferences of the students' parents and healthcare providers. Allowing Kluge to continue in the practice thus placed an undue hardship on Brownsburg's mission to educate all of its students, and its desire to treat all students

---

other or how to behave around transgender students and similar students because of Kluge's practice. R. 120-5, at 9. The teachers reports of harm to students as well as classroom and school disruption are a far cry from "third-party grumblings."

with respect and affirmation for their identity in the service of that mission.

**2.**

Brownsburg claimed a second undue hardship, namely, that Kluge's practice unreasonably exposed the school to liability under Title IX. Close in time to Brownsburg's adoption of the Name Policy, our court issued its decision in *Whitaker*. In *Whitaker*, we recognized that transgender students may bring a sex discrimination claim under Title IX based on a theory of sex-stereotyping. 858 F.3d at 1047–50. We have already concluded that the district court correctly ordered summary judgment in favor of Brownsburg because the uncontested evidence demonstrated that Kluge's last-names-only practice harmed students and disrupted the educational environment, which constituted an undue hardship on Brownsburg's conduct of its business. Thus, we decline to reach the issue of whether Kluge's accommodation created an additional undue hardship by exposing the school to liability under Title IX. Our decision to decline to address liability under Title IX should not be interpreted as agreement with the dissent's analysis of this issue. It is simply unnecessary to reach this issue in this case.

**C.**

Kluge also brought a claim for retaliation against Brownsburg, alleging that Brownsburg "retaliated against Mr. Kluge for engaging in protected conduct, when it agreed in writing to the accommodation Mr. Kluge requested for his religious beliefs, then removed the accommodation—without any showing of undue hardship—and told Mr. Kluge he could

use transgender names and pronouns, resign, or be terminated." R. 15, at 17–18. Kluge sought to prove his retaliation claim using the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In order make out a *prima face* case for retaliation under the burden-shifting method, Kluge must demonstrate that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there is a but-for causal connection between the two events. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020); *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001). The causation standard in retaliation claims is more stringent than the standard in discrimination claims. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014). Following *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013), "the protected activity of an employee making a retaliation claim must have been 'a but-for cause of the alleged adverse action by the employer.'" In contrast, a "lessened causation standard" applies in Title VII discrimination cases. *Nassar*, 570 U.S. at 348. "The requirement of but-for causation in retaliation claims does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *Nassar*, 570 U.S. at 346–47. *See also Robertson*, 949 F.3d at 378 (describing the causation requirement as producing adequate evidence to establish that "there existed a but-for causal connection" between the protected activity and the adverse action). Once the *prima facie* case of retaliation is established:

> an employer may produce evidence which, if
> taken as true, would permit the conclusion that

it had a legitimate non-discriminatory reason
for taking the adverse employment action. … If
the employer meets this burden, the plaintiff, to
avoid summary judgment, then must produce
evidence that would permit a trier of fact to es-
tablish, by a preponderance of the evidence,
that the legitimate reasons offered by the em-
ployer were not its true reasons but were a pre-
text for discrimination.

*Robertson* 949 F.3d at 378. *See also Lord v. High Voltage Software,
Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (where the employer
demonstrates that the employee would have been fired absent
his protected activity, then the alleged retaliatory motive,
even if unchallenged, was not a but-for cause of the em-
ployee's harm).

In the district court, Brownsburg sought summary judg-
ment on this claim, contending that: (1) Kluge could not make
out a *prima facie* case of retaliation because no reasonable jury
could conclude on this record that there was a causal connec-
tion between the protected activity of seeking a religious ac-
commodation at the start of the school year, and the adverse
employment action which occurred at the end of the school
year after it became apparent that the accommodation was
not working; and (2) even if Kluge was able to establish a
*prima facie* case, Brownsburg had articulated legitimate, non-
discriminatory reasons for its actions, and Kluge presented no
evidence from which a reasonable jury could infer pretext.

Kluge responded to Brownsburg's motion by asserting
that he had engaged in statutorily protected activity by

identifying a sincerely held religious belief that he should identify students by their "birth names, instead of their 'new' transgender names," by asking for an accommodation in July 2017, and by asking in February 2018 for the school to confirm that his accommodation was still valid. R. 153, at 27. For an adverse employment action, he asserted that the school with-drew the accommodation, demanded his compliance with the Name Policy or his resignation, and then coerced him into submitting a conditional resignation.[19] In his district court briefing, Kluge then flatly stated, "there is a causal connection between the protected conduct and the adverse employment action." R. 153, at 27. The remainder of his argument on retal-iation was simply a recitation of the same facts that he alleged in support of his discrimination claim. Namely, he asserted that the accommodation was implemented in July 2017, the school indicated its intent to withdraw it in the January 2018 "Transgender Questions" document, he then asked in Febru-ary for the school to confirm that his accommodation agree-ment had no end date, and the school indicated that it did in-tend to require compliance with the Name Policy from all fac-ulty beginning in the next academic year as explained in the "Transgender Questions" document. Kluge then asserted that Gordon told him that he could submit a conditional resigna-tion, that he did so in reliance of her promise that it would be conditional, that he attempted to rescind the resignation on May 28, 2018, but the school would not allow him to rescind

---

[19]     In the district court, Brownsburg did not contest for summary judgment purposes that Kluge could produce evidence in support of pro-tected activity and an adverse action, focusing instead on the causation element of the *prima facie* case, and the lack of any evidence of pretext.

and instead terminated his employment.[20] Kluge did not ad-
dress Brownsburg's stated nondiscriminatory reason for his
termination, that his refusal to comply with the Name Policy
was detrimental to students and to the learning environment.
He made no attempt to show that this reason was a pretext to
cover religious discrimination.

As we noted above, the district court found that Kluge
waived his retaliation argument at summary judgment with
meager briefing, simply reciting his version of the facts with-
out discussing how those facts meet the legal requirements of
a retaliation claim. The court also noted that Kluge failed to
address Brownsburg's argument that there is no evidence in
the record from which a reasonable fact finder could infer that
its nondiscriminatory explanation for its action was a pretext.
The court thus found that Kluge had waived his retaliation

---

[20]    The district court found that the record contained no factual basis
for Kluge's claim that Gordon led him to believe that he could submit a
conditional resignation that could later be withdrawn. Nor was there any
factual basis supporting his contention that he did in fact submit a condi-
tional resignation, according to the district court. On appeal, Kluge cites
no evidence contradicting those findings. As the district court pointed out,
Gordon told Kluge only that she would respect an employee's wish not to
disclose his resignation to colleagues until the end of the school year. She
never told him that he could withdraw a properly submitted resignation,
and in fact it was not possible to withdraw a resignation made to the Su-
perintendent or his agent (Gordon, in this instance). R. 112-4, at 11–12;
R. 120-8; R. 120-9. Kluge himself recorded the meeting where he asserts
that Gordon made the offer of a conditional resignation, and the transcript
of that meeting does not support his claim. R. 112-4, at 20–55. Nor is there
any language in his actual resignation suggesting that it was conditional.
The issue of the purported breach of a promise to allow a conditional res-
ignation has no merit and we will not give it further consideration.

claim. As an alternate basis for granting judgment in favor of the defendant, the court also addressed the merits, noting that Kluge failed to present any evidence from which a reasonable fact finder could conclude that a causal connection exists between Kluge's protected activity and his resignation, any evidence of pretext, or any evidence that Brownsburg's action was motivated by discriminatory animus. The court therefore granted summary judgment in favor of the school on the retaliation claim as well.

Although Kluge's briefing on retaliation in the district court was thin, we find that the argument was not waived and proceed to the merits. Kluge's claim fails on the causation element. That is, he failed to produce evidence that established a but-for causal link between protected activity and the adverse action, and so failed to make out a *prima facie* case of retaliation.[21] Indeed, on appeal, Kluge relies on outdated precedent to assert that, to establish a causal link, he must show

---

[21]        In his reply brief on appeal, Kluge suggests for the first time that he meets the causation element with evidence that, in the July 27, 2017 meeting, Dr. Snapp became "very angry" with him the first time that Kluge mentioned his religious objection to using the transgender students' PowerSchool first names. Appellant's Reply Brief, at 20; R. 120-3, at 19. He also asserts that Dr. Snapp engaged in a theological debate with him, and told him that his beliefs were wrong. *Id*. Kluge waived this argument by not raising it in the district court, and by not raising it on appeal until his reply brief. *Accident Fund Ins. Co. of America v. Custom Mech. Constr., Inc.*, 49 F.4th 1100, 1108 (7th Cir. 2022) (arguments raised for the first time in a reply brief are waived); *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) (same); *DM Trans, LLC v. Scott*, 38 F.4th 608, 619 (7th Cir. 2022) (issues and arguments raised for the first time on appeal are forfeited, as are arguments that are not sufficiently developed).

only "that the protected activity and the adverse action were not wholly unrelated." *Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1014 (7th Cir. 1997). But as we explained above, after the Supreme Court's decision in *Nassar*, he must demonstrate that the protected activity of an employee making a retaliation claim was a but-for cause of the alleged adverse action by the employer. Kluge's evidence falls short of meeting this standard. He says only that he engaged in protected activity and that when he refused to either comply with the policy or resign, "his supervisors subjected him to a [sic] 'a pattern of criticism and animosity' and finally constructively discharged him." Appellant's Opening Brief, at 42 (quoting *Hunt-Golliday*, 104 F.3d at 1014). He cited no record evidence in the district court in support of this conclusory claim that anyone subjected him to a "pattern of criticism and animosity," failed to cite any such evidence on appeal until his reply brief, and makes no attempt to connect his protected activity to his resignation. Although he cites evidence of protected activity and an adverse action (both of which Brownsburg conceded for the purposes of summary judgment), he cites nothing supporting but-for causation.

Instead, the undisputed evidence demonstrates that Brownsburg worked with Kluge to create a workable accommodation during the 2017-2018 school year. Only after the last-names-only practice proved harmful to students and the learning environment did the school withdraw it, and even then Brownsburg allowed Kluge to continue the practice through the end of the school year. Further, Brownsburg did not disturb the additional accommodation relieving Kluge of

the task of handing out gender-specific uniforms. The length of time between the protected activity (of Kluge requesting a religious accommodation) and the adverse employment action, together with the school's attempt to find a workable solution defeat any inference that Brownsburg asked Kluge to resign in retaliation for his protected activity.

Even if we assume that Kluge cleared the hurdle of the *prima facie* case, he makes no effort to demonstrate any material issue of fact on the question of pretext:

> "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos*, 539 F.3d at 736 (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)). We have repeatedly emphasized that when "assessing a plaintiff's claim that an employer's explanation is pretextual, we do not ... second-guess[ ] an employer's facially legitimate business decisions." *Id.* (internal quotation marks omitted). An employer's reasons for firing an employee can be "foolish or trivial or even baseless,'' as long as they are "honestly believed." *Culver*, 416 F.3d at 547 (quoting *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997)).

*Lord*, 839 F.3d at 564. Instead of producing evidence of pretext, Kluge simply ties the legitimacy of his retaliation claim to the validity of his discrimination claim. That is, he asserts that he need not present evidence of pretext because Brownsburg

never presented a legitimate, nondiscriminatory basis for terminating his employment, and that his "whole argument was that the district had *no legitimate basis* for revoking his accommodation and forcing him to resign." Appellant's Opening Brief, at 40. In so arguing, Kluge is essentially conceding that he has never provided evidence of pretext, apparently resting entirely on his claim that Brownsburg never produced a legitimate, nondiscriminatory reason for his termination. That was a risky strategy.

As we have just concluded, Brownsburg did in fact demonstrate legitimate reasons for withdrawing the accommodation. Brownsburg was within its rights as an employer facing an undue hardship to withdraw the requested accommodation when it became apparent that it was not working in practice and was causing harm to students and to the educational environment. That was a legitimate, nondiscriminatory reason for the termination. In the absence of any evidence that it was a pretext for religious discrimination—i.e., that it was a lie or a phony reason—we will not second-guess Brownsburg's business decision. *Lord*, 839 F.3d at 564. *See also Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("[W]hen an employer articulates a plausible, legal reason for its action, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for its action;" the "federal courts are not a super-personnel department that second-guesses facially legitimate employer policies."). "We have said time and again (in more than one hundred reported opinions, by our count) that we are not a super-personnel department that will substitute our criteria for an employer's for hiring, promoting, or disciplining employees."

*Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020). *See also Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) ("To successfully challenge the honesty of the company's reasons [the plaintiff] must specifically rebut those reasons. But an opportunity for rebuttal is not an invitation to criticize the employer's evaluation process or simply to question its conclusion about the quality of an employee's performance. Rather, rebuttal must include facts tending to show that the employer's reasons for some negative job action are false, thereby implying (if not actually showing) that the real reason is illegal discrimination. In other words, arguing about the accuracy of the employer's assessment is a distraction … because the question is not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest*.'"). Here, the employer conclusively demonstrated that it withdrew the accommodation solely because it worked an undue hardship on the school's business of educating all students. There is no hint in this record that this explanation was false and that the real reason for the termination was discrimination.

Interestingly, the dissent acknowledges that Kluge's failure to demonstrate that Brownsburg's legitimate, nondiscriminatory reason for his termination was a pretext dooms his retaliation claim. Yet even though Kluge himself tied the success of his two claims together, the dissent does not acknowledge that Kluge's failure to rebut the school's uncontested, nondiscriminatory explanation for withdrawing the accommodation is also fatal to his discrimination claim.

Brownsburg began developing the Name Policy before it ever knew that Kluge would have a religious objection to the

directive. In the face of his objection, the school made several efforts to accommodate his beliefs, meeting with him multiple times, agreeing to allow his use of last names only, and offering to have another person hand out gender-specific orchestra uniforms (an accommodation that Brownsburg never withdrew). The school's decision to allow students to change their names and gender markers in the PowerSchool database only with the approval of a parent and a healthcare provider assuaged the religious concerns of three of the four teachers lodging a religious objection. That the school decided to withdraw the last-names-only accommodation only when it was apparent that it was harming students and disrupting the learning environment was to the school's credit. *See Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1490 (10th Cir. 1989) ("The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted."); *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975) (same). For all of these reasons, we affirm the grant of summary judgment in favor of Brownsburg on the retaliation claim.

### III.

In sum, we affirm summary judgment against Kluge on his discrimination claim. Brownsburg has demonstrated as a matter of law that the requested accommodation worked an undue burden on the school's educational mission by harming transgender students and negatively impacting the learning environment for transgender students, for other students in Kluge's classes and in the school generally, and for faculty. Title VII does not require that employers accommodate religious practices that work an undue hardship on the conduct

of the employer's business; that sometimes means that a religious employee's practice cannot be accommodated. Moreover, Kluge's retaliation claim fails as a matter of law because he failed to produce any evidence supporting the causation element of the *prima facie* case, or any evidence that the school's explanation for its actions was a pretext for religious discrimination.

AFFIRMED.

BRENNAN, *Circuit Judge*, concurring in part and dissenting in part.

Brownsburg Community School Corporation required music teacher John Kluge to use the chosen first names and pronouns of transgender students. Kluge objected on religious grounds, and a gender-neutral accommodation was arrived at: He would address his students by their last names only. The School District received some complaints about this practice, so it revoked the accommodation and told Kluge he could comply, resign, or be terminated. He tendered his resignation.

Kluge sued the School District under Title VII for failure to reasonably accommodate his religious beliefs and for retaliation against his accommodation request. The majority opinion affirms summary judgment for the School District on both claims. On Kluge's retaliation claim, I disagree with my colleagues' conclusion as to causation but concur in the judgment for the School District. I respectfully dissent on the religious accommodation claim.

This case tests the limits of the Supreme Court's atextual but controlling interpretation of "undue hardship" in Title VII's religious accommodation provision as "more than a *de minimis* cost." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); 42 U.S.C. § 2000e(j). Do complaints of offense constitute more than a *de minimis* cost? Specifically, is being offended by an employee's religious practice enough to discharge the employer's duty to reasonably accommodate the employee's religious practice? The majority opinion answers in the affirmative. Under its reasoning, Title VII provides no protections for religious conscientious objectors who in good faith try to accommodate their employers' dictates. This court

SA-082

has not ruled on whether taking offense can constitute more than a *de minimis* cost, so we should tread carefully.

I would reverse the district court in part and grant partial summary judgment for Kluge that his religious beliefs are sincerely held and that he has established a prima facie case for religious discrimination. Then Kluge's religious accommodation claim comes down to a fact-intensive inquiry: Did the School District demonstrate that Kluge's gender-neutral accommodation of calling all students by only their last names causes undue hardship—that is, more than a *de minimis* cost? The majority opinion says "yes," but it sidesteps Kluge's countervailing evidence, fails to construe the record in his favor, and overlooks credibility issues on both sides, which are reserved for resolution by the factfinder.

Courts uniformly review context-specific evidence to evaluate whether a religious accommodation in fact imposes an undue hardship. But without supporting authority, my colleagues hold that the undue hardship inquiry looks only to evidence within the employer's knowledge at the time of the adverse employment decision. The majority opinion thus resolves this case based on the School District's receipt of some allegations that the accommodation did not work and caused tension and discomfort. It deems irrelevant the testimony of Kluge, three students, and another teacher. Considering the entire record, there is a genuine issue of material fact on undue hardship, which we should remand for trial.

### I. Factual Background

The majority opinion downplays certain record evidence that in my view creates a genuine issue of material fact on undue hardship. This includes evidence about the School

District's Name Policy and Kluge's last-names-only accom-
modation; complaints about that accommodation; counter-
vailing evidence about Kluge's accommodation as practiced
in his classroom; the School District's revocation of the accom-
modation; and Kluge tendering his resignation.

### A. Name Policy & Accommodation

John Kluge is a Christian and a leader in his church. From
2014 to 2018, he taught orchestra at Brownsburg High School,
part of the Brownsburg Community School Corporation
(School District), west of Indianapolis. But he was not just any
orchestra teacher; many students and former students said he
was a great one. R. 52-5, at 2; R. 52-4, at 2; R. 120-18, at 11, 13.

In May 2017, discussions surrounding the needs of
transgender students led the School District to adopt the
Name Policy. R. 120-1, at 3–4. Kluge believes that based upon
his religion, he cannot affirm the transgender identity of his
students by calling them by their chosen names. R. 113-1, at
6–9. On July 27, 2017, Kluge objected to the Name Policy
based on his religious convictions, and Principal Daghe and
Superintendent Snapp gave Kluge three choices: comply, re-
sign, or be suspended pending termination. R. 15-3, at 3; R.
120-3, at 14. At this meeting, Kluge says Snapp got "very an-
gry," explained why Kluge's beliefs were "wrong," and ar-
gued that his "beliefs aren't what's in the Bible." R. 120-3, at
19. Kluge responded with scripture that supported his beliefs.
To the contrary, Snapp recalled that he had a "cordial conver-
sation" on their respective religious beliefs. R. 113-6, at 6. In

the end, Kluge refused to comply, and Superintendent Snapp gave him the weekend to consider his options. R. 120-3, at 15.

On Monday July 31, 2017, Kluge met with Snapp and Human Resources Director Gordon. *Id.* at 17. Gordon presented Kluge with a form to indicate whether he would comply with the Name Policy. R. 15-1, at 1. Kluge proposed a compromise that he be allowed to refer to students by their last names only, "like a sports coach," and the school administrators agreed. R. 120-3, at 17.

### B. Complaints

During the 2017–2018 school year—the relevant time frame for evaluating undue hardship—Principal Daghe "first learned of concerns with Mr. Kluge and how he was addressing students in class via an email from Craig Lee … on August 29, 2017." R. 120-2, at 4. Lee served as the faculty advisor and host for the Equality Alliance, a student club that met weekly "to discuss issues that impact the LGBTQ community." R. 120-14, at 6.

*Staff.* In his email, Lee referenced a teacher who refused to call a transgender student by their new name, but he did not mention Kluge. R. 120-15. Still, Principal Daghe attested he believed and confirmed that the email referred to Kluge. R. 120-2, at 4. Among other things, Lee stated, "[T]here is confusion amongst some teachers and students that I think needs clarification and perhaps a teacher or two that needs to know that it is not ok to disobey the powerschool [sic] rule." R. 120-15. Lee said he was "not totally sure" of the best next step and that he was "very biased" on the topic. *Id*. Lee testified separately that several students in Equality Alliance meetings

found Kluge's last-names-only practice insulting and disre-spectful. R. 58-2, at 2.

Assistant Superintendent Jessup also recounted visiting an Equality Alliance meeting where she heard four or five stu-dents complain about a teacher using last names only. R. 120-1, at 4. In her view, the other 35 or so students in attendance appeared to agree with the complaints.[1] *Id.* Again, while the students did not identify Kluge by name, "it was certainly im-plied that he was the teacher in question." *Id.* She had no doubt the teacher was Kluge because he was the only staff member who had been permitted the last-names-only accom-modation. *Id.* Deposition testimony also revealed that some teachers had complained about Kluge's accommodation. R. 120-14, at 16–17; R. 113-5, at 8–9; *see also* R. 113-4, at 9.

*Students.* Two transgender students in Kluge's orchestra class during the 2017–2018 school year, Aidyn Sucec and Sam Willis, submitted declarations. The majority opinion ad-dresses them at length, so I highlight only a few points. Aidyn said "Kluge's behavior was noticeable to other students in the class." R. 22-3, at 4. Aidyn recalled, "At one point, my stand partner asked me why Mr. Kluge wouldn't just say my name.

---

[1] The record does not reflect the total number of transgender students at Brownsburg High School in school year 2017–2018. The evidence shows three transgender students in Kluge's classes: Aidyn Sucec, Sam Willis, and an unnamed third student. R. 22-3; R. 58-1; R. 52-3 at 3. A student in Kluge's orchestra class, Lauren Bohrer, said the class averaged about 40 students. R. 52-3 at 2. According to the Indiana Department of Education Data Reports Archive, Attendance & Enrollment, in the 2017–2018 school year, Brownsburg High School had 2,646 students. IND. DEP'T OF EDUC., *School Enrollment by Grade Level*, https://www.in.gov/doe/it/data-center-and-reports/data-reports-archive/.

I felt forced to tell him that it was because I'm transgender." *Id.* Similarly, Sam opined that "Kluge's use of last names in class made the classroom environment very awkward." R. 58-1, at 3. Sam said "[m]ost of the students knew why Mr. Kluge had switched to using last names, which contributed to the awkwardness and [his] sense that [he] was being targeted because of [his] transgender identity." *Id.* at 3–4.

*Parents.* In fall 2017, the high school received two complaints about Kluge. The first was in a letter from the parents of a transgender student, and the second in an email exchange between a Brownsburg school counselor and a transgender student's parent. R. 120-12; R. 120-13. In the email exchange, the counselor advised that the administration "require[d] that students role play" at home "to practice situations in which" they are called by a name other than the one they prefer. R. 120-13, at 6. The counselor continued, "As a school, we will certainly do our best to get the name/pronouns right, but we are all human and there may [be] instances where we don't get it quite right. In those moments, we do not want [the student] to be offended, feel disrespected, or feel discouraged." *Id.* at 6–7.

### C. Countervailing Evidence

These complaints are just one side of the story, however. Three of Kluge's students and a fellow teacher, all of whom observed his classes in the 2017–2018 school year, attested that the last-names-only practice did not adversely affect the classroom environment. This evidence, along with Kluge's

testimony, create a genuine issue of material fact on undue hardship.

*Lauren Bohrer Declaration.* Lauren Bohrer and Aidyn were students in Kluge's orchestra class. R. 52-3, at 2. Bohrer attested that she "did not hear Mr. Kluge ever call students by gendered prefixes." *Id.* She explained that orchestra is a larger class, so individual interactions were few. "It was rare that Mr. Kluge had occasion to call on any individual student directly unless they raised their hand to ask a question." *Id.* Bohrer remembered that after the first few weeks of class, Kluge stopped calling out last names to take attendance and instead took attendance by noting students that were absent.

According to Bohrer, "Mr. Kluge never once brought up the use of only last names or made known to our class his reason for using only last names. I did not find it odd and Mr. Kluge did not seem uncomfortable addressing us in this fashion. I never suspected that it was anything other than the easiest way for him to address us as our last names are listed first in PowerSchool." *Id.* at 3. Bohrer also said she had a transgender stand partner—not Aidyn—and that she "never saw Mr. Kluge treat [her] stand-mate any differently than cisgender students." *Id.* "[She] never saw or heard about any animosity between them." *Id.* "[Her] stand mate never told [her] that they disliked Mr. Kluge's behavior or that Mr. Kluge had been unfair to them." *Id.*

Bohrer did not know Aidyn personally, but she was hesitant to engage or interact with him "due to [his] reputation for confrontational and aggressive behavior toward people who did not strictly conform to [his] mindset." *Id.* In fall semester 2018—after Kluge's termination—Bohrer alleges that she was called to the principal's office based on Aidyn's false

accusations of her calling him a "f----t." *Id.* at 4. Per Bohrer, the principal conceded that it was unlikely that Aidyn's accusations were true. *Id.* at 5.

*Kennedy Roberts Declaration.* Kennedy Roberts, another orchestra student, said Kluge was a "favorite teacher[]." R. 52-4, at 1. Roberts recalled that "the energy [Kluge] put into conducting [their] orchestra and creating a fun classroom environment is incomparable to any teacher [he'd] had." *Id.* at 1. Roberts said, "During the school year, [Kluge] always called everyone by their last names, which I never knew the reason as to why, but I never really thought anything of it. It's just what he did." *Id.* at 2. Roberts corroborated Bohrer's testimony that Kluge called student last names for attendance "at first, maybe 5-8 times over the year." *Id.* From what Roberts could tell, Kluge "treated everyone this way, no one was singled out in front of the class or intentionally treated disrespectfully." *Id.*

*Mary Jacobson Declaration.* A third student, Mary Jacobson, was in both Kluge's Music Theory and Advanced Orchestra classes. R. 52-5, at 2. Jacobson attested that, between these two classes, "[she] never heard Mr. Kluge refer to students by their first name, or by any gendered prefix or pronouns." *Id.* at 2. She "never heard Mr. Kluge discuss his use of last names with any student or give any explanation for it. His use of last names was not unnatural sounding. I never heard any students question him about it, and I never brought up the topic to him myself." *Id.* at 2. And she "did not see or hear Mr. Kluge in conflict with any students nor did [she] witness any students receiving different treatment than the rest of the class received." *Id.* She also added that Kluge was a

"wonderful teacher" whose "kindness and fairness" made for an "open and honest classroom demeanor." *Id.* at 2–3.

*Natalie Gain Declaration.* In addition to these student declarations, Natalie Gain, a teacher who led private music lessons at the school during the day, submitted a declaration stating that she "never heard [Kluge] use gendered language in the classroom." R. 52-2, at 3. "[She] only heard him use last names with the students" and "never heard any of the students discussing the [sic] Mr. Kluge's use of last names, or any references to his agreement with the administration." *Id.* "[A]s far as [she] could tell, Mr. Kluge's accommodation was not common knowledge … ." *Id.* She also said Kluge "had mostly used last names … the previous school year anyway, with 'Mr./Ms.' for students to encourage a respectful teaching environment, like college classes." *Id.* at 2.

*Kluge's Testimony.* Kluge also attested there were no issues with the last-names-only accommodation. He said that in the 2017 fall semester leading up to a meeting with Principal Daghe on December 13, 2017, "there were no student protests, there were no written complaints about [his] use of last names for all students, there were no classroom disturbances, and there were no cancelled classes." R. 113-2, at 4. Kluge said he did not witness tension in the students and faculty. R. 120-3, at 23. He did not see animosity from the students toward him. *Id.* Instead, Kluge averred that "the accommodation worked as intended and [his] students excelled," some winning awards for their performances during the 2017–2018 school year. R. 113-2, at 4. He recounted, "We performed better than ever in our orchestra competitions. Students' grades on their AP [Music Theory] exam were great. There was a lot of participation in the extracurricular programs, a lot of students

performing in the voluntary extra stuff that you can do in orchestra." R. 120-3, at 23–24.

### D. Revocation of Kluge's Accommodation

On January 22, 2018, Assistant Superintendent Jessup presented faculty with a document entitled "Transgender Questions" accompanied by a presentation titled "Transgender Considerations." Both stated that the last-names-only accommodation would not be permitted the following school year. R. 15-4; R. 120-20. The majority opinion refers to excerpts from only the Transgender Questions document. Other portions of that document include:

> **Where is the line drawn on "pleasing" students and their beliefs?** It is our job to make all students feel welcome and accepted in the public school environment.
>
> …
>
> **How do we deal with a student exploding in anger with being called the wrong name or gender?** If it's the fifth time this week the staff member has messed up the pronoun, then the staff member needs to get on board. However, if the student explodes on one small mistake, we

SA-091

would address the student behavior as we nor-
mally would.

R. 15-4, at 9–10.

The Transgender Considerations presentation stated in
relevant part:

> ### Considerations
> …
> - Replace gender specific language with inclusive
>   alternatives—instead of "ladies and gentleman"
>   [sic] or "boys and girls" try using "everyone,"
>   "people" or "folks"
> - If you are creating a form for students, consider
>   whether you really need to have a question
>   about sex or gender; if so, provide gender op-
>   tions
> - Try not to make assumptions about the genders
>   of students … .
> …
> - Avoid using boy/girl methods to divide stu-
>   dents—seating charts, lining up, groups, etc.
> - If possible, provide gender neutral uniforms
> …
> ### Other Guidance
> - Creating a safe and supportive environment for
>   all students is important
>   - Be respectful and nonjudgmental; do not
>     show skepticism and/or disapproval

R. 120-20, at 5–7.

On February 6, 2018, Kluge, Principal Daghe, and Human
Resources Director Gordon met, and the school administra-
tors confirmed that Kluge would not be allowed his

accommodation in the next school year. R. 113-2, at 6. In this
meeting, the three discussed how Kluge might announce his
departure if he resigned. Gordon said other staff had left and
not told anybody—without "any fanfare." R. 113-4, at 39. She
suggested that Kluge did not have to talk about his retirement
with staff or students. But Gordon qualified, "that's kind of
up to you." *Id.*

### E. Kluge Tenders Resignation

Kluge submitted his resignation letter on April 30, 2018,
and continued to teach for the rest of the school year. In May,
he presided over the school's orchestra awards ceremony,
where he referred to all students by their PowerSchool first
and last name. R. 120-3, at 32. On May 25, 2018, the School
District locked Kluge out of its buildings, effectuating his res-
ignation. R. 15-3, at 1; R. 113-2, at 7. Two weeks later at a
School District Board meeting, Kluge asked the Board of Trus-
tees not to accept his resignation and requested that he be re-
instated. R. 113-2, at 7; R. 120-3, at 29–30; R. 120-18, at 10. The
Board heard comments from Kluge and the community—
some in support of termination and others against—and ulti-
mately accepted Kluge's resignation, ending his employment.
R. 113-2, at 7; R. 120-18, at 9–13. Both Aidyn and Sam offered
comments at the Board meeting. R. 120-18, at 11.

After the meeting, Jeff Gracey, a parent of a School District
student, recalled that Kluge addressed the Board with passion
and wept when he found out that he would not retain his po-
sition. R. 52-6, at 3. Gracey opined that Aidyn's comments
were "confrontational," and that he "seemed well coached"
and "enthused about the prospect of Mr. Kluge losing his
job." *Id.* Gracey said that Aidyn's comments before the Board

"seemed like a personal vendetta or a means to force others to use their voices to reinforce their ideology." *Id.* at 4.

## II. Legal Framework

Kluge's religious accommodation and retaliation claims and the record evidence are considered under the familiar law of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Still, close review of the law on failure-to-accommodate claims is critical in this case because some of it is in flux and the law that is unclear bears directly upon the claims we decide.

### A. Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … religion." 42 U.S.C. § 2000e-2(a)(1). The statute defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

To make a prima facie case based on an employer's failure to provide a religious accommodation, a plaintiff must show: (1) an observance or practice that is religious in nature; (2) that conflicts with an employment requirement; and (3) that the need for a religious accommodation was a motivating factor in the adverse employment decision or other discriminatory treatment. *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (citations omitted); *EEOC v.*

No. 21-2475                                                    93

*Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772–73 (2015) (modifying the former third factor—the employer's actual notice of the employee's need for a religious accommodation). In addition, the employee must show his religious belief is sincerely held. *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013) (citing *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978)).

Whether an accommodation is reasonable is necessarily linked to the question of undue hardship: "Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to make a reasonable accommodation of the religious practice or to show that any reasonable accommodation would result in undue hardship." *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012) (citing *Ilona*, 108 F.3d at 1575–76). "Reasonableness is assessed in context, of course, and this evaluation will turn in part on whether or not the employer can *in fact* continue to function absent undue hardship" with the accommodation in place. *Adeyeye*, 721 F.3d at 455 (emphasis added). Undue hardship is an objective inquiry that "will depend on close attention to the specific circumstances of the job" and the nature of the accommodation. *Id.*

**B. *Hardison*'s *De Minimis* Cost Test**

The Supreme Court interpreted "undue hardship" to mean "more than a *de minimis* cost" in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). *Hardison* involved a Sabbatarian employee who refused to work on Saturdays on religious grounds. *Id.* at 66. In holding that accommodating Hardison's schedule would impose more than a *de minimis* cost, the Court observed that replacing him with other employees "would involve costs to TWA, either in the form of

lost efficiency in other jobs or higher wages," and require TWA to "carve out a special exception to its seniority system" of giving senior employees priority in choosing their schedule. *Id.* at 83–84. Accordingly, this court has observed that *Hardison* is most instructive when there is an existing system that attempts to accommodate the religious and non-religious preferences of employes—such as by a seniority system or collective bargaining agreement. *Adeyeye*, 721 F.3d at 456; *see also EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 315 (4th Cir. 2008) (discussing pre-existing company policies to accommodate employees' work scheduling preferences). *Hardison*'s core is that "Title VII does not require an employer to offer an 'accommodation' that comes at the expense of other workers." *EEOC v. Walmart Stores E., L.P.*, 992 F.3d 656, 659 (7th Cir. 2021).

Since *Hardison*, the Supreme Court has reaffirmed the *de minimis* cost test in *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 67 (1986). In that case, the Court also clarified that the employer's duty to accommodate under § 2000e(j) ends "where the employer has already reasonably accommodated the employee's religious needs." *Id.* at 68. The Court, in its only other Title VII religious accommodation case post-*Hardison*, did not mention the *de minimis* cost test because the Court remanded for further proceedings under its holding that the need for a religious accommodation need only be a motivating factor for the employer's adverse employment decision. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772–73, 775 (2015). The case apparently settled on remand.

So the *de minimis* cost test remains controlling law absent a contrary indication from the Supreme Court. *See Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016). But remember, *Hardison*'s test is

"*more* than a *de minimis* cost," and the Court has not defined how much more. 432 U.S. at 84 (emphasis added). The Court reaffirmed in *Abercrombie* that "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices." 575 U.S at 775. "Rather, it gives them favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual ... because of such individual's' 'religious observance and practice.'" *Id.* (citing §§ 2000e-2(a)(1), 2000e(j)). "Title VII requires otherwise-neutral policies to give way to the need for an accommodation." *Id.* So the Court apparently reads the *de minimis* cost test to have some substance.

Since *Hardison*, the *de minimis* cost test has come under criticism.[2] Most importantly, the Supreme Court has recently

---

[2] *E.g.*, *Patterson v. Walgreen Co.*, 140 S. Ct. 685 (2020) (Alito, Thomas, and Gorsuch, Js., concurring) ("*Hardison*'s reading does not represent the most likely interpretation of the statutory term 'undue hardship.'"); *Small v. Memphis Light, Gas & Water*, 141 S. Ct. 1227, 1229 (2021) (Gorsuch and Alito, JJ., dissenting) (referring to *Hardison* as a "mistake … of the Court's own making" and observing "it is past time for the Court to correct it"); *Small v. Memphis Light, Gas & Water*, 952 F.3d 821, 826–29 (6th Cir. 2020) (Thapar, J., concurring) (discussing how the *Hardison* test is contrary to ordinary, contemporary meaning and incongruent with the treatment of "undue hardship" in other federal statutory contexts); Debbie N. Kaminer, *Religious Accommodation in the Workplace: Why Federal Courts Fail to Provide Meaningful Protection of Religious Employees*, 20 Tex. Rev. L. & Pol. 107, 122 (2015) ("In relying on the de minimis standard, the Court essentially held that little more than virtual identical treatment of religious employees was required."); Matthew P. Mooney, *Between a Stone and a Hard Place: How the Hajj Can Restore the Spirit of Reasonable Accommodation to Title VII*, Note, 62 Duke L.J. 1029, 1040 (2013) ("Thus, the Court was left to fill in the gaps, which it did by severely limiting employers' duty to accommodate their employees.").

No. 21-2475

granted certiorari in *Groff v. DeJoy*, 143 S. Ct. 646 (2023) (mem.). That case presents a classic Sabbatarian scenario, as in *Hardison.* The Third Circuit held that the employee's requested accommodation to be exempted from work on Sunday caused more than a *de minimis* cost to the employer. *See Groff v. DeJoy*, 35 F.4th 162, 175 (3d Cir. 2022), *cert. granted*, 143 S. Ct. 646 (2023). The questions presented in *Groff* on which the Court has granted certiorari are squarely relevant here: "1. Whether this Court should disapprove the more-than-de-minimis-cost test for refusing Title VII religious accommodations stated in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977)[;] 2. Whether an employer may demonstrate 'undue hardship on the conduct of the employer's business' under Title VII merely by showing that the requested accommodation burdens the employee's co-workers rather than the business itself." Petition for Writ of Certiorari, *Groff*, No. 22-174, at i; Questions Presented Report, *Groff*, No. 22-174.

### C. "Undue Hardship" & Offense

#### 1. Statutory Text

The statutory text of 42 U.S.C. § 2000e(j) provides little help in answering whether offense constitutes undue hardship. At enactment, "hardship" generally meant "'adversity,' 'suffering' or 'a thing hard to bear.'" *Small*, 952 F.3d at 826–827 (quoting THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 601 (1969); BLACK'S LAW DICTIONARY 646 (5th ed. 1979); WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 826 (2d ed. 1975)). The ordinary meaning of "hardship" does not exclude non-economic

difficulties such as hurt feelings, albeit connoting a degree of severity given the adjective "undue."

*Hardison*'s controlling test uses the word "cost," 432 U.S. at 84, which implies an economic or at least quantifiable loss to the employer. As mentioned above, *Hardison* was focused on "costs to [the employer]" by scheduling around the Sabbatarian employee's schedule—"either in the form of lost efficiency in other jobs or higher wages." *Id.* at 84. So, from the outset, the Supreme Court appears to have set an operational or economic gloss on "hardship."

### 2. EEOC Regulation

While neither the statute's text nor *Hardison* provide answers to whether offense is enough, the Equal Employment Opportunity Commission has issued informative regulations and guidance. For Title VII, the EEOC may issue procedural but not substantive regulations to carry out the statutory provisions. 42 U.S.C. § 2000e-12(a); *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 113 (2002) (citations omitted). Nonetheless, the regulations are persuasive (albeit nonbinding) guidance, meriting lesser deference under *Skidmore* in light of the "specialized experience and broader investigations and information" available to the agency. *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944)); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360–61 (2013); *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (explaining that the EEOC's interpretive statements are entitled to a "measure of respect" (quoting *Alaska Dept. of Env't Conservation v. EPA*, 540 U.S. 461, 487–88 (2004))).

In 29 C.F.R. § 1605.2(e), the EEOC states that it will determine "undue hardship" as "more than a *de minimis* cost" in

accordance with *Hardison*. In making the "undue hardship" determination, the EEOC gives "due regard [] to the identifiable cost in relation to the size and operating cost of the employer, and the number of individuals who will in fact need a particular accommodation." *Id.* "In general, the Commission interprets this phrase as it was used in the *Hardison* decision to mean that costs similar to the regular payment of premium wages of substitutes, which was at issue in *Hardison*, would constitute undue hardship." *Id.* But administrative costs for providing a religious accommodation, such as "costs involved in rearranging schedules and recording substitutions for payroll purposes" "will not constitute more than a *de minimis* cost." *Id.* Coworker or customer feelings, preferences, and complaints are not mentioned in § 1605.2.

### 3. EEOC Guidance

An EEOC Guidance addresses coworker complaints and customer preferences. U.S. EQUAL EMPLOYMENT OPPORTUNITY COMM'N, Section 12: Religious Discrimination (2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_25500674536391610749986%207844 (*EEOC Guidance*).

As to coworker complaints, the Guidance states, "Although infringing on coworkers' abilities to perform their duties or subjecting coworkers to a hostile work environment will generally constitute undue hardship, the general disgruntlement, resentment, or jealousy of coworkers will not." *Id.* (footnotes omitted). "Undue hardship requires more than proof that some coworkers complained or are offended by an unpopular religious belief or by alleged 'special treatment' afforded to the employee requesting religious accommodation; a showing of undue hardship based on coworker interests

generally requires evidence that the accommodation would actually infringe on the rights of coworkers or cause disruption of work." *Id.* (footnote omitted). "Applying this standard, it would be an undue hardship for an employer to accommodate religious expression that is unwelcome potential harassment based on race, color, sex, national origin, religion, age, disability, or genetic information, or based on its own internal anti-harassment policy." *Id.* So in general, the EEOC requires more than coworker complaints or offense by an employee's religious observance or practice to constitute an undue hardship. The religious accommodation must cause some operational disruption, or rise to such a level that it can be considered harassment or to cause a hostile work environment. *Id.*

As to customer preference, the Guidance states, "An employer's action based on the discriminatory preferences of others, including coworkers or customers, is unlawful." *Id.* It provides an illustrative example:

> **Employment Decision Based on Customer Preference**
>
> Harinder, who wears a turban as part of his Sikh religion, is hired to work at the counter in a coffee shop. A few weeks after Harinder begins working, the manager notices that the work crew from the construction site near the shop no longer comes in for coffee in the mornings. When he inquires, the crew complains that Harinder, whom they mistakenly believe is Muslim, makes them uncomfortable in light of the September 11th attacks. The manager tells Harinder that he has to let him go because the

> customers' discomfort is understandable. The
> manager has subjected Harinder to unlawful re-
> ligious discrimination by taking an adverse ac-
> tion based on customers' preference not to have
> a cashier of Harinder's perceived religion. Ha-
> rinder's termination based on customer prefer-
> ence would violate Title VII regardless of
> whether he was – or was misperceived to be --
> Muslim, Sikh, or any other religion.

*Id.*

This example shows that the EEOC does not tolerate reli-
gious discrimination based on the preferences, opinions, and
feelings of customers about an employee's religious ob-
servance or practice.

It can be debated whether a public-school student is more
like a coworker or a customer. A customer gives voluntary
patronage to a business, while a public school requires stu-
dent attendance (unless alternative schooling is available). So
a public-school student may be more akin to a coworker than
a customer. If a student is seen as a coworker, the Guidance
suggests that the student's disgruntlement at employee con-
duct is not enough for undue hardship. But if the employee
conduct constitutes harassment of the student or causes a hos-
tile educational environment, then it would be enough. If a
public-school student is closer to a customer of a school, the
Guidance suggests that the student's disgruntlement is not
enough for undue hardship. The majority opinion situates the
student offense as closer to customer preference, which

No. 21-2475                                               101

categorically would not provide a basis for undue hardship under the EEOC Guidance.

### 4. Caselaw

The post-*Hardison* caselaw is sparse on whether coworker or customer offense is enough for more than a *de minimis* cost to the employer. This court has not addressed the question, but other circuits have and generally find that the grumblings or offense of others are not enough to constitute undue hardship.

*Customer Sentiments.* The majority opinion cites *Anderson v. U.S.F. Logistics (IMC), Inc.,* 274 F.3d 470 (7th Cir. 2001), for the proposition that customer complaints—and thus student complaints—may suffice to constitute an undue hardship upon the employer. *Anderson* involved a Christian employee who sought to use the phrase "Have a Blessed Day" in signing off on written correspondence or ending telephone conversations. *Id.* at 473. The employer became concerned when one of its clients complained that the employee's use of the phrase was "unacceptable" and "must stop." *Id.* The employee filed suit for a preliminary injunction that allowed her to use the phrase in communications with the employer's customers, which the district court denied. *Id.* at 474.

In affirming the district court, this court observed that "Anderson's religious practice did not require her to use the 'Blessed Day' phrase with everyone" and that the employer was "concerned about its relationship with its customers." *Id.* at 476. We also recognized that the employer had a "legitimate interest[]" in protecting its relationship with clients. *Id.* at 477. Ultimately, we concluded that the employer had reasonably accommodated its employee by allowing Anderson to use the

phrase with co-workers but not clients. *Id.* at 474–76. Recall that the employer's Title VII duty to accommodate "is at an end" when "where the employer has already reasonably accommodated the employee's religious needs." *Ansonia*, 479 U.S. at 68. Therefore, in *Anderson* this court did not consider whether customer objections to an employee's religious belief or practice were enough to constitute more than a *de minimis* cost to the employer.

More importantly, *Anderson* is distinguishable from the facts in this case. Anderson sought to use a religious phrase, which the district court had found to impose her religious beliefs on the employer's clients or vendors. *Anderson*, 274 F.3d at 477–78. As the majority opinion recognizes, *Anderson* held that the employer could restrict the employee's religious speech with clients in providing the reasonable accommodation. *Id.* But here, an employer seeks to force an employee to engage in transgender-affirming speech contrary to his religious beliefs. Whether Kluge's gender-neutral accommodation constitutes an undue hardship by way of the School District's clients—the students—should be an open question for the factfinder. Recall that the EEOC opines that employers' adverse employment "action based on the discriminatory preferences of others, including coworkers or customers, is unlawful." *EEOC Guidance*.

*Coworker Sentiments.* Other courts have addressed whether coworker offense is enough to constitute undue hardship. In *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397 (9th Cir. 1978), the Ninth Circuit held that coworkers' "general sentiment against" a "free rider[]" employee who refused to join an employer-mandated union on religious grounds was not an undue hardship. *Id.* at 402. The court stated,

"Undue hardship means something greater than hardship. Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts. Even proof that employees would grumble about a particular accommodation is not enough to establish undue hardship." *Id.* And in a factually similar case, the Ninth Circuit reiterated that "undue hardship requires more than proof of some fellow-worker's grumbling or unhappiness with a particular accommodation to a religious belief." *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 407 (9th Cir. 1978) (citing *General Dynamics*, 589 F.2d at 402). Though *General Dynamics* did not discuss *Hardison*'s *de minimis* cost test, the Ninth Circuit cited the case and operated under its regime. *Id.* at 400–01 (citing *Hardison*, 432 U.S. 63). *Burns* affirmed *General Dynamics*'s core principle that grumblings are not sufficient in an explicit analysis under *Hardison*. *Burns*, 589 F.2d at 406–07. Whether students are closer to coworkers or customers, *General Dynamics*, *Burns*, and the EEOC Guidance provide that grumblings are not enough for undue hardship.

In *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607–08 (9th Cir. 2004), the Ninth Circuit explained that an employer "need not accept the burdens that would result from allowing actions that demean or degrade, or are designed to demean or degrade, members of its workforce." The relevant employee had publicly posted in the workplace Bible scriptures condemning sodomy in response to his employer's poster promoting inclusion of gay workers. *Id.* at 601–02. So the Ninth Circuit's law generally accords with the EEOC Guidance's

suggestion that, while coworker grumblings are not sufficient to establish undue hardship, coworker harassment is.[3]

*How much more than* de minimis? In *Burns* and *General Dynamics*, the courts entered a judgment in favor of the employee, reversing bench trial decisions and concluding that the employer had failed to demonstrate that no reasonable accommodation could be provided without undue hardship. *Burns*, 589 F.2d at 407–08; *General Dynamics*, 589 F.2d at 402–03. That these cases and numerous other court decisions on the *de minimis* cost issue have been resolved by trial—some in favor of the employer, others for the employee—shows that the test, even if more than a *de minimis* cost, has some teeth.[4]

---

[3] Kluge also cited a decision that was later vacated, *Cummins v. Parker Seal Co.*, 516 F.2d 544 (6th Cir. 1975), *aff'd*, *Parker Seal Co. v. Cummins*, 429 U.S. 65 (1976), *vacated on reh'g*, 433 U.S. 903 (1977). Another Sixth Circuit decision, *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520–21 (6th Cir. 1975), stands for the principle for which Kluge cited it: that coworker grumblings are not enough for undue hardship. Whether *Draper*'s holding on coworker grumblings remains good law in the Sixth Circuit after *Hardison* is an open question.

[4] *See, e.g.*, *Beadle v. City of Tampa*, 42 F.3d 633 (11th Cir. 1995) (judgment for employer); *Mann v. Frank*, 7 F.3d 1365 (8th Cir. 1993) (same); *Cook v. Chrysler Corp.*, 981 F.2d 336 (8th Cir. 1992) (same); *Ryan v. U.S. Dep't of Just.*, 950 F.2d 458 (7th Cir. 1991) (same); *United States v. Bd. of Educ. for Sch. Dist. of Phila.*, 911 F.2d 882 (3d Cir. 1990) (same); *Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986) (same); *Turpen v. Missouri-Kansas-Texas R. Co.*, 736 F.2d 1022 (5th Cir. 1984) (same); *Wren v. T.I.M.E.-D.C., Inc.*, 595 F.2d 441 (8th Cir. 1979). *But see, e.g.*, *Opuku-Boateng v. California.*, 95 F.3d 1461, 1469 (9th Cir. 1996) (Sabbatarian case in which the Ninth Circuit concluded that the district court clearly erred in finding undue hardship and granted judgment for employee); *Brown v. Polk County*, 61 F.3d 650, 656–57 (8th Cir. 1995) (partial reversal and remand for judgment and relief for employee because employer had not demonstrated that "occasional spontaneous prayers and

No. 21-2475                                                    105

At least one circuit court has remanded for a new jury trial on the *de minimis* cost issue. *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1439–41 (9th Cir. 1993). So, it follows that this fact-laden issue is often decided by trial.

Even when the *de minimis* cost issue is decided at summary judgment, our fellow circuits vary greatly in construing the test.[5] But religious accommodation caselaw confirms that the

---

isolated references to Christian belief" caused undue hardship); *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 134–35 (3d Cir. 1986) (upholding on clear error review the district court's finding of no undue hardship based on the lower court's familiarity with the evidence and witness credibility findings); *Nottelson v. Smith Steel Workers D.A.L.U. 19806, AFL-CIO*, 643 F.2d 445, 452 (7th Cir. 1981) (affirming judgment for plaintiff because the employer failed to present evidence of undue hardship).

[5] *See, e.g.*, *Groff v. DeJoy*, 35 F.4th 162, 175 (3d Cir. 2022) (judgment for employer), *cert. granted*, 143 S. Ct. 646 (2023); *EEOC v. Walmart Stores E., L.P.*, 992 F.3d 656 (7th Cir. 2021) (judgment for employer); *EEOC v. GEO Grp., Inc.*, 616 F.3d 265 (3d Cir. 2010) (same); *Webb v. City of Philadelphia*, 562 F.3d 256 (3d Cir. 2009) (same); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004) (judgment for employer where there was harassment of coworkers); *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508 (6th Cir. 2002) (judgment for employer); *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495 (5th Cir. 2001) (same); *Daniels v. City of Arlington*, 246 F.3d 500 (5th Cir. 2001) (same); *Seaworth v. Pearson*, 203 F.3d 1056 (8th Cir. 2000) (same); *Weber v. Roadway Exp., Inc.*, 199 F.3d 270 (5th Cir. 2000) (same); *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019 (10th Cir. 1994) (same); *Cooper v. Oak Rubber Co.*, 15 F.3d 1375 (6th Cir. 1994) (same); *Eversley v. MBank Dallas*, 843 F.2d 172 (5th Cir. 1988) (same). *But see, e.g.*, *Tabura v. Kellogg USA*, 880 F.3d 544, 557–58 (10th Cir. 2018) (remanded for trial because defendant did not move for summary judgment on undue hardship issue); *Davis v. Fort Bend County*, 765 F.3d 480 (5th Cir. 2014) (genuine issue of material fact on undue hardship issue); *Antoine v. First Student, Inc.*, 713 F.3d 824 (5th Cir. 2013) (same); *Adeyeye v. Heartland Sweeteners*, LLC, 721 F.3d 444, 455–56 (7th Cir. 2013) (same); *Balint v. Carson City*, 180 F.3d 1047 (9th Cir.

*de minimis* cost test has some weight. Application of that test to an accommodation is necessarily fact-intensive, and many cases are resolved by the factfinder. The majority opinion's reading of the *de minimis* cost test effectively eliminates the duty of the employer to provide reasonable religious accommodations where there are complaints of offense.

### III. Religious Accommodation Claim

At the heart of this appeal is the district court's grant of summary judgment to the School District on Kluge's religious accommodation claim. We review that decision de novo. *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020). When reviewing cross-motions for summary judgment, as here, we view the facts "in favor of the party against whom the motion under consideration is made," drawing all reasonable inferences in its favor. *Id.* (citation omitted); *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016) (citation omitted).

I conclude first that Kluge has demonstrated his religious beliefs are sincerely held and he has established a prima facie case for religious discrimination. In reaching this partial summary judgment for Kluge, I construe all facts in favor of the School District. Then the burden shifts to the School District to show that any reasonable accommodation would in fact result in undue hardship. *Porter*, 700 F.3d at 951; *Adeyeye*, 721 F.3d at 455. We do not have to postulate a reasonable accommodation as one is provided: Kluge's last-names-only accommodation as used in the 2017–2018 school year. The question then is whether, construing the evidence and reasonable inferences in favor of Kluge, the School District has carried its

---

1999) (same); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1577, 1583 (7th Cir. 1997) (affirming summary judgment for employee).

burden to prove that the accommodation caused more than a *de minimis* cost to it. In performing this analysis, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are reserved for the factfinder. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCottrell v. White*, 933 F.3d 651, 655 (7th Cir. 2019). To me, the School District has not satisfied its burden and a genuine issue of material fact remains for trial.

### A. Sincerity

The School District concedes for purposes of appeal that Kluge made his prima facie case, but it challenges the sincerity of Kluge's religious beliefs in the alternative.

To show sincerity, Kluge "must present evidence that would allow a reasonable jury to find that (1) 'the belief for which protection is sought [is] religious in [the] person's own scheme of things' and (2) that it is 'sincerely held.'" *Adeyeye*, 721 F.3d at 451 (quoting *Redmond*, 574 F.2d at 901 n.12). When reviewing a plaintiff's sincerity, courts do not review an individual's "motives or reasons for holding the belief." *Id.* at 452. Nor do courts "dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 452–53 (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715 (1981)). "In such an intensely personal area, … the claim of the [practitioner] that his belief is an essential part of a religious faith must be given great weight." *United States v. Seeger*, 380 U.S. 163, 184 (1965). Title VII does not "require perfect consistency in observance, practice and interpretation when determining if a belief system qualifies as a religion or whether a person's belief is sincere." *Adeyeye*, 721 F.3d at 453.

"[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance." *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012) ("[F]or where would religion be without its backsliders, penitents, and prodigal sons?") (citing *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988)). It is not within the court's "province to evaluate whether particular religious practices or observances are necessarily orthodox or even mandated by an organized religious hierarchy." *Adeyeye*, 721 F.3d at 452.

Kluge has proved the sincerity of his beliefs. He is an active leader at his local church and believes in the absolute truth of the Bible, a fact he repeatedly told the School District when voicing concerns over its new policies. R. 120-3, at 4–5, 7, 19; R. 113-1, at 6–9; R. 113-2, at 2. He believes that, per his religion, he cannot affirm transgender identity by calling his transgender students by their modified PowerSchool names. R. 120-3, at 14; R. 120-19, at 6. All of this is uncontested, and "[t]he validity of what he believes cannot be questioned." *Seeger*, 380 U.S. at 184; *see also Adeyeye*, 721 F.3d at 452.

Kluge and Superintendent Snapp recount discussing their contrasting Christian beliefs on July 27, 2017, and I credit Snapp's testimony that it was a "cordial" chat. R. 113-6, at 6–7; R. 120-3, at 19. During that conversation, Kluge said he explained his beliefs with scripture. R. 120-3, at 19. Nothing in Snapp's recollection of the discussion suggests this is untrue. R. 113-6, at 6–7. In that meeting, Kluge ultimately refused to comply with the School District's Name Policy because his religious beliefs would not permit it. R. 120-3, at 14; R. 120-19,

at 6. So when opposed, Kluge defended his religious beliefs and practices.

The School District's sole rejoinder to these undisputed facts is Kluge's deviation from the last-names-only accommodation during the May 2018 orchestra awards ceremony. Kluge testified he complied with the Name Policy on that occasion because he believed "it would have been unreasonable and conspicuous" to refer to his students by only their last names at the ceremony.[6] R. 120-3, at 33. Kluge said he was "making a good effort to work within the bounds of [his] accommodation," and believed an exception for this "special" and "formal" event complied with his religious beliefs because it was not "ordinary" or regular behavior. *Id.* at 33–34. On this point, his attorney's EEOC submission states, "Kluge's Christian faith required that he do no harm to his students, and this acquiescence to the administration's position was done solely out of sincerely-held beliefs." R. 120-19, at 7.

No evidence is presented to the contrary. The School District notes that Kluge testified there are instances where it is appropriate and consistent with his religious beliefs to address a transgender student by the student's first name, even if the first name differs from the student's biological sex. R. 120-3, at 8–9. This is consistent with Kluge balancing his Christian beliefs of not affirming transgender identity with doing no harm. The School District also cites evidence that Kluge's religious denomination does not take a hardline

---

[6] The majority opinion construes this statement as a legal concession that using last names only would potentially cause harm to his students, but Kluge did not concede this point in his briefs or at oral argument.

stance in requiring a transgender child to use the bathroom of her birth sex. R. 120-4, at 12. But even construing the record in the light most favorable to the School District, I do not see how this evidence impugns Kluge's otherwise regular religious belief and practice of not using the PowerSchool names.

The evidence shows Kluge balancing his Christian values of not "regularly calling students by transgender names" with his duty to "do no harm." R. 120-3, at 33; R. 120-19, at 7. In evaluating sincerity, we are not to criticize Kluge's balancing or take issue with a one-time exception. *Adeyeye*, 721 F.3d at 453–54 (rejecting employer's contention that the court should probe and disapprove of employee's religious beliefs); *Grayson*, 666 F.3d at 454 (overlooking that Nazirite believer followed certain biblical proscriptions but not others). At the ceremony, Kluge chose a path in accord with his balancing of his Christian values. This does not detract from his sincerity or create a genuine issue of material fact on the issue. Construing all facts in the School District's favor, I conclude that Kluge has established the sincerity of his religious beliefs and practices.

### B. Prima Facie Case

The majority opinion proceeds under the School District's concession on appeal that Kluge established a prima facie case for the religious accommodation claim. I conclude that Kluge is entitled to partial summary judgment on the prima facie case for his religious accommodation claim.

Recall that to make a prima facie case based on an employer's failure to provide a religious accommodation, a plaintiff must show: (1) an observance or practice that is religious in nature; (2) that conflicts with an employment

requirement; and (3) that the need for a religious accommodation was a motivating factor in the adverse employment decision or other discriminatory treatment. *Ilona*, 108 F.3d at 1575; *Abercrombie*, 575 U.S. at 772–73. There is no question that Kluge's refusal to adhere to the Name Policy is a religiously motivated practice. This refusal conflicts with the School District's Name Policy. Further, the School District does not dispute that requiring Kluge to choose between Name Policy compliance, resignation, or termination was an adverse employment action. So, the prima facie case turns on whether Kluge's need for a religious accommodation was a motivating factor for his forced resignation.

There is no doubt that it was, viewing the record in the School District's favor. Its asserted reason for forcing Kluge to resign was the "[c]omplaints from the high school community" regarding the very last-names-only accommodation that Kluge had requested in July 2017. R. 121, at 45. The School District said it had "received complaints that the accommodation was not conducive to a well-run classroom and negatively impacted students." *Id.* Thus, the reason for the adverse employment action is the accommodation that Kluge requested and received for the 2017–2018 school year. Kluge had three choices at the end of that school year: comply with the Name Policy, resign, or be terminated. R. 113-2, at 6; R. 15-3, at 6.

If Kluge did not need a religious accommodation for the Name Policy and complied with its terms, he could stay. So, there is no genuine issue of material fact that Kluge's need for a religious accommodation was a motivating factor behind the School District's adverse employment decision. The Supreme Court clarified in *Abercrombie* that Title VII supplies a

"motivating factor" standard even lower than "the traditional standard of but-for causation." 575 U.S. at 773 (citing 42 U.S.C. § 2000e-2(m)). Under this lenient standard Kluge proved the motivating factor element and thus a prima facie case for his religious accommodation claim.

Having established the prima facie case, the burden shifts to the School District to show that any reasonable accommodation would result in undue hardship—that is, more than a *de minimis* cost. *Porter*, 700 F.3d at 951; *Hardison*, 432 U.S. at 84. Viewing the evidence and reasonable inferences in Kluge's favor, there is a genuine issue of material fact on the question of undue hardship. The School District points to two sources of hardship: fear of Title IX liability and interference with its ability to educate students. I consider these two grounds in the next two sections.

### C. Fear of Title IX Liability

The evidence is lacking that the School District considered and was concerned about Title IX liability. Under current caselaw, the alleged fear amounted to speculation.

Only a single piece of evidence might indicate that the School District contemplated Title IX liability: one sentence in the form presented to Kluge on July 31, 2017, which stated, "This directive is based on the status of a current court decision applicable to Indiana." R. 15-1, at 1. Nothing suggests what the School District meant by this sentence. Yet the majority opinion states, without record support, that "[t]he 'current court decision applicable to Indiana' was likely our decision in *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), abrogated on other grounds by *Illinois Republican Party v. Pritzker*, 973 F.3d

760 (7th Cir. 2020), which had been issued two months prior to" the July 31 compromise meeting. Presumably the majority opinion juxtaposes the timing of the School District's form and *Whitaker* to conclude that the District was likely referring to that case. But without record evidence, that inference stretches too far. In addition, this speculation runs counter to the requirement at this stage that facts and inferences be construed in favor of Kluge. Properly viewed, the sentence on the School District's form is an unclear statement of concern about the implications of an unidentified court decision.

Even if we were to accept that the School District considered *Whitaker*, at best that case creates only a speculative risk of Title IX liability based on Kluge's actions. First, *Whitaker* concerned a district court's grant of preliminary injunction based on a Title IX theory of transgender sex-stereotyping by a school district. 858 F.3d at 1038–39. In that case this court concluded only that the transgender students in question were sufficiently likely to succeed on the merits of their Title IX sex discrimination claim against the school district to warrant a preliminary injunction. *Id.* at 1046–50. That said, the Supreme Court has held that, under Title VII, an employer who discriminates against an employee for being transgender discriminates on the basis of sex. *Bostock v. Clayton County*, 140 S. Ct. 1731, 1743 (2020). But the Court has not held that the same construction of sex discrimination applies to Title IX.

Second, *Whitaker* concerned a transgender student who requested preliminary injunctive relief to allow him to use the boys' bathroom in violation of the school district's bathroom policy. *Whitaker*, 858 F.3d at 1038–39. So, assuming that "on the basis of sex" is interpreted in accordance with *Bostock*, the school district's policy of excluding transgender students

SA-115

from non-birth-sex restrooms only arguably violated Title IX's provision that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also* 34 C.F.R. § 106.31(a). Such legal assumptions, without the benefit of Supreme Court or Seventh Circuit authorities establishing Title IX liability for transgender discrimination, present merely speculative risk of Title IX liability for the School District.

Even more, it is unlikely that Kluge conforming with the Name Policy constitutes a benefit of a federally funded educational program. Further, Kluge's last-names-only practice is gender-neutral and generally applicable, so it is doubtful that the practice constitutes discrimination on the basis of sex. Even if we assume that the School District considered the implications of *Whitaker* and Title IX liability, any risk it faced was speculative. Construing the record in Kluge's favor, I conclude that the School District may not rely on fear of Title IX liability in the undue hardship equation.

### D. Interference with Educational Mission

This leaves the School District with its other alleged basis for undue hardship—interference with its educational mission. The majority opinion agrees with the district court's conclusion that "Kluge's use of the last names only accommodation burdened [the School District's] ability to provide an education to all students and conflicted with its philosophy of creating a safe and supportive environment for all students." I evaluate this ground by examining: (1) the School District's educational mission; (2) the complaints of offense taken to Kluge's last-names-only accommodation and whether they

constitute more than a *de minimis* cost; and (3) other considerations, including caselaw and the practical impact of the majority opinion.

### 1. The School District's Educational Mission

Before assessing the evidence, it is important to understand what the School District's educational mission is for its students and its grounds for claiming this mission.

*Indiana Constitution.* The School District relies first on the Education Clause (Article 8, Section 1) of the Indiana Constitution to define its educational mission. That provision states in relevant part that it "shall be the duty of the General Assembly … to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." IND. CONST. art. VIII, § 1. The district court suggests that this charge to provide public education "equally open to all" meant the School District has a constitutional mission to affirm transgender identities in public schools.

But the text and history of the Education Clause confirm that the phrase "equally open to all" refers only to the equal admission of students. The text of the Indiana Constitution expresses "a duty to *provide* for a general and uniform system of open common schools without tuition." *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 520 (Ind. 2009). The Education Clause "does not require the attainment of any standard of resulting educational quality." *Id.* at 521. "The phrases 'general and uniform,' 'tuition … without charge,' and 'equally open to all' do not require or prescribe any standard of educational achievement that must be attained by the system of common schools." *Id.* Contemporary dictionaries confirm this

reading. For example, "open" was defined as "[a]dmitting all persons without restraint; free to all comers." *Open*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 571 (1841). On its face, the text of the Education Clause "says nothing whatsoever about educational quality." *Bonner*, 907 N.E.2d at 521.

The historical context of the Education Clause supports this plain meaning interpretation. In the years preceding the Education Clause's ratification, the Indiana General Assembly had engaged in a series of constitutional and legislative efforts to provide for a "common school" education. *Nagy ex rel. Nagy v. Evansville-Vanderburgh Sch. Corp.*, 844 N.E.2d 481, 484–89 (Ind. 2006); 2 DONALD F. CARMONY, THE HISTORY OF INDIANA 381 (1998); DONALD F. CARMONY, THE INDIANA CONSTITUTIONAL CONVENTION OF 1850–1851 103–04 (1931). The phrase "common school" referenced schools that were "open to the children of all the inhabitants of a town or district." *Nagy ex rel. Nagy*, 844 N.E.2d at 489 (quoting AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 988 (1856))

By the 1850–1851 Indiana Constitutional Convention—in which the Education Clause was drafted—the common school movement had garnered "considerable attention" and support for the idea that the state should be responsible for providing every child the opportunity for elementary education. *Embry v. O'Bannon*, 798 N.E.2d 157, 162–63 (Ind. 2003). The convention debates centered on the need to provide for the "education of every child in the State." 2 REPORT OF THE DEBATES AND PROCEEDINGS OF THE CONVENTION FOR THE REVISION OF THE CONSTITUTION OF THE STATE OF INDIANA 1858–61 (1851). The Convention also adopted a resolution to describe the relevant changes in the Indiana Constitution it had drafted, which stated: "It is also provided, that the Legislature

shall establish a uniform system of common schools, wherein tuition shall be free." INDIANA HISTORICAL COMMISSION, CONSTITUTION MAKING IN INDIANA 410 (1916) (quoting *An Address to the Electors of the State* (Feb. 8, 1851)). The Education Clause was thereafter ratified as part of the Constitution of 1851. IND. CONST. art. VIII, § 1; WILLIAM P. MCLAUCHLAN, THE INDIANA STATE CONSTITUTION 16 (2011). Following ratification, in December 1851, Governor Joseph A. Wright addressed the General Assembly, stating that it was their "duty to husband this fund … to provide for the education of the youth of every county, township, and district." *Horner v. Curry*, 125 N.E.3d 584, 599 (Ind. 2019) (quoting *Indiana House Journal* at 20 (Dec. 2, 1852)).

This historical tour confirms that the text of the Indiana Constitution's Education Clause only charges the School District with admitting all children into its schools. It does not require or prescribe any specific standard of educational quality.

*Statutory Directive.* In identifying the School District's educational mission, the district court also relied on the fact that "[t]he Indiana Supreme Court has recognized that public schools play a 'custodial and protective role,' which has been codified by the legislature in passing compulsory education laws that mandate the availability of public education. *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002)." The majority opinion also relies on *Linke*. But the Indiana Supreme Court in *Linke* merely confirmed that the Indiana legislature had codified compulsory school attendance and Indiana school corporations' supervision over all pupils in accordance with the Education Clause. *Linke*, 763 N.E.2d at 979, 983 (citing IND. CONST. art. VIII, § 1 and the then-effective IND. CODE

§ 20–8.1–5.1–3). That court did not read into the Education Clause a requirement that Indiana school corporations affirm transgender identity.

*The School District's Policy.* Without a purported constitutional or statutory obligation to affirm transgender identity, the School District is left with its own recent policy to inform its educational mission. The principles and mission underlying the Name Policy were outlined in the January 22, 2018 Transgender Questions document and accompanying Transgender Considerations presentation in the middle of the 2017–2018 school year. R. 15-4; R. 120-20. While styled as "Questions" and "Considerations" and couched in precatory language on gender-neutral practices, as applied to Kluge and in practice, they were more than suggestions.

For example, the Questions document said that staff should "make all students feel welcome and accepted in the public school environment." R. 15-4, at 9. And the Considerations presentation said, "Creating a safe and supportive environment for all students is important." R. 120-20, at 7. The Considerations presentation also had several gender-neutral best practices such as providing "gender neutral uniforms"; avoiding using "boy/girl methods to divide students"; and using gender-neutral indefinite pronouns/nouns such as "everyone" or "people" instead of "ladies and gentlemen." *Id.* at 5. It suffices to say that the School District adopted an educational mission to create a safe and supportive learning environment for all students and, more specifically, transgender students.

## 2. Complaints of Offense

The question then becomes whether the complaints of offense taken by school staff and students to Kluge's use of last names are enough to constitute more than a *de minimis* cost to the School District's mission of creating a transgender-supportive learning environment. Considering Kluge's gender-neutral accommodation, teacher and student complaints about that accommodation, evidence in Kluge's favor, and various credibility questions, I conclude that there is a genuine issue of material fact on this evidentiary record.

### i. Gender-neutral Accommodation

The last-names-only accommodation was, obviously, gender-neutral. Kluge called students by their last names in the 2017–2018 school year. The evidence conflicts as to whether he was perfectly consistent in this practice. *See* R. 58-2, at 3; R. 120-19, at 7; R. 120-3, at 36; R. 52-3, at 2; R. 52-4, at 2; R. 52-5, at 2. But Kluge, another teacher, and three of his students during the 2017–2018 school year attested that he was consistent. R. 120-3, at 36; R. 52-2, at 3; R. 52-3, at 2; R. 52-4, at 2; R. 52-5, at 2. Construing the record in Kluge's favor and crediting his testimony leads to the conclusion that he adhered to the accommodation.

Even if Kluge's testimony is not credited, the school administration acknowledged that mistakes could happen. A Brownsburg High School counselor acknowledged that there may be instances where school staff "don't get" a transgender student's name or pronoun "quite right." R. 120-13, at 5. And the Considerations presentation stated, "*Try* not to make assumptions about the genders of students." R. 120-20, at 5 (emphasis added). The Questions document even addressed how

to handle a "student exploding in anger with being called the wrong name or gender." R. 15-4, at 10. For the most part, Kluge consistently referred to all students in a gender-neutral manner by their last names only, so undue hardship either did not arise or the record presents a factual dispute.

### ii. Teacher Complaints

Craig Lee and several teachers, including two fine arts department heads, complained about how Kluge was addressing students to the school administration. R. 120-2; R. 120-14, at 16–17; R. 113-5, at 8–9. Lee averred the complaints of three teachers arose out of concerns that Kluge's practice "was harming students." R. 120-14, at 17. Lee did not mention any harm or harassment of the teachers themselves. But he added that none of the three teachers told him that they had visited Kluge's class or witnessed the harm firsthand. *Id.* And Principal Daghe attested the complaints from the department heads mostly arose from "continued issues" relayed from students "that were in [Kluge's] classes." R. 113-5, at 8. Unlike in *Peterson*, where the employee posted scriptures demeaning or degrading gay coworkers, 358 F.3d at 601–02, 607, nothing in the record shows Kluge harassing his coworkers by adhering to the last-names-only accommodation.

Undue hardship requires more than coworker offense by a religious belief or practice. It requires actual infringement on the rights of coworkers—such as by harassment—or the disruption of work. *See EEOC Guidance*; *General Dynamics*, 589 F.2d at 402; *Burns*, 589 F.2d at 407. Viewing the record in favor of Kluge, the evidence does not show that his coworkers' complaints were more than mere complaints of offense. In fact, the teacher complaints relay student complaints, which

form the real core of the School District's case for undue hardship.

### iii. Student Complaints

Two transgender students and an unidentified number of other students complained that Kluge's use of last names only offended them. Teacher Craig Lee relayed that at Equality Alliance meetings, Aidyn and Sam said they found the practice "insulting and disrespectful." R. 120-14, at 7. He could not "recall any other students … who are transgendered [sic]" talking about the subject. *Id.* at 6–7. Lee's declaration said students in Kluge's class felt likewise. R. 58-2, at 2. Assistant Superintendent Jessup's recollection of an Equality Alliance meeting accords with this report. R. 120-1, at 4.

Aidyn and Sam also spoke on their own behalf. Aidyn said Kluge's practice "made [Aidyn] feel alienated, upset, and dehumanized." R. 22-3, at 4. Sam attested "Mr. Kluge's use of last names in class made the classroom environment very awkward" and that, even now, Kluge's actions hurt him and cause him anxiety. R. 58-1, at 3–4. Their complaints were consistent with one letter and one email chain from parents of transgender students, which were transmitted to the school administration in fall 2017. R. 120-12; R. 120-13. The parents of one transgender student, in reference to a teacher that "routinely refers to [our child] by his last name only," said the practice was "ok, but we do wonder if the teacher does this with other students or if it is only [our child]." R. 120-12. So at least one transgender student's parents thought Kluge's practice was fine if consistently applied.

The majority opinion repeatedly states that Kluge's last-names-only practice caused classroom "disruption," citing

portions of Principal Daghe's affidavit and deposition. R. 120-2, at 4; R. 112-5, at 7. Daghe does not mention disruption. Instead, he notes "tension," "uncomfortableness," and that the accommodation was "not going well." R. 120-2, at 4; R. 112-5, at 7–8. He asserts such "tension … was affecting the overall functioning of the performing arts department." R. 120-2, at 4. But neither Daghe nor the record reveals how Kluge's last-names-only practice hampered the department's operations, and there is much countervailing evidence. Besides, we are to draw all reasonable inferences in Kluge's favor.

My colleagues also infer that Kluge acknowledged creating tension and conflict at the school when he said Principal Daghe wanted him to resign "simply because [Daghe] didn't like the tension and conflict." R. 15-3, at 5. But the context of this quote demonstrates that Kluge was referring to *Daghe's* perception of tension and conflict—not his own. In the paragraph directly before this quote, Kluge recounted that Daghe said "he didn't like things being tense and didn't think things were working out." The majority opinion again fails to view the record in Kluge's favor.

There is a crucial distinction here: No evidence shows that Kluge revealed to students his motivations for calling them by their last names in the 2017–2018 school year. Lee's retelling of a student's complaint said that the student "was fairly certain that all the students knew why Mr. Kluge had switched to using last names." R. 58-2, at 3. Aidyn alleged that "Kluge's behavior was noticeable to other students in the class." R. 22-3, at 4. But Aidyn also recalled, "At one point, my stand partner asked me why Mr. Kluge wouldn't just say my name. I felt forced to tell him that it was because I'm transgender." *Id.* The record says nothing about Aidyn telling

the stand-mate about his intuitions of Kluge's motive. And importantly, Aidyn's recollection of his stand partner asking him about Kluge's last-names-only practice corroborates other testimony that students did not know Kluge's motives. Similarly, Sam said "[m]ost of the students knew why Mr. Kluge had switched to using last names." R. 58-1, at 3–4. But Sam did not explain how the students knew Kluge's motives for using last names only.

In contrast, the record is replete with evidence that Kluge never revealed his religious motives and that students did not know the reason why Kluge used last names only. Three students—Lauren Bohrer, Kennedy Roberts, and Mary Jacobson—attested that Kluge consistently called his students by their last names and did not explain his motives for doing so. R. 52-3, at 3; R. 52-4, at 2; R. 52-5, at 2. Roberts "never really thought anything of it. It's just what he did." R. 52-4, at 2. And fellow music teacher Natalie Gain averred that she "never heard [Kluge] use gendered language in the classroom"; "only heard him use last names with the students"; and "never heard any of the students discussing the [sic] Mr. Kluge's use of last names, or any references to his agreement with the administration." R. 52-2, at 3. "[A]s far as [she] could tell, Mr. Kluge's accommodation was not common knowledge … ." *Id.*

The evidence shows that student complaints of offense at Kluge's last-names-only practice came not from any discomfort with the practice itself but from students' assumptions and intuitions about why Kluge was using only last names. Neither this nor any other court has held that mere offense at an employee's religious observance or practice is enough for undue hardship. And the facts here are a step removed: The

alleged offense arose from students' presumptions and guesses as to Kluge's motives for using last names only. The majority opinion breaks new ground here. This distinction, as well as the evidence in Kluge's favor, presents a genuine issue of material fact on undue hardship.

### iv. Evidence for Kluge

The record also contains the testimony of Kluge, three students, and a teacher, who contradict the complaints about Kluge's last-names-only accommodation. The district court failed to give due weight to this evidence. But the majority opinion goes further, stating that Kluge's evidence is not relevant to undue hardship. To my colleagues, the undue hardship inquiry ended once the School District received some reports that the accommodation did not work and caused tension and discomfort.

Every court to consider undue hardship has framed the inquiry as an objective one, dependent on the factual context of the case. *See, e.g., Groff*, 35 F.4th at 174 ("The undue hardship analysis is case-specific, requiring a court to look to 'both the fact as well as the magnitude of the alleged undue hardship' … ." (quoting *GEO Group*, 616 F.3d at 273)); *Tabura*, 880 F.3d at 558 (cleaned up and citations omitted) ("Whether an employer will incur an undue hardship is a fact question that turns on the particular factual context of each case."); *Adeyeye*, 721 F.3d at 455. In a similar vein, cases evaluating undue hardship—including *Hardison*—address factors such as the need to rearrange schedules or the additional work burden on coworkers. *See, e.g., Hardison*, 432 U.S. at 83–84; *Adeyeye*, 721 F.3d at 455; *Ilona*, 108 F.3d at 1576–77. Because undue hardship depends on the factual context, the reports of three students and a teacher that contradict the alleged harms caused

by Kluge's last-names-only practice are relevant, whether or not this information was known by the School District at the time of the adverse employment decision.

The majority opinion holds that the undue hardship inquiry considers only evidence within the employer's knowledge when the adverse employment decision is made. But no authority is cited for this proposition. Under this reasoning, an employer's sole focus on allegations of difficulties arising from a religious accommodation would defeat any employee's failure-to-accommodate claim. Such an outcome creates a perverse incentive for employers to avoid investigating undue hardship. If, by contextual evidence obtained after discharge, an employee plaintiff is not able to undermine the alleged presence of undue hardship, when, if ever, can the employee prevail? Before his termination, the employee would have to bring to the employer's attention evidence contrary to the reports of undue hardship.

Consider the evidence for Kluge. Three students and a teacher submitted declarations that Kluge's practice did not diminish the classroom environment. Bohrer attested that because the orchestra class was large, Kluge rarely had occasion to call on any individual student directly. R. 52-3, at 2. Roberts corroborated that Kluge called last names for attendance "at first, maybe 5-8 times over the year." R. 52-4, at 2. This evidence tends to show that Kluge's last-names-only practice did not have more than a *de minimis* impact on classroom operations.

A number of students said Kluge's practice did not cause significant interruption with the classroom environment. Bohrer, Roberts, and Jacobson all testified similarly that Kluge's use of only last names was not unnatural, odd, or

126                                            No. 21-2475

uncomfortable. R. 52-3, at 3; R. 52-4, at 2; R. 52-5, at 2. Bohrer
said she never saw Kluge treat her transgender stand partner
differently and that the stand-mate "never told [her] that they
disliked Mr. Kluge's behavior or that Mr. Kluge had been un-
fair to them." R. 52-3, at 3. Fellow teacher Natalie Gain added
that Kluge "had mostly used last names … the previous
school year anyway, with 'Mr./Ms.' for students to encourage
a respectful teaching environment, like college classes." R. 52-
2, at 2. As such, she "saw no reason as to why there would be
issues with Mr. Kluge's compromise." *Id.*

Kluge also alleged that there were no issues with his use
of last names—no protests, classroom disturbances, cancelled
classes, student animosity, or tensions. R. 113-2, at 4; R. 120-3,
at 23. Instead, Kluge says the accommodation worked with-
out undue hardship. His students excelled, winning awards,
scoring high on their AP Music Theory exams, and participat-
ing in extracurricular music activities. R. 113-2, at 4; R. 120-3,
at 23–24. The School District contests none of these objective
measures of pedagogical success.

### v. Credibility Issues

The record also revealed potential biases and credibility
issues with many of the witnesses. A few notable examples
underscore the fact-intensive nature of the undue hardship
decision. Weighing the evidence on undue hardship and mak-
ing credibility determinations are reserved for the factfinder.
*Liberty Lobby*, 477 U.S. at 255; *McCottrell*, 933 F.3d at 655. Only
the factfinder "can be aware of the variations in demeanor and
tone of voice that bear so heavily on the listener's understand-
ing of and belief in what is said." *Anderson v. Bessemer City*,

470 U.S. 564, 575 (1985); *see also Kadia v. Gonzales*, 501 F.3d 817, 819–20 (7th Cir. 2007).

Kluge is biased to give testimony in his favor. His student Bohrer is a professed Christian, so her testimony may have been offered to favor Kluge. R. 52-3, at 3. Aidyn also has credibility issues. Bohrer alleged that Aidyn falsely accused her of calling him a "f----t." *Id.* at 4. A parent, Jeff Gracey, also opined that Aidyn seemed motivated to put Kluge out of a job. R. 52-6, at 3–4. And Craig Lee, the teacher who relayed student complaints about Kluge to the school administration, admitted he was "very biased." R. 120-15.

*          *          *

The evidence on undue hardship cuts for and against Kluge. Three students, a teacher, and Kluge all attest that the last-names-only accommodation worked without issue. But Aidyn and Sam, some students in secondhand accounts, and some teachers complained the accommodation did not work. Both sides have credibility issues. The witnesses conflict as to whether and to what degree Kluge's accommodation was offensive. Even more, the evidence shows that any alleged offense came from students' assumptions about Kluge's motives for the last-names-only practice—not from the practice itself. The record also shows that Kluge's practice was infrequent and not critical to how his music classes operated. Of course, at this posture, we must draw inferences from the facts in favor of Kluge, and reserve credibility issues and weighing of the evidence for the factfinder. This record demonstrates a genuine issue of material fact as to whether

the accommodation caused more than a *de minimis* cost to the School District's educational mission.

### 3. Caselaw and Practical Impact

In examining the School District's alleged basis for undue hardship—interference with its educational mission—there are also other considerations, including consistency with caselaw and the practical impact of the majority opinion's analysis.

*Caselaw.* Concluding that a fact issue exists on this record accords with this court's caselaw on the employer's duty to provide reasonable religious accommodations under Title VII. In *Walmart*, this court stated *Hardison*'s core is "that Title VII does not require an employer to offer an 'accommodation' that comes at the expense of other workers." *Walmart*, 992 F.3d at 659 (citing *Hardison*, 432 U.S. at 78–79). As mentioned earlier, there was no evidence that Kluge's accommodation burdened other school staff.

The majority opinion cites *Smiley v. Columbia College Chicago*, 714 F.3d 998, 1002 (7th Cir. 2013), for the proposition that a school has a legitimate interest in ensuring that its "instructors will teach classes in a professional manner that does not distress students." While correct, *Smiley* involved a teacher who singled out and harassed a student for being Jewish. *Id.* at 1000. The teacher was terminated for unprofessional conduct that "distress[ed] students." *Id.* at 1002. Kluge's last-names-only practice is different in kind, not just degree.

The majority opinion also analogizes the facts here to those in *Baz*, in which a V.A. hospital chaplain actively proselytized and held "Christian evangelical service[s]" in contravention of the hospital's purpose for his role that he serve as

a "quiescent, passive listener and cautious counselor." 782 F.2d at 703–04, 709. The V.A. had "instituted … an ecumenical approach to its chaplaincy with special attention to the sensitive needs of its patient population." *Id.* at 709. Reverend Baz's self-ascribed "active, evangelistic, charismatic" preaching and proselytization went against the hospital's mission and purpose for his role. *Id.* at 709. This court held that the V.A. had met its burden of producing evidence "tending to show that Reverend Baz's philosophy of the care of psychiatric patients is antithetical to that of the V.A." *Id.* at 706–07. "To accommodate Reverend Baz's religious practices, they would have to either adopt his philosophy of patient care, expend resources on continually checking up on what Reverend Baz was doing or stand by while he practices his (in their view, damaging) ministry in their facility." *Id.*

Here, of course, Kluge did not proselytize. He did not reveal to his students why he used only last names, and he never shared his religious beliefs with them. He used last names only with all his students, and Bohrer and Roberts suggested that even this last name usage was relatively infrequent. R. 53-3, at 2; R. 52-4, at 2. The question is whether this infrequent use of last names only when referring to students caused more than a *de minimis* cost as to render the practice unreasonable.

This court stated in *Adeyeye* that "[r]easonableness is assessed in context … and this evaluation will turn in part on whether or not the employer can in fact continue to function absent undue hardship" under the accommodation. 721 F.3d at 455. *Adeyeye* involved an employee who sought several weeks of unpaid leave to lead his father's religious burial rites. *Id.* at 447. This court held that the employer was not

entitled to summary judgment "that any reasonable jury would have to find that permitting Adeyeye to take three weeks of unpaid leave in conjunction with his week of vacation would have created an undue hardship." *Id.* at 455. Similarly in *Ilona*, this court upheld the district court's factual finding that the employer had not demonstrated that allowing two employees to take off a day for Yom Kippur resulted in more than a *de minimis* cost to the employer. 108 F.3d at 1572, 1576–77. If taking time off from work does not establish more than a *de minimis* cost, perhaps neither does allowing a teacher to use last names only.

In the district court, the School District argued that using a student's chosen first name is a "purely administrative" task or duty. R. 145, at 9-10; R. 121, at 24, 28. So it should come as no surprise that Kluge's accommodation required no adjustment to the School District's operation, scheduling, or curriculum. Our and other circuits' caselaw shows that the *de minimis* cost test has substance.

*Practical Impact.* Under the reasoning of the majority opinion, once an employer receives complaints of offense about an employee's religious observance or practice, undue hardship has been established as long as avoiding offense is its policy. But reviewing those complaints and the credibility of those complainants—including assessing any biases and motivations—are context-specific questions for the factfinder, which our caselaw requires. *See Adeyeye*, 721 F.3d at 455; *Kadia*, 501 F.3d at 819–20.

Consider a variation of the facts here. What if a teacher does not take issue with a transgender student's chosen first names, but that teacher does take issue—on religious grounds—with the use of chosen pronouns (they / them /

No. 21-2475                                                    131

their). So, the teacher insists on calling students by their chosen first name. Say a transgender student feels uncomfortable with the teacher's efforts to refer to all students by their first name where a pronoun would suffice. Would the students' discomfort and complaints be sufficient to force the teacher to use the chosen pronouns where appropriate or be terminated? Under the majority opinion's reasoning, the answer is "yes." The facts here are close to this hypothetical.

Recall the EEOC Guidance's example of the Sikh coffee shop employee, Harinder, who sought to wear his religiously mandated turban at work. Is Harinder out of luck if the café decides that religious neutrality or avoiding customer offense by religious apparel is its official policy? The EEOC is concerned that the already lenient *de minimis* cost test may be read out of existence by customer preferences or opinions. The majority opinion realizes these fears.

Properly interpreted and applied, Title VII should provide protection for conscientious religious objectors who in good faith try to accommodate their employers' dictates. The undue hardship provision should not become "an exemption from the accommodation requirement altogether," whenever an employer receives some complaints of emotional hurt arising from protected religious activity. *Ilona*, 108 F.3d at 1577. More broadly, the purpose of Title VII is to protect minorities against those who disagree with their beliefs. *See* 42 U.S.C § 2000e–2. Under the majority opinion, if some people—on this record, at most a few transgender students in Kluge's classes—say they are offended, the protected religious adherent has no right to a reasonable accommodation.

On Kluge's religious accommodation claim, I conclude that a genuine issue of material fact exists about whether the

last-names-only accommodation would result in more than a *de minimis* cost. So I would reverse the district court's grant of summary judgment to the School District on this claim and remand the undue hardship issue for trial.

## IV. Retaliation Claim

Although at least a genuine issue of material fact exists as to whether Kluge's protected activity was a but-for cause of his forced resignation by the School District, I concur with my colleagues to affirm the judgment for the School District on his retaliation claim. The record does not contain sufficient evidence from which a reasonable jury could infer that the School District's nondiscriminatory explanation for its adverse employment action was pretext for religious discrimination.[7]

Kluge's claimed protected activity was his July 2017 request for the last-names-only religious accommodation. R. 15,

---

[7] Kluge's failure to show that the School District's nondiscriminatory explanation was pretext does not also doom his religious accommodation claim. A different version of the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework applies to failure-to-accommodate cases, as opposed to retaliation or disparate treatment cases. *See Tabura*, 880 F.3d at 549–50; *Porter*, 700 F.3d at 951; *Firestone Fibers & Textiles Co.*, 515 F.3d at 312. Neither discriminatory intent nor pretext are elements of a failure-to-accommodate claim. *See Walmart Stores East*, 992 F.3d 656; *Adeyeye*, 721 F.3d at 449; *Porter*, 700 F.3d at 951; *Anderson*, 274 F.3d at 475; *Rodriguez v. City of Chicago*, 156 F.3d 771, 775 (7th Cir. 1998); *Ilona*, 108 F.3d at 1574–75; *Ryan*, 950 F.2d 458; *Redmond*, 574 F.2d at 901. After Kluge established a prima facie case, the burden was on the School District "to show that any reasonable accommodation would result in undue hardship." *Porter*, 700 F.3d at 951 (citing *Ilona*, 108 F.3d at 1575–76). Because a genuine issue of material fact exists on undue hardship, that issue should

at 17–18; R. 121, at 44–45. The School District does not contest that forcing Kluge to comply with the Name Policy, resign, or be terminated is an adverse employment action. The nondiscriminatory reason for forcing Kluge to comply or resign was the "[c]omplaints from the high school community" about the accommodation that Kluge had requested in July 2017. R. 121, at 45.

Recognizing the obvious tie between the School District's claimed reason for terminating Kluge and the religious accommodation requested, in my view Kluge has established but-for causation. (The prima facie causation standard for Title VII retaliation claims is but-for—not proximate—causation. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020).) At a minimum, construing all the facts in his favor, there is a genuine issue of material fact on this question. This is not a case where the employer has a separate nondiscriminatory reason—such as poor work performance—unrelated to the protected accommodation activity. *See, e.g., Logan v. City of Chicago*, 4 F.4th 529, 537 (7th Cir. 2021); *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 954 (7th Cir. 2021). The employer's asserted nondiscriminatory reason is the alleged harm caused by the protected accommodation requested and granted. So this case presents enough facts to establish but-for cause. Ultimately though, I agree with my colleagues that

---

proceed to trial. A retaliation claim, however, is governed by the standard *McDonnell Douglas* framework. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 926 (7th Cir. 2019); *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000). So once the School District supplied a nondiscriminatory reason for forcing Kluge to resign, he had to come up with enough evidence of pretext to raise a genuine issue of material fact, which he did not.

134                                          No. 21-2475

Kluge has failed as a matter of proof to show pretext, so I concur that the judgment for the School District on Kluge's retaliation claim should be affirmed.

### V. Conclusion

Title VII's religious accommodation provisions do not apply only in a community accepting of the tenets of an employee's religion. "If relief under Title VII can be denied merely because the majority group … will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 775 (1976) (quoting *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 663 (2d Cir. 1971)).

For the reasons explained above, I respectfully DISSENT on the religious accommodation claim, and I conclude that a genuine issue of material fact exists on undue hardship and would remand that issue for trial. I respectfully CONCUR in the judgment for the School District on Kluge's retaliation claim.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | No. 1:19-cv-2462-JMS-DLP |
| | ) | |
| BROWNSBURG COMMUNITY SCHOOL | ) | |
| CORPORATION, | ) | |
| | ) | |
| *Defendant*. | ) | |

**FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 58**

For the reasons set forth in the Court's Order entered this day, the Court now enters

**FINAL JUDGMENT** against Plaintiff and in favor of Defendant, such that Plaintiff shall take

nothing by way of his Complaint.

Date: 7/12/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Roger A.G. Sharpe, Clerk

BY: _____

Deputy Clerk, U.S. District Court

**Distribution via ECF only to all counsel of record**

SA-137

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| vs. | ) | No. 1:19-cv-2462-JMS-DLP |
| | ) | |
| BROWNSBURG COMMUNITY SCHOOL | ) | |
| CORPORATION, | ) | |
| | ) | |
| *Defendant.* | ) | |

## **ORDER**

What's in a name?  William Shakespeare suggested maybe not much, for "that which we call a rose, by any other name would smell as sweet."[1]  But a transgender individual may answer that question very differently, as being referred to by a name matching one's identity can provide a great deal of support and affirmation.  This case involves the legal ramifications of a public-school corporation's practical response to that philosophical question.

Plaintiff John Kluge was formerly employed as a teacher by Brownsburg Community School Corporation ("BCSC"), but was eventually forced to resign after refusing to refer to transgender students by the names selected by the students, their parents, and their healthcare providers due to his religious objections to affirming transgenderism.  Pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., Mr. Kluge asserts two claims against BCSC related to the end of his employment: (1) discrimination based on failure to accommodate his religious beliefs; and (2) retaliation.  Mr. Kluge has filed a Motion for Partial Summary Judgment, seeking judgment in his favor on his failure to accommodate claim.  [Filing

---

[1]   WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 2, available at http://shakespeare.mit.edu/romeo_juliet/romeo_juliet.2.2.html.

SA-138

No. 112.] BCSC has filed a Cross-Motion for Summary Judgment, seeking judgment in its favor on both claims. [Filing No. 120.] In addition, a group of medical, mental health, and transgender youth support organizations have filed a Motion for Leave to File Brief of Amici Curiae in support of BCSC's summary judgment motion. [Filing No. 131.] All three of these motions are ripe for the Court's consideration.

# I.
## SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those

2

SA-139

facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in light most favorable to the non-

SA-140

movant, first for one side and then for the other, may highlight the point that neither side has

enough to prevail" on summary judgment.  *Id.* at 648.

## II.
### BACKGROUND

### A.  The Parties

BCSC is a public-school corporation in Brownsburg, Indiana, and is governed by an elected

Board of Trustees ("the Board").  [Filing No. 120-1 at 2.]  At all relevant times, Dr. Jim Snapp was

the Superintendent, [Filing No. 120-1 at 3]; Dr. Kathryn Jessup was the Assistant Superintendent,

[Filing No. 120-1 at 2]; Jodi Gordon was the Human Resources Director, [Filing No. 113-4 at 5];

and Phil Utterback was the President of the Board, [Filing No. 113-3 at 5].  Brownsburg High

School ("BHS") is the sole high school within BCSC.  [Filing No. 120-2 at 2.]  At all relevant

times, Dr. Bret Daghe was the principal of BHS.  [Filing No. 120-5 at 4.]

Mr. Kluge was hired by BCSC in August 2014 to serve as a Music and Orchestra Teacher

at BHS.  [Filing No. 113-2 at 2; Filing No. 120-2 at 3.]  He was employed in that capacity until

the end of the 2017-2018 academic year.  [Filing No. 120-2 at 3.]  Mr. Kluge taught beginning,

intermediate, and advanced orchestra, beginning music theory, and advanced placement music

theory, and was the only teacher who taught any sections of those classes during his time at BHS.

[Filing No. 120-2 at 3; Filing No. 120-3 at 19-20.]  Mr. Kluge also assisted the middle school

orchestra teacher in teaching classes at the middle school.  [Filing No. 120-3 at 19-20.]

### B.  Mr. Kluge's Religious Beliefs

Mr. Kluge identifies as a Christian and is a member of Clearnote Church, which is part of

the Evangel Presbytery.  [Filing No. 113-1 at 4.]  He serves as a church elder, meaning he is a

member of the board of elders, which "exercise[s] spiritual oversight over the church" and is "part

of the government of [the] church."  [Filing No. 120-3 at 3-4.]  In addition, Mr. Kluge serves as

SA-141

head of the youth group ministries, head of the Owana Program (a discipleship program for children), and a worship group leader. [Filing No. 120-3 at 5.]

Mr. Kluge's religious beliefs "are drawn from the Bible," and his "Christian faith governs the way he thinks about human nature, marriage, gender, sexuality, morality, politics, and social issues." [Filing No. 15 at 6.]  "Mr. Kluge believes that God created mankind as either male or female, that this gender is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." [Filing No. 15 at 6.] He also believes that "he cannot affirm as true ideas and concepts that he deems untrue and sinful." [Filing No. 15 at 7.]  As a result of these principles, Mr. Kluge believes that "it is sinful to promote gender dysphoria."[2]  [Filing No. 15 at 5; Filing No. 120-3 at 5.]  In addition, according to Mr. Kluge, transgenderism "is a boringly old sin that has been repented for thousands of years," and because being transgender is a sin, it is sinful for him to "encourage[] students in transgenderism." [Filing No. 113-1 at 8-9; *see also* Filing No. 120-3 at 10.]

### C.  BCSC's Policies and Practices Regarding Transgender Students

According to Dr. Jessup, BCSC's Assistant Superintendent, prior to the start of the 2017-2018 academic year, "the high school community at BCSC began to become more and more aware of the needs of transgender students," and "[s]everal discussions were held by and between school leadership at both the high school level and the corporation level about addressing these needs." [Filing No. 120-1 at 3.]  Mr. Kluge and other BCSC staff first became aware of these discussions

---

[2] According to the American Psychiatric Association, "gender dysphoria" is "an acute form of mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity."  *Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 451 (5th ed. 2013)).  Mr. Kluge disagrees with this definition, and instead defines gender dysphoria to be "what scripture refers to as effeminacy which is for a man to play the part of a woman or a woman to play the part of a man and so that would include acting/dressing like the opposite sex." [Filing No. 120-3 at 5-6.]

5

SA-142

in January 2017, when administrators invited Craig Lee, a BHS teacher and faculty advisor of the Equality Alliance Club, to speak about transgenderism at a faculty meeting.  [Filing No. 15-3 at 2; Filing No. 58-2 at 1-2.]  At another faculty meeting in February 2017, Mr. Lee and a BHS guidance counselor, Lori Mehrtens, gave a presentation on what it means to be transgender and how teachers can encourage and support transgender students.  [Filing No. 15-3 at 2.]

BHS Principal Dr. Daghe testified that during the second semester of the 2016-2017 academic year, BHS faculty and staff members approached him seeking direction about how to address transgender students.  [Filing No. 113-5 at 4.]  In May 2017, Mr. Kluge and three other teachers called a meeting with Dr. Daghe, during which they presented a signed letter expressing their religious objections to transgenderism and other information supporting their position that BHS should not "promote transgenderism." [Filing No. 113-1 at 19-32; Filing No. 113-5 at 6; Filing No. 120-3 at 11.]  The letter specifically asked that BCSC faculty and staff not be required to refer to transgender students using their preferred pronouns and that transgender students not be permitted to use the restrooms and locker rooms of their choice.  [Filing No. 113-1 at 30-31.]

In response to these various competing concerns, BCSC implemented a policy ("the Name Policy"),[3] which took effect in May 2017 and required all staff to address students by the name

---

[3] Mr. Kluge repeatedly emphasizes that the Name Policy was not a formal BCSC policy in that it was not formally reviewed or adopted by the Board.  [*E.g.*, Filing No. 153 at 17].  That appears to be true. [*See* Filing No. 113-4 at 6 (Ms. Gordon testifying that "It actually wasn't really a policy. It was a direction.  It was guidelines that we had given to the staff."); Filing No. 113-4 at 6 (Ms. Gordon acknowledging that, in order to become a policy, an issue must be presented to the Board for discussion, review, and approval at a formal Board meeting); Filing No. 113-3 at 8 (Mr. Utterback testifying that the subject of transgender students changing their names was never formally addressed by the Board).]   However, that distinction is irrelevant given that it is undisputed that the Name Policy and BCSC's other practices, such as those concerning uniforms and restrooms—whether formally adopted by the Board or not—were directives that BCSC staff members were required to follow.  The Court uses the term "policy" to refer to the Name Policy and the other practices colloquially and as a matter of convenience, not to imply that the any of these matters were formally ratified by the Board.

SA-143

that appears in PowerSchool, a database that BCSC uses to record and store student information, including grades, attendance, and discipline.  [Filing No. 113-3 at 6; Filing No. 113-5 at 4; Filing No. 113-6 at 7.]  Transgender students could change their first names in PowerSchool if they presented a letter from a parent and a letter from a healthcare professional regarding the need for a name change.  [Filing No. 113-5 at 4-5; Filing No. 120-1 at 4-5.]  Through the same process, students could also change their gender marker and the pronouns used to refer to them.  [Filing No. 113-5 at 5.]  In addition to the Name Policy, transgender students were permitted to use the restrooms of their choice and dress according to the gender with which they identified, including wearing school-related uniforms associated with the gender with which they identified.  [Filing No. 113-5 at 5.]  The three other teachers who initially expressed objections to "promot[ing] transgenderism" accepted the Name Policy, while Mr. Kluge did not.  [Filing No. 120-3 at 12.]

BCSC's practices regarding transgender students were based on BCSC's administrators' ultimate conclusion that "transgender students face significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying" and that "these challenges threaten transgender students' classroom experience, academic performance, and overall well-being."  [Filing No. 120-1 at 3.]  Regarding the Name Policy specifically, Dr. Jessup explained:

> The high school and BCSC leadership thought that this practice furthered two primary goals.  First, the practice provided the high school faculty a straightforward rule when addressing students; that is, faculty need and should only call students by the name listed in PowerSchool.  Second, it afforded dignity and showed empathy toward transgender students who were considering or in the process of gender transition.  Stated differently, the administration considered it important for transgender students to receive, like any other student, respect and affirmation of their preferred identity, provided they go through the required and reasonable channels of receiving and providing proof of parental permission and a healthcare professional's approval.

SA-144

[Filing No. 120-1 at 4.]  Dr. Jessup further opined that the BCSC and BHS leaders gave "heightened attention to these issues  prior to the start of the 2017-2018 school year because several transgender students were enrolled as high school freshman for that school year." [Filing No. 120-1 at 3.]

### D. Mr. Kluge's Religious Objections to BCSC Policies and His Initial Accommodations

In July 2017, Mr. Kluge informed Dr. Daghe that he could not follow the Name Policy because he had a religious objection to referring to students using names and pronouns corresponding to the gender with which they identify, rather than the biological sex that they were assigned at birth.[4] [Filing No. 113-2 at 3; Filing No. 113-5 at 5-6.]  Dr. Daghe called a meeting with Mr. Kluge and Dr. Snapp to discuss the situation.  [Filing No. 120-3 at 14-17; Filing No. 120-5 at 6.]  At the meeting, Dr. Daghe gave Mr. Kluge three options: (1) comply with the Name Policy; (2) resign; or (3) be suspended pending termination.  [Filing No. 120-3 at 14.]  Mr. Kluge refused to either follow the Name Policy or resign, so he was suspended.  [Filing No. 120-3 at 14-17.]

---

[4] Mr. Kluge and his counsel often use the terms "transgender names" and "transgender pronouns" to refer to the first names and pronouns chosen by transgender students and affirmed by their parents to reflect the gender with which they identify.  [*See* Filing No. 120-3 at 15 (Mr. Kluge testifying that he uses "transgender names" to mean "[t]he opposite sex first name that [the transgender students] had switched to that was not their legal name").]  They use terms like "legal names" to refer to the names and gender that the students were assigned at birth.  [*See* Filing No. 120-3 (stating that "legal names" refers to "[t]he name that's on their birth certificate, the one that was stored on their birth records").]  The Court finds this terminology imprecise and often confusing.  People can be transgender, but names and pronouns cannot.  Relatedly, transgender individuals can and often do change their "legal" names and gender markers to reflect the gender with which they identify.  Accordingly, the Court will refer to the names and pronouns chosen by transgender students to reflect the gender with which they identify as "preferred" names and pronouns.

SA-145

The following week, on July 31, 2017, another meeting was held between Dr. Snapp, Ms. Gordon, and Mr. Kluge.  [Filing No. 120-3 at 17.]  At the July 31 meeting, Mr. Kluge proposed that he be permitted to address all students by their last names only, similar to a sports coach ("the last names only accommodation"), and the administrators agreed.  [Filing No. 113-2 at 3-4; Filing No. 113-6 at 7; Filing No. 120-3 at 17.]  Mr. Kluge signed a document that stated the following, including a handwritten notation initialed by Ms. Gordon:

> You are directed to recognize and treat students in a manner using the identity indicated in PowerSchool.  This directive is based on the status of a current court decision applicable to Indiana.
> We agree that John may use last name only to address students.
> You are also directed not to attempt to counsel or advise students on his/her lifestyle choices.

[Filing No. 15-1 at 1.]  Another handwritten note, also initialed by Ms. Gordon, further stated: "In addition, Angie Boyer will be responsible for distributing uniforms to students."  [Filing No. 15-1 at 1.]

Mr. Kluge understood the last names only accommodation to mean that he would refer to all students—not just transgender students—by their last names only, not use any honorifics such as "Mr." or "Ms." to refer to any student, and if any student were to directly ask why he used last names only, he would respond that he views the orchestra class like a sports team and was trying to foster a sense of community.  [Filing No. 120-3 at 18.]  He also understood that he would not be required to distribute gender-specific orchestra uniforms to students.  [Filing No. 120-3 at 17-18.]

### E.  BCSC Receives Complaints About Mr. Kluge's Use of Last Names Only

Dr. Daghe "first learned of concerns with Mr. Kluge and how he was addressing students in class" in an August 29, 2017 email from another teacher, Craig Lee.  [Filing No. 120-2 at 4.]  In addition to teaching classes at BHS, Mr. Lee was one of three teachers on the BHS Faculty

SA-146

Advisory Committee and the faculty advisor of the Equality Alliance, a student club that meets on a weekly basis to discuss issues that impact the LGBTQ community and provides a safe space for students who identify as LGBTQ.  [Filing No. 120-2 at 4; Filing No. 120-14 at 6.]  In relevant part, the email stated:

> I wanted to follow up regarding the powerschool/students changed name discussion at the Faculty Advisory [meeting] as some issue have arisen in the last few days that need to be addressed. . . . There is a student who has had their name changed in powerschool. They are a freshman who this teacher knew from 8th grade. The teacher refuses to call the student by their new name. I see this is a serious issue and the student/parents are not exactly happy about it.

[Filing No. 120-15 at 2.]  Although the email did not mention Mr. Kluge by name, Dr. Daghe believed and was later able to confirm that the teacher discussed in the email was Mr. Kluge. [Filing No. 12-2 at 4.]

Regarding the Equality Alliance, between 12 and 40 students generally attend each meeting, and in 2019 there were at least four transgender students who regularly attended meetings.  [Filing No. 120-14 at 6-7; *see also* Filing No. 58-1 at 2 (estimating that there are "approximately five to ten transgender students currently in the Equality Alliance").]  Aidyn Sucec and Sam Willis were two transgender students who regularly attended Equality Alliance meetings during the relevant time.  [Filing No. 120-14 at 7.]  According to Mr. Lee, both Aidyn and Sam discussed during Equality Alliance meetings how Mr. Kluge was referring to them by their last names only, and they found that practice to be insulting and disrespectful.  [Filing No. 120-14 at 7.]  Mr. Lee testified that: "It was clearly visible the emotional distress and the harm that was being caused towards them.  It was very, very clear, and, so, that was clear for everyone to see but that is also what they described as well."  [Filing No. 120-14 at 7-8; *see also* Filing No. 120-14 at 8 ("Q: Was it your interpretation that Aidyn and Sam . . . felt as if they were being discriminated against by Mr. Kluge? A: I wouldn't describe it so much as an interpretation.  It was just very, very

SA-147

clear at the meetings to see how much emotional harm was being caused towards Sam and Aidyn.

It was clear for everyone at the meetings just to see how much of an impact it was having on them.

So, when I say like I wouldn't call it an interpretation, I mean, it was so clearly visible that I don't

feel like there was anything to necessarily interpret.").]

In his declaration, Mr. Lee stated the following:

> During Equality Alliance meetings, we have a policy of not using names when discussing offensive or insensitive behavior of other students and faculty. During the 2017-2018 school year, I heard students discuss how they were being treated "in orchestra class," or "by the orchestra teacher." I understood these to be references to John Kluge, the orchestra teacher at [BHS].

> Mr. Kluge's behavior was a frequent topic of conversation during Equality Alliance meetings. Students in Mr. Kluge's class said that they found not being called by their first names to be insulting and disrespectful. Transgender students felt strongly that they wanted others to acknowledge their corrected names, and Mr. Kluge's refusal to do so hurt them. These students also felt like it was their presence that caused Mr. Kluge's behavior, which made them feel isolated and targeted. I relayed the students' concerns to the principal of [BHS] and the assistant superintendent of [BCSC].

> Multiple times, Equality Alliance members mentioned that Mr. Kluge would occasionally "slip-up," and use first names or gendered honorifics (e.g., "Mr." or "Miss") rather than last names. Some students also expressed that they felt that Mr. Kluge avoided acknowledging transgender students who raised their hands in class.

> Mr. Kluge's behavior was also the subject of discussion outside of the Equality Alliance. One student who was not a member of the Equality Alliance, but was in Mr. Kluge's orchestra class, approached me to tell me that Mr. Kluge's use of last names made him feel incredibly uncomfortable, even though he did not identify as LGBTQ. The student said that he found Mr. Kluge's use of last names very awkward because he was fairly certain that all the students knew why Mr. Kluge had switched to using last names, and that it made the transgender students in Mr. Kluge's orchestra class stand out. This student told me that he felt bad for his transgender classmates. He also mentioned that there were other students who felt this way as well.

[Filing No. 58-2 at 2-3.]

SA-148

Dr. Jessup confirmed that Mr. Kluge's use of last names only was a topic of discussion at

Equality Alliance meetings, stating:

> I attended a meeting of the [BHS] Equality Alliance Club in Fall 2017. The purpose
> for my attending that meeting was concerns that had been shared from counselors
> of students feeling uncomfortable. Approximately 40 students attended this
> meeting. During the meeting, approximately four or five students complained
> specifically about a teacher using last names only to address students and, in my
> view, the other students in attendance appeared to agree with these complaints.
> While the students did not identify John Kluge by name in making these
> complaints, it was certainly implied that he was the teacher in question, and I had
> no doubt that it was him they were speaking of since he was the only teacher
> employed by BCSC who had been permitted the accommodation of using last
> names only instead of using the names stated in PowerSchool.

[Filing No. 120-1 at 4.]

Mr. Lee also testified that three other teachers—Jason Gill, Melinda Lawrie, and Justin

Bretz—approached him during the 2017-2018 school year with concerns that Mr. Kluge's use of

last names only was causing harm to students.  [Filing No. 120-14 at 16-17.]  In addition, the

Faculty Advisory Committee met with Dr. Daghe approximately twice per month, and during those

meetings, "Mr. Lee continued to relate to [Dr. Daghe] the complaints and concerns he was hearing,

primarily in Equality Alliance Club meetings, . . . about Mr. Kluge's use of last-names-only with

students."  [Filing No. 120-2 at 4.]  Dr. Daghe testified that in addition to receiving information

from Mr. Lee, he received complaints from students and teachers, including teachers Tracy

Runyon and Melissa Stainbrook, regarding Mr. Kluge referring to his students by last name only.

[Filing No. 113-5 at 8-9; *see also* Filing No. 113-4 at 9 (Ms. Gordon testifying that she "was made

aware that there had been complaints made to Dr. Daghe from students and staff that Mr. Kluge

wasn't following th[e] guidelines that he had agreed to at the start of the year").]

Aidyn Sucec was a transgender student in Mr. Kluge's orchestra class during the 2017-

2018 academic year.  [Filing No. 22-3 at 1.]  Aidyn submitted a declaration in which he stated that

SA-149

after coming out as transgender, "[b]eing addressed and recognized as Aidyn was critical to helping alleviate [his] gender dysphoria," and his "emotional and mental health significantly improved once his family and friends began to recognize [him] as who [he is]." [Filing No. 22-3 at 3.] Pursuant to the Name Policy, Aidyn's mother and his therapist submitted letters requesting that his name and gender be updated in PowerSchool. [Filing No. 22-3 at 3.] According to Aidyn, Mr. Kluge referred to him by last name only or avoided referring to him by any name, instead simply nodding or waving in Aidyn's direction. [Filing No. 22-3 at 4.] However, Aidyn states that Mr. Kluge would sometimes refer to other students using the honorifics "Mr." or "Ms.," or by their first names. [Filing No. 22-3 at 4.] Aidyn believes that Mr. Kluge "avoided" him and other transgender students, and states:

> Mr. Kluge's behavior made me feel alienated, upset, and dehumanized. It made me dread going to orchestra class each day, and I felt uncomfortable every time I had to talk to him one-on-one. In addition, Mr. Kluge's behavior was noticeable to other students in the class. At one point, my stand partner asked me why Mr. Kluge wouldn't just say my name. I felt forced to tell him that it was because I'm transgender. . . . By the end of the first semester, in December of 2017, I told my mother that I did not want to continue taking orchestra during my sophomore year.

[Filing No. 22-3 at 4.] Aidyn explains that "[t]he controversy around Mr. Kluge's resignation during the summer of 2018 is why [he] no longer attend[s] Brownsburg High School." [Filing No. 22-3 at 4.] Several students made negative and derogatory remarks to Aidyn, suggesting that he had been responsible for Mr. Kluge leaving the school, and "[t]hese incidents, in combination with [his] ongoing health struggles, made [him] feel that [he] could not return to school" after August 2018. [Filing No. 22-3 at 4-5.]

Sam Willis was another transgender student in one of Mr. Kluge's orchestra classes during the 2017-2018 academic year. [Filing No. 58-1 at 2.] Prior to the start of that year, he decided to publicly transition and use the name "Samuel" or "Sam" and masculine pronouns going forward.

SA-150

[Filing No. 58-1 at 2.]  Although Sam's parents emailed the school counselor and Mr. Kluge directly to notify them of this change, Sam did not initially change his information in PowerSchool, because he was not aware of the Name Policy permitting him to do so.  [Filing No. 58-1 at 2-3.] According to Sam, before he changed his information in PowerSchool, Mr. Kluge referred to him on several occasions as "Miss Willis," which led to confusion among other students and was "very upsetting" to Sam.  [Filing No. 58-1 at 2-3.]  Once Sam changed his first name and gender marker in PowerSchool, however, Mr. Kluge stopped referring to him as "Miss Willis," and Sam was permitted to wear the boys' tuxedo uniform for the fall orchestra concert.  [Filing No. 58-1 at 3.] Sam states that Mr. Kluge generally used last names only to refer to students, but would occasionally use gendered honorifics or gendered pronouns with non-transgender students.  [Filing No. 58-1 at 3.]  Sam opines that "Mr. Kluge's use of last names in class made the classroom environment very awkward," and "[m]ost of the students knew why Mr. Kluge had switched to using last names, which contributed to the awkwardness and [Sam's] sense that [he] was being targeted because of [his] transgender identity."  [Filing No. 58-1 at 3-4.]  Sam states that Mr. Kluge's actions upset him and his family, and exposed him and other transgender students to "widespread public scrutiny."  [Filing No. 58-1 at 5.]  His declaration ends with the following statement: "I truly believe that if everyone in my life had refused, like Mr. Kluge, to use my corrected name, I would not be here today."  [Filing No. 58-1 at 5.]

Mr. Kluge expressly disputes the allegations in Aidyn's declaration and the other allegations that he did not strictly comply with the last names only accommodation.  [*See* Filing No. 52-1.]  Natalie Gain, a teacher who led private music lessons for students during the school day, submitted a declaration stating that she never heard Mr. Kluge use gendered language in the classroom and "only heard him use last names with the students."  [Filing No. 52-2 at 3.]  She

further stated that she "never heard any of the students discussing the . . . use of last names" and "as far as [she] could tell, Mr. Kluge's accommodation was not common knowledge" among students. [Filing No. 52-2 at 3.] Three students who were in Mr. Kluge's orchestra class during the 2017-2018 school year also submitted declarations stating that they never heard Mr. Kluge used gendered language, that they observed him using last names only to refer to all students, and that they did not witness him treating transgender students differently than other students. [Filing No. 52-3; Filing No. 52-4; Filing No. 52-5.]

Dr. Daghe continued to hear complaints about Mr. Kluge throughout the fall 2017 semester, but was hopeful that the issue would resolve itself. [Filing No. 120-1 at 4.] It was not until December 2017 that Dr. Daghe determined it was appropriate to address these issues with Mr. Kluge directly. [Filing No. 120-2 at 4.] Mr. Kluge testified that he was not aware of any complaints until December 2017, and when Mr. Daghe informed him that complaints had been made, Dr. Daghe did not provide any specific information or disclose the names of people who had allegedly complained. [Filing No. 120-3 at 21-23.] Mr. Kluge further testified that he did not personally witness or experience any tension with his students or other faculty members. [Filing No. 120-3 at 23-24.]

### F.  Mr. Kluge's Discussions with Administration and Ultimate Resignation

On December 13, 2017, Mr. Kluge met with Dr. Daghe. [Filing No. 113-2 at 4; Filing No. 120-3 at 22.] Mr. Kluge's account of this meeting, in relevant part is as follows:

[Dr.] Daghe scheduled a meeting with me to ask me how the year was going and to tell me that my last-name-only Accommodation was creating tension in the students and faculty. He said the transgender students reported feeling "dehumanized" by my calling all students last-name-only. He said that the transgender students' friends feel bad for the transgender students when I call the transgender students, along with everyone else, by their last-name-only. He said that I am a topic of much discussion in the Equality Alliance Club meetings. He said that a number of

SA-152

faculty avoid me and don't hang out with me or include me as much because of my stance on the issue.

***

I explained to [Dr.] Daghe that this persecution and unfair treatment I was undergoing was a sign that my faith as witnessed by my using last-names-only to remain neutral was not coming back void, but was being effective.  He didn't seem to understand why I was encouraged.  He told me he didn't like things being tense and didn't think things were working out.  He said he thought it might be good for me to resign at the end of the year.  I told [Dr.] Daghe that I was now encouraged all the more to stay.

[Filing No. 15-3 at 4-5.]  Mr. Kluge later testified that although Dr. Daghe stated during the meeting that the use of last names only was "creating complaints among many students," he would not provide the names of the students who complained.  [Filing No. 120-3 at 23.]  Mr. Kluge further testified that he did not witness any tension or experience any animosity from students or other faculty, and that his students were performing better than ever in their competitions, receiving high scores on their AP exams, and participating voluntarily in extra programs.  [Filing No. 120-3 at 23-24.]

On January 17, 2018, Dr. Daghe scheduled another meeting with Mr. Kluge, because he "didn't think he was direct enough in [the] December 13 meeting."  [Filing No. 15-3 at 5.]  At the January 17 meeting, Dr. Daghe expressed that, because of complaints about the use of last names only, Mr. Kluge should resign at the end of the school year.  [Filing No. 15-3 at 5; Filing No. 120-3 at 25.]  Dr. Daghe offered to write Mr. Kluge letters of recommendation to help him find a new job.  [Filing No. 15-3 at 5.]

At the BHS faculty meeting on January 22, 2018, Dr. Jessup presented the faculty with a document titled "Transgender Questions."  [Filing No. 15-3 at 5.]  The document contained a series of questions and answers concerning BCSC policies regarding transgender students and how faculty and staff should handle matters related to transgender students.  [*See* Filing No. 15-4.]  In addition to reiterating that the staff and faculty should address students by the names and genders

SA-153

listed in PowerSchool, [Filing No. 15-4 at 6; Filing No. 15-4 at 9], the document contained the

following relevant questions and answers:

> **Are we allowed to use the student's last name only?**  We have agreed to this for
> the 2017-2018 school year, but moving forward it is our expectation the student
> will be called by the first name listed in PowerSchool.
>
> ***
>
> **How do teachers break from their personal biases and beliefs so that we can
> best serve our students?**  We know this is a difficult topic for some staff members,
> however, when you work in a public school, you sign up to follow the law and the
> policies/practices of that organization and that might mean following practices that
> are different than your beliefs.
>
> **What feedback and information has been received from transgender students?**
> They appreciate teachers who are accepting and supporting of them.  They feel
> dehumanized by teachers they perceive as not being accepting or who continue to
> use the wrong pronouns or names.  Non-transgender students in classrooms with
> transgender students have stated they feel uncomfortable in classrooms where
> teachers are not accepting.  For example, teachers that call students by their last
> name, don't use correct pronouns, don't speak to the student or acknowledge them,
> etc.

[Filing No. 15-4 at 9-10 (numbering omitted).]

Following the faculty meeting, Mr. Kluge sent an email to Dr. Snapp and Dr. Daghe,

referring to the "Transgender Questions" document and asking whether he was correct in believing

that he would continue to be permitted to follow the last names only accommodation after the

2017-2018 school year.  [Filing No. 120-16 at 2.]  In response to the email, Ms. Gordon and Dr.

Daghe scheduled a meeting with Mr. Kluge to take place on February 6, 2018.  [Filing No. 15-3

at 6.]

Mr. Kluge recorded audio of the February 6 meeting.  [Filing No. 113-4 at 20-55; Filing

No. 120-3 at 25.]  During the meeting, Mr. Kluge was informed that he would not be permitted to

continue using last names only after the 2017-2018 school year.  [Filing No. 113-4 at 24.]  Ms.

Gordon stated that employers are not obligated to accommodate all of their employees' religious

beliefs, but instead need only provide reasonable accommodations, and the last names only

SA-154

accommodation was not reasonable. [*Filing No. 113-4 at 27*.] Mr. Daghe agreed. [*See* Filing No. 113-4 at 28 ("Not when it's detrimental to kids it's not reasonable.").] Ms. Gordon also discussed how Mr. Kluge's pay and other logistical matters would be handled, depending on whether he finished the current school year or resigned mid-year. [*Filing No. 113-4 at 33-35*.] Regarding "processing" of a resignation, Ms. Gordon explained the following to Mr. Kluge:

> [S]ometimes people are very sensitive about letting their students know[] or even their colleagues knowing . . . .
>
> ***
>
> If someone – I've had one for a year now, um, that we – someone submitted a resignation or retirement letter and asked "I'd rather you just hold onto this. I'm not – I don't want it communicated. I'd rather, you know, it just wait until the school year is over and then you process it." We honor requests like that.
>
> ***
>
> How long we hold that can hold us up a little bit on being able to search for a replacement. And obviously a replacement for your position . . . is not going to be an easy one. So, you know, if that were to happen, it kind of depends on the position.
>
> ***
>
> So while we like to honor those, we also like to – to talk about, like, okay, a reasonable amount of time for us to be able to – in order to be able to find – put a – get a posting out and do a good search for someone.

[Filing No. 113-4 at 36-37.] According to Mr. Kluge, this explanation from Ms. Gordon led him to believe that he was entitled to submit a "conditional resignation." [*See* Filing No. 120-3 at 26 ("[Dr. Daghe and Ms. Gordon] said the option was I could give Jodi a conditional resignation that wouldn't be processed until a date I specified, that she had done that in the past, that she had held onto resignations and not processed them before and she would honor any such requests.").]

In March 2018, Ms. Gordon scheduled another meeting with Mr. Kluge. [Filing No. 15-3 at 6; Filing No. 113-2 at 6.] At that meeting, she informed Mr. Kluge that he could either follow the Name Policy and continue his employment, resign, or be terminated. [Filing No. 113-2 at 6.] She told him that, if he intended to resign, he would need to submit his resignation to her by May 1, 2018, otherwise the termination process would begin on that date. [Filing No. 15-3 at 6.]

SA-155

On April 30, 2018, Mr. Kluge sent an email to Ms. Gordon with the subject "Request."

[Filing No. 15-2 at 1.]  The email stated:

> I'm writing you to formally resign from my position as a teacher, effective at the end of the 2017-2018 school year when my contract is finished, i.e., early August 2018.
>
> I'm resigning my position because [BCSC] has directed its employees to call transgender students by a name and sex not matching their legal name and sex. BCSC has directed employees to call these students by a name that encourages the destructive lifestyle and psychological disorder known as gender dysphoria.  BCSC has allowed me the accommodation of referring to students by last name only starting in August 2017 so I could maintain a "neutral" position on the issue.
>
> Per our conversation on 3/15/18, [BCSC] is no longer allowing this accommodation.  BCSC will require me to refer to transgender students by their "preferred" name as well as by their "preferred" pronoun that does not match their legal name and sex.  BCSC will require this beginning in the 2018-2019 school year.  Because my Christian conscience does not allow me to call transgender students by their "preferred" name and pronoun, you have said I am required to send you a resignation letter by May 1, 2018 or I will be terminated at that time.
>
> Please do not process this letter nor notify anyone, including any administration, about its contents before May 29, 2018.  Please email me to acknowledge that you have received this message and that you will grant this request.

[Filing No. 15-2 at 1.]

On the same day, Ms. Gordon replied to Mr. Kluge's email with the following:

> I appreciate hearing from you.
>
> I will honor your request and not process this letter or share with the BHS administration until May 29.
>
> Let me know if you have any questions at all.

[Filing No. 15-2 at 1.]

Ms. Gordon believed that she was honoring Mr. Kluge's request not to "process" his resignation before May 29 by not presenting the resignation to the Board or sharing it with his colleagues and students until after that date.  [Filing No. 113-4 at 12.]  According to Ms. Gordon,

SA-156

submitting a resignation to her is equivalent to submitting a resignation to the superintendent, and the only permissible condition for an employee to include in a resignation is the end date of employment. [Filing No. 113-4 at 11-12; Filing No. 113-6 at 6.] However, in his deposition, Mr. Kluge characterized his resignation as a "conditional resignation, the condition being I could take it off [Ms. Gordon's] desk before May 29." [Filing No. 120-3 at 27.]

Relevant to the issue of resignation, BCSC's Bylaws provide that:

Pursuant to State law, following submission of a resignation to the Superintendent, the employee may not withdraw or otherwise rescind that resignation. . . . The Superintendent shall inform the Board of the submission of that resignation at its next meeting. The Board may choose to accept that resignation, deny that resignation or take any other appropriate action relating to the termination, suspension or cancellation or employment of the person submitting the resignation. A resignation, once submitted, may not then be rescinded unless the Board agrees.

[Filing No. 113-6 at 8.] The Bylaws cite Indiana Code § 5-8-4-1, which in turn provides that:

Whenever any officer, servant or employee of . . . any . . . school corporation[] . . . shall submit in writing his or her resignation, whether to take effect at once, when accepted, or at some future fixed date, with the proper officer, person or persons or authority of government to receive such resignation, the person so submitting such written resignation shall have no right to withdraw, rescind, annul or amend such resignation without the consent of the officer, person or persons or authority of government having power by law to fill such vacancy.

In May 2018, Mr. Kluge attended an orchestra awards ceremony. [Filing No. 120-3 at 32.] At the ceremony, he addressed all students by their first and last names, including transgender students, whom Mr. Kluge addressed by their preferred first names. [Filing No. 120-3 at 33.] Mr. Kluge explained that he used first and last names because "it would have been unreasonable and conspicuous" to refer to students by last names only at a formal event. [Filing No. 120-3 at 33.] Mr. Kluge also opined that referring to students by last name only at the awards ceremony would be inconsistent with the last names only accommodation, because the accommodation was based

SA-157

on the understanding that he would address students like a sports coach would, and a sports coach would likely use first and last names at a formal event.  [Filing No. 120-3 at 33.]

On May 25, 2018, Mr. Kluge was scheduled to meet with Ms. Gordon and Dr. Daghe, but when he arrived for the meeting, Mr. Daghe told him that the meeting was cancelled because "We have everything we need."  [Filing No. 15-3 at 1.]  That same afternoon, Mr. Kluge submitted to Ms. Gordon a document titled "Withdrawal of Intention to Resign and Request for Continuation of Accommodation."  [Filing No. 15-3 at 1-7.]  In that document, Mr. Kluge explained that he was "confused" as to why Dr. Daghe cancelled the meeting, and asserted that at the meeting he planned to withdraw his "emailed intention to resign," which he had sent to Ms. Gordon on April 30 along with a request that the email not be processed.  [Filing No. 15-3 at 1.]  He outlined his version of events leading up to his forced resignation, accused BCSC of discriminating against him based on his religious beliefs, and ultimately asked that he be permitted to continue his employment using the last names only accommodation.  [Filing No. 15-3 at 1-7.]  Approximately two hours after Mr. Kluge submitted the purported rescission to Ms. Gordon, BCSC "locked [Mr. Kluge] out of the BCSC buildings and internet database, and posted [his] job as vacant."  [Filing No. 113-2 at 7.]

At a Board meeting on June 11, 2018, Mr. Kluge asked the Board not to accept his resignation and to reinstate his employment.  [Filing No. 113-2 at 7; Filing No. 120-18 at 10.]  Various members of the community also spoke at the meeting, some in support of Mr. Kluge's termination, and others against it.  [See Filing No. 120-18 at 9-13.]  The Board accepted Mr. Kluge's resignation, thereby ending his employment with BCSC.  [Filing No. 113-2 at 7; Filing No. 120-18 at 1.]

SA-158

### G.  This Lawsuit

Mr. Kluge filed his Amended Complaint in this action, asserting thirteen claims against BCSC and several of its employees.  [Filing No. 15.]  Upon Defendants' Motion to Dismiss, [Filing No. 44], the Court dismissed several claims and Defendants, leaving only Mr. Kluge's claims against BCSC for failure to accommodate and retaliation under Title VII, [Filing No. 70].  As noted earlier, Mr. Kluge then filed his Motion for Partial Summary Judgment seeking judgment in his favor on his failure to accommodate claim.  [Filing No. 112.]  BCSC filed its Cross-Motion for Summary Judgment seeking judgment in its favor on the failure to accommodate claim and the retaliation claim.  [Filing No. 120.]  In addition, the National Association of Social Workers and its Indiana Chapter, the American Academy of Pediatrics and its Indiana Chapter, the American Medical Association, and Indiana Youth Group (collectively, "Movants") filed a Motion for Leave to File Brief of Amici Curiae, seeking "to offer additional insight regarding the harm of [Mr. Kluge's] proposed accommodation on the health and wellbeing of transgender students that is not discussed in the briefs submitted by the parties to this case."  [Filing No. 131 at 1.]  All three of these motions are fully briefed and ripe for the Court's decision.

### III.
#### DISCUSSION

### A.  Title VII Background

"Title VII forbids employment discrimination on account of religion."  *EEOC v. Walmart Stores E., L.P.*, 992 F.3d 656, 658 (7th Cir. 2021) (citing 42 U.S.C. § 2000e–2(a)(1)).  As used in Title VII, "religion" "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

SA-159

To state a prima facie case of religious discrimination based on failure to accommodate, a plaintiff must show that his religious belief or practice conflicted with a requirement of his employment and that his religious belief or practice was the basis for the discriminatory treatment or adverse employment action. *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012), as modified by *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2031-33 (2015).[5] "Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to make a reasonable accommodation of the religious practice or to show that any reasonable accommodation would result in undue hardship." *Porter*, 700 F.3d at 951.

"In addition to prohibiting discrimination, Title VII 'forbids retaliation against anyone who "has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."'" *Id.* at 956 (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 314 (7th Cir. 2011) (quoting 42 U.S.C. § 2000e–3(a))).  To survive summary judgment on a retaliation claim, the plaintiff must produce evidence showing a causal link between his protected activity and the adverse employment action. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578 (7th Cir. 2021). "The question is: 'Does the record contain sufficient evidence to permit

---

[5] In *Porter*, the Seventh Circuit articulated an additional element of the prima facie case for failure to accommodate: that the employee called the religious practice to his employer's attention. 700 F.3d at 951.  However, the Supreme Court later made clear that an employee need not prove that his employer had actual knowledge of the religious belief or practice, and instead must demonstrate only that the desire not to accommodate was a motivating factor in an adverse employment action. *See Abercrombie*, 135 S. Ct. at 2032-33.  Other District Courts in this Circuit have therefore disregarded this additional element. *See, e.g., Jackson v. NTN Driveshaft, Inc.*, 2017 WL 1927694, at *1 (S.D. Ind. May 10, 2017).  This Court will do the same, although it makes no difference because it is undisputed that BCSC was aware of Mr. Kluge's religion-based objections to the Name Policy.

SA-160

a reasonable fact finder to conclude that retaliatory motive caused the discharge?'" *Id.* (quoting

*Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).

### B.  Motion for Leave to File Brief of Amici Curiae

Movants argue that as highly regarded medical and mental health organizations and a

provider of support services to transgender youth in Indiana, they are well-positioned to provide

the Court with insight regarding how inclusive policies that respect the names and pronouns that

match a student's gender identity have been demonstrated to reduce harm to the student's physical

and mental health, including by reducing levels of depression, thoughts of suicide, and attempted

suicide among transgender youth.  [Filing No. 131 at 2-3.]  Movants point out that other courts

have routinely permitted them to file amicus briefs to offer their expertise and insight on issues of

mental health and welfare, including with respect to transgender youth.  [Filing No. 131 at 3 (citing

cases).]  Movants attach their proposed brief to the motion.  [Filing No. 131-1.]

Mr. Kluge responds that "[t]he proposed *amicus* brief . . . does little more than add twenty-

two additional pages to BCSC's fifty-page long brief by rehashing—at length and with additional

citations—the proposition that some transgender students may experience negative emotions or

psychological difficulty when they do not feel socially supported."  [Filing No. 145 at 2.]

According to Mr. Kluge, "[t]his is not a unique insight, it is not relevant to the salient legal issues

in this case, and it will not provide any assistance to the Court not already available in the parties'

briefs."  [Filing No. 145 at 2.]  Specifically, Mr. Kluge contends that the proposed amicus brief

sheds no light on whether BCSC suffered an undue burden, what accommodation BCSC ought to

have made for Mr. Kluge's religious beliefs, and whether Mr. Kluge has demonstrated retaliation.

[Filing No. 145 at 7.]  Mr. Kluge asserts that the cases cited by Movants, in which they were

permitted to file amicus briefs, are distinguishable from the present case.  [Filing No. 145 at 7-9.]

SA-161

Finally, Mr. Kluge contends that the proposed amicus brief stands for the proposition that calling transgender students by their chosen names respects and affirms their gender identity, but BCSC has argued that using chosen first names is a purely administrative task, and therefore the proposed brief has no relevance to the issues in this case. [Filing No. 145 at 9-10.]

In reply, Movants argue that the evidence presented in their proposed amicus brief concerning the importance of calling transgender students by names and pronouns that affirm their gender identity "bears directly on a central issue in this case: whether [Mr.] Kluge's proposed accommodation caused an undue hardship on [BCSC]." [Filing No. 147 at 1.]  According to Movants, "[i]f the scientific evidence shows that Mr. Kluge's proposed accommodation would be contrary to the health and well-being of transgender students, then the accommodation undoubtedly imposed 'more than a *de minimis* cost' to BCSC whose mission is to educate and protect those students." [Filing No. 147 at 1.]  Movants maintain that their perspective is unique because although the parties address the harm caused to two particular transgender students, Movants explain from a scientific research perspective why the last names only arrangement threatens the mental and physical wellbeing of transgender youth more broadly. [Filing No. 147 at 2.]

The Seventh Circuit "has held that whether to allow the filing of an amicus curiae brief is a matter of 'judicial grace.'" *Voices for Choices v. Illinois Bell Tel. Co*., 339 F.3d 542, 544 (7th Cir. 2003) (quoting *National Organization for Women, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000)).  In deciding whether to permit such a brief, courts should consider "whether the brief will assist the judges by presenting ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs." *Voices for Choices*, 339 F.3d at 545.  "The criterion is more likely to be satisfied in a case in which a party is inadequately represented; or in which the would-

SA-162

be amicus has a direct interest in another case that may be materially affected by a decision in this case; or in which the amicus has a unique perspective or specific information that can assist the court beyond what the parties can provide." *Id.* (citing *Scheidler*, 223 F.3d at 616-17).

The Court acknowledges that Movants and other similar organizations have been permitted to submit amicus briefs in other cases, and that they have provided courts with information and perspectives that are important to addressing legal issues affecting transgender individuals. In the instant case, however, that information is not necessary. As Mr. Kluge acknowledges, the general notion that failing or refusing to affirm a transgender individual's identity using preferred names and pronouns causes psychological and emotional harm is "not a unique insight." [Filing No. 145 at 2.] Indeed, it is undisputed that BCSC accepted that premise as true and sought to alleviate potential psychological and emotional harm to students through its policies and practices concerning the treatment of transgender students. [*See* Filing No. 15-4 at 9 (BCSC's January 2018 "Transgender Questions" document stating "It is our job to make all students feel welcome and accepted in the public school environment").] Even Mr. Kluge acknowledges that failing to affirm the identities of transgender students causes "emotional harm" to those students, although he argues that such harm is insufficient to constitute an undue burden. [*See, e.g.*, Filing No. 153 at 19 ("The emotional discomfort and complaints of two students and a single teacher cannot justify forcing Kluge to face a choice between violating his religious beliefs and losing his job.").] Accordingly, the Court will resolve the pending motions by considering only the parties' briefs, and Movants' Motion for Leave to File Brief of Amici Curiae, [Filing No. 131], is **DENIED**.

SA-163

### C.  Summary Judgment Motions

#### 1.  *Failure to Accommodate Claim*

Mr. Kluge argues that BCSC discriminated against him by refusing to accommodate his sincerely held religious beliefs.  [Filing No. 114 at 19-35.]  Specifically, he asserts that his belief against promoting transgenderism by using a transgender student's preferred name and pronouns is religious in nature, is sincerely held, and was clearly communicated to BCSC.  [Filing No. 114 at 19-23.]  He further argues BCSC discriminated against him based on that belief in three ways: (1) "withdr[awing] the last-name only accommodation despite a lack of undue hardship"; (2) "refus[ing] to offer or discuss any other accommodation"; and (3) "coerc[ing] his resignation letter through misrepresentation."  [Filing No. 114 at 23-28.]  Mr. Kluge contends that BCSC failed to offer any accommodation after it withdrew the last names only accommodation, and even if the last names only accommodation was the only possible accommodation, BCSC cannot show that use of that accommodation would cause undue hardship.  [Filing No. 114 at 28-29.]  He argues that students' "emotional discomfort" does not constitute undue hardship, and "[t]he fact that BCSC and [Mr.] Kluge agreed to an accommodation and used it successfully for a full semester establishes last-names only as a 'reasonable accommodation' for [Mr.] Kluge's religious beliefs, and also that there was no 'undue hardship' associated with that accommodation."  [Filing No. 114 at 29-30.]  According to Mr. Kluge, when BCSC informed him that he could no longer use last names only, "BCSC did not detail any undue hardship and did not engage [Mr.] Kluge in any specific discussions concerning undue hardship," but instead Ms. Gordon characterized the last names only arrangement as a "policy violation."  [Filing No. 114 at 30.]  Mr. Kluge contends that BCSC has not identified any hardship that rises above the *de minimis* level because it has shown no economic costs or disruption to operations and no classroom disruptions, rearrangements of

27

personnel scheduling, or demonstrably impaired learning outcomes as a result of his use of last names only. [Filing No. 114 at 31.] In fact, he argues, it is undisputed that his orchestra students excelled. [Filing No. 114 at 31.] Mr. Kluge contends that the only hardships identified are the complaints of two students and one teacher, which were not relayed to Mr. Kluge "until well after the fact," as well as "references to unspecified attorneys' fees and 'opportunity costs' for the management of the accommodation," which are not sufficient to constitute undue hardship within the meaning of Title VII. [Filing No. 114 at 31-32.] Finally, Mr. Kluge argues that BCSC's policies regarding transgender students provide accommodations to those students to the detriment of employees' sincere religious beliefs, which are not equally accommodated, creating the suggestion "that transgender rights overrule religious rights and that is the antithesis of reasonableness." [Filing No. 114 at 32-35.]

In its Cross-Motion for Summary Judgment and Response to Mr. Kluge's Motion for Partial Summary Judgment ("Cross-Motion/Response"), BCSC argues that Mr. Kluge cannot establish a prima facie case of discrimination based on failure to accommodate because addressing students by their preferred names and pronouns is a purely administrative task and therefore does not objectively conflict with his sincerely held religious beliefs. [Filing No. 121 at 28-32.] In support of this argument, BCSC cites *Summers v. Whitis*, 2016 WL 7242483 (S.D. Ind. Dec. 15, 2016). [Filing No. 121 at 29-32.] Even if he could establish a prima facie case, BCSC argues, Mr. Kluge's claim still fails because his use of last names only created undue hardship. [Filing No. 121 at 32-43.] Specifically, BCSC contends that its "business" comprises a constitutional statutory obligation to educate students, and Mr. Kluge's use of last names only frustrates that purpose by causing emotional harm to students and impairing BCSC's efforts to educate them. [Filing No. 121 at 34-36.] BCSC further argues that courts have routinely found undue hardship where a

SA-165

religious accommodation threatens the classroom learning environment.  [Filing No. 121 at 36-38 (citing cases).]  BCSC asserts that Mr. Kluge's suggestion that the complaints received by the school constitute "heckler's vetoes" and therefore cannot amount to an undue burden is without merit because "[t]hat is not the law" and because the case Mr. Kluge relied upon addresses alleged First Amendment free speech violations and has no application in the Title VII context.  [Filing No. 121 at 39.]  BCSC also contends that it was not required to offer Mr. Kluge another reasonable accommodation, and instead is only required to demonstrate that no accommodation would be reasonable, which it has done because it is obvious that a high school classroom can only function when teachers address students directly.  [Filing No. 121 at 40.]  Under these circumstances, BCSC argues, it has established as a matter of law that any accommodation would impose undue hardship.  [Filing No. 121 at 41.]  In addition, the last names only arrangement created an undue hardship by placing BCSC on "the razor's edge of liability" by exposing it to potential lawsuits by transgender students alleging discrimination.  [Filing No. 121 at 41-43.]  Finally, BCSC argues that if the Court declines to grant summary judgment in BCSC's favor on the failure to accommodate claim, it should also decline to grant summary judgment in Mr. Kluge's favor on the issue of the sincerity of his religious belief against using transgender students' preferred names and pronouns.  [Filing No. 121 at 47-49.]  Specifically, BCSC asserts that genuine issues of material fact exist regarding whether Mr. Kluge's belief is sincerely held, given that he used transgender students' preferred names at an orchestra awards ceremony in May of 2018 and that he testified in his deposition that there may be instances in which it is appropriate and consistent with his religious beliefs to address a transgender student by the student's preferred first name.  [Filing No. 121 at 48-49.]

In his combined Reply in Support of his Motion for Partial Judgment and Response in Opposition to BCSC's Cross-Motion for Summary Judgment ("Reply/Response"), Mr. Kluge

SA-166

maintains that his religious belief against using transgender students' preferred names and pronouns is sincerely held. [Filing No. 153 at 32-35.] Mr. Kluge argues that the requirement that BCSC teachers address transgender students using their preferred names and pronouns objectively conflicts with his religious beliefs against affirming transgenderism, and BCSC's position to the contrary "ignores the tremendously important role that names play." [Filing No. 153 at 10-12.] He urges the Court to follow the Sixth Circuit's decision in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), and conclude that using names and pronouns is more than a ministerial act and carries a specific message affirming an individual's gender identity. [Filing No. 153 at 12-13.] Mr. Kluge further reiterates that the last names only accommodation was reasonable. [Filing No. 153 at 14-30.] Specifically, he contends that "[t]he undisputed evidence shows that [Mr.] Kluge's accommodation worked quite well and actually enhanced his ability to educate his students in music and orchestra," because there were no student protests, written complaints, classroom disturbances, or cancelled classes, but rather the students excelled and received awards for their musical performances. [Filing No. 153 at 14-15.] Again relying on *Meriwether*, Mr. Kluge asserts that using students' last names only does not negatively impact the learning environment, and at the very least, an issue of fact remains as to whether the last names only accommodation created an undue hardship. [Filing No. 153 at 15-16; Filing No. 153 at 23-26.] Mr. Kluge points out that BCSC never told him specifically that the last names only accommodation was creating an undue hardship, and instead told him that it was a "policy violation." [Filing No. 152 at 16-17.] Mr. Kluge asserts that "[t]here is no admissible evidence that any students, except two transgender students—Aidyn Sucec and Sam Willis—complained about [Mr.] Kluge's use of last names only," and these complaints "are 'heckler's vetoes,' not evidence of an undue burden or a negative impact on the learning environment." [Filing No. 153 at 17-19.] According to Mr. Kluge, "[t]he

SA-167

emotional discomfort and complaints of two students and a single teacher[, Mr. Lee,] cannot justify forcing [Mr.] Kluge to face a choice between violating his religious beliefs and losing his job." [Filing No. 153 at 19.] Mr. Kluge contends that complaints by unnamed students at Equality Alliance Club meetings regarding Mr. Kluge's use of last names only "constitute inadmissible hearsay and hearsay within hearsay," and should not be considered by the Court. [Filing No. 153 at 21-22.] Mr. Kluge further argues that any cases cited by BCSC for the proposition that the last names only accommodation exposed it to liability for discrimination against transgender students are inapposite, and "using someone's legal surname does not create any risk of liability." [Filing No. 153 at 26-28 (distinguishing cases cited by BCSC).] Mr. Kluge contends that any claim that BCSC feared potential lawsuits is undercut by its failure to conduct any investigation into student complaints. [Filing No. 153 at 29-30; Filing No. 153 at 29 ("If BCSC felt it might be sued, why did the administration fail to conduct any investigation upon learning of the alleged complaints by unidentified students?").]

In its Reply in Support of Cross-Motion for Summary Judgment ("Reply"), BCSC maintains that this case is indistinguishable from *Summers* and Mr. Kluge has failed to demonstrate an objective conflict between his religious beliefs and the requirement that he refer to transgender students by the names and pronouns listed in PowerSchool. [Filing No. 150 at 2-6.] BCSC argues that *Meriwether* is distinguishable because, among other things, it involved claims under the First Amendment and therefore has no application to the objective conflict analysis required for Title VII claims. [Filing No. 150 at 6-8.] BCSC asserts that it has established two separate grounds for undue hardship: (1) the last names only accommodation led to complaints and impeded BCSC's mission to educate students; and (2) the continued use of last names only could have resulted in BCSC being exposed to liability for discrimination. [Filing No. 150 at 8-16.] According to BCSC,

SA-168

Mr. Kluge's argument that the last names only accommodation was successful ignores evidence of complaints from members of the BHS community, and his assertion that no undue hardship exists because his students excelled and he did not perceive any problems ignores the undue hardship standard.  [Filing No. 150 at 9-10.]  BCSC asserts that Mr. Kluge's accommodation did not constitute protected speech, the fact that BCSC never informed Mr. Kluge in writing or otherwise that the accommodation was causing undue hardship and instead called it a policy violation is irrelevant, and Mr. Kluge's description of Aidyn's and Sam's complaints as "heckler's vetoes" or indicative of mere "emotional discomfort" are inapt.  [Filing No. 150 at 10-12.]  BCSC contends that the complaints about Mr. Kluge's use of last names are not hearsay because they are offered to show their effect on BCSC's state of mind as it relates to whether the accommodation was causing undue hardship.  [Filing No. 150 at 12-13.]  In addition, BCSC argues that in order to show undue hardship based on potential exposure to liability, it need not prove that it would lose a lawsuit brought by a transgender student, and instead it is sufficient to show that transgender students felt targeted by Mr. Kluge's practices and that law in the Seventh Circuit during the relevant timeframe would have permitted a transgender student to assert a sex discrimination claim under federal law.  [Filing No. 150 at 14-16.]  Finally, BCSC reiterates that, if the Court declines to grant summary judgment in its favor as to the failure to accommodate claim, the question of the sincerity of Mr. Kluge's religious beliefs should be submitted to the factfinder.  [Filing No. 150 at 18-19.]

    a.   Hearsay Objections

Mr. Kluge argues that the complaints received by Mr. Lee from unidentified students constitute inadmissible hearsay.  [Filing No. 153 at 21-22.]  "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted."  *Khungar*, 985 F.3d at 575 (citing Fed. R. Evid.

SA-169

801(c).  The Seventh Circuit has held in another Title VII case that complaints received by an employer do not constitute hearsay when they are not offered to show that the employee in fact engaged in the conduct complained of, but to show the employer's state of mind when making an employment decision.  *Khungar*, 985 F.3d at 575.  A case that Mr. Kluge relies on, *Emich Motors Corp. v. General Motors Corp.*, 181 F.2d 70, 82 (7th Cir. 1950), *rev'd on other grounds*, 340 U.S. 558 (1951), is over 70 years older but stands for the same proposition:  "We agree with the defendants that the complaint letters received by them should have been admitted, not for their testimonial use, to prove the facts contained therein, but to show the information on which they acted.  This is a well-established exception to the hearsay rule."  *See also Walker v. Alcoa, Inc.*, 2008 WL 2356997, at *5 (N.D. Ind. June 9, 2008) ("The Court finds, however, that Musi's testimony regarding the employee complaints he overheard about Sunday absences is not hearsay under Federal Rules of Evidence 801 and 802 because it is not offered for the truth of the matter asserted; instead, Musi's testimony is offered to show the effect of those statements on the hearer, which in this case is the employer.").

Mr. Lee's testimony that he received complaints about Mr. Kluge from students is not offered for the truth of the matter asserted in those complaints, *i.e.*, that Mr. Kluge referred to students by last names only, or that he sometimes "slipped up" and used gendered names and honorifics.  Instead, the testimony is offered to show BCSC's state of mind in considering his continued employment and the information upon which it acted in seeking his resignation.  Mr. Lee's testimony is therefore admissible to that extent.  *See Khungar*, 985 F.3d at 575; *Emich Motors*, 181 F.2d at 82; *Walker*, 2008 WL 2356997, at *5.  *See also Junior v. Anderson*, 724 F.3d 812, 814 (7th Cir. 2013) ("Testimony to what one heard, as distinct from testimony to the truth of what one heard, is not hearsay.").

SA-170

In any event, Mr. Kluge does not (and could not) challenge the admissibility of the declarations provided by Aidyn and Sam, nor does he challenge the admissibility of the testimony by Dr. Daghe, Dr. Jessup, or Ms. Gordon stating that BCSC received complaints about Mr. Kluge's treatment of transgender students.  Nor does he seek to exclude the minutes from the June 2018 Board meeting, which show that Mr. Kluge and BCSC's policies concerning transgender students were subjects of concern for several community members.  In other words, even if the Court were to exclude Mr. Lee's testimony that he received complaints from unnamed students, the Court's analysis would remain largely unchanged.[6]  Finally, it is also worth noting that while Mr. Kluge may dispute the truth of the matter asserted in the students' complaints to the extent he maintains that he strictly complied with the last names only accommodation and did not refer to any students using their first names or gendered language, that dispute is not material.  As addressed more fully below, the question that is ultimately dispositive of Mr. Kluge's failure to accommodate claim is whether, assuming perfect compliance with the last names only accommodation, that accommodation resulted in undue hardship to BCSC.[7]

---

[6] Mr. Kluge seems to imply that because he was not specifically informed of the complaints as they were being made and was not told who specifically was making the complaints, they did not exist.  [*See* Filing No. 153 at 7 (stating that Mr. Kluge disputes that complaints were made by unnamed persons and teachers who did not submit sworn statements because "[n]one of these alleged complaints were made known to [Mr.] Kluge until after his termination" and "[n]one were investigated").]  Mr. Kluge has identified no legal authority for his apparent belief that complaints must be relayed to an employee before they can be considered relevant to an employer's decision as to whether an undue hardship exists.  Furthermore, the Seventh Circuit has previously rejected a similar argument, concluding that it was not a "justifiable" inference to conclude that complaints were illegitimate based solely on the employee's lack of knowledge of those complaints.  *Khungar*, 985 F.3d at 575 ("That [plaintiff] wasn't informed of each complaint tells us only that; it does not mean they were fictitious.").

[7] To the extent that Mr. Kluge makes arguments concerning the credibility of certain witnesses or the weight their testimony should be afforded, [*see* Filing No. 153 at 18 ("Kluge identified credibility issues associated with [Aidyn]'s statement."); Filing No. 153 at 21 ("[Mr.] Lee's inability to identify any other students [who complained] reflects negatively on his credibility.")], the Court has disregarded these arguments because they are not proper at summary judgment, *see,*

SA-171

b.  Adverse Employment Actions

Mr. Kluge identifies three separate purported adverse employment actions that could form the basis of his discrimination claim based on failure to accommodate: (1) withdrawal of the last names only accommodation; (2) refusal to offer or discuss other potential accommodations; and (3) "coerc[ion of] his resignation letter through misrepresentation."  [Filing No. 114 at 23.] Because it can be resolved easily, the Court will deal with the last claim first.

### i.  Coercion of Resignation Through Fraud

Any contention that Mr. Kluge's resignation was coerced through misrepresentation is wholly without merit.  The misrepresentation, according to Mr. Kluge, is that he was led to believe that he could submit a conditional resignation.  But this argument is not supported by the evidence. In dismissing Mr. Kluge's state law fraud claim, the Court has already determined that "Mr. Kluge's written resignation . . . was not expressly conditioned on anything, did not contain any language concerning his ability to withdraw it, and instead merely requested that the letter not be 'processed' and that no one be notified until a certain date."  [Filing No. 70 at 39-40.]  In other words, even if Mr. Kluge thought he was permitted to submit a conditional or rescindable resignation, he failed to actually do so.  Furthermore, the evidence presented along with the summary judgment motions demonstrates that Ms. Gordon never told Mr. Kluge that his resignation could be conditional or that he could withdraw it for any reason.  In fact, the transcript of the recorded conversation between Ms. Gordon, Mr. Kluge, and Dr. Daghe concerning "processing" of resignations shows that Ms. Gordon merely discussed the circumstances under which Ms. Gordon and the BCSC administration would respect an employee's wishes not to disclose the employee's resignation to

_____

*e.g., Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) ("[D]istrict courts presiding over summary judgment proceedings may not 'weigh conflicting evidence,' or make credibility determinations, both of which are the province of the jury." (citations omitted)).

SA-172

others.  [*See* Filing No. 113-4 at 36-37.]  Her email response to Mr. Kluge's resignation also does

not state—or even imply—that Mr. Kluge could rescind his resignation.  [Filing No. 15-2 at 1.]

BCSC's Bylaws and relevant Indiana law concerning school corporation employees' resignations

further demonstrates that a "conditional" resignation was not authorized.  Accordingly, to the

extent that Mr. Kluge suggests that Ms. Gordon lied to him as a means to coerce his resignation,

and that such lying is somehow independently actionable as discrimination, he has presented no

evidence to support that theory.

### ii.  Failure to Offer or Discuss Other Potential Accommodations

To the extent that Mr. Kluge argues that BCSC discriminated against him in that it failed

to propose an alternative accommodation, or to engage in further discussions regarding a potential

accommodation, the law does not require it to do so.  Title VII merely requires an employer to

"show, as a matter of law, that any and all accommodations would have imposed an undue

hardship." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 455 (7th Cir. 2013).  Mr. Kluge

points to no legal authority supporting his position that failure to offer an alternative

accommodation or conduct discussions concerning whether an alternative accommodation may

exist constitutes an adverse employment action that can serve as an independent basis for a

discrimination claim.  *See Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000) ("Although we define

'adverse employment action' broadly, not everything that makes an employee unhappy is an

actional adverse action.  For an employment action to be actionable, it must be a 'significant change

in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities or a decision causing a significant change in benefits.'"  (quoting

*Burlington Indus. V. Ellerth*, 524 U.S. 742, 761 (1998))); *cf. Bolden v. Caravan Facilities Mgmt.,

LLC*, 112 F. Supp. 3d 785, 791 (N.D. Ind. 2015) (observing that although the federal regulations

SA-173

implementing the American with Disabilities Act require an interactive process between the employer and the employee to determine the appropriate reasonable accommodation for the employee's disability, the plaintiff could not cite any comparable regulation imposing an interactive process requirement in Title VII cases).

Similarly, Mr. Kluge has not pointed to any evidence showing that he devised or proposed an alternate accommodation—separate from the last names only accommodation—that BCSC refused to discuss with him.  Accordingly, any purported discrimination claim based on a refusal to entertain discussions regarding the possibility of other accommodations is both legally unsupported and inconsistent with the evidence of record.[8]

### iii. Withdrawal of the Last Names Only Accommodation and Forced Resignation

The undisputed facts show that the last names only accommodation was withdrawn, and Mr. Kluge was given the choice to either resign or be terminated; it was not an option for Mr. Kluge to continue his employment without following the Name Policy or BCSC's other directives concerning transgender students.  Although the Court has rejected as factually incorrect Mr.

---

[8] It is also significant that Mr. Kluge has not proposed or identified any alternative accommodation that BCSC could have offered, and the Court cannot conceive of any such accommodation. Without conflating the issue of whether the failure to propose or discuss an alternative accommodation constitutes an independent act of discrimination with the issue of whether any potential reasonable accommodation exists that would not result in undue hardship to BCSC, it is sufficient to say that any potential alternative accommodation would succeed or fail for the same reasons the last names only accommodation would.  The central issue in this case is whether BCSC could permit Mr. Kluge to refer to students by anything other than their preferred first names as listed in PowerSchool without incurring undue hardship.  It is undisputed that Mr. Kluge refused to use those names, and therefore if any other potential accommodation did in fact exist, it would necessarily involve him not using those names.  It is the very refusal to use those names that caused the alleged hardships addressed below.  Accordingly, if BCSC can demonstrate that the last names only accommodation results in undue hardship, it can demonstrate that any other potential accommodation would result in the same undue hardship.  Mr. Kluge has suggested no alternative, and the Court can conceive of none. For those reasons, the Court need not and will not specifically address the issue of other potential accommodations any further in this Order.

SA-174

Kluge's repeated assertion that his resignation was coerced through misrepresentation, his resignation was "coerced" in the sense that he had to choose between resigning and being terminated.  BCSC does not dispute that the end of Mr. Kluge's employment, however it is characterized, constituted an adverse employment action for purposes of a Title VII discrimination claim based on failure to accommodate.  *See Leitgen v. Franciscan Skemp Healthcare, Inc*., 630 F.3d 668, 673 (7th Cir. 2011) ("There is no dispute that [plaintiff's] forced resignation constitutes an adverse employment action . . . .").  The Court will therefore treat Mr. Kluge's forced resignation as the relevant adverse employment action, encompassing the withdrawal of the last names only accommodation and the ultimate end of his employment.

          c.   <u>Sincerity of Mr. Kluge's Beliefs</u>

"Title VII and courts . . . do not require perfect consistency in observance, practice, and interpretation when determining if a belief system qualifies as a religion or whether a person's belief is sincere.  These are matters of interpretation where the law must tread lightly." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 453 (7th Cir. 2013); *see also Grayson v. Schuler*, 666 F.3d 450, 454-55 (7th Cir. 2012) ("[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?").  Nevertheless, the sincerity of an individual's religious belief is a question of fact that is generally not appropriate for a court to determine at summary judgment. *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (7th Cir. 2002).  Because BCSC has shown that there are issues of fact as to whether Mr. Kluge's religious beliefs are sincerely held, the Court cannot decide that issue at this juncture.  However, for purposes of this Order, the Court will

SA-175

assume without deciding that Mr. Kluge's religious beliefs against referring to transgender students by their preferred names and pronouns are sincerely held.

### d.   Conflict Between BCSC's Policies and Mr. Kluge's Beliefs

In *Summers v. Whitis*, 2016 WL 7242483, *1 (S.D. Ind. Dec. 15, 2016), plaintiff Linda Summers worked as a deputy clerk in the Harrison County, Indiana Clerk's Office until she was fired for refusing to process marriage licenses for same-sex couples based on her religious opposition to same-sex marriage.  The Court granted summary judgment in favor of the defendants on Ms. Summers' failure to accommodate claim, concluding that there was no objective conflict between her religious belief and the requirement that she process marriage licenses for same-sex couples.  *Id.* at *7.  The Court emphasized that the conflict inquiry must be objective, and further determined that Ms. Summers was merely required to process licenses by viewing the application, verifying that certain information was correct, collecting a statutory fee, printing a form, and recording the license in a book for the public record.  *Id.* at *5.  "She was simply tasked with certifying—on behalf of the state of Indiana, not on her own behalf—that the couple was qualified to marry under Indiana law," a duty which the Court concluded was "purely administrative."  *Id.* The Court emphasized that Ms. Summers was not required to perform marriage ceremonies, personally sign marriage certificates, attend marriage ceremonies, say congratulations, offer a blessing, pray with couples, or condone or express religious approval of any particular marriage. *Id.*  Because there was no conflict between her religious belief and her job duties, the employer had no duty to accommodate Ms. Summers' beliefs.  *See id.* ("If the employee fails to show a bona fide conflict, it makes no sense to speak of a duty to accommodate.") (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 76 (1986) (Stevens, J., concurring in part and dissenting in part)) (internal quotations omitted).

SA-176

In *Meriwether v. Hartop*, 992 F.3d 492, 492-503 (6th Cir. 2021), the Sixth Circuit considered whether the district court erred in dismissing a professor's claim that the small public university where he worked violated the First Amendment by disciplining him for refusing to refer to a transgender student using the student's preferred pronouns. In concluding that the professor had stated a claim for violation of his freedom of speech, the court rejected the university's argument that using a student's preferred titles and pronouns is the "type of non-ideological ministerial task would not be protected by the First Amendment." *Id.* at 507. Instead, the court reasoned:

> [T]itles and pronouns carry a message. The university recognizes that and wants its professors to use pronouns to communicate a message: People can have a gender identity inconsistent with their sex at birth. But Meriwether does not agree with that message, and he does not want to communicate it to his students. That's not a matter of classroom management; that's a matter of academic speech.

*Id.*

The Court agrees with BCSC that *Summers* provides the relevant rule that there must be an objective conflict between an employee's religious beliefs and his duties before the employer can be expected to provide a reasonable accommodation related to those beliefs. The Court disagrees, however, with BCSC's argument that *Summers* requires a finding that no such conflict exists in this case. It is inconsistent for BCSC to argue on one hand that referring to students by the names listed in PowerSchool is a purely administrative duty that does not conflict with Mr. Kluge's religious beliefs against affirming a person's transgender identity, while arguing on the other hand that Mr. Kluge's refusal to use the names listed in PowerSchool causes harm to students—and therefore, undue hardship to BCSC—because the students do not feel affirmed in their identities. Accordingly, the Court rejects BCSC's administrative task argument and concludes that Mr.

SA-177

Kluge's religious beliefs objectively conflict with the Name Policy and BCSC's other requirements concerning how faculty and staff address and refer to transgender students.

To be clear, this conclusion is not the result of the Court's reliance on *Meriwether*. Without expressing an opinion as to the correctness of that case's holding or its application to the facts of this case, the Court observes that *Meriwether* is not binding precedent in this Circuit, that it involved a First Amendment claim rather than a Title VII claim, and that courts have continually emphasized the distinction between public K-12 schools and universities in addressing speech and other constitutional issues. *See, e.g., Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) (recognizing that "universities occupy a special niche in our constitutional tradition"). Having already concluded that an objective conflict exists between BCSC's policies and Mr. Kluge's religious beliefs, it is unnecessary to examine any of these distinctions more closely.

> e.   <u>Undue Hardship</u>

Because Mr. Kluge has established a prima facie case of discrimination based on failure to accommodate, the burden shifts to BCSC to demonstrate that it cannot provide a reasonable accommodation "without undue hardship on the conduct of [its] business." 42 U.S.C. § 2000e(j); *Porter*, 700 F.3d at 951. Requiring an employer "to bear more than a *de minimis* cost" or incur more than a "slight burden" constitutes an undue hardship. *EEOC v. Walmart Stores E., L.P.*, 992 F.3d 656, 658 (7th Cir. 2021) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). "The relevant costs may include not only monetary costs but also the employer's burden in conducting its business." *E.E.O.C. v. Oak-Rite Mfg. Corp.*, 2001 WL 1168156, at *10 (S.D. Ind. Aug. 27, 2001).

### i.   Interference with BCSC's Ability to Educate Students

As an initial matter, the Court recognizes that BCSC is in the "business" of providing public education, as required by Indiana statutory and constitutional law.  The Indiana Supreme Court has recognized that public schools play a "custodial and protective role," which has been codified by the legislature in passing compulsory education laws that mandate the availability of public education. *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002).  The Indiana Constitution also provides that "it shall be the duty of the General Assembly . . . to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all."  IND. CONST. art. VIII, § 1.

BCBS argues that Mr. Kluge's failure to address transgender students by the names and pronouns reflected in PowerSchool created undue hardship related to interference with its mission to educate students. To support its position, BCSC asks the Court to analogize the facts of this case to those at issue in *Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986).  In *Baz*, a hospital chaplain brought a claim under Title VII against his former employer, the Veterans Administration ("VA"). *Id.* at 702.  The chaplain was ultimately terminated for violating the VA's regulations against proselytizing;  As a result of his religious beliefs, he "saw himself as an active, evangelistic, charismatic preacher while the chaplain service and the medical staff saw his purpose as a quiescent, passive listener and cautious counselor." *Id.* at 704.  The chaplain argued that the VA should be required to accommodate his religious ministry, but the Seventh Circuit disagreed, concluding that the defendants had demonstrated that they could not accommodate the chaplain's religious beliefs without undue hardship and writing:

> [Defendants] have produced evidence tending to show that Reverend Baz's philosophy of the care of psychiatric patients is antithetical to that of the V.A. To accommodate Reverend Baz's religious practices, they would have to either adopt his philosophy of patient care, expend resources on continually checking up on

SA-179

what Reverend Baz was doing or stand by while he practices his (in their view, damaging) ministry in their facility. None of these is an accommodation required by Title VII.

*Id*. at 706-07.

The Court agrees that the analogy between BCSC as a public-school corporation and the VA hospital in *Baz* is an apt one as it relates to a court's determination of an organization's mission. Just as the chaplain's philosophy of patient care was directly at odds with the philosophy of his employer, Mr. Kluge's religious opposition to transgenderism is directly at odds with BCSC's policy of respect for transgender students, which is grounded in supporting and affirming those students. Under *Baz*, BCSC would not be required to adopt Mr. Kluge's views relative to the treatment of transgender students nor stand by while he expresses those views. *Baz* does not, however, squarely resolve this case, because the central issue here is whether the last names only accommodation—which presents a sort of middle ground between the opposing philosophies of Mr. Kluge on the one hand and BCSC on the other—results in undue hardship to BCSC. No such potential accommodation was addressed in *Baz*.

Nevertheless, the undisputed evidence in this case demonstrates that the last names only accommodation indeed resulted in undue hardship to BCSC as that term is defined by relevant authority. Aidyn's and Sam's declarations show that Mr. Kluge's use of last names only— assuming, only for purposes of this Order, that Mr. Kluge strictly complied with the rules of the accommodation—made them feel targeted and uncomfortable. Aidyn dreaded going to orchestra class and did not feel comfortable speaking to Mr. Kluge directly. Other students and teachers complained that Mr. Kluge's behavior was insulting or offensive and made his classroom environment unwelcoming and uncomfortable. Aidyn quit orchestra entirely. Certainly, this evidence shows that Mr. Kluge's use of the last names only accommodation burdened BCSC's

SA-180

ability to provide an education to all students and conflicted with its philosophy of creating a safe and supportive environment for all students.[9]  BCSC was not required to allow an accommodation that unduly burdened its "business" in this manner.[10]  *See Erlach v. New York City Bd. of Educ.*, 1996 WL 705282, at *11 (E.D.N.Y. Nov. 26, 1996), *aff'd*, 129 F.3d 113 (2d Cir. 1997) ("interference with students' learning need not be undertaken because it constitutes 'undue hardship' for the employer").

In an attempt to show that his interference with BCSC's business did not rise above the *de minimis* level, Mr. Kluge repeatedly emphasizes that many of his orchestra students were successful during the 2017-2018 school year in that they participated in extracurricular activities and won awards for their musical performances.  He also submitted declarations from students and another teacher stating that they did not perceive any problems in Mr. Kluge's classes resulting from the use of last names only.  These facts may well be true, and are accepted as such, but they are neither dispositive of nor relevant to the undue hardship question.  BCSC is a public-school corporation and as such has an obligation to meet the needs of *all* of its students, not just a majority of students or the students that were unaware of or unbothered by Mr. Kluge's practice of using

---

[9] Interestingly, *Meriwether*, the case upon which Mr. Kluge so vehemently relies as to the objective conflict issue, could fairly be read to support the existence of an undue hardship.  In describing the relevant facts, the Sixth Circuit called the university's suggestion that the professor eliminate all gendered language "a practical impossibility that would also alter the pedagogical environment in his classroom" and noted that the professor was of the opinion that "eliminating pronouns altogether was next to impossible, especially when teaching."  *Meriwether*, 992 F.3d at 499-500.

[10] To the extent that Mr. Kluge argues that the fact that he was permitted to use the last names only accommodation for the full 2017-2018 school year demonstrates that the accommodation was not unreasonable and did not result in undue hardship, he is incorrect.  BCSC attempted in good faith to provide an accommodation to Mr. Kluge.  The fact that BCSC chose to endure the undue hardship resulting from that accommodation for the remainder of the school year, rather than ending Mr. Kluge's employment immediately when the hardship arose, does not support Mr. Kluge's position that the accommodation was reasonable and was not an undue hardship.  BCSC simply honored its agreement.

SA-181

last names only.  BCSC has presented evidence that two specific students were affected by Mr.

Kluge's conduct and that other students and teachers complained.  And, given that Mr. Kluge does

not dispute that refusing to affirm transgender students in their identity can cause emotional harm,

this harm is likely to be repeated each time a new transgender student joins Mr. Kluge's class (or,

as the case may be, chooses not to enroll in music or orchestra classes solely because of Mr. Kluge's

behavior).  As a matter of law, this is sufficient to demonstrate undue hardship, because if BCSC

is not able to meet the needs of *all* of its students, it is incurring a more than *de minimis* cost to its

mission to provide adequate public education that is equally open *to all*.[11]

### ii.  Potential for Liability

Title VII does not require employers to provide accommodations that would place them

"on the 'razor's edge' of liability." *Matthews v. Wal-Mart Stores, Inc*., 417 F. App'x 552, 554 (7th

Cir. 2011) (citing *Flanagan v. Ashcroft*, 316 F.3d 728, 729-30 (7th Cir. 2003)).  *See also E.E.O.C.*

---

[11] Mr. Kluge repeatedly characterizes Aidyn's, Sam's, and others' complaints about Mr. Kluge's conduct as impermissible "heckler's vetoes."  [*E.g.*, Filing No. 153 at 19 ("The complaints from Aidyn Sucec and Sam Willis are 'heckler's vetoes,' not evidence of an undue burden or a negative impact on the learning environment.").]  The "heckler's veto" doctrine is a concept of First Amendment law providing that although the government may take action to preserve order when unpopular speech is disruptive, it cannot restrict speech merely to prevent another party from reacting adversely.  *See Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005) ("The police must permit the speech and control the crowd; there is no heckler's veto.") (internal quotations and citation omitted).  The Court has already dismissed Mr. Kluge's First Amendment freedom of speech claim, [Filing No. 70 at 13-15], and Mr. Kluge has not provided any legal authority in support of his belief that the heckler's veto doctrine applies in the Title VII context.  In any event, it makes no sense to apply that concept here.  Mr. Kluge asserts that if the Court were to allow a heckler's veto and conclude that "emotional discomfort constituted an undue burden, employers would be able to skirt their duty to accommodate at will, simply by finding an employee offended at the accommodation."  [Filing No. 153 at 19.]  But the Title VII standard *requires* the Court to consider the impact of any proposed accommodation—including by taking into account the reaction of any so-called "hecklers"—to determine whether undue hardship exists.  And, as discussed above, people were not merely "offended" by Mr. Kluge's conduct, the undisputed evidence establishes that his conduct actively interfered with BCSC's mission to provide a safe and supportive educational environment.  Mr. Kluge's slippery slope argument is not persuasive.

*v. Oak-Rite Mfg. Corp.*, 2001 WL 1168156, at *10 (S.D. Ind. Aug. 27, 2001) (noting that undue hardship can be established by showing "that the proposed accommodation would either cause or increase . . . the risk of legal liability for the employer"); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999) ("[C]ourts agree that an employer is not liable under Title VII when accommodating an employee's religious beliefs would require the employer to violate federal or state law.").

In *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1038-39 (7th Cir. 2017), the Seventh Circuit considered whether the district court erred in granting preliminary injunctive relief to a transgender student who brought claims under Title IX of the Education Amendments Act of 1972 and the Fourteenth Amendment's Equal Protection Clause, alleging that his school district discriminated against him by not permitting him to use the boys' restroom.  In affirming the district court's decision, the Seventh Circuit concluded that the student was likely to succeed on his discrimination claims, the court recognized that discrimination on the basis of transgender status is actionable under Title IX.  *Id.* at 1047-50.

In this case, continuing to allow Mr. Kluge an accommodation that resulted in complaints that transgender students felt targeted and dehumanized could potentially have subjected BCSC to a Title IX discrimination lawsuit brought by a transgender student.[12]  Whether such lawsuit would

---

[12] Mr. Kluge emphasizes that there is no evidence that Ms. Gordon or any other BCSC employee ever investigated claims of discrimination by transgender students.  [*E.g.*, Filing No. 153 at 29.] However, there was never any question that Mr. Kluge was refusing to call transgender students by their preferred pronouns or the names listed in PowerSchool, as Mr. Kluge himself initially and repeatedly informed BCSC and BHS officials of his religious objections to doing so.  In other words, it is unclear why the BCSC administration would have needed to conduct any investigation into students' complaints.  Mr. Kluge not only confirmed that the complained of conduct was occurring, he represented that he would not change his behavior, and expressed satisfaction when the complaints occurred.  Accordingly, the failure to investigate does not undercut BCSC's claim that permitting the last names only accommodation increased its risk of being sued for discrimination.

SA-183

ultimately have been successful is not for the Court to decide at this juncture, as it is sufficient that the state of the law during Mr. Kluge's employment created a risk of liability, and BCSC considered that risk in determining how to resolve Mr. Kluge's objections to the policies concerning transgender students.[13]   The increased risk of liability also constitutes an undue hardship that Title VII does not require BCSC to bear.

In sum, BCSC has demonstrated as a matter of law that it cannot accommodate Mr. Kluge's religious belief against referring to transgender students using their preferred names and pronouns without incurring undue hardship.   Accordingly, Mr. Kluge's Motion for Partial Summary Judgment is **DENIED**, and BCSC's Cross-Motion for Summary Judgment is **GRANTED** as to Mr. Kluge's failure to accommodate claim.

### 2. Retaliation Claim

In its Cross-Motion/Response, BCSC argues that Mr. Kluge cannot establish a prima face case of retaliation because no reasonable jury could conclude that protected activity—specifically, asking for religious accommodations in July 2017—was causally connected to Mr. Kluge's employment ending in June 2018.  [Filing No. 121 at 44-45.]   BCSC points out that it never rescinded its accommodation regarding uniforms, and there is no evidence of complaints concerning that accommodation, which demonstrates that the last names only arrangement was withdrawn because of complaints causing undue hardship, not because of hostility to Mr. Kluge's religious beliefs or because of his request for accommodations.  [Filing No. 121 at 45.]  Even if the Court determines that Mr. Kluge can establish a prima facie case of retaliation, BCSC argues,

---

[13] Although the issue was not specifically raised by the parties, the Court notes that the United States Supreme Court has recognized "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000).  BCSC's Name Policy clearly respected that right, allowing a name change in PowerSchool only with parental permission.

SA-184

summary judgment should be granted in BCSC's favor because it has articulated a legitimate nondiscriminatory reason for its actions and Mr. Kluge has not submitted evidence from which a reasonable jury could find pretext. [Filing No. 121 at45.]  According to BCSC, the fact that it did not disclose to Mr. Kluge the identity of the individuals who complained about the use of last names only is not evidence of pretext, and Mr. Kluge's subjective perceptions that there was no tension with students or faculty do not create a genuine issue of material fact as to pretext given the evidence of complaints. [Filing No. 121 at 45-46.]

In his Response/Reply, Mr. Kluge asserts that he engaged in statutorily protected activity by: (1) identifying a sincerely held religious belief that conflicted with the Name Policy; (2) offering the last names only accommodation; and (3) asking the BCSC administration to confirm in February 2018 that the last names only accommodation was still valid. [Filing No. 153 at 30.]  He argues that, as a result of engaging in those activities, he "suffered an adverse employment action when BCSC removed his last-names only accommodation without even claiming any undue hardship, demanded his resignation unless he violated his beliefs, refused to investigate his allegations of discrimination, and coerced him into submitting a conditional resignation they promised not to process until a certain date." [Filing No. 153 at 30.]

In its Reply, BCSC argues that Mr. Kluge's Response/Reply "does not challenge [BCSC]'s lack-of-pretext argument or otherwise attempt to demonstrate pretext," and therefore he has waived any opposition to those arguments and such waiver is fatal to his retaliation claim. [Filing No. 150 at 17.]  BCSC also contends that Mr. Kluge's argument that retaliation is evidenced by alleged misrepresentations related to Mr. Kluge's ability to submit a "conditional" resignation is based on an inaccurate recitation of the facts, because it is undisputed that Ms. Gordon never told Mr. Kluge that he could withdraw his resignation whenever he pleased, and in dismissing Mr.

SA-185

Kluge's state law fraud claim the Court has already concluded that Mr. Kluge did not condition his resignation on anything.  [Filing No. 150 at 17-18.]

"To succeed on a Title VII retaliation claim, a plaintiff must produce enough evidence for a reasonable jury to conclude that (1) [he] engaged in a statutorily protected activity; (2) the [employer] took a materially adverse action against [him]; and (3) there existed a but-for causal connection between the two." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (internal quotations and citations omitted) (second alteration in original).  Once the plaintiff establishes a prima facie case of retaliation, the employer may produce evidence that would permit a factfinder to conclude that it had a non-discriminatory reason for taking the adverse employment action.  *Id.* (citation omitted).  If the employer does so, the burden shifts to the plaintiff to produce evidence that would permit a factfinder to determine that the legitimate reason offered by the employer was pretextual.  *Id.*

At the outset, the Court notes that Mr. Kluge's briefing on his retaliation claim is meager, totaling less than three pages and merely reiterating his version of the facts he believes to be relevant without discussion of how those facts meet the requirements of a retaliation claim.[14]  Mr. Kluge also does not address the argument raised by BCSC that there is no evidence from which a reasonable factfinder could infer pretext.  These issues alone provide a sufficient basis to grant summary judgment in favor of BCSC on the retaliation claim.  *See, e.g., Lee v. Chicago Youth Centers*, 69 F. Supp. 3d 885, 889 (N.D. Ill. 2014) (recognizing that Seventh Circuit precedent "consistently holds that undeveloped, unsupported, perfunctory, or skeletal arguments in briefs are

---

[14] Curiously, although Mr. Kluge did not move for summary judgment in his favor on this claim, he also did not assert or attempt to show that summary judgment in BCSC's favor is inappropriate because, for example, disputed issues of fact remain.  [*See* Filing No. 153 at 30-32.]

SA-186

waived"). The Court finds Mr. Kluge has waived any argument in opposition to BCSC's motion for summary judgment as to his retaliation claim, and grants its motion.

In addition, in concluding that Mr. Kluge's retaliation claim should not be dismissed for failure to state a claim, the Court reasoned that it was plausible based on the allegations contained in the Amended Complaint "that school officials, over time, became less inclined to tolerate Mr. Kluge's religious beliefs and used the idea of student complaints as a pretext to withdraw the last-names-only arrangement, refuse to provide another accommodation to which Mr. Kluge was entitled, and force him to resign." [Filing No. 70 at 29.]  The Court made clear, however, that it was "assuming that Mr. Kluge's allegations concerning pretext [were] supported by a good-faith basis for asserting them and warn[ed] that the revelation that they were not could have consequences under Federal Rule of Civil Procedure 11 and 28 U.S.C § 1927." [Filing No. 70 at 29 n.9.]  That warning makes Mr. Kluge's failure to attempt to produce evidence of pretext—or even address BCSC's pretext argument at all in his Response/Reply brief—all the more perplexing.

In any event, Mr. Kluge has not presented evidence from which a reasonable factfinder could conclude that a causal connection exists between Mr. Kluge's protected activity and his ultimate resignation,[15] that any of BCSC's reasons for the actions it took against Mr. Kluge were pretextual, or that any of BCSC's action were motivated by retaliatory animus.  "It is not unreasonable for [a school] to expect that its instructors will teach classes in a professional manner that does not distress students," *Smiley v. Columbia Coll. Chicago*, 714 F.3d 998, 1002 (7th Cir.

---

[15] Mr. Kluge also asserts in one of the headings in his brief that BCSC retaliated against him "by misrepresenting material facts in order to secure his resignation." [Filing No. 153 at 30 (capitalization omitted).]  For the reasons discussed above, the Court rejects this argument because the evidence establishes that Ms. Gordon did not make any misrepresentations and that despite his repeated assertions to the contrary, Mr. Kluge's resignation was not conditional, it merely had a delayed effective date.  The adverse actions at issue are BCSC's withdrawal of the last names only accommodation and his forced resignation.

2013), and nothing in the record suggests that BCSC officials were acting with any motive other than to ensure such was the case. The undisputed evidence shows that Mr. Kluge initially sought two accommodations based on his religious objections to affirming transgenderism—the last names only accommodation and the exemption from handing out gender specific uniforms—and received what he asked for. Only after BCSC received complaints about the last names only accommodation did the administration seek to withdraw it, and even then, Mr. Kluge was not immediately terminated but was permitted to finish out the academic year. Dr. Daghe offered to write Mr. Kluge letters of recommendation to help him find a new position. BCSC never withdrew the uniform accommodation, and there is nothing in the record to suggest that any member of the school community complained about that accommodation. Furthermore, the evidence is undisputed that BCSC and BHS administrators were acting because of complaints received from the school community, and there is nothing in the record to suggest that the complaints were fabricated or that another motive was possible. "Pretext does not exist if the decision-maker honestly believed the nondiscriminatory reason for its employment action." *Id.* at 1005.

Based on the foregoing, BCSC is entitled to judgment as a matter of law on Mr. Kluge's retaliation claim, and BCSC's Cross-Motion for Summary Judgment is **GRANTED** as to that claim.

### IV.
#### CONCLUSION

So, what's in a name? This Court is ill-equipped to answer that question definitively, but for the reasons articulated in this Order, it concludes that a name carries with it enough importance to overcome a public school corporation's duty to accommodate a teacher's sincerely held religious beliefs against a policy that requires staff to use transgender students' preferred names when supported by a parent and health care provider. Because BCSC did not coerce Mr. Kluge's

51

SA-188

resignation by misrepresentation and could not accommodate Mr. Kluge's religious beliefs without

sustaining undue hardship, and because Mr. Kluge has failed to make a meaningful argument or

adduce evidence in support of a claim for retaliation, BCSC's Cross-Motion for Summary

Judgment, [120], is **GRANTED** and Mr. Kluge's Motion for Partial Summary Judgment, [112], is

**DENIED**.  And because empirical data from non-parties concerning the importance of honoring a

transgender student's preferred name and pronouns was not necessary to resolve the issues

currently before the Court, Movants' Motion for Leave to File Brief of Amici Curiae, [131], is also

**DENIED**.  Finally, BCSC's Motion to Vacate and Continue Final Pre-Trial Conference and Trial,

[156], is **DENIED AS MOOT**.  Final judgment shall issue accordingly.


Date: 7/12/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record**

SA-189

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN M. KLUGE, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BROWNSBURG COMMUNITY SCHOOL | ) | No. 1:19-cv-2462-JMS-DLP |
| CORPORATION, | ) | |
| JAMES SNAPP, | ) | |
| PHIL UTTERBACK, | ) | |
| JODI GORDON, and | ) | |
| BRET DAGHE, | ) | |
| | ) | |
| *Defendants*. | ) | |

## **ORDER**

John M. Kluge, a former music and orchestra teacher at Brownsburg High School ("BHS"), filed this action against Brownsburg Community School Corporation ("BCSC") and several of its employees, alleging that he was discriminated against and ultimately forced to resign because his sincerely-held religious beliefs prevented him from following a school policy that required him to address transgender students by their preferred names and pronouns. [Filing No. 15.] Defendants have filed a Motion to Dismiss all of Mr. Kluge's claims. [Filing No. 44.] In addition, Indiana Youth Group, Inc. ("IYG"), an organization that supports LGBTQ youth in Indiana, has moved to intervene as a defendant in this action, [Filing No. 22], and has sought leave to file its own motion to dismiss, [Filing No. 55]. These motions are now ripe for the Court's decision.

SA-190

## I.
### DEFENDANTS' MOTION TO DISMISS

#### A.  Standard of Review

The Federal Rules of Civil Procedure require only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  To that end, the complaint need only provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson*, 551 U.S. at 93 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted).  In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must contain allegations that collectively "state a claim to relief that is plausible on its face." *Id*. (internal quotations omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

In reviewing the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019). This review is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012).

SA-191

### B.  Background

Consistent with the standard of review described above, the following allegations from Mr. Kluge's Amended Complaint are accepted as true for purposes of deciding Defendants' Motion to Dismiss.  The allegations in this section are those common to all of Mr. Kluge's claims, and his additional, claim-specific allegations will be recounted as necessary in relation to each of his claims below.

Mr. Kluge became employed by BCSC as a music and orchestra teacher at BHS in August of 2014, and throughout his employment has received positive performance evaluations and met and exceeded BCSC's legitimate expectations.  [Filing No. 15 at 5.]  His students have received multiple awards for their musical performances.  [Filing No. 15 at 6.]

Mr. Kluge "is a professing evangelical Christian who strives to live by his faith on a daily basis," and has practiced that faith since before he was employed by BCSC.  [Filing No. 15 at 5-6.]  His "faith governs the way he thinks about human nature, marriage, gender, sexuality, morality, politics, and social issues, and it causes him to hold sincerely-held religious beliefs in these areas" that are "drawn from the Bible."  [Filing No. 15 at 6.]  Specifically, "Mr. Kluge believes that God created mankind as either male or female, that this gender is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires."  [Filing No. 15 at 6.]  "Mr. Kluge also believes he cannot affirm as true ideas and concepts that he deems untrue and sinful, as this would violate Biblical injunctions against dishonesty, lying, and effeminacy."  [Filing No. 15 at 7.]

SA-192

During the summer of 2017, BCSC began to allow transgender students and students experiencing gender dysphoria[1] to use the restroom of their choice and to change their names and genders in the BCSC database known as PowerSchool. [Filing No. 15 at 7.] Name changes in the PowerSchool database required a letter from the student's parent(s) and a letter from a healthcare professional. [Filing No. 15-4.][2]  BCSC employees, including Mr. Kluge, were instructed to refer to students using the names and genders listed in the PowerSchool database, which Mr. Kluge believes constitute preferred names "based upon the students' gender dysphoria." [Filing No. 15 at 7; Filing No. 15-4 at 6.]

In July 2017, Mr. Kluge informed BCSC Superintendent Dr. James Snapp that the requirement that he use the students' names as listed in PowerSchool ("the Policy") conflicted with his religious beliefs against affirming gender dysphoria, and Dr. Snapp responded that Mr. Kluge could either "use the transgender names, say he was forced to resign from BCSC, or be terminated without pay." [Filing No. 15 at 7-8.] Because Mr. Kluge refused to use the names listed in PowerSchool, Dr. Snapp initiated an administrative leave of absence for Mr. Kluge and Dr. Bret Daghe, the principal of BHS, "issued Mr. Kluge an ultimatum . . . mandating the use of transgender preferred names, and giving Mr. Kluge [three days] to decide if he would comply." [Filing No. 15 at 8.] Mr. Kluge then requested "an accommodation for his religious beliefs," and proposed the solution of "addressing all students by their last names only, similar to a sports coach." [Filing No. 15 at 8.] Dr. Snapp and Jodi Gordon, the BCSC Human Resources Director,

---

[1] "Gender dysphoria" is "an acute form of mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity." *Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 451 (5th ed. 2013)).

[2] The documents attached to the Amended Complaint and referenced therein are considered part of the pleadings for purposes of deciding a Rule 12(b)(6) motion to dismiss. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

SA-193

agreed in writing to allow Mr. Kluge to address all students by their last names only ("the last-names-only arrangement") and assigned someone to distribute gender-specific uniforms to students so Mr. Kluge would not have to.  [Filing No. 15 at 8; Filing No. 15-1.]  Despite this agreement, the school board retroactively administered a two-day suspension in response to Dr. Snapp's previous action.  [Filing No. 15 at 8.]

On December 13, 2017, Mr. Kluge met with Dr. Daghe, at which time Dr. Daghe informed Mr. Kluge that the last-names-only arrangement had created "tension" and that Mr. Kluge should resign by the end of the school year.  [Filing No. 15 at 9.]  However, Mr. Kluge alleges that the last-names-only arrangement created no undue hardship for Defendants, and no Defendant identified in writing any undue hardship that was purportedly caused.  [Filing No. 15 at 9.]  Instead, he asserts, "nothing dramatic occurred" between July and December 2017, and there were no student protests, written complaints, classroom disturbances, or cancelled classes.  [Filing No. 15 at 9.]  Instead, that last-names-only arrangement "worked as intended and Mr. Kluge's students excelled," with his extra-curricular program experiencing "record numbers of participation" and his students winning awards and gold ratings.  [Filing No. 15 at 9.]

According to Mr. Kluge, "Defendants simply decided not to accommodate or tolerate [his] sincerely-held religious beliefs any longer," and Ms. Gordon informed him that the last-names-only arrangement was being withdrawn because "students were offended at the use of last names."  [Filing No. 15 at 9-10.]  Mr. Kluge asserts that Ms. Gordon provided no evidence that students were offended and maintains that he "never told his students why he was referring to them by their last names."  [Filing No. 15 at 10.]  Mr. Kluge again attempted to explain "that he believes encouraging students to present themselves as the opposite sex by calling them an opposite-sex first name is sinful and potentially harmful to the students," but Ms. Gordon

SA-194

advised him that he could either resign by May 1, 2018 and be paid over the summer or be fired without pay.  [Filing No. 15 at 10.]  He states that Defendants' contentions that the last-names-only arrangement created tension or offended students were not based in fact but were simply pretexts for religious discrimination.  [Filing No. 15 at 14.]

Mr. Kluge alleges that Ms. Gordon "agreed that he could submit a conditional resignation" and agreed that his resignation, which he submitted on April 30, 2018, "would not be processed or shown to anyone, including any administrator, until May 28, 2018."  [Filing No. 15 at 10-11.]  On May 25, 2018, Mr. Kluge delivered a time-stamped rescission of his resignation, and, despite receiving the rescission, Ms. Gordon "processed" Mr. Kluge's resignation anyway.  [Filing No. 15 at 11.]  Mr. Kluge alleges that when Defendants told him that he could submit a conditional resignation, then accepted his conditional resignation, "they had no intention of honoring the conditions he attached to his resignation, but instead planned on treating [his] resignation as unconditional upon receipt and claiming that he voluntarily resigned his position."  [Filing No. 15 at 11.]  BCSC and the School Board accepted Mr. Kluge's resignation as if it was submitted unconditionally.  [Filing No. 15 at 11.]  On May 25, 2018, Defendants locked Mr. Kluge out of all BCSC buildings, revoked his access to the school's internet, and posted his job as vacant.  [Filing No. 15 at 12.]

Mr. Kluge alleges that most of BCSC's policies and practices relating to students with gender dysphoria are "informal and unwritten."  [Filing No. 15 at 12.]  Furthermore, he asserts that the policies provide "few objective guidelines, standards, or criteria for school employees . . . to use when deciding what constitutes gender dysphoria or gender discrimination, thereby granting Defendants overbroad discretion to restrict expression."  [Filing No. 15 at 12.]  He states that, at a faculty meeting in early 2018, BCSC distributed an 11-page document titled

"Transgender Questions," which identifies BCSC's policies regarding transgender students and provides answers to questions submitted by faculty members.   [Filing No. 15 at 12.]   That document is attached to the Amended Complaint.   [Filing No. 15-4.]   According to Mr. Kluge, no earlier written policy with the same title was issued.   [Filing No. 15 at 12.]

Mr. Kluge asserts that the "Transgender Questions" policy is "vague and overbroad in many respects," and cites as an example the fact that the policy allows "fully transitioned" students to use the dressing room of their chosen gender but does not define "fully transitioned" or instruct faculty as to whether to require some proof from a student who claims to be "fully transitioned" or simply take the student's word.   [Filing No. 15 at 12-13.]   Mr. Kluge also points out that the policy instructs faculty to use names that the "students choose as part of their gender dysphoria" and quotes the following information from the policy, in question and answer format:

**Are we allowed to use the student's last name only?**
We have agreed to this for the 2017-2018 school year, but moving forward it is our expectation that the student will be called by the first name listed in PowerSchool;

**Can teachers refuse to call the student by his/her preferred name?**
Staff members need to call students by name in PowerSchool;

**How do teachers break from their personal biases and beliefs so that we can best serve our students?**
We know this is a difficult topic for some staff members, however, when you work in a public school, you sign up to follow the law and the policies/practices of that organization and that might mean following practices that are different than your beliefs.

[Filing No. 15 at 13-14; Filing No. 15-4 at 9-10.]   According to Mr. Kluge, the "Transgender Questions" document establishes that BCSC's "formal policy was not to allow [Mr.] Kluge's last-name only accommodation—not because it created any undue hardship but because it violated the policy."   [Filing No. 15 at 14.]

SA-196

Mr. Kluge asserts that all of Defendants' formal and informal policies concerning transgender students "attempt to regulate and compel the expression of individual faculty members . . . beyond any quantifiable need in educating students." [Filing No. 15 at 15.] He alleges that "Defendants, by policy and practice, apply their speech code policies to regulate all interactions faculty members have with students in the classroom or within the school." [Filing No. 15 at 15.] He asserts that "Defendants' directive . . . that he either communicate [BCSC's] ideological message regarding gender dysphoria, resign, or be fired" left him to make an "untenable choice" between following his sincerely-held religious beliefs or maintaining his employment, and that Defendants' removal of his "successful" last-names-only arrangement based on the alleged complaints of students "does not amount to hardship, but is an impermissible 'heckler's veto.'"[3]  [Filing No. 15 at 15.]

Based on these allegations, Mr. Kluge asserts thirteen claims for relief: (1) religious discrimination based on failure to accommodate under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.; (2) retaliation under Title VII; (3) hostile work environment under Title VII; (4) retaliation under the First Amendment; (5) content and viewpoint discrimination under the First Amendment; (6) compelled speech under the First Amendment; (7) violation of his right to the free exercise of religion under the First Amendment; (8) violation of the right to be free from unconstitutional conditions; (9) violation of the right to due process under the Fourteenth Amendment; (10) violation of the right to equal protection under the Fourteenth Amendment; (11) violations of the rights of conscience and free exercise of

---

[3] The "heckler's veto" doctrine is the idea that, while the government may preserve order when unpopular speech is disruptive, it cannot restrict speech merely to prevent another party from reacting adversely. *See Ovadal v. City of Madison, Wis.*, 416 F.3d 531, 537 (7th Cir. 2005) ("The police must permit the speech and control the crowd; there is no heckler's veto.") (internal quotations and citation omitted).

SA-197

religion under the Indiana Constitution; (12) intentional infliction of emotional distress under Indiana common law; and (13) fraud under Indiana common law.  [Filing No. 15 at 17-31.] Defendants have moved to dismiss all thirteen claims.  [Filing No. 44.]

### C.  Discussion

At the outset, the Court notes that Mr. Kluge has conceded that dismissal of his claims against the individual Defendants in their official capacities and his equal protection claim against all Defendants is warranted.  [Filing No. 57 at 11-12; Filing No. 57 at 31.]  Accordingly, all claims against the individual Defendants in their official capacities are **DISMISSED**.  In addition, the equal protection claim against all Defendants is also **DISMISSED**.  The remaining claims against BCSC will be addressed in turn, although, in the interest of clarity, they will be in different order than presented in the Amended Complaint.

### 1.  First Amendment Speech Claims (Counts 4, 5, and 6)

Mr. Kluge asserts three separate claims for violations of his right to freedom of speech under the First Amendment.  First, in Count 4, Mr. Kluge alleges that, by punishing and threatening to punish him "for expressing his views regarding gender dysphoria," BCSC retaliated against him for engaging in protected speech.  [Filing No. 15 at 19.]  Second, in Count 5, Mr. Kluge asserts that BCSC discriminated against him by disciplining him due to the content and viewpoint of his speech.  [Filing No. 15 at 20-22.]  Finally, in Count 6, he alleges that, by punishing or threatening to punish him "for refusing to communicate a school corporation-mandated ideological message regarding gender dysphoria," BCSC compelled him to communicate messages about gender dysphoria with which he disagreed.  [Filing No. 15 at 22.]

In relevant part, BCSC argues that all of Mr. Kluge's First Amendment speech claims fail because his refusal to address students by the names and genders listed in PowerSchool is not

SA-198

protected speech under the First Amendment. [Filing No. 45 at 13-18.] Specifically, it argues that, as a matter of law, Mr. Kluge was speaking in his capacity as a public-school teacher—not as a private citizen—when addressing students. [Filing No. 45 at 14-16.] Furthermore, according to BCSC, addressing students in the classroom does not constitute a matter of public concern. [Filing No. 45 at 16-17.]

Mr. Kluge responds that his speech is indeed protected under the First Amendment. [Filing No. 57 at 21; Filing No. 57 at 26.] Specifically, he argues that "[i]n speaking and refusing to speak on the mental disorder known as gender dysphoria, [he] spoke as a citizen on a matter of public concern." [Filing No. 57 at 21.] He asserts that "gender identity" is a matter of great public importance, and his official teaching duties did not include the use of "transgender names" or "a school-mandated message approving 'affirmance therapy' by the use of transgender names which were not students' legal names." [Filing No. 57 at 21-22.] He further asserts that neither his ability to teach music and orchestra nor his method of teaching hinged on the use of students' first or last names, pronouns, or honorifics. [Filing No. 57 at 22.] Mr. Kluge also argues that BCSC cannot now claim that using the first names listed in PowerSchool was part of his official duties, because it agreed to allow him to address students by last names only for a period of time. [Filing No. 57 at 22-23.]

In reply, BCSC reiterates the arguments raised in its initial brief, and asserts in relevant part that requiring faculty to address students in a consistent manner is "plainly related to [BCSC's] pedagogical interest in having classroom instruction proceed efficiently." [Filing No. 60 at 8-9.]

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citation

SA-199

omitted).  Nevertheless, "[t]he [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *Id.* at 417 (collecting cases).  "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.*  The determination of whether a public employee's speech is constitutionally protected is a question of law.  *E.g.*, *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016).

In *Pickering*, the Supreme Court considered whether the termination of a public-school teacher based on a letter he wrote to a local newspaper violated the First Amendment.  *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 565-66 (1968).  In doing so, the Court sought to balance "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Id.* at 568.  The Court characterized the statements contained in the teacher's letter as concerning issues "currently the subject of public attention," which were critical of his employer but were "neither shown nor . . . presumed to have in any way either impeded the teacher's proper performance . . . or to have interfered with the regular operation of the schools," and, therefore, "the interest of the school administration in limiting teachers' opportunities to contribute to public debate [was] not significantly greater than its interest in limiting a similar contribution by any member of the general public."  *Id.* at 572-73.  Accordingly, firing the teacher based on the contents of his letter violated the First Amendment.  *Id.* at 573-75.

From *Pickering* and its progeny, the Supreme Court has distilled a two-part inquiry to analyze the constitutional protection accorded to public employee speech.  *Garcetti*, 547 U.S. at 418.  The first step is to determine whether the employee spoke as a citizen on a matter of public

SA-200

concern. *Id.* (citation omitted). If the answer is "no," the employee has no First Amendment cause of action based on the employer's reaction to the speech. *Id.* (citation omitted). If the answer is "yes," then the possibility of a First Amendment claim arises, and the second step is to determine whether the government entity had an adequate justification for treating the employee differently from any other member of the general public. *Id.* (citation omitted).

When considering whether an employee spoke as a private citizen, the fact that the employee spoke inside his workplace, rather than publicly, is not dispositive. *Id.* at 420. Neither is the fact that the speech "concerned the subject matter of [his] employment." *Id.* at 421. However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* Determining the official duties of an employee requires "a practical inquiry into what duties the employee is expected to perform." *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008) (citation omitted).

In *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019), the Seventh Circuit Court of Appeals concluded that a university professor acted "in his capacity as a teacher" when he "interrogated" students about their failure to recommend him for an award and posted information about the students online. *Id.* at 1010. Recognizing that such conduct did not involve the professor's "core academic duties" such as running his classroom, grading exams, or assisting students in writing papers, the Court determined that "how faculty members relate to students *is* part of their jobs." *Id.* (emphasis in original).

In assessing whether speech addresses a matter of public concern, courts look to the "content, form, and context" of a given statement. *Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48, 148 n.7 (1983)). Though none of

SA-201

these factors is singularly dispositive, content is the most important of the three.  *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 377 (7th Cir. 2009) (citation omitted). Furthermore, when examining the context of speech, the employee's motive for speaking is a relevant consideration.  *Id.* (citations omitted).  To that end, motive "matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee, or if the *only* point of the speech was to further some purely private interest."  *Id.* (emphasis in original) (internal quotations and citation omitted).

Here, Mr. Kluge has failed to state any claim under the First Amendment because, as a matter of law, the speech at issue is not constitutionally protected.  Importantly, he is not asserting that he was disciplined for criticizing or opposing the Policy, but that he was disciplined for refusing to follow it in his classroom by refusing to call students by the first names listed in PowerSchool.  Mr. Kluge's own allegations establish that the way in which he addresses students is part of his official duties as a teacher.  Mr. Kluge expressly alleges that BCSC sought to regulate his interactions with students inside school and in the context of the school day or school activities.  [Filing No. 15 at 15 (alleging that BCSC applies its "speech code policies to regulate all interactions faculty members have with students in the classroom or within the school").]  While addressing students by name may not be part of the music or orchestra curriculum, it is difficult to imagine how a teacher could perform his teaching duties on any subject without a method by which to address individual students.  Indeed, addressing students is necessary to communicate with them and teach them the material—as the Seventh Circuit has stated, how teachers relate to students *is* part of their jobs, and running a classroom is a "core academic dut[y]."  *Wozniak*, 932 F.3d at 1010.  Thus, the speech at issue was part of Mr.

SA-202

Kluge's official duties, and this alone is sufficient to preclude any free speech claim under the First Amendment.

However, the Court also concludes that Mr. Kluge's choice as to how to address a given student did not involve a matter of public concern. To be sure, issues relating to the treatment of individuals based on their gender identity are of great public importance. *See Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2476 (2018) (recognizing that "gender identity" is a "sensitive political topic[]" that is "undoubtedly [a] matter[] of profound value and concern to the public"). However, Mr. Kluge was not conveying a message concerning such matters when he refused to call students by their names as listed in PowerSchool or referred to students by last name only, because the act of referring to a particular student by a particular name does not contribute to the broader public debate on transgender issues. Instead, choosing the name to call a student constituted a private interaction with that individual student and a private statement about Mr. Kluge's subjective perception of that student. In addition, according to Mr. Kluge's own allegations, the only point of his speech was to address students. He did not tell students that he had opinions about using transgender students' preferred names or explain why he was using last names only. [Filing No. 15 at 10.] Thus, Mr. Kluge's speech—merely stating (or refusing to state) names and pronouns without explaining that his opposition to "affirming" transgender students was the reason for doing so— adds little to the public discourse on gender identity issues, and therefore is not the kind of speech that is valuable to the public debate. *Cf. Garcetti*, 547 U.S. at 420 (acknowledging that underlying the public concern inquiry is "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion").

Because the speech at issue was pursuant to Mr. Kluge's official duties as a public employee and did not involve a matter of public concern, he cannot maintain a cause of action for his employer's regulation of or reaction to his speech.  *See id*. at 418.  Accordingly, BCSC's Motion to Dismiss is **GRANTED** as to Mr. Kluge's claims for retaliation, content and viewpoint discrimination, and compelled speech under the First Amendment, and those claims (Counts 4, 5, and 6) are **DISMISSED**.

2.  First Amendment Free Exercise Claim (Count 7)

Mr. Kluge asserts in his Amended Complaint that his "views and expression related to gender dysphoria are motivated by his sincerely-held religious beliefs, are avenues through which he exercises his religious faith, and constitute a central component of his sincerely-held religious beliefs." [Filing No. 15 at 23.]  Accordingly, he alleges, expressing BCSC's "mandated message regarding gender dysphoria" by using the names listed in PowerSchool would require him to violate his sincerely-held religious beliefs.  [Filing No. 15 at 23.]  Moreover, he alleges that BCSC's "transgender policies and related practices" are neither neutral nor generally applicable because they "represent a system of individualized assessments" and allow BCSC to specifically target religious expression and express hostility toward such expression.  [Filing No. 15 at 23.]  Mr. Kluge also asserts that the policies and practices are under-inclusive because they prohibit some expression while allowing "other expression equally harmful to [BCSC's] asserted interests." [Filing No. 15 at 23.]  He alleges that BCSC's discipline of him "for communicating his views on issues related to gender dysphoria" violated his religious beliefs and his right to free exercise of religion.  [Filing No. 15 at 24.]

BCSC argues that the policy requiring faculty to address students by the names listed in PowerSchool—which is the only specific policy that Mr. Kluge challenges—is both neutral and

SA-204

generally applicable.  [Filing No. 45 at 20.]  Specifically, it applies to all faculty, not just to faculty members of a certain religion, and there is no indication that, in imposing the requirement, BCSC intended to discriminate based on any religion.  [Filing No. 45 at 20.]  BCSC further argues that the purpose of the policy was to provide the faculty with an easy-to-follow rule for addressing students, and Mr. Kluge does not claim that the rule lacks a legitimate purpose.  [Filing No. 45 at 20-21.]

In response, Mr. Kluge reiterates the allegations stated in his Amended Complaint, states that these allegations must be taken as true, and asserts that they state a claim for violation of his right to free exercise of religion.  [Filing No. 57 at 28.]

BCSC replies that Mr. Kluge's reiterated allegations contain legal conclusions, which the Court is not required to accept as true, and maintains that the free exercise claim should be dismissed.  [Filing No. 60 at 10.]

"[N]o Free Exercise Clause violation results where a burden on religious exercise is the incidental effect of a neutral, generally applicable, and otherwise valid regulation, in which case such regulation need not be justified by a compelling governmental interest."  *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 998 (7th Cir. 2006) (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 763 (7th Cir. 2003)) (internal quotations omitted); *see also Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990) ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'") (citation omitted).

However, the Supreme Court has "been careful to distinguish such [neutral and generally applicable] laws from those that single out the religious for disfavored treatment."

SA-205

*Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2020 (2017). For example, the Court has struck down "facially neutral" city ordinances prohibiting certain forms of animal slaughter after concluding that the ordinances were not in fact neutral or generally applicable but instead had a discriminatory purpose of prohibiting residents from performing sacrificial rituals integral to their practice of the Santeria religion. *Id.* at 2021 (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533-33 (1993)). Summarizing its Free Exercise Clause jurisprudence, the Supreme Court reiterated that laws may not discriminate against religious beliefs, regulate or outlaw conduct because it is religiously motived, or impose special disabilities based on one's religious status. *Trinity*, 137 S. Ct. at 2021 (citations omitted).

Here, Mr. Kluge's allegations and supporting documentation demonstrate that the Policy was neutral and generally applicable: every teacher, regardless of religious belief, was required to address every student by the name listed in PowerSchool, regardless of what that name was or why. Furthermore, Mr. Kluge does not allege that any of BCSC's policies or practices were developed to target any particular religious belief, affiliation, or activity, and, to the contrary, he alleges that these policies and practices were part of an effort to "affirm childhood gender dysphoria." [Filing No. 15 at 6.] Although he asserts that the Policy required individual assessments, is under-inclusive, and permits other "harmful" speech, these allegations are conclusory, unsupported, and inconsistent with his allegations demonstrating that the Policy was straightforward and clear in the sense that it requires teachers to refer to students by the names listed in PowerSchool—nothing more, nothing less, and without room for individualized judgments. Notably, no other BCSC policy is alleged to be the basis of his discipline. Because the Policy is neutral and generally applicable and Mr. Kluge has not alleged facts showing that it targeted or otherwise was motivated by an animus toward any particular religion or religious

SA-206

belief, he has not stated a claim for violation of the Free Exercise Clause.  Accordingly, BCSC's

Motion to Dismiss is **GRANTED** as to this claim (Count 7), which is **DISMISSED**.

### 3.   <u>Unconstitutional Conditions (Count 8)</u>

In the Amended Complaint, Mr. Kluge asserts that, by conditioning his employment on

his willingness to surrender his constitutional rights, BCSC imposed an unconstitutional

condition upon him in violation of the First Amendment.  [Filing No. 15 at 24.]  Specifically, he

asserts that BCSC's "transgender policies in practices and the[] enforcement of those policies

and practices" require faculty members to surrender their constitutionally-protected rights to

freedom of speech, free exercise of religion, due process, and equal protection as a condition to

their receipt of a state benefit in the form of continuing employment as a public school teacher.

[Filing No. 15 at 25.]

BCSC asserts that the unconstitutional conditions claim fails because: (1) Mr. Kluge has

not alleged facts showing that BCSC violated the Constitution; and (2) the unconstitutional

conditions doctrine has not been extended beyond the context of political patronage as a

condition of public employment.  [Filing No. 45 at 19.]

Mr. Kluge responds that the unconstitutional conditions doctrine logically extends to

other First Amendment violations, including claims based upon speech and religious exercise.

[Filing No. 57 at 29.]  He maintains that he has stated a claim for unconstitutional conditions.

[Filing No. 57 at 29.]

In reply, BCSC asserts that the Court should decline to extend the unconstitutional

conditions doctrine beyond the political patronage context, and maintains that, in any event, the

claim fails because Mr. Kluge has not demonstrated that a First Amendment violation has

occurred.  [Filing No. 60 at 10-11.]

SA-207

As a preliminary matter, BCSC's argument that the unconstitutional conditions doctrine does not apply outside the context of political patronage conditions is contrary to existing caselaw.  *E.g., Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) ("We have said *in a variety of contexts* that 'the government may not deny a benefit to a person because he exercises a constitutional right.' . . . Those cases reflect an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." (emphasis added) (citations omitted)).   Indeed, there is support for the specific proposition that the unconstitutional conditions doctrine prevents the government from imposing conditions that violate other provisions of the First Amendment beyond political association.  *See Garcetti*, 547 U.S. at 413 ("It is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" (quoting *Connick*, 461 U.S. at 142)); *Dolan v. City of Tigard*, 512 U.S. 374, 407 n.12 (1994) ("[M]odern decisions invoking the [unconstitutional conditions] doctrine have most frequently involved First Amendment liberties.").

Nevertheless, Mr. Kluge's claim, while cognizable, fails for the simple reason that, as discussed above, Mr. Kluge has not alleged facts demonstrating that BCSC violated the Constitution.  In other words, he has not stated a claim that any of BCSC's policies or conditions on his employment were unconstitutional.   Accordingly, BCSC's Motion to Dismiss is **GRANTED** as to the unconstitutional conditions claim (Count 8), which is **DISMISSED**.

4.   Fourteenth Amendment Due Process Claim (Count 9)

In the Amended Complaint, Mr. Kluge alleges that BCSC violated his right to due process of law by "threatening to punish and punishing [him] under vague and overbroad

19

SA-208

policies and practices." [Filing No. 15 at 26.] Specifically, he asserts that the "transgender policies and related practices" are unconstitutionally vague because they grant BCSC officials "unbridled discretion in deciding what constitutes 'gender dysphoria' and 'gender discrimination,' because they utilize terms that are inherently subjective and elude any precise or objective definition that would be consistent from one official, teacher, or student to another, and because they are incapable of providing meaningful guidance to Defendants." [Filing No. 15 at 27.] He alleges that the policies lack objective criteria, factors, or standards, rendering them unconstitutionally vague. [Filing No. 15 at 27.]

BCSC argues that the Policy is not vague or overbroad, and Mr. Kluge's own allegations defeat his vagueness claim, because he admits that he was aware of the consequences of addressing students by their last names only or by a name other than that listed in PowerSchool. [Filing No. 45 at 21-22.]

Mr. Kluge responds that he has stated a valid due process claim because "BCSC's policies were informal, sometimes unwritten, and when written, suggested they were subject to change," and, as a result, were unconstitutionally vague. [Filing No. 57 at 30.] He argues that such vagueness is illustrated by the fact that the requirement that teachers use students' names listed in PowerSchool suggests that a teacher could use students' last names, which appear in PowerSchool, but BCSC changed its policy without warning to prohibit that practice. [Filing No. 57 at 30-31.] He asserts that BCSC's policies incorrectly stated that teachers who work at public schools sign up to follow the school's rules, even if those rules conflict with their personal beliefs. [Filing No. 57 at 31.] Finally, he asserts that similarly-situated teachers must guess which "gender dysphoria policies" are in effect at any given time, and supervisors will differ as to their enforcement of these policies. [Filing No. 57 at 31.]

SA-209

In reply, BCSC asserts that Mr. Kluge fails to address his awareness of the consequences of not addressing students by the first names listed in PowerSchool.  [Filing No. 60 at 11.]

A public employee may challenge the rules pursuant to which he was disciplined on the basis that they are void for vagueness.  *See Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000).  A government regulation, like a criminal statute, generally is impermissibly vague if people of common intelligence must guess at its meaning and could differ as to its application.  *Id.*  However, "the government acting in the role of employer enjoys much more latitude in crafting reasonable work regulations for its employees" than it does in crafting regulations applicable to the general public.  *Id.*; *see also Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 717 (7th Cir. 2016) (noting that "an employee code of conduct need not be as clear as a criminal law").

Here, as a preliminary matter, although Mr. Kluge takes issue with the alleged vagueness of many of BCSC's different policies related to transgender students—as well as with the alleged overall lack of clarity concerning when and how the school enforced those different policies—the only rule pursuant to which Mr. Kluge was disciplined was the Policy requiring him to address students by the first names and pronouns listed in PowerSchool.  Thus, that is the only rule that the Court needs to consider in determining whether Mr. Kluge has stated a plausible due process claim based on vagueness.  His allegations concerning other issues—such as restrooms or changing rooms—are not relevant to this analysis.

With that limitation in mind, Mr. Kluge's allegations defeat his due process claim.  The materials attached to the Amended Complaint acknowledge that BCSC's policies related to the treatment of transgender students were in flux as the school district sought to determine workable solutions to newly-arising issues.  [*See* Filing No. 15-4 at 7 ("BCSC is working to develop policy that reflects the answers [to faculty policy questions presented in] this document.").]  However,

SA-210

based on Mr. Kluge's own allegations, there can be no dispute that, after BCSC terminated the last-names-only arrangement, the Policy required him to refer to students by the first names listed in PowerSchool.  [Filing No. 15 at 7 (alleging that faculty "were instructed to use the transgender students' preferred names" listed in PowerSchool); Filing No. 15-4 at 9 (stating, in response to a question about how to address students after the last-name-only arrangement ended after the 2017-2018 school year, that "moving forward it is our expectation the student will be called by the first name listed in PowerSchool").]  Mr. Kluge's argument that the Policy was so vague that it appeared to permit the last-names-only arrangement—because students' last names are necessarily listed in PowerSchool—is illogical and disingenuous at best.  Mr. Kluge's claims are all based on his having to use "transgender names" from the PowerSchool database.  [Filing No. 15 at 7-8; Filing No. 15 at 10; Filing No. 15 at 15.]  If he was—and still is—willing to use students' last names only, then the first names alone must be the "transgender names" that he wanted to avoid.  Thus, he must have understood the Policy to require the use of first names, and he did not have to guess at its meaning.  *See Greer*, 212 F.3d at 369.  There can also be no serious dispute that Mr. Kluge's allegations demonstrate his own understanding and awareness of the Policy and its requirements long before his resignation, as he had several conversations with school administrators concerning his assertions that the Policy conflicted with his religious beliefs and addressing his desire not to follow the Policy.  [Filing No. 15 at 7-14; Filing No. 15-3 at 2-6.]  Accordingly, Mr. Kluge has failed to state a claim that the Policy was unconstitutionally vague, and BCSC's Motion to Dismiss is **GRANTED** as to this claim (Count 9), which is **DISMISSED**.

SA-211

5.  <u>Title VII Claims (Counts 1, 2, and 3)</u>

   **a.  Count 1: Religious Discrimination for Failure to Accommodate**

As to Count 1, Mr. Kluge asserts that BCSC, in violation of Title VII, discriminated against him in the terms and conditions of his employment on the basis of his sincerely-held religious beliefs by: (1) refusing to discuss an accommodation for those beliefs; (2) agreeing in writing to the last-names-only arrangement that did not result in undue hardship, then removing that arrangement without identifying any undue hardship it caused; and (3) "coercing [his] conditional resignation under threat of termination." [Filing No. 15 at 17.]

BCSC argues that Mr. Kluge has failed to state a failure-to-accommodate claim because the facts alleged do not demonstrate an objective conflict between his teaching duties and his sincerely-held religious beliefs.  [Filing No. 45 at 7-10.]  Specifically, BCSC asserts that referring to students by the name and gender listed in the PowerSchool database constituted a purely administrative duty and did not require Mr. Kluge to express approval for the reasons underlying any particular name change, congratulate a transgender student for transitioning, or endorse or otherwise show support for transgender issues.  [Filing No. 45 at 8-10.]

Mr. Kluge responds that the allegations in his Amended Complaint establish a *prima facie* case of religious discrimination based on failure to accommodate.  [Filing No. 57 at 12-15.] He asserts that addressing students by the names listed in PowerSchool is not an administrative function, as it is "grossly incorrect to suggest that requiring teachers to use a new name selected by an adolescent suffering from gender dysphoria is not an expression of approval, acceptance, and even celebration."  [Filing No. 57 at 13.][4]  He also appears to assert that, because BCSC

---

[4] Mr. Kluge further argues that the last-names-only arrangement did not create an undue hardship for BCSC.  [Filing No. 57 at 15.]  BCSC did not address this issue in its Motion to Dismiss, stating that its "undue hardship defense is outside the scope of this Motion" and reserving the

SA-212

agreed to the last-names-only arrangement for a period of time, it is estopped from arguing that the Policy does not conflict with his sincerely-held religious beliefs.  [Filing No. 57 at 12-13.][5]

In reply, BCSC reiterates the argument made in its initial brief that calling students by the names listed in PowerSchool constitutes a purely administrative duty and there is no objective conflict between that duty and Mr. Kluge's religious beliefs.  [Filing No. 60 at 2-4.]  BCSC also asserts that Mr. Kluge has not identified any authority supporting his argument that BCSC is estopped from denying that an objective conflict exists between the Policy and Mr. Kluge's religious beliefs, and, in any event, nothing in the Amended Complaint reflects that, in permitting the last-names-only arrangement, BCSC affirmatively agreed that such conflict existed.  [Filing No. 60 at 2-3.]

Title VII prohibits employers from discriminating against employees on the basis of their religion, and also requires employers to accommodate employees' sincerely-held religious beliefs where they conflict with rules of employment and where providing an accommodation would not result in undue hardship.  *42 U.S.C. §§ 2000e(j)*, 2000e-2(a)(1); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2031-32 (2015).  To state a *prima facie* case

---

right to raise it later if warranted.  [Filing No. 45 at 8 n.4.]  The Court agrees with BCSC that the undue hardship question, which is a factual determination that only becomes relevant after a plaintiff has made a *prima facie* case of failure to accommodate and is a matter to be proved by a defendant, is not properly before the Court at this time.  *See Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012) (explaining that, after the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show that providing an accommodation would result in undue hardship).

[5]Also omitted from the Court's recitation of Mr. Kluge's argument is his inflammatory, hyperbolic, and irrelevant hypothetical discussion of how teachers might feel if students came to school pretending to have a disability or claiming to be of a different race than they really are. [Filing No. 57 at 14-15.]  The Court notes that such rhetoric is an unnecessary distraction as it does not—nor does it appear intended to—further the resolution of the legal issues in dispute. While the Court understands that the parties on both sides of this litigation may have strong convictions as to their positions, such unhelpful language and tone are inconsistent with the level of professionalism expected by this Court and shall be left out of future filings in this matter.

SA-213

of religious discrimination based on failure to accommodate, a plaintiff must show that his religious belief or practice conflicted with a requirement of his employment and that his religious observance or practice was the basis for the discriminatory treatment or adverse employment action. *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012), *as modified by Abercrombie*, 135 S. Ct. at 2032-33.[6]

"A Title VII plaintiff need not set forth allegations of a prima facie case in the complaint." *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 539 (7th Cir. 2005) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)). Instead, the plaintiff alleging a violation of Title VII need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.*; Fed. R. Civ. P. 8(a).

Both parties discuss *Summers v. Whitis*, 2016 WL 7242483 (S.D. Ind. Dec. 15, 2016), which BCSC asserts dictates dismissal of this claim. In *Summers*, plaintiff Linda Summers worked as a deputy clerk in the Harrison County, Indiana Clerk's Office until she was fired for refusing to process marriage licenses for same-sex couples based on her religious opposition to same-sex marriage. *Id.* at *1. The Court granted summary judgment in favor of the defendants on Ms. Summers' failure-to-accommodate claim, concluding that there was no objective conflict between her religious belief and the requirement that she process marriage licenses for same-sex couples. *Id.* at *7. The Court emphasized that the conflict inquiry must be objective, because if

---

[6] In *Porter*, the Court articulated an additional element of the *prima facie* case for failure-to-accommodate: that the employee called the religious practice to his employer's attention. 700 F.3d at 951. However, the Supreme Court later made clear that an employee need not prove that his employer had actual knowledge of the religious belief or practice, and instead must demonstrate only that the desire not to accommodate was a motivating factor in an adverse employment action. *See Abercrombie*, 135 S. Ct. at 2032-33. Other District Courts in this Circuit have therefore disregarded this additional element. *See, e.g., Jackson v. NTN Driveshaft, Inc.*, 2017 WL 1927694, at *1 (S.D. Ind. May 10, 2017). This Court will do the same, although it makes no difference because Mr. Kluge's factual allegations demonstrate that BCSC was aware of his religion-based objections to the Policy.

it were purely subjective, there would be no reason to include it as a part of the *prima facie* case. *Id*. at *5.

The *Summers* Court determined that Ms. Summers was merely required to process licenses by viewing the application, verifying that certain information was correct, collecting a statutory fee, printing a form, and recording the license in a book for the public record. *Id*. at *5. "She was simply tasked with certifying—on behalf of the state of Indiana, not on her own behalf—that the couple was qualified to marry under Indiana law," a duty which the Court concluded was "purely administrative." *Id*. The Court emphasized that Ms. Summers was not required to perform marriage ceremonies, personally sign marriage certificates, attend marriage ceremonies, say congratulations, offer a blessing, pray with couples, or condone or express religious approval of any particular marriage. *Id*. Because there was no conflict between her religious belief and her job duties, the employer had no duty to accommodate Ms. Summers' beliefs. *See id*. ("If the employee fails to show a *bona fide* conflict, it makes no sense to speak of a duty to accommodate.") (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 76 (1986) (Stevens, J., concurring in part and dissenting in part)) (internal quotations omitted).

*Summers* is distinguishable from the instant case in one important respect: it was decided at the summary judgment stage with the benefit of factual development and where the plaintiff had the burden of establishing a *prima facie* case. Here, however, the Court is bound by the standard of review to accept all of Mr. Kluge's factual allegations as true and merely determine whether he has stated a plausible claim. Mr. Kluge alleges that, insofar as transgender students are concerned, using the names as listed in the PowerSchool database violates his religious belief that "encouraging students to present themselves as the opposite sex by calling them an opposite-sex first name is sinful." [Filing No. 15 at 10.] Because the Court must accept this allegation as

true, it follows that the Court must also conclude that Mr. Kluge has alleged a conflict between the Policy and his sincerely-held religious beliefs.  To conclude otherwise would require a qualitative analysis of the Policy and Mr. Kluge's religious beliefs, which is better suited for a later stage in the litigation.  The Court must also accept as true the allegations that BCSC refused to accommodate Mr. Kluge's belief where doing so would not result in undue hardship and that this conflict was the basis of BCSC's demand for his resignation, and together these allegations state a claim for failure to accommodate.[7]  Accordingly, BCSC's Motion to Dismiss Mr. Kluge's Title VII failure-to-accommodate claim is **DENIED**, and that claim (Count 1) **shall proceed**.[8]

### b.  Count 2: Retaliation

Mr. Kluge asserts that BCSC retaliated against him for engaging in protected conduct by: (1) agreeing to the last-names-only accommodation and then withdrawing the accommodation without demonstrating that it caused undue hardship; and (2) telling him that he could either "use transgender names and pronouns, resign, or be terminated."  [Filing No. 15 at 17-18.]

---

[7] The Court is not, as Mr. Kluge requests, giving any sort of estoppel effect to BCSC's attempt at a compromise through the last-names-only arrangement, as its efforts (or lack thereof) to cooperate with Mr. Kluge's preferences do not determine the extent of its legal obligation (or lack thereof) to accommodate his religious beliefs.  Nevertheless, the allegation that there was an "accommodation" in place that was later withdrawn is indicative that there might be a question of undue hardship which, again, is a factual matter not properly resolved at this stage in the litigation.

[8] Notably, it is not inconsistent to permit Mr. Kluge's Title VII claim to proceed where he does not have a First Amendment claim concerning his exercise of religion in the workplace.  Existing caselaw dictates that the Title VII inquiry is distinct from the constitutional free exercise question.  *See Ryan v. U.S. Dep't of Justice*, 950 F.2d 458, 461 (7th Cir. 1991) ("Title VII requires of the [government employer] more than the Constitution in its own right. An employer may not discriminate on account of religion—that is to say, may not use an employee's religion as a ground of decision."); *Filinovich v. Claar*, 2006 WL 1994580, at *4 (N.D. Ill. July 14, 2006) ("[T]he Free Exercise Clause does not require Defendants to provide Plaintiff an accommodation from their neutral and generally applicable employment requirement.").

SA-216

BCSC argues that the retaliation claim fails for the same reasons that the failure-to-accommodate claim fails: using the names listed in PowerSchool is an administrative activity that does not conflict with his religious beliefs. [Filing No. 45 at 10.] In addition, BCSC argues that Mr. Kluge has not adequately stated a claim for retaliation because there is no causal connection between his request for an accommodation and ultimate resignation. [Filing No. 45 at 11.] Specifically, BSCS asserts that "[i]t defies logic that [BCSC] would accommodate [Mr.] Kluge in several ways from the outset, then somehow concoct student complaints as an excuse to rescind the last-name accommodation, all because [BCSC] harbored discriminatory animus toward [Mr.] Kluge from the beginning." [Filing No. 45 at 11.]

Mr. Kluge responds that the Court must accept as true his allegation that BCSC's reason for withdrawing the last-names-only accommodation—i.e., student complaints—was pretextual. [Filing No. 57 at 16.] He maintains that he has stated a claim for retaliation, and asserts that BCSC cannot articulate a legitimate, non-discriminatory reason for its actions. [Filing No. 57 at 16-17.]

In reply, BCSC argues that it is apparent from Mr. Kluge's attempt to rescind his resignation that he was aware of the student complaints underlying BCSC's decision to withdraw the last-name-only accommodation, but, in any event, the Court need not accept his pretext argument because it merely establishes a possibility that he is entitled to relief, which falls short of the standard of review. [Filing No. 60 at 5.]

To state a claim for retaliation under Title VII, the plaintiff must allege facts showing that he engaged in statutorily protected expression and was subjected to an adverse employment action as a result. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (citations omitted). Here, for the reasons discussed above and given the standard of review on a motion to

SA-217

dismiss, the Court cannot conclude that BCSC had no duty to accommodate Mr. Kluge's religious beliefs, and therefore the Court also cannot conclude that his retaliation claim fails on that basis.  BCSC's alternative argument is that it "defies logic" that BCSC would first permit the last-names-only arrangement and then subsequently withdraw that arrangement based on religious animus.  However, accepting Mr. Kluge's allegations as true—which the Court must do—it is plausible that school officials, over time, became less inclined to tolerate Mr. Kluge's religious beliefs and used the idea of student complaints as a pretext to withdraw the last-names-only arrangement, refuse to provide another accommodation to which Mr. Kluge was entitled, and force him to resign.  Whether Mr. Kluge can produce evidence to support such a contention is another question entirely, which is not before the Court at this time.[9]  Nevertheless, at this stage, the Court concludes that Mr. Kluge's allegations were sufficient to state a claim for retaliation under Title VII.  Accordingly, BCSC's Motion to Dismiss is **DENIED** as to the Title VII retaliation claim, and that claim (Count 2) **shall proceed**.

### c.  Count 3: Hostile Work Environment

Mr. Kluge alleges that BCSC created a hostile work environment by "demanding that [he] address students with gender dysphoria by their preferred names, resign, or be terminated." [Filing No. 15 at 18.]  He alleges that BSCS gave him an "untenable choice" between violating his conscience and sincerely-held religious beliefs or losing his job, and "effectively told [him] to leave his religion outside of the classroom or get out."  [Filing No. 15 at 18.]  He asserts that this hostile environment was so severe and pervasive that it adversely affected his working conditions.  [Filing No. 15 at 18.]

---

[9] The Court is assuming that Mr. Kluge's allegations concerning pretext are supported by a good-faith basis for asserting them and warns that the revelation that they were not could have consequences under Federal Rule of Civil Procedure 11 and 28 U.S.C § 1927.

SA-218

BCSC argues that Mr. Kluge's allegations are insufficient to state a claim for hostile work environment because BCSC merely required him, and all faculty, to address students by the names listed in PowerSchool, which does not rise to the level of the "hellish" environment necessary to state a claim under Title VII. [Filing No. 45 at 12-13.]

Mr. Kluge responds that he need not allege facts demonstrating that his work environment was "hellish." [Filing No. 57 at 17.]  Instead, he argues, his allegations need only show that he was subjected to unwelcome harassment based on a protected characteristic, that such harassment was so severe or pervasive that it altered the conditions of employment and created an abusive work environment, and that there is a basis for employer liability. [Filing No. 57 at 18.]  Mr. Kluge asserts that his allegations satisfy this standard because the combined actions and statements of Superintendent Snapp, Principal Daghe, and Ms. Gordon directing him to either violate his sincerely-held religious beliefs or leave his job amounted to harassment. [Filing No. 57 at 18-19.]

In reply, BCSC asserts that Mr. Kluge has not alleged facts showing that BCSC's conduct was objectively offensive or severe and pervasive and has not cited any case supporting his proposition that requiring him to address students by the names listed in the school's database can support a hostile work environment claim. [Filing No. 60 at 6.]

To state a claim for hostile work environment under Title VII, a plaintiff must allege facts demonstrating that: (1) he was subject to unwelcome harassment; (2) the harassment was based on a characteristic or category protected by Title VII; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015) (citation omitted).  In

SA-219

determining whether the plaintiff has stated a claim that the work environment was "objectively hostile," the Court must consider the totality of the circumstances, including the frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating, whether it unreasonably interfered with the employee's work performance, and the relationship between the harassing party and the party being harassed. *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (citations omitted). Although the workplace need not be "hellish" to state a claim for hostile work environment, it must be so pervaded by discrimination that the terms and conditions of employment are altered. *Id.* (citations omitted).

Mr. Kluge's allegations do not state a plausible claim for hostile work environment under Title VII. While he alleges that BCSC took disciplinary actions against him for his failure to follow the Policy, none of his allegations demonstrate that he was frequently harassed, threatened, or humiliated, or that his work environment became abusive as a result of this discipline. Furthermore, while he alleges that BCSC's actions were so severe and pervasive that they adversely affected his working conditions, this is a conclusory statement that the Court is not required to credit, and it is unsupported by any specific factual allegations demonstrating that he was harassed. Indeed, he does not allege that his work performance was impeded, and instead alleges that his students excelled. [Filing No. 15 at 9.] Accordingly, BCSC's Motion to Dismiss is **GRANTED** as to this claim (Count 3), which is **DISMISSED**.

### 6.   Indiana Constitutional Claims (Count 11)

Mr. Kluge asserts in the Amended Complaint that BCSC's transgender policies and the enforcement of those policies violate his rights to free exercise of religion guaranteed by Article 1, Sections 2 and 3 of the Indiana Constitution. [Filing No. 15 at 29-30.] He alleges that, by punishing him and threatening to punish him for exercising his sincerely-held religious beliefs,

BCSC infringed on his right to engage freely in his religious convictions and practices and forced him to violate his conscience. [Filing No. 15 at 29.] He asserts that BCSC's policies do not serve any government interest of sufficient magnitude to override his right to live according to the dictates of his faith and according to his own conscience. [Filing No. 15 at 29-30.]

BCSC argues that this claim should be dismissed because there is no caselaw establishing that the protections created by Article 1, Sections 2 and 3 of the Indiana Constitution apply in the context of public employment. [Filing No. 45 at 24.]

Mr. Kluge responds that, although no case has applied these provisions in the public employment context, "[i]t seems logical the protection should apply to public employment," and this Court should either conclude that it does, or, alternatively, certify the question to the Indiana Supreme Court for determination. [Filing No. 57 at 32-33.]

In reply, BCSC maintains that the absence of controlling precedent applying the provisions in question in the employment context warrants dismissal and Mr. Kluge is "simply wrong" in asserting that logic dictates that the provisions should apply in that context. [Filing No. 60 at 12.] BCSC argues that certification to the Indiana Supreme Court is inappropriate because Mr. Kluge has not addressed any of the factors for determining when certification is proper. [Filing No. 60 at 12.]

Analysis of religious freedom under the Indiana Constitution is separate from the analysis of religious freedom under the First Amendment to the United States Constitution. *City Chapel Evangelical Free Inc. v. City of S. Bend ex rel. Dep't of Redevelopment*, 744 N.E.2d 443, 446 (Ind. 2001) ("Clearly, the religious liberty provisions of the Indiana Constitution were not intended merely to mirror the federal First Amendment. We reject the contention that the Indiana Constitution's guarantees of religious protection should be equated with those of its federal

SA-221

counterpart and that federal jurisprudence therefore governs the interpretation of our state guarantees.") (footnote omitted).

Instead, the Indiana Supreme Court analyzes constitutional claims using the material burden standard, which considers whether a given state action places a "material burden, in contrast to a permissible qualification" upon the core values embodied in a particular constitutional provision.  *See id.* at 447; *Price v. State*, 622 N.E.2d 954, 960 (Ind. 1993) ("[T]here is within each provision of [Indiana's] Bill of Rights a cluster of essential values which the legislature may qualify but not alienate.  A right is impermissibly alienated when the State materially burdens one of the core values which it embodies." (citations omitted)).  In this sense, the freedoms guaranteed by the Indiana Constitution, much like those guaranteed by the federal constitution, are not absolute.  *See City Chapel*, 744 N.E.2d at 446-47 (discussing that the Indiana constitutional right to freedom of religion is subject to some qualifications justified by the state's police power).  A material burden exists if, "[c]onsidering only the magnitude of the impairment and excluding any consideration for the social utility of the proposed [action], . . . the right, as impaired, would no longer serve the purpose for which it was designed."  *Id.* at 451 (internal quotations and citation omitted); *see also Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973, 984 (Ind. 2005) ("[A] state regulation creates a material burden if it imposes a substantial obstacle on a core constitutional value serving the purpose for which it was designed; and we hold that in most circumstances, less than a substantial obstacle does not.").

The relevant constitutional provisions provide as follows:

Section 2. All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences.

Section 3. No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience.

Ind. Const. art. I, §§ 2, 3.

As to the core constitutional values protected by these provisions, the Indiana Supreme Court has stated that, "[b]y protecting the right to worship according to the dictates of conscience and the rights freely to exercise religious opinion and to act in accord with personal conscience, Sections 2 and 3 advance core values that restrain government interference with the practice of religious worship, both in private and in community with other persons." *City Chapel*, 744 N.E.2d at 450. "At most, the rights of conscience referred to in Article 1, Section 3 extend only to the right to hold whatever beliefs one desires." *Gul v. City of Bloomington*, 22 N.E.3d 853, 858 (Ind. Ct. App. 2014). Thus, Section 3 "protects only the right to hold one's own opinions, and does not protect the right to act on one's own opinions in contravention of the law." *Id.* To establish a violation of Sections 2 or 3, the plaintiff must show that a government action "materially burdens [his] right to worship according to the dictates of conscience, [or] the right freely to exercise religious opinions and rights of conscience." *City Chapel*, 744 N.E.2d at 451.

As a preliminary matter, BCSC asserts that this claim should be dismissed because the Indiana Supreme Court has never applied these constitutional provisions in the context of public employment. It is true that the Indiana Supreme Court has declined to decide whether the Indiana Constitution extends to public employees in the context of workplace discipline. *See Cantrell v. Morris*, 849 N.E.2d 488, 498 (Ind. 2006) ("We therefore explicitly leave open the extent to [which] public employees enjoy Indiana constitutional protection against employment action."). However, the Indiana Supreme Court has never held that the Indiana Constitution *does not* apply in the public employee context, and the mere lack of express approval of this type of claim is not a valid reason to dismiss the claim at this stage in the proceeding.

SA-223

Furthermore, the Court declines to certify the question to the Indiana Supreme Court. Mr. Kluge has not developed his argument in favor of certification.  In any event, the issue is not outcome-determinative because, as explained below, Mr. Kluge's claim fails either way.  *See e.g.*, *Cedar Farm, Harrison Cty., Inc. v. Louisville Gas & Elec. Co.*, 658 F.3d 807, 813 (7th Cir. 2011) ("[C]ertification is appropriate when the case concerns a matter of vital public concern, where the issue will likely recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to illuminate a clear path on the issue.") (internal quotations and citations omitted).

Assuming, without deciding, that public employees in Indiana are protected by the religious freedom provisions of the Indiana Constitution, Mr. Kluge nevertheless has failed to state a claim upon which relief can be granted.  Specifically, Mr. Kluge has not alleged facts demonstrating that the Policy materially burdens his right of conscience or to exercise his religion such that enforcement of the Policy would render his religious freedom entirely meaningless.  To the extent that Mr. Kluge argues that the Policy violates his right to conscience, the claim fails because Section 3 protects the right to hold opinions but does not create a right to disobey the law.  *See Gul*, 22 N.E.3d at 858.  In that sense, the Policy does not prevent Mr. Kluge from believing that affirming people who experience gender dysphoria is a sin, it merely regulates his conduct in the workplace, and therefore does not violate Section 3.

To the extent that Mr. Kluge argues that the Policy interferes with his religious exercise, he has not alleged facts showing that the Policy creates a material burden on his right, especially in light of the state's countervailing interests.  Indiana courts have stated that Indiana constitutional rights are not absolute, and the idea that they may be limited in the exercise of legitimate state police power is especially salient in the context of public employment.

SA-224

Specifically, the state has recognized interests in promoting the efficiency of its public schools, protecting the rights of public-school students, and controlling the content of public employee's expression in the context of performing their official duties.  *See Pickering*, 391 U.S. at 568; *Garcetti*, 547 U.S. at 418; *Mayer v. Monroe Cty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (discussing a school district's ability to dictate teachers' speech and curriculum).  The Policy controlled the way in which Mr. Kluge addressed individual students during the course of his employment, but did not otherwise affect his ability to exercise his religion in the remainder of his life.  Accordingly, to the extent that the Policy limited his religious exercise, the limitation was not so significant as to render the entire idea of free exercise of religion meaningless, because Mr. Kluge remained free to exercise his religious beliefs at other times and in other places.  *See State v. Econ. Freedom Fund*, 959 N.E.2d 794, 807 (Ind. 2011) (concluding that a statute preventing the use of automated dialing devices without the recipient's consent did not materially burden the right to engage in political speech, because plaintiffs remained free to engage in such speech without the use of an automatic dialer).  Accordingly, BCSC's Motion to Dismiss is **GRANTED** as to this claim (Count 11), which is **DISMISSED**.

7.  Intentional Infliction of Emotional Distress (Count 12)

In the Amended Complaint, Mr. Kluge alleges that BCSC intentionally caused him to suffer severe emotional distress by: (1) removing the last-names-only arrangement; (2) threatening him with termination if he did not either "use transgender names and pronouns" or resign; (3) refusing to accommodate his sincerely-held religious beliefs; and (4) violating his rights under Title VII, the United States Constitution, and the Indiana Constitution.  [Filing No. 15 at 30.]

SA-225

BCSC argues that this claim should be dismissed because Mr. Kluge has failed to allege all of the elements of an intentional infliction of emotional distress ("IIED") claim, "even in boilerplate fashion." [Filing No. 45 at 24-25.] Furthermore, it argues, none of Mr. Kluge's allegations demonstrate extreme or outrageous conduct. [Filing No. 45 at 25.]

Mr. Kluge responds that his allegations contain a short and plain statement of all the required elements, except for a specific recitation that BCSC's conduct was extreme or outrageous. [Filing No. 57 at 33.] Nevertheless, he argues, the allegations were sufficient to give BCSC notice of the nature of the claim. [Filing No. 57 at 33.]

In reply, BCSC asserts that Mr. Kluge's factual allegations "fail to meet the high bar required" to sustain a claim for IIED. [Filing No. 60 at 12-13.] BCSC also argues that Mr. Kluge's allegations—including that BCSC accommodated until faced with student complaints and that Mr. Kluge was "encouraged" in response to the alleged "persecution and unfair treatment"—demonstrate that Mr. Kluge did not suffer emotional distress as a result of any extreme or outrageous conduct. [Filing No. 60 at 12-13.]

Under Indiana law, the elements of IIED are that the defendant (1) engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) caused (4) severe emotional distress to another. *E.g.*, *Lachenman v. Stice*, 838 N.E.2d 451, 456 (Ind. Ct. App. 2005) (citations omitted). It is the intent to harm the plaintiff emotionally that constitutes the basis for this tort, and the requirements are "rigorous." *Id.* (citations omitted).

In order for a defendant's conduct to be extreme or outrageous, it is not enough that "defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.*

SA-226

(citation omitted).   Instead, liability can be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 456-57.   "In the appropriate case, the question [of whether a defendant's conduct was sufficiently extreme and outrageous] can be decided as a matter of law." *Id.* at 457 (citation omitted).

Here, Mr. Kluge has failed to state an IIED claim because, as a matter of law, his allegations do not demonstrate that BCSC's conduct was extreme or outrageous.   In fact, his claim is premised on allegations that BCSC attempted to enforce a policy that he did not agree with, but there are no factual allegations to suggest that any school official acted in an outrageous, harassing, or threatening way in doing so.   Mr. Kluge also did not allege facts from which any intent to cause emotional harm can be inferred.   Accordingly, BCSC's Motion is **GRANTED** as to the IIED claim (Count 12), which is **DISMISSED**.

###### 8.   Fraud (Count 13)

Mr. Kluge alleges in the Amended Complaint that BCSC committed fraud under Indiana law when it intentionally misrepresented to him that he could submit a conditional resignation, with the intent that he rely upon such misrepresentation.   [Filing No. 15 at 31.]   He asserts that BCSC acted with "malice, oppression, and fraud," and he reasonably relied on its false representation, causing actual damage.   [Filing No. 15 at 31.]

BCSC argues that Mr. Kluge has failed to state a claim for fraud because, by allegedly agreeing that Mr. Kluge could withdraw his resignation before its effective date, Ms. Gordon was at best making a promise that she later broke, which cannot be the basis for a fraud claim.   [Filing No. 45 at 25-26.]   BCSC submits that Mr. Kluge's written resignation does not contain a condition that he could rescind it at any time prior to its effective date, and, pursuant to Indiana

SA-227

law, an employee of a school corporation who submits his written resignation for some fixed future date has no right to withdraw it.  [Filing No. 45 at 25-26.]

Mr. Kluge responds that his fraud claim was based on a misrepresentation of existing fact—not a promise of future conduct—because Ms. Gordon represented that he could submit a conditional resignation while knowing that he could not do so, in order to induce his resignation and avoid having to terminate him.  [Filing No. 57 at 34.]  He also argues that his resignation was invalid because it was processed before its effective date.  [Filing No. 57 at 34-35.]

In reply, BCSC asserts that Mr. Kluge does not acknowledge its argument that his resignation was not actually conditional because it did not include any language permitting him to withdraw it.  [Filing No. 60 at 13.]  Moreover, it argues, even if the resignation was conditional, Mr. Kluge still cannot assert a claim of fraud based on a misrepresentation concerning future conduct.  [Filing No. 60 at 13.]

Under Indiana law, the elements of actual fraud are: (1) a material representation of a past or existing fact by the party to be charged that; (2) was false; (3) was made with knowledge or reckless ignorance of its falsity; (4) was relied upon by the complaining party; and (5) proximately caused the complaining party's injury.  *Ruse v. Bleeke*, 914 N.E.2d 1, 10 (Ind. Ct. App. 2009) (citation omitted).  "Actual fraud may not be based upon representations of future conduct, broken promises, or representations of existing intent that are not executed."  *Id.* (citation omitted).

Here, Mr. Kluge argues that Ms. Gordon misrepresented that he could file a conditional resignation.  It is unclear what he means by "conditional resignation," other than his reference to being permitted to withdraw the resignation before it was "processed" or shared with the administration.  Notably, however, Mr. Kluge's written resignation, which he attached to his

SA-228

Amended Complaint, was not expressly conditioned on anything, did not contain any language concerning his ability to withdraw it, and instead merely requested that the letter not be "processed" and that no one be notified until a certain date. [Filing No. 15-2.] Ms. Gordon stated in response, "I will honor your request and not process this letter or share with the BHS administration until May 29." [Filing No. 15-2.] Such statement by Ms. Gordon is nothing more than a representation of her existing intent, which was not later executed, and therefore cannot form the basis of an actionable claim for fraud under Indiana law.

To the extent that Mr. Kluge relies upon Ms. Gordon's alleged more general representation that he was allowed to submit a conditional resignation, the claim nonetheless fails. Mr. Kluge alleges that, at a meeting on February 6, 2018, Ms. Gordon "agreed that he could submit a conditional resignation." [Filing No. 15 at 9-10]. However, the resignation he attached to the Amended Complaint contradicts this allegation, as Mr. Kluge did not in fact submit a conditional resignation. In any event, Ms. Gordon's purported representation that Mr. Kluge could submit a conditional resignation is another way of stating her agreement that she would allow him to withdraw his resignation at a later date, which is nothing but a representation concerning future conduct that is not actionable under a theory of fraud. Accordingly, BCSC's Motion to Dismiss is **GRANTED** as to the fraud claim, and that claim (Count 13) is **DISMISSED**.

## II.
### IYG'S PENDING MOTIONS

#### A. Intervention as of Right

It its Motion to Intervene as a Defendant, IYG seeks to intervene as of right, pursuant to Fed. R. Civ. P. 24(a)(2), or, alternatively, to intervene permissively under Rule 24(b)(1). [Filing No. 22.] IYG asserts that it is a nonprofit organization with a primary purpose of promoting the

SA-229

safety and healthy development of LGBTQ youth in Indiana schools and communities.  [Filing No. 23 at 5.]  In furtherance of this mission, IYG manages a network of student-run groups across Indiana that seek to provide safe spaces for LGBTQ students, including one group at BHS called the Equality Alliance.  [Filing No. 23 at 15.]

As to intervention as of right, IYG argues that it has a direct interest in this lawsuit that might be harmed if it is not permitted to intervene.  [Filing No. 23 at 13-19.]  Specifically, IYG asserts that, if Mr. Kluge prevails and is reinstated with the last-names-only arrangement, transgender students at BHS will be harmed because they will feel ostracized, stigmatized, humiliated, and unsafe as a result of having a teacher who refuses to address them by their proper names and pronouns.  [Filing No. 23 at 13-14.]  Because IYG represents the interests of these students, who are or will be members of the Equality Alliance, and because those students will be directly affected by the outcome of this lawsuit, IYG argues that it should be permitted to intervene as a matter of right.  [Filing No. 23 at 14-15.]  In addition, IYG contends that the outcome of this action could constrain how it allocates its resources, because it would be forced to assist transgender and gender nonconforming students at BHS who are negatively affected, instead of expending resources on other issues.  [Filing No. 23 at 15-16.]

IYG argues that BCSC may not adequately protect these interests for two reasons.  [Filing No. 23 at 17.]  First, IYG asserts that it may advance different legal arguments in the litigation, including the argument that transgender students have a right to be addressed with correct names and pronouns under federal law, and BCSC may not be inclined to make such arguments because they acknowledge legal obligations beyond the scope of this lawsuit.  [Filing No. 23 at 17.]  Second, IYG argues that BCSC has different priorities that will affect its litigation strategy.  [Filing No. 23 at 17.]  Specifically, while IYG would focus on protecting transgender

SA-230

students from harm, BCSC may have to balance the interests of teachers, parents, and other stakeholders and therefore may be more inclined to resolve the case by striking a balance among these interests, instead of arriving at the resolution that would be best for the students.  [Filing No. 23 at 17-19.]

IYG attaches three sworn declarations to its Motion to Intervene.  [Filing No. 22-1; Filing No. 22-2; Filing No. 22-3.]  The first is from Christine Paulsen, the Chief Executive Officer of IYG, who provides background information concerning IYG and its mission and services and the support it has provided to BCSC students.  [Filing No. 22-1 at 1-8.]  The second declaration is by a parent of a student whose transgender son, Aidyn, quit orchestra and transferred to another school after Mr. Kluge refused to use his chosen name.  [Filing No. 22-2 at 1-6.]  The third declaration is from Aidyn himself, who avers that Mr. Kluge's failure to address him by his name listed in PowerSchool was an issue that was discussed at Equality Alliance meetings, that he left BHS because the controversy surrounding Mr. Kluge subjected the student to bullying, and that IYG has provided him with valuable programming.  [Filing No. 22-3 at 1-8.]

In response, Mr. Kluge argues that this Court should disregard the declarations attached to IYG's Motion to Intervene because: (1) Aidyn is not credible, is not transgender, and, in any event, no longer attends BHS; (2) Aidyn's mother's declaration is based on inadmissible hearsay; and (3) Christine Paulsen's declaration is conclusory and lacks foundation.  [Filing No. 53 at 17-28.]  In support of his arguments, Mr. Kluge presents declarations from the following individuals: (1) himself, disagreeing with the contents of the declarations of Aidyn and his mother, [Filing No. 52-6]; (2) his teaching assistant, stating that she supported the last-names-only arrangement and never heard Mr. Kluge use incorrect names or gendered language, [Filing No. 52-2]; (3) a BHS student, asserting that she never witnessed Mr. Kluge treating transgender

students differently and that Aidyn had falsely accused her of bullying because she is a Christian who opposes affirming people who identify as transgender, [Filing No. 52-3]; (4) a second student, who confirmed that Mr. Kluge followed the last-names-only arrangement and treated everyone equally, [Filing No. 52-4]; (5) a third student, who stated that she witnessed Mr. Kluge following the last-names-only accommodation and did not hear him use first names or gendered language, [Filing No. 52-5]; and (6) a parent of a BCSC student who witnessed Aidyn speaking at a school board meeting and perceived that Aidyn had a "personal vendetta" against Mr. Kluge, and, based on secondhand accounts of others' interactions with Aidyn and Aidyn's social media posts, does not believe that Aidyn is a transgender boy, [Filing No. 52-6].

As to the elements for intervention as of right, Mr. Kluge argues that IYG cannot show that it has an interest in the litigation because it cannot demonstrate Article III standing. [Filing No. 53 at 29-32.] Specifically, Mr. Kluge asserts that, if he were successful in this lawsuit and reinstated with the last-names-only arrangement, "he would not have license to discriminate against transgender students" but would simply refer to all students by their last names. [Filing No. 53 at 31-32.] Furthermore, he argues, IYG has not shown that Mr. Kluge's previous use of the last-names-only arrangement impaired its ability to provide its programs and services and has not presented a statement from any current student, which demonstrates that it does not have any interest in the outcome of this suit. [Filing No. 53 at 30-31.] Finally, Mr. Kluge argues that IYG's interests are adequately protected by BCSC, because both entities are seeking dismissal of this lawsuit and because BCSC, through enacting policies concerning transgender students, has already demonstrated its dedication to ensuring that transgender students are addressed by the names and pronouns of their choice. [Filing No. 53 at 32-33.]

SA-232

IYG replies that it has a direct interest in this matter because it provides services to LGBTQ students in the BCSC school system and a ruling in favor of Mr. Kluge would undermine its mission of helping those students, as reinstating Mr. Kluge with the last-names-only accommodation would harm transgender students and force IYG to expend its resources supporting those students. [Filing No. 59 at 6.] IYG asserts that Mr. Kluge failed to acknowledge other cases supporting its position, presented a wholly circular argument that intervention was unnecessary because he would prevail on the merits, and ignored the relevant standard of review. [Filing No. 59 at 7-9.] IYG argues that, while not required, it has both direct and associational Article III standing. [Filing No. 59 at 9-10.] IYG reiterates that BCSC will not adequately protect its interest and distinguishes cases cited by Mr. Kluge in his response. [Filing No. 59 at 10-13.] IYG attaches to its response declarations from a current transgender student at BHS and a teacher at BHS who serves as the faculty advisor for the Equality Alliance, as well as an article concerning the positive effects of calling transgender individuals by their chosen names. [Filing No. 58-1; Filing No. 58-2; Filing No. 58-3.]

Mr. Kluge asks the Court for leave to file a sur-reply responding to the evidence attached to IYG's reply. [Filing No. 61.] In his proposed sur-reply, Mr. Kluge disputes the veracity of IYG's evidence and argues that the Court should disregard it. [Filing No. 61-1.] Mr. Kluge's Motion for Leave to File a Sur-Reply, [61], is **GRANTED** to the extent that the Court has reviewed the attached proposed sur-reply, although, as discussed below, the Court concludes that the material contained therein is irrelevant and unnecessary to the resolution of the Motion to Intervene.

To intervene as a matter of right in a federal lawsuit under Rule 24, a proposed intervenor must satisfy four criteria: "(1) timely application; (2) an interest relating to the subject matter of

SA-233

the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action."  *Planned Parenthood of Wisconsin, Inc. v. Kaul*, 942 F.3d 793, 797 (7th Cir. 2019) (internal quotations and citation omitted).  "The proposed intervenor has the burden of establishing all four elements; the lack of even one requires that the court deny the motion."  *Id.* (citation omitted).  The Court must accept as true all non-conclusory allegations in the motion to intervene and should not deny the motion "unless it appears to a certainty that the intervenor is not entitled to relief under any set of facts which could be proved under the complaint."  *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995) (internal quotations and citations omitted).

As to the second element, the proposed intervenor must demonstrate a direct, significant, and legally protectable interest in the question at issue in the lawsuit, and such interest must be unique to the proposed intervenor.  *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 658 (7th Cir. 2013).  Because this inquiry is fact-specific, "making comparison to other cases [is] of limited value."  *Id.* (internal quotations and citation omitted).

In analyzing whether the named parties inadequately represent the proposed intervenor's interest, the Seventh Circuit applies a "three-tiered" standard.  *Kaul*, 942 F.3d at 799.  The baseline rule is liberal: the inadequacy requirement is satisfied if the proposed intervenor shows that the parties' representation of its interest "may be inadequate."  *Id.* (internal quotations and citation omitted).  "Where the prospective intervenor and the named party have 'the same goal,' however, there is a rebuttable presumption of adequate representation that requires a showing of 'some conflict' to warrant intervention."  *Id.* (citation omitted).  This presumption of adequacy is strengthened to the point of requiring a showing of gross negligence or bad faith where the

SA-234

representative party is a governmental body that is charged by law with protecting the interests of the proposed intervenors. *Id.* (citations omitted). "[Q]uibbles with the [representative party's] litigation strategy" do not create a sufficient conflict of interest to warrant intervention. *Wisconsin Educ. Ass'n Council*, 705 F.3d at 659.

As a preliminary matter, this Court would like to point out that, though these issues seem to be a matter of significant focus in the parties' briefs, a motion to intervene is not the appropriate juncture or vehicle to ask the Court to decide factual disputes concerning Mr. Kluge's conduct during the last-names-only arrangement, students' reactions to that conduct, or the potential impacts of such conduct. This Court certainly will not adjudicate a dispute concerning the gender identity of a non-party minor student, and reminds the parties of their obligation to maintain a certain level of decorum that does not include assembling a group of different non-parties to criticize a child or weigh in on that child's gender identity or credibility where the child is not even involved in this action. To that end, the Court finds that the majority of the material contained in the declarations submitted by both parties is either unnecessary or irrelevant to the issue of intervention and borders on inappropriate.

Consistent with the standard of review, the Court will accept as true the non-conclusory allegations in IYG's Motion, to the extent that such allegations are relevant to the issues actually underlying the question of whether intervention is proper. Based on these allegations, the Court concludes that IYG has not demonstrated entitlement to intervene in this action as a matter of right. Although the Court recognizes IYG's interest in supporting LGBTQ youth within the BCSC community and recognizes that Mr. Kluge's actions could affect those students, that interest is only indirectly impacted by this litigation, which is now focused on Mr. Kluge's rights as an employee under Title VII.

SA-235

Regardless, even if IYG has a direct interest in this litigation, it has not shown that such interest would not be adequately protected by BCSC.  IYG has conceded that it has "the same goal" as BCSC—dismissal of this action—and therefore a rebuttable presumption of adequacy arises.  *See Kaul*, 942 F.3d at 799.  To rebut this presumption, IYG offers only the fact that BCSC may advance "different legal arguments" and that BCSC has different priorities that might affect its litigation strategy.  Notably, however, BCSC enacted the policies in question, refused to back down from those policies, and is defending this action, presumably because of its desire to protect its transgender and gender nonconforming students.  The assertion that BCSC may decide that advancing the argument that transgender students have the right to be addressed by their chosen names and pronouns because such argument might not be necessary to resolution of this lawsuit is unavailing.  Specifically, an argument not necessary to the resolution of the lawsuit likely is not properly before the Court in the first place, and even if it is, IYG merely speculates that BCSC would not properly advance it.  Although BCSC has not yet raised the argument that transgender students have the right to be called by their preferred names and pronouns, in the context of this particular lawsuit, that argument is relevant only to the undue hardship portion of the Title VII claim, which, as previously noted, is not properly before the Court at this time.  Furthermore, the contention that BCSC might balance the interests of other stakeholders is conclusory, because there is no indication as to what those other interests might be or how considering those interests would harm students.  Accordingly, to the extent that IYG seeks intervention as a matter of right, the Motion is **DENIED**.

### B.  Permissive Intervention

In the alternative, IYG argues that it satisfies the requirements for permissive intervention because: (1) its defenses share common questions of law and fact with the main action; (2) its

SA-236

motion is timely; and (3) it does not intend to assert any counterclaims, so there is no need for an independent showing of jurisdiction. [Filing No. 23 at 19-20.] IYG also argues that intervention would be in the interest of judicial economy because if Mr. Kluge were reinstated and permitted to refuse to call students by the correct names and pronouns, IYG or other affected parties might then sue BCSC for discrimination, resulting in serial and potentially conflicting litigation of the same issues. [Filing No. 23 at 20.] For these reasons, IYG asserts, courts have regularly permitted LGBTQ-focused public interest groups to intervene in challenges to school policies protecting transgender students. [Filing No. 23 at 20-21 (citing cases).]

Mr. Kluge responds that IYG does not satisfy the requirements for permissive intervention because it does not present any claim or defense for which there is independent jurisdiction. [Filing No. 53 at 33-35.] Mr. Kluge further asserts that, even if IYG did satisfy the requirements for permissive intervention, the Court should exercise its discretion to deny the motion because granting the motion would delay the adjudication of this matter and prejudice his rights because litigating a second motion to dismiss would waste judicial resources. [Filing No. 53 at 34-35.]

In reply, IYG argues that Rule 24(b) does not require an independent basis for jurisdiction, but instead requires only that its claims or defenses share a common question of law or fact, which is the case here. [Filing No. 59 at 13-14.] IYG further argues that Mr. Kluge's assertion that intervention has delayed this action and will result in prejudice to him is conclusory and baseless. [Filing No. 59 at 14.] In addition, IYG asserts that intervention would promote judicial economy because it would prevent IYG from having to file a separate lawsuit if Mr. Kluge prevails in this action. [Filing No. 59 at 14-15.]

SA-237

As to permissive intervention, upon a timely motion, a district court "may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).  The decision whether to permit intervention is "wholly discretionary." *Kaul*, 942 F.3d at 803 (citation omitted).  While the Federal Rules require a district court to consider whether intervention would unduly delay or otherwise prejudice the adjudication of the original parties' rights, they otherwise leave the court with ample authority to consider a wide variety of factors and manage the litigation before it.  *Id.* (citing Fed. R. Civ. P. 24(b)(3)).

Here, as IYG acknowledges, it is not asserting a claim or defense independent of the defenses already asserted by BCSC and indeed is seeking only to dismiss this lawsuit.  To that end, the issues it raises do indeed share common issues of law and fact with the main action because it has raised exactly the same issues.  Notably, the arguments raised in IYG's proposed Motion to Dismiss, [Filing No. 55-2], are essentially the same as the arguments advanced by BCSC in its Motion, with the exception of the undue hardship argument which BCSC has correctly not raised at this juncture.  In other words, judicial economy will not be served by permitting IYG to intervene because, as discussed above, its intervention would add nothing to the litigation.  Thus, the Court declines to exercise its discretion to permit IYG to intervene, and its Motion is **DENIED** to the extent that it seeks permissive intervention.

As a final note, the Court emphasizes that nothing in this Order should be construed as prohibiting IYG from seeking permission to file an amicus curiae brief, should a situation arise in which doing so would be appropriate.  *See e.g.*, *Monarch Beverage Co. v. Johnson*, 2014 WL 7063019, at *1 (S.D. Ind. Dec. 11, 2014) (explaining that, while the Federal Rules of Civil Procedure do not expressly contemplate the submission of amicus briefs in the district court, the

SA-238

court may permit such briefs in accordance with the principles underlying Federal Rule of
Appellate Procedure 29, which concerns amicus briefs at the appellate level).   However, the
Court reminds IYG that such filings, if permitted upon proper motion, should provide the Court
with additional helpful theories or insights, not merely reiterate arguments already raised by the
parties.  *See Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997)
(explaining that amicus briefs that merely "duplicate the arguments made in the litigants' briefs"
are "an abuse" and should not be allowed).

### C.  Motion for Leave to File a Motion to Dismiss

Given the Court's denial of IYG's Motion to Intervene, described above, the Motion for
Leave to File a Motion to Dismiss, [55], is **DENIED AS MOOT**.

## III.
### CONCLUSION

Based on the foregoing, the Court makes the following rulings:

1.  Defendants' Motion to Dismiss, [44], is **GRANTED IN PART** and **DENIED IN PART** as
    follows:

    a.  The Motion is **GRANTED** to the extent that all claims against Defendants Dr. James
        Snapp, Phil Utterback, Jodi Gordon, and Dr. Bret Daghe individually in their official
        capacities are **DISMISSED WITH PREJUDICE**.

    b.  The Motion is **GRANTED** to the extent that the following claims against BCSC are
        **DISMISSED WITH PREJUDICE**:

        i.   Count 3: Hostile Work Environment under Title VII,

        ii.  Count 4: First Amendment Retaliation,

        iii. Count 5: Content and Viewpoint Discrimination under the First Amendment,

        iv.  Count 6: Compelled Speech under the First Amendment,

        v.   Count 7: Free Exercise of Religion under the First Amendment,

SA-239

     vi.  Count 8: Unconstitutional Conditions,

    vii.  Count 9: Due Process,

   viii.  Count 10: Equal Protection,

    ix.  Count 11: Claims under the Indiana Constitution,

     x.  Count 12: Intentional Infliction of Emotional Distress, and

    xi.  Count 13: Fraud;

  c.  The Motion is **DENIED** to the extent that the following claims **SHALL PROCEED** against Defendant BCSC only:

     i.  Count 1: Failure to Accommodate under Title VII, and

    ii.  Count 2: Retaliation under Title VII.

2. Mr. Kluge's Motion for Leave to File Sur-Reply Responding to IYG's New Evidence Cited in its Reply in Support of Motion to Intervene, [61], is **GRANTED** to the extent that the Court considered the attached proposed sur-reply.

3. IYG's Motion to Intervene as Defendant, [22], is **DENIED**.

4. IYG's Motion for Leave to File a Motion to Dismiss Plaintiff's Amended Complaint, [55], is **DENIED AS MOOT.**

Date: 1/8/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

51

SA-240



# BROWNSBURG COMMUNITY SCHOOL CORPORATION

## F.L. O'NEAL ADMINISTRATION CENTER
310 Stadium Drive
Brownsburg, IN 46112
(317) 852-5726
www.brownsburg.k12.in.us

TO:        John Kluge   *BLD*
FROM:      Bret Daghe
DATE:      July 28, 2017

You are directed to recognize and treat students in a manner using the identity indicated in PowerSchool.  This directive is based on the status of a current court decision applicable to Indiana.

*We agree that John may use the last name only to address Students.*

You are also directed to not attempt to counsel or advise students on his/her lifestyle choices.

Please indicate below if you will comply with this directive.  This document must be returned to me by noon on Monday, July 31, 2017.

___✓___  Yes, I will comply with this directive.

_____  No, I will not comply with this directive.

_____            _7_/_31_/_17_
John Kluge, teacher                         Date

Cc:  Personnel file

*In addition, Angie Boyer will be responsible for distributing uniforms to students*
*7/31/17*


KLUGE V. BCSC
**EXHIBIT**
**A**
7-31-17 ACCOMMODATION AGREEMENT

SA-241

TO: Brownsburg School Corporation HR Director Jodi Gordon
FROM: John Kluge
Date: Friday, May 25, 2018

<u>WITHDRAWAL OF INTENTION TO RESIGN AND REQUEST FOR CONTINUATION OF
ACCOMODATION</u>

I requested a meeting with you, HR Director Jodi Gordon, and BHS building principal Dr. Bret

Daghe that was scheduled for Friday, May 25, 2018 at 1:30pm at BCSC Central Office. I arrived on time

and Dr. Daghe told me that, contrary to what had been planned, he said "We have everything we need.

We don't need to meet. Go back to the high school." When I insisted that I had set up this meeting to talk

to HR and Dr. Daghe and that I needed to talk to you about something new, Dr. Daghe ordered me not to

go upstairs to your office and to instead return to the high school. I'm confused how "We have

everything we need," as Dr. Daghe claimed, since you had agreed to not take any action on my forced

intent to resign. I'm also confused as to why Dr. Daghe thinks he is entitled to prohibit me from

accessing you, the school corporation's HR director, even at our appointed meeting time. What I was

going to present to you was the following:

Today I am WITHDRAWING my emailed intention to resign sent to you April 30, 2018 for which

you had agreed to withhold processing at my specific request. The time that you have given me to

consider this intended action has been helpful for me to realize that there was no choice for me and my

family. Effectively, a gun was placed to my head forcing my signature. I now see that this effort by the

administration was a means to compel me to deny my religious beliefs, and to punish me for these

beliefs. It is infringing on my protections of free speech by compelling me to demonstrate and embrace

core personal-development values for youth that are totally in opposition to my actual heartfelt beliefs. In

previously agreeing to an Accommodation for my use of last names only for all of my students, I relied

upon a good faith effort by the administration to be sensitive to my faith and my adherence to a respectful

means of working with my employer as well as equally honoring my students. This approach was



KLUGE V. BCSC
**EXHIBIT**
C
SA-242

successful, in that it demonstrated a teacher's commitment to personal values, even while individual

students, both within the transgender population and outside of it, as well as the classes as a whole,

advanced in measureable ways. Plus there is no burden on Brownsburg School Corporation in

maintaining my Accommodation. Accordingly, if the Brownsburg School Corporation retracts the

Accommodation afforded me this year, it does so without just cause. In threatening me with rescission of

my rights to be compensated through the summer, the administration has acted in a high-handed,

arbitrary, illegitimate, and most likely, illegal manner. I request that the School Corporation maintain my

employment for the upcoming school year, and renew the present Accommodation that will allow me to

continue to perform my job.

What follows is a timeline that I believe reflects the facts leading up to the administration's effort to

squeeze me out of the school, along with some of the reasons for my NOT agreeing to this effort to force

my resignation.

- January 23, 2017 – Administration invited Craig Lee, the teacher sponsor of the LGBT "Equality Alliance" club at school, also a union representative of the teacher's union (the union which I have opted to not join) to speak at a faculty meeting.  In "starting a dialogue" about transgenderism, Lee solicited questions/concerns that the faculty had about transgenderism, asking faculty to write them down on an index card for the administration to look over. Lee said they were doing this because he claimed to have been receiving at least 1 or 2 emails a month asking him for advice regarding transgender students in their classes.  At this meeting, I asked the question out loud about how the school will handle diverse worldviews such as those who believe transgenderism is sin/sexual immorality. The moderator thanked me for the question, asserting that those were good questions to ask, but my question went unanswered.

- February 27, 2017 – Administration again invited Craig Lee as well as Lori Mehrtens, one of our guidance counselors, to give a presentation on what transgenderism is, why we need to encourage students in it who have these feelings, why it is sometimes good to keep the information from their parents and cultivate it secretly at school (because of the possibility of their parents abusing them), and they stated that the #1 goal as teachers was to make our students "comfortable."

- May 15, 2017 – I met with BHS building principal Dr. Bret Daghe to read out loud a letter that had been previously written, and I, accompanied by other faculty, discussed the

contents. I pleaded with Daghe to not pursue the transgenderism path that was being presented. In this meeting, Daghe indicated that he had resisted changing the names in the online PowerSchool database up to this point. The three other teachers and I left that meeting in disagreement, and I was dejected by the tension of the school leadership in pushing us to call students by names other than the sexually correct birth names. I soon returned to Daghe's office and told him that if he had been able to resist changing the students' names in the online database, good for him and he should keep on resisting.

- Summer 2017 – High School Guidance Counselor Lori Mehrtens announced that the students were now permitted to change their first name in the official school database, "PowerSchool", and stated that their parents were on board with it. They also informed only these students—not the student body at large—that they could use the general bathroom of the opposite sex if they wanted to. Otherwise they needed to use the nurse's single-stall bathroom. They would not be incorporated into the opposite sex's changing room, but would be provided with a separate changing area for gym and for performing arts concerts. Up to this point, the students who were uncomfortable using the bathroom that matched their biological sex had been given the option of using the single-stall bathroom in the nurse's office.

- July 18, 2017 – I receive a couple of emails from Mehrtens supposedly informing me and other teachers having 2 transgender students in our classrooms, in light of this summer's changed policy. We were also instructed on a reporting process as to other students who were not in compliance with these developing policies, policies which had not been made known to either the general student body or the general body of parents.

- July 27, 2017 – On the first day of school I planned to take roll call using the students' legal first names, because the email of July 18 used language that was permissive, not mandatory, stating, "feel free to call them their transgender names." I planned to do this because my conscience would not allow me to encourage students in transgenderism. To protect myself from encouraging what my faith states is sinful behavior, I opted to adhere to the stated words in the email and to call the 2 students by their legal names. I met with Daghe briefly and told him that I could not in good conscience call these students by their transgender names. Daghe told me to hold tight in my office till he could discuss it with Superintendent Dr. Jim Snapp. Later that morning, Snapp and Daghe met with me for about 2-3 hours. During this meeting, I explained my Christian convictions and urged them not to pursue this path. During the meeting, Snapp gave me three options: (1) comply with calling students transgender names, (2) say that I was "forced to resign," or (3) get fired. I told them that I would rather get fired than resign because I wanted to teach at the school and didn't want to quit on the kids. If they were going to end my job, I wouldn't do it for them. With that, we ended the meeting. Because I had chosen option 3, Snapp initiated an administrative leave of absence beginning immediately, pending termination procedures.

SA-244

- July 31, 2017 – After giving prayerful consideration to my plight, I met with Snapp and asked to be given an Accommodation.  I suggested that I use last-names-only like coaches generally use when addressing the students. I also requested that I not be required to handle the uniform responsibility, and Snapp agreed to this, and agreed that another school employee would distribute the uniforms to the students, which actually had been the practice previously. This Accommodation was agreed upon by both of us, and we both signed an agreement to that effect.

- August 7, 2017 – Despite our agreement, I was given an Administrative leave of absence from July 27-28, 2017, a suspension, at the BCSC School Board meeting. It has never been made clear to me as to why this occurred.

- August 14, 2017 – Assistant Superintendent Kat Jessup presented what she submitted to be new transgender policies to the high school faculty at a faculty meeting.

- November 6, 2017 – Teachers from our school were asked at a faculty meeting to write down any questions/concerns/scenarios-they-had-questions-about on an index card. The administration collected them and told the faculty that Jessup would work on answering these questions with counsel from the school's lawyer and report back at our December 2018 meeting. I later learned that Brownsburg East Middle School and Brownsburg West Middle School were presented with the same scenario as was our faculty.

- December 2017 – Jessup postponed this presentation on transgenderism by another month because answers had not been formulated to all the questions that had been submitted by faculty in November.

- December 13, 2017 –Daghe scheduled a meeting with me to ask me how the year was going and to tell me that my last-name-only Accommodation was creating tension in the students and faculty. He said the transgender students reported feeling "dehumanized" by my calling all students last-name-only. He said that the transgender students' friends feel bad for the transgender students when I call the transgender students, along with everyone else, by their last-name-only. He said that I am a topic of much discussion in the Equality Alliance Club meetings. He said that a number of faculty avoid me and don't hang out with me or include me as much because of my stance on the issue.

  Daghe said that parents complain about me. He stated that a transgender student's mother complained to the principals about my orchestra policy, that it was an unfair and unwarranted policy that should be removed. The building principal asked if the other teachers had this same policy. I told him "yes" and sent him their policies and mine. He responded to the parent and the parent backed down. This was a policy by my entire performing arts department that students must have natural-colored hair for performances so they don't distract from the music being played.

SA-245

Daghe referred to this parent complaint in this meeting as being evidence of me being singled out while other teachers with the same policies did not receive any complaints.

I explained to Daghe that this persecution and unfair treatment I was undergoing was a sign that my faith as witnessed by my using last-names-only to remain neutral was not coming back void, but was being effective. He didn't seem to understand why I was encouraged. He told me he didn't like things being tense and didn't think things were working out. He said he thought it might be good for me to resign at the end of the year. I told Daghe that I was now encouraged all the more to stay.

- January 17, 2018 – Daghe scheduled a meeting with me because he said he didn't think he was direct enough in our December 13 meeting.  He told me in this meeting plainly that he really wanted to see me resign at the end of this school year. I told him that it was simply because he didn't like the tension and conflict. But I used examples in scripture to point to why this is a sign that I should stay. I referenced Acts 19:11-41 with Paul's conflict in Ephesus and 1 Corinthians 16:8-9 when Paul was encouraged by the opportunity, saying "a wide door for effective service has opened to me, and there are many adversaries."

Daghe asked me if I was going to resign. He offered to write me letters of recommendation, etc. I told him I'd have a clearer picture if I would stay or leave after the January 22, 2018 faculty meeting where the new transgender policies would be announced. I told him I'd meet with him after those policies were announced and we could follow up with this meeting.

- January 22, 2018 – Jessup presented the faculty with a Q and A document she and the lawyer had come up with. These policies were not being announced to the general student population, to the parents or community. They went into effect immediately except for the last-name-only Accommodation which had been permitted under my Accommodation, was to be withdrawn next school year. The document provided in part that (1) transgender students could now use the restroom of their choice, i.e. men's, women's, single-stall nurse's office; (2) "fully transitioned" transgender students could now change in the opposite sex's locker-room (gym) and changing room (performing arts concerts) instead of changing in a separate changing area—"fully transitioned" was not defined.

- January 31, 2018 – I scheduled a meeting with Daghe because I had told him I'd get back with him after the faculty meeting that occurred January 22, 2018, regarding his question as to whether I would resign at our January 17, 2018 meeting. I asked Daghe to elaborate on details of what resignation would look like, which he did.

- February 4, 2018 – I sent an email to Snapp and Daghe reminding them that it was my understanding that, per our signed agreement, I would be allowed to use last-names-only indefinitely, and inquired as to whether this was correct understanding.

SA-246

- February 6, 2018 – HR director Jodi Gordon and Daghe scheduled a meeting with me. During this meeting, Daghe told me that, in response to my February 4, 2018 email, the answer was "no," I would not be allowed to continue using last-names-only. It was said in the meeting that I would be fired starting in the summer if I intended to use last names only. They said my Accommodation was unreasonable because students were "offended" at me using last-names-only. I told Gordon and Daghe they were acting illegally and discriminating against their Christian employees in violation of Title VII. In this meeting, I told Gordon that Daghe wants me to resign at the end of the school year. Gordon informed me that I would be paid over the summer if I resign.

- March 15, 2018 – Gordon scheduled a meeting with me. She told me that I would have to hand in a resignation letter by May 1, 2018 if I wanted to resign. If I failed to do that, the termination process would start May 1, 2018 so that I could be out the door by June, 2018. Gordon called it a "contract cancellation" for the following school year.

- April 30, 2018 – I sent an email to Gordon. In the email I indicate that I intend to resign at the end of the school year with reference to the ultimatums with which I had been presented. I asked that my email not be processed or anyone told about its contents before May 29, 2018. Gordon responded that she would honor this request. By today's letter, I am now RESCINDING that April 30, 2018 email stating an intention to resign.

I am quite concerned that the compelled speech in which BHS has engaged itself is a threat to my own right of expression. As a teaching professional, I have never experienced such effort at blackmailing me and students with threats of repercussions should we voice dissent with the latest and evolving policy towards the faculty and students insofar as references to transgender students.

I greatly object to the stifling of my religious beliefs as well as those of others who are in my charge. What follows are a few of my concerns.

I adhere to a biblically-based belief regarding the inherent dignity of every individual, that we are all created in the image of God and that, as a result, each person is entitled to be treated with dignity and respect.

The Bible teaches that there were created two distinct, complementary sexes, not subject to human change, and that I, as a teacher, cannot tell someone that their gender is something different than what God biologically created them to be.

There is no conflict between my heart for finding and exercising dignity towards another and my differing beliefs. Christians may not agree with the religious beliefs of a Hindu or Muslim, but that does not mean that a Christian cannot peacefully work cooperatively with someone of a different faith. In fact, we do it every day. But a Christian could not be required to affirm the truth of a Hindu or Muslim's beliefs, as that would conflict with the Christian's own beliefs.

SA-247

I see no difference in the gender identity conflict. Christians can and should be able to peacefully work and interact with those who assert a gender identity different from their biological sex. But the Christian must not be required to affirm as truth a person's mistaken gender identity.

Without an Accommodation, the Brownsburg School Corporation's continually changing policies, which appear to be based upon the shifting sands, make impossible a congruence between the two world views of my own and others' faiths and the compelled speech of gender alteration.

For the numerous reasons that I have stated here and over the past year, I request that the School Corporation continue my employment and maintain the present Accommodation that will allow me to continue to perform my work, which I hope that you will agree has brought positive recognition and favorable results to the school.


Respectfully,


John Kluge


Submitted to Jodi Gordon on Friday, May 25, 2018


SA-248

# TRANSGENDER QUESTIONS

**Important Information for you to Know:**
- By federal law, the School is prohibited from disclosing any student's personal information with members of the public.  This includes answering questions about whether a transgender students is enrolled in the School or at a specific building.
- School policy prohibits discrimination on the basis of sex or gender conformity.
- It is expected that school employees treat all students fairly and provide all students with equal access to educational programs and activities.
- Any requests for information about transgender students, policies, etc. should be sent to administration.

**<u>East Middle School</u>**

**Legal Questions:**

1. **What is the legal requirement of administration to identify the transgender students and to relay that information to the teachers?** BCSC allows name changes with a letter from the student's parent(s) and a letter from a health care professional.  These letters must both be submitted before a change is made in PowerSchool.  In the year the change takes place we will notify the teachers.  Once the change in PowerSchool, etc. has taken place, there would be no further notification of future teachers unless requested by the parent and/or student.

2. **What is the legal protocol for a student deciding to change his/her name?** BCSC allows name changes with a letter from the student's parent(s) and a letter from a health care professional.  These letters must both be submitted before a change is made in PowerSchool.

**BCSC Policy Questions:** BCSC is working to develop policy that reflects the answers of this document.

1. **What is the BCSC policy regarding restroom and locker room usage for transgender students?**  It is BCSC practice that Transgender students can use the restroom of their choice.

**Logistical Questions:**

1. **How do teachers determine which restroom the student should use? (4)** Teacher will not make the determination; the student can use the restroom of their choice.



Revised 1/3/18 kj

SA-249

2. **What is the best way to approach a name change during the course of the school year to the rest of the class?** This is a conversation that should happen with the student and the counselor.  The name change will, in most cases, happen with no announcement to the class.  If students ask about the name change, the teacher would respond along the lines of, "Jessica is her name.  Please be sure that is the name you are calling her."

3. **How does the transgender situation affect sporting events (i.e., locker room changing, teams, etc.)?** For sporting events, IHSAA has guidelines for schools to follow.  We will follow those same rules at the middle school.  As far as locker rooms and changing, fully transitioned students will be allowed to use the dressing room of their gender.  Students who are not fully transitioned will be allowed an alternate dressing location.

4. **What do groups do about uniforms (i.e., orchestra, band, choir, sports, etc.) when they fit differently and are gender specific?**  The uniform that matches the student's chosen gender should be offered.

5. **What does the choir do about singing parts that are gender specific (i.e., student identifies as gender A but can only sing the parts for gender B)?**  ISSMA has developed rules regarding transgender students and singing parts.  Students should be placed in singing groups according to their vocal ranges, not their gender.

**West Middle School**

**Legal Questions:**

1. **Can we legally call a student by his/her preferred name with no other background information or legal paperwork?** BCSC allows name changes with a letter from the student's parent(s) and a letter from a health care professional.  Both must be submitted before a change is made in PowerSchool. Once that is completed, the name/gender in PowerSchool should be used.

2. **What is the legal liability for employees using the wrong pronouns or names with transgender students? (2)** It is the employee's professional responsibility to follow the expectations and guidelines set forth.  (Please see the question and answer above for additional guidance.) The consequences in this case could depend on if this is the first time and/or the intent in calling the student the wrong name/pronoun.

3. **What is the legal requirement for following the student's wishes and the parent's wishes regarding the name change as well as the gender change?  Which do we follow:  student or parent?** This is a parental choice; they are involved in this process.

**BCSC Policy Questions:** BCSC is working to develop policy that reflects the answers of this document.

Revised 1/3/18 kj

SA-250

1. **What is the BCSC policy on informing employees that a student is transgender?** In the year the change takes place we will notify the teachers.  Once the change in PowerSchool, etc. has taken place, further notification would be done on a case by case basis at the discretion of the school counselor.

2. **What is the BCSC policy on transitioning transgender students to BHS (i.e., counselors, teams, etc.)?**  The middle school counselors will work with the student and their family on the initial transition to the high school.  Once the high school counselor has been brought on board, the high school counselor will begin to work with the student to make the transition to BHS.

3. **What is the BCSC policy on consistency between EMS, WMS, and BHS in terminology and policy?** It is our belief that terminology and policy should be the same between the middle schools and high school. This document assists in communicating a coherent plan.

4. **How is the district handling the situation?** BCSC is working to create an environment which is accepting of all students.

5. **How early is the situation being dealt with and addressed within our schools?** We are dealing with situations as we become aware of them.

**Logistical Questions:**

1. **How do we handle students who want to be called by a different name?** We expect staff to call students by the name in PowerSchool.  It is fine for teachers to call students by a commonly accepted nickname – Kim or Kimmy for Kimberly, Alex or Xander for Alexander, etc.

2. **How do we handle restroom issues? (4)**  Transgender students can use the restroom of their choice.

3. **How do we explain transgender student situations to the other students?** Teachers do not need to explain transgender situations to other students.  If students want to talk about transgender topics, they can speak with their counselor.

4. **What do we do with the parent complaints regarding restroom usage by transgender students?** Send the concerns/complaints to administration.

5. **How do we avoid students "claiming" they are x gender to use a different restroom?** If there are students you feel are abusing this, please contact administration.

Revised 1/3/18 kj

SA-251

6. **How do we avoid the restroom use becoming a distraction?** If the use of bathrooms is a distraction, please contact administration to discuss your concerns.

7. **How do we address the "pronoun" issue? (2)** It is our expectation that teachers use the pronoun associated with the gender as it appears in PowerSchool.  If they/them is requested, we expect that pronoun to be used as well.

8. **Can we still split the class into boys and girls (i.e., Pacer Test)?** Yes.  However, a transgender student would be placed with their identified gender.  Staff are encouraged to consider other ways of dividing students rather than always using gender -- alpha order, birth month, etc.


**Awareness/Informational Questions:**

1. **What does transfluid mean?** This gender identity is described as a mix between male and female.  People who are transfluid report feeling more male at times and at other times more female.

2. **Can you review terminology and how to properly use it?** Specific terminology is needed to answer this question.

3. **How do we help educate and support while still respecting that this issue can be controversial?** Our expectation is that staff is supportive of all of our students.  As we understand it is a controversial issue, we feel it is best to not attempt to educate students about transgender issues.

4. **What are some suggestions for the struggles with culture and with handling situations with transgender students?** We should strive to create a culture that is tolerant of all students and their differences.

5. **What are some suggestions for handling the students who do not understand and/or the parents who wish for their child/children not to learn or to be exposed to these topics?** We understand there are parents and students who do not want to learn about or be exposed to these topics.  As stated above, we do not expect staff to educate about these topics.  Rather, we expect for our staff to demonstrate and encourage respectful behavior.

6. **Will there be an LBGTQ club?** There is currently an Equality Alliance Club at the high school, however, it does not provide counselor directed support.  An Equality Alliance Club could be started at the middle school level based on student interest and sponsor interest.

Revised 1/3/18 kj

SA-252

7. **How much of the transgender behavior is attention seeking behavior?** This question is difficult to answer as attention seeking behavior is based on individual actions not the actions of a group.

Revised 1/3/18 kj

SA-253

## High School

**Legal Questions:**

1. **How do we legally deal with a student telling us not to reveal their transgender identification to their parents?** Staff members who are told by a student they are transgender and have not told their parents should encourage the student to discuss this with either their guidance counselor or an administrator. If the staff member is concerned about the welfare and/or does not believe the student will seek out the counselor or administrator, the staff member should contact the counselor or administrator immediately.

2. **What is our legal responsibility in keeping gender choices and names from parents (per student's request) especially if the student is a minor? (2)** Changing a student name and/or gender in PowerSchool is a parental choice; they are involved in this process. Staff members are required to call students by the name listed in PowerSchool.

3. **When contacting parents, which name do we use: legal or requested?** The name listed in PowerSchool is the name you should use.

4. **Legally, do we go with the parental choice on name/gender or the student's choice?** The name in PowerSchool should be used.

5. **What are the legal expectations required by teachers when working with a transgender student/parent(s)? Are they merely suggestions, or are they requirements by law? (6)** If this question is referring to the name of a student – the name in PowerSchool should be used; this BCSC practice based on current case law.

6. **Are teachers required to call the student by his/her preferred gender? (2)** The name/gender in PowerSchool should be used.

7. **What legal consequence would a teacher receive if accidentally calling a student by the wrong name/pronoun especially if the student is explosive and reports the incident or if the situation leads to their self-harm or their reporting of my action?** It is your professional responsibility to follow the expectations and guidelines set forth by the school district. The consequences in this case could depend on if this is the first time and/or the intent in calling the student the wrong name/pronoun.

8. **What legal documentation is required by the student who is transgender (i.e., name change, etc.)?** BCSC allows name changes with a letter from the student's parent(s) and a letter from a health care professional. These letters must both be submitted before a change is made in PowerSchool.

Revised 1/3/18 kj

SA-254

9. **Because of the medication aspect for some transitioning transgender students, is a 504 plan warranted in these cases?  What is the legal responsibility?** 504 plans are investigated on a case by case basis.  Just because a student is on medication does not require them to be on a 504 plan.

10. **What are the legal implications if the student has not made us aware of the change or we do not know of the change?** We can only deal with what we are aware of.

**BCSC Policy Questions:** BCSC is working to develop policy that reflects the answers of this document.

1. **How will the corporation respond to those who believe transgender issues reveal a level of mental illness?** If a staff member feels a student has any mental health issue they should be contacting the student's counselor.  Staff members should not confront students regarding what they believe could be a mental illness.  They should refer all concerns of this nature to the counselor or administration.

2. **What is the policy on teachers taking the student's cue to call him/her by a different name if there is no office/administrative directive?  Do we honor that as a corporation? (12)** We expect staff to call students by the name in PowerSchool.  It is fine for teachers to call students by a commonly accepted nickname – Kim or Kimmy for Kimberly, Alex or Xander for Alexander, etc.

3. **What is the BCSC policy on overnight trips and the transgender students?  For example, what is the policy on parents (or students) who demand that their children room with students of the opposite sex? (6)** BCSC will not allow students of opposite birth gender to room together during overnight trips.  Alternatives will be discussed well in advance of any trip and can include, but not limited to: rooming alone, rooming with a parent, etc.

4. **Does BCSC provide support groups for transgender students?** We don't have any specific support group, but the Quality Alliance Club is available for students.  This group, however, does not provide counselor directed support.

5. **What is the process or requirements for changing names of transgender students in Power School?  Can Power School be marked to identify parent knowledge or lack of knowledge in the change to the student's name?** The name is only changed in Power School if we have a parent letter and letter from a medical professional.

6. **If there is no change of name/gender in Power School or no support from home in making this change, how does BCSC proceed?  Is there a policy in place? (8)** Same question as above

Revised 1/3/18 kj

SA-255

7. **What is the policy on informing parents of the change?  Who informs the parent?** There would be no change without parent involvement.

8. **What are the bus seating policies? (4)** Currently, we have worked through each bus situation on a case by case basis.  Typically, the school counselor or administrator works with the Transportation Department to develop a solution.

9. **What if a student identifying as the opposite gender wants to be in a sport of the opposite gender?  Does BCSC policy allow for this?**  The IHSAA has guidelines for schools to follow regarding this.  BCSC will follow these guidelines.  ISSMA also has guidelines regarding transgender students.  BCSC will follow these guidelines.

10. **How are transgender students identified in our school data sub groups:  by birth gender or assumed gender?**  Birth gender

11. **What is the policy on dressing room assignments for transgender students? (2)** Fully transitioned students will be allowed to use the dressing room of their gender.  Students who are not fully transitioned will be allowed an alternate dressing location.

12. **What is the policy on informing teachers about the students who are identified as transgender?**  In the year the change takes place, once we have parent permission, we then notify the teachers.  Once the change in PowerSchool, etc. has taken place, there would no further notification of future teachers unless requested by the student and/or parents.

13. **What is the policy on giving teachers as much information on the student as possible so as to avoid potential problems?**  We provide teachers with the information that is necessary.  If there are additional concerns/issues, those should be addressed with the building administrators.

**Logistical Questions:**

1. **Are transgender students allowed to inform classes about personal experiences through classroom writing or speaking?** Like all students, transgender students can write about whatever topic they choose given the teacher instructions.  However, as a teacher you have a choice on how you allow students to share their work.  If the assignment is a speech, within parameters, the student can address what is considered appropriate.  For example, a student might give a speech on racism, woman's equal rights, etc. and that is fine.  So a transgender student talking about transgender topics is appropriate.  There are some topics we wouldn't permit any student to talk about in an assignment or a speech such as intercourse, etc.

2. **What are the restroom policies? (4)**  Transgender students can use the restroom of their choice.

Revised 1/3/18 kj

SA-256

3. **Can the Senior Academy have a restroom for transgender students as many go to the clinic and miss class?** We do not plan to change any restrooms in the Senior Academy. As the renovations continue at BHS, there will be additional single person and/or family restrooms. These restrooms will be available for anyone to use during the school day.

4. **What do we do with students who are transgender who use one restroom one day and the other restroom the next day?** Teachers should make the counselor aware of this and the counselor will have conversation as to why this is happening.

5. **Are we allowed to use the student's last name only?** We have agreed to this for the 2017-2018 school year, but moving forward it is our expectation the student will be called by the first name listed in PowerSchool.

6. **Can teachers refuse to call the student by his/her preferred name?** Staff members need to call students by name in PowerSchool.

7. **In classes where guest speakers come in to speak on gender specific topics, where do we send the transgender student (i.e., health topics)?** This situation should be discussed between the teacher/counselor and the student to determine what session is the most appropriate.

8. **There are labels for restrooms in the building. Will there be labels for a specific transgender restrooms. . .or a family restroom be designated for them?** There are no planned changes for the restrooms. As the renovations continue at BHS, there will be additional single person and/or family restrooms. These restrooms will be available for anyone to use during the school day.

**Awareness/Informational Questions:**

1. **Where is the line drawn on "pleasing" students and their beliefs?** It is our job to make all students feel welcome and accepted in the public school environment.

2. **What questions are acceptable to ask of transgender students?** The same questions that are acceptable to ask any other students are acceptable to ask a transgender student. Asking why they are transgender – not appropriate.

3. **What is the correct way to approach a transgender student when asking questions?** Ask a question the same way you would address any other student. Imagine asking this same question and trading transgender for African American or female, or special education.

4. **How many students at BHS are transgender?** This number has the potential to change.

Revised 1/3/18 kj

SA-257

5. **Where do we send students for help or questions on this topic?** School Counselor

6. **How much goes into finding the validity of transgender claims?** If a parent tells us their student is transgender, we require a letter from the parent and one from a medical professional.

7. **Are we ignoring what many high level health institutions are saying regarding the allowance of transgenderism in students under the age of 18?** That's not our decision / place to make that decision.

8. **How do teachers break from their personal biases and beliefs so that we can best serve our students?** We know this is a difficult topic for some staff members, however, when you work in a public school, you sign up to follow the law and the policies/practices of that organization and that might mean following practices that are different than your beliefs.

9. **What feedback and information has been received from the transgender students?** They appreciate teachers who are accepting and supporting of them. They feel dehumanized by teachers they perceive as not being accepting or who continue to use the wrong pronouns or names. Non-transgender students in classrooms with transgender students have stated they feel uncomfortable in classrooms where teachers are not accepting. For example, teachers that call students by their last name, don't use correct pronouns, don't speak to the student or acknowledge them, etc.

10. **How do we address other students who are uncomfortable, who laugh, who call names, etc.? (5)** This is bullying and should be dealt with in the manner we deal with other bullying situations.

11. **Are teachers the only ones being told to be patient with transgender students, or are students being told as well?** We have an expectation that all students will treat each other with respect.

12. **How do we deal with a student exploding in anger with being called the wrong name or gender?** If it's the fifth time this week the staff member has messed up the pronoun, then the staff member needs to get on board. However, if the student explodes on one small mistake, we would address the student behavior as we normally would.

13. **Can we receive some resources to help us deal with the topic of transgenderism?** We will look for information to be able to share. These answers are a step in bringing clarity to this topic.

14. **Can we receive information regarding the change that takes place during hormone therapy for transgender students?** We can provide information.

Revised 1/3/18 kj

SA-258

**15. What is the number of transgender students in 2007 compared to 2017?  How has the population grown?**  We do not have that data.

**16. Is there information on dealing with students glorifying the transgender lifestyle for attention?  What do we do with that?**  We would treat this in the same manner we would treat other children with attention seeking behaviors.

Revised 1/3/18 kj

SA-259

# EXHIBIT 3

## Deposition Excerpts of John Kluge

## (<u>Note</u>: these are excerpts that were not included in Filing No. 113-1.)

Case 1:19-cv-02462-JMS-DLP   Document 120-3   Filed 03/15/21   Page 2 of 36 PageID #: 1241
Case: 24-1942    Document: 16    Filed: 07/10/2024    Pages: 306

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CASE NO. 1:19-cv-2462-JMS-DLP

JOHN M. KLUGE                         )
                                      )
            Plaintiff(s),             )
                                      )
      -vs-                            )
                                      )
BROWNSBURG COMMUNITY SCHOOL           )
CORPORATION, et al.,                  )
                                      )
            Defendant(s).             )


        The videoconference deposition upon oral

examination of JOHN M. KLUGE, a witness produced and

sworn before me, Brandy L. Bradley, RPR, a Notary

Public in and for the County of Hamilton, State of

Indiana, taken on behalf of the Defendants at the

remote location of the witness, Indianapolis, Marion

County, Indiana, on the 17th day of November, 2020,

pursuant to the Indiana Rules of Trial Procedure.




                CIRCLE CITY REPORTING
            135 N. Pennsylvania Street
                    Suite 1720
            Indianapolis, IN  46204
                 (317) 635-7857

SA-261

---

### Page 6

1     brief synopsis, please.
2 A   Work was being a -- at Indiana University I was
3     teaching undergraduate classes as an AI -- it's
4     like a teacher's assistant -- teaching music
5     theory classes to freshman and sophomores at
6     Indiana University while I was taking graduate
7     level classes. I have also worked as a
8     substitute teacher both in New York State and in
9     Indiana. I had worked a summer as a painter
10    with the Indiana Painting Company the summer
11    before I started my employment with Brownsburg
12    High School.
13       MR. BORG: Rita, let's pull up Exhibit A.
14 Q   Mr. Kluge, I'm going to represent that these are
15    interrogatory responses that you provided based
16    on certain requests from Brownsburg. If you can
17    scroll through the document and I'm going to ask
18    you to eventually get to the last page.
19 A   I need control of it, so --
20       MR. BORG: Rita, can we get Mr. Kluge
21    access to the document?
22 A   Okay. I don't know if I have control of the
23    screen yet. Can someone confirm that I've been
24    given control?
25       THE MODERATOR: Mr. Kluge, you do have

### Page 7

1    control.
2 Q   So you're on Exhibit A. I just need you to
3    scroll down to the last page on that PDF
4    document.
5 A   Page 15 of 15. It says Certificate of Service?
6 Q   Yes. Let's go up one more page?
7 A   One more page, okay. I'm now on Page 14 of 15.
8    "Answer: I have been counseled by Pastor Dave
9    Abu-Sara..." Is that correct?
10 Q   Yes, sir. And my question is is that your
11    signature on Page 13 and your handwritten date
12    of June 11th, 2020?
13 A   That's my signature and the date, yes.
14 Q   Okay. And take a moment to scroll through the
15    document, if need be, but I'm just asking you to
16    confirm that these are your responses to
17    interrogatories that Brownsburg had proposed.
18 A   Okay. These are my responses. Brent just got
19    offline.
20      (Mr. Borg lost connection and a recess was
21    taken.)
22      MR. BORG: For the record, I don't know
23    what happened. I got kicked off but I didn't
24    lose Internet connection.
25 Q   If you could, please, go to your response to

### Page 8

1    Interrogatory No. 10.
2 A   I'm there.
3 Q   That asks certain questions about your work
4    since you left Brownsburg. And my question is
5    simply is that an accurate description of your
6    employment since you left Brownsburg?
7 A   It is an accurate description, yes.
8 Q   Okay. And you submitted these interrogatories
9    on or about the date that you signed them which
10    was June 11th, 2020; correct?
11 A   Correct.
12 Q   And is there anything that has changed with
13    respect to Interrogatory No. 10 since you
14    submitted these responses?
15 A   No.
16 Q   It continues on the next page, too, if you want
17    to take a quick look.
18 A   All of that is still accurate.
19 Q   Thank you. You're married; correct?
20 A   Correct.
21 Q   For how long?
22 A   For three and a half -- no, four years. I
23    should know.
24 Q   Do you have children?
25 A   Yes, we have three.

### Page 9

1 Q   What are their ages?
2 A   Their ages are three, one and a half, and about
3    six months.
4 Q   Do any attend school? I suppose the
5    three-year-old might attend preschool?
6 A   None of them attend school.
7 Q   Other than this case have you ever been party to
8    a lawsuit?
9 A   Other than this case I have not been party to a
10    lawsuit.
11 Q   You are a Christian?
12 A   I am a Christian.
13 Q   You are a member of Clearnote Church on 10th
14    Street in Indianapolis; is that correct?
15 A   That is correct.
16 Q   How long have you been a member of Clearnote?
17 A   I believe for seven years, maybe six at
18    Clearnote Church in Indianapolis.
19 Q   For the entirety of the seven years
20    Clearnote located at the 10th Street address in
21    Indianapolis?
22 A   No, they had been renting from a couple of
23    buildings before the 9101 West 10th Street.
24 Q   Were those rental locations in Indianapolis?
25 A   One was in Indianapolis and one was in

JOHN M. KLUGE vs.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

**Page 10**

1 Brownsburg.
2 Q   For approximately how long would you say
3 Clearnote has been located at the 10th Street
4 address?
5 A   For about three years.
6 Q   How often do you attend services at Clearnote?
7 A   Every week normally.
8 Q   Do you attend services anywhere else?
9 A   Not normally.
10 Q   Where might you attend in a not normal
11 situation?
12 A   If I was visiting my family out of town, I might
13 attend their church.
14 Q   And what church might that be and where is it
15 located?
16 A   I think it's called Christ the King Church in
17 Ferry, Michigan.
18 Q   Do you hold any positions with Clearnote?
19 A   Yes, I'm an elder there.
20 Q   How long have you been an elder?
21 A   For about one and a half years.
22 Q   What is an elder?
23 A   An elder is an overseer, someone who is part of
24 the session of our board of elders who exercise
25 spiritual oversight over the church, part of the

**Page 11**

1 government of our church.
2 Q   You mentioned a board of elders; correct?
3 A   That's correct.
4 Q   How many people sit on that board?
5 A   There are three active elders right now and one
6 who is on sabbatical and our pastor is also
7 considered a teaching elder, so there's three
8 active elders right now plus our pastor.
9 Q   Are the three active laypersons?
10 A   They are elders.  They're not ordained pastors.
11 They have day jobs but they're ordained elders
12 like I am.
13 Q   Thank you for that.  Is it fair to say they're
14 selected from the laity of the church?
15 A   From among the congregation, yep.
16 Q   How does that selection occur?
17 A   To the best of my knowledge, we are nominated
18 and then the session approves that nomination
19 and the congregation votes whether they want to
20 have that person as an elder.
21 Q   You mention the session a couple times.  What is
22 that?
23 A   The session is another name for the board of
24 elders.
25 Q   So, correct me if I'm wrong, but maybe with

**Page 12**

1 respect to your process of becoming an elder, do
2 I have it correct that you believe you were
3 nominated, your nomination was submitted to the
4 session, and the session approved you as an
5 elder?
6 A   The session approved the nomination and,
7 therefore, I was put forward before the
8 congregation and they voted me to become an
9 elder.
10 Q   Okay.  Thank you.  And the vote before the
11 congregation, how did that work specifically?
12 Was it majority voting approved you?  Was it if
13 there were more yes than noes, you would be
14 approved?  Help me understand that.
15 A   Yes, it was a secret ballot vote at our normal
16 yearly meeting and as a majority, yes.  Then
17 I would get elected as an elder.
18 Q   Is the board always comprised of three elders or
19 can that number change?
20 A   That number can change.
21 Q   What is the, I guess, the range, minimum or
22 maximum, in terms of how large the board of
23 elders can be?
24 A   To the best of my knowledge, at least one and
25 there's no maximum limit.

**Page 13**

1 Q   Is there any sort of document or written
2 guidance that governs the composition of the
3 board of elders and Clearnote Church more
4 generally?
5 A   Regarding -- can you say the first part of your
6 question?
7 Q   Certainly.  I think the first part is if there
8 is any sort of document or written guidance that
9 governs the board the elders or its composition.
10 A   Sir, the first document that governs the
11 composition of our board of elders is Holy
12 Scripture which stipulates what are the
13 qualifications for an overseer, for an elder.
14 Other than that, we have guidelines and rules in
15 our Book of Church Order which is the Book of
16 Church Order of Evangel Presbytery.  That is the
17 presbytery that my church belongs to.  And, so,
18 you have the Book of Church Order for Evangel
19 Presbytery and then you also have our particular
20 Clearnote Church Indianapolis's church bylaws
21 which also, I believe, talk about how the board
22 of elders is comprised and what the process is
23 to vote and elect elders.
24 Q   Other than your current position as an elder,
25 have you held any other positions with Clearnote

JOHN M. KLUGE VS.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

Case 2:21-1042   Document: 16   Filed: 07/10/2024   Pages: 306

JOHN M. KLUGE
November 17, 2020

**Page 14**

Church?

1
Church?

2 A   Yes.  I have also been the -- I am currently and

3   have been for a period of time the worship

4   leader of the church.

5 Q   Anything else?

6 A   I'm also the head of the youth ministries and

7   Owana Program.

8 Q   I'm sorry, what did you say after head of youth

9   ministries?

10 A   Owana Program.

11 Q   Are you currently head of the youth ministry?

12 A   Yes.

13 Q   Are you also currently head of the Owana

14   Program?

15 A   Yes.

16 Q   What is the Owana Program?

17 A   It's a discipleship program that we offer on a

18   twice monthly basis to children ages

19   kindergarten through fifth grade and then we

20   also have a youth group which is sixth grade

21   through eighth grade that meets at the same

22   time.

23 Q   Are you also currently a worship group leader?

24 A   I am also currently the worship leader of

25   Clearnote Church Indianapolis, yes.

**Page 15**

1 Q   Any other positions that you hold currently or

2   have previously held that you haven't mentioned?

3 A   No official positions that I can think of.

4 Q   Do you know how long Clearnote Church has been

5   part of the Evangel Presbytery?

6 A   Clearnote Church has been part of Evangel

7   Presbytery since Evangel Presbytery formed.

8 Q   When was that?

9 A   I believe it was about one, two years ago.

10 Q   Am I using a fair label when I refer to the

11   Evangel Presbytery as a denomination?

12 A   You could describe it that way.

13 Q   What denomination was Clearnote affiliated with,

14   if any, prior to the Evangel Presbytery?

15 A   It was not affiliated with any denomination

16   before.  It was a church plant of Clearnote

17   Church Bloomington and so it was associated with

18   that sister congregation in Bloomington.

19 Q   Can you give me a brief synopsis of what process

20   was involved for Clearnote Church to become a

21   member church of the Evangel Presbytery?

22 A   Yes.  To the best of my knowledge, you have to

23   have a congregational vote that you want to

24   become a member of Evangel Presbytery and I

25   believe you have to agree to the Evangel

**Page 16**

1   Presbytery BCO, their Book of Church Order, and

2   I'm not quite sure more than that.  I would have

3   to look at the BCO to find more details.

4 Q   Fair enough.

5       MR. BORG: Rita, let's pull up Exhibit B.

6 Q   Mr. Kluge, Exhibit B is the Amended Complaint

7   that was filed in this lawsuit.  It looks like

8   it's 33 pages.  I'd just ask that you look over

9   it and my question is does it appear to be the

10   Amended Complaint filed in this lawsuit?

11 A   It does.

12 Q   Please go to Paragraph 23.  I believe that's

13   right around Page 8 of the document.  Do you see

14   Paragraph 23 there toward the bottom?

15 A   Does it say "Mr. Kluge's sincerely-held

16   religious beliefs include a belief that it is

17   sinful to promote gender dysphoria"?

18 Q   Correct.

19 A   Then I do.

20 Q   I think you've already answered it, but you

21   allege in that paragraph that your

22   sincerely-held religious beliefs include a

23   belief that it is sinful to promote gender

24   dysphoria.  Is that your allegation?

25 A   That is correct.

**Page 17**

1 Q   The American Psychiatric Association's

2   Diagnostic and Statistical Manual of Mental

3   Disorders defines gender dysphoria as "an acute

4   form of mental distress stemming from strong

5   feelings of incongruity between one's anatomy

6   and one's gender identity."  Do you agree with

7   that definition?

8 A   I do not.

9       MR. CORK: I object to the extent it calls

10   for a medical opinion.

11 Q   What do you mean by the term "gender dysphoria"

12   in Paragraph 23 of your Amended Complaint?

13 A   Let's go back to your previous question.  You

14   read me a definition of gender dysphoria and you

15   gave a medical definition is what you said.  Are

16   you asking me to say what my religious

17   convictions are regarding what gender dysphoria

18   really is?

19 Q   Well, I think you answered my question.  I asked

20   you if you agreed with the definition of gender

21   dysphoria as it appears in the American

22   Psychiatric Association's Diagnostic and

23   Statistical Manual of Mental Disorders.  I

24   believe you said you do not agree with that

25   definition; correct?

JOHN M. KLUGE VS.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

Case 2:18-cv-1042   Document: 16   Filed: 07/10/2024   Pages: 306

JOHN M. KLUGE
November 17, 2020

Page 18

1 A   That's correct.
2 Q   Okay.  So, if you do not agree with that
3   definition, then my question is what do you mean
4   by the term "gender dysphoria" as it appears in
5   Paragraph 23 of your Amended Complaint?
6 A   Okay.  What I mean by gender dysphoria is what
7   scripture refers to as effeminacy which is for a
8   man to play the part of a woman or a woman to
9   play the part of a man and so that would include
10   acting like/dressing like the opposite sex.
11 Q   Is there anything else that goes into your
12   definition of gender dysphoria as it's used in
13   Paragraph 23 of your Amended Complaint?
14 A   There is and I have explained it further in my
15   interrogatories.  If you want to look at that,
16   I've explained it more in-depth there.
17 Q   That's certainly fair.  If you had a couple
18   minutes to look at your interrogatory responses,
19   would you be able to direct me in those
20   responses that add to your definition of gender
21   dysphoria as it's used in Paragraph 23 of your
22   Amended Complaint?
23 A   Yes.  If you showed me the interrogatory, I
24   could show you where I lay out where effeminacy
25   is talked about and where I explain what this

Page 19

1   means.
2       MR. BORG: Okay.  Let's take a five-minute
3   break.
4       Rita, can we go back to Exhibit A?  I
5   suppose Mr. Kluge can pull it on the tab there.
6       If you need more time, sir, and I don't
7   need you to quote it for me.  Really my question
8   is just which responses further that definition.
9       Let's take five, okay?
10       THE PLAINTIFF: Okay.  Thank you.
11       (A recess was taken.)
12   DIRECT EXAMINATION CONTINUING,
13       QUESTIONS BY BRENT R. BORG:
14 Q   We just took a quick break and we were talking
15   about your definition of gender dysphoria as it
16   appeared in Paragraph 23 of your Amended
17   Complaint; correct?
18 A   Correct.
19 Q   And I think you testified that part of your
20   definition of gender dysphoria is what you
21   called effeminacy; correct?
22 A   Correct.
23 Q   And that refers generally to a man acting like a
24   woman or a woman acting like a man.  Is that a
25   fair statement?

Page 20

1 A   That's correct.
2 Q   Okay.  And I think you also said that your
3   definition includes information that you
4   provided in interrogatory responses; correct?
5 A   Correct.
6 Q   And then we took a break so you could have some
7   time to find which of those interrogatory
8   responses further your definition of gender
9   dysphoria as it's stated in Paragraph 23 of the
10   Amended Complaint; correct?
11 A   Correct.
12 Q   Please tell me what those interrogatory
13   responses are that further your definition of
14   gender dysphoria as it's used in Paragraph 23 of
15   the Amended Complaint.
16 A   So, if you look at Interrogatory No. 7, part way
17   down I reference the scripture verse 1
18   Corinthians Chapter 6, Verses 9 and 10.  "Or do
19   you not know that the unrighteous will not
20   inherit the kingdom of God?  Do not be deceived;
21   neither fornicators, not idolaters, no
22   adulterers, nor effeminate, nor homosexuals, nor
23   thieves, nor the covetous, nor drunkards, nor
24   revilers, nor swindlers, will inherit the
25   kingdom of God.  1 Corinthians 6:9.

Page 21

1       And I have a description there that talks
2   about what effeminacy is and the Greek word
3   malakoi that's specifically used in the original
4   text of 1 Corinthians 6:9-10.
5 Q   Thank you.  Anything else from Interrogatory
6   No. 7 that you wish to highlight that defines
7   your definition of gender dysphoria?
8 A   Not at this time.
9 Q   Okay.  Anything else in any of your other
10   interrogatory responses?
11 A   Not at this time.
12 Q   Go to the Amended Complaint which is Exhibit B,
13   specifically Paragraph 92.
14 A   This is statements of law and the First Cause of
15   Action, Title VII of the Civil Rights Act,
16   Religious Discrimination - Failure to
17   Accommodate.
18 Q   Correct.  And you see Paragraph 92?
19 A   I do.
20 Q   You allege in that paragraph that Brownsburg
21   discriminated against you in the terms and
22   condition of your employment on the basis of
23   your sincerely-held beliefs; is that correct?
24 A   Yes, that's what I've written.  That is what I
25   allege.

JOHN M. KLUGE VS.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 22

1  Q    In that Paragraph 92 are you referring to your
2       sincerely-held religious belief that it is
3       sinful to promote gender dysphoria?
4  A    (Audio malfunction.) Brent, did you hear my
5       answer?
6  Q    No, I did not.
7  A    Oh, okay.  I said yes, I'm referring to my
8       sincerely-held belief that it's sinful to
9       promote gender dysphoria.
10 Q    Thank you.  Are you referring to any other
11      sincerely-held religious belief in that
12      Paragraph 92?
13 A    The ones outlined in all of that scripture of my
14      interrogatory.
15 Q    Look at Paragraph 95, which is at the bottom of
16      that page and continues on to the next.
17 A    Okay.
18 Q    You allege in Paragraph 95 that you requested a
19      reasonable accommodation for your religious
20      beliefs; is that correct?
21 A    Yes.
22 Q    Is the religious belief that you're referring to
23      in that Paragraph 95 your belief that it's
24      sinful to promote gender dysphoria?
25 A    Yes.

Page 23

1  Q    Are you referring to any other sincerely-held
2       religious belief in that Paragraph 95?
3  A    The ones I outline in my Interrogatory 7.
4  Q    Any others?
5  A    No.
6  Q    Go back to Exhibit A.  Look at your response to
7       Interrogatory No. 6.
8  A    Originally formed this belief by reading Holy
9       Scripture as contained in the Bible and also see
10      No. 7.  Got it.  I see it.
11 Q    That interrogatory asks how you originally
12      formed your sincerely-held belief that it is
13      sinful to promote gender dysphoria; is that
14      correct?
15 A    That's correct.
16 Q    And I think you already stated it, but, to be
17      clear, you say you originally formed this
18      sincerely-held belief, quote, "By reading Holy
19      Scripture, as contained in the Bible," correct?
20 A    Correct.
21 Q    Other than Holy Scripture, what else informs
22      your sincerely-held belief that it is sinful to
23      promote gender dysphoria?
24 A    I think I answered that in one of the
25      interrogatories, too, and I can show you.

Page 24

1  Q    Please.
2  A    Different question, but Holy Scripture and the
3       preaching of God's word.  And as I was putting
4       that interrogatory responses together, to get
5       the Greek word and the definition of what I
6       understand to be malakoi, just to get a book to
7       help me lay out those explanations of scripture
8       in answering the Interrogatory No. 7, I used, as
9       I say in Interrogatory Answer No. 9, a book
10      called The Grace of Shame:  7 Ways the Church
11      Has Failed to Love Homosexuals.  And in that
12      they use the word malakoi, arsenokoitai, Greek
13      words.  I'm not a Greek expert, so I looked it
14      up.
15 Q    Thank you.  Anything else you haven't mentioned
16      that informs your sincerely-held belief that it
17      is sinful to promote gender dysphoria?
18 A    Not that I can think of.
19 Q    You mentioned earlier the Evangel Presbytery
20      Book of Church Order.
21 A    Is that a question?
22 Q    Yeah.  You mentioned that earlier in your
23      testimony?
24 A    Yes.
25 Q    What is that?

Page 25

1  A    It is a governing document that governs how our
2       presbytery operates.
3  Q    What are some of the type of things that it
4       governs?
5  A    It governs how to handle issues of discipline,
6       it governs how churches can enter and leave the
7       presbytery are just a couple of the several
8       things it talks about.
9  Q    There is a chapter in that book called the
10      Declaration of Doctrine and Policies Concerning
11      Sexuality.  Are you familiar with that chapter?
12 A    I'm familiar with it.  I haven't committed it to
13      memory but I'm familiar with it.
14 Q    Do you think you've read it before?
15 A    I think I have read it before.
16 Q    Let's pull up Exhibit C on your tab.  Go to the
17      next page, please.  That says The Book of Church
18      Order of Evangel Presbytery, Second Draft,
19      Revised on February 20th of 2019.  I will
20      represent to you that that includes the Table of
21      Contents and then the chapter titled Declaration
22      of Doctrine and Policies Concerning Sexuality
23      and I just ask that you look through that and
24      confirm that that appears to be correct.
25 A    Yes, it appears to be the document.

JOHN M. KLUGE vs.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

Page 26

1 Q   Now, is Clearnote, I guess, subject to this Book
2     of Church Order during your employment with
3     Brownsburg in 2017 and 2018?
4 A   Well, when was the presbytery even -- I'd have
5     to check when we even formed the presbytery.
6 Q   Well, I think you testified --
7 A   I think it was one or two years ago, so I think,
8     to the best of my knowledge, we joined Evangel
9     Presbytery after my employment terminated with
10    Brownsburg.  That's the best of my knowledge.
11 Q   Fair enough.  Let me ask you this.  Do you think
12    this chapter on Declaration of Doctrine and
13    Policies Concerning Sexuality is consistent with
14    the teaching of Clearnote Church in 2017 and
15    2018?
16 A   Absolutely.
17 Q   Okay.  Is it fair to say that this Chapter 28
18    provides members of your faith with a framework
19    for approaching issues related to sexuality?
20 A   That's fair to say.
21 Q   Under Chapter 28 it's divided into numbered
22    paragraphs.  If you could look at Paragraph 15.
23 A   Okay.
24 Q   That paragraph addresses facilities usage by men
25    including restrooms; is that correct?

---

Page 27

1 A   Yes.
2 Q   And the next paragraph, Paragraph 16, addresses
3     facilities use by women including restrooms;
4     correct?
5 A   Yes.
6 Q   Flip to the next page and look at Paragraph 17.
7     My question is if you're familiar with that
8     paragraph but I realize it's lengthy, so, if you
9     need to, take a minute and read it.
10 A   I am familiar with the contents of that
11    Paragraph 17.
12 Q   Tell me what you think it means.
13 A   It means that if someone who is fast bound in
14    presenting themselves as the opposite sex, they
15    come into the church, the church would not
16    immediately require them to use a multi-stall
17    restroom of their biological sex.  Instead, they
18    would sometimes say to that individual that they
19    can use a single stall, one stall individual
20    family restroom.
21 Q   What do you think is meant by these two
22    sentences -- and I'm in the same paragraph, 17.
23 A   Yes.
24 Q   "For this reason, wise and compassionate
25    pastoral discretion is necessary to apply the

---

Page 28

1     rules set forth in this Declaration, especially
2     concerning access to facilities.  In certain
3     instances the higher law of love will preclude
4     swift and rigid enforcement of rules."
5 A   So repeat your question, please.
6 Q   My question was what do you think was meant by
7     those two sentences I just quoted.
8 A   What was meant is if you, like I said in my
9     previous example, have someone who is headlong,
10    fast bound presenting themselves as the opposite
11    sex, you're not going to force them to start
12    using multi-stall restrooms of their biological
13    sex.  You would in some circumstances and, as
14    they say, with discretion, in some instances you
15    would instead of saying you must use a
16    multi-stall men's restroom, you would say no, a
17    single stall family restroom.
18 Q   Do you think this principle also obtains when
19    addressing a transgender person whose name
20    differs from the person's biological sex?
21 A   Can you repeat that question?  You used a word
22    that -- attains?  Say it again.
23 Q   Do you think this principle also obtains when
24    addressing a transgender person whose name
25    differs from the person's biological sex?

---

Page 29

1 A   In certain circumstances, which is why my
2     last-name accommodation worked so well.  It
3     didn't force anything on the student.  I was
4     able to address the student with their name in
5     PowerSchool, namely their last name, and teach
6     content.  I was able to make this whole issue a
7     nonissue by not forcing them to recognize their
8     biological sex and I wasn't forced to encourage
9     their transgender identity.  It was a great
10    accommodation that was working.
11 Q   Let's unpack that a little bit.  I think I
12    understand your testimony that says that there's
13    certain circumstances when it might be
14    appropriate to address a transgender person
15    whose name differs from the person's biological
16    sex and I think you just said that one of those
17    circumstances might be with respect to using
18    their last name only; correct?
19 A   Right.
20 Q   Might there be circumstances where it is
21    appropriate to, in your view, address a
22    transgender person by their first name when that
23    first name differs from their biological sex?
24 A   There might be.  None come to mind right now.
25    Certainly my beliefs as regards classrooms that

---

SA-267

Page 30

1  during the course of the teaching a class of
2  students it's not appropriate and it encourages
3  gender dysphoria.
4  Q   To be clear, I understand that your testimony is
5      that there might be circumstances where it is
6      appropriate and consistent with your religious
7      belief to address a transgender student by their
8      first name where that first name differs from
9      their biological sex but you can't think of any
10     specific circumstances.  Is that fair?
11 A   That's fair.
12 Q   In your view, are there any circumstances where
13     a person's biological sex is ambiguous?
14         MR. CORK: Objection.  Foundation.
15 Q   You can answer the question if you understand
16     it.
17 A   Why are you asking this question?
18 Q   Because you filed a lawsuit against Brownsburg
19     Community School Corporation and this is
20     relevant to the issues raised in the lawsuit.
21 A   I believe that it's always clear.  Even with
22     hermaphrodites, there's always one dominant sex
23     present.
24 Q   Look at Footnote 9 of Exhibit C.
25 A   What page is that on?

Page 31

1  Q   Go back two pages.  Maybe around Page 8 or 9 of
2      the document.
3  A   This is not a footnote.  Is this what you're
4      talking about?
5  Q   I'm sorry.  Do you see toward the bottom how
6      they're smaller font?
7  A   Yeah.  It starts with 18.
8  Q   Yeah.  See if you can go back to Footnote 9.
9          MR. CORK: Brent, I note the absence of any
10     Bates numbers on this document.  I don't
11     remember this document ever being disclosed, nor
12     do I ever remember it being produced to us.
13     Would you confirm that, please?
14         MR. BORG: That's accurate.
15         MR. CORK: Okay.  I'm going to move to
16     strike this.  I will need a copy of it.
17         And, Rita, if you or somebody could send to
18     me via e-mail before we finish this deposition.
19     Obviously, there's nobody here present to rule
20     on that motion and I will, under objection,
21     allow my client to continue to answer the
22     questions about this document but with that
23     objection noted and then I will want to look at
24     it when we take a break and ask my own
25     questions.

Page 32

1      I don't think it's appropriate for you to
2  use a document that has never been identified
3  previously in the deposition of a plaintiff.
4      MR. BORG: I understand your objection.
5  For the record, I believe the witness has
6  testified that he's familiar with the document.
7  It is a document that he has confirmed via
8  testimony that is part of a governing document
9  of his church and it was consistent with his
10 beliefs in 2017 and 2018.  I'm simply making my
11 record.
12     Michael, if you'd like to, I understand you
13 want to ask some questions concerning the
14 document.
15     MR. CORK: My objection is that we've been
16 sandbagged and you waited until this deposition
17 to produce and ask questions about this document
18 when you've known about it long enough to
19 disclose it and produce it.  You may proceed.
20     MR. BORG: Thank you.
21     THE PLAINTIFF: Brent, if you look at the
22 bottom of Page 48, it is Footnote 11.  I go back
23 one page, there are no footnotes.  I go back
24 another page, there are no footnotes.  What are
25 you talking about?

Page 33

1      MR. BORG: Fair enough.  Let's take a
2  five-minute break.  I think I need to get you a
3  better cite before I ask my question, Mr. Kluge.
4      (A recess was taken.)
5  DIRECT EXAMINATION CONTINUING,
6      QUESTIONS BY BRENT R. BORG:
7  Q   Mr. Kluge, before the break we were talking
8      about Exhibit C and I gave you a bad cite.  If
9      you could instead look at Footnote 19 of that
10     document.
11 A   Do I have control of this document?  Footnote
12     19.  Let me see what this footnote is talking
13     about first which it looks like it's on the
14     previous page.  So Paragraph 4 says "God forms
15     each person in his mother's womb and creates the
16     unborn child male or female."
17 Q   Do you see the part of Footnote 19 where it
18     says, quote, "'Intersex' is a medical diagnosis
19     of atypical male or female anatomies not to be
20     confused with those born with typical male or
21     female anatomies who claim a 'transgender' or
22     'transsexual' identity."  Do you see that?
23 A   I see that footnote.
24 Q   Appreciating that intersex diagnoses are
25     probably quite rare, would you agree that is one

JOHN M. KLUGE VS.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

**Page 34**

1 circumstance where one's name might not align
2 with one's biological sex and yet --
3      MR. CORK: Objection. Calls for medical
4 opinion. You may answer if you can.
5 A  I'm not a doctor. My sincerely-held belief is
6 that there's always a dominant biological sex
7 present. With things that are ambiguous or
8 could be, there's always a dominant sex present.
9 Q  In which case if a person's first name did not
10 align with that dominant sex, in your view, is
11 your religious belief, that would be sinful?
12 A  To encourage someone to (audio malfunction)
13 female and presents as a male is sinful.
14      (At this time the reporter interrupts and a
15 discussion was held off the record while
16 Plaintiff adjusts his audio settings.)
17 A  Can we bring the document back in question?
18 Q  Mr. Kluge, let me try to backtrack a little. I
19 think you had testified several moments ago that
20 it's your belief that even in cases where
21 somebody is a hermaphrodite there's what you
22 call a dominant sex for that person. Is that a
23 fair characterization?
24 A  That's correct.
25 Q  Okay. And my question was is it your belief

---

**Page 35**

1 that if somebody's first name deviates from what
2 that dominant sex is, that is sinful; correct?
3      MR. CORK: Objection. Mischaracterizes his
4 testimony. You may answer.
5 A  That's not what I was saying. I was saying for
6 a man to present as a woman or for a woman to
7 present as a man, that is sinful, and to
8 encourage them in that (audio malfunction)
9 opposite sex, that's sinful for someone to
10 encourage that behavior.
11 Q  Okay. Is it sinful in a case where a person has
12 a dominant sex for their first name to deviate
13 from whatever that dominant sex is?
14 A  It's sinful for them to present themselves as a
15 man if they're a woman and it's sinful for them
16 to present themselves as a woman if they're a
17 man.
18      In the case of Brownsburg, I have students
19 that are changing their name to an opposite sex
20 first name in order to present themselves as the
21 opposite sex and that's against my
22 sincerely-held religious beliefs.
23 Q  But presenting can also refer to the first name
24 that's being used; correct?
25 A  My students had specifically changed their first

---

**Page 36**

1 names in order to have an opposite sex first
2 name and, so, they were, in fact, presenting
3 themselves, in the act of changing their name to
4 an opposite sex first name, that was what my
5 sincerely-held beliefs would say is presenting
6 themselves as the opposite sex.
7 Q  From your view, that would be an instance of
8 effeminacy and therefor sinful?
9 A  That is correct.
10 Q  And is it fair to say that by addressing a
11 student by an effeminate first name, in your
12 view, you are also engaging in that person's
13 sin? Is that fair?
14 A  That's fair. I'm encouraging them in sin. I'm
15 encouraging them to sin.
16 Q  So, in that instance, it's not only --
17 A  Encouraging them to sin is sinful.
18 Q  So it's fair to say the sin in that instance is
19 twofold. First, it's the student adopting an
20 effeminate first name and you addressing the
21 student by that name is encouraging the student
22 to engage in that sin?
23 A  I think you're conflating things. What are you
24 saying the sin is twofold? My sincerely-held
25 religious beliefs and the whole point of why I

---

**Page 37**

1 didn't want to call them by a name that would
2 encourage transgenderism is because I would be
3 sinning by doing that. I would be sinning by
4 encouraging them in sin. Maybe that answers
5 your question, but the whole point of why I
6 can't in good conscience encourage someone in
7 effeminacy is because it would be sinful for me
8 to do that and that's why we arrived at the
9 last-name accommodation.
10 Q  Thank you. I think we're on the same page
11 there.
12 A  Okay.
13 Q  Let's go ahead and look at Exhibit D.
14 A  I'm trying to and I'm not able to. Is there a
15 problem?
16      MR. BORG: Rita?
17 Q  Go to Page 2 of Exhibit D.
18 A  Okay.
19 Q  Exhibit D are documents that you produced in
20 response to certain discovery requests from
21 Brownsburg as indicated in the Page 2 that we're
22 looking at. If you wouldn't mind, just look
23 through it and familiarize yourself with it.
24 A  Okay.
25 Q  Now, as I look at that --

---

Case 1:19-cv-02462-JMS-DLP   Document 120-3   Filed 03/15/21   Page 11 of 36 PageID #: 1250

JOHN M. KLUGE VS.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Case 1:24-cv-01942   Document 16   Filed 07/10/2024   Pages: 306

Page 38

1  A   Wait. I'm actually not done.
2  Q   Let me know when you're ready.
3  A   Thank you. Alright. I've familiarized myself
4      with the document, but, before I go on, I did
5      remember one thing, Brent, if you wouldn't mind
6      me going back to a previous document.
7  Q   Certainly.
8  A   This is Exhibit C where it's labeled Page 49 and
9      I think Paragraph 7 also helps to describe what
10     my sincerely-held religious beliefs are. And it
11     says "The proper conception of 'sexual identity'
12     is a matter of being and obeying the genetic sex
13     God made us, either male or female. Genetic sex
14     and sexual identity cannot be separated, and
15     they remain bound together throughout one's
16     life. Sexuality does not admit of gradations.
17     You are either male or female, not part male and
18     part female. Nor are there a great multitude of
19     sexual identities. There are only two, male and
20     female. Any attempt of a man to play the woman
21     or a woman to play the man violates God's
22     decree, attacks His created order, and
23     constitutes sin so serious that God himself
24     pronounces it an 'abomination'" in Deuteronomy
25     22:5 and 1 Corinthians 6:9-10 which I've already

Page 39

1      talked about.
2          So just wanted to also mention that.
3      That's also a good representation of me
4      believing that we're either male or female.
5  Q   Thank you for that.
6  A   Yep. So Exhibit D.
7  Q   I just want to understand what we're looking at
8      with Exhibit D. That looks to me like two
9      versions of the same document and specifically
10     what I see in the first version is that -- stay
11     on that page -- if you look at the upper
12     right-hand corner, that is dated April 7th,
13     2017.
14 A   Yep.
15 Q   And that first version is not signed at the end
16     whereas the second version removes that April 7,
17     2017 date and it appears to be signed at the end
18     by you and three others and I just ask that you
19     confirm you're looking at that the same way I
20     am.
21 A   Do you want me to tell you how this document
22     came about?
23 Q   Why don't we try it that way. Thank you.
24 A   Okay. So this document was important for me to
25     plead with Principal Daghe not to pursue

Page 40

1      encouraging transgenderism and forcing it on
2      teachers in our schools based on alarming
3      teaching we had been receiving at our faculty
4      meetings in January and then in February. And,
5      so, I drafted a letter to give to Principal
6      Daghe and then in May of 2017 I and three other
7      teachers met with Daghe to urge him not to
8      promote transgenderism in our schools.
9          The reason there is no date in the second
10     version of it is because I wasn't -- between the
11     time of us signing the document and us actually
12     being able to arrange a meeting with Daghe, I
13     didn't know exactly what date that would be.
14     So, it was signed between April 7th, 2017,
15     somewhere between that time and the time we
16     actually met in May of 2017, me, the three other
17     teachers, and Daghe in his office.
18 Q   Okay. Thank you for that context. Let me ask
19     you a couple more questions to clean up.
20 A   Yes.
21 Q   The first version of this Exhibit D that has the
22     April 7, 2017 at the top right, you drafted
23     that; is that correct?
24 A   That is correct.
25 Q   Okay. And did you present that to Mr. Daghe on

Page 41

1      or about April 7th of 2017?
2  A   No.
3  Q   Okay. The second version, that's your signature
4      first if you go to Kluge 109. Do you see in the
5      bottom right-hand corner how it's got a -- it's
6      called a Bates stamp. That's kind of like a
7      unique page number.
8  A   That is my signature.
9  Q   Okay. Who are the other signatures?
10 A   The other signatures are Kirk Young, Shara
11     Davis, and Rachel Jones.
12 Q   Who are they?
13 A   They were teachers at Brownsburg High School at
14     this time. I don't know what they're currently
15     doing.
16 Q   At that time what did each person teach?
17 A   I'm not entirely sure. I think a couple of them
18     were math teachers, one was a science teacher.
19 Q   Okay. And is this signed version what was
20     presented to Dr. Daghe?
21 A   Yes, this signed version is what was presented
22     to Dr. Daghe when we met in May of 2017.
23 Q   Okay. And during that meeting was there a
24     discussion among the five of you?
25 A   I read the letter out loud to Daghe and then

Case 1:19-cv-02462-JMS-DLP Document 120-3 Filed 03/15/21 Page 12 of 36 PageID #: 1251

JOHN M. KLUGE VS.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

**Page 42**

1 pleaded with him, as I say in the document, to
2 not pursue promoting transgenderism in our
3 schools. We urge them, yada, yada, yada. All
4 of these, we urge, we urge, we urge not to
5 require, pressure, suggest that teachers
6 encourage transgender students in their folly,
7 that we actually encourage them to discourage
8 it. It goes against -- well, you know the
9 contents of the document. So, yeah, we were
10 urging him not to promote transgenderism in the
11 schools.
12 Q  Do you think this meeting where you presented
13    the signed version of this document occurred in
14    approximately May of 2017?
15 A  Yes, it did.
16 Q  And you indicated that you read the document out
17    loud to Principal Daghe?
18 A  That's correct.
19 Q  What response did he provide, if anything?
20 A  He had -- I don't know exactly what he said
21    before this but near the end of the meeting he
22    asked -- well, he told us that "I," Bret Daghe,
23    "have been resisting pressure that I feel to
24    change names in our PowerSchool database. I've
25    been resisting that pressure thus far and

**Page 43**

1 keeping legal names in PowerSchool. Would you
2 like me to change the names to transgender
3 names? Would that solve your concerns?"
4    At that point the three other teachers
5 said, yes, that would resolve our concerns. I
6 was shocked that they did an about-face and I
7 said nothing. And then the meeting ended.
8    Minutes later I walked back into Bret
9 Daghe's office and I tell him, "Look, I know
10 that those other teachers said they would be
11 happy to have the transgender names in
12 PowerSchool and that would resolve their issues,
13 but if you've been able to resist the pressure
14 you feel to change names in PowerSchool and
15 you've been successfully keeping legal names in
16 PowerSchool, keep up the good work. Do that,
17 keep using legal names."
18    I left that meeting May of 2017 thinking
19 that Bret and I were on the same page, that he
20 would keep using legal names, we would not be
21 promoting transgenderism in our school. That's
22 how I left that day.
23 Q  Well, why do you say that? Did Dr. Daghe --
24 A  Because --
25 Q  Let me finish my question. I think you're

**Page 44**

1 anticipating. Thank you. I think you said
2 following the meeting with the teachers you came
3 back in and had a one-on-one meeting with
4 Dr. Daghe; correct?
5 A  That is correct.
6 Q  Okay. And you just testified about the concerns
7    you expressed with respect to keeping legal
8    names and not using transgender names; correct?
9 A  Correct.
10 Q  Okay. And what, if anything, did Mr. Daghe say
11    in response to that?
12 A  He acted and he said things like "Thank you,
13    John. I appreciate it."
14 Q  And, based on his response, what was your
15    thinking with respect to how Brownsburg High
16    School would proceed as far as student names
17    were concerned?
18 A  Based on his response, my understanding is that
19    they would continue to use legal names and that
20    we would not be promoting transgenderism in our
21    schools, we would stop teaching it in our
22    faculty meetings, and that he had heeded our
23    urging.
24 Q  Do you see down at the bottom right-hand corner
25    where it says Kluge 109?

**Page 45**

1 A  That's correct.
2 Q  Okay. That's a Bates stamp. It's just a unique
3    identifier. I may refer to documents --
4 A  Do you care if I grab a sweater or something?
5    Just the room I'm in is a little chilly.
6 Q  Certainly.
7 A  Okay. I will be right back. You can't see it
8    but I have a blanket now, so go ahead. Proceed.
9 Q  On the pages marked Kluge 108 and 109 there is
10    some numbered requests 1 to 12. Do you see
11    that?
12 A  I see that.
13 Q  Okay. And Requests 4 to 6 have to do with not
14    requiring teachers to use transgender students'
15    preferred pronoun; is that correct?
16 A  You said 4 through what?
17 Q  Requests 4 to 6.
18 A  4 to 6. Let me read them. Those Requests 4
19    through 6 do talk about preferred pronouns.
20 Q  Okay. And by preferred pronouns, we're talking
21    about if a biological female student wanted to
22    be referred by a masculine pronoun such as he,
23    him, or his, you were asking in those requests
24    that Brownsburg not require the teachers to do
25    that; is that correct?

**Page 46**

1 A   That's part of what we were asking for, yes.
2 Q   Okay.  Isn't it true that Brownsburg granted
3     that request for the 2017/2018 school year by
4     allowing teachers to use the name listed in
5     PowerSchool?
6 A   That's not correct.
7 Q   Okay.  Tell me your understanding of what the
8     PowerSchool database is.
9 A   The PowerSchool database is a database that
10    tells you information about students including
11    their name and grades, their parents' names,
12    their address, phone numbers.  I think you can
13    see maybe their discipline logs, maybe not.  I
14    don't remember.
15 Q   Okay.  Do you recall during the 2017/2018 school
16    year if PowerSchool would display a student's
17    biological sex?
18 A   I believe, yes, it had male or female listed by
19    the student.
20 Q   Okay.  And, to your knowledge, could you as a
21    teacher during the 2017/2018 school year enter
22    or change any information in PowerSchool?
23 A   No, you could not.
24 Q   Okay.  Is it more accurate to simply say that
25    you as a teacher during the 2017/2018 school

**Page 47**

1     year simply had access to the information?
2 A   As regards to student's name and sex, yes.
3 Q   Is it your understanding that at some point
4     during the 2017/2018 school year Brownsburg
5     allowed students to change the first name listed
6     in PowerSchool provided they had approval from
7     their health care provider and a parent?
8 A   That is my understanding.
9 Q   Going back to Exhibit D, did Bret Daghe or
10    anyone at Brownsburg discipline you for writing
11    this letter and providing it to him?
12 A   Are you referring -- you said the 2017/'18
13    school year?
14 Q   At any time.
15 A   I did not get disciplined for writing this
16    letter.  They did suspend me pending termination
17    later in July based on the beliefs given in this
18    letter.
19 Q   Right.  But, as far as this letter is concerned,
20    Bret Daghe or anybody else at Brownsburg didn't
21    discipline you for providing it to Bret, for
22    voicing your views, anything like that?
23 A   That's correct.
24 Q   Take a look at the next exhibit, Exhibit E.
25    These are two e-mails from Lori Mehrtens dated

**Page 48**

1     July 18th of 2017 regarding two transgender
2     students; correct?
3 A   Let me look at them.  What was your question
4     now?
5 Q   These appear to be e-mails from Lori Mehrtens
6     dated July 18th of 2017 regarding two
7     transgender students; correct?
8 A   Yes.
9 Q   Do you recall receiving these e-mails on or
10    around July 18th of 2017?
11 A   I do.
12 Q   That would have been nine days before the first
13    day of classes for the 2017/2018 school year;
14    does that sound correct?
15 A   The first day of classes in the 2017/2018 school
16    year was July 27, nine days later.
17 Q   Thank you.  Is it fair to say that these e-mails
18    made you start thinking about the last-name-only
19    accommodation?
20 A   Actually, no.  I hadn't thought of that
21    accommodation until I was told I was going to be
22    terminated.  And when I saw these e-mails, you
23    see in the first bullet point it says "Parents
24    are supportive and aware - Feel free to use 'he'
25    and 'Aidyn' when communicating."  I saw that and

**Page 49**

1     when I first received these e-mails I say I
2     thought Daghe and I had an understanding that we
3     were not gonna be doing this.  Where is this
4     coming from?  I was actually pretty shocked and
5     surprised that the school was starting to do
6     this.  I thought Bret and I had an understanding
7     we weren't going to be doing this, but when I
8     saw the words "Feel free to use 'he' and
9     'Aidyn'" and in the other page it says "Feel
10    free to use 'he' and 'Sylar' when
11    communicating," I did not take that as a command
12    as them directing me to do this.  It was a
13    suggestion in my eyes.
14       And, so, I said I don't know why the school
15    is moving in this direction but they say "feel
16    free."  It sounds like it's more of a do this if
17    you'd like to; don't do it if you don't want to.
18       And, so, when I saw these e-mails, I
19    planned to use students' legal names the first
20    day of classes.  I could go on in the timeline
21    but I think you'll probably ask some more
22    questions about that.
23 Q   We will.  So I just want to be clear.  So it's
24    fair to say from these e-mails they didn't first
25    make you start thinking about what eventually

Page 50

1  became the last-name-only accommodation.  Is
2  that fair?
3 A  That's correct.
4 Q  Okay.  Now go back when you were talking.  I
5  want to be clear.  I think you touched on it
6  before, but why did you have the understanding
7  from talking with Bret, I believe, in May of
8  2017 that Brownsburg High School is not gonna
9  require you to use transgender names?
10 A  Because when Bret and I met alone after the May
11  meeting with the three teachers, myself, and
12  Bret, in that meeting minutes afterward with
13  just Bret and myself when he had said previously
14  I've resisted this pressure to change names in
15  the PowerSchool database, he said that he had
16  resisted that pressure when we were meeting with
17  all of the teachers.  Then minutes later in this
18  individual meeting between Bret and I, I tell
19  him if you've been able to successfully resist,
20  good job, keep it up, keep doing legal names,
21  and he said, "Thank you, John.  I appreciate
22  it."  To me, that was thanks for the
23  encouragement, I will continue to resist.
24 Q  Thank you.  Going back to Exhibit E.  At the
25  time you received these e-mails, did you know

Page 51

1  either of the students?
2 A  At the time of receiving these e-mails I had
3  been an assisting teacher to their orchestra
4  teacher when they were in eighth grade.
5 Q  Okay.  And help me with what does it mean to be
6  an assisting teacher to the eighth grade
7  orchestra teacher?  Would you attend classes?
8  Would you attend other events, that sort of
9  thing?
10 A  I would attend classes, I would help the
11  students learn their music, and I would attend
12  the concerts and help them tune their
13  instruments, so I had met both Sucec and Haskett
14  before.
15  THE PLAINTIFF: Can we pause for lunch at
16  some point soon?
17  MR. BORG: Yeah.  What sounds good, guys,
18  30 to 45 minutes?
19  MR. CORK: Yeah, that's fine with me.
20  (A recess was taken.)
21 DIRECT EXAMINATION CONTINUING,
22  QUESTIONS BY BRENT R. BORG:
23 Q  We broke for about 30 minutes for lunch.
24  Mr. Kluge, I think you testified previously that
25  July 27, 2017 was the first day of school for

Page 52

1  the 2017/2018 school year; is that correct?
2 A  It was the first student day of school, correct.
3 Q  And I understand that on that day you had a
4  meeting or meetings with Principal Daghe and
5  Dr. Snapp; is that correct?
6 A  That's correct.  I originally went to Daghe in
7  the morning to tell him what my plan was.  I
8  received this e-mail that says "feel free" to
9  use transgender first names.  It says "feel
10  free."  I don't think that's an obligation.  I
11  don't think they're telling me to do it, so I
12  intend to use legal names when I start teaching
13  later in the day.
14  He says to me, "Hold on, John.  Wait in
15  your office.  I'm going to get in touch with
16  Snapp and see what we should do."
17  So then he calls me into his office later
18  that day, July 27, 2017, and in that meeting
19  between me, Daghe, and Snapp in Daghe's office
20  Snapp tells me, "You can't use legal names,
21  John."
22  And I tell him my sincerely-held religious
23  beliefs, that to use a transgender first name --
24  he tells me you have to use the transgender name
25  in PowerSchool.  And I say, "I can't do that.

Page 53

1  That's against my sincerely-held religious
2  beliefs."
3  And he says, "Well, then you have three
4  options.  You can either, one, comply and use
5  the transgender name in PowerSchool; two, you
6  can resign, say you were forced to resign; or
7  three, you'll be suspended pending termination."
8  That's the phrase he used.
9  And I told him, "I can't use the
10  transgender first name.  It's against my
11  conscience.  It's against my sincerely-held
12  religious beliefs."
13  So he said, "Fine, then say that you were
14  forced to resign."
15  And I said, "Well, I don't want to resign.
16  I want to continue teaching here and I want to
17  continue using legal names."
18  And he said, "You can't do that."
19  And I said, "I can't quit on the students,
20  so if I'm not gonna resign, if I'm going to be
21  terminated, you're gonna have to terminate me.
22  I'm not gonna quit on my students."
23  And he said, "So you want me to terminate
24  you?"
25  And I said, "No, I want you to continue

Page 54

1  letting me teach here and use legal names."
2      And he says, "Again, I can't do that."  So
3  we left that meeting with him saying, "Well, if
4  you're not gonna use transgender first names and
5  you're not gonna resign, then, John, I'm sorry
6  to say this, but you are suspended pending
7  termination."  And that's how we left that
8  meeting.
9  Q    Let me backtrack on that just to make sure I
10     have the sequence.
11 A    Yeah.
12 Q    You first met with just you and Principal Daghe
13     on July 27, 2017; correct?
14 A    Just me and Daghe, yes.
15 Q    Thank you.  And I think you said you
16     communicated to Principal Daghe that since the
17     e-mail you had received with respect to the
18     transgender student was permissive regarding
19     transgender first names, it was your intention
20     to use their legal name?  Is that fair?
21 A    Because the e-mail didn't mandate us using
22     transgender names, I intended to use legal
23     names.
24 Q    Okay.  Just so we're clear, what do you mean by
25     legal names?

Page 55

1  A    The name that's on their birth certificate, the
2      one that was stored on their birth records.
3  Q    Okay.  And what do you mean by transgender
4      names?
5  A    The opposite sex first name that they had
6      switched to that was not their legal name.
7  Q    And I think we established previously that there
8      was a process where a student, to use your
9      terms, could have their legal name changed to
10     their transgender name in PowerSchool; correct?
11 A    That's correct.
12 Q    And was it your understanding that as of July
13     27, 2017 the directive to high school teachers
14     was to use the name that was listed in
15     PowerSchool?
16 A    No, it was not a directive; it was a suggestion.
17 Q    Okay.  And then back to how events transpired in
18     July 27 of 2017.  The first initial meeting with
19     Principal Daghe ended by having him say hold on,
20     let me get Dr. Snapp and we'll be in touch
21     further?
22 A    That's correct.
23 Q    Okay.  What did you do in the interim?  Did you
24     teach classes or did you go home?  Did you take
25     a break?

Page 56

1  A    I didn't have classes until later in the day.
2      My first scheduled classes, I believe, were
3      supposed to be helping with the middle school
4      teacher.  They weren't my own students.  It was
5      just helping the other teacher and so I didn't
6      actually teach any students before meeting with
7      Snapp and Daghe later in the day or later that
8      morning.  I was just sitting in my office.
9  Q    Okay.  So you did not go help the middle school
10     teacher as planned?
11 A    I did not.  I just sat in my office.  I actually
12     did not even interface with any students.  I saw
13     Daghe and he told me to go to my office.  I went
14     in my office and then he calls me to the meeting
15     with him and Snapp and then I go to that
16     meeting.
17 Q    Okay.  And you described that meeting where I
18     think you said Principal Daghe communicated
19     these three options to you; correct?
20 A    No, Snapp presented those three options.
21 Q    Snapp presented those, okay.  And then what
22     happened after the meeting with you, Principal
23     Daghe, and Dr. Snapp?
24 A    Snapp had said, "John, you are suspended pending
25     termination.  Please go home and we can arrange

Page 57

1  to have you collect your things."  And, so, I
2  went home.
3      After that, my pastor got in touch with Jim
4  Snapp.  I don't know who called who.  In that
5  meeting I had told Jim Snapp who my pastor is.
6  He asked me who is my pastor and I told him.  So
7  those two talked on the phone after that July 27
8  meeting and my pastor asked Jim Snapp, "Jim,
9  could you at least give John over the weekend to
10 think about what to do and not terminate him?"
11     And Jim Snapp agreed to my pastor's
12 suggestion.  And, so, Jim agreed to give me
13 until Monday to decide what I was gonna do.
14 Q    Okay.  The conversation that occurred between
15     Dr. Snapp and your pastor, was that also July
16     27?
17 A    I believe it was.  It could have been the next
18     day.
19 Q    And you were not privy to that conversation;
20     correct?
21 A    I was not in that conversation if that's what
22     you mean.  What do you mean by privy?  He told
23     me he talked to Snapp.
24 Q    Privy is a bad word.  You didn't participate in
25     that conversation; correct?

---

Page 58

1 A   I did not participate in that conversation.
2 Q   You know about that conversation because the
3     information about it was relayed from your
4     pastor; correct?
5 A   That's correct.
6 Q   And then eventually at some point did your
7     pastor relay to you that Dr. Snapp had agreed
8     to, I guess, give you the weekend to think
9     things over?
10 A   That's correct.  After my pastor and Snapp got
11     off the phone, at some point between then and
12     the Monday meeting with Snapp and Gordon my
13     pastor relayed that I asked -- I, Dave Abu-Sara,
14     the pastor, asked Jim Snapp to give me the
15     weekend to think about things and Snapp has
16     agreed.
17 Q   Dr. Snapp testified in his deposition that he
18     had a one-on-one conversation with you on July
19     27, 2017.  Do you recall having a meeting with
20     him like that?
21 A   I do not.  It was Daghe, Snapp, and me.  Never
22     Snapp and me alone.
23 Q   Do you recall ever having a one-on-one with him
24     not necessarily July 27th but at some other time
25     around then?

---

Page 59

1 A   No, it was Daghe, Snapp, and me.  And then on
2     July 31 it (audio malfunction) --
3 Q   Mr. Kluge, I'm sorry, my screen froze up when
4     you started to say it was July 31.
5 A   So July 27 it was Snapp, Daghe, and myself.  And
6     then July 31 it was Snapp, Gordon, and myself.
7 Q   Okay.  But, as far as you recall around this
8     time, you never had a one-on-one conversation
9     with Dr. Snapp?
10 A   A one-on-one conversation?  Now, it could be
11     possible that someone left the room to go to the
12     bathroom during that three-hour meeting we had
13     on the 27th.
14 Q   Okay.
15 A   But the meeting was between three people.
16 Q   Well, let me tell you what he shared about this
17     conversation and maybe that will jog your
18     memory.  He described the conversation as
19     lasting more than an hour.
20 A   Nope.
21 Q   He described it as cordial.  Let me finish my
22     question and see if it refreshes your
23     recollection.  He described the conversation as
24     cordial and he said the conversation was focused
25     on religious beliefs.  Is that jogging your

---

Page 60

1     memory at all?
2 A   You know, what date did he say this occurred?
3 Q   He testified it occurred on July 27 of 2017.
4 A   That same exact day.  I have -- yeah, I have a
5     vague memory of talking to him privately about
6     religious topics.  I could not testify about
7     what day it was or what it was concerning.
8 Q   Well, let me ask you this.  Do you think it was
9     around this time at the start of classes for the
10     2017/2018 school year?
11 A   It's possible.
12 Q   One of the other things that Dr. Snapp testified
13     during this conversation -- and, again, I'm
14     sharing this with you to see if it refreshes
15     your recollection.
16 A   Uh-huh.
17 Q   He asked at one point during the conversation,
18     "What do you want me to do?" posing that
19     question to you.  And your response was to the
20     effect that you wanted him to fire you and then
21     go to the media and tell them that this was an
22     unjust law and he disagreed with it but that he
23     had to fire you anyway.  Do you recall having a
24     discussion with Dr. Snapp along those lines?
25 A   No.  What I recall is that when he asked me what

---

Page 61

1     I want him to do, I told him "I want you to keep
2     me employed and allow me to use legal names."
3 Q   Do you ever recall telling Dr. Snapp "I want you
4     to fire me" or anything like that?
5 A   Given the Hobson's choice of resign or be fired,
6     I told him "I won't quit on the students."  If
7     he's construing that I told him I want to be
8     terminated, that's a misrepresentation of what I
9     told him.  I always told him I want to work here
10     and I want you to allow me to use legal names.
11     That's what I was telling him before I presented
12     the option, the accommodation, and they agreed
13     to it.
14 Q   What else do you recall your pastor sharing with
15     you about the conversation he had with
16     Dr. Snapp?
17 A   That's all I recall.
18 Q   Who was your pastor at that time?
19 A   Pastor Dave Abu-Sara.
20 Q   And he's also the current pastor at Clearnote;
21     correct?
22 A   That's correct.
23       MR. BORG: Let's look at Exhibit F, Rita.
24 Q   If you could go to Page 2, Mr. Kluge.
25 A   There it is.

---

Page 62

1 Q    You recognize this document; correct?
2 A    I do recognize this document.
3 Q    Okay.  Is it fair to say that the outcome of the
4      discussions with Bret Daghe and Dr. Snapp on
5      July 27, 2017 resulted in Brownsburg agreeing to
6      two reasonable accommodations?
7 A    No, that's not a correct representation of the
8      July 2017 meeting.
9 Q    Okay.  What was the result of those meetings?
10 A    I was suspended pending termination as a result
11      of the July 27th, 2017 meeting.
12 Q    Okay.  Are you familiar with the statutes that a
13      school corporation has to follow to terminate a
14      teacher's employment?
15         MR. CORK: Objection.  Calls for a legal
16      conclusion.  You may answer if you can.
17 A    I don't have those committed to memory and I'm
18      not very familiar, no.
19 Q    Do you know that there are statutes that a
20      school corporation has to follow before it
21      terminates a teacher's employment?
22 A    I don't know what the word "statute" means in
23      terms of what you're talking about, so --
24 Q    A statute, Mr. Kluge, is a written law, in this
25      case a law passed by the Indiana General

Page 63

1      Assembly.  Do you think you ever reviewed a law
2      passed by the Indiana General Assembly that has
3      to do with the steps a school corporation has to
4      follow to terminate a teacher's employment?
5 A    No, I have not seen those.  I was just told I
6      was suspended pending termination.
7 Q    Okay.  But eventually there came a time where we
8      got to Exhibit F and what's discussed there;
9      correct?
10 A    This exhibit does exist.  What's your question?
11 Q    I guess my question is what is your
12      understanding from your perspective of how we
13      went to administrative leave pending termination
14      to this document that's depicted in Exhibit F?
15 A    So Snapp, Daghe, and I left our meeting, the
16      three of us, July 27th with the understanding
17      that they would not allow me to use legal names
18      and that I was suspended pending termination.
19         Over the weekend after carefully consider
20      what to do, I, on Monday, July 31, go to the
21      meeting where this document was presented to me.
22      I hadn't seen it before July 31.  And in that
23      meeting on July 31, it's Snapp and Gordon and
24      myself in the meeting.  Bret Daghe is not in the
25      meeting.  At that meeting on July 31 they give

Page 64

1      me this piece of paper.  It's the first time I
2      had seen this piece of paper and they say, "Do
3      you comply or will you not comply?  If you will
4      comply with this and use transgender first names
5      that are listed in PowerSchool, you can keep
6      your job.  If you will not comply, you are going
7      to be terminated.  What do you choose, John?"
8         And I said to them -- I offered at that
9      meeting on July 31 between Snapp and Gordon, I
10      said, "Well, can I use last name only like a gym
11      coach?  That way we cannot get into this issue
12      at all.  I can just teach my content and it will
13      be as if we're the orchestra team."
14         And Snapp looked at Gordon at that point in
15      the meeting and said, "Is this allowable?"  And
16      Gordon said, "Yeah, that's fine."
17         And Snapp then asked me, "Well, what would
18      you do if a student asked you outright 'Are you
19      using last names only because you think that
20      transgenderism is evil?'"
21         And I told Snapp at that point, "If a
22      student asks me that outright, I would say I'm
23      using last names only because we're a team,
24      we're an orchestra team, just like a sports
25      coach says, hey, Smith, hey, Jones.  We are one

Page 65

1      orchestra team working towards a common goal."
2         And, so, our understanding at that meeting
3      is that I would use last names only for all
4      students just like a sports coach, just like a
5      gym coach, and that's when they wrote in the
6      handwriting that I was allowed to address
7      students by last name only.
8 Q    Did you come up with that idea right on the spot
9      or had you been thinking about it?
10 A    I had thought about it over the weekend.
11 Q    What about the part at the bottom?  I believe
12      that's Jodi Gordon's handwriting.  It says, "In
13      addition, Angie Boyer will be responsible for
14      distributing uniforms to students."  What's that
15      about?
16 A    That was an accommodation for I'm not officially
17      in charge of the uniforms, Angie Boyer will be,
18      and, so, I'm not the one directly responsible
19      for giving a man's clothing item to a female
20      student.  And what that accommodation
21      accomplishes is (audio malfunction) officially
22      in charge.  The people who actually distribute
23      the uniforms is the orchestra uniform parent
24      helper.
25         And, so, after this meeting I'm given that

**Page 66**

1 accommodation that Angie Boyer will be
2 responsible for distributing uniforms to
3 students and I go to Angie Boyer and tell her,
4 "You are officially the one responsible for
5 distributing uniforms to students." And then I
6 tell the orchestra parent volunteers who
7 actually do the distributing that "Angie Boyer
8 is now in charge of you guys and responsible for
9 distributing uniforms. I'm no longer the one
10 officially in charge. You keep on doing your
11 work but Angie Boyer will be the one in charge
12 of you."
13 Q   Was all of that with respect to the uniform
14 accommodation proposed by you?
15 A   Yes.
16 Q   And it's fair to say that Brownsburg
17 administration agreed to allow you to address
18 students using last name only based on your
19 proposal; correct?
20 A   Yes, they agreed to that.
21 Q   And they also agreed to the uniform proposal
22 that you've just described?
23 A   Yes.
24 Q   And you signed this document and you dated it
25 July 31st, 2017?

**Page 67**

1 A   That's correct.
2 Q   You also checked the box there that says "Yes, I
3 will comply with this directive."
4 A   I checked the box that, yes, I will comply with
5 this directive to use -- yeah, and treat
6 students in the manner indicated on PowerSchool
7 with the understanding that I can use last names
8 only so that way I can still use the name in
9 PowerSchool but I'm only using the legal part of
10 their name, their last name.
11 Q   There's also a line there under Jodi Gordon's
12 first set of handwritten remarks. It says "You
13 are also directed to not attempt to counsel or
14 advise students on his/her lifestyle choices."
15 Was there any discussion about that part of this
16 document?
17 A   In that meeting?
18 Q   Yes.
19 A   Yes, they told me that and I agreed.
20 Q   Okay. Do you have any idea what that was about?
21 Were they saying there were student complaints
22 or concerns to that effect?
23 A   There were no student complaints to that effect.
24 Snapp said he did not want me telling
25 transgender students that they're choosing the

**Page 68**

1 wrong lifestyle. And that's why this last names
2 only, we're all on the same orchestra team,
3 that's why that accommodation worked so well.
4 It wasn't about sexuality as far as the students
5 were concerned. It was about creating team
6 identity as an orchestra class and that's what I
7 did tell my student if they ever asked me, "Hey,
8 why do we do last names only in your class?" I
9 told them, "Well, you know how on a sports team
10 you're all last names? Well, we're an orchestra
11 team. We're all working towards the same goal.
12 I want to foster that sense of community." And
13 they were satisfied with that answer.
14 Q   Let's focus on the I'm going to refer to it as
15 the last-name-only accommodation. Was it your
16 understanding that you would address students in
17 all of your classes by last name only as opposed
18 to just classes with a transgender student?
19 A   That was my understanding, all my classes last
20 name only.
21 Q   Was it your understanding that you would not use
22 honorifics at all when addressing students? And
23 by that I mean "Mr." followed by the last name
24 or "Ms." and followed by the last name?
25 A   Yes, that was my understanding.

**Page 69**

1 Q   Did you understand this last-name-only
2 accommodation to only concern working hours?
3 A   If any time I saw a student at school -- and I
4 never saw students outside of school -- I think
5 my understanding would have been that any time
6 I'm at school I'm doing this, whether it's after
7 school, during school, before school, and I
8 never saw any students outside of school.
9 Q   Okay. And, Mr. Kluge, for what it's worth, I
10 think when you lean back we're losing you in
11 audio, so if you could just keep that in mind.
12 A   Okay. That's fine.
13 Q   To drive that home, you didn't understand that
14 Brownsburg with respect to this last-name-only
15 accommodation was trying to dictate how you
16 addressed people outside the classroom or
17 outside working hours; correct?
18 A   Correct.
19 Q   Did you begin teaching classes following this
20 meeting with Dr. Snapp and Jodi Gordon on July
21 31st?
22 A   I believe that I started teaching classes that
23 very day, July 31, for the first time that
24 school year. I had not seen any students prior
25 to that during the school year. The first time

SA-277

Case 1:19-cv-02462-JMS-DLP    Document 120-3    Filed 03/15/21    Page 19 of 36 PageID #:
1258

JOHN M. KLUGE vs
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

## Page 70

1    I saw students in the 2017/'18 school year was
2    after this meeting.
3  Q  Okay.  And at that point in time after you had
4    concluded this meeting with Dr. Snapp and Jodi
5    Gordon, is it fair to say that Brownsburg's
6    administrators were working with you in good
7    faith to find accommodation for your
8    sincerely-held religious beliefs?
9  A  To say they were working with me to find an
10    accommodation, I think, is not representing it
11    correctly.  I presented this accommodation and
12    they agreed to it.  Does that answer your
13    question?
14  Q  It does.
15  A  They never gave the accommodation.  That was the
16    one I gave to them and they agreed to it.
17  Q  Okay.  And I'm just asking for your point of
18    view, but, again, at this point in time after
19    you concluded this meeting with Dr. Snapp and
20    Jodi Gordon, is it fair to say that Brownsburg
21    administrators did not harbor animosity toward
22    you based on your religious beliefs?
23  A  I think we had reached an agreement.  I don't
24    know what they were thinking in terms of how
25    they felt towards me.  That would be to know

## Page 71

1    what their thoughts were.
2  Q  Well, that's fair.  But, by the same token, up
3    to this point in time was there anything that
4    they said or did or made an outward
5    manifestation that you thought they were hostile
6    toward you based on your religious belief?
7  A  Yes, Snapp was very angry in the meeting on July
8    27.
9  Q  Anything else?
10  A  Not to my knowledge at this point.  I can't
11    remember anything particularly besides just the
12    -- hostile towards?  Can you say the question
13    again?
14  Q  Sure.  I think we're talking about whether you
15    believed at this point in time, again, the
16    conclusion of the meeting with Dr. Snapp and
17    Jodi Gordon on July 31st, whether there were any
18    outward manifestations, words, body language
19    from a Brownsburg administrator that made you
20    think they were hostile toward your religious
21    beliefs.
22  A  Oh, yeah.  I think the fact that they didn't
23    provide me -- that they were hesitant to provide
24    me with even this accommodation made me suspect
25    that they were hostile towards it.

## Page 72

1    When Dr. Snapp got the okay when he asked
2    Gordon, "I don't know.  What do you think about
3    this?" and Gordon said, "Yes, this is fine," his
4    hesitation would have been showing me that he's
5    hesitant to give me this accommodation, that
6    he's hostile towards my beliefs, yes.
7  Q  Anything else you can think of that made you
8    think Brownsburg or Brownsburg administrator
9    might be hostile toward your religious beliefs
10    at this time?
11  A  In the July 27 meeting just Snapp arguing with
12    me that my beliefs aren't what's in the Bible
13    and me explaining what my beliefs are and
14    bringing in scripture and him saying that I'm
15    wrong.  So, like, yeah, he was angry and he was
16    telling me that my beliefs weren't correct, so
17    that would have been hostile, I guess, too.
18  Q  So you did have a conversation --
19  A  That was the Snapp and Daghe meeting on July 27
20    that I'm talking about when he was angry and he
21    was saying that my beliefs are wrong.
22  Q  Okay.  Can you elaborate on that?  It sounds
23    like you're having a discussion along religious
24    lines.  Is he providing you with his reasoning
25    of why he thinks your beliefs are wrong?

## Page 73

1  A  He said why he thinks they're wrong and then I
2    would give a scripture of why I believe what I
3    believe.
4  Q  Do you recall what he said about why he thinks
5    that the belief was wrong?
6  A  I don't remember the particulars of it but just
7    that he was arguing that my beliefs were wrong.
8    If I remember anything, I'll let you know.
9  Q  Thank you.  Let's talk about you started to say,
10    as far as you recall, you resumed teaching
11    classes on July 31st of 2017; correct?
12  A  I believe so.
13  Q  Okay.  Forgive me.  There's a saying that, you
14    know, people who have graduated from high school
15    think they know everything about high school and
16    high school was half my life ago, so I'm
17    pleading ignorance, but I want to better
18    understand your teaching schedule during the
19    2017/2018 school year.  So maybe we could start
20    by just telling me what classes that you had in
21    a school day.
22  A  Sure.  I had three orchestra classes, a
23    beginning, an intermediate, and an advanced
24    orchestra.  I helped teach classes at the middle
25    school.  I helped the middle school teacher out.

Page 74

1     I also had a beginning music theory class and an
2 advanced placement music theory class, and some
3 semesters I would teach piano as well, piano
4 class.
5 Q   Did you teach piano during the 2017/2018 school
6 year?
7 A   I think so. I'd have to double check on that,
8 though.
9 Q   Okay. And then let's go through these one by
10 one. The orchestra, beginning, intermediate,
11 advanced, did you teach those during the
12 2017/2018 school year?
13 A   I did.
14 Q   The help at the middle school, I think you
15 testified already that you did that during the
16 2017/2018 school year; correct?
17 A   Correct.
18 Q   And the music theory and AP music theory, did
19 you teach those during the 2017/2018 school
20 year?
21 A   Correct.
22 Q   Was Brownsburg High School on semesters,
23 trimesters during the 2017/'18 school year?
24 Help me understand that.
25 A   They were on -- we had some classes that were

Page 75

1 one semester long and other classes that were an
2 entire school year long. Does that answer your
3 question?
4 Q   I think so. To the best of your recollection,
5 take me through your teaching schedule from
6 Monday to Friday.
7 A   I believe that I had the same classes each day
8 of the week to the best of my knowledge.
9 Q   And what's the progression from morning to
10 afternoon? I think you started to say that your
11 first classes might have been helping out at the
12 middle class?
13 A   I think so, yep.
14 Q   And then what would come next?
15 A   I don't recall. I think it even changed from
16 one semester to the next possibly, so half of
17 the year. I think they might have even switched
18 up the schedule, so I couldn't give you an
19 accurate account without looking back at my
20 schedule.
21 Q   That's fair. Let's talk a little more about the
22 orchestra classes, beginning, intermediate,
23 advanced. Did that level roughly correspond to
24 a student's age, freshman, sophomore, junior,
25 senior?

Page 76

1 A   The freshman class was the beginning. There's
2 all freshman and if you're not a freshman,
3 generally, you're not in that class.
4 Intermediate was comprised of 10th through 12th
5 graders and advanced was comprised of 10th
6 through 12th graders.
7 Q   With respect to the intermediate and advanced,
8 how was it determined which student would go
9 where? Would they just sign up based on what
10 level they perceive they're at or was there a
11 process where you helped determine which level
12 they were at?
13 A   Like the band, my program you auditioned in the
14 spring semester to get into the advanced
15 orchestra if you would like to be in the
16 advanced orchestra. If you make it past the
17 audition, then you're in. If you don't audition
18 or you don't have a good audition, then you're
19 in the intermediate orchestra.
20 Q   The two transgender students that we talked
21 about previously, Sucec and Willis, tell me all
22 the classes that you recall you taught them in
23 during the 2017/2018 school year.
24 A   Sucec was in my freshman orchestra. Willis was
25 not a transgender student according to the

Page 77

1 PowerSchool database until the end of September
2 2017 and then she was a transgender student at
3 that point and she was in my intermediate
4 orchestra.
5 Q   Approximately how large was each of your
6 orchestra classes?
7 A   About 30, maybe up to 40 students in each of
8 those orchestra classes.
9 Q   With respect to your orchestra classes, was
10 there a daily attendance or a roll call or
11 anything like that during the 2017/2018 school
12 year?
13 A   There was a daily attendance taken.
14 Q   How would that work?
15 A   On the first day I was in my classes, this would
16 have been July 31 of 2017, I called the students
17 one by one through the name of the alphabet
18 using last name only. I did not give an
19 explanation why I was doing it. I didn't draw
20 attention to myself as I was doing it. I just
21 started saying their names last name only. In
22 order to take attendance they would say "here"
23 or they wouldn't say anything if they were
24 absent.
25     And then later on in the school year, as I

Page 78

1  had a seating chart, I would just look to see
2  who was here and who wasn't.  I didn't need to
3  call their names anymore.
4  Q
5  Q   Okay.  So it's fair to say you did, I guess, a
6  roll call, for lack of a better term, the first
7  day; is that correct?
8  A   That's correct.
9  Q   And then do you think you did roll call for the
10  orchestra classes further or you just based
11  attendance on a seating chart?
12  A   I know that once I had a proper seating chart I
13  would just look and see who was there.  I don't
14  know if it was one day or two days that I did
15  roll call.
16  Q   Did you use a similar process in your other
17  classes, essentially starting with roll call and
18  then working toward a seating chart?
19  A   Exact same process.  Last name only in all my
20  classes.
21  Q   And other than the last name only, did this roll
22  call/seating chart, was that consistent in prior
23  years that you taught as well?
24  A   Say that question again.
25  Q   Yeah, it's poorly worded.  In prior years did

Page 79

1  you have a similar process for your classes,
2  namely you would start with roll call and then
3  eventually use a seating chart?
4  A   That's correct.
5  Q   The only difference being in prior years you
6  didn't have the last-name-only accommodation;
7  correct?
8  A   That's correct.
9  Q   During the 2017/2018 school year did anyone
10  other than a Brownsburg administrator ever make
11  you aware that parents or students had
12  complained about your use of last name only when
13  addressing students?
14  A   The Brownsburg administrators didn't tell me
15  that parents had complained about my use of last
16  name only.  The only time I was told that anyone
17  was complaining was they said students were
18  complaining and teachers were complaining that I
19  was using last name only.
20  Q   Okay.  Let me break that down further then.
21  A   Yep.
22  Q   During the 2017/2018 school year did anyone
23  other than a Brownsburg administrator ever make
24  you aware that students had complained about
25  your use of last name only when addressing

Page 80

1  students?
2       MR. CORK:  Object to the form of the
3  question.  It's misleading.  You may answer if
4  you understand it.
5  A   Can you repeat the question?
6       MR. BORG:  Repeat the question, Brandy.
7       (The reporter read back the previous
8  question.)
9       MR. CORK:  Object to the form.  Assumes
10  facts not in evidence.
11  A   What I'll tell you is that in December of 2017
12  Daghe told me that students were complaining
13  that I was using last name only and I asked him
14  who, "Who is complaining?"  And he didn't tell
15  me who.  He just said, "Students."
16       MR. BORG:  Okay.  We might come back to
17  that.  Let's pull up Exhibit G, Rita.
18  Q   Exhibit G is an eight-page document.  At the top
19  on Page 2 it says "To:  Brownsburg School
20  Corporation HR Director Jodi Gordon; From:  John
21  Kluge; Date:  Friday, May 25, 2018."
22       Mr. Kluge, are you familiar with this
23  document?
24  A   Let me look at it.
25  Q   Certainly.

Page 81

1  A   I am familiar with it.
2  Q   And you signed that at the last page; correct?
3  A   That is my signature.  I did sign it.
4  Q   Okay.  And then below your signature -- stay on
5  that page, please.  So you think you, in fact,
6  submitted that to Jodi Gordon on Friday, May
7  25th of 2018?
8  A   Yes, I did and the time stamp gives the exact
9  time that I submitted it.
10  Q   You prepared this document?
11  A   What did you say?
12  Q   You prepared this document?
13  A   That's right.
14  Q   And is it fair to say that in this document you
15  request two things, first, that Brownsburg allow
16  you to withdraw your resignation; and, second,
17  that they allow you to continue the
18  last-name-only accommodation?
19  A   I requested "that the school corporation
20  continue my employment and maintain the present
21  Accommodation that will allow me to continue to
22  perform my work, which I hope that you will
23  agree has brought positive recognition and
24  favorable results to the school."
25       Where are you seeing my requests?  It's my

SA-280

**Page 82**

1 understanding -- Gordon led me to believe that I
2 was able to rescind that conditional resignation
3 on the condition that once May 29 hit it would
4 be submitted and processed but before that date
5 it was my right and it was the condition that I
6 could take that letter off of her desk. So I
7 wasn't --
8 Q   You were requesting; right?
9 A   Yeah. I was stating that I have decided thank
10 you for this time to let me think about this, I
11 have decided not to resign, you can take that
12 letter and put it in the trash effectively.
13 Q   And that's why, I guess, the title, for lack of
14 a better term, at the top of Page 1 says
15 Withdrawal of Intention to Resign and Request
16 for Continuation of Accommodation; correct?
17 A   That's correct.
18 Q   The accommodation you're referring to in that
19 title, for lack of a better term, is the
20 last-name-only accommodation; correct?
21 A   That is correct.
22 Q   Okay. And in this document you also provide a
23 timeline of some of the events that transpired
24 dating back as far as the 2016/2017 school year;
25 is that correct?

**Page 83**

1 A   That is correct.
2 Q   Look at the entry, the bullet point entry, for
3 December 13th of 2017.
4 A   December, okay. So it continues to the next
5 page. I'm there.
6 Q   Do you see the first paragraph of that -- well,
7 let's be clear. That December 13, 2017 bullet
8 point is, I believe, three paragraphs. Will you
9 flip to the next page?
10 A   It looks like it's four.
11 Q   Four. I do think it's four paragraphs. The
12 first paragraph, I think you started to testify,
13 are you describing the first time Daghe
14 referenced student complaints with respect to
15 the last-name-only accommodation?
16 A   Let me look at that entry.
17 Q   Take your time to read it.
18 A   Thank you. Okay. I read that entry, December
19 13, 2017. Go ahead, Brent.
20 Q   Okay. Is that first paragraph on the December
21 13, 2017 an accurate report of what Bret Daghe
22 conveyed to you regarding student and faculty
23 concerns?
24 A   Faculty concerns, yes, it's what he told me,
25 yep.

**Page 84**

1 Q   That's an accurate report of what he told you
2 when the two of you met on December 13th, 2017?
3 A   Yes, that is what he told me.
4 Q   Okay. In the first paragraph you state that
5 Daghe told "me that my last-name-only
6 Accommodation was creating tension in the
7 students and faculty." Do you see that?
8 A   Yes.
9 Q   Is it fair to say that this meeting was the
10 first time you heard that there were concerns
11 amongst students and faculty about the
12 last-name-only accommodation?
13 A   This is the first time that I had heard any
14 complaints about my last-name-only
15 accommodation.
16 Q   Okay. Up to this point you hadn't heard
17 complaints from anyone; correct?
18 A   Correct.
19 Q   What is the second paragraph referencing or
20 about?
21 A   So this is not about my last-name-only
22 accommodation. This second paragraph is Daghe
23 trying to blame my religion as the reason why a
24 student's parent complained about a policy for a
25 hair color that everybody else in my music

**Page 85**

1 department had. They had the same exact hair
2 color policy. I wasn't doing anything
3 differently for this particular student than I
4 was for my other students and I wasn't doing
5 anything as regard to this policy different than
6 any of the other teachers in my department and
7 Daghe was telling me that it's because of my
8 religion. He's blaming my religion on why
9 parents complained about a hair color policy for
10 the entire music department.
11 Q   Okay. Is it fair to say in that second
12 paragraph he's referencing a parent complaint
13 that is not related to the last-name-only
14 accommodation; correct?
15 A   That's correct.
16 Q   Okay. Go to the next page. What's that, I
17 guess, third paragraph that's a single sentence
18 at the top referring to?
19 A   The same hair color policy.
20 Q   Which, again, is, as far as you're concerned,
21 unrelated to the last-name-only accommodation;
22 correct?
23 A   Unrelated, correct.
24 Q   Thank you. And then the last paragraph, we'll
25 get into it, but you provide some detail on how

---

Page 86

1    you responded to Principal Daghe making you
2    aware of these situations?
3 A   Yes.
4 Q   Okay.  Is there anything else you recall about
5    this meeting with Bret Daghe from December 13th,
6    2017 that's not included in this document?
7 A   Just that when I asked him who is complaining
8    against me, what's their complaint, he just said
9    you using last names only for all your students
10    is creating complaints among many students.  And
11    I asked him who and he didn't tell me any names
12    and I didn't hear any names for that meeting or
13    subsequent meetings with the administration.
14    They didn't tell me who, they didn't give me any
15    name.  Go ahead.
16 Q   Did Principal Daghe explain to you why he wasn't
17    providing specific names?
18 A   He didn't.  He just said a lot of people.
19 Q   Up to this point how would you describe your
20    professional relationship with Bret Daghe?
21 A   Up to this point we had an okay working
22    relationship until he decided to be forcing me
23    out of my job and then our relationship declined
24    at that point.
25 Q   As you sit here today, do you think Bret Daghe

Page 87

1    is an honest person?
2 A   Based on things that I have seen come out of the
3    lawsuit, I think there are things that are being
4    misconstrued or fabricated from multiple parties
5    in the administration.
6 Q   And does that have any bearing on whether or not
7    you think he's an honest person?
8 A   If someone is dishonest, then they're not an
9    honest person.
10 Q   I would agree with that.  I think I'll ask it
11    again because you haven't responded.  As you sit
12    here today, do you think Bret Daghe is an honest
13    person?
14 A   The reason I'm -- I'd like to say no, he's not
15    an honest person if he was saying things that
16    are untrue and I'll be talking later about
17    things that are untrue, so I can't bring up
18    every little detail of things that were
19    misconstrued.  If I say he's an honest person,
20    that's a blanket statement that I think that
21    what he's saying is true and you're gonna use
22    that against me, so I'm not gonna say he's an
23    honest person.  I will say that there are
24    certain things coming from multiple people in
25    the administration that are not true and I'll

Page 88

1    leave it at that.
2 Q   That first paragraph on the December 13th bullet
3    point.
4 A   Yep, go ahead.
5 Q   When Bret Daghe shared that information with you
6    about student and faculty concerns, did you
7    think he was lying and making it up?
8 A   I suspected.  That's why I asked who and he
9    didn't tell me who.  I did not witness any
10    faculty animosity toward me.  I was still eating
11    lunch with my music faculty and we seemed to get
12    along great.  I rarely interacted with any other
13    faculty besides the performing arts faculty, so
14    nothing seemed out of the ordinary.  And, so,
15    regarding the faculty, I didn't witness anybody
16    avoiding me.  And, regarding the students, he
17    didn't tell me any names even when I asked him,
18    so I suspected that this seems fishy.
19 Q   As you sit here today, do you think he was lying
20    or making up the information --
21 A   I do.
22 Q   What specifically do you think he lied about or
23    made up?
24 A   I think the student complaints.  He continually
25    told me in that meeting that he had received

Page 89

1    student complaints.  He said there were lots of
2    students and yet I haven't seen things produced
3    that show that there were lots of students
4    complaining.  I think there's been evidence of
5    one student complaining maybe.  So, as far as
6    I'm concerned, if he's not giving names, then he
7    could have been fabricating, could have been
8    misinformed himself, or it could have been
9    exaggerating.  I don't know.
10 Q   Other than him not providing you the names at
11    the time you met, is there anything else that
12    leads you to believe that he was lying or making
13    things up with respect to student complaints?
14 A   Well, he says that it's creating tension in the
15    students and faculty.  I did not witness this
16    tension.  My classes were performing very well
17    during that school year.  The students were
18    responding well to my teaching.  I didn't see
19    animosity from students towards me, and, so, to
20    say that there was tension, I didn't experience
21    that myself.
22    We performed better than ever in our
23    orchestra competitions.  Students' grades on
24    their AP exam were great.  There was a lot of
25    participation in the extracurricular programs, a

Page 90

1    lot of students performing in the voluntary
2    extra stuff that you can do in orchestra.  So,
3    yeah, that was suspect, too, the fact that it
4    wasn't my experience of this tension.
5 Q   Flip to the next page to the fourth paragraph on
6    this December 13th meeting.  I think we started
7    and as far as we got is that this paragraph
8    reports, I guess, your response to Daghe during
9    this meeting; is that fair?
10 A   It's my response to the hair color paragraph,
11    that if it's true, Daghe, that I'm being singled
12    out for my religion, then I guess that's a
13    positive that -- the fact that I'm pushing for
14    equal treatment of all students and not pushing
15    an agenda.  And he says I'm being singled out
16    for my Christian witness.  Well, that's a sign
17    that I should continue to endeavor to keep
18    calling all my students by the same treatment,
19    the same last name only, and it's working.  It
20    was a sign to me that I should not give up, that
21    I should continue treating all my students
22    equally.
23 Q   The first sentence says, "I explained to Daghe
24    that this persecution and unfair treatment I was
25    undergoing was a sign that my faith as witnessed

Page 91

1    by my using last-names-only to remain neutral
2    was not coming back void, but was being
3    effective."  What do you mean by that?
4 A   If I'm endeavoring to be fair and I'm having
5    false accusations railed against me, well, then
6    I should keep on endeavoring to be fair.  That's
7    what that means.  If I'm trying to remain
8    neutral on an issue and I'm being attacked,
9    well, that's a sign that I should keep on
10    endeavoring to be neutral.
11 Q   Then you say, "He didn't seem to understand why
12    I was encouraged."  What do you mean by that?
13 A   He didn't understand why I would continue -- why
14    I was encouraged to continue pursuing neutrality
15    with last name only.  If there was people
16    complaining about hair color policy while they
17    didn't complain about other teachers for the
18    hair color policy, he saw that as unfair
19    treatment of me.  And if it was unfair treatment
20    of me, then that's a sign that I should continue
21    pursuing neutrality and I shouldn't give up this
22    work.
23        As I say in the last sentence there or the
24    second to last sentence, "He said he thought it
25    might be good for me to resign at the end of the

Page 92

1    year."  That's what I'm talking about.  He
2    thought, "Oh, John, you're being singled out
3    even though your policies are the same as other
4    teachers.  You should quit."
5        I said, "No, if I'm being singled out, it's
6    a sign that I shouldn't give up pursuing
7    neutrality with last names only."
8 Q   Are you using the phrase "pursuing neutrality,"
9    that's in reference to the last-name-only
10    policy?
11 A   Right.  I'm not pushing my religion on people
12    and I'm not encouraging the sinful behavior of
13    my students.  I'm neutral.  Last name only, I'm
14    able to teach my content without conceding my
15    own beliefs and without (audio malfunction) my
16    beliefs on others.
17 Q   During the December 17th, 2017 meeting with
18    Daghe, did you propose any further
19    accommodation?
20 A   Why would I?  The accommodation was working and
21    he didn't tell me -- he didn't tell me that I
22    would be needing any other one.  Why would I
23    need another accommodation if I already had an
24    accommodation for my beliefs that was working?
25 Q   Well, correct me if I'm wrong, but I think he's

Page 93

1    relaying to you that there's some
2    student/faculty concerns with respect to the
3    last-name-only accommodation; correct?
4 A   He's telling me that there are student and
5    faculty complaints, a heckler's veto, but the
6    law says that unless there's undue hardship
7    shown, which none was shown, that an employee is
8    entitled to a reasonable accommodation and it
9    was reasonable, so there is no reason to need
10    another accommodation.  This one was reasonable
11    and he didn't show me -- I got no written
12    document showing any undue hardship, so it was a
13    valid accommodation that worked.  It was
14    reasonable and so why would I pursue something
15    else?
16 Q   Okay.  In light of the student and faculty
17    concerns that Daghe had shared on December 13th,
18    2017, you thought it was appropriate to continue
19    the last-name-only accommodation?
20 A   You say concerns; he said creating tension.
21 Q   Tension, concern, complaint, issues among
22    student and faculty.
23 A   Yes, it was appropriate to continue using
24    last-name-only accommodation, yes.
25 Q   And I guess my question is how do you reconcile

SA-283

Case 1:19-cv-02462-JMS-DLP   Document 120-3   Filed 03/15/21   Page 25 of 36 PageID #:
1264

JOHN M. KLUGE vs.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

---

**Page 94**

1     that with the fact that he is sharing that there
2     are student/faculty tension, complaint, concern,
3     et cetera?
4  A   That's not undue hardship.  It's a reasonable
5     accommodation.  He showed me no undue hardship.
6     It's a heckler's veto.  And he didn't even
7     identify any names of who was complaining.  For
8     all I knew, he could be making it up.
9          Let's say that a teacher had some other
10    accommodation, they take off for a Hindu holiday
11    and a student complains.  Is that accommodation
12    for them taking off work for that Hindu holiday
13    now unreasonable?  No, that's a heckler's veto.
14    So, if it's a reasonable accommodation and he
15    hasn't shown undue hardship, why would I change?
16  Q   Do you think he was required to tell you the
17    names of the student and faculty for it to
18    potentially be undue hardship in your view?
19  A   I think so, yes.
20  Q   That would have been a start for continuing the
21    discussion, I guess?
22  A   I don't think it would have been undue hardship
23    in itself.  It would have been a complaint.  He
24    would've had to show a hardship that this is
25    not reasonable.

**Page 95**

1  Q   The next meeting you reference in this document
2    is between you and Daghe on January 17th, 2018.
3    Do you see where you state that Daghe wanted to
4    see you resign at the end of the school year?
5  A   Let me read it.
6  Q   Fair enough.
7  A   Okay.  I've read it.  Go ahead.
8  Q   Again, the reference where you state Daghe
9    wanted to see you resign at the end of the
10    school year, do you see that?
11  A   "He really wanted to see me resign at the end of
12    this school year," yes, I see that.
13  Q   Okay.  To your knowledge, is that because of the
14    student and faculty concerns about the
15    last-name-only policy?
16  A   Yes, because of the complaints he alleged he had
17    received.
18  Q   You go on in the January 17 bullet point.  You
19    state that you responded and referenced "tension
20    and conflict."  Do you see that?
21  A   "He didn't like the tension and conflict," I see
22    that.
23  Q   What tension and conflict are you referring to?
24  A   The purported tension and conflict that he
25    claimed there was.  It was not that I really

**Page 96**

1     witnessed this.  I'm just hearing it from him
2     and I'm telling him if there is tension and
3     conflict, well, that's encouragement that I
4     shouldn't quit but I should continue to pursue
5     neutrality.
6          MR. BORG: Let's take a break.
7          (A recess was taken.)
8  DIRECT EXAMINATION CONTINUING,
9     QUESTIONS BY BRENT R. BORG:
10  Q   Mr. Kluge, let's stay on Exhibit F, I believe.
11  A   Wait a second.  That's Exhibit G.
12  Q   It's G.  I'm mistaken.
13  A   Okay.  Go ahead.
14  Q   Let's go to the next page.  There should be a
15    bullet point for a meeting on February 6th of
16    2018.
17  A   Okay.  I see it.
18  Q   That references a meeting you had on the date
19    indicated with Bret Daghe and Jodi Gordon;
20    correct?
21  A   That's correct.  Can I read that first?
22  Q   Certainly.  Let me know when you're ready for
23    the question.
24  A   Alright.  Go ahead, Brent.
25  Q   You audio recorded this meeting with Bret Daghe

**Page 97**

1     and Jodi Gordon on February 6th of 2018; is that
2     correct?
3  A   That's correct.
4  Q   Did you tell Bret and Jodi that you were
5    recording the meeting?
6  A   I did not.
7  Q   Why not?
8  A   Because I was afraid of them.  In the January
9    '17 meeting Daghe is telling me that he didn't
10    say it plainly enough but he really wants me to
11    resign at the end of this school year.  I took
12    that as hostile.  It was distressing to hear my
13    administrator say he wants me out of here, and I
14    did not trust him.  I did not trust my HR
15    director and I was afraid.  It was mentally and
16    emotionally distressing and I didn't trust them.
17    That's why I didn't tell them I was recording
18    it.  I wanted some protection from them in case
19    they lied about what they were telling me.
20  Q   And you also audio recorded another meeting with
21    Daghe and Gordon in March of 2018; is that
22    correct?
23  A   That's correct.
24  Q   Why didn't you record --
25  A   Can you say that last question?  The March 15

Page 98

1  was that Gordon and myself.  Is that what you
2  said?
3 Q   No.  I'll rephrase.  So the March 15, 2018 is
4   the meeting that you audio recorded?
5 A   I did and it was just Gordon and myself.
6 Q   Thank you.  And I think I previously stated that
7   I thought Daghe was in that meeting but you're
8   saying he was not?
9 A   He was not.  On February 6th it's Jodi Gordon,
10   Daghe, and myself, and then on March 15th it's
11   just Gordon and myself.
12 Q   Why didn't you audio record the prior meetings
13   with Daghe, specifically December 13th of 2017
14   and January 17 of 2018?
15 A   Because there was no reason to.  I thought
16   things were -- I thought that they weren't going
17   to -- I wasn't afraid of them to be lying about
18   me and to be discriminating against me, but when
19   I heard that Daghe really wanted me to resign at
20   the end of the school year and then when I hear
21   on January 22 that the school district is not
22   going to allow a last-name-only approach from
23   teachers starting the 2018/'19 school year,
24   which I say is discrimination, when I see these
25   things, my administrator hostilely telling me

Page 99

1   that he wants me gone and a faculty meeting
2   where they're telling me teachers are not going
3   to be allowed to use last name only starting
4   next school year 2018/'19, I'm feeling
5   threatened.  I didn't feel threatened before
6   these meetings and so that's why I didn't record
7   them.  I didn't think they were out to get me
8   like they were.
9 Q   I think you already said it, but, to be clear,
10   during the, for example, February 6, 2018
11   meeting, did Gordon and Daghe inform you that
12   you could continue using the last-name-only
13   accommodation until the end of the current
14   school year but after that it would no longer be
15   available?
16 A   That was all of -- that was what they told me.
17 Q   At the February 6, 2018 meeting?
18 A   Yes.
19 Q   Was it also reiterated at the February 6, 2018
20   meeting that students had complained about the
21   last-name-only accommodation?
22 A   They, again, purported that students were
23   complaining and they still didn't identify
24   anybody.
25 Q   Similar nature to what Daghe had shared with you

Page 100

1   on December 17th of 2017?
2 A   That's correct.
3 Q   And they also gave you three options at the
4   February 6, 2018 meeting.  Namely those three
5   were, first, resign; second, continue to use the
6   last-name-only accommodation in which case
7   Brownsburg would initiate termination
8   procedures; or, third, stop using the last-name
9   only-accommodation.  Is that a fair
10   characterization of the options?
11 A   Yeah, they told me either in 2018/'19 school
12   year start using transgender first names or
13   resign, except they didn't say resign.  They
14   said -- they misconstrued material information.
15   They didn't tell me resign.  They said the
16   option was I could give to Jodi a conditional
17   resignation that wouldn't be processed until a
18   date I specified, that she had done that in the
19   past, that she had held onto resignations and
20   not processed them before and she would honor
21   any such requests.
22     And, so, the ultimatum was either comply in
23   the 2018/'19 school year and agree to do it
24   right now, agree that you will comply in the
25   2018/'19 school year or be fired or give me a

Page 101

1   piece of paper that won't be processed until a
2   date you specify.  You have until that time to
3   think about it but I want the piece of paper on
4   my desk, effectively.  And she clarifies in
5   March meeting what that looks like and she
6   specifies in the February meeting and the March
7   meeting that I will be paid over the summer if
8   you give me this conditional resignation.
9     She leads me to believe that I am allowed
10   to do this but then later doesn't honor it.  And
11   she says if you don't give me this conditional
12   resignation, then you will be fired May 1st of
13   2018.  And that's in my e-mail to her where I
14   tell her the conditional resignation letter, I
15   say do not process this or show it to any
16   administrator until May 29.  And, so, it's my
17   understanding she's not going to submit it to
18   Dr. Snapp as a resignation letter until May 29
19   and I have until then to be able to take it off
20   her desk and say, actually, no, I've decided to
21   continue teaching.
22     Instead of that, on May 25 when I give her
23   this rescission of intent to resign letter to
24   take that resignation letter off her desk saying
25   thank you for the time you've given me to think

Case 1:19-cv-02462-JMS-DLP   Document 120-3   Filed 03/15/21   Page 27 of 36 PageID #:
1266

JOHN M. KLUGE VS.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

**Page 102**

1 about this, instead of honoring that request
2 which she said I will honor, I won't process it,
3 I won't show it to any administrator, instead of
4 honoring that request where she led me to
5 believe that she would honor it, she instead
6 processes this conditional resignation as if it
7 was given unconditionally.  She submits it to
8 Snapp and, therefore, she's mischaracterizing or
9 misrepresenting material information, that she
10 did not intend to actually allow me to have a
11 conditional resignation, the condition being I
12 could take it off her desk before May 29.
13 Q    We'll get to that in a moment, but thank you for
14       that.
15 A    Yep.
16 Q    Was it your understanding around the time of
17       February or March that there was a process to go
18       through to terminate your employment as a
19       teacher as opposed to just saying you're fired
20       and that's it?
21 A    Yes.  She said in the February and March
22       meetings that my termination process would begin
23       May 1 and would be finished when the school year
24       ended and it would be a contract cancellation
25       and if I gave them a resignation letter, then I

**Page 103**

1 would be paid over the summer.
2 Q    Did you understand that that termination process
3       included a hearing before the board?
4 A    I did not understand that.
5 Q    Did you understand that that termination process
6       had a right to present evidence?
7 A    I did not.
8 Q    Did you understand that that termination process
9       gave ultimate discretion to the board to decide
10       whether or not to cancel your employment?
11 A    I did not.
12 Q    And I think previously you testified that you
13       haven't consulted with laws passed by the
14       Indiana General Assembly that pertain to teacher
15       termination; correct?
16 A    Right.  I was trusting what she said was what
17       would happen.
18       MR. BORG: Let's go to Exhibit H, Rita.
19 A    First, Brent, when you say I would have a right
20       to present material information or whatnot to
21       state my case, no, I was not aware of that.  I
22       might have been aware that the board would
23       approve the termination.  I don't know or not.
24 Q    You don't know one way or the other?
25 A    Yeah, I don't know if I was aware of that or

**Page 104**

1 not.  It wasn't significant in my mind.  I
2 thought that termination was termination and
3 they were going to process it.  It was just an
4 administrative type deal that was going to
5 happen, if that makes sense, that I wasn't
6 (audio malfunction) to present evidence.  Does
7 that make sense?
8 Q    It does.  Let's go to H.
9 A    H, okay.
10 Q    And I think you're kind of anticipating my next
11       question, but, just so we're clear, this is a --
12       I don't want to put words in your pain.  I know
13       you're laying pains -- a conditional resignation
14       you submitted via e-mail to Jodi Gordon dated
15       April 30 of 2018; correct?
16 A    Yes.
17 Q    Why did you opt to send this e-mail to Jodi
18       Gordon as opposed to the other option of
19       termination?
20 A    I have a family to feed and to be terminated
21       before the school year is out and to lose my job
22       and to not get paid was effectively putting a
23       gun to my head and saying if you want to get
24       paid, you have to put this piece of paper on my
25       desk.  You have to give me this conditional

**Page 105**

1 resignation.  You have until a date that you
2 specify to make your final decision but I need
3 this paper sitting on my desk if you want to get
4 paid and not be terminated before the school
5 year is up.
6 Q    On Exhibit H, look at the first sentence of the
7       last paragraph.
8 A    Yep.
9 Q    You write, "Please do not process this letter
10       nor notify anyone, including any administration,
11       about its contents before May 29, 2018."  What
12       did you mean by "Please do not process"?
13 A    Don't submit it as a letter of resignation,
14       don't give it to Snapp.  This is not me
15       resigning.  This is a piece of paper on your
16       desk and if I decide before that time that I've
17       made my final decision to continue employment
18       here, you can take that piece of paper off your
19       desk.
20 Q    Submit it to whom?
21 A    To Snapp.
22 Q    Okay.
23 A    That's why I say "including any administration."
24       Snapp is the head administrator.  If it gets to
25       him and it's submitted to him, that's submitted,

JOHN M. KLUGE vs.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 106

1 but if it's a piece of paper laying on her desk
2 that can be thrown away, that's not submitted.
3 Q  In your prior communication with Jodi Gordon,
4 did she explain to you that she would have to
5 share a resignation with Bret and Dr. Snapp?
6 A  She did not share that she would have to.  She
7 said that she would honor any requests and, on
8 the contrary, when I asked her not to show this
9 to anybody including any administrator, she
10 agreed to that.  So, if she was never intending
11 to acquiesce that request, then she should have
12 said so, but she agreed to not show it to any
13 administration.  So, if she intended fully on
14 showing it to the administration, then she was
15 lying and misrepresenting what she was going to
16 do with this conditional letter.
17 Q  Do you recall that Jodi Gordon replied to this
18 e-mail?
19 A  I do recall that.
20 Q  And do you recall that her reply included a
21 reference that she would not show the e-mail to
22 any BHS administrator?
23 A  Yes, and as part of not showing it to any
24 administration, she agreed to my request and
25 also said I won't process this and show it to

Page 107

1 any BHS administration, but she agreed to my
2 request which says "any administration."
3 Q  Well, did you understand her reference to a BHS
4 administrator to mean any Brownsburg High School
5 administrator but not a Central Office
6 administrator such as Dr. Snapp?
7 A  I did not understand.  If that was her intention
8 in that e-mail, then I did not understand it
9 that way.  I understood her reply to mean she
10 would do my request and not show it to any
11 administration and she would not process it
12 including the BHS but not limited to the BHS
13 administration.  It wasn't a qualifier of her
14 agreement to accept my request.  It was just a
15 for example.
16 Q  So, just to be clear, when you saw in Jodi
17 Gordon's reply that she wouldn't show to any BHS
18 administrator, you never reached out to her
19 further to express concern about her reference
20 to BHS administrator as opposed to any
21 administrator?
22 A  No, I understood that -- she didn't say "namely
23 BHS administration."  She said -- do you have
24 the exact reply that we're talking about?  Is it
25 one of these exhibits?

Page 108

1 Q  It is not.
2 A  Do you have it handy?
3    MR. BORG:  Yeah, we can take five and pull
4 it up.  I knew you were gonna ask that.  Let's
5 go off the record.  I'll track it down.
6    (A recess was taken.)
7 DIRECT EXAMINATION CONTINUING,
8 QUESTIONS BY BRENT R. BORG:
9 Q  Thank you for referencing Plaintiff's 17.  This
10 is the e-mail we've been discussing.  I guess
11 I'll restate my question, Mr. Kluge, now that
12 you have the benefit of this e-mail, but it was
13 really to the effect of if Jodi Gordon
14 referenced BHS administration in this e-mail,
15 whether you reached out to her further to
16 express concern about her reference to BHS
17 administration as opposed to any Brownsburg
18 administrator.
19 A  I took this, her saying "I will honor your
20 request," to mean I will honor your request.
21 And it's a compound sentence, not process this
22 letter, share it with BHS administration.  That
23 did not change her honoring my request or her
24 obligation to honor my request to not process
25 it, not send it to Snapp for (audio malfunction)

Page 109

1 process of resignation.  It was just to be a
2 piece of paper on her desk for her to hold it
3 until the date I specified as she led me to
4 believe that I could do.
5 Q  Thank you.  Was your last day of classes May
6 25th of 2018?
7 A  I believe it was.
8 Q  And I understand there may have been a couple
9 more days after that where faculty entered the
10 building but they weren't teaching classes; is
11 that correct?
12 A  That's correct.
13 Q  Do you know if that was one day or two days or
14 three days?
15 A  Maybe one or two.
16 Q  Okay.  What are the purpose of those days?
17 A  The purpose of those days is to finish your
18 grading and organize any paperwork you need to.
19 Q  After May 25th of 2018, is it fair to say that
20 you had no further teaching responsibilities for
21 the 2017/2018 school year?
22 A  I wouldn't tie it to a date.  Once I finished my
23 grading which I did -- I'm not exactly sure when
24 I finished the grading, if it was on the 25th or
25 if it was on the 26th, but once I finished my

**Page 110**

1 grading and closed up my classroom, I didn't
2 have any more responsibilities. I actually got
3 locked out before I was able to finish that.
4 Q   What is that, your grading or your classroom or
5 both?
6 A   At least closing up the classroom, maybe grading
7 as well.
8 Q   Is there any reason you would have needed a
9 Brownsburg e-mail account after May 25th of
10 2018?
11 A   To communicate with the administration, to
12 communicate with other teachers, communicate
13 with parents as regards students. I mean, the
14 same purpose that I would need it before that
15 date, too.
16 Q   I think you might have said, but as of May 25th
17 of 2018, had you finished all your grading
18 responsibilities?
19 A   I don't know that to be a fact. I don't know if
20 I finished my grading responsibilities on the
21 25th, 26th, 27th. I could not definitively say.
22 Q   Is there any reason you needed access to the
23 building after May 25th of 2018?
24 A   Yes, to close up my classroom and potentially to
25 finish grading. I actually had not closed up my

**Page 111**

1 classroom and there was still papers lying
2 around that needed to be filed and instruments
3 that needed prepped for the summer and -- yeah.
4 Q   You participated in a hearing before the board
5 in June of 2018; is that correct?
6 A   I wouldn't call it a hearing. I tried to make
7 it a hearing but it wasn't.
8 Q   I'm sorry. A board meeting in June of 2018;
9 correct?
10 A   What was your question?
11 Q   I interrupted you. I'm sorry. I need to
12 rephrase my question. You participated in a
13 board meeting in June of 2018; is that correct?
14 A   Participate is a strong word. I expressed as a
15 member in the community comment section, I
16 pleaded with them to -- I had asked to
17 participate in the meeting and they ignored that
18 request. And then in the
19 let's-hear-from-the-community section, I then
20 expressed my claims of discrimination and
21 pleaded with them to reconsider reinstating me
22 and to let me continue working in the school.
23 Q   And you say that was during the community
24 section of the board meeting?
25 A   Right.

**Page 112**

1 Q   It's fair to say that there's essentially an
2 opportunity for public comment, anybody can
3 submit their name and they're allotted an amount
4 of time; is that fair?
5 A   That's right. And they didn't respond. They
6 just heard me and then the next person. They
7 said, "Alright. Next person."
8 Q   Okay. And you just testified to some things
9 that you shared during your allotted time;
10 correct?
11 A   Yes, namely a brief account of what had
12 transpired the previous year and a plea that
13 they would let me teach there.
14 Q   Did you also request that they, I guess, not
15 accept or rescind your resignation or allow you
16 to withdraw it, something along those lines?
17 A   To the effect of let me teach here next year.
18 This was not -- this was coerced. This was not
19 legitimate. This was retaliatory.
20     I'd have to look at a tape to see what I
21 exactly said but something to the effect of let
22 me teach here and don't process the resignation.
23 Please, yeah, rescind it. Please let me teach
24 here. That was not a valid resignation. It was
25 coerced.

**Page 113**

1 Q   Do you also recall during the meeting that many
2 people were allowed to address the board and
3 show their support for you?
4 A   I recall that many people were allowed to speak.
5 Q   Approximately how many people do you think
6 showed support for you at the board meeting?
7 A   That would be a guess. I'm not gonna guess.
8 There were I would say many people who showed
9 support, but I'm not gonna guess. It would be a
10 wild guess.
11 Q   You don't need to.
12 A   I was pretty distressed at the time. I wasn't
13 paying attention to numbers.
14 Q   Do you recall also that some people addressed
15 the board who did not support you?
16 A   Yes, I was aware.
17 Q   Same question if you know. You don't need to
18 guess. Approximately how many people do you
19 think that was?
20 A   Fewer than showed support.
21 Q   Are you aware that the June 2018 board meeting
22 was recorded?
23 A   I was aware that there were news cameras. What
24 do you mean recorded?
25 Q   Media recordings.

**Page 114**

1 A    Yep.

2 Q    Are you also aware that after the board had
3    received this information from you and others it
4    voted 5/nothing to accept your resignation?

5 A    Restate that question.  Am I aware what?

6 Q    Are you also aware that after the board had
7    received this information you just testified
8    from you and others it voted 5/nothing to accept
9    your resignation?

10 A    That's not what happened in my understanding.

11 Q    Okay.  What is your understanding?

12 A    My understanding is that they already received
13    my resignation and then the community section
14    happened.  I was not allowed to speak and
15    address the board in the meeting.  They ignored
16    my requests and near the beginning of the
17    meeting they processed the, quote/unquote,
18    "resignation," and then after that people from
19    the community were allowed to speak.  That's my
20    recollection.  If I saw a videotape or saw the
21    minutes from the meeting, I believe it would
22    show that.

23 Q    During the 2017/2018 school year did any
24    Brownsburg administrator direct you to use a
25    transgender student's preferred pronoun when

**Page 115**

1    addressing that student?

2 A    No, not during the school year.  They said you
3    would have to do it -- now, okay, that's a
4    general -- yeah, of course, in July 27 of 2017
5    Snapp did say that or else I would be fired, so,
6    yes, they did direct me to use transgender
7    pronouns or else I would be fired.  That's a
8    very broad questions.  A lot of things happened
9    and, yes, Snapp did tell me I had to use
10    transgender pronoun or else I would be fired.

11 Q    Okay.  Other than Snapp stating that on July
12    27th, any other time that you can think of?

13 A    Any time before?

14 Q    Any time during the 2017/2018 school year.

15 A    Can you narrow it down?  Can we narrow it to
16    starting with when the last-name accommodation
17    went into effect and, from that time forward, I
18    was allowed to use the last-name accommodation
19    and was not directed to use pronouns except
20    coming from the guidance counselors.  When they
21    would announce students in your classes, they
22    would say feel free to use he, him, his and I
23    was using last names anyway.  And, so, when I
24    saw things like that, I was able to continue
25    using my accommodation and I was able to

**Page 116**

1    continue using the accommodation without going
2    against their directive or their suggestion.

3 Q    Is it fair to say the last-name-only
4    accommodation began on July 31st of 2017?

5 A    That's correct.

6 Q    Okay.  And these "feel free to use" references
7    that you received from guidance, did any of
8    those occur after July 31st of 2017?

9 A    Yeah.  To my knowledge, I got an e-mail late
10    September of 2017 that Willis had switched in
11    PowerSchool from female to male.

12 Q    Okay.  Any others that you can think of after
13    July 31st of 2017?

14 A    No, no more of my students switched in
15    PowerSchool.  Was that the intent of your
16    question?  Any more guidance counselor e-mails
17    saying use these pronouns?  Is that what you're
18    asking?

19 Q    Yes, I think you've answered my question.

20 A    Okay.

21 Q    During the 2017/2018 school year did Brownsburg
22    ever require you to make positive statements
23    regarding transgender students' lifestyles?

24 A    Require me to make positive statements?  When
25    they required me to use their transgender first

**Page 117**

1    names, yes, they were requiring me to make
2    positive statements about their lifestyle.

3 Q    Okay.  And they would have required that before
4    the last-name-only accommodation on July 31st of
5    2017; correct?

6 A    They did require that before the July 31
7    meeting, yes.

8 Q    But they did not require that after?

9 A    They did require it after when they said that
10    you have to agree to do this.  Let's go back to
11    -- do I have control of the documents here?

12        Okay.  Exhibit G in the February 6, 2018
13    meeting and the March 5th, 2018 meeting they
14    tell me either I need to agree to use
15    transgender first names or submit this
16    conditional resignation or be terminated before
17    the school year is up, so I would say that is
18    them telling me, yes, you need to approve the
19    lifestyle of transgender students -- that's what
20    I would take that as -- against my religious
21    convictions.  Does that answer your question?

22 Q    It does.  During the 2017/2018 school year
23    Brownsburg never required you to attend an
24    Equality Alliance Club or similar LGBT student
25    group; is that correct?

Case 1:19-cv-02462-JMS-DLP   Document 120-3   Filed 03/15/21   Page 31 of 36 PageID #:
JOHN M. KLUGE VS.                Document: 16   1270   Filed: 07/10/2024   Pages: 306   JOHN M. KLUGE
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.                                        November 17, 2020

**Page 118**

1 A   No, they never required me to attend the
2 Equality Alliance Club or a student LGBT club,
3 correct.  They did require me to hear and be
4 taught the propaganda promoting transgenderism
5 in faculty meetings, so they did require that.
6 Q   Did the fact that you were subjected to that
7 information in faculty meetings conflict with a
8 sincerely-held religious belief?
9 A   You gotta rephrase that question.  I didn't
10 think attending the meeting was sinful.
11 Attending a meeting that I'm required to go to
12 is not me promoting transgenderism in the way
13 that saying a first name transgender name is
14 promoting transgenderism.  I'm required to go to
15 a meeting where they're talking about a number
16 of things and one of those things is this is
17 what we think about transgenderism.  Me hearing
18 that information is not me giving my stamp of
19 approval to their agenda.
20 Q   You may not have agreed with some of the
21 information that was presented with respect to
22 transgenderism at these faculty meetings but you
23 didn't understand your attendance of those as
24 necessarily indicating approval of it or
25 anything like that?

**Page 119**

1 A   It did not indicate an approval of it, of
2 transgenderism.
3 Q   So, by the same token, you wouldn't have thought
4 to request an accommodation such as please
5 relieve me from the obligation of attending
6 these faculty meetings or anything like that?
7 A   Correct, and that's why I did not request an
8 accommodation.  In fact, at these meetings they
9 were rolling out what they were claiming were
10 policies of the school, things that were not
11 actually policies, things that were not policies
12 approved by the school board.  These were just
13 practices of the school and if I didn't attend
14 these meetings, I wouldn't be told what the
15 school, quote/unquote, "policies" are.  And, so,
16 in fact, not attending these meetings would be a
17 great detriment to me because they're rolling
18 out these so-called policies in these meetings
19 and they seem to be evolving as the school year
20 is progressing.
21 Q   Had you not been afforded the last-name-only
22 accommodation, is it your understanding that all
23 you would have had to do when addressing
24 students was use the first and last name in
25 PowerSchool?

**Page 120**

1 A   You're starting to break up in your question.
2 Can you say that again?
3 Q   I can.  Had you not been afforded the
4 last-name-only accommodation, is it your
5 understanding that all you would've had to do
6 when addressing students was use the name in
7 PowerSchool?
8 A   Are you saying that if in July 31 of 2017 they
9 did not allow me to have the last-name
10 accommodation that would have meant I would have
11 been forced to use the first and last name in
12 PowerSchool including transgender names?  Is
13 that what you're asking me?
14 Q   Yes.
15 A   Yes, they told me either use the first and last
16 name, the transgender name in PowerSchool, or
17 quit or we're going to fire you.
18 Q   Let's look at Exhibit I.
19 A   Here's I.  This is April 30th, Dear, Ms. Gordon?
20 Is that Exhibit I?
21 Q   Nope, go one over.
22 A   Okay.  Yep.  This is Plaintiff's Response to
23 Defendant's First Request for Production.  Go
24 ahead.
25 Q   And I'll give you time to look over this, but I

**Page 121**

1 guess let me ask an initial question.  You filed
2 a Charge of Discrimination with the U.S. Equal
3 Employment Opportunity Commission; is that
4 correct?
5 A   Yes.
6 Q   And is it your understanding that Brownsburg
7 responded to that charge?
8 A   Yes, it is my understanding.
9 Q   And is it also your understanding that you, in
10 turn, were afforded an opportunity to submit a
11 rebuttal?
12 A   I believe we did submit a rebuttal.  Did we not?
13 Q   Well, let me help you there.  My question is to
14 look at the rest of Exhibit I and ask if that's
15 the rebuttal statement.
16 A   Yes, I think this is rebuttal.
17 Q   And, more specifically, it's a letter your
18 attorney submitted to the EEOC on your behalf;
19 is that correct?
20 A   Let me get to the last page here.  .
21 Q   Without getting into communication you may have
22 had with your attorneys concerning this exhibit,
23 my question is whether you reviewed it before
24 your attorney submitted it to the EEOC.
25 A   I believe I did.

Page 122

1 Q    And, again, without getting into communications
2      with your attorneys, do you recall that you
3      approved your attorney sending it to the EEOC?
4 A    I believe I did.
5 Q    Is it fair to say then that this is an accurate
6      account of the factual incidents that are
7      described in this document?
8 A    I believe it is.
9 Q    Look at Kluge 298. It's got those Bates stamps
10     in the bottom right.
11 A   Here we go.
12 Q   At the very top, one of the factual incidents
13     that's described is a May 15th, 2017 meeting
14     that you had with Daghe and three other faculty
15     members. My question is simply are the three
16     other faculty members the ones who signed the
17     document that we looked at earlier?
18 A   That is the three other faculty members who
19     signed the document, yes.
20 Q   And, to be clear, that was Exhibit D as in David
21     that we talked about earlier?
22 A   Yes, Exhibit D. Hey, Brent, I just skipped to
23     D. What exhibit are we talking about right now?
24 Q   You can go back to I when you're ready.
25 A   I. Got it. Go ahead.

Page 123

1 Q    In that first full paragraph about halfway down
2      it says, "Daghe asked the teachers" -- and this
3      is in reference to the May 15th, 2017 meeting --
4      "if they would use transgendered first-names if
5      he changed students' first names in PowerSchool.
6      The three other teachers in the meeting
7      acquiesced to these terms, while Kluge did not."
8      You testified to that earlier. Is this
9      consistent with what your testimony was earlier?
10 A   Yes.
11 Q   Okay. Help me understand. How did you not
12     acquiesce?
13 A   I already told you.
14 Q   Fair enough.
15 A   Do you have another question about that?
16 Q   I do. Sit tight. Go to the next page. The
17     third full paragraph references a July 27, 2017
18     meeting that you had with Bret Daghe and
19     Dr. Snapp. We've already talked about that at
20     length, but my question is the next paragraph.
21     It says, "Later that day Dr. Snapp and Kluge's
22     pastor talked..." That's the same discussion we
23     already talked about that occurred on or around
24     July 27th; correct?
25 A   Yeah, and so it must have been later that day.

Page 124

1      When I said on or around, looking at this it was
2      on July 27.
3 Q    Okay. And, to be clear, I'm just trying to make
4      sure we're talking about the same things that we
5      talked about previously.
6 A    Go ahead.
7 Q    Go to Kluge 300, which is the next page.
8 A    Okay.
9 Q    And there's a heading there under Roman Numeral
10     V that references an orchestra award ceremony.
11     Do you recall that ceremony?
12 A   Let me read this.
13         MR. BORG: Why don't we go off the record
14     and just say five minutes and you can take your
15     time to read that and acclimate yourself because
16     I have some questions about that.
17         THE PLAINTIFF: Okay.
18         MR. BORG: Thank you.
19         (A recess was taken.)
20 DIRECT EXAMINATION CONTINUING,
21     QUESTIONS BY BRENT R. BORG:
22 Q   We're on I, specifically the page Kluge 300.
23 A   It was the Subsection Roman Numeral V; correct?
24 Q   Correct. Have you had a chance to look over
25     that?

Page 125

1 A    I have, yep.
2 Q    And I think we started to talk about that it
3      references an orchestra award ceremony; correct?
4 A    That is correct.
5 Q    And, just generally speaking, what is that
6      ceremony?
7 A    That ceremony is when the orchestra students at
8      the end of the year get awards for merit as well
9      as for their participation in the program. We
10     recognize our seniors and kind of like a
11     graduation ceremony for them.
12 Q   You alluded to it, but do you recall -- you said
13     it was toward the end of the 2017/2018 school
14     year. Do you recall what month maybe?
15 A   I think around May of 2018 is when my orchestra
16     award ceremony at the 2017/'18 school year
17     happened.
18 Q   Okay. And is what's in this paragraph under
19     Roman Numeral V on Kluge 300 an accurate report
20     of what transpired at the orchestra ceremony?
21 A   Yes.
22 Q   Was the orchestra award ceremony a
23     school-sponsored event?
24 A   Yes. Sponsored? It was part of my curriculum.
25     I wasn't doing this as part of my out-of-school

JOHN M. KLUGE VS
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 126

1    -- yeah.
2  Q   And, by the same token, it was your
3    understanding that you were participating in the
4    ceremony as an employee of Brownsburg Community
5    School Corporation?
6  A   Absolutely.
7  Q   Am I correct that what you're describing here is
8    that during this ceremony you addressed all
9    students by their first and last names?
10 A   That is correct.
11 Q   Okay.  Am I also correct that transgender
12   students were participants in the ceremony?
13 A   That is correct.
14 Q   Am I also correct that you addressed transgender
15   students by their first and last names, more
16   specifically their transgender first name?
17 A   That is correct.
18 Q   Okay.  Tell me why you did that.
19 A   I say it even in this paragraph that it would
20   have been unreasonable and conspicuous to
21   address students in such an informal manner at
22   such a formal event as opposed to the classroom
23   setting where teachers refer to students by last
24   names as a normal form of address.  And, so, me
25   saying last names only in the classroom is what

Page 127

1    a gym teacher would do, but at such a formal
2    event it would have been conspicuous and
3    unreasonable to give such an informal address to
4    students at a graduation ceremony.  And, like I
5    say at the end, it brought into doubt my stated
6    rationale for the usage of last names only.
7      Remember that Snapp and I had agreed that
8    we're gonna use last names only and if someone
9    asks you why, you'll start talking about gym
10   teachers, sports coaches.  Well, they wouldn't
11   use a last name only at a formal event, so
12   neither did I.
13 Q   Did we establish earlier that you calling
14   students by transgender name is sinful?  Is that
15   accurate?
16 A   Yes.
17 Q   Okay.  Help me understand how you reconcile
18   calling transgender students by their
19   transgender first name in this context versus a
20   classroom context.
21 A   Uh-huh.  I'm making a good faith effort to work
22   within the bounds of my accommodation in this
23   context, that it's a reasonable accommodation to
24   allow me in the classroom to address by last
25   name only and it would be unreasonable,

Page 128

1    conspicuous, as I say, in such a formal event to
2    use last name only and use such an informal
3    address.  I don't agree.  It didn't indicate
4    that I agreed with their policy but I was making
5    a good faith effort to do what was reasonable.
6  Q   In your view, is it inconsistent with your
7    sincerely-held belief to address students by
8    their transgender name during this type of
9    ceremony?
10 A   It was a good faith effort.  I don't believe
11   that -- what's it called?  I don't believe that
12   promoting and encouraging transgenderism is
13   allowed in the Bible and I believe it's sinful,
14   and, in this context, I was making a good faith
15   effort to work with the school to do what was a
16   reasonable accommodation and to abide by our
17   agreement.
18 Q   If you were to call a student by their
19   transgender name during the classroom
20   environment, do you think that's promoting a
21   transgender lifestyle?
22 A   Yes.
23 Q   When you called transgender students by a
24   transgender name at the orchestra awards
25   ceremony, do you think that was promoting a

Page 129

1    transgender lifestyle?
2  A   It was part of our agreement to treat this as a
3    sports coach.  It was not me agreeing that
4    transgenderism is okay.  It was assuring a good
5    faith effort to work with the administration,
6    like I've said, to do what was reasonable.  Our
7    agreement was, John, treat it like you're a
8    sports coach.  You can use last names only, but
9    if someone asks, you're treating the orchestra
10   like a team.  So this was the good faith effort
11   to work with the administration to do what was
12   reasonable.
13 Q   Mr. Kluge, I'm not certain you answered my
14   question.  It was whether you think you're
15   promoting a transgender lifestyle when you
16   address students by a transgender first name at
17   the orchestra awards ceremony.
18 A   I don't believe I was as this wasn't my habit,
19   if that makes sense, that I'm not going to say
20   that -- this was not my habit to be regularly
21   calling students by transgender names, and, so,
22   for a teacher to refer to a student in a formal
23   title at a formal event is not them promoting
24   the lifestyle.  It's a special event.  It's a
25   formal event.  It's not normal.  It's not

SA-292

Page 130

1   ordinary behavior.  But for me to every day be
2   given the accommodation to use the last name
3   only and to be regularly -- if I was to
4   regularly be using transgender names, that
5   would, by all means, yes, be promoting
6   transgenderism.  So the formal nature of this
7   makes it exceptional and that's why I behaved
8   exceptionally in trying to work with the
9   administration.
10 Q   Did you have any discussions with any Brownsburg
11      administrator prior to the orchestra awards
12      ceremony about how you would address students at
13      this event?
14 A   I did not.  It was just a good faith effort
15      based on my understanding of the nature of the
16      event and the nature of the accommodation, that
17      it was reasonable to use last names only as a
18      gym coach would, and a gym coach would not have
19      done this.
20      And that's what I was telling the students,
21      that we're a team.  In fact, I, throughout the
22      year, didn't tell the students why I was doing
23      it except one time when one student asked me why
24      I was doing it, that's when I said that, "Well,
25      you know, we're all a team and a sports coach

Page 131

1   calls their team members by last name only.  I
2   want to foster that community and we're all
3   working towards one goal."
4      And, so, I wasn't regularly referencing or
5   bringing attention to my use of last name.  It's
6   just something I did.  And, so, to -- I lost my
7   train of thought.
8 Q   Do you agree with me that you were not following
9      the last-name-only accommodation at the
10      orchestra awards ceremony?
11 A   No, I don't agree with that.  I believe that it
12      was actually perfectly in accordance with what
13      we understood, namely that I would address the
14      students as a sports coach would.  And the
15      formal nature of the event, like I said, led me
16      to address students with a formal first name,
17      last name.  It would have been unreasonable,
18      conspicuous, and not in accordance with the
19      accommodation.  And the understanding of the
20      accommodation coming from the angle of sports
21      coach, it would have been not consistent to do
22      something so conspicuous and informal at such a
23      formal event, like I've said in that paragraph.
24 Q   Who is Natalie Gain?
25 A   Natalie Gain is a violin teacher that taught

Page 132

1   private lessons during my classes and would
2   teach sectionals.  All of the violins section
3   would get coaching from her during my classes.
4 Q   So she participated in all of the beginning,
5      intermediate, and advanced orchestra sections
6      during the 2017/2018 school year?
7 A   Yeah, she would teach during all of those
8      classes, I believe.
9 Q   Would she have been present during all the
10      orchestra classes Monday to Friday during
11      2017/2018?
12 A   It's the same classes Monday, Tuesday,
13      Wednesday, Thursday, Friday.  It depends on what
14      her private lesson teaching schedule for my
15      students was.  It could have been any number of
16      those days any number of weeks.
17 Q   Is it fair to say it depended on her schedule
18      and kind of an as-needed basis?
19 A   Yeah, it depends on her schedule.  She would
20      regularly be in several of my classes.  I don't
21      know exactly which ones and it would have been a
22      smattering of all of them.
23 Q   But, to be clear, we're talking the orchestra
24      classes as opposed to the music theory or
25      anything like that?

Page 133

1 A   It was the orchestra classes, high school
2      orchestra, yes.
3 Q   Okay.  And when she was in an orchestra class, I
4      think you started to say it, but might she take
5      one or two violinists and pull them off to the
6      side and work on specific instruction?
7 A   That's correct.
8 Q   And you, in turn, in that scenario would be
9      instructing the remainder of the class?
10 A   That's correct.
11 Q   And then there might also be times where she was
12      providing instruction to the entire violin
13      section?
14 A   That's correct.
15 Q   Okay.  When she was providing instruction to a
16      small group of violinists, would she go in
17      another room or something like that?
18 A   That is correct, unless there were times if she
19      was helping while I was teaching.  So, yes, that
20      happened sometimes.  Other times there were
21      times where she was helping during instruction.
22 Q   When she was helping out with the orchestra
23      classes during the 2017/2018 school year, what
24      percentage of time would you estimate she was
25      with you in the class versus the percentage of

Case 1:19-cv-02462-JMS-DLP    Document 120-3    Filed 03/15/21    Page 35 of 36 PageID #:
1274
JOHN M. KLUGE VS.
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.

JOHN M. KLUGE
November 17, 2020

Page 134

1  time in a separate room working with a small
2  group of violinists?
3  A  I don't know.  I think it would depend.  I'd
4  have to look back at the schedule.  Some
5  instructors would actually be helping in class
6  and playing along with the sections.  It would
7  just be a guess at this point.
8  Q  Do you think a school has an interest in being
9  concerned with the mental health of its
10  students?
11  A  Does a school have an interest -- say that
12  again.
13  Q  Do you think a school has an interest in being
14  concerned with the mental health of its
15  students?
16  A  Yes.
17  Q  Other than your situation, do you have personal
18  knowledge of any instance during the 2017/2018
19  school year where a Brownsburg High School
20  teacher did not address students by the name
21  listed in PowerSchool?
22  A  I did address students by the last name listed
23  in PowerSchool, so can you clarify your
24  question?
25  Q  Yeah.  I think you may have missed the first

Page 135

1  part, so I'll just repeat it.  Other than your
2  situation, do you have personal knowledge of any
3  instance during the 2017/2018 school year where
4  a Brownsburg High School teacher did not address
5  students by using the name listed in
6  PowerSchool?
7  A  You're gonna have to specify.  That's a bad
8  question because -- are you talking about do I
9  know of any other teachers that used last name
10  only?  Because you're saying that I didn't use
11  the name listed in PowerSchool but I did use the
12  last name in PowerSchool, so you're gonna have
13  to clarify what you mean by that.
14  Q  Mr. Kluge, I'm not talking about your situation.
15  I'm talking about your personal knowledge of
16  what other high school teachers might have done.
17  A  You're saying "any other" which presumes that I
18  didn't use what was in PowerSchool but I did use
19  the last name in PowerSchool, so --
20  Q  Okay.  Well, I'm referring to the first and the
21  last name listed in PowerSchool, if that helps.
22  I understand you used the last name only listed
23  in PowerSchool.
24  A  Okay.  I vaguely remember hearing that other
25  teachers might have been using it but I couldn't

Page 136

1  definitively say.
2  Q  Okay.  But if you heard it --
3  A  Specifically the last name only I'm talking
4  about.
5  Q  Okay.  But you didn't personally observe another
6  high school teacher using last name only or
7  anything like that when addressing students?
8  A  I actually did.
9  Q  You personally observed it?
10  A  Yeah.
11  Q  Okay.  Tell me about that incident or incidents.
12  A  When I was working in the musical, it would be
13  normal for students to be referred to by other
14  teachers by last name only.
15  Q  And that was during the 2017/2018 school year?
16  A  Yes.
17  Q  Any other instances that you personally
18  observed?
19  A  No, because that's the only class that I was
20  co-teaching and that there was a number of
21  different -- that's the only instance where I
22  would have been working alongside other teachers
23  at all.  Other times I'm in my own classroom.  I
24  don't see what other teachers do.  Does that
25  make sense?

Page 137

1  Q  It does.  In the musical example that you cite,
2  do you have any personal knowledge of whether
3  those students complained about being referred
4  to by their last name only?
5  A  I do not have knowledge that there were
6  complaints about that.
7  Q  Okay.  And you've also alluded on several
8  occasions to a coach's use of last name when
9  addressing students.  Do you recall mentioning
10  that a few times?
11  A  Yes.
12  Q  Do you have any personal knowledge of that
13  occurring during the 2017/2018 school year?
14  A  I wasn't on the football field.  I was in the
15  music classroom, so --
16  Q  So no?
17  A  No, I didn't observe any gym classes, period, to
18  hear what they were saying or not saying, but it
19  was certainly an understanding of Gordon and
20  Snapp and myself that it is a regular occurrence
21  on sports teams.  Otherwise, why would they have
22  agreed to it and specifically mention that
23  scenario in that July 31, 2017 meeting if it
24  wasn't a normal occurrence in schools, in
25  general?  Do you get what I'm saying?

SA-294

Case 1:19-cv-02462-JMS-DLP    Document 120-3    Filed 03/15/21    Page 36 of 36 PageID #:

JOHN M. KLUGE VS.                                                                    JOHN M. KLUGE
BROWNSBURG COMMUNITY SCHOOL CORPORATION, et al.                        November 17, 2020

Case 4:23-cv-1943    Document 16-1275    Filed 07/10/2024    Pages: 306

Page 138

1  Q    I do.  So I'll ask this question.  It's similar
2       to the musical question.  You're not personally
3       aware of an instance of a student complaining
4       that a coach called him or her by last name only
5       during the 2017/2018 school year; is that
6       correct?
7  A    No, I'm not.  The only complaints that were
8       purported is when Daghe purported to say there
9       were complaints about me by students but that's
10      the only time I had heard anything and he didn't
11      even say who was doing it.  He just said lots of
12      people.
13 Q    I understand and we've talked about that already
14      and that was the December 2017 meeting with you
15      and Dr. Daghe; correct?
16 A    That's correct.
17 Q    Do you recall that you withdrew from the
18      Brownsburg Teachers Association in early Summer
19      of 2017?
20 A    Yes.  I don't know the exact date but I remember
21      during my employment at BCSC withdrawing from --
22      you said the Teachers Association?
23 Q    Correct, the teachers union, for lack of a
24      better term.
25 A    That's right.  They support the national union

Page 139

1       which supports Planned Parenthood and so I
2       didn't want to be supporting Planned Parenthood.
3  Q    Okay.  Thank you.  You answered my next
4       question.  But is that the entirety of the
5       reason that you withdrew from the association?
6  A    That's the entirety of the reason.  I didn't
7       want to be giving money even indirectly to
8       Planned Parenthood.
9  Q    Thank you.  Let's look at Exhibit J.
10 A    This is Declaration of Aidyn Sucec in Support of
11      -- okay, yep.
12 Q    Do you recognize this document?  Have you seen
13      it before?
14 A    I do recognize it.
15 Q    Do you think you've read it before?
16 A    I think I have.
17 Q    Go to Paragraph 12.  Do you see that?
18 A    I see Paragraph 12.
19 Q    Okay.  I'm just gonna read it.  "The problems
20      continued from there.  During the fall semester,
21      Mr. Kluge refused to call me Aidyn.  Instead,
22      Mr. Kluge either referred to me as 'Sucec' (my
23      last name) or he avoided calling me by any name
24      and instead simply nodded or waved in my
25      direction.  Moreover, while Mr. Kluge referred

Page 140

1       to me by my last name only, he would sometimes
2       refer to other students in the same class using
3       Mr. or Ms. (Last Name), and less frequently, by
4       their first names."
5            Do you agree with what Aidyn is asserting
6       there in Paragraph 12?
7  A    No.
8  Q    What parts do you dispute?
9  A    Starting with the problems.  So you're referring
10      to Paragraph 12, was it?
11 Q    Correct.
12 A    So "The problems continued from there," I would
13      dispute that there was no problem.  From Day 1 I
14      was consistent in using last names only and
15      using it for all students.  I didn't target
16      students.
17           "During the fall semester, Mr. Kluge
18      refused to call me Aidyn."  That's a
19      mischaracterization of my
20      last-name-only-for-all-students policy.  I
21      wasn't refusing to call her Aidyn.  I was
22      calling all my students by last name only, and,
23      so, that's a misrepresentation of what happened.
24           Next sentence, "Instead, Mr. Kluge either
25      referred to me as 'Sucec' (my last name) or he

Page 141

1       avoided calling me by any name and simply nodded
2       or waved in my direction."  I don't recall ever
3       avoiding her or doing as she says.  I called her
4       Sucec just like I referred to my other students
5       by last name only, so that's misrepresented,
6       fabricated.
7            Next sentence, "Moreover, while Mr. Kluge
8       referred to me by my last name only, he would
9       sometimes refer to other students in the same
10      class using Mr. or Ms. (Last Name), and less
11      frequently, by their first names."  I called all
12      my students by last name only, so I think that's
13      a misrepresentation of what happened in the
14      classroom.
15 Q    I understand you dispute what's alleged in
16      Paragraph 12, but assuming that what is alleged
17      in Paragraph 12 is accurate, do you agree that
18      it could interfere with a well-run classroom?
19 A    If a teacher was avoiding a student and treating
20      them differently than other students, that would
21      not be a good teacher.  That's not what (audio
22      malfunction).
23 Q    And, again, I'm not asking you to agree.  I
24      understand you dispute what's in Paragraph 11,
25      but if you were to say for argument sake that

# EXHIBIT 16

## Email from Plaintiff to Dr. Jim Snapp and Dr. Bret Daghe dated February 4, 2018

**Kathy Javella**

| | |
|---|---|
| **From:** | John Kluge <johnmkluge@yahoo.com> |
| **Sent:** | Sunday, February 4, 2018 4:01 PM |
| **To:** | jsnapp@brownsburg.k12.in.us; bdaghe@brownsburg.k12.in.us |
| **Subject:** | Question about next year |
| **Attachments:** | 201707311440.pdf |

Dear Dr. Snapp and Mr. Daghe,

On the 1/3/18 "Transgender Questions" document we received at our January faculty meeting, it is written:

"5. Are we allowed to use the student's last name only?
We have agreed to this for the 2017-2018 school year, but moving forward it is our expectation the student will be called by the first name listed in PowerSchool."

The contract that we signed in July 2017 does not limit itself to the 2017-2018 school year (see attached), so it is my understanding that I would be allowed to continue to use last-names-only when addressing students next school year and beyond. Is this correct that I would be allowed to continue to use last-names-only when addressing students next school year and beyond?

Sincerely,
John Kluge

1

**Defendant Brownsburg CSC 139**

BCSC-000000139

SA-297

# EXHIBIT 17

## Emails between Plaintiff and Jodi Gordon
## dated April 30, 2018

**From:** Jodi Gordon <jgordon@brownsburg.k12.in.us>
**Date:** April 30, 2018 at 4:34:54 PM EDT
**To:** John Kluge <jkluge@brownsburg.k12.in.us>
**Subject:** RE: Request
Hi John,



I appreciate hearing from you.

I will honor your request and not process this letter or share with the BHS administration until May 29.

Let me know if you have any questions at all.
Jodi

_____

**From:** John Kluge
**Sent:** Monday, April 30, 2018 6:56 AM
**To:** Jodi Gordon <jgordon@brownsburg.k12.in.us>
**Subject:** Request

Dear Ms. Gordon,

I'm writing you to formally resign from my position as a teacher, effective at the end of the 2017-2018 school year when my contract is finished, i.e., early August 2018.

I'm resigning my position because Brownsburg Community School Corporation (BCSC) has directed its employees to call transgender students by a name and sex not matching their legal name and sex. BCSC has directed employees to call these students by a name that encourages the destructive lifestyle and psychological disorder known as gender dysphoria. BCSC has allowed me the accommodation of referring to students by last name only starting in August 2017 so I could maintain a "neutral" position on the issue.

Per our conversation on 3/15/18, Brownsburg Community School Corporation is no longer allowing this accommodation. BCSC will require me to refer to transgender students by their "preferred" name as well as by their "preferred" pronoun that does not match their legal name and sex. BCSC will require this beginning in the 2018-2019 school year. Because my Christian conscience does not allow me to call transgender students by their "preferred" name and pronoun, you have said I am required to send you a resignation letter by May 1, 2018 or I will be terminated at that time.

Please do not process this letter nor notify anyone, including any administration, about its contents before May 29, 2018. Please email me to acknowledge that you have received this message and that you will grant this request.

Thank you,

John Kluge
Orchestra Director
Brownsburg High School

SA-299

KLUGE –000000173

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **JOHN M. KLUGE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-cv-2462-JMS-DLP |
| | ) | |
| **BROWNSBURG COMMUNITY** | ) | |
| **SCHOOL CORPORATION**, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## **Defendant's Responses to Plaintiff's Second Set of Interrogatories**

Defendant hereby responds to Plaintiff's Second Set of Interrogatories:

## **Objections to Plaintiff's "Instructions for Answering"**

1.  Defendant objects to Plaintiff's Instruction No. 2 to the extent it attempts to impose an obligation on Defendant inconsistent with Federal Rule of Civil Procedure 26(b)(3). That Rule exempts from discovery documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent). Defendants therefore object to the production of documents within he possession, custody, or control of the Defendant, its agents, representatives and attorneys, that are privileged and/or exempt from discovery under Rule 26(b)(3).

2.  Defendant objects to Plaintiff's Instruction No. 12 because it attempts to impose an obligation on Defendant that exceeds that stated in Federal Rule of Civil

1

SA-300

Procedure 26(b)(5)(A).

## **Responses to Interrogatory**

**INTERROGATORY NO. 19**:  Please identify the accountant(s) or other individuals who are either retained, engaged as service professionals, or employed by BCSC for the purpose of preparing budgets, balance sheets, profit and loss statements, or statements of revenue and expenses, and who track administrative costs, including, but not limited to, "opportunity costs" and legal expenses.

**RESPONSE**: Defendant is not contending in this case that it incurred any specific administrative costs as evidence that it suffered undue hardship in addressing Plaintiff's request for accommodation. Therefore, Defendant objects to this request as not relevant.

Without waiving this objection, Defendant states that no individual or individuals is (or are) retained, engaged, or employed for the purpose of completing all tasks identified in Interrogatory No. 19. For example, The Defendant does not prepare a "profit and loss statement" nor does it track opportunity costs. Defendant states that its chief financial officer, Shane Hacker, is the individual who prepares budgets and similar financial documents and who would have general knowledge of the Defendant's administrative costs.

SA-301

**Affirmation**

I affirm, under penalties of perjury, that:

a.  I am the Superintendent for Brownsburg Community School Corporation, the Defendant in the above-captioned case.

b.  I have read the foregoing interrogatories and responses;

c.  I do not have personal knowledge of all information that is requested in the interrogatories and believe that no individual has personal knowledge of all such matters; and

d.  I have made a reasonably inquiry in response to the foregoing interrogatories and believe that the information reflected in the responses is true based on information known to me, , on information supplied by others, and on information reflected in documents.

_____          Dated: __6.30-2020_____

Dr. Jim Snapp

SA-302

**As to Objections:**

Respectfully submitted,

CHURCH CHURCH HITTLE + ANTRIM

By: _____

Alexander P. Pinegar, Attorney #26543-49
Attorney for Defendant

Church Church Hittle + Antrim
Two North Ninth Street
Noblesville, IN 46060
317-773-2190
317-773-5320 fax
apinegar@cchalaw.com

SA-303

## Certificate of Service

I, the undersigned, hereby certify that a copy of the foregoing has been served on the following by depositing the same in the United States mail, postage prepaid, properly addressed, this _6th_ day of July, 2020:

Kevin E. Green
Kevin Green Associates
456 N. Meridian Street, #1517
Indianapolis, IN 46204

Roscoe Stovall, Jr.
101 So. Gulfstream Ave., Unit 4F
Sarasota, FL 34236

Michael J. Cork
Michael J. Cork, Esq.
5754 N. Delaware St.
Indianapolis, IN 46220-2528

Alexander P. Pinegar, #26543-49

SA-304