No. 24-1942

# In the
# United States Court of Appeals
## for the Seventh Circuit

---

JOHN M. KLUGE,
*Plaintiff-Appellant*

v.

BROWNSBURG COMMUNITY SCHOOL CORPORATION,
*Defendant-Appellee*

**On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
Case No. 1:19-cv-02462-JMS-KMB
The Honorable Jane Magnus-Stinson, District Court Judge, Presiding**

---

### *AMICUS BRIEF* OF NC VALUES INSTITUTE
### IN SUPPORT OF APPELLANT AND REVERSAL

---

Deborah J. Dewart
Counsel of Record
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554
lawyerdeborah@outlook.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Appellate Court Number:　　　　24-1942

Short Caption:　　　　　　　Kluge v. Brownsburg Community School Corp.

(1)　　The full name of every party that the attorney represents in the case:

　　　　NC Values Institute

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　　　　Deborah J. Dewart., Attorney at Law

(3)　　If the party, amicus, or intervenor is a corporation:

　　　　i)　　Identify all its parent corporations, if any; and　　　NONE

　　　　ii)　　List any publicly held company that owns 10% or more of the party's or amicus' stock:　　　NONE

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: NOT APPLICABLE

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
　　　　NOT APPLICABLE

Attorney's Signature: /s/Deborah J. Dewart　　　　　Date: July 15, 2024

Attorney's Printed Name: Deborah J. Dewart

Are you Counsel of Record for the above listed parties pursuant to Cir. Rule 3(d)?
YES

Address: 111 Magnolia Ln., Hubert, NC 28539
Phone Number: (910) 326-4554　　　　　　　Fax Number: NONE
E-mail Address: lawyerdeborah@outlook.com

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ................................................................... iv

INTEREST OF *AMICUS CURIAE* ........................................................ 1

INTRODUCTION AND SUMMARY ...................................................... 1

ARGUMENT ........................................................................................ 2

I.   THE INDIANA CONSTITUTION DEFINES THE "EDUCATIONAL MISSION" OF PUBLIC EDUCATION IN PLAIN TERMS AND THE LEGISLATURE IS RESPONSIBLE FOR ESTABLISHING A SYSTEM OF "COMMON SCHOOLS." .................................................................. 2

     A.   The "educational mission" of public schools is stated in plain, simple terms ................................................................................. 3

     B.   BCSC has expanded its mission far beyond the contours of any constitutional mandate or legislative policy ........................................ 4

     C.   Maintenance of harmonious, cooperative relationships between schools and teachers is a critical component of fulfilling a public school's educational mission ................................................................. 5

     D.   Respect for religious faith is essential for a school to maintain harmonious relationships with its teachers and fulfill its mission ........ 6

II.  AS A GOVERNMENT ENTITY, A PUBLIC SCHOOL MUST PURSUE ITS MISSION IN COMPLIANCE WITH THE CONSTITUTION .............. 8

     A.   BCSC must comply with the Constitution in pursuing its educational mission. ................................................................................. 9

     B.   A public school must comply with the Constitution in its role as a government employer ................................................................ 11

C.     BCSC must prepare students for the "marketplace of ideas" they will experience in higher education............................................................15

III.   BCSC's PURPORTED "EDUCATIONAL MISSION" IS AT WAR WITH THE FIRST AMENDMENT BECAUSE IT TRANSGRESSES RIGHTS OF CONSCIENCE AND IMPOSES A VIEWPOINT-BASED POLICY THAT COMPELS SPEECH ......................................................................................18

CONCLUSION ..............................................................................................28

CERTIFICATE OF COMPLIANCE ........................................................30

CERTIFICATE OF SERVICE ................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. U.S.F. Logistics (IMC), Inc.*,
274 F.3d 470 (7th Cir. 2001) ............................................................ 13

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002)........................................................................ 22

*Baz v. Walters*,
782 F.2d 701 (7th Cir. 1986) ..................................................... 7, 13

*Benton v. Maryland*,
395 U.S. 784 (1969)........................................................................ 21

*Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*,
457 U.S. 853 (1982)........................................................................ 16

*Bonner ex rel. Bonner v. Daniels*,
907 N.E.2d 516 (Ind. 2009) ......................................................... 3, 4

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)........................................................................ 20

*Branti v. Finkel*,
445 U.S. 507 (1980)........................................................................ 15

*Capitol Square Review & Advisory Bd. v. Pinette*,
515 U.S. 753 (1995)........................................................................ 23

*Coles ex rel. Coles v. Cleveland Bd. of Educ.*,
171 F.3d 369 (6th Cir. 1999) ......................................................... 18

*Connick v. Myers*,
461 U.S. 138 (1983)................................................................... 11, 15

iv

*Culver Cmty. Teachers Ass'n v. Ind. Educ. Empl. Rels. Bd.*,
  174 N.E.3d 601 (Ind. 2021) ............................................................ 5, 6

*Davis v. Monroe County Bd. of Educ.*,
  526 U.S. 629 (1999)........................................................................... 1

*EEOC v. Ilona of Hungary*, Inc.,
  108 F.3d 1569 (7th Cir. 1997) ......................................................... 13

*Elk Grove Unified School District v. Newdow*,
  542 U.S. 1 (2004)............................................................................. 17

*Embry v. O'Bannon*,
  798 N.E.2d 157 (Ind. 2003) ..................................................... 2, 7, 8

*Fort Wayne Cmty. Sch.*,
  159 N.E.2d 708 (Ind. 1959) .............................................................. 4

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006)................................................................... 11, 15

*Girouard v. United States*,
  328 U.S. 61 (1946)........................................................................... 24

*Griswold v. Connecticut*,
  381 U.S. 479 (1965)......................................................................... 16

*Groff v. DeJoy*,
  600 U.S. 447 (2023)......................................................................... 13

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988)......................................................................... 16

