No. 24-1942

# In the United States Court of Appeals for the Seventh Circuit

◆

JOHN M. KLUGE,

*Plaintiff-Appellant,*

v.

BROWNSBURG COMMUNITY SCHOOL CORPORATION,

*Defendant-Appellee.*

◆

On Appeal from the United States District Court for
the Southern District of Indiana, Indianapolis
Division, Case No. 1:19-cv-02462-JMS-KMB
Hon. Jane Magnus-Stinson

**AMICUS CURIAE BRIEF OF ADVOCATES PROTECTING CHILDREN, BILLY BURLEIGH, KATHYGRACE DUNCAN, AND LAURA PERRY SMALTS IN SUPPORT OF PLAINTIFF-APPELLANT SEEKING REVERSAL**

JOSHUA K. PAYNE
  *Counsel of Record*
JORDAN CAMPBELL
RONALD MILLER
DANIEL SEPULVEDA
CAMPBELL MILLER PAYNE, PLLC
5955 Alpha Rd #1491
Dallas, Texas 75240
(214) 316-7156
josh@cmppllc.com

July 17, 2024                    Counsel for *Amici Curiae*

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: No. 24-1942

Short Caption: John M. Kluge v. Brownsburg Community School Corporation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Amici Curiae: Advocates Protecting Children, Billy Burleigh, KathyGrace Duncan, and Laura Perry Smalts

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Campbell Miller Payne, PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        Regarding Amicus Advocates Protecting Children: None. The other Amici are individuals.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        Regarding Amicus Advocates Protecting Children: None. The other Amici are individuals.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: s/ Joshua K. Payne      Date: July 17, 2024

Attorney's Printed Name: Joshua K. Payne

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑   No ☐

Address: 5955 Alpha Rd #1491, Dallas, Texas 75240

Phone Number: (214) 316-7156      Fax Number: N/A

E-Mail Address: josh@cmppllc.com

rev. 12/19 AK

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................i

TABLE OF AUTHORITIES ......................................................................ii

INTEREST OF *AMICI CURIAE*................................................................ 1

SUMMARY OF ARGUMENT ................................................................... 3

ARGUMENT ......................................................................................... 5

  I.  *Amici* Know from Personal Experience That Social and Medical Transition Is Harmful....................................................................................... 5

  II.  Scientific Evidence Demonstrates That Social and Medical Transition Is Harmful....................................................................................... 12

    A.  Encouraging Children to Transition Changes Outcomes by Preventing Natural Desistance. ............................................................... 12

    B.  Detransitioning Is on the Rise, and Also Shows That Young People Become Comfortable with Their Sex over Time. ................................. 13

    C.  Evidence Is Lacking for Benefits That Would Outweigh the Clear Harms of Transitioning. ........................................................................ 15

CONCLUSION..................................................................................... 17

CERTIFICATE OF COMPLIANCE.............................................................19

CERTIFICATE OF SERVICE...................................................................20

# TABLE OF AUTHORITIES

## Other Authorities

Carly Guss, et al., *Transgender and Gender Nonconforming Adolescent Care: Psychosocial and Medical Considerations*, 27(4) Curr. Opin. Pediatr. 421-426 (2015) ................................................................................................... 13

Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69(9) J. Homosex. 1602-1620 (2022), Epub Apr. 30, 2021 ....... 13, 14

*Independent Review of Gender Identity Services for Children and Young People: Final Report*, The Cass Review (April 2024)……………………………………………..16

Isabel Boyd, et al., *Care of Transgender Patients: A General Practice Quality Improvement Approach*, 10(1) Healthcare 121 (2022) ........................................... 15

J. Straub, et al., *Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery*, 16(4):e57472 Cureus 1-9 (2024)……………………………………………..17

Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment Is Failing Trans Kids*, Wash. Post, Nov. 24, 2021 ................................................. 14, 15

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners,* 50(8) Arch. Sex. Behav. 3353-3369 (2021) ........................... 14, 15

Lisa Marchiano, *Gender Detransition: A Case Study*, 66(4) J. of Anal. Psychol. 813-832 (2021) ................................................................................................. 15

Pamela Paul, *As Kids, They Thought They Were Trans. They No Longer Do.*, N.Y. Times, Feb. 2, 2024 ........................................................................................ 15, 16

Pamela Paul, *Why Is the U.S. Still Pretending We Know Gender-Affirming Care Works?*, N.Y. Times, July 12, 2024 ................................................................. 16, 17

