No. 24-1942

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

John M. Kluge,

*Plaintiff-Appellant,*

*v.*

Brownsburg Community School Corporation,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:19-cv-02462-JMS-KMB

## BRIEF *AMICUS CURIAE* OF THE FOUNDATION FOR MORAL
## LAW IN SUPPORT OF APPELLANT

John Eidsmoe*
*Counsel of Record
Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com
talmadge@morallaw.org

July 17th, A.D. 2024          Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 and Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure, the *amicus* Foundation for Moral Law, Inc., certifies that it is not a subsidiary or affiliate of a publicly owned corporation.

*/s/ John Eidsmoe*

John Eidsmoe
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com

Counsel for *Amicus Curiae*

July 17th, A.D. 2024

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................... C-1

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES ......................................................... ii

INTEREST OF THE *AMICUS* ........................................................1

ARGUMENT ...............................................................................2

I.    The Brownsburg policy violates Kluge's First Amendment right to free exercise of religion ....................................................4

    A. The Framers held a jurisdictional view of Church and State ..........4

    B. The Framers derived their understanding of Church/State relations from the Bible and the Judeo-Christian tradition ............................4

    C. The Framers held a jurisdictional understanding of Church/State relations ....................................................... 10

    D. This jurisdictional understanding of Church/State relations also applies to the Free Exercise clause................................ 14

II.    Brownsburg's policy constitutes compelled speech and thus violates Kluge's First Amendment right to freedom of speech ....................... 21

CONCLUSION........................................................................ 22

CERTIFICATE OF COMPLIANCE............................................. 23

CERTIFICATE REGARDING SERVICE ................................. 24

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

*303 Creative v. Elenis,*
    600 U.S. 570 (2023)...................................................................... 22

*Employment Division Dept. of Human Resources of Oregon v. Smith,*
    494 U.S. 872 (1990)..................................................................... 19-20

*Everson v. Bd. of Educ. of the Twp. of Ewing,*
    330 U.S. 1 (1947)....................................................................... 13, 17

*Groff v. DeJoy,*
    600 U.S. 147 (2023)..................................................................... 2-3

*Lawrence v. Texas,*
    539 U.S. 558 (2003)........................................................................3

*McGowan v. Maryland,*
    366 U.S. 420 (1961)...................................................................... 15

*National Institute of Family and Life Advocates v Becerra,*
    585 U.S. 755 (2018)...................................................................... 22

*Obergefell v. Hodges,*
    576 U.S. 644 (2015)........................................................................3

*Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo,*
    No. 20A87 (U.S. Nov. 25, 2020)...................................................... 20

*South Bay United Pentecostal Church v. Newsom,*
    141 S. Ct. 716 (2021).................................................................... 20

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021)................................................................... 20

*United States v. Macintosh,*
    283 U.S. 605 (1931)................................................................... 18-19

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943)................................................................ 21

*Wooley v. Maynard*,
430 U.S. 705 (1977)............................................................... 21

*Zorach v. Clauson*,
343 U.S. 306 (1952)......................................................... 14-15

**Other Authorities**

Dr. Donald S. Lutz, "The Relative Influence of European Writers on Late Eighteenth-Century American  Political Thought," *American Political Science Review*, 189 (1984)......................................................5

George Washington, May 1789; quoted by Paul F. Boller, Jr., George Washington and Religion  (Dallas: Southern Methodist University Press, 1963) ................................................................... 11

Hebden Taylor, *The Christian Philosophy of Law, Politics, and the State* (Nutley, NJ: Craig Press, 1966).................................................6

James Madison, *Memorial and Remonstrance* (June 20, 1785)........ 12, 15-16

James Madison, Veto Message, February 21, 1811, http://baptiststudiesonline.com/wp-content/uploads/2018/03/Madison-VetoMessageCongress.pdf ............................................... 11-12

John Calvin, Institutes of the Christian Religion, 1537...................................9

John of Damascus, *Second Speech against Those Who Reject Images*, reprinted in O'Donovan, 213-15 .................................................8

Loraine Boettner, *The Reformed Doctrine of Predestination*, Presbyterian and Reformed Published Company (April 15, 1991)................................8

Martin Luther, "Secular Authority: To What Extent It Should Be Obeyed," 1523, reprinted in *Works of Martin Luther* (Grand Rapids: Baker Book House, 1982)................................................................9

