APPEAL NO. 24-1942

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

JOHN M. KLUGE,
*Plaintiff-Appellant,*

v.

BROWNSBURG COMMUNITY SCHOOL CORPORATION,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
Case No. 1:19-cv-02462-JMS-KMB
The Honorable Jane Magnus-Stinson

---

## APPELLEE'S RESPONSE BRIEF

---

Brent R. Borg
Cassie N. Heeke
Church, Church Hittle + Antrim
10765 Lantern Road, Suite 201
Fishers, IN  46038
317-773-2190
bborg@cchalaw.com
cheeke@cchalaw.com

Alexander P. Pinegar
Church, Church Hittle + Antrim
Two North Ninth Street
Noblesville, IN 46060
317-773-2190
apinegar@cchalaw.com

*Attorneys for Defendant-Appellee*
*Brownsburg Community School*
*Corporation*

Save As    Clear Form

Case: 24-1942    Document: 9    Filed: 06/11/2024    Pages: 1
**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1942

Short Caption: John M. Kluge v. Brownsburg Community School Corporation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Brownsburg Community School Corporation

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Church Church Hittle + Antrim

(3) If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and
         N/A

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
         N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
   N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
   N/A

Attorney's Signature: s/ Brent R. Borg    Date: June 11, 2024

Attorney's Printed Name: Brent R. Borg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✔    No ☐

Address: Church Church Hittle + Antrim, 10765 Lantern Road, Suite 201

Fishers, IN 46038

Phone Number: 317-773-2190    Fax Number: 317-572-1609

E-Mail Address: bborg@cchalaw.com

rev. 12/19 AK

i

| Save As | | Clear Form |
|---------|---|-----------|

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1942

Short Caption: John M. Kluge v. Brownsburg Community School Corporation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Brownsburg Community School Corporation

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Church Church Hittle + Antrim

(3) If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: s/ Alexander P. Pinegar        Date: June 11, 2024

Attorney's Printed Name: Alexander P. Pinegar

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ✔  No ☐

Address: Church Church Hittle + Antrim; Two North Ninth Street

    Noblesville, IN 46060

Phone Number: 317-773-2190        Fax Number: 317-572-1609

E-Mail Address: apinegar@cchalaw.com

rev. 12/19 AK

| | Save As | | Clear Form |
|---|---|---|---|

Case: 24-1942    Document: 11    Filed: 06/11/2024    Pages: 1

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1942

Short Caption: John M. Kluge v. Brownsburg Community School Corporation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Brownsburg Community School Corporation

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Church Church Hittle + Antrim

(3)   If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  N/A

Attorney's Signature: s/ Cassie N. Heeke      Date: June 11, 2024

Attorney's Printed Name: Cassie N. Heeke

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ✔  No ☐

Address: Church Church Hittle + Antrim, 2 North 9th Street

      Noblesville, IN 46060

Phone Number: 317-773-2190      Fax Number: 317-572-1609

E-Mail Address: cheeke@cchalaw.com

rev. 12/19 AK

# Table of Contents

**Circuit Rule 26.1 Disclosure Statements** ........................................................i

**Table of Contents** ...........................................................................................iv

**Table of Authorities** ......................................................................................vii

**Jurisdictional Statement** ...............................................................................1

**Statement of Issues Presented for Review** ..................................................2

**Statement of the Case** ....................................................................................4

I.    Overview of the parties.................................................................................4

II.   Kluge's alleged sincerely-held religious belief. ........................................5

III.  Brownsburg's organizational structure, policies, and practices. ...............6

     a.  Board-level policies. ..............................................................................6

     b.  Practices related to transgender high school students............................7

IV.  Kluge's disapproval of the administration's approach
to transgender students and Brownsburg's efforts
to accommodate Kluge.................................................................................8

     a.  Initial accommodation efforts in May 2017. ........................................8

     b.  Accommodation efforts around the start of
the 2017-2018 school year...................................................................10

     c.  The agreed-upon accommodations. ....................................................11

V.   Students, parents, and teachers complain about the
last-name-only accommodation.................................................................12

     a.  Complaints from parents. ....................................................................12

     b.  Complaints from Equality Alliance Club students................................13

     c.  Complaints from others in the high school community..........................16

VI.    Brownsburg's efforts to work with Kluge in light of the complaints. ..........18

VII.   Kluge refuses to stop using the last-name-only accommodation
       and resigns effective at the end of the school year. ......................19

VIII.  Despite Brownsburg allowing the last-name-only accommodation
       to continue until the end of the 2017-2018 school year,
       Kluge abandons it during an orchestra awards ceremony. ........................21

IX.    Brownsburg's board accepts Kluge's resignation. ...................................23

X.     Relevant procedural history. ..................................................................23

       a.  The District Court dismisses most of
           Kluge's Amended Complaint. ...................................................23

       b.  The District Court resolves Kluge's remaining
           claims in Brownsburg's favor. ..................................................24

**Summary of the Argument** ..................................................................25

**Argument** ..........................................................................................27

I.     Standard of Review. ..............................................................................27

II.    The District Court properly granted summary judgment
       in Brownsburg's favor on Kluge's failure-to-accommodate claim. ..............28

       a.  The District Court's treatment of Kluge's prima facie case. ....................28

       b.  As a matter of law, Brownsburg established two separate
           bases for undue hardship. .........................................................29

           1.  *Groff*'s clarified standard for undue hardship. ...................29

           2.  The nature of Brownsburg's "business.". .............................31

           3.  Undue hardship based on interference with Brownsburg's
               ability to educate students. .......................................34

               A.  Brownsburg did not rescind the last-name-only
                   accommodation based on animosity
                   towards Kluge's religion. ...............................................35

B.  The complaints are more than mere third-party grumblings. .......37

C.  Kluge's "universal affirmation" argument is meritless. .................39

D.  The District Court did not rely on after-the-fact evidence. ............40

E.  Kluge's reliance on "recent research" is misplaced. ........................42

4.  Undue hardship based on Brownsburg's unreasonable
exposure to liability. ................................................................................43

III.  The District Court properly declined to revisit its previous grant
of summary judgment in Brownsburg's favor
on Kluge's retaliation claim. ........................................................................47

IV.  If the Court reverses on Kluge's failure-to-accommodate claim,
then it should remand for trial because there are genuine issues
of material fact regarding the sincerity of Kluge's religious belief.............51

**Conclusion** ........................................................................................................53

**Statement for Oral Argument**................................................................54

**Certificate of Compliance** .......................................................................55

**Certificate of Service**................................................................................56

# Table of Authorities

**Cases**

*Alioto v. Town of Lisbon*, 651 F.3d 715 (7th Cir. 2011)........................................44-45

*Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986)........................................38

*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007) ...................50

*Carlson v. CSX Transp., Inc.*, 758 F.3d 819 (7th Cir. 2014) ................................49

*E.E.O.C. v. Abercrombie & Fitch, Inc.*, 135 S. Ct. 2028 (2015)...........................28

*E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018)........................................46

*E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569 (7th Cir. 1997).....................29, 52

*E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y
    Alcantarilladoes de Puerto Rico*,
    279 F.3d 49 (1st Cir. 2002) ........................................52

*Groff v. DeJoy*, 600 U.S. 447 (2023) ................................................. passim

*Kluge v. Brownsburg Community School Corporation*,
    64 F.4th 861 (7th Cir. 2023) ........................................31

*Matthews v. Wal-Mart Stores, Inc.*,
    417 F. App'x 552 (7th Cir. 2011).............................................43-46

*Nottelson v. Smith Steel Workers D.A.L.U. 19806, AFL-CIO*,
    643 F.2d 445, 451 (7th Cir. 1981)........................................29

*Parker v. Brooks Life Sciences, Inc.*, 39 F.4th 931, 937 (7th Cir. 2022)..............50

*Porter v. City of Chicago*, 700 F.3d 944 (7th Cir. 2012).......................................28

*Reed v. Great Lakes Companies, Inc.*, 330 F.3d 931 (7th Cir. 2003)....................52

*Trans World Airlines v. Hardison*, 432 U.S. 63 (1977) ........................................29

*Troxel v. Granville*, 530 U.S. 57 (2000)................................................43

*United States v. Bethlehem Steel Corporation*,
    446 F.2d 652 (2d Cir. 1971) ........................................40

*United States v. Varner*, 948 F.3d 250 (5th Cir. 2020)........................................39

*V. v. Vilsack*, 2024 WL 1155256 at *9 (E.E.O.C. Mar. 7, 2024)...........................32

**Cases (continued)**

*Whitaker ex. rel. Whitaker v. Kenosha Unified School District*,
 858 F.3d 1034 (7th Cir. 2017) ............................................................ 26, 44-45

**Constitution**

IND. CONST. art. VIII, sec. 1 .................................................................. 31

**Statutes**

42 U.S.C. § 2000e-2(a) ........................................................................ 26

42 U.S.C. § 2000e(j) ............................................................................ 26, 28

Ind. Code § 20-26-3-3(b)(2) ................................................................ 31, 33

**Rules**

Seventh Circuit Rule 28(b) .................................................................. 1

Federal Rule of Appellate Procedure 28(b)(4) .................................... 27

Federal Rule of Appellate Procedure 34(a)(1) .................................... 54

## Jurisdictional Statement

As required by Circuit Rule 28(b), Appellee states that the jurisdictional summary in Appellant's Opening Brief is complete and correct.

## Statement of Issues Presented for Review

During the 2017-2018 school year, Appellee Brownsburg Community School Corporation ("Brownsburg") required its high school teachers to address students by the first and last names in its student database, PowerSchool. On the first day of classes for that school year, Appellant John M. Kluge ("Kluge"), a teacher at the high school, told administrators that he would not address students in this manner because some of his students had "transgender" first names, and doing so would violate his alleged sincerely-held religious belief that prohibited him from promoting gender dysphoria.

Brownsburg and Kluge reached an accommodation that let Kluge address students by last name only. But the accommodation had negative effects, including most prominently on students. Some of Kluge's students reported that his use of only last names negatively impacted their learning, in addition to reports of other classroom-related concerns. When Brownsburg told Kluge about the complaints, he thought nothing was wrong and told the administration that he intended to continue using the last-name-only accommodation. When Brownsburg told Kluge that it would not continue the accommodation past the 2017-2018 school year, Kluge resigned.

Kluge argues that Brownsburg's actions create liability under Title VII for failure to accommodate and for retaliation. The District Court held, and this Court affirmed, that Kluge's claims failed as a matter of law. Following the Supreme Court of the United States' articulation of a clarified standard for undue hardship

in Title VII religious accommodation cases, *Groff v. DeJoy*, 600 U.S. 447 (2023), this Court vacated its opinion and remanded to the District Court for application of the clarified standard. The District Court again held for Brownsburg.