*Healy v. James*,
  408 U.S. 169 (1972)......................................................................... 16

*Higginbottom v. Keithley*,
  103 F. Supp. 2d 1075 (S.D. Ind. 1999).............................................. 9

*Hoagland v. Franklin Twp. Cmty. Sch. Corp.*,
   27 N.E.3d 737 (Ind. 2014) ................................................................. 4

*Horner v. Curry*,
   125 N.E.3d 584 (Ind. 2019) ............................................................... 3

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
   515 U.S. 557 (1995) ................................................................. 25, 27

*Iancu v. Brunetti.*
   139 S. Ct. 2294 (2019) ...................................................................... 26

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*,
   138 S. Ct. 2448 (2018) ............................................. 10, 11, 12, 23, 26

*Jay Classroom Teachers Ass'n v. Jay Sch. Corp.*,
   55 N.E.3d 813 (Ind. 2016) ............................................................ 5, 6

*Kennedy v. Bremerton Sch. Dist.*,
   4 F.4th 910 (9th Cir. 2021) ............................................................... 18

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022) ...................................................................... 23

*Keyishian v. Bd. of Regents*,
   385 U.S. 589 (1967) ..................................................................... 15, 16

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
   64 F.4th 861 (7th Cir. 2023) ............................... 2, 3, 4, 5, 6, 7, 9, 14

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
   2024 U.S. Dist. LEXIS 78340 (S.D. Ind. 2024) ..................... 5, 13, 14, 17, 21

*Lane v. Franks*,
   573 U.S. 228 (2014) .......................................................................... 15

*Lee v. Weisman*,
   505 U.S. 577 (1992) ............................................................ 17, 18, 24, 28

*Matal v. Tam*,
  137 S. Ct. 1744 (2017) ........................................................................ 20

*Meredith v. Pence*,
  984 N.E.2d 1213 (Ind. 2013) ............................................................... 8

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) .............................................................. 12

*Minkus v. Metro. Sanitary Dist. of Greater Chicago (MSD)*,
  600 F.2d 80 (7th Cir. 1979) ............................................................... 14

*Nagy v. Evansville-Vanderburgh Sch. Corp.*,
  844 N.E.2d 481 (Ind. 2006) ............................................................. 2-3

*National Institute of Family & Life Advocates v. Becerra* (*NIFLA*),
  138 S. Ct. 2361 (2018) ........................................................... 19, 24, 27

*Northwestern Sch. Corp. v. Linke*,
  763 N.E.2d 972 (Ind. 2002) ................................................................. 9

*Pacific Gas & Electric Co.* v. *Public Utilities Comm'n of Cal.*,
  475 U.S. 1 (1986) ............................................................................... 25

*Palko v. Connecticut*,
  302 U.S. 319 (1937) ........................................................................... 21

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ...................................................................... 11, 15

*Pickering v. Bd. of Educ. of Township High School District 205*,
  391 U.S. 563 (1968) ...................................................................... 12, 15

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) .................................................................. 20-21, 22

*Robinson v. Schenck*,
  1 N.E. 698 (Ind. 1885) ......................................................................... 3

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ............................................................. 26, 27

*Ryan v. Dep't of Just.*,
950 F.2d 458 (7th Cir. 1991) ................................................ 13

*Schneiderman v. United States*,
320 U.S. 118 (1943) ............................................................. 22

*Seshadri v. Kasraian*,
130 F.3d 798 (7th Cir. 1997) ................................................ 14

*Shelton v. Tucker*,
364 U.S. 479 (1960) ..................................................... 10, 15, 23

*Snyder v. Phelps*,
562 U.S. 443 (2011) ............................................................. 17

*State ex rel. Osborn v. Eddington*,
195 N.E. 92 (Ind. 1935) ........................................................ 4

*Texas v. Johnson*,
491 U.S. 397 (1989) ............................................................. 17

*Thomas v. Collins,*
323 U.S. 516 (1945) ............................................................. 27

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ....................................................... 11, 16

*Turner Broadcasting Systems, Inc. v. FCC*,
512 U. S. 622 (1994) ............................................................ 26

*United States v. Schwimmer*,
279 U.S. 644 (1929) ............................................................. 20

*Vernonia School District 47J v. Acton*,
515 U.S. 646 (1995) .............................................................. 9

*West Virginia State Board of Education v. Barnette*,
   319 U.S. 624 (1943) ................................................... 10, 18, 19, 22, 23, 24, 26, 27

*Wieman v. Updegraff*,
   344 U.S. 183 (1952) ...................................................................... 18

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ................................................... 10, 19, 22, 23, 26


## State Constitutions

Ind. Const. of 1816, art. 9, § 2 ...................................................... 4

Ind. Const. Art. I, § 1 .................................................................. 3

Ind. Const. Art. I, § 2 ............................................................. 6-7, 24

Ind. Const. Art. I, § 3 .................................................................. 21

Ind. Const. Art. I, § 6 ................................................................... 7

Ind. Const. Art. VIII, § 1 ........................................................ 1, 3, 5


## State Statutes

Ind. Code § 20-8.1-5.1-3(b) (1988) ............................................... 9

Ind. Code § 20-29-1-1(1) ........................................................... 6, 7

Ind. Code § 20-29-1-1(2) ............................................................. 6

Ind. Code § 20-29-1-1(4)(A) ......................................................... 6


## Other Authorities

Donald F. Carmony, *Indiana, 1816-1850: The Pioneer Era*
   (Indiana Historical Bureau & Indiana Historical Society 1998) ......................... 7

Richard F. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly Through the Lens of Telescope Media*,
99 Neb. L. Rev. 58 (2020) .................................................. 21, 22, 24, 25, 26, 27

Richard F. Duncan, *Article: Defense Against the Dark Arts: Justice Jackson, Justice Kennedy, and the No-Compelled Speech Doctrine*,
32 Regent U. L. Rev. 265 (2019-2020) ................................................. 19, 20, 22