Pien Rawee, et al., *Development of Gender Non-Contentedness During Adolescence and Early Adulthood*, 53 Arch. Sex. Behav. 1813-1825 (2024)………..……………..12

R. Hall, et al., *Access to Care and Frequency of Detransition Among a Cohort Discharged by a UK National Adult Gender Identity Clinic: Retrospective Case-Note Review*, 7(6):e184 BJPsych Open. 1-8 (2021) ................................................... 15

Thomas D. Steensma, et al., *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) J. Am. Aca. Child Adolesc. Psychiatry 582-590 (2013) ............................................................. 13

Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, J. of Clinic. Endocrin. & Metab. 3869-3903 (2017) .................................................. 12, 13

### INTEREST OF *AMICI CURIAE*

*Amici* Advocates Protecting Children, Billy Burleigh, KathyGrace Duncan, and Laura Perry Smalts respectfully submit this brief in support of Plaintiff-Appellant seeking reversal.[1]

Advocates Protecting Children is a national non-profit organization dedicated to fighting the gender industry, and especially its predation on children in the form of unethical social and medical transition for the sake of political and financial profit. It supports individuals, families, churches, businesses, and organizations by providing facts, robust research, and evidence-based information about the mental and physical health of children who suffer gender dysphoria.

Billy Burleigh, KathyGrace Duncan, and Laura Perry Smalts experienced gender dysphoria when they were adolescents and young adults. They were led to believe that "affirming" interventions for the purpose of "gender transition," including cross-sex hormones and surgical procedures, would resolve their gender dysphoria and permit them to live healthy, well-adjusted lives. Sadly, *Amici* learned through their experiences that such interventions did not resolve their mental health issues or gender dysphoria, but only caused physical harm and increased their distress as they realized their bodies had been irreversibly altered based upon a false promise.

*Amici* respectfully submit this brief to provide this Court with an understanding of the experiences of detransitioners, the evidence showing that

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than *Amici*, their members, or their counsel made a monetary contribution intended to fund the preparation or submission of the brief.

medical and social transition is harmful, and the evidence showing that gender dysphoria often resolves when children are allowed to grow up naturally without being steered into a path of medical or social transition.

## SUMMARY OF ARGUMENT

Advocates Protecting Children is comprised of professional women who hold B.A. degrees in education, professional writing, foreign language, communications and a B.S. in cognitive science; M.S. degrees in education and educational psychology; a Ph.D. in instructional technology and learning science; a J.D.; and an M.D. in pediatric medicine. All told, the Advocates team has over 85 years of teaching experience ranging from preschool through adult instruction, from homeschool to private school to public school. These women are also mothers and share more than 100 years' worth of parenting experience. They are also practicing Christians.

As both teachers and Christians, the Advocates team recognizes that the best educational outcome for all children relies on the respectful, honest student-teacher partnership. Respect for one's teacher is an integral part of any student's educational success and lifelong love of learning. Insisting that our teachers transmit only concepts of truth and reality in the classroom should be the bare minimum of what we are to expect from our teachers. Accordingly, the teacher who affirms a student's transgender identification by using false pronouns or names undermines the student-teacher relationship and the entire class's respect for that teacher.

Billy Burleigh, KathyGrace Duncan, and Laura Perry Smalts are living proof that such affirmation is deeply harmful. They experienced gender dysphoria when they were adolescents and young adults. They were led to believe that "affirming" interventions for the purpose of "gender transition," including cross-sex hormones and surgical procedures, would resolve their gender dysphoria and permit them to

live healthy, well-adjusted lives. Sadly, *Amici* learned through their experiences that such interventions did not resolve their mental health issues or gender dysphoria, but only caused physical harm and increased their distress as they realized their bodies had been irreversibly altered based upon a false promise.

Consistent with the experiences of *Amici*, available evidence shows that gender dysphoria usually resolves on its own, in which case social and medical transition is proved unnecessary and only harmful. Furthermore, evidence is lacking for benefits that would outweigh the clear harms of transitioning.