M.E. Bradford, *A Worthy Company: Brief Lives of the Framers of the United States Constitution* (Marlborough, ND: Plymouth Rock Foundation, 1982) .............................................................................................8

Norman Cousins, "*In God We Trust*" (New York: Harper & Brothers, 1958) .................................................................................................. 12

Sydney E. Ahlstrom, A Religious History of the American People (Doubleday, 1975) .............................................................. 9-10

Zoltan Haraszti, *John Adams and the Prophets of Progress* (Cambridge: Harvard University Press, 1952) ..........................................................5

## INTEREST OF THE *AMICUS*[1]

*Amicus curiae* Foundation for Moral Law, Inc. ("the Foundation") is a non-profit, non-partisan public interest organization dedicated to the defense of constitutional liberties and to the strict interpretation of the Constitution as intended by its Framers. The Foundation has a direct interest in this case because we believe that the free exercise of religion is under attack in America. A new religion of progressive secularism is becoming the de facto public doctrine, and any who dare act according to their religious beliefs and convictions otherwise are punished. The Foundation believes the present case is a prime example of this new status quo which must be reversed lest the freedom of religion perish in America.

---

[1] *Amicus* submits this brief accompanied by a motion for leave to file. No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund its preparation or submission; and no person other than the *amicus curiae,* its members, or its counsel, contributed money that was intended to fund the preparation or submission of this brief.

# ARGUMENT

For four years, John Kluge taught music for the Brownsburg Community Schools with excellent evaluations. Then, in the 2017-18 school year, the Administration (hereinafter "Brownsburg") first requested and then required that he address students by their "preferred pronouns." He advised the Brownsburg) that this violated his religious convictions[2] and requested as an accommodation that he be allowed to address them by their last names. At first Brownsburg approved this accommodation, but after receiving a few complaints from students and parents largely with the student LGBTQ organization, Brownsburg rescinded the accommodation and terminated Kluge's employment.

Kluge filed suit for wrongful termination. The District Court granted summary judgment to Brownsburg. The Seventh Circuit first affirmed the summary judgment, then vacated the summary judgment and remanded to the District Court for further proceedings consistent with the U.S. Supreme Court

---

[2] Plaintiff's Brief in Support of Motion for Summary Judgment  filed November 3, 2023, states in part that Mr. Kluge is "a man of deep Christian faith, an ordained elder, who served as his church's worship leader, led its youth ministries, and directed its children's Bible memory program (AWANA). The Bible shapes Mr. Kluge's worldview.  Before teaching in the district, he developed sincerely held religious beliefs about gender dysphoria.  Based on his study of Scripture, he believes (1) God 'created us as a man or a woman,' (2) it is wrong 'to act or dress in the manner of the opposite sex,' (3) it would be sinful for him to 'encourage students in transgenderism,' and (4) causing children to stumble in this way would subject him to 'special punishment' from God. He also believes God ordains '[g]enetic sex,' it 'cannot be separated' from gender identity, and the two 'remain bound together throughout one's life.' (citations omitted).

decision in *Groff v. DeJoy*, 600 U.S. 147 (2023). The District Court again granted summary judgment in favor of Brownsburg, and Kluge again appeals.

This case might be framed as a clash between two "rights": The God-given rights of free exercise of religion and freedom of speech, versus the fabricated right to be addressed by one's preferred pronouns. The first is guaranteed by the First Amendment at the beginning of the Bill of Rights, as well as by numerous decisions of the U.S. Supreme Court.[3] The second is guaranteed nowhere. *Lawrence v. Texas*, 539 U.S. 558 (2003), recognized a right to engage in homosexual conduct, and *Obergefell v. Hodges*, 576 U.S. 644 (2015), recognized a right to enter into same-sex marriage; but no case has recognized a right to be addressed by one's preferred pronouns. The right to define one's existence recognized in Lawrence might include a right to call oneself whatever one chooses, but it does not include a right to force others to do so.

Rather than a clash between two rights, the case may be better framed as a clash between the most time-honored of all rights, free exercise of religion coupled with free speech, versus an alleged state interest in calling people by

---

[3] Because Kluge has thoroughly addressed the accommodation and undue burden issues of the Civil Rights Act, the Foundation will focus upon the First Amendment.

their preferred pronouns. Whatever that state interest may be, it does not justify infringing First Amendment rights.

## I.    The Brownsburg policy violates Kluge's First Amendment right to free exercise of religion.

Let us consider the high value the Framers of our Constitution placed upon religious freedom.