This appeal raises two issues:

1.      Did the District Court properly conclude that the last-name-only accommodation caused undue hardship as a matter of law under *Groff*'s clarified standard, either because it would continue to unreasonably interfere with Brownsburg's ability to educate students and cause them harm, or because it would expose Brownsburg to an unreasonable risk of litigation?

2.      Did the District Court properly decline to revisit Kluge's retaliation claim—and instead properly incorporate its previous ruling—based on its reasoning that reassessing the claim would exceed the scope of this Court's remand order?

## Statement of the Case[1]

*I.     Overview of the parties.*

Brownsburg is a public school corporation under Indiana Code section 20-18-2-16 and is governed by a five-member elected board. [Doc. 71 at 6, ¶16.]  Kluge is a former employee of Brownsburg, having worked in the performing arts department at Brownsburg High School from August 2014 to June 2018. [Doc. 71 at 8; 120-2 at 3.] During his employment, Kluge taught orchestra, beginning music theory, and advanced music theory. [Doc. 120-2 at 3.] Kluge was the only teacher at Brownsburg High School who taught these classes. [*Id.*]

The facts relevant to Kluge's appeal occurred during the 2017-2018 school year and preceding months. [Doc. 15 at 6-16.] During that time, Dr. Bret Daghe was Brownsburg High School's principal and Kluge's supervisor. [Doc. 120-5 at 4 (Daghe Depo. 11:22-13:7).] Dr. Daghe reported to the Superintendent, Dr. Jim Snapp. [*Id.* at 4 (Daghe Depo. 12:7-14).] Dr. Kathryn Jessup served as the Assistant Superintendent, and Jodi Gordon was the Human Resources Director. [Docs. 120-6 at 4 (Jessup Depo. 15:8-15); 120-7 at 4 (Gordon Depo. 10:13-18).]

---

[1] All references to "Doc." refer to documents filed with the District Court and are identified by ECF number. All references to "App. I Doc." refer to documents filed with this Court in the first appeal (No. 21-2475) and are identified by ECF number. All references to "App. II Doc." Refer to documents filed with this Court in this second appeal and are identified by ECF number. All references to "RSA" refer to documents filed with Kluge's Required Short Appendix.

II.     *Kluge's alleged sincerely-held religious belief.*

Kluge is a Christian and a member of an Indianapolis church that is under the Evangel Presbytery denomination. [Doc. 120-3 at 3, 5 (Plaintiff Depo. 9:11-15, 15:4-12).] In addition to the Bible, the Evangel Presbytery Book of Church Order governs how Kluge and other members of his church conduct themselves on many aspects of life, including discipline, church participation, and sexuality. [*Id.* at 4, 7 (Plaintiff Depo. 13:7-23, 24:19-25:25).]

Kluge asserts that his sincerely held religious beliefs include a belief that it is sinful to promote gender dysphoria. [Docs. 15 at 5; 120-3 at 6-7 (Plaintiff Depo. 21:12-23:5).] According to Kluge, gender dysphoria "is what scripture refers to as effeminacy which is for a man to play the part of a woman or a woman to play the part of a man and so that would include acting like/dressing like the opposite sex." [Doc. 120-3 at 6 (Plaintiff Depo. 18:2-10).] Kluge believes it is sinful for a person to act effeminate and also sinful to encourage someone to act effeminate. [*Id.* at 10 (Plaintiff Depo. 35:11-37:12).]

Kluge's denomination recognizes that there are circumstances where effeminacy might warrant tolerance, notwithstanding its sinful nature. [Doc. 120-3 at 8-9 (Plaintiff Depo. 26:11-30:11).] For example, the Evangel Presbytery Book of Church Order instructs that

> if a female has transitioned to a male in appearance, *it may be best that she not use the bathroom of her birth sex* until she has been presented with pastoral counsel concerning God's calling of manhood and womanhood and she begins to learn of Jesus' Lordship over her sexuality and the implications it has for her sexual identity and its public

5

expression. In this case, the female would be asked not to use the men's restroom, but instead a single-stall restroom available to either sex.

[Doc. 120-4 at 12 (emphasis added).] Consistent with this instruction, according to Kluge, there are instances where it is appropriate and consistent with his religious beliefs to address a transgender student by the student's first name, even if the first name differs from the student's biological sex. [Doc. 120-3 at 8-9 (Plaintiff Depo. 29:11-30:11).]

III. *Brownsburg's organizational structure, policies, and practices.*

a. *Board-level policies.*

During the 2017-2018 school year, Brownsburg maintained two board-level policies relevant to this appeal; the first, 3122—Nondiscrimination and Equal Employment Opportunity, prohibited discrimination in employment based on religion. [Doc. 113-4 at 14.] The policy also prohibited retaliation against any "person in the exercise or enjoyment of any right granted or protected by" certain antidiscrimination laws, including Title VII. [*Id.* at 16-17.] The policy included informal and formal complaint processes, which allowed employees to make such complaints according to the procedures specified in the policy. [*Id.* at 16-18.]

The second policy, 3140—Resignation, applied to teacher resignations and stated in relevant part that "[p]ursuant to State law, following submission of a resignation to the Superintendent, the employee may not withdraw or otherwise rescind that resignation" and "[a] resignation, once submitted, may not then be rescinded unless the Board agrees." [Doc. 120-8 at 2.] Another board-level policy,

0100—Definitions, defined "Superintendent" to include "a delegate unless the law, policy or guideline specifically prohibits the delegation." [Doc. 120-9 at 4.]

    *b.*    *Practices related to transgender high school students.*

Before the start of the 2017-2018 school year, Brownsburg's high school community was experiencing a growing awareness of and attentiveness to the needs of transgender students. [Doc. 120-1 at 3.] In the opinion of Brownsburg's administration, transgender students face significant challenges at school, including diminished self-esteem and heightened exposure to bullying. [*Id.*] Brownsburg's administration also thought that these challenges threaten transgender students' classroom experience, academic performance, and overall well-being. [*Id.*] Brownsburg's administration had heightened attention to these issues before the start of the 2017-2018 school year because several transgender students had enrolled as high school freshmen. [*Id.*] For his part, Kluge conceded that a school has an interest in being concerned with the mental health of its students. [Doc. 120-3 at 35 (Plaintiff Depo. 134:13-16).]

A very practical and important question that arose for the Brownsburg administration was how high school staff should address transgender students in class. [Doc. 120-1 at 3.] A high school classroom cannot function without teachers addressing students directly. [*Id.*] The practice Brownsburg's administration developed to help transgender students, teachers, and other members of the high school community was to allow any student to change the name listed in the high school's "PowerSchool" database, but only if the student provided letters from a

parent and a healthcare professional regarding the need for the name change. [*Id.*] Staff were then required to use the name in PowerSchool. [*Id.*]

Brownsburg's administration thought this practice furthered two primary goals. First, it provided high school staff with a straightforward, easy-to-follow rule when addressing students—that is, staff need only "call students by the name in PowerSchool." [Docs. 120-1 at 4; Doc. 15-4 at 6.] Second, and more important in the administration's view, the practice afforded dignity and showed empathy toward transgender students, as well as those considering or in the process of gender transition. [Doc. 120-1 at 4.] As Dr. Jessup explained, Brownsburg's administration considered it important for transgender students to receive, like any other student, respect and "official" affirmation of their preferred identity, provided they go through reasonable channels such as receiving parent permission and a healthcare professional's approval. [*Id.*]

IV.  *Kluge's disapproval of the administration's approach to transgender students and Brownsburg's efforts to accommodate Kluge.*

a.  *Initial accommodation efforts in May 2017.*

In May 2017, Kluge read and provided a letter to Dr. Daghe, signed by Kluge and three other high school teachers, in which Kluge expressed concern over his perception of the administration's approach to transgender students at recent high school faculty meetings. [Doc. 120-3 at 11-12 (Plaintiff Depo. 39:7-42:18).] Kluge stated in the letter that "encouraging gender dysphoria is harmful to the individual" and "dangerous to the rest of the community." [Doc. 113-1 at 28.] Kluge cited "research documents" that he claimed demonstrated the "devastating effects of

transgenderism" and quoted several Bible passages. [*Id.* at 26-30.] Kluge concluded the letter with twelve requests, including an observation that "we should provide our students with a safe learning environment" and that the administration not "suggest that teachers encourage transgender students in their folly by playing along with their psychiatric disorder in referring to [transgender students] by their preferred pronoun." [Docs. 113-1 at 30-31; 120-3 at 12-13 (Plaintiff Depo. 44:24-46:1).]

When Dr. Daghe met with Kluge and the three other teachers who signed the letter, he perceived that their main concern was they wanted an easy-to-follow rule when addressing students. [Doc. 120-5 at 7 (Daghe Depo. 34:8-35:4; 36:7-14).] Dr. Daghe proposed that the teachers use the name listed in PowerSchool, and the other three teachers agreed. [Doc. 120-3 at 12 (Plaintiff Depo. 42:12-43).] Kluge said nothing in response, but was "shocked" the other teachers agreed to Dr. Daghe's proposal and concluded they had done an "about-face." [*Id.* (Plaintiff Depo. 42:19-43:22)]

Minutes after the meeting concluded, Kluge spoke alone with Dr. Daghe and encouraged him to resist changing the PowerSchool database from "legal names" to "transgender names."[2] [Docs. 120-3 at 12, 15 (Plaintiff Depo. 42:19-43:22; 54:24-

---

[2] Kluge explained that by "legal names," he meant "[t]he name that's on their birth certificate, the one that was stored on their birth records." [Doc. 120-3 at 15 (Plaintiff Depo. 54:24-55:2).] By "transgender names," Kluge meant "[t]he opposite sex name that they had switched to that was not their legal name." [*Id.* (Plaintiff Depo. 55:3-6).] At least two transgender students who were in Kluge's classes legally changed their birth name to their "transgender name," albeit after they were enrolled in Kluge's class. [Docs. 22-3 at 2; 58-1 at 2.]

55:6).] Based on this conversation, Kluge thought that the administration "would continue to use legal names and that we would not be promoting transgenderism in our schools, we would stop teaching it in our faculty meetings, and that [Dr. Daghe] had heeded our urging." [*Id.* at 12, 14 (Plaintiff Depo. 44:14-23, 50:4-23).]