Robert P. George, Facebook (Aug. 2, 2017),
https://www.facebook.com/ RobertPGeorge/posts/101554176553779066……20

Erica Goldberg, *"Good Orthodoxy" and the Legacy of Barnette*,
13 FIU L. Rev. 639 (2019) ......................................................................... 24, 28

Paul Horwitz, *A Close Reading of Barnette, in Honor of Vincent Blasi*,
13 FIU L. Rev. 689 (2019) ............................................................................... 24

Carl F. Kaestle, *Pillars of the Republic: Common Schools and American Society, 1780-1860* (Hill and Wang 1983) ................................. 8

George Orwell, "1984" (Penguin Group 1977) (1949) ......................................... 22

## INTEREST OF AMICUS CURIAE[1]

NC Values Institute, as amicus curiae, respectfully submits that the decision of the District Court should be reversed.

NC Values Institute ("NCVI")[2] is a North Carolina nonprofit organization that exists to preserve and promote faith, family, and freedom through public policies that protect constitutional liberties, including the right to live and work according to conscience and faith. See https://ncvi.org. NCVI is engaged in fighting laws and policies like the one challenged here.

## INTRODUCTION AND SUMMARY

"Public schools are generally obligated by law to educate all students who live within defined geographic boundaries." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 664 (1999). Indiana, like "almost every State in the country," "guarantees the State's students a free primary and secondary public education." *Ibid.*, citing Ind. Const., Art. VIII, § 1, among many examples. The primary mission of each public school, as stated in the Indiana Constitution and further explained in

---

[1] The parties have consented to the filing of this brief.  *Amicus curiae* certifies that no counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus*, its members, or its counsel, has made a monetary contribution to its preparation or submission.

[2] Previously known as The Institute for Faith and Family.

case law, is to ensure that a tuition-free public education is available to every child within its geographical boundaries.

Brownsburg Community School Corporation ("BCSC") interprets its mission expansively to require that all persons involved in public education accommodate the wishes of any child who "identifies" as the opposite sex. But as a government-affiliated entity, BCSC must abide by the demands of both federal and state constitutions in defining and pursuing its mission. Transgender ideology is a matter of contentious public debate and often conflicts with deeply held religious convictions and conscience, as this case illustrates. BCSC must pursue its mission in a manner consistent with both state and federal constitutional authority, following the basic mandate to provide common schools "open to all" without catering to the whims of any minority segment.

## ARGUMENT

## I.     THE INDIANA CONSTITUTION DEFINES THE "EDUCATIONAL MISSION" OF PUBLIC EDUCATION IN PLAIN TERMS AND THE LEGISLATURE IS RESPONSIBLE FOR ESTABLISHING A SYSTEM OF "COMMON SCHOOLS."

The state of Indiana is "responsible for providing every child the opportunity for elementary education." *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 917 (7th Cir. 2023) (Brennan, J., dissenting), citing *Embry v. O'Bannon*, 798 N.E.2d 157, 162-63 (Ind. 2003). The responsibility falls on the Indiana General Assembly to establish "common schools" open to all. *Nagy v. Evansville-Vanderburgh Sch. Corp.*,

2

844 N.E.2d 481, 484 (Ind. 2006). The system created must be "general and uniform," "free and open to all . . . inhabitants of a town or district" *(id*., 484, 489), but "*nothing more*." *Robinson v. Schenck*, 1 N.E. 698, 705 (Ind. 1885) (emphasis added). "The duty rests on the Legislature . . . not the courts . . . to judge what is the best system." *Ibid*. "[T]uition shall be without charge, and equally open to all." Ind. Const. Art. VIII, § 1; see *Horner v. Curry*, 125 N.E.3d 584, 587 (Ind. 2019) (discussing the "Common School fund" established to finance public education).

### A. The "educational mission" of public schools is stated in plain, simple terms.

The "principal purpose" of public education is stated in "plain and prominent" terms in the Indiana Constitution and must "yield to the plain intention of the framers" (*Robinson*, 1 N.E. at 700), expressed as follows:

> Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government, it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement, and to provide, by law, for a general and uniform system of common schools, wherein tuition shall be without charge and equally open to all.

*Ibid*., quoting Ind. Const. Art. 1, § 1.

The phrase "equally open to all" calls for "the equal admission of students," not "the attainment of any standard of resulting educational quality." *Kluge*, 64 F.4th at 917 (Brennan, J., dissenting); *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 520-522 (Ind. 2009).  Other case law explains the underlying conviction "that the

general diffusion of knowledge and learning throughout a community is essential to the preservation of free government." *State ex rel. Osborn v. Eddington*, 195 N.E. 92, 94 (Ind. 1935). "It has always been the policy of this state to foster and encourage education." *Hoagland v. Franklin Twp. Cmty. Sch. Corp*., 27 N.E.3d 737, 742 (Ind. 2014), quoting *Fort Wayne Cmty. Sch*., 159 N.E.2d 708, 709 (Ind. 1959).

Since the legislature is explicitly charged with the duty to establish a system of common schools in accordance with the constitutional mandate, its policy decisions control. *Hoagland*, 27 N.E.3d at 738 (rejecting the argument that free transportation is mandatory).

**B.     BCSC has expanded its mission far beyond the contours of any constitutional mandate or legislative policy.**

The Indiana Supreme Court has acknowledged "two express duties" of the General Assembly in providing a system of common schools. *Hoagland*, 27 N.E.3d at 742. One duty is "to encourage moral, intellectual, scientific, and agricultural improvements," and the other is "to provide for a general and uniform system of open common schools without tuition." *Id*. at 750, quoting *Bonner*, 907 N.E.2d at 520. These duties are similar to the provisions of Indiana's first constitution. *Ibid*., citing Ind. Const. of 1816, art. 9, § 2.