# ARGUMENT

## I. *Amici* Know from Personal Experience That Social and Medical Transition Is Harmful.

### Advocates Protecting Children

As a national non-profit organization dedicated to providing facts, robust research, and evidence-based information about the mental and physical health of children who suffer gender dysphoria, Advocates Protecting Children knows that so-called social and medical "gender transition" of children is harmful. Advocates Protecting Children is comprised of professional women who hold B.A. degrees in education, professional writing, foreign language, communications and a B.S. in cognitive science; M.S. degrees in education and educational psychology; a Ph.D. in instructional technology and learning science; a J.D.; and an M.D. in pediatric medicine.

All told, the Advocates team has over 85 years of teaching experience ranging from preschool through adult instruction, from homeschool to private school to public school. These women are also mothers and share more than 100 years' worth of parenting experience. They are also practicing Christians.

As both teachers and Christians, the Advocates team recognizes that the best educational outcome for all children relies on the respectful, honest student-teacher partnership. Respect for one's teacher is an integral part of any student's educational success and lifelong love of learning.

Insisting that our teachers transmit only concepts of truth and reality in the classroom should be the bare minimum of what we are to expect from our teachers.

Accordingly, the teacher who affirms a student's transgender identification by using false pronouns or names undermines the student-teacher relationship and the entire class's respect for that teacher.

**Billy Burleigh**

Billy Burleigh grew up in a good family with supportive parents. But in the first grade he began experiencing intrusive thoughts that "God made a mistake. I'm a girl." Through elementary school he had learning and emotional difficulties. He was in emotional pain, and he withdrew from others, trying to cope. He was sexually abused in sixth grade by a male diving coach.

Looking for answers to his distress, the prevailing information he received was that the only way to overcome the disconnect was to change his body to conform to what his mind was telling him. Driven by depression and thoughts of suicide, Billy was willing to try anything to relieve his suffering. He told his therapist he wanted to transition, and she provided him a letter to begin cross-sex hormones. Billy was prescribed spironolactone, to block testosterone, and estrogen. He underwent multiple surgeries. Starting at age 34, he underwent vaginoplasty, labioplasty, an Adam's apple shave, facial plastic surgery, and voice feminization surgery.

However, no matter how many surgeries he had, every time Billy looked in the mirror he saw a man staring back at him. Despite a successful professional career and passing well as a woman he still had all the same problems and mental distress he had before transitioning. After seven years, he began to detransition. What helped Billy come to terms with his male body was finding peace with God and a wonderful

faith community. With the help of healthy relationships with other men and a community that loved and supported him, he was able to make the journey back to embracing his male self. Billy got married in 2011 and is currently living happily as a male, a husband, and father, although he still must live with the consequences of a scarred body and the inability to engage sexually with his wife.

Based on his experience, Billy believes strongly that, even with parental consent, interventions aimed at "affirming" a discordant gender identity are harmful to children. They are putting a band-aid on the underlying issues that the child is having. Children are looking for acceptance, significance, and security. "Gender-affirming" treatments are offered to satisfy those needs, but from his own painful experience Billy warns they cannot do that long term. Billy has spoken with many detransitioned young people. Many of them have experienced trauma and/or sexual abuse. Billy has realized that these kids need therapy and a safe environment to work through and address the severe mental health issues they are experiencing. Children facing the struggles Billy faced need help with their thoughts, not a body "fix" with hormones and surgery.

**KathyGrace Duncan**

From a very young age, KathyGrace was gender nonconforming; she preferred male attire, thought she was a "boy," and wanted to live as one. However, it was not until after she had medically transitioned and lived for many years as a man that she was able to reflect on the complex true origins and causes of her self-perception and gender dysphoria. Growing up in a dysfunctional family in which her mother was

often the victim of her father's emotional and verbal abuse, KathyGrace intuited the message that "my dad would love me if I were a boy." Sexual abuse by a family member between the ages of 10 and 12 further convinced her that being a girl meant being unsafe and unlovable.

In sixth grade, she learned about female to male transsexuals, leading her to conclude that her distress was caused by not having the "right" body and the only way to live a normal life was to medically transition and become a heterosexual male. At age 19, she began living as a man named Keith and went to a therapist who formally diagnosed her with gender dysphoria. She began testosterone and a year later had a mastectomy. At the time, she believed changing her body was necessary so that what she saw in the mirror matched what she felt on the inside. She never viewed her condition as touching on mental health issues, and neither did the therapist who diagnosed her. Whether her self-perception and desire to transition was related to her mental health issues was never explored.