### A. The Framers held a jurisdictional view of Church and State.

*It is proper to take alarm at the first experiment on our liberties. We hold this prudent jealousy to be the first duty of citizens, and one of the noblest characteristics of the late Revolution.*

James Madison, *A Memorial and Remonstrance*, 1785, Works 1:163.

As Jefferson recognized in the Declaration of Independence, this nation is founded on the "laws of nature and of nature's God," and the "unalienable" rights to "life, liberty, and the pursuit of happiness" are "endowed by [the] Creator." The Framers viewed church and state as separate institutions with separate jurisdictions. When Jefferson spoke of a "wall of separation between church and state," he meant a jurisdictional separation.

### B. The Framers derived their understanding of Church/State relations from the Bible and the Judeo-Christian tradition.

The Framers did not view Church and State simply as man-made institutions. They did not accept Rousseau's notion that the State is above the

Church and above all other institutions.[4] Like the people of their time and those of preceding generations, they understood Church and State as divinely-established institutions, each with distinctive authority and distinctive limitations.

This institutional separation goes back to the ancient Hebrews. Going back to the time of Moses and perhaps further back to the time of Jacob's sons Judah and Levi, the Levites (descendants of Levi, the Tribe of Levi) served as Israel's religious authority, the priests. From the time of King David onward, Israel's kings came out of the tribe of Judah. These were separate offices and separate jurisdictions, but both were subject to the will of God and the Law of God. On several occasions, God disciplined kings severely for usurping the functions of the priesthood. For example, when King Saul offered sacrifices instead of waiting for Samuel the priest, God cut off his descendants from the kingship forever. When King Uzziah tried to usurp the functions of the priesthood by burning incense on the altar in the Temple, eighty "valiant" priests withstood him, saying

---

[4] Dr. Donald S. Lutz, "The Relative Influence of European Writers on Late Eighteenth-Century American Political Thought," *American Political Science Review*, 189 (1984) 189-97, studied citations of European thinkers by American writers 1760-1805 and demonstrated that American writers most frequently cited Montesquieu (8.3%), Blackstone (7.9%), and Locke (2.9%), and cited much less frequently (0.9%). John Adams wrote, "If ever there existed a wise fool, a learned idiot, a profound deep-thinking coxcombe, it was David Hume. As much worse than Voltaire and Rousseau as a sober decent libertine is worse than a rake." John Adams, handwritten notes on his copy of Historical and Moral View of the Origin and Progress of the French Revolution, reprinted in Zoltan Haraszti, *John Adams and the Prophets of Progress* 187 (Cambridge: Harvard University Press, 1952).

"It appertaineth not to thee, Uiziah, to burn incense to the Lord, but to the priests the sons of Aaron, that are consecrated to burn incense: go out of the sanctuary; for thou hast trespassed." (II Chronicles 26:16-18). When Uzziah persisted, God smote him with leprosy, and he remained a leper all the days of his life (II Chron 2:19-23).

This institutional separation continued in the New Testament. When the Pharisees asked Jesus about paying taxes to the Roman government, He pointed to Caesar's image on a coin and answered, "Render therefore to Caesar the things which are Caesar's; and to God, the things that are God's." (Matthew 22:21). Lord Acton said of Christ's answer,

> It was left for Christianity to animate old truths, to make real the metaphysical barrier which philosophy had erected in the way of absolutism. The only thing Socrates could do in the way of a protest against tyranny was to die for his convictions. The Stoics could only advise the wise man to hold aloof from politics and keep faith with the unwritten law in his heart. But when Christ said "Render unto Caesar the things that are Caesar's and unto God the things that are God's," He gave to the State a legitimacy it had never before enjoyed, and set bounds to it that had never yet been acknowledged. And He not only delivered the precept but He also forged the instrument to execute it. To limit the power of the State ceased to be the hope of patient, ineffectual philosophers and became the perpetual charge of a universal Church.[5]

---

[5] Lord Action, quoted by Gertrude Himmelfarb (London, 1955) p. 45; in ElL. Hebden Taylor, *The Christian Philosophy of Law, Politics, and the State* (Nutley, NJ: Craig Press, 1966) pp. 445-46.

It is neither surprising nor unreasonable to conclude that the Framers derived their understanding of church / state relations from religious sources. On October 4, 1982, Congress passed and the President then signed Public Law 97-280, declaring 1983 the "Year of the Bible." The opening clause of the bill reads:

> Whereas, Biblical teachings inspired concepts of civil government that are contained in our Declaration of Independence and the Constitution of the United States...