      *b.*     *Accommodation efforts around the start of the 2017-2018 school year.*

Nine days before the 2017-2018 school year began, a guidance counselor emailed Kluge to inform him that two transgender students had enrolled in his class and that those students' first names had been changed in PowerSchool. [Docs. 120-3 at 13 (Plaintiff Depo. 47:24-49); 120-10 at 2; 120-11 at 2.] Because the guidance counselor stated that Kluge should "feel free" to use the students' preferred first name and pronoun, Kluge did not consider this a directive. [Doc. 120-3 at 13 (Plaintiff Depo. 48:17-49:22).]

On the first day of classes for the 2017-2018 school year, Kluge met with Dr. Daghe and told him that because the guidance counselor's email was not a directive, his plan was to use "legal names when I start teaching later in the day." [Doc. 120-3 at 14 (Plaintiff Depo. 50:23-52:13).] Dr. Daghe contacted Dr. Snapp and, in a meeting later that day, Kluge told them that his sincerely-held religious belief prohibited him from using a "transgender" first name when addressing students. [*Id.* at 14 (Plaintiff Depo. 52:14-53:2).] Dr. Snapp provided three options—address students by the name in PowerSchool, resign, or face suspension pending termination. [*Id.* (Plaintiff Depo. 53:3-8).] After a separate telephone conversation between Dr. Snapp and Kluge's pastor, the administration agreed to the pastor's

request that Kluge have the weekend to consider his options. [*Id.* at 15-16 (Plaintiff Depo. 56:20-57:18, 58:2-16).]

  *c.*  *The agreed-upon accommodations.*

  The following Monday, Kluge met with Dr. Snapp and Gordon and proposed that Brownsburg allow him to address students by the last name in PowerSchool. [Doc. 120-3 at 17 (Plaintiff Depo. 63:11-65:10).] The administration agreed to Kluge's proposal as an accommodation, as well as another accommodation that Kluge proposed. [*Id.* at 17-18 (Plaintiff Depo. 65:11-66:23).] Both accommodations are memorialized in a memorandum from Dr. Daghe to Kluge dated July 28, 2017:

- First, the administration agreed that Kluge "may use last name only to address students."

- Second, the administration relieved Kluge from passing out orchestra uniforms to students.

[Doc. 15-1.] Kluge signed the memorandum on July 31, 2017, agreeing to comply with these accommodations. [*Id.*]

  Regarding the first accommodation, Kluge understood that he would address all of his students by last name, as opposed to only transgender students. [Doc. 120-3 at 18 (Plaintiff Depo. 68:14-69:18).] To illustrate, Kluge would address Heather Williams as "Williams" or Lucas Jones as "Jones." [Doc. 120-2 at 4.] In addition, Kluge understood that he would not use honorifics when addressing students. [Doc. 120-3 at 18 (Plaintiff Depo. 68:14-69:18).]

The second accommodation addressed Kluge's concern that he not be "directly responsible for giving a man's clothing item to a female student" or vice-versa. [Doc. 120-3 at 17-18 (Plaintiff Depo. 65:11-67:1).]

After his meeting with Dr. Snapp and Gordon, Kluge began teaching. [Doc. 120-3 at 18-19 (Plaintiff Depo. 69:19-70:2).]

V.    *Students, parents, and teachers complain about the last-name-only accommodation.*

During the Fall 2017 semester, Brownsburg's administration received complaints about Kluge's use of last names from members of the high school community, including parents and students. [*See infra* at 12-15.]

a.    *Complaints from parents.*

In a letter to the administration dated September 1, 2017, the parents of a transgender student wrote, "Our medical providers agree that it is in our child's best interest to socially transition as a male. We fully support and love our child, and want to help him live the best life that he can live." [Doc. 120-12 at 2.] Although the parents noted that "most of the staff at Brownsburg High School have been very supportive and have willingly made the transition to using [our child's] male name and pronouns," they were concerned about a teacher who called their child "Miss." routinely. [*Id.*] In the parents' view, this "causes understandable confusion for other students, and leads to students reverting to using female pronouns." [*Id.*] Several weeks later, the mother emailed the school counselor stating that Kluge was continuing to call her child "Miss [    ]," that it was causing her child "a lot of

distress," and that Kluge's conduct was "very disrespectful and hurtful." [Doc. 120-13 at 2.]

b.    *Complaints from Equality Alliance Club students.*

The main source of complaints about Kluge's use of last names came from the Equality Alliance Club, a high school extracurricular club that met weekly to discuss issues impacting the LGBTQ community. [Docs. 120-14 at 32 (Lee Depo. 32:18-33:9); 58-2 at 2.] Craig Lee, a teacher at the high school, was the club's faculty advisor. [Docs. 120-14 at 4 (Lee Depo. 22:20-23:3); 58-2 at 1-2.] Lee's duties as advisor included serving as a resource for the students and supervising the meetings. [Doc. 120-14 at 4 (Lee Depo. 23:17-25).] Attendance at the club's weekly meetings ranged from twelve to forty students, and at least four of its regular participants were transgender. [Docs. 120-14 at 6-7 (Lee Depo. 33:19-35:1); 58-2 at 2.]

Students who attended the meetings complained weekly about Kluge's use of last names. [Docs. 120-14 at 7-8, 13-14; (Lee Depo. 36:20-38:3, 73:9-23, 76:19-77:10); 58-2 at 7-8.] Sam Willis and Aidyn Sucec, two transgender students in Kluge's orchestra class during the 2017-2018 school year, were among the students who complained. [Docs. 22-3 at 3-4; 58-1 at 2-3, 7-10.] Based on Lee's observations, "It was just very, very clear at the meetings to see how much emotional harm was being caused towards Sam and Aidyn. It was clear for everyone at the meetings just to see how much of an impact it was having on them." [Docs. 120-14 at 8, 11 (Lee Depo. 39:2-6, 51:12-52:6).] According to Lee, students felt hurt because Kluge would

not use their preferred first names. [Doc. 58-2 at 2-3.] Lee also reported that transgender students felt "isolated and targeted" because they understood that their presence in class was why Kluge changed the way he addressed students. [*Id.*]

Sucec was diagnosed with gender dysphoria in Spring 2017 and received treatment from medical providers to help alleviate it. [Doc. 22-3 at 2.] Sucec also took steps to socially transition around that time, changing his name to Aidyn and asking others to use masculine pronouns when addressing him. [Doc. 22-3 at 2.] Sucec explained that "[b]eing addressed and recognized as Aidyn was critical to helping alleviate my gender dysphoria. My emotional and mental health significantly improved once my family and friends began to recognize me as who I am." [Doc. 22-3 at 3.] To further this progress, in Summer 2017 and before his freshman year at Brownsburg High School, Sucec's mother spoke to his guidance counselor "about me being transgender, and discussed steps the school could take to ensure [his] safety and well-being, including use of my name and pronouns." [Doc. 22-3 at 3.] That meeting resulted in Sucec's mother and therapist submitting letters to change his name to Aidyn and his gender to male in PowerSchool. [Doc. 22-3 at 3.] According to Sucec, all of his teachers except Kluge used his correct name and pronouns. [Doc. 22-3 at 3.]

Sucec explained that "Kluge's behavior made me feel alienated, upset, and dehumanized. It made me dread going to orchestra class each day, and I felt uncomfortable every time I had to talk to him one-on-one." [Doc. 22-3 at 4.] Sucec also explained that Kluge's behavior was noticeable to his classmates, including an

14

incident where Sucec's stand partner "asked me why Mr. Kluge wouldn't just say my name," and Sucec felt forced to tell him that it was because he was transgender. [Doc. 22-3 at 4.] By December 2017, Sucec's experience in Kluge's class made him decide not to enroll in orchestra after the 2017-2018 school year. [Doc. 22-3 at 4.] Sucec later decided to stop attending Brownsburg High School. [*Id.* at 5.]

Willis knew Kluge before enrolling at Brownsburg High School, having played the violin for the middle school orchestra program since sixth grade. [Doc. 58-1 at 2.] In eighth grade, Willis realized he was transgender and decided to publicly transition during his sophomore year (the 2017-2018 school year), which included using the name "Samuel" or "Sam" and masculine pronouns. [Doc. 58-1 at 2.] Willis' mother emailed Kluge about her son's name change because Kluge had known Willis previously and anticipated that Kluge might have difficulty with the change. [*Id.*] In the early Fall of Willis' sophomore year, his parents and healthcare provider submitted a letter to Brownsburg requesting the name and gender marker change. [Doc. 58-1 at 3.] Brownsburg made this change in PowerSchool in October 2017. [*Id.*]

Willis observed that "Kluge's use of last names in class made the classroom environment very awkward" and led him to conclude "that I was being targeted because of my transgender identity." [Doc. 58-1 at 3-4.] Willis further explained, "Even now, it hurts to think about how Mr. Kluge treated me that year." [*Id.* at 4.] Willis opined that "if everyone in my life had refused, like Mr. Kluge, to use my corrected name, I would not be here today." [*Id.* at 5.]

In the Fall of 2017, Jessup attended an Equality Alliance Club meeting based on concerns she received from counselors. [Doc. 120-6 at 7 (Jessup Depo. 44:9-24).] Approximately forty students attended. [Doc. 120-1 at 4.] Approximately four or five students complained specifically about a teacher using only last names to address students and, in Jessup's view, the other students in attendance appeared to agree. [*Id.*] Although students did not identify Kluge by name, Jessup had no doubt he was the teacher, for he was the only Brownsburg teacher permitted to use last names only instead of the names stated in PowerSchool. [*Id.*]

Lee shared the Equality Alliance Club's student complaints with Dr. Daghe and Jessup. [Doc. 58-2 at 2-3.] For example, in an email to Dr. Daghe dated August 29, 2017, Lee reported that there was a teacher who refused to call a student by the student's new name in PowerSchool and that "this is a serious issue and the student/parents are not exactly happy about it." [Doc. 120-15 at 2.] Although Lee did not identify Kluge by name in this email, Dr. Daghe knew it was Kluge, as Kluge was the only teacher who had received an accommodation regarding using last names only and, in any event, Lee later confirmed to Daghe that the teacher was Kluge. [Doc. 120-2 at 4.] At faculty advisory meetings that occurred twice per month during the Fall 2017 semester, Lee continued to share with Dr. Daghe the complaints and concerns he was hearing. [*Id.*] Lee also shared the complaints with Jessup during a mid-Spring 2018 meeting. [Doc. 120-14 at 14-15 (Lee Depo. 74:22-79:17).]

c.      *Complaints from others in the high school community.*

Beyond students in the Equality Alliance Club, others in the high school community complained about Kluge using last names:

One of Lee's students, who was also in one of Kluge's classes but did not attend Equality Alliance Club meetings, complained to Lee that Kluge's use of last names made the student feel "very uncomfortable" and that the student "felt really bad for those transgender students because of how [Kluge] . . . was conducting himself in class." [Doc. 120-14 at 15-16 (Lee Depo. 79:4-84:12).] The student also told Lee that Kluge's use of last names was "very awkward because he was fairly certain that all the students know why Mr. Kluge had switched to using last names, and that it made the transgender students in Mr. Kluge's class stand out." [Doc. 58-2 at 3.]