BCSC crafts its mission with the goal of creating "a safe and supportive learning environment for all students and, more specifically, transgender students." *Kluge*, 64 F.4th at 918 (Brennan, J., dissenting) (emphasis added); *Kluge v.*

*Brownsburg Cmty. Sch. Corp*., 2024 U.S. Dist. LEXIS 78340, \*52 (S.D. Ind. 2024) ("educat[e] all students and foster[] a safe, inclusive environment for all the children it serves"; to "educat[e] all students," . . . by "fostering a learning environment of respect and affirmation") (*id*. at 51). All of this purportedly relies on the Indiana Constitution's Education Clause (Art. VIII, §1). *Kluge*, 64 F.4th at 917 (Brennan, J., dissenting). But nothing in that Clause, or anywhere else in the Indiana Constitution, requires schools to forcibly impose transgender ideology. On the contrary, its promise of being open to *all* does not even allow such compulsion, which would exclude many persons who hold conscientious objections to transgenderism. Coerced endorsement is not only inconsistent with the mission of public education generally—it also flouts respect for conscience and the constitutional prohibition against viewpoint discrimination. (See further discussion in Sect. III, infra.)

**C.    Maintenance of harmonious, cooperative relationships between schools and teachers is a critical component of fulfilling a public school's educational mission.**

Because of their state constitutional rights to free public education, Indiana citizens have a "fundamental interest" in the "development of harmonious and cooperative relationships between school corporations and their certified employees." *Culver Cmty. Teachers Ass'n v. Ind. Educ. Empl. Rels. Bd*., 174 N.E.3d 601, 605 (Ind. 2021), quoting *Jay Classroom Teachers Ass'n v. Jay Sch. Corp*., 55 N.E.3d 813, 816-17 (Ind. 2016). The issue in *Culver Cmty*. was collective

bargaining, but "alleviat[ing] various forms of strife and unrest" (174 N.E.3d at 605, citing I.C. § 20-29-1-1(2)) is equally relevant to protecting other rights of both educators and students. As Judge Brennan observed, Kluge "was not just any orchestra teacher; many students and former students said he was a great one." *Kluge*, 64 F.4th at 901 (Brennan, J., dissenting). But students are now deprived of Kluge's skills because BSCS refuses to honor his conscience and religious liberty.

Tuition-free public education is constitutionally guaranteed by Indiana's state constitution, and schools are organized as nonprofit entities (I.C. § 20-29-1-1(4)(A) (2014)). Accordingly, "the unique relationship between school corporations and teachers cannot be compared to the relationship between private employers and employees." *Jay*, 55 N.E.3d at 817. Maintenance of a "strong educational system" is important for the children of Indiana and depends on preserving these relationships: "The citizens of Indiana have a fundamental interest in the development of harmonious and cooperative relationships between school corporations and their certificated employees." I.C. § 20-29-1-1(1) (2014). Coerced transgender ideology destroys the harmony and cooperation that must exist between schools and those they hire to educate Indiana's children.

### D. Respect for religious faith is essential for a school to maintain harmonious relationships with its teachers and fulfill its mission.

Indiana's strong protection for religious liberty is reflected in its Constitution, history, and Indiana Supreme Court decisions about public education. Ind. Const.

Art. 1, § 2. BCSC's favoritism toward transgender students, regardless of the impact on the faith and conscience of others in the school system, goes far beyond the constitutional mandate to provide a school equally open to all. On the contrary, its policies flout that mandate by promoting unequal treatment for students, teachers, and others who disagree with the prevailing transgender ideology. In this case, Kluge reported a heated theological debate with a school superintendent who became angry and argued that his beliefs were not consistent with the Bible. *Kluge*, 64 F.4th at 901 (Brennan, J., dissenting). Kluge ultimately lost his job because of his religious convictions, a result inconsistent with the "harmonious and cooperative relationships" the state legislature intended between schools and their teachers; *see* I.C. § 20-29-1-1(1) (2014). Unlike other cases, e.g., *Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986), "Kluge did not proselytize" or even "reveal to his students why he used only last names, and he never shared his religious beliefs with them." *Kluge*, 64 F.4th at 923 (Brennan, J., dissenting).

Indiana's protection for religious liberty extends to education, which "was substantially provided by the family or by religious or private schools" prior to the 1830's. *Embry*, 798 N.E.2d at 162, citing Donald F. Carmony, *Indiana, 1816-1850: The Pioneer Era* at 363 (Indiana Historical Bureau & Indiana Historical Society 1998). Although state citizens are never taxed for the support of religious worship (Ind. Const. Art. 1, § 6), the constitutional prohibition "does not expressly include

7

or make any reference to educational institutions with religious affiliations." *Embry*, 798 N.E.2d at 161. Indeed, as public school funding initially developed in Indiana, "the meager public funds available for education were often distributed to public and independent schools alike, including those run by churches." *Id*. at 162, citing Carl F. Kaestle, *Pillars of the Republic: Common Schools and American Society, 1780-1860*, at 166-67 (Hill and Wang 1983). More recently, the Indiana Supreme Court upheld a school voucher program that extended to religious schools, explaining that "the phrase 'religious or theological institution[s]' in Section 6 of the Indiana Constitution was not intended to, nor does it now, apply to preclude government expenditures for functions, programs, and institutions providing primary and secondary education." *Meredith v. Pence*, 984 N.E.2d 1213, 1230 (Ind. 2013).

Indiana's benevolent attitude toward religious education, as displayed in these cases, is inconsistent with a school "mission" or policy that fails to honor or accommodate an individual teacher's religious convictions.

## II. AS A GOVERNMENT ENTITY, A PUBLIC SCHOOL MUST PURSUE ITS MISSION IN COMPLIANCE WITH THE CONSTITUTION.

The School, as a *government* entity and a *government* employer, cannot bypass the Constitution (either state or federal) in pursuit of its educational mission. Neither students nor teachers shed their constitutional rights at the schoolhouse door. Students not only need to learn how the Constitution guards their own rights—they must also learn to respect the constitutional rights of others, including their teachers.