After 11 years passing as a man and living a relatively "happy" and stable life (which included having a number of girlfriends), KathyGrace realized that she was living a lie built upon years of repressed pain and abuse. Hormones and surgery had not helped her resolve underlying issues of rejection, abuse, and sexual assault. Her desire to live as a man was a symptom of deeper, unmet needs.

With the help of life coaches and a supportive community, KathyGrace returned to her female identity and began addressing the underlying issues that had been hidden in her attempt to live as a man. She experienced depression that she had

repressed for years and grieved over the irreversible changes to her body. KathyGrace believes that if someone had walked with her through her feelings instead of affirming her desire to transition, she would have been able to address her mental health issues more effectively and not spent so many years making and recovering from a grave mistake.

### Laura Perry Smalts

Laura Perry Smalts will never experience giving birth to or breastfeeding a child because she became convinced that she was "born in the wrong body" and that her body needed to be altered to conform to her belief that she was really male. She now realizes that there are far better and healthier ways to assist a child who is distressed with her body that bring long-term resolution, and her story is living proof of that truth.

Like many detransitioners, Laura did not conform to gender stereotypes and experienced sexual abuse by a neighbor and family dysfunction during childhood, which contributed to her believing that she was really a boy. From an early age she fantasized about being a boy and wrote stories of herself as a male character but was not aware of the concept of being transgender until age 25. The desire to become male had become so strong that she began searching on the internet and was shocked to find numerous stories, websites, and support groups related to being transgender.

Laura went to a support group which immediately affirmed her as "transgender." From that point on, she was absolutely convinced that she was a "man trapped in a woman's body" and her body needed to be fixed. She started taking

testosterone at age 25 after receiving a diagnosis of gender identity disorder and letter from a therapist. Laura's physician, who was aware of her history of chronic hormone imbalance, nevertheless prescribed the cross-sex hormones on the same day. During nine years on testosterone, Laura experienced her voice getting lower, her jaw becoming more masculinized, her body shape changing, more hair growing on her body, and hair receding on her scalp. Her blood became very thick so that she became in danger of a stroke. Laura had to undergo therapeutic blood withdrawals to thin her blood.

With the medical interventions to support "gender transition," Laura fully passed as male and would have described herself as happy for the first few years. However, she also began to have problems with her memory and cognitive functioning. She became anxious, depressed, and neurotic about talking to people, becoming obsessed with "every detail of life fitting a male narrative." She couldn't function at work. Still, Laura was convinced that she wanted these interventions and underwent a double mastectomy at age 27 and complete hysterectomy, sending her into menopause, at age 30.

During the time that she lived as a man, Laura was constantly reminded of the truth, but had to constantly override it, which she found to be exhausting. After seven years of medical transition treatments, Laura was depressed and suicidal. She was so restless she had difficulty sleeping and staying focused at work. She credits faith in Jesus Christ and the "positive message of love in God's Word," as what brought true healing in her heart. If Laura had not given her life to Christ, she

believes that she would have taken her own life because she realized she could neither escape the pain of her past nor become the man she longed to be. She entered a support group that helped her process the pain of her life and talk openly about the sexual trauma, issues with her mother, and rejection by others. She began working through a healing community, which restored her emotionally and psychologically as a woman. She received counseling that helped her see the broken patterns, process negative thinking towards herself, and understand healthy womanhood. She began to realize that she was not a man but had fixated on becoming a person who would be loved. In 2016 she detransitioned. In May 2022, Laura got married and no longer experiences any gender dysphoria.

Laura believes minors do not have the capacity to appreciate the gravity of these decisions, which involve the complications of medical transition and what children would be giving up, including sexual function and parenting. Nor does she believe a parent should be allowed to radically alter their child's body or allow their child to be sterilized because their child is experiencing a mental ailment. Based on her experience, Laura believes transition procedures do not solve anything but only give temporary relief, like taking a pain killer for a broken bone. From personal experience, Laura knows there are far healthier ways to help children resolve distress with their bodies.