The Bible, coupled with Church and Jewish tradition, is therefore relevant to the Framers' understanding of Church and State.

From the beginning, Church scholars understood that Church and State were distinct kingdoms, but they sometimes differed as to the relationship between them.  Some, like the North African lawyer and Church Father Tertullian (c. AD 200), asked, "What concord hath Athens with Jerusalem?" Augustine of Hippo (AD 356-430), whose Civitas Dei "set the very course of Western Civilization,"[6]  wrote of the City of God and the City of Man, although he did not precisely identify the City of God as the Church or the City of Man as the State.

---

[6] Martin Luther describes Augustine's masterpiece as "one of the most influential works of the Middle Ages" and says it " would be read in various ways, at some points virtually as a founding document for a political order of kings and popes that Augustine could hardly have imagined. Indeed, his famous theory that people need government because they are sinful served as a model for church-state relations in medieval times. He also influenced the work of St. Thomas Aquinas and John Calvin and many other theologians throughout the centuries." quoted at http://grantian.blogspot.com/2006/11/tale-of-two-men.html; *Encyclopedia Britannica*, https://www.britannica.com/topic/The-City-of-God

Still others, such as John of Damascus (ca. 670 -- ca. 750), declared that

> Kings have no right to make laws for the church. As the apostle says, "God has appointed in the church first apostles, second prophets, third pastors and teachers" (I Cor. 12:28) "for the equipment" of the church (Eph 4:12). No mention of kings!
> . . .
> Saul tore the cloak of Samuel, and what became of him? God tore the kingdom from him, and gave it to David, a man of self-restraint. Jezebel pursued Elijah, and the swine and dogs licked up her blood , and the prostitutes washed in it. . . . Herod destroyed John, and was eaten by worms and perished.
> . . .
> [H]e said, "Give to Caesar what is Caesar's, and to God what is God's (Matthew 22:15-21). We defer to you, o king, in the affairs of life, in tax and revenue and privileges, and in all of our affairs that are your responsibility. In the management of the church we have pastors who have spoken the word of God to us, and have given form to the law of the church.[7]

The Protestant Reformation took force in Northern Europe in the 1500s, a century before the settlement of the English colonies in North America. The Reformers' understanding of the Two Kingdoms of Church and State is therefore instrumental in understanding the views of the Framers. Most of them were children of the Reformation,[8]  and as such they understood that

---

[7] John of Damascus, *Second Speech against Those Who Reject Images*, reprinted in O'Donovan, 213-15.

[8] As Dr. M.E. Bradford established in *A Worthy Company: Brief Lives of the Framers of the United States Constitution* (Marlborough, ND: Plymouth Rock Foundation, 1982) pp. iv-v, the fifty-five delegates to the Constitutional Convention included 28 Episcopalians, 8 Presbyterians, 2 Lutherans, 2 Dutch Reformed, 2 Methodists, 2 Roman Catholics, one uncertain, and 3 who might be Deists. And as Dr. Loraine Boettner observed in *The Reformed Doctrine of Predestination*,

> It is estimated that of the 3,000,000 Americans at the time of the American Revolution, 900,000 were of Scotch or Scotch-Irish origin, 600,000 were Puritan English, and 400,000 were German or Dutch Reformed. In addition to this the Episcopalians had a Calvinistic confession in their Thirty-nine Articles, and many French Huguenots also had come to this

God had established two kingdoms, Church and State, each with distinctive

authority.  As Luther said,

> . . . these two kingdoms must be sharply distinguished, and both be permitted to remain; the one to produce piety, the other to bring about external peace and prevent evil deeds; neither is sufficient in the world without the other.[9]

And as John Calvin stated in his Institutes of the Christian Religion,

> Let us first consider that there is a twofold government in man: one aspect is spiritual, whereby the conscience is instructed in piety and in reverencing God; the second is political, whereby man is educated for the duties of humanity and citizenship that must be maintained among men. These are usually called the 'spiritual' and the 'temporal' jurisdiction (not improper terms) by which is meant that the former sort of government pertains to the life of the soul, while the latter has to do with the concerns of the present life - not only with food and clothing but with laying down laws whereby a man may live his life among other men holily, honorably, and temperately. For the former resides in the inner mind, while the latter regulates only outward behavior. The one we may call the spiritual kingdom, the other, the political kingdom. Now these two, as we have divided them, must always be examined separately; and while one is being considered, we must call away and turn aside the mind from thinking about the other. There are in man, so to speak, two worlds, over which different kings and different laws have authority.[10]