Three of Lee's teaching colleagues told Lee that they had received complaints from students and that based on those complaints, they thought Kluge's use of last names was harming students. [Doc. 120-14 at 16-17 (Lee Depo. 85:4-86:15).]

The two performing arts department heads told Dr. Daghe during regular meetings in Fall 2017 that they had received complaints about Kluge's use of last names. [Doc. 120-2 at 4.] The department heads also shared with Dr. Daghe they perceived that Kluge was making students uncomfortable by using last names only "and that the tension this was causing was affecting the overall functioning of the performing arts department." [Doc. 120-2 at 4.] Dr. Daghe received more complaints

17

from these department heads than the complaints Lee shared from students at the Equality Alliance Club meetings. [Doc. 120-5 at 9 (Daghe Depo. 57:15-24).]

## VI.    *Brownsburg's efforts to work with Kluge in light of the complaints.*

As Dr. Daghe heard these concerns throughout the Fall of 2017, he wanted to be fair to Kluge, give the situation some time, and see if the problems and student concerns resolved themselves. [Doc. 120-2 at 4.] When they did not, by December 2017, Dr. Daghe realized he needed to address these issues directly with Kluge. [*Id.*] On December 13, 2017, Dr. Daghe met with Kluge to tell him about the complaints he received regarding Kluge's use of last names. [Doc. 120-3 at 22 (Plaintiff Depo. 83:6-84:8).] Kluge claims this was the first time he heard such complaints. [*Id.* (Plaintiff Depo. 84:9-18).] According to Kluge,

> Daghe scheduled a meeting with me to ask how the year was going and to tell me that my last-name-only [a]ccommodation was creating tension in the students and faculty. He said the transgender students reported feeling "dehumanized" by my calling all students last-name-only. He said that the transgender students' friends feel bad for the transgender students when I call the transgender students, along with everyone else, by their last-name-only. He said that I am a topic of much discussion in the Equality Alliance Club meetings. He said that a number of faculty avoid me and don't hang out with me or include me as much because of my stance on the issue.

[Docs. 120-3 at 22 (Plaintiff Depo. 83:20-84:3); 15-3 at 4.]

Kluge responded to the complaints as follows:

> I explained to Daghe that this persecution and unfair treatment I was undergoing was a sign that my faith as witnessed by my using last-names-only to remain neutral was not coming back void, but was being effective. He didn't seem to understand why I was encouraged. He told me he didn't like things being tense and didn't think things were working out. He said he thought it might be good for me to resign at the

18

end of the year. I told Daghe that I was now encouraged all the more to stay.

[Docs. 120-3 at 24 (Plaintiff Depo. 90:5-22); 15-3 at 5.]

According to Kluge, after learning about the complaints from Dr. Daghe at the December 13, 2017, meeting, Kluge still believed that the last-name-only accommodation was working, that it should continue, and that there was no reason to consider an alternative. [Doc. 120-3 at 24 (Plaintiff Depo. 92:5-93:24).] Kluge also thought the complaints did not demonstrate undue hardship and instead were a "heckler's veto." [*Id.* at 24-25 (Plaintiff Depo. 93:25-94:6).] As Kluge put it, "[W]hy would I change?" [*Id.* at 25 (Plaintiff Depo. 94:4-95:15).] Further, Kluge suspected that Dr. Daghe was lying about student and teacher complaints because Kluge had not experienced animosity with co-workers, Dr. Daghe did not identify by name any students or teachers who complained, Kluge perceived no tension in his classes, and his students performed "better than ever" at orchestra competitions. [*Id.* at 23 (Plaintiff Depo. 88:5-90:4).]

VII.  *Kluge refuses to stop using the last-name-only accommodation and resigns effective at the end of the school year.*

During their next meeting on January 17, 2018, Dr. Daghe told Kluge that he wanted him to resign at the end of the school year. [Docs. 120-3 at 25 (Plaintiff Depo. 95:8-12); 15-3 at 5.] Dr. Daghe cited the student and faculty complaints about the last-name-only accommodation as the reason for his request. [Doc. 120-3 at 25 (Plaintiff Depo. 95:13-17).] Kluge responded that "if there is tension and conflict,

well, that's encouragement that I shouldn't quit but I should continue to pursue neutrality," by which he meant using last names when addressing students. [*Id.*]

In an email to Dr. Snapp and Dr. Daghe dated February 4, 2018, Kluge referenced an FAQ from a recent faculty meeting indicating that next school year, Brownsburg expected teachers to address students by the first name listed in PowerSchool. [Doc. 120-16 at 2.] Kluge concluded the email by asking if it was "correct that I would be allowed to continue to use last-names-only when addressing students next school year and beyond?" [*Id.*]

Dr. Daghe and Gordon met with Kluge on February 6, 2018, to respond to Kluge's question. [Docs. 120-3 at 25 (Plaintiff Depo. 96:10-21); 15-3 at 6.] They told Kluge that although Brownsburg would continue the last-name-only accommodation for the remainder of the 2017-2018 school year, it would not be available for the next school year. [Docs. 120-3 at 26 (Plaintiff Depo. 99:9-24); 113-4 at 24 (Gordon Depo. 5:4-12).] They reiterated to Kluge that students were offended by being called by their last names only. [Doc. 113-4 at 26 (Gordon Depo. 7:16-19).] Kluge acknowledged in this conversation that he understood that an employer is not obligated to accommodate all religious beliefs. [*Id.* at 27 (Gordon Depo. 8:9-11).] Dr. Daghe also stated that the last-name-only accommodation was not reasonable because it was detrimental to students. [*Id.* at 28 (Gordon Depo. 9:8-13).] They gave Kluge three options: resign, continue to use the last-name-only accommodation and face termination procedures, or stop using the last-name-only accommodation. [Doc. 120-3 at 26-27 (Plaintiff Depo. 100:3-102:12).]

On April 30, 2018, Kluge tendered his resignation, effective at the end of the 2017-2018 school year. [Doc. 120-17 at 2.] Kluge concluded his resignation with the following requests: "Please do not process this letter nor notify anyone, including any administration, about its contents before May 29, 2018. Please email me to acknowledge that you have received this message and that you will grant this request." [*Id.*] In response, Gordon stated, "I will honor your request and not process this letter or share with the BHS administration until May 29." [*Id.*] Kluge did not follow up with Gordon to clarify what she meant by the term "BHS administration." [Doc. 120-3 at 28 (Plaintiff Depo. 108:9-109-4).]

VIII.  *Despite Brownsburg allowing the last-name-only accommodation to continue until the end of the school year, Kluge abandons it during an orchestra awards ceremony.*

In May 2018, Kluge participated in an orchestra awards ceremony that honored graduating students and others for their achievements during the school year. [Doc. 120-3 at 32 (Plaintiff Depo. 125:2-17).] The ceremony was part of the curriculum, and Kluge was participating as a Brownsburg employee. [*Id.* at 32-33 (Plaintiff Depo. 125:22-126:6).] According to Kluge, the following is an accurate report of the ceremony:

> During classes, Kluge addressed students by last names, as a reasonable accommodation for his sincerely held Christian beliefs. But during the orchestra awards ceremony, because of its formal nature, he used the full names for students as listed in PowerSchool to address all students as they were receiving their awards—including transgender students— because he was trying to work with the school in only requesting what was reasonable. Kluge thought it unreasonable and conspicuous to address students in such an informal manner at such a formal event, as opposed to the classroom setting where teachers refer to students by last names as a normal form of address. Kluge's Christian faith required that

> he do no harm to his students, and this acquiescence to the
> administration's position was done solely out of sincerely-held beliefs,
> and not in agreement with the policy. Otherwise, Kluge would have
> created a scene that would bring into doubt his stated rationale for
> usage of last names only.

[Docs. 120-3 at 32 (Plaintiff Depo. 125:18-21); 120-19 at 7.] Kluge did not tell

Brownsburg before the ceremony that he intended to address all students by the

first and last names in PowerSchool. [Doc. 120-3 at 34 (Plaintiff Depo. 130:10-

131:4).] Kluge thought that he was promoting a transgender lifestyle when he

addressed students by their "transgender names" during class, but not when he did

so during the ceremony. [*Id.* at 33-34 (Plaintiff Depo. 128:6-130:9).]

Kluge justified a different approach in each setting because addressing

students in the classroom occurs more frequently and is less formal. [Doc. 120-3 at

33-34 (Plaintiff Depo. 128:6-130:9).] Further, Kluge analogized the classroom

setting to a high school coach addressing student-athletes by last names, but he

lacked personal knowledge whether this actually occurred at the high school during

the 2017-2018 school year or whether any student-athlete complained about a coach

using last names. [*Id.* at 33, 35-36 (Plaintiff Depo. 127:7-12, 129:2-12, 137:7-

138:12).] Other than his classroom experience, the only instance where Kluge

claims that he observed teachers addressing students by last name was during work

on the school musical. [*Id.* at 35 (Plaintiff Depo. 134:17-136:25).] Kluge did not know

whether any musical student complained about being addressed by last name. [*Id.*

Plaintiff Depo. 137:1-6).]

IX.    *Brownsburg's board accepts Kluge's resignation.*

At its regular monthly meeting on June 11, 2018, Brownsburg's board unanimously approved Kluge's resignation, effective at the end of the 2017-2018 school year. [Doc. 120-18 at 2, 8.] Kluge's resignation was one of ten teacher resignations that the board approved during that meeting. [*Id.*] Several dozen people spoke about Kluge's resignation during the public comment session. [Doc. 120-18 at 8-13.] The comments included statements that supported Kluge, statements that were critical of Kluge's use of last names, and citizens' opinions on transgender issues more generally. [*Id.*]

X.    *Relevant procedural history.*

Kluge's Amended Complaint is the operative pleading for this appeal. [Doc. 15.] In his Amended Complaint, Kluge attempted to raise thirteen claims, naming Brownsburg as a defendant along with several employees and a board member. [*Id.* at 17-31.]

a.    *The District Court dismisses most of Kluge's Amended Complaint.*

The original defendants moved to dismiss Kluge's Amended Complaint. [Doc. 44.] Kluge conceded that dismissal was appropriate for one of his claims and for those against the individual defendants. [Doc. 56 at 10-11, 31.] The District Court accepted these concessions and further concluded that all but two of Kluge's claims survived the pleading stage, specifically Kluge's Title VII failure-to-accommodate claim and his Title VII retaliation claim. [Doc. 70 at 50-51.]

b.     *The District Court resolves Kluge's remaining claims in Brownsburg's favor.*

Kluge sought partial summary judgment as to Brownsburg's liability for his failure-to-accommodate claim. [Doc. 112 at 3-4.] Brownsburg filed a cross-motion for summary judgment, seeking final judgment in its favor on Kluge's two remaining claims. [Doc. 120.] The District Court denied Kluge partial summary judgment and granted summary judgment in Brownsburg's favor on Kluge's remaining claims. [Doc. 159 at 51-52.]