Teachers can respect the dignity of each student without sacrificing their own rights to thought, conscience, and speech.

### A. BCSC must comply with the Constitution in pursuing its educational mission.

Public school officials are indisputably "state actors subject to constitutional oversight," even though their "custodial and tutelary" role allows for greater supervision and control over young students than would be permissible for adults. *Northwestern Sch. Corp. v. Linke*, 763 N.E.2d 972, 979 (Ind. 2002) (upholding random drug testing policy for voluntary student activities, as distinguished from mandatory courses); *Vernonia School District 47J v. Acton*, 515 U.S. 646, 655 (1995). The *Linke* court noted that "public schools stand 'in the relation of parents and guardians to the students' … regarding [all] matters of discipline and conduct of students." *Ibid*., citing *Higginbottom v. Keithley*, 103 F. Supp. 2d 1075, 1080 (S.D. Ind. 1999), quoting Ind. Code § 20-8.1-5.1-3(b) (1988). But the school's semi-parental role does not override the fundamental rights of parents to direct the upbringing of their children, nor does it grant officials carte blanche to impose transgender ideology on anyone—students, teachers, or parents. *Linke* confirmed that the state legislature had "codified compulsory school attendance," but "did not read into the Education Clause a requirement that Indiana school corporations affirm transgender identity." *Kluge*, 64 F.4th at 918 (Brennan, J., dissenting).

9

**The School's mission is to serve all students. *All* means *all*.** The School must respect the rights and dignity of all students as well as its faculty. If a "safe and inclusive" standard is applied, it should apply to all students. But school officials are more concerned about transgender students than those who object to transgenderism based on religious convictions or privacy concerns (e.g., bathrooms). BCSC "protects" transgender students at the expense of all others involved in public education, including other students, teachers, and families. The District demands that all persons involved in public education become "instrument[s] for fostering . . . an ideological point of view" many find "morally objectionable." *Wooley v. Maynard*, 430 U.S. 705, 714-715 (1977). A government edict that commands "involuntary affirmation" demands "even more immediate and urgent grounds than a law demanding silence." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018), citing *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 633 (1943) (internal quotation marks omitted). Even a legitimate and substantial government purpose "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Wooley*, 430 U.S. at 716-717, citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960). BCSC cannot jump this hurdle.

**B. A public school must comply with the Constitution in its role as a government employer.**

Even as an employer, the *government* is still the *government*, subject to constitutional constraints. Even as a government employee, a citizen is still a citizen. Government employees "do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). The Constitution does not permit BCSC to "leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Id*. at 419; see *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Connick v. Myers*, 461 U.S. 138, 147 (1983) ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government"). Neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist*., 393 U.S. 503, 506 (1969).

**Speech on matters of public concern.** All citizens, whether employed by a private or public employer, have a fundamental right to speak on matters of public concern. In America today, there is hardly a more contentious "matter of public concern" than gender identity, "a controversial [and] sensitive political topic[] . . . of profound value and concern to the public." *Janus*, 138 S. Ct. at 2476 (cleaned up). BCSC's policy "use[s] pronouns to communicate a message" that Kluge believes is false, namely that "[p]eople can have a gender identity inconsistent with their sex at

birth." *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021). "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id*. at 508.

In *Pickering*, the Supreme Court crafted a test that balances "between the [free speech] interests of [a] teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Township High School District 205*, 391 U.S. 563, 568 (1968). *Pickering*'s balancing test does not warrant BCSC's compelled expression of Kluge's personal agreement on a controversial public issue where citizens are deeply divided. *Janus*, 138 S. Ct. at 2471 ("prominent members of the founding generation condemned laws requiring public employees to affirm or support beliefs with which they disagreed").

Kluge's speech touches a matter of intense public concern and debate. Pronouns are an integral part of common, everyday speech practice based on objective biological reality concerning each person's sex. Kluge's use of pronouns reflects his personal belief that each person is created immutably male or female. He does not accept the culturally popular "gender identity" concept nor does he believe that a person can transition from one sex to the other. The First Amendment safeguards Kluge's right to speak according to his beliefs on these matters, even in the public school where he teaches.

12

**The School's self-definition of its mission must be consistent with the Constitution**. The district court refers to a "long line of Seventh Circuit authority squarely holding that an employer can define its own legitimate mission," noting that these cases were "left untouched" by the Supreme Court's recent holding in *Groff v. DeJoy*, 600 U.S. 447 (2023). *Kluge*, 2024 U.S. Dist. LEXIS 78340, *55. This line of authority is cited to argue that "contradictions to its legitimate mission are relevant to analyzing undue hardship" in cases of religious accommodation. *Ibid*. On closer examination of the cases cited, several distinctions should be noted. Two cases involve private employers, not government employers restrained by the Constitution. See *Anderson v. U.S.F. Logistics (IMC), Inc*., 274 F.3d 470, 473 (7th Cir. 2001) (employer does shipping for other companies); *EEOC v. Ilona of Hungary*, Inc., 108 F.3d 1569, 1572 (7th Cir. 1997) (beauty salon). Government employers must comply with the Constitution and may also have other legal mandates to fulfill a specific mission. *Ryan v. Dep't of Just*., 950 F.2d 458, 462 (7th Cir. 1991) (FBI agent refused assignment requiring him to arrest persons engaged in unlawful protests, and he declined to swap assignments—a federal law enforcement agency does not legislate and has limited ability to define its mission); *Baz*, 782 F.2d at 706 (government chaplain employed by Veterans Administration at psychiatric hospital—another federal agency). One case was reversed and remanded in favor of a Jewish applicant for employment who objected to taking and examination on a

Saturday, based on certain statutory requirements imposed on the employer. *Minkus v. Metro. Sanitary Dist. of Greater Chicago (MSD)*, 600 F.2d 80, 84 (7th Cir. 1979). Only one of the cases cited involved a school—this circuit found that a university's adverse action against a professor was not based on his membership in a religious group but rather his refusal to meet legitimate expectations even with a reasonable accommodation. *Seshadri v. Kasraian*, 130 F.3d 798, 799 (7th Cir. 1997).