## II.     Scientific Evidence Demonstrates That Social and Medical Transition Is Harmful.

### A.  Encouraging Children to Transition Changes Outcomes by Preventing Natural Desistance.

Over the last 50 years, numerous scientific studies have shown that gender dysphoria in children is not fixed; rather, the vast majority of prepubertal children with gender dysphoria *who do not socially or medically transition* will stop feeling dysphoric by the time they reach adulthood. Eleven peer-reviewed studies published between 1972 and 2021 investigated the persistence of childhood-onset gender dysphoria, and all reached the same conclusion: "among prepubescent children who feel gender dysphoric, the majority cease to want to be the other gender over the course of puberty—ranging from 61-88% desistance across the large, prospective studies." Expert Report of James M. Cantor, PhD, *Poe, et al. v. Labrador, et al.*, No. 1:23-cv-00269 (D. Idaho), ECF 56-4 at 57-58 (listing studies); *see also* Pien Rawee, et al., *Development of Gender Non-Contentedness During Adolescence and Early Adulthood*, 53 Arch. Sex. Behav. 1813-1825, 1813 (2024) ("Gender non-contentedness, while being relatively common during early adolescence, in general decreases with age and appears to be associated with a poorer self-concept and mental health throughout development."). No published study has shown otherwise.

Given this evidence, the Endocrine Society's Clinical Practice Guidelines acknowledge "the large majority (about 85%) of prepubertal children with a childhood diagnosis did not remain GD/gender incongruent in adolescence." Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An*

*Endocrine Society Clinical Practice Guideline*, 102(11) J. of Clinic. Endocrin. & Metab. 3869-3903, 3879 (2017).

Yet among children who are *affirmed* in a transgender identity, multiple studies have found that few or none grow into comfort with their biological sex: "The gender identity affirmed during puberty appears to predict the gender identity that will persist into adulthood." Carly Guss, et al., *Transgender and Gender Nonconforming Adolescent Care: Psychosocial and Medical Consideration*s, 27(4) Curr. Opin. Pediatr. 421-426, 421 (2015); *see also* Thomas D. Steensma, et al., *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) J. Am. Aca. Child Adolesc. Psychiatry 582-590, 588-89 (2013) (childhood social transitions are "important predictors of persistence").

Available evidence, then, suggests that affirming a transgender identity in children changes outcomes and prevents natural desistence in many children. Because, as the Endocrine Society recognizes, "we cannot predict the psychosexual outcome for any specific child," Hembree, et al. at 3876, protecting the freedom of teachers like Plaintiff-Appellant to speak the truth and not "affirm" a student's transgender identity would preserve children's ability to desist naturally, with their natal bodies and functions intact.

### B. Detransitioning Is on the Rise, and Also Shows That Young People Become Comfortable with Their Sex over Time.

Consistent with these studies and the experiences of *Amici*, research shows that an increasing number of youth and adults are detransitioning, indicating harm and lack of efficacy of the interventions. Vandenbussche 2021, for example, is a

survey of 237 detransitioners with 70% reporting that they detransitioned after realizing their gender dysphoria was related to other issues. Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69(9) J. Homosex. 1602-1620, 1606 (2022), Epub Apr. 30, 2021. And Littman 2021 is a survey of 100 detransitioners where 60% reported their decision to detransition was motivated by the fact that they "became comfortable identifying with their natal sex." Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50(8) Arch. Sex. Behav. 3353-3369, 3361 (2021).

In her study, Dr. Littman found that, as is true of *Amici*, a majority of the study subjects felt that they had been rushed into "gender-affirmative" interventions with irreversible effects without the benefit of adequate psychologic evaluation. *Id.* at 3364-3366. Dr. Littman also found that several of the participants in her study felt pressured to transition from their doctors or therapists. *Id.* at 3366. Thirty-eight percent of participants in Dr. Littman's study said that their gender dysphoria was caused by trauma or mental health issues, and more than half said that transitioning delayed or prevented them from getting treatment for their trauma or mental health issues. *Id.* at 3361-3362.

In addition, many clinicians have commented on the rising numbers of detransitioners they are seeing. *See, e.g.,* Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment Is Failing Trans Kids*, Wash. Post, Nov. 24, 2021, https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-

psychologist/ (noting "rising number of detransitioners that clinicians report seeing," which is typically "youth who experienced gender dysphoria and other complex mental health issues, rushed to medicalize their bodies and regretted it"); Lisa Marchiano, *Gender Detransition: A Case Study*, 66(4) J. of Anal. Psychol. 813-832, 814 (2021) ("[T]he number of young people detransitioning (reaffirming their natal sex) … appears to be increasing. Detransitioners are now sharing their stories online and entering therapy."); *see also* R. Hall, et al., *Access to Care and Frequency of Detransition Among a Cohort Discharged by a UK National Adult Gender Identity Clinic: Retrospective Case-Note Review*, 7(6):e184 BJPsych Open. 1-8, 1 (2021) ("Detransitioning might be more frequent than previously reported."); Isabel Boyd, et al., *Care of Transgender Patients: A General Practice Quality Improvement Approach*, 10(1) Healthcare 121 (2022) ("[T]he detransition rate found in this population is novel and questions may be raised about the phenomenon of overdiagnosis, overtreatment, or iatrogenic harm as found in other medical fields.").