---

Western world.  Thus, we see that about two-thirds of the colonial population had been trained in the school of Calvin. 382.
Yale History Professor Sydney E. Ahlstrom places the figure even higher:  "If one were to compute such a percentage on the basis of all the German, Swiss, French, Dutch, and Scottish people whose forebears bore the 'stamp of Geneva' in some broader sense, 85 or 90 percent would not be an extravagant estimate." Sydney E. Ahlstrom, *A Religious History of the American People* (Garden City, NY: Doubleday & Co., Image Books, 1975) I:169.
[9] Martin Luther, "Secular Authority: To What Extent It Should Be Obeyed," 1523, reprinted in *Works of Martin Luther* (Grand Rapids: Baker Book House, 1982), III:237.
[10] John Calvin, *Institutes of the Christian Religion*, 1537, III:19:15.

This understanding of Church and State as two separate kingdoms, both established by God but with separate spheres of authority, shaped the legal and political thinking of the Reformers, of the colonists, and of the Framers of the Declaration of Independence, the Constitution, and the Bill of Rights. As Yale History Professor Sydney E. Ahlstrom has noted,

> No factor in the "Revolution of 1607-1760" was more significant to the ideals and thought of colonial Americans than the Reformed and Puritan character of their Protestantism; and no institution played a more prominent role in the molding of colonial culture than the church. Just as Protestant convictions were vitally related to the process of colonization and a spur to economic growth, so the churches laid the foundations of the educational system, and stimulated most of the creative intellectual endeavors, by nurturing the authors of most of the books and the faculties of most of the schools. The churches offered the best opportunity for architectural expression and inspired the most creative productions in poetry, philosophy, music, and history.[11]

### C. The Framers held a jurisdictional understanding of Church/State relations.

Long before Jefferson would speak of the "wall of separation between church and state," Rhode Island founder Roger Williams wrote of a "gap in the hedge or wall of separation between the garden of the church and the wilderness of the world,"  and George Washington declared to the General Committee of United Baptist Churches in Virginia that "no one would be more

---

[11] Sydney E. Ahlstrom, *A Religious History of the American People* (Doubleday, 1975), I:423.

zealous than myself to establish effectual barriers against the horrors of spiritual tyranny, and every species of religious persecution."[12]

Reflecting this same jurisdictional view of Church and State, James Madison as President vetoed "an Act incorporating the Protestant Episcopal Church in the town of Alexandria, in the District of Columbia":

> Because the bill exceeds the rightful authority to which governments are limited by the essential distinction between civil and religious functions, and violates in particular the article of the Constitution of the United States which declares that "Congress shall make no law respecting a religious establishment." The bill enacts into and establishes by law sundry rules and proceedings relative purely to the organization and polity of the church incorporated, and comprehending even the election and removal of the minister of the same, so that no change could be made therein by the particular society or by the general church of which it is a member, and whose authority it recognizes. This particular church, therefore, would so far be a religious establishment by law, a legal force and sanction being given to certain articles in its constitution and administration. Nor can it be considered that the articles thus established are to be taken as the descriptive criteria only of the corporate identity of the society, inasmuch as this identity must depend on other characteristics, as the regulations established are generally unessential and alterable according to the principles and canons by which churches of that denomination govern themselves, and as the injunctions and prohibitions contained in the regulations would be enforced by the penal consequences applicable to a violation of them according to the local law.[13]

---

[12] George Washington, May 1789; quoted by Paul F. Boller, Jr., *George Washington and Religion* (Dallas: Southern Methodist University Press, 1963) 169-70.
[13] James Madison, Veto Message, February 21, 1811, http://baptiststudiesonline.com/wp-content/uploads/2018/03/Madison-VetoMessageCongress.pdf

Madison's veto was consistent with his jurisdictional view of Church and State.   In his "Memorial and Remonstrance Against Religious Assessments" (1785), he objected to a proposed tax for the support of Christian churches and pastors, not because he opposed the Church, but because Christianity is "the Religion which we believe to be of divine origin." Christianity, he said, is a religion of "innate excellence" and a religion that enjoys the "patronage of its Author."   Christianity therefore does not need the aid of the State:

> ...the establishment proposed by this Bill is not requisite for the support of the Christian Religion.   To say that it is, is a contradiction to the Christian Religion itself: for every page of it disavows a dependence on the powers of this world: it is a contradiction to fact; for it is known that this Religion both existed and flourished, not only without the support of human laws, but in spite of every opposition from them; and not only during the period of miraculous aid [the New Testament period and shortly thereafter], but long after it had been left to its own evidence, and the ordinary care of Providence: Nay, it is a contradiction in terms; for a Religion not invented by human policy, must have pre-existed and been supported, before it was established by human policy.[14]

Jefferson's "wall of separation" must be viewed in this context, as a jurisdictional separation between the two kingdoms, Church and States.  As he wrote in 1808,

---

[14] James Madison, "Memorial and Remonstrance Against Religious Assessments," 1785, reprinted in Norman Cousins, "*In God We Trust*" (New York: Harper & Brothers, 1958)  308-14. https://founders.archives.gov/documents/Madison/01-08-02-0163

I consider the government of the United States as interdicted by the Constitution from intermeddling in religious institutions, their doctrines, discipline, or exercises. This results not only from the provision that no law shall be made respecting the establishment or free exercise of religion, but from that also which reserves to the states the powers not delegated to the United States. Certainly, no power to prescribe any religious exercise or to assume authority in religious discipline has been delegated to the General Government. It must rest with the States, as far as it can be in any human authority.[15]

The first Supreme Court Establishment Clause case, *Everson v. Board of Education*, 330 U.S. 1 (1947), is consistent with this jurisdictional understanding of the kingdoms of Church and State. As the Court explained at 18 (emphasis added):

> The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. *Neither can force nor influence a person to go to or to remain away from church against his will* or force him to profess a belief or disbelief in any religion. *No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.* No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever from they may adopt to teach or practice religion. *Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.*

---

[15] Thomas Jefferson, Letter to Samuel Miller, January 23, 1808; "Thomas Jefferson on Separation of Church and State," https://candst.tripod.com/tnppage/qjeffson.htm. Jefferson's closing statement that authority over churches "must rest with the States, as far as it can be in any human authority," reflects his belief that the First Amendment restricts only the federal government and not the States. Rightly or wrongly, the Supreme Court has incorporated the First Amendment and applied it to the States in *Cantwell v. Connecticut*, 310 US. 296 (1940), *Everson v. Board of Education*, 330 U.S. 1 (1947), and subsequent cases.

*Everson* did not address issues of strict scrutiny, compelling interest, or rational basis. Nor did the Court discuss specific types of state regulation of churches. Rather, the Court stated as an absolute that "neither a state nor the Federal Government" can "force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion."

After providing that "Congress shall make no law respecting an establishment of religion," the First Amendment adds an equally important clause, "or prohibiting the free exercise thereof."

 Like the Establishment Clause, the Free Exercise Clause is also jurisdictional, because there is a jurisdiction—"our duty to God and the manner of discharging it"—that is beyond the jurisdiction of government.

**D. This jurisdictional understanding of Church/State relations also applies to the Free Exercise clause.**

The Framers held a jurisdictional understanding of Free Exercise. Certainly, foremost among the rights included in the term "liberty" in the Declaration of Independence is the right to free exercise of religion.

As the Declaration makes clear, this nation was founded upon Higher Law. The Supreme Court said in *Zorach v. Clauson,* 343 U.S. 306, 313 (1952), "We are a religious people whose institutions presuppose a Supreme Being." The Court found that recognition is completely compatible with

statements such as "We guarantee the freedom to worship as one chooses" *id.* at 314, and "There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated.  And so far as interference with the 'free exercise' of religion and an 'establishment' of religion are concerned, the separation must be complete and unequivocal" *id.* at 312.

And in *McGowan v. Maryland* (1961), Justice Douglas, the author of the *Zorach* opinion, stated in dissent:

> The institutions of our society are founded on the belief that there is an authority higher than the authority of the State; that there is a moral law which the State is powerless to alter; that the individual possesses rights, conferred by the Creator, which government must respect.