Regarding the failure-to-accommodate claim, the District Court concluded that although Kluge had established a prima facie case, [Doc. 159 at 38-39.], Brownsburg had established two separate bases for undue hardship, specifically that continuing the last-name-only accommodation would have unduly interfered with Brownsburg's ability to educate students and that it would have unduly exposed Brownsburg to legal liability. [*Id.* at 42-48.] Regarding the retaliation claim, the District Court concluded that Kluge had waived it by failing to adequately brief the claim, [Doc. 159 at 49-50.], and regardless, the retaliation claim failed on the merits—there was no causal connection between Kluge's protected activity and his resignation and, even if there was, there was no evidence from which a reasonable factfinder could infer pretext. [*Id.* at 50-51.] Based on the foregoing, the District Court entered final judgment. [Doc. 160.]

Kluge appealed [Doc. 164.], and this Court affirmed the District Court's summary judgment rulings and its entry of final judgment in Brownsburg's favor. [Doc. 168 at 4-82.] This Court agreed with the District Court that Kluge's requested

accommodation posed an undue hardship on Brownsburg as a matter of law. [Doc. 168 at 48-71.] Regarding the retaliation claim, This Court disagreed that Kluge had waived his claim but nonetheless affirmed the District Court's holding based on Kluge's failure to establish a *prima facie* case of retaliation. [*Id*. at 71-81.]

Several months later, this Court vacated its decision and remanded based on the Supreme Court's decision in *Groff v. DeJoy*, 600 U.S. 447 (2023). [Doc. 168 at 2.] The Seventh Circuit explained in its order that *Groff* had clarified "the standard to be applied in Title VII cases for religious accommodation" and, in light of that clarification, it instructed the District Court "to apply the clarified standard to the religious accommodation claim in the first instance." [Doc. No. 168 at 2.]

The District Court, as instructed, analyzed Kluge's religious accommodation claim under *Groff's* clarified standard and again concluded that Brownsburg was entitled to summary judgment on that claim. [RSA at 29-44.] Under the *Groff*'s clarified standard, the District Court concluded that Brownsburg demonstrated undue hardship as a matter of law because the last-name-only accommodation disrupted the learning environment and exposed Brownsburg to an unreasonable risk of Title IX liability. [*Id*.] The District Court did not reevaluate Kluge's retaliation claim, as *Groff* did not apply to Title VII retaliation claims and, at any rate, this Court's remand order did not direct the District Court to address Kluge's retaliation claim. [*Id*. at 23.] Accordingly, the District Court incorporated its previous discussion and ruling on Kluge's retaliation claim and again granted summary judgment in Brownsburg's favor. [*Id*.]

## Summary of the Argument

The District Court properly granted summary judgment in Brownsburg's favor on Kluge's failure-to-accommodate claim. Applying *Groff's* clarified standard for the affirmative defense of undue hardship, and recognizing the specific nature of Brownsburg's "business" of educating all students who come through its doors, the District Court properly concluded that Kluge's use of only last names imposed an undue hardship on Brownsburg and conflicted with its mission of creating a safe and supportive environment for all students. Kluge's arguments for reversal misconstrue the case law and mischaracterize the nature and quality of the record supporting the District's Court's decision.

The District Court also properly concluded that Brownsburg established a separate basis for undue hardship, namely, that continuing the last-name-only accommodation would have subjected Brownsburg to an unreasonable risk of liability under Title IX. The risk of substantial and disruptive litigation, the District Court held, imposed substantial increased costs on Brownsburg, and thus constituted an undue burden as a matter of law under *Groff*. Kluge's arguments to the contrary are meritless. The law interpreting Title IX, most prominently *Whitaker ex. rel. Whitaker v. Kenosha Unified School District*, 858 F.3d 1034 (7th Cir. 2017), recognized that discrimination on the basis of a student's transgender status was actionable under Title IX, and Kluge's use of only last names exposed Brownsburg to an unreasonable risk of such a discrimination suit.

The District Court also correctly left undisturbed its grant of summary judgment in Brownsburg's favor on Kluge's retaliation claim. *Groff* has no application to Title VII retaliation claims and, even if it did, this Courts' remand order instructed the District Court to re-analyze only Kluge's failure-to-accommodate claim. No additional evidence has been presented that might change the District Court's previous decision or this Court's affirmance of that decision. If this Court revisited Kluge's retaliation claim, Brownsburg would be prejudiced.

Finally, as an alternative, if this Court reverses Kluge's failure-to-accommodate claim, then issues of fact remain on the sincerity of Kluge's religious belief. The record established that Kluge acted inconsistently with his alleged sincerely-held religious belief. Kluge's inconsistency is apparent from the undisputed fact that he unilaterally decided to address students, some of whom were transgender, by their first and last names during an awards ceremony. Kluge's attempts to reconcile this inconsistency are unconvincing, or at least a reasonable jury could so conclude.

## Argument

I.     *Standard of review.*

Per Federal Appellate Rule 28(b)(4), Brownsburg agrees with Kluge's statement of the standard of review. [App. II Doc. 15 at 46.]

II.     *The District Court properly granted summary judgment in Brownsburg's favor on Kluge's failure-to-accommodate claim.*

Title VII prohibits an employer from discriminating in the terms, conditions, or privileges of employment because of an employee's religion and also requires an employer to provide reasonable accommodation for an employee's religious belief unless it would cause "undue hardship on the conduct of the employer's business." 42 U.S.C. §§ 2000e-2(a), 2000e(j).

To state a prima facie case of religious discrimination based on failure to accommodate, an employee must show that his sincerely-held religious belief conflicted with an employment requirement and that the employee's need for an accommodation of that religious belief was the basis for the employer's adverse employment action. *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012), *as modified by E.E.O.C. v. Abercrombie & Fitch, Inc.*, 135 S. Ct. 2028, 2032-33 (2015). If the employee establishes a prima facie case, then the burden shifts to the employer to show that the reasonable accommodation would have caused undue hardship. *Porter*, 700 F.3d at 951.

a.     *The District Court's treatment of Kluge's prima facie case.*

In assessing Brownsburg's summary judgment argument, the District Court assumed that Kluge had established a prima facie claim for failure to accommodate. [RSA at 29.] As such, the District Court focused on whether Brownsburg demonstrated that Kluge's continued use of the last-name-only accommodation would amount to an undue hardship under *Groff*'s clarified "substantial cost" standard. [*Id.*]

28

For this appeal only, and subject to Part IV below, Brownsburg does not challenge the District Court's conclusion that Kluge established a prima facie case for failure to accommodate. As such, Brownsburg's argument turns to its affirmative defense of undue hardship.

> b.    *As a matter of law, Brownsburg established two separate bases for undue hardship.*

The District Court concluded that as a matter of law, Brownsburg had established two separate bases for undue hardship. [RSA at 29-44.] In his Opening Brief, Kluge argues that this Court not only reverse that conclusion, but also grant summary judgment in his favor on his failure-to-accommodate claim. [App. II Doc. 15 at 84.] The following explains why the District Court's decision should be affirmed and why Kluge's arguments to the contrary lack merit.

> 1.    Groff*'s clarified standard for undue hardship.*

Title VII relieves an employer of the obligation to provide reasonable religious accommodation if the employer cannot do so "without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

Before *Groff*, the Supreme Court "construed the term 'undue hardship' in 42 U.S.C. § 2000e(j) to mean a cost to the employer that is anything more than de minimis." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1997) (citing *Trans World Airlines v. Hardison*, 432 U.S. 63, 84 (1977)); *see also Nottelson v. Smith Steel Workers D.A.L.U. 19806, AFL-CIO*, 643 F.2d 445, 451 (7th Cir. 1981). Now, "an employer must show that the burden of granting an accommodation would

result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470.

In determining whether an employer has met the clarified standard, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Groff*, 600 U.S. at 470-71 (citation omitted). Put another way, "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.*

The Court concluded its opinion with two observations that elaborate on "several recurring issues," *Groff*, 600 U.S. at 471-72, that commonly arise in undue hardship cases:

First, regarding an accommodation's impact on coworkers, the relevant ones are those that "go on to affect the conduct of the business." *Groff*, 600 U.S. at 472 (internal quotations and citation omitted). But that does not include coworker "animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice," because if such animosity "provided a defense to a reasonable accommodation claim," then "Title VII would be at war with itself." *Id.*

Second, the Court observed that "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation." *Groff*, 600 U.S. at 473. That means that if an employer concludes that an accommodation causes

undue hardship, then the employer must consider other options for a potential accommodation and not simply throw in the towel. *Id.*

When this clarification is applied to the undisputed facts of this case in the "common-sense manner" that *Groff* requires, 600 U.S. at 471, it becomes apparent that Brownsburg has demonstrated undue hardship as a matter of law on two separate and independent bases.

### 2. The nature of Brownsburg's "business."

The District Court acknowledged that Brownsburg's business, for purposes of analyzing undue hardship, was to provide public education. [RSA at 34 (quoting *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 899 (7th Cir. 2023)).] That type of business is not voluntary in the same sense that a for-profit corporation is. Brownsburg's "business," moreover, is shaped by the Indiana constitutional and statutory law. [*Id.* at 33.] The Indiana Constitution obligates the General Assembly "to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all," Ind. Const. art. VIII, § 1. As the District Court noted, consistent with that Constitutional mandate, "Indiana law also grants to a school corporation 'all . . . powers necessary or desirable in the conduct of the school corporation's affairs, even if the power is not granted by statute or rule.'" [*Id.* (quoting Ind. Code § 20-26-3-3(b)(2)).]