None of these Seventh Circuit cases suggest that a public school, constitutionally required to be open to all students within its geographic boundaries, can redefine its mission to compel all public school participants to affirm transgender ideology.

**Offense does not establish undue hardship**. If "avoiding offense" is the official policy in determining undue hardship, no school could fulfill its educational mission to be open to all students. But that is exactly the standard BCSC appears to have adopted, i.e., "once an employer receives complaints of offense about an employee's religious observance or practice, undue hardship has been established as long as avoiding offense is its policy." *Kluge*, 64 F.4th at 924 (Brennan, J., dissenting). BCSC relied on complaints that Kluge's behavior was "insulting or offensive and made his classroom environment unwelcoming and uncomfortable," thus "conflict[ing] with its philosophy of creating a safe and supportive environment for all students." *Kluge*, 2024 U.S. Dist. LEXIS 78340, *62.

**Unconstitutional conditions.** The doctrine of unconstitutional conditions further condemns the School's position. "[A] State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Garcetti*, 547 U.S. at 413; *see Connick*, 461 U.S. at 142; *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605-606 (1967); *Pickering*, 391 U.S. 563; *Perry v. Sindermann*, 408 U.S. at 597; *Branti v. Finkel*, 445 U.S. 507, 515-516 (1980). There was a time when "a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights." *Garcetti*, 547 U.S. at 417, quoting *Connick*, 461 U.S. at 143. That theory has been "uniformly rejected." *Pickering*, 391 U.S. at 568); *Keyishia*n, 385 U.S. at 605-606. As the Supreme Court confirmed in *Lane v. Franks*, "public employees do not renounce their citizenship when they accept employment, and . . . public employers may not condition employment on the relinquishment of constitutional rights." 573 U.S. 228, 236 (2014).

**C.     BCSC must prepare students for the "marketplace of ideas" they will experience in higher education.**

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton*, 364 U.S. at 487. The School's imposition of transgender ideology tramples basic First Amendment liberties and stifles the free flow of ideas, particularly with respect to sexuality.

The First Amendment facilitates the free flow of information, protecting a multitude of viewpoints—and "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853, 866 (1982), quoting *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965). This is particularly true in public education, where undergraduate students are exposed to a broad range of subjects to prepare for the university, the quintessential "marketplace of ideas." *Healy v. James*, 408 U. S. 169, 180 (1972).

"The Nation's future depends upon leaders trained through wide exposure" to a "robust exchange of ideas" that "discovers truth out of a multitude of tongues" rather than "authoritative selection." *Keyishian*, 385 U.S. at 603. "[S]tate-operated schools may not be enclaves of totalitarianism . . . . [S]tudents may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Pico*, 457 U.S. at 877 (Blackmun, J., concurring), quoting *Tinker*, 393 U.S. at 511.

**Broad First Amendment rights apply to both students and faculty.** The Supreme Court has long recognized the First Amendment rights of both students and professors. Even undergraduate students do not "shed their constitutional rights...at the schoolhouse gate." *Tinker*, 393 U.S. 503, 506 (1969); see also *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988).

16

**No person has an absolute right to freedom from exposure to opposing views or practices**. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011), quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989).  BCSC argues that "the last-name-only accommodation resulted in 'substantial student harm.'" *Kluge*, 2024 U.S. Dist. LEXIS 78340, *62 . "[T]he Constitution does not guarantee citizens a right entirely to avoid ideas with which they disagree. It would betray its own principles if it did; no robust democracy insulates its citizens from views that they might find novel or even inflammatory." *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 44 (2004) (O'Connor, J., concurring). Students must learn to endure speech that is offensive or even false as "part of learning how to live in a pluralistic society, a society which insists upon open discourse towards the end of a tolerant citizenry." *Lee v. Weisman*, 505 U.S. 577, 590 (1992). Indeed, public school students attending required classes are exposed to "ideas they find distasteful or immoral or absurd or all of these." *Id*. at 591.

**Respect for the religious practices of others is a fundamental civic virtue that public schools can and should cultivate.** Public education plays a critical role in preparing young minds to exercise their own constitutional rights and respect the rights of others. As students learn how to implement First Amendment principles,

"maintaining respect for the religious observances of others is a fundamental civic virtue that government (including the public schools) can and should cultivate." *Lee*, 505 U.S. at 638 (Scalia, J., dissenting).

Teachers are asked "to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens . . . . They cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them." *Kennedy v. Bremerton Sch. Dist.*, 4 F.4th 910, 936 (9th Cir. 2021) (O'Scannlain, J., dissenting from denial of rehearing en banc), quoting *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J., concurring). Public schools have a role in "educat[ing] youth in the values of a democratic, pluralistic society." *Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 378 (6th Cir. 1999); "public schools are particularly important to the maintenance of a democratic, pluralistic society" (*id*. at 377). Rigorous protection of constitutional liberties is essential to preparing young persons for citizenship, so that we do not "strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Barnette*, 319 U.S. at 637.

## III. BCSC's PURPORTED "EDUCATIONAL MISSION" IS AT WAR WITH THE FIRST AMENDMENT BECAUSE IT TRANSGRESSES RIGHTS OF CONSCIENCE AND IMPOSES A VIEWPOINT-BASED POLICY THAT COMPELS SPEECH.