Dr. Littman observed that her research into detransitioners "adds to the existing evidence that gender dysphoria can be temporary." Littman 2021 at 3365. She concluded that "intervening too soon to medicalize gender dysphoric youth risks iatrogenically derailing the development of youth who would otherwise grow up to be LGB nontransgender adults." *Id.*

## C. Evidence Is Lacking for Benefits That Would Outweigh the Clear Harms of Transitioning.

The New York Times recently published accounts of detransitioners, which demonstrate the negative effects of "unproven treatments for children." Pamela Paul,

*As Kids, They Thought They Were Trans. They No Longer Do.*, N.Y. Times, Feb. 2, 2024, https://www.nytimes.com/2024/02/02/opinion/transgender-children-gender-dysphoria.html. As one detransitioner, who is also a psychotherapist, put it: "'You're made to believe these slogans . . . . Evidence-based, lifesaving care, safe and effective, medically necessary, the science is settled — and none of that is evidence based.'" *Id.* (quoting Paul Garcia-Ryan). The same publication also highlighted that "[g]ender-affirming care can include social transition," such as that at issue in this case, which involves "allowing kids to change their name, appearance and pronouns" at school. Pamela Paul, *Why Is the U.S. Still Pretending We Know Gender-Affirming Care Works?*, N.Y. Times, July 12, 2024, https://www.nytimes.com/2024/07/12/opinion/gender-affirming-care-cass-review.html.

In what is widely regarded as the most comprehensive review of available evidence, Dr. Hilary Cass, a renowned pediatrician in the United Kingdom, found adequate evidence lacking to support transition in children and young people. *See Independent Review of Gender Identity Services for Children and Young People: Final Report*, The Cass Review (April 2024), https://cass.independent-review.uk/home/publications/final-report/. As the New York Times summarized, Dr. Cass's four-year review "found no definitive proof that gender dysphoria in children or teenagers was resolved or alleviated by what advocates call gender-affirming care, in which a young person's declared 'gender identity' is affirmed and supported with social transition, puberty blockers and/or cross-sex hormones." Pamela Paul, *Why Is*

*the U.S. Still Pretending We Know Gender-Affirming Care Works?*, N.Y. Times, July 12, 2024, https://www.nytimes.com/2024/07/12/opinion/gender-affirming-care-cass-review.html.

Dr. Cass also noted the lack of "clear evidence that transitioning kids decreases the likelihood that gender dysphoric youths will turn to suicide, as adherents of gender-affirming care claim." *Id.* That finding is consistent with a recent study, which found that patients who had undergone sex-modification surgery had "a 12.12 times greater risk of suicide attempts" than patients who had not undergone such surgery. J. Straub, et al., *Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery*, 16(4):e57472 Cureus 1-9, 3 (2024). Patients who had undergone surgery also had "a 7.76 times higher risk of PTSD." *Id.*

Scientific evidence, as well as the experiences of *Amici* and other detransitioners, supports Plaintiff-Appellant's position that teachers should not be forced to participate in and support a student's transition because doing so would cause harm to the student.

## CONCLUSION

*Amici* respectfully submit that this Court should reverse the judgment of the district court.

Dated: July 17, 2024                    Respectfully submitted,

                                      /s/ Joshua K. Payne
                                        JOSHUA K. PAYNE
                                          *Counsel of Record*
                                        JORDAN CAMPBELL
                                        RONALD MILLER
                                        DANIEL SEPULVEDA
                                        CAMPBELL MILLER PAYNE, PLLC
                                        5955 Alpha Rd #1491
                                        Dallas, Texas 75240
                                        (214) 316-7156
                                        josh@cmppllc.com

                                        Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of 7th Cir. R. 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,827 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 7th Cir. R. 32(b), and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Schoolbook font.

Respectfully submitted, this 17th day of July, 2024.

<u>/s/ Joshua K. Payne</u>
Joshua K. Payne

Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Joshua K. Payne
Joshua K. Payne

Counsel for *Amici Curiae*