This is entirely consistent with Madison's understanding of free exercise.  As he said in the Remonstrance,

> We remonstrate against the said Bill,
> Because we hold it for a fundamental and undeniable truth, "that Religion or the duty which we owe to our Creator and the manner of discharging it, can be directed only by reason and conviction, not by force or violence." [quoting from Article XVI of the Virginia Declaration of Rights of 1776].  The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only

as he believes to be acceptable to him. This duty is precedent, both in order of time and in degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governour of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the General Authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign. We maintain therefore that in matters of Religion, no man's right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance. True it is, that no other rule exists, by which any question which may divide a Society, can be ultimately determined, but the will of the majority; but it is also true that the majority may trespass on the rights of the minority.[16]

Establishment and Free Exercise go together. In the term "free exercise thereof," the word "thereof" refers back to "religion" in the Establishment Clause. The very punctuation of the First Amendment sets these clauses apart from the rest. There are three parts to the First Amendment, separated by semicolons, and each of these parts consists of two clauses, separated by commas:

"Congress shall make no law"

(1) "respecting an establishment of religion, or prohibiting the free exercise thereof;"
(2) "or abridging the freedom of speech, or of the press;"
(3) "or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

---

[16] Madison, Remonstrance, https://founders.archives.gov/documents/Madison/01-08-02-0163.

16

Note, also, that the one verb "abridging" introduces the last two parts and sub-parts, thus further setting these last four cluses from the first two, the religion clauses which contain the verbs "respecting" and "prohibiting."

Jefferson's words, quoted earlier, pertain to both establishment and free exercise:

> I consider the government of the United States as interdicted by the Constitution from intermeddling in religious institutions, their doctrines, discipline, or *exercises.* This results not only from the provision that no law shall be made respecting the establishment or free exercise of religion, but from that also which reserves to the
> states the powers not delegated to the United States. *Certainly, no power to prescribe any religious exercise or to assume authority in religious discipline has been delegated to the General Government.* It must rest with the States, as far as it can be in any human authority.

(Emphasis added). The Court's explanation of the Establishment Clause in *Everson* applies in part to Free Exercise as well:

> The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. *Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance*. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever from they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

(Emphasis added).

In *United States v. Macintosh,* 283 U.S. 605, 633-35 (1931), the Court recognized in a case involving a person seeking citizenship who held conscientious objections to military service:

> Much has been said of the paramount duty to the state, a duty to be recognized, it is urged, even though it conflicts with convictions of duty to God. Undoubtedly that duty to the state exists within the domain of power, for government may enforce obedience to laws regardless of scruples. When one's belief collides with the power of the state, the latter is supreme within its sphere and submission or punishment follows. But, in the forum of conscience, duty to a moral power higher than the state has always been maintained. The reservation of that supreme obligation, as a matter of principle, would unquestionably be made by many of our conscientious and law-abiding citizens. The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation. As was stated by Mr. Justice Field, in *Davis v. Beason*, 133 U. S. 333, 342: 'The term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will.' One cannot speak of religious liberty, with proper appreciation of its essential and historic significance, without assuming the existence of a belief in supreme allegiance to the will of God. Professor Macintosh, when pressed by the inquiries put to him, stated what is axiomatic in religious doctrine. And, putting aside dogmas with their particular conceptions of deity, freedom of conscience itself implies respect for an innate conviction of paramount duty. The battle for religious liberty has been fought and won with respect to religious beliefs and practices, which are not in conflict with good order, upon the very ground of the supremacy of conscience within its proper field. What that field is, under our system of government, presents in part a question of constitutional law, and also, in part, one of legislative policy in avoiding unnecessary clashes with the dictates of conscience. There is abundant room for enforcing the

> requisite authority of law as it is enacted and requires obedience,
> and for maintaining the conception of the supremacy of law as
> essential to orderly government, without demanding that either
> citizens or applicants for citizenship shall assume by oath an
> obligation to regard allegiance to God as subordinate to
> allegiance to civil power. The attempt to exact such a promise,
> and thus to bind one's conscience by the taking of oaths or the
> submission to tests, has been the cause of many deplorable
> conflicts. The Congress has sought to avoid such conflicts in this
> country by respecting our happy tradition. In no sphere of
> legislation has the intention to prevent such clashes been more
> conspicuous than in relation to the bearing of arms. It would
> require strong evidence that the Congress intended a reversal of
> its policy in prescribing the general terms of the naturalization
> oath. I find no such evidence.

The Court said the conflict between the power of the state and what the person believes to be his duty to God must be resolved on jurisdictional grounds. In areas in which the state has jurisdiction, its needs must take precedence, but in areas in which the state does not have jurisdiction, the individual conscience must take precedence.