Referencing *Groff*, the District Court added it is simply "common sense" that a public school is not a typical business, and a public-school student is not a typical customer. [RSA at 34.] "Far from maximizing shareholder value, the stated nature

of [Brownsburg's] business is providing a supportive environment for students and respecting the legitimate expectations of their parents and medical providers." [*Id.*] As the District Court noted, *Groff* did not mandate that all costs involved in an undue hardship analysis affect an employer's bottom line; courts can still consider non-economic costs. [RSA at 34]; *see also V. v. Vilsack*, 2024 WL 1155256 at *9 (E.E.O.C. Mar. 7, 2024) ("Undue hardship, however, is not limited to considerations of financial cost. Indeed, Title VII does not refer to 'cost' at all.").

In addition to the nature of Brownsburg's business, the District Court observed that an employer has the authority, under Indiana state law and Seventh Circuit precedent, to "set its policy" and "define its own legitimate mission." [RSA at 33.] Critically, as a natural extension to this authority, the District Court noted "a long line of Seventh Circuit authority squarely holding . . . that contradictions to [an employer's] legitimate mission are relevant to analyzing undue hardship." According to the District Court, Brownsburg

> is entitled to determine that its legitimate mission does not stop at whether some students are literally blocked from entering the schoolhouse gates; rather, that mission can legitimately extend to fostering a safe, inclusive learning environment for all students and evaluating whether that mission is threatened by substantial student harm and the potential for liability.

[RSA at 34.]

In his Opening Brief, Kluge completely misses the point on how the District Court treated Brownsburg's mission as a backdrop for its undue hardship analysis. [App. II Doc. 15 at 70-75.] To elaborate:

First, Kluge claims that Brownsburg's mission exceeded Indiana's requirements. [App. II Doc. 15 at 70-71.] That is wrong. A natural way to educate all students is to foster a safe and inclusive learning environment, and that is hardly at odds with Indiana requirements, particularly when one considers statutory authority granting school corporations "all . . . powers necessary or desirable in the conduct of the school corporation's affairs, even if the power is not granted by statute or rule." Ind. Code § 20-26-3-3(b)(2).

Second, Kluge cites First Amendment cases to support his argument that Brownsburg's mission should have supported "the marketplace of ideas" and served as a "nursery of democracy." [App. II Doc. 15 at 71-72 (cleaned up; citation omitted).] These cases, however, do not apply to Title VII undue hardship analysis.

Third, Kluge argues that Brownsburg did not establish that the last-name-only accommodation jeopardized its mission. [App. II Doc. 15 at 72-74.] But Kluge's attempts to support this argument disregard the nature and quality of Brownsburg's undue hardship evidence. To use but one example, Kluge states, "A few hurt feelings doesn't show hardship" [*id.* at 72], but the designated evidence of student harm was far more substantial than that. *See supra,* Statement of the Case Part V.

Fourth and finally, Kluge claims that the Seventh Circuit cases the District Court relied on to support its observation that an employer can define its own legitimate mission (and consider contradictions to that mission as relevant to undue hardship) are inapposite. [App. II Doc. 15 at 74-75.] However, all Kluge has done is

quote from other aspects of those cases to show, for example, that the employer's evidence of undue hardship fell short in a particular case. [*Id.*] The law holds that an employer can consider its own legitimate mission when assessing undue hardship. That unremarkable proposition is consistent with the "common-sense" analysis espoused by *Groff.*

In sum, the relevant constitutional and statutory obligations require Brownsburg to educate all students who come through its doors. Brownsburg cannot discharge those obligations if, as the District Court noted in its first summary judgment ruling, it accommodates an employee whose religious views are "directly at odds with [Brownsburg's] policy of respect for transgender students" [Doc. 159 at 43.] And this sort of backdrop for undue hardship—assessing an employer's mission and the accommodation's impact on that mission—is a valid part of undue hardship under *Groff.*

With this context in mind, we turn to the two bases for undue hardship that the District Court concluded were established as a matter of law, as well as Kluge's challenges to each.

### 3. *Undue hardship based on interference with Brownsburg's ability to educate students.*

The District Court concluded, "Because of the substantial harm to students, the [last-name-only accommodation] imposed on [Brownsburg] substantially increased costs, amounting to an undue hardship as a matter of law." [RSA at 40.] Supporting this conclusion was undisputed evidence that Kluge's use of only last names made two transgender students "feel targeted and uncomfortable," that one

34

of those students "dreaded going to orchestra class and did not feel comfortable speaking to Mr. Kluge directly" and "quit orchestra entirely," and that other students and teachers "complained that Mr. Kluge's behavior was insulting or offensive and made his classroom environment unwelcoming and uncomfortable." [*Id.* at 37.] In its first summary judgment ruling, the District Court also noted that "Mr. Kluge does not dispute that refusing to affirm transgender students in their identity can cause emotional harm." [Doc. 159 at 45.] As such, the District Court reasoned that "this harm is likely to be repeated each time a new transgender student joins Mr. Kluge's class (or, as the case may be, chooses not to enroll in music or orchestra classes solely because of Mr. Kluge's behavior)." [*Id.*]

Kluge attacks the foregoing undisputed evidence and the District Court's conclusion on five grounds, but none has merit.

> A.   *Brownsburg did not rescind the last-name-only accommodation based on animosity towards Kluge's religion.*

Kluge argues that Brownsburg disregarded *Groff*'s admonition that "bias or hostility to a religious practice or a religious accommodation" is no "defense to a religious accommodation claim." [App. II Doc. 15 at 57 (quoting *Groff*, 600 U.S. at 472).] He also claims that the District Court "astonishingly" never addressed this point. [*Id.*] Neither is true.

First, there is no evidence in the record to support a reasonable inference that Brownsburg acted based on the religious animosity of a student, employee, or anyone else. Kluge's motive (whether religious or otherwise) was not relevant to

Brownsburg because it was his last-name-only practice, and not his motive, that caused substantial harm to students and disrupted the learning environment. Further underscoring the lack of religious animosity is the undisputed fact that Brownsburg allowed the uniform accommodation—which, critically, did not harm students—to continue, whereas it withdrew the last-name-only accommodation because of the undisputed, significant evidence that it was causing student harm and disrupting the learning environment. Thus, Brownsburg rightfully considered the impact (or lack thereof) of each accommodation on its students and reacted accordingly. That Brownsburg withdrew one and not the other is consistent with *Groff*'s instruction that an employer take the "further logical step" of assessing the accommodation's impact "on the conduct of the employer's business." 600 U.S. at 472 (citation omitted).

Second, the District Court *did* consider religious animosity and found it lacking. The District Court observed that the myriad complaints from those in the high school community were "[f]ar from religious animus" and that Brownsburg was instead responding "to concerns rooted in the merits of inclusion." [RSA at 39.] Kluge also overlooks that the interests of students should count more than the interests of co-workers when assessing undue hardship. Here, the complaints established that the last-name-only accommodation *harmed* students, *disrupted* the learning environment, and *interfered* with Brownsburg's philosophy of creating a safe and supportive environment for all. As a matter of law, that constitutes "substantial increased costs" under *Groff*'s clarified standard.

36

B.   *The complaints are more than mere "third-party grumblings."*

Downplaying the nature and quality of the complaints, Kluge characterizes them as a "storm in a teacup generated by a group of complainants" and argues the District Court failed to address *Groff*'s directive to consider the "nature, size[,] and operating cost" of Brownsburg's "business." [App. II Doc. 15 at 61.] Kluge also emphasizes that "Brownsburg has over 10,000 students and over 600 teachers . . . rendering seven offended students 0.067% of the student body and four upset teachers 0.65% of the faculty." [*Id.*]

*Groff* instructs that a reviewing court consider an accommodation's "practical impact" in light of the employer's "size" and "operating cost," but it also requires "common-sense" and attention to the employer's "nature." 600 U.S. at 470-71. Brownsburg's "nature" is educating all students, which it accomplishes in part by fostering a learning environment of respect and affirmation. That is a marked contrast to the "business" of most employers. Many if not most undue hardship cases involve employers that are corporations or non-profits, and the analysis tends to focus on costs common to those enterprises, whether monetary, operational, or otherwise. But Brownsburg's interest is different. It does not exist to maximize shareholder investment or raise money for a cause. Brownsburg exists to educate students and, unlike a corporation or non-profit, that *raison d'être* has constitutional and statutory dimensions. [Doc. 159 at 42 (District Court recognizing that Brownsburg provides public education "as required by Indiana statutory and constitutional law" and that public schools play a "custodial and protective role"

37

over students as part of their role in the public education system) (citation omitted).] The value of any single student's safety and ability to learn at school is not minimized within larger school districts. In other words, the level of undue hardship caused by putting the safety and education of several students at risk is the same whether the school has 100 students or 10,000 students.

Thus, as required by *Groff*, the student harm and disruptions to the learning environment must be addressed in relation to Brownsburg's "particular business" of educating all students and fostering a safe, inclusive learning environment for all the children it serves. There cannot be a stronger nexus between the undisputed, substantial student harm and disruption to the learning environment caused by the last-name-only accommodation and Brownsburg's particular business—the accommodation struck right its heart. Just as in *Baz v. Walters*, 782 F.2d 701, 706-07 (7th Cir. 1986), which was discussed at length in Brownsburg's first summary judgment brief [Doc. 121 at 34-35, 38]—where Reverend Baz's desired accommodation would have required his employer to upend its philosophy of patient care—Kluge's last-name-only accommodation became, as *Baz* put it, "antithetical" to Brownsburg's particular business and core mission. Indeed, as the District Court observed in its first summary judgment ruling, the accommodation was not a mere tangential interference with some aspect of Brownsburg's business—rather, it "*actively interfered* with [Brownsburg's] mission to provide a safe and supportive educational environment." [Doc. 159 at 45 n.11 (emphasis added).]

C.    *Kluge's "universal affirmation" argument is meritless.*

Kluge argues that Title VII does not permit Brownsburg to compel a "religious objector" such as him to "participate" in its "terminology rules." [App. II Doc. 15 at 62.] To support this argument, Kluge cites several cases that do not apply to Title VII undue hardship analysis at all.