BCSC's "Name Policy" is the epitome of viewpoint-based compelled speech. As in *Barnette*, there is "probably no deeper division" than a conflict provoked by

the choice of "what doctrine . . . public educational officials shall compel youth to unite in embracing." Richard F. Duncan, *Defense Against the Dark Arts, Justice Jackson, Justice Kennedy, and the No-Compelled Speech Doctrine*, 32 Regent U. L. Rev. 265, 292 (2019-2020), citing *Barnette*, 319 U.S. 624, 641 (1943). There are deep divisions over what public school students should be taught, particularly about sexuality and other contentious matters. These divisions impact the speech of both students and the teachers who instruct them.

Compelled speech is anathema to the First Amendment, particularly where the government mandates conformity to its preferred viewpoint. *Barnette*, *Wooley*, *NIFLA* and other "eloquent and powerful opinions" stand as "landmarks of liberty and strong shields against an authoritarian government's tyrannical attempts to coerce ideological orthodoxy." Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 266; *Barnette*, 319 U.S. 624; *Wooley*, 430 U.S. 705*; National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361 (2018).

Compelled speech is even more tyrannical than compelled silence because "it invades the private space of one's mind and beliefs." Richard F. Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 275. While "ordinary authoritarians" merely demand silence, prohibiting people from saying what they believe is true, "[t]otalitarians insist on forcing people to say things they know or believe to be

untrue." *Id*., quoting Professor Robert George.[3] BCSC has adopted a totalitarian mode by demanding that Kluge acknowledge the sex of students according to their individual preferences. Kluge cannot in good conscience comply with this decree.

Compelled speech and viewpoint discrimination are uniquely pernicious First Amendment violations. Their combination is a formula for tyranny. The "proudest boast" of America's free speech jurisprudence is that we safeguard "the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (plurality opinion) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). Gender identity may be "embraced and advocated by increasing numbers of people," but that is "all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000). Our law also protects the right to remain silent— to not express thoughts or viewpoints a speaker hates. Compelled expression is even worse than merely silencing a speaker. It is difficult to discern the viewpoint of one who is silent, but compelled speech affirmatively associates the speaker with a viewpoint he does not hold.

BCSC "[m]andate[d] speech that [Kluge] would not otherwise make" and "exact[ed] a penalty"—the loss of his livelihood—because he refused. *Riley v. Nat'l*

---

[3] Robert P. George, Facebook (Aug. 2, 2017), https://www.facebook.com/ RobertPGeorge/posts/10155417655377906.

*Fed'n of the Blind of N.C., Inc*., 487 U.S. 781, 795 (1988). The School demands that Kluge make false assertions by using pronouns inconsistent with a student's biological sex, contrary to his concern that he would be "lying to [transgender students] about their sex." *Kluge*, 2024 U.S. Dist. LEXIS 78340, *73. The mandate is obviously based on content—the pronouns Kluge uses when he speaks to or about his students. Worse yet, it is viewpoint-based because it requires him to implicitly endorse transgender ideology that conflicts with his conscience.

"When the law strikes at free speech it hits human dignity . . . when the law compels a person to say that which he believes to be untrue, the blade cuts deeper because it requires the person to be untrue to himself, perhaps even untrue to God." Richard F. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly Through the Lens of Telescope Media*, 99 Neb. L. Rev. 58, 59 (2020) (emphasis added). The School's mandate combines the worst of two worlds—compelled speech and viewpoint discrimination.

**Freedom of thought.** Indiana protects freedom of thought: "No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience." Ind. Const. Art. 1, § 3. Freedom of thought is the "indispensable condition" of "nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 326-27 (1937), overruled on other grounds by *Benton v. Maryland*, 395 U.S. 784 (1969). The freedom of thought that undergirds the First

Amendment merits "unqualified attachment." *Schneiderman v. United States*, 320 U.S. 118, 144 (1943). The distinction between compelled speech and compelled silence is "without constitutional significance." *Riley*, 487 U.S. at 796. These two rights are "complementary components" of the "individual freedom of mind." *Wooley*, 430 U.S. at 714; *Barnette*, 319 U.S. at 637. Together they guard "both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714; *Barnette*, 319 U.S. at 633-634; *id*., at 645 (Murphy, J., concurring). A system that protects the right to promote all sorts of ideological causes "must also guarantee the concomitant right to decline to foster such concepts." *Wooley*, 430 U.S. at 714; Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 63.

Viewpoint discrimination ushers in an Orwellian system that destroys liberty of thought. "The possibility of enforcing not only complete obedience to the will of the State, but complete uniformity of opinion on all subjects, now existed for the first time." George Orwell, "1984" 206 (Penguin Group 1977) (1949) (emphasis added). As Justice Kennedy cautioned, "The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal*., 535 U.S. 234, 253 (2002); see Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 265. BSCS imposes a policy that imperils all these liberties.

BSCS's Name Policy is a government demand that would force Kluge to become "an instrument for fostering . . . an ideological point of view" he finds "morally objectionable." *Wooley*, 430 U.S. at 714-715. A government edict that commands "involuntary affirmation" demands "even more immediate and urgent grounds than a law demanding silence." *Janus*, 138 S. Ct. at 2464, citing *Barnette*, 319 U.S. at 633 (internal quotation marks omitted). Even a legitimate and substantial government purpose "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more  narrowly achieved." *Wooley*, 430 U.S. at 716-717, citing *Shelton*, 364 U.S. at 488. BSCS cannot jump this hurdle.

**Religious speech.** The Name Policy encroaches on religious speech that is grounded in the conviction that God creates each person immutably male or female. Religious speech is not only "as fully protected . . . as secular private expression," but historically, "government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022), quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (internal citations omitted).