The Court has sometimes recognized the power of the State to regulation certain arguably religious practices. But at least within the area of church doctrine and church worship and attendance, the Court has recognized a jurisdictional limit to the Free Exercise Clause. In *Unemployment Division v. Smith,* 494 U.S. 872 (1990), Justice Scalia recognized that jurisdictional limit in his majority opinion at 877-78:

> The free exercise of religion means, first and foremost, the right
> to believe and profess whatever religious doctrine one desires.

Thus, the First Amendment obviously excludes all "governmental regulation of religious beliefs as such." *Sherbert v. Verner, supra,* 374 U.S. at 402. The government may not compel affirmation of religious belief, *see Torcaso v. Watkins,* 367 U.S. 488 (1961), punish the expression of religious doctrines it believes to be false, *United States v. Ballard,* 322 U.S. 78, 86-88 (1944), impose special disabilities on the basis of religious views or religious status, *see McDaniel v. Paty,* 435 U.S. 618 (1978); *Fowler v. Rhode Island,* 345 U.S. 67, 69 (1953); *cf. Larson v. Valente,* 456 U.S. 228, 245 (1982), or lend its power to one or the other side in controversies over religious authority or dogma, *see Presbyterian Church v. Hull Church,* 393 U.S. 440, 445-452 (1969); *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 95-119 (1952); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 708-725 (1976).

(Emphasis added).

In 2020 and 2021, the Supreme Court decided three cases which involved the closure of churches because of COVID-19, and ruled in all three cases that the Governors of New York and California violated the free exercise clause: *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 63 (Nov. 25, 2020), *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 719 (Feb. 5, 2021), and *Tandon v. Newsom*, 141 S. Ct. 1294, 1294 (April 9, 2021).

This is not surprising. Over the years, the courts have wrestled with what practices are protected by the Free Exercise Clause. But one thing has been clear from the beginning: If the Free Exercise Clause protects nothing else, it protects the right to go to church and worship, and the right to believe

and speak in accordance with one's religious convictions. Even the concurrence in *Smith* recognized that

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.[17]

## II. Brownsburg's policy constitutes compelled speech and thus violates Kluge's First Amendment right to freedom of speech.

Under the Compelled Speech Doctrine, forcing someone to say something he doesn't want to say is as much a First Amendment violation as prohibiting him from saying what he does want to say.  In fact it might be a greater violation: Telling a liberal Democrat he may not criticize Donald Trump is offensive, but forcing hm to praise Donald Trump is even more offensive than remaining silent.

The Supreme Court has articulated the Compelled Speech Doctrine in many cases, including *West Virginia State Board of Education v. Barnette,* 319 U.S. 624 (1943) (public school children may not be forced to participate in flag salute); *Wooley v. Maynard,* 430 U.S. 705 (1977) (New Hampshire motor vehicle owner may not be forced to display "Live Free or Die" motto

---

[17] *Id.* at 903 (O'Conner, J., concurring).

on license plate); *National Institute of Family and Life Advocates v Becerra,* 585 U.S. 755 (2018) (crisis pregnancy center may not be compelled to display abortion information); *303 Creative v. Elenis,* 600 U.S. 570 (2023) (website designer may not be compelled to design a website for a same-sex wedding).

By forcing Kluge to address student by their preferred pronouns, Brownsburg's policy compels Kluge to say what he believes God's Word forbids him to say.  This is a classic instance of compelled speech.

## CONCLUSION

The Foundation urges this Court to reverse the District Court and hold that Kluge's right to free exercise of religion is protected by the Free Exercise and Free Speech Clauses of the First Amendment.

This Court should reverse in favor Plaintiff-Appellants.

Respectfully submitted,

John Eidsmoe*
*Counsel of Record
Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@morallaw.org
talmadge@morallaw.org

Counsel for *Amicus Curiae*

July 17th, A.D. 2024

22

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Rule 32(a)(7), Fed. R. App. P., because, excluding the parts of the document exempted by Rule 32(f), Fed. R. App. P., this document contains 6,035 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word in 14-point Times New Roman.

*/s/ John Eidsmoe*

John Eidsmoe
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com

Counsel for *Amicus Curiae*

July 17th, A.D. 2024

## CERTIFICATE REGARDING SERVICE

I certify that on July 17th, A.D. 2024, a true copy of this document is being filed electronically (via CM/ECF) and will thereby be served on all counsel of record.

/s/ *John Eidsmoe*

John Eidsmoe
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com

Counsel for *Amicus Curiae*