Particularly odd is Kluge's reliance on *United States v. Varner*, 948 F.3d 250 (5th Cir. 2020). [App. II Doc. 15 at 62.] He quotes from that opinion as follows: "[N]o authority supports the proposition that [Brownsburg] may require . . . anyone . . . to refer to gender-dysphoric [students] with pronouns matching their subjective gender identity." [*Id.* (quoting *Varner*, 948 F.3d at 254-55).] As suggested by Kluge's liberal use of brackets, this quote is stripped of its context. The appeal in *Varner* concerned a convicted sex offender's request to have the offender's name changed on the judgment of committal, as well as a request by separate motion that the Court "use female pronouns when addressing Appellant." 948 F.3d at 252-53. The court concluded that it lacked jurisdiction to change the judgment of committal because no federal rule or statute authorized such a change. *Id.* at 253. Regarding the separate motion, the court reasoned that although "[f]ederal courts sometimes choose to refer to gender-dysphoric parties by their preferred pronouns," no binding precedent or other authority obligated the court to do so. *Id.* at 255. Nowhere did the *Varner* court remotely suggest that its decision applied to Title VII undue hardship analysis—and particularly not to a case concerning a public school—and there is no legitimate reason for this Court to apply *Varner* here.

Likewise deficient is Kluge's reliance on First Amendment cases in the remainder of this argument. [App. II Doc. 15 at 62-63.] The District Court observed that "arguments rooted in the First Amendment are inapt and beyond the scope of the mandate on remand." [RSA at 38 n.4.] *Groff* said no such thing about applying First Amendment principles to Title VII hardship analysis, and Kluge makes no attempt to show otherwise.

In short, none of the cases that Kluge cites to support his "universal affirmation" argument applies to Title VII undue hardship analysis, and Kluge offers no further authority suggesting that it does. Kluge closes his argument by suggesting a parade of horribles: "Title VII no more allows ideological opponents to drum Mr. Kluge out of Brownsburg based on his Christian beliefs than it allows conspiracy theorists to expel Sikhs who wear turbans or Muslims who pray five times a day." [App. II Doc. 15 at 63.] Such extreme hypotheticals only expose the weakness of Kluge's arguments, for in neither is the employee's conduct actively harming minor students or disrupting the learning environment of a public school. The Court should not engage in them any further.

> D.   *The District Court did not rely on after-the-fact evidence.*

Kluge claims that Brownsburg's undue hardship defense "hinges on *after-created evidence*" and that the District Court's reliance on affidavits from two students, Sam Willis and Aidyn Sucec, was improper. [App. II Doc. 15 at 64-65 (emphasis in original).] Neither is the case.

Most of the evidence that Kluge characterizes as "after-created" is no such thing. Kluge claims, for example, that the District Court should not have considered the students' affidavits because a party who sought to intervene filed them into the record, and because some of the events described in the affidavits occurred after Kluge's resignation. [App. II Doc. 15 at 64.] The affidavits describe the students' concerns, including that Kluge's use of only last names made Sucec "dread going to orchestra class each day" and feel "uncomfortable every time I had to talk to [Kluge] one-on-one." [Doc. 22-3 at 4.] Willis observed that "Kluge's use of last names in class made the classroom environment very awkward" and led him to conclude "that I was being targeted because of my transgender identity." [Doc. 58-1 at 3-4.] Critically, both students reported their concerns during Equality Alliance Club meetings [doc. 22-3 at 4; 58-2 at 2], and the adult sponsor for those meetings, Craig Lee, in turn reported their concerns and those of other students to Dr. Daghe for eventual discussion with Kluge. [Doc. 58-2 at 2-3, 120-2 at 4.] Far from serving as after-the-fact justification for Brownsburg's action, the students' affidavits instead recap their negative experiences in Kluge's classroom and their efforts to make teachers and administrators aware of those negative experiences. It was appropriate for the District Court to consider this evidence.[3]

---

[3] Granted, one student withdrew from Brownsburg after Kluge resigned. But putting to the side that the District Court did not rely on that fact exclusively, it is hard to see how it helps Kluge, for it further demonstrates that Brownsburg's administration had valid concerns about how the last-name-only accommodation was affecting Kluge's students.

But even if one were to brush this evidence aside for argument's sake, Kluge ignores his discussions with Daghe (and later with Daghe and Gordon) where they detailed the concerns of students and others and spoke at length about how the last-name-only accommodation had become untenable. Kluge points to no evidence that Daghe and Gordon were making this up (nor can he), and his description of the District Court's analysis of the evidence as "a game of telephone" is meritless. [App. II Doc. 15 at 65.]

### E.     Kluge's reliance on "[r]ecent research" is misplaced.

Kluge's final argument in this section includes eighteen footnote citations to "[r]ecent research" that he claims "shows he's right" that encouraging gender dysphoria is harmful. [App. II Doc. 15 at 66.]

As an initial matter, fourteen of the articles that Kluge cites were published after his resignation at the end of the 2017-2018 school year. In other words, that information was not available to Brownsburg at the time of the events underlying Kluge's lawsuit. Considering that Kluge accuses Brownsburg and the District Court of relying on after-acquired evidence, one would think that Kluge should not fault Brownsburg for failing to rely on information that was never available to it.

At any rate, and putting to the side that *Amici* has provided research to the contrary, [App. I Doc. 33 at 25-31 (Brief of *Amici Curiae* American Academy of Pediatrics and others) (filed Nov. 8, 2021)], implicit in Kluge's argument is that Brownsburg should endorse his research and thereby disregard the judgment of transgender students' parents and healthcare professionals, both of whom must

provide written approval for a student's name-change request. [Doc. 185 at 10-11.]

There is no legitimate reason for Brownsburg to do this and, in fact, doing so might

expose it to further litigation in addition to what is discussed in Part II.b.4 below.

*See Troxel v. Granville*, 530 U.S. 57, 66 (2000) (listing cases that recognize "the

fundamental rights of parents to make decisions concerning the care, custody, and

control of their children," which include the right "to direct the education and

upbringing of one's children"). Put more succinctly, the District Court considered

Kluge's argument "irrelevant" because it exceeded the scope of this Court's remand

order [RSA at 38 n.4], and this Court should reach the same conclusion.

<p align="center">***</p>

To conclude this section, high school students—and, as Brownsburg

determined, particularly its transgender students—have it hard enough through

the normal maturation process and moving from childhood to early adulthood. Title

VII should not require a public school to continue with an adult teacher's religious

accommodation when the harm to its students, who are children, and the

interference to its mission, is as substantial as what the evidence showed here.

The Court should affirm the District Court's grant of summary judgment in

Brownsburg's favor on this point.

> 4.    *Undue hardship based on Brownsburg's unreasonable exposure
>        to liability.*

The District Court correctly recognized that an employer is not required to

provide a religious accommodation that would subject it to the "razor's edge" of

liability. [RSA at 42 (quoting *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552,

<p align="center">43</p>

554 (7th Cir. 2011)).] Referencing Seventh Circuit precedent "that discrimination on the basis of transgender status is actionable under Title IX," [*id.* (citing *Whitaker ex rel. Whitaker v. Kenosha Unified School District*, 858 F.3d 1034, 1047-50 (7th Cir. 2017))], the Court noted that precedent had expanded: "Since the date of decision in *Whitaker*, it has become clear that treating transgender students differently than other students invites litigation under a variety of theories beyond Title IX, many of which have been successfully litigated." [*Id.* at 43 (collecting Seventh Circuit and other cases).]

Based on this case law, the Court concluded that Brownsburg had established as a matter of law that continuing the last-name-only accommodation would have created undue hardship. [RSA at 43-44.] The Court further concluded that either basis for undue hardship—student harm and disruption to the learning environment, or exposure to an unreasonable risk of liability—was sufficient for summary judgment in Brownsburg's favor. [*Id.*]

In less than two pages of his Opening Brief, Kluge raises three arguments challenging the District Court's reasoning, but none has merit. To elaborate:

First, Kluge argues that Brownsburg's failure to "cite Title IX litigation as a contemporary justification for withdrawing [the] accommodation" somehow forecloses this basis for undue hardship. [App. II Doc. 15 at 76.] Putting to the side that Kluge does not specify to whom Brownsburg needed to "cite" this information, let alone provide authority in support, this Court can apply waiver because Kluge never argued this to the District Court. [Doc. 183 at 30-31; Doc. 186 at 40-41]; *Alioto*

*v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court."). Waiver aside, Kluge provides no authority to support his contention that Brownsburg was required to "cite" Title IX litigation as its reason for withdrawing the accommodation.

Second, citing *Groff*, Kluge asserts that "Title VII doesn't allow for heckler's vetoes" and that "'[A]dverse customer reaction' can't show undue hardship." [App. II Doc. 15 at 76.] *Groff*, however, does not mention "heckler's vetoes," which is a principle of First Amendment law, but even if it did, the complaints Brownsburg received from the high school community concerning the last-name-only accommodation were far more substantial than that. Kluge, moreover, fails to recognize that the interests of students and their relationship to a public school are far more substantial than a company's relationship to its customers.

Third, Kluge claims the cases the District Court compared are not "remotely similar" to this one. [App. II Doc. 15 at 76-77.] For starters, this Court recognized in *Whitaker* that "[p]roviding a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates [Title IX]." 858 F.3d at 1050. The same logic should apply here, for even if it were the case that Kluge called all students in a class with a transgender student by their last names, it was obvious that he was doing so because of the transgender student's presence. [Doc. 58-1 at 3-4.] And that in turn caused the hostile atmosphere that could have led to Title IX litigation. Likewise, to use but one example from the cases the

District Court compared, the *Harris Funeral Home* court granted summary judgment in the EEOC's favor on a Title VII sex discrimination claim. *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 574 (6th Cir. 2018). In doing so, the Sixth Circuit credited the EEOC's argument that "discrimination because of an individual's transgender status is *always* based on gender-stereotypes: the stereotype that individuals will conform their appearance and behavior—whether their dress, the name they use, or other ways they present themselves—to the sex assigned them at birth." *Id.* at 575 (emphasis in original). Similarly, if Brownsburg let the last-name-only accommodation continue, it would condone a teacher's refusal to call students by their preferred names because they are transgender—that is, because of their sex.

<div align="center">***</div>

In sum, the District Court properly concluded that continuing the last-name-only accommodation would have subjected Brownsburg to an unreasonable risk of a Title IX lawsuit. Kluge's argument that "Brownsburg didn't show allowing one teacher to remain silent on transgenderism created *any* risk of Title IX liability" is meritless. [RSA at 77 (emphasis in original).] It should be enough to conclude that continuing the last-name-only accommodation would have placed Brownsburg, as this Court phrased it, on the "'razor's edge' of liability," *Matthews*, 417 F. App'x at 554, which is a Hobson's Choice that Title VII does not require.

III.     *The District Court properly declined to revisit its previous grant of summary judgment in Brownsburg's favor on Kluge's retaliation claim.*

The District Court declined to reevaluate Kluge's retaliation claim because *Groff* does not apply to Title VII retaliation claims and the scope of this Court's remand order was "to apply [*Groff*'s] clarified standard to the religious accommodation claim." [RSA at 23 (citation omitted).] The District Court also incorporated its previous discussion and ruling on Kluge's retaliation claim "in the interest of completeness." [*Id.*] None of this was error.