**Conscience.** The vast majority of state constitutions expressly define religious liberty in terms of conscience. Indiana is among them: "All people shall be secured in the natural right to worship Almighty God, according to the dictates of their own

consciences." Ind. Const. Art. 1, § 2. The victory for freedom of thought recorded in the Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. *Girouard v. United States*, 328 U.S. 61, 68 (1946). Courts have an affirmative "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee v. Weisman*, 505 U.S. at 592. BSCS's Name Policy assaults liberty of thought and conscience, compelling Kluge "to contradict [his] most deeply held beliefs, beliefs grounded in basic philosophical, ethical, or religious precepts"—by affirming the lie that a biological female is a male (or vice versa). *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring); see Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 65-66.

**There is no "good orthodoxy."** "[T]he history of authoritarian government . . . shows how relentless authoritarian regimes are in their attempts to stifle free speech." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring). There is "no such thing as good orthodoxy" under a Constitution that safeguards thought, speech, conscience, and religion, even when the government pursues seemingly benign purposes like national allegiance (*Barnette*), equality, or tolerance. Erica Goldberg, *"Good Orthodoxy" and the Legacy of Barnette*, 13 FIU L. Rev. 639, 643 (2019). "Even commendable public values can furnish the spark for the dynamic that Jackson insists leads to the 'unanimity of the graveyard.'" Paul Horwitz, *A Close Reading of Barnette, in Honor of Vincent Blasi*, 13 FIU L. Rev. 689, 723 (2019).

24

Every speaker must decide "what to say and what to leave unsaid." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 575 (1995), quoting *Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (plurality opinion). An individual's "intellectual autonomy" is the freedom to say what that person believes is true and to refrain from saying what is false. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 85. A speaker's choice "not to propound a particular point of view" is simply "beyond the government's power to control," regardless of the speaker's reasons for remaining silent. *Hurley*, 515 U.S. at 575. There is "no more certain antithesis" to the Free Speech Clause than a government mandate imposed to produce "orthodox expression." *Ibid*. at 579. Such a restriction "grates on the First Amendment." *Ibid*. "Only a tyrannical government" "requires one to say that which he believes is not true," e.g., that "two plus two make five." *Ibid*.

The Supreme Court has never upheld a viewpoint-based mandate compelling "an unwilling speaker to express a message that takes a particular ideological position on a particular subject." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 78. But that is precisely what BSCS attempts to do. The Name Policy darkens the "fixed star in our constitutional constellation" that forbids any government official, "high or petty," from prescribing "what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force

citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. Regardless of how acceptable transgender ideology is in the current culture, the School's interest in disseminating that ideology "cannot outweigh [Kluge's] First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 717. *Barnette* and *Wooley* long ago solidified the principle that government lacks the "power to compel a person to speak, compose, create, or disseminate a message on any matter of political, ideological, religious, or public concern." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 63-64.

**Viewpoint-based compelled speech stifles debate and attacks the dignity of those who disagree with the prevailing state orthodoxy.** Viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). It creates a "substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). This is "poison to a free society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring). "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Janus*, 138 S. Ct. at 2464.

The government may not regulate speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the

restriction." *Rosenberger*, 515 U.S. at 829. The Name Policy is "a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring). This viewpoint-based compulsion to speak seeks not only to control the content (pronouns) but also to promote an ideology unacceptable to Kluge. Such coerced compliance attacks his dignity. "Freedom of thought, belief, and speech are fundamental to the dignity of the human person." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 59.

The Name Policy contravenes "[t]he very purpose of the First Amendment . . . to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring). This is dangerous to a free society where the government must respect a wide range of diverse viewpoints. "Struggles to coerce uniformity" of thought are ultimately futile, "achiev[ing] only the unanimity of the graveyard." *Barnette*, 319 U.S. at 640, 641. The government itself may adopt a viewpoint but may never "interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

The state sometimes attempts to use one person's speech to vindicate the dignity interests of others, as BCSC does in this case, but that purpose is "insufficient

to override First Amendment concerns." Goldberg, "*Good Orthodoxy*", 13 FIU L. Rev. at 664. Even when it is appropriate to regulate harmful discriminatory conduct, the state may not require that some citizens "communicate a message of tolerance that affirms the dignity of others." *Ibid*. Dignity is an interest "so amorphous as to invite viewpoint-based discrimination, antithetical to our viewpoint-neutral free speech regime, by courts and legislatures." *Id*. at 665. The state may not enhance the dignity of some persons by censoring the protected expression of other persons.

**Teachers can and should affirm the dignity of every student without sacrificing their own constitutional liberties.** It is a "critical part of a professor's job" to "affirm[] the equal dignity of every student," so as to create the best learning environment. Goldberg, "*Good Orthodoxy*", 13 FIU L. Rev. at 666. At the same time, "students need to tolerate views that upset them, or even disturb them to their core, especially from other students, and perhaps *even from professors*." *Id*. (emphasis added). Students must learn to endure speech that is offensive or even false as "part of learning how to live in a pluralistic society, a society which insists upon open discourse towards the end of a tolerant citizenry." *Lee v. Weisman*, 505 U.S. at 590. Indeed, public school students attending required classes are exposed to "ideas they find distasteful or immoral or absurd or all of these." *Id*. at 591.

## CONCLUSION

The district court ruling is profoundly wrong and should be reversed.

Respectfully submitted,

/s/ Deborah J. Dewart
Deborah J. Dewart
Counsel of Record
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554
lawyerdeborah@outlook.com

*Counsel for Amicus Curiae*

July 15, 2024

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION</u>

1. This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 28(e)(2) and 32(a)(7)(B), as modified by Circuit Rules 28.1 and 32(c), because the brief contains 6,736 words, excluding the parts of the brief exempted from the word count by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), as modified by Circuit Rule 32(b), because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ Deborah J. Dewart
Deborah J. Dewart

*Counsel for Amicus Curiae*

Dated: July 15, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 15, 2024, I caused a copy of the foregoing to be served via this Court's ECF filing system, which will provide a copy to all counsel of record.

<u>/s/ Deborah J. Dewart</u>
Deborah J. Dewart

*Counsel for Amicus Curiae*

Dated: July 15, 2024