This Court did not instruct the District Court to reconsider Kluge's retaliation claim because *Groff* does not apply to such claims at all. Moreover, Brownsburg will experience unfair prejudice if Kluge receives a second bite at the apple. Such unfair prejudice includes Brownsburg responding now to arguments that Kluge could have made over two years ago but did not, all on the mere happenstance that the Supreme Court handed down an opinion that impacted his other claim. That is an unwarranted reason to revisit Kluge's retaliation claim. This Court should summarily affirm the District Court's decision for all the reasons stated in the District Court's original summary judgment ruling.

Nevertheless, Kluge's claim still fails for all the reasons Brownsburg advanced in its original summary judgment brief [Doc. 121 at 43-47], most prominently that there is no reasonable inference for a causal connection due to the undisputed fact that Brownsburg's withdrawal of the accommodation was due to the nature and quality of the complaints it was receiving from the high school community. The District Court noted as much in its first summary judgment ruling:

47

"the evidence is undisputed that [Brownsburg] and [its] administrators were acting because of complaints received from the school community . . . ." [Doc. 159 at 51.] Two additional pieces of evidence further undermine the lack of any causal connection, first that Brownsburg never withdrew Kluge's uniform accommodation—the common thread being that no one complained about it—and second that Brownsburg allowed the last-name-only accommodation for some time, going so far as addressing the matter with Kluge and, even though it became apparent he was not open to discussion, deciding that it would not withdraw the accommodation until the beginning of the following school year. And even if one were to brush all of this aside for argument's sake, Kluge's claim still fails for lack of pretext. As the District Court noted in its first summary judgment ruling, "there is nothing in the record to suggest that the complaints were fabricated or that another motive was possible." [Doc. 159 at 51.]

Kluge's arguments to the contrary are unavailing:

First, Kluge claims that *Groff* requires reconsideration of his retaliation claim and that his failure-to-accommodate and retaliation claims are "joined at the hip." [RSA at 78.] It does not, and they are not. For all the reasons stated at the outset of this Part III, *Groff* does not apply to Title VII retaliation claims, and Brownsburg will experience prejudice if Kluge is allowed to revive a claim that he waived years ago.

Second, regarding a causal connection, Kluge makes the remarkable contention that "Brownsburg's *only* reason for forcing Mr. Kluge to resign was his

religious objection and claim to an accommodation." [App. II Doc. 15 at 82 (emphasis added).] The evidence that Kluge cites does not support this contention at all.

Third, also regarding a causal connection, Kluge asserts that Brownsburg "subjected him to a pattern of criticism and animosity" based on Principal Daghe allegedly pressuring him to resign and "constructively discharge[ing] him." [App. II Doc. 15 at 82.] There is no support in the record for these assertions and, as explained above, Kluge overlooks the undisputed fact that Principal Daghe thought resignation was appropriate when it became apparent that Kluge would agree to nothing short of continuing the last-name-only accommodation, complaints notwithstanding. *See supra*, Statement of the Case Part VI.

Fourth, Kluge claims that Dr. Snapp's interaction with him on the first day of classes for the 2017-2018 school year creates a causal connection. [App. II Doc. 15 at 82.] But that interaction occurred many months before Brownsburg's administration decided to withdraw the last-name-only accommodation and, in those intervening months, complaints from students and others, as well as Kluge's recalcitrance when made aware of those complaints—"Why would I change?" [Doc. 185 at 21]—foreclose any causal connection under this Court's standards. Regarding the former point, "intervals shorter than four months are unlikely, standing alone, to establish the causation element of a retaliation claim," and Kluge's interval was longer than that. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014). Regarding the latter point, the causal chain breaks when "a significant intervening

event separates an employee's protected activity from her discharge." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022). Kluge's interaction with Dr. Snapp suffers from both of these deficiencies— too much time elapsed between the interaction and the adverse employment action, and there were significant intervening events in the interim. Either is sufficient to foreclose any reasonable inference of retaliation based on Dr. Snapp's interaction with Kluge.

Fifth and finally, Kluge claims that he need not show pretext because he relied on the direct method of proof. [App. II Doc. 15 at 83-84.] Direct proof in the context of a Title VII retaliation claim includes "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn," *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007), but one strains to see where Kluge has provided any. If anything, the record is to the contrary. To address but one of these, there is nothing suspicious about Brownsburg allowing the last-name-only accommodation for some time when there are no complaints and then later withdrawing it when the complaints become substantial. The inference a reasonable factfinder would draw from such evidence is not retaliatory animus, but rather that the complaints influenced Brownsburg's decision. Kluge's claim that he has provided direct proof of retaliation is baseless.

IV. *If the Court reverses on Kluge's failure-to-accommodate claim, then it should remand for trial because there are genuine issues of material fact regarding the sincerity of Kluge's religious belief.*

The District Court concluded that there were genuine issues of material fact regarding the sincerity of Kluge's religious belief, but for purposes of its ruling assumed such belief was sincere. [RSA at 25-29.] That was correct.

Kluge cannot legitimately reconcile his use of last names in class with his decision to abandon that accommodation during the May 2018 orchestra awards ceremony. Kluge used the full names for students in PowerSchool to address all students as they received their awards, including transgender students. [Doc. 120-9 at 7.] Kluge thought that addressing students by their "transgender names" promoted a transgender lifestyle and was therefore sinful, yet he thought it appropriate to use such names during the ceremony but not in class because the latter occurs more frequently and is less formal. [Doc. 120-3 at 33-34 (Plaintiff Depo. 128:6-130:9).]

Ironically, Kluge acknowledged that by addressing students by their "transgender names" during the ceremony, he was seeking to avoid the same type of negative consequences that resulted from his use of only last names in class. [Doc. 120-19 at 7.] Kluge stated his "Christian faith required that he do no harm to students" [*id.*], yet it is undisputed that Kluge's use of only last names harmed students. Kluge also sought to avoid appearing "unreasonable and conspicuous" and "creat[ing] a scene" during the ceremony [doc. 120-19 at 7], but at the same time, his "behavior was noticeable to other students in the class" [doc. 22-3 at 4] and, as

Kluge acknowledged when he first learned of the complaints from Dr. Daghe, by December 2017 he had become "a topic of much discussion in the Equality Alliance Club meetings." [Doc. 15-3 at 4.] In short, everything Kluge was trying to avoid by using "transgender names" during the ceremony *actually resulted* when he did the opposite in class.

Reasonable religious accommodation should not be based on an employee's arbitrary say-so regarding when the accommodation applies. To that end, "[I]f the religious beliefs that apparently prompted a request are not sincerely held, there has been no showing of a religious observance or practice that conflicts with an employment requirement." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997). Moreover, "Evidence tending to show that an employee acted in a manner inconsistent with his professed religious belief is, of course, relevant to the factfinder's evaluation of sincerity." *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarilladoes de Puerto Rico*, 279 F.3d 49, 57 (1st Cir. 2002). The District Court recognized as much, observing that "a reasonable jury could find that Mr. Kluge's religious beliefs were insincere in that avoiding addressing transgender student[s] by their preferred names was a 'purely personal preference.'" [RSA at 28-29 (quoting *Reed v. Great Lakes Companies, Inc.*, 330 F.3d 931, 934-35 (7th Cir. 2003)).]

There is more. Kluge testified at his deposition that there are instances where it is appropriate and consistent with his religious beliefs to address a transgender student by the student's first name, even if the first name differs from

the student's biological sex. [Doc. 120-3 at 8-9 (Plaintiff Depo. 29:11-30:11).] Although he did not provide an example [*id.*], it is apparent that the orchestra awards ceremony was one of them. Moreover, Kluge's denomination does not take a hardline approach when it comes to restroom use for a transgender child, instructing instead that "it may be best that she not use the bathroom of her birth sex until she has been presented with pastoral counsel concerning God's calling of manhood and womanhood . . . ." [Doc. 120-4 at 12.] It would seem, then, that the same principle that allows a child to deviate from her biological sex when using a bathroom might also apply to the child's name. And that calls into question the sincerity of Kluge's belief, or at least a reasonable juror could so conclude.

## Conclusion

For reasons stated, the Court should affirm the District Court's grant of summary judgment in Brownsburg's favor on Kluge's failure-to-accommodate claim and his retaliation claim.

Alternatively, if the Court disagrees that summary judgment is appropriate on Kluge's failure-to-accommodate claim, then Brownsburg respectfully submits that the Court should remand for trial, as genuine issues of material fact preclude summary judgment in Kluge's favor on that claim.

## Statement for Oral Argument

Per Federal Rule of Appellate Procedure 34(a)(1), Brownsburg states that oral argument should be permitted because this appeal raises interesting and important issues regarding the competing rights of teachers, students, and public schools under Title VII, specifically as those rights are applied to undue hardship analysis.

Dated:     August 9, 2024                    Respectfully submitted,

                                             By:  */s/ Brent R. Borg*

                                             Brent R. Borg
                                             Cassie N. Heeke
                                             Church Church Hittle + Antrim
                                             10765 Lantern Road, Suite 201
                                             Fishers, IN 46038
                                             317-773-2190
                                             bborg@cchalaw.com
                                             cheeke@cchalaw.com

                                             Alexander P. Pinegar
                                             Church Church Hittle + Antrim
                                             Two North Ninth Street
                                             Noblesville, IN 46060
                                             317-773-2190
                                             apinegar@cchalaw.com

                                             *Attorneys for Defendant-Appellee*
                                             *Brownsburg Community School*
                                             *Corporation*

## Certificate of Compliance

1.     This Response Brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by Circuit Rule 32(c), because it contains 13,277 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2.     This Response Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), as modified by Circuit Rule 32(b), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 (Version 2407) in 12-point Century Schoolbook font.

Dated:     August 9, 2024

*/s/ Brent R. Borg*
Brent R. Borg
Church Church Hittle + Antrim
10765 Lantern Road, Suite 201
Fishers, IN 46038
317-773-2190
bborg@cchalaw.com

*Attorney for Defendant-Appellee*
*Brownsburg Community School*
*Corporation*

**Certificate of Service**

I certify that on August 9th, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

<div style="margin-left:40%">

*/s/ Brent R. Borg*
Brent R. Borg
Church Church Hittle + Antrim
10765 Lantern Road, Suite 201
Fishers, IN 46038
317-773-2190
bborg@cchalaw.com

*Attorney for Defendant-Appellee*
*Brownsburg Community School*
*Corporation*

</div>