# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

JOHN M. KLUGE,
*Plaintiff-Appellant*,

v.

BROWNSBURG COMMUNITY SCHOOL CORPORATION,
*Defendant-Appellee*,

On Appeal from the United States District Court for the Southern
District of Indiana, Indianapolis Division
Case No. 1:19-cv-2462-JMS-KMB —Hon. Jane Magnus-Stinson

## BRIEF OF *AMICI CURIAE* NATIONAL ASSOCIATION OF SOCIAL WORKERS INCLUDING ITS INDIANA CHAPTER; AMERICAN ACADEMY OF PEDIATRICS; INDIANA CHAPTER OF THE AMERICAN ACADEMY OF PEDIATRICS; AMERICAN MEDICAL ASSOCIATION; AND INDIANA YOUTH GROUP, INC. IN SUPPORT OF DEFENDANT-APPELLEE BROWNSBURG COMMUNITY SCHOOL CORPORATION AND AFFIRMANCE

D. Jean Veta
William R. Isasi
Komal S. Shah
Kendall T. Burchard*
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
 *Counsel of Record*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1942

Short Caption: John Kluge v. Brownsburg Community School Corporation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Nat'l Assoc. of Soc. Workers, including Ind. Chapter; Am. Academy of Pediatrics; Ind. Chapter of the Am. Academy of

Pediatrics; Am. Medical Assoc; and Ind. Youth Group, Inc.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Covington & Burling LLP

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Kendall T. Burchard                    Date: 8/16/24

Attorney's Printed Name: Kendall T. Burchard

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☑   No ☐

Address:  One CityCenter, 850 Tenth Street, NW

Washington, DC 20001-4956

Phone Number: 202 662 5131                    Fax Number:

E-Mail Address: kburchard@cov.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1942

Short Caption: John Kluge v. Brownsburg Community School Corporation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Nat'l Assoc. of Soc. Workers, including Ind. Chapter; Am. Academy of Pediatrics; Ind. Chapter of the Am. Academy of

Pediatrics; Am. Medical Assoc.; and Ind. Youth Group, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Covington & Burling LLP

(3)    If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

N/A

ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ D. Jean Veta       Date: 8/16/24

Attorney's Printed Name: D. Jean Veta

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: One CityCenter, 850 Tenth Street, NW

Washington, DC 20001-4956

Phone Number: 202 662 5294       Fax Number:

E-Mail Address: jveta@cov.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1942

Short Caption: John Kluge v. Brownsburg Community School Corporation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Nat'l Assoc. of Soc. Workers, including Ind. Chapter; Am. Academy of Pediatrics; Ind. Chapter of the Am. Academy of

Pediatrics; Am. Medical Assoc.; and Ind. Youth Group, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Covington & Burling LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ William R. Isasi     Date: 8/16/24

Attorney's Printed Name: William R. Isasi

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: One CityCenter, 850 Tenth Street, NW

Washington, DC 20001-4956

Phone Number: 202 662 5102     Fax Number:

E-Mail Address: wisasi@cov.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1942

Short Caption: John Kluge v. Brownsburg Community School Corporation

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Nat'l Assoc. of Soc. Workers, including Ind. Chapter; Am. Academy of Pediatrics; Ind. Chapter of the Am. Academy of

Pediatrics; Am. Medical Assoc.; and Ind. Youth Group, Inc.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Covington & Burling LLP

(3)     If the party, amicus or intervenor is a corporation:

i)        Identify all its parent corporations, if any; and

N/A

ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Komal S. Shah       Date: 8/16/24

Attorney's Printed Name: Komal S. Shah

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐   No ☑

Address: One CityCenter, 850 Tenth Street, NW

Washington, DC 20001-4956

Phone Number: 202 662 5869       Fax Number:

E-Mail Address: kshah@cov.com

rev. 12/19 AK

# TABLE OF CONTENTS

I.    STATEMENT OF INTEREST OF *AMICI CURIAE* ...................................... 1

II.   INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 7

III.  ARGUMENT ...................................................................................... 11

    A.    Transgender Youth Face Severe Discrimination and Serious Physical and Mental Health Risks ......................................... 11

        1.    More than One Million Americans, Including over One Hundred Thousand Teenagers, Identify as Transgender. ........ 11

        2.    Transgender Youth Face Severe Discrimination, Which Threatens Their Education and Physical and Mental Well-Being. ..................................................................... 13

    B.    School Communities like BCSC Should Adopt Policies That Require Respect for Students' Names and Pronouns Consistent with Their Gender Identities. .............................................. 16

        1.    Using Transgender Students' Names and Pronouns That Accord with Their Gender Identities Improves Physical and Mental Health Outcomes ...................................... 16

        2.    The Growing Professional Consensus Requires Schools To Respect Students' Names and Pronouns That Accord with Their Gender Identities. ...................................... 19

    C.    Mr. Kluge's Proposed Accommodation Would Result in an Undue Hardship to BCSC Because It Harms the Well-being of Transgender Students. ................................................... 22

IV.   CONCLUSION ................................................................................. 24

**Cases**                                                                                **Page(s)**

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
No. 1:19-CV-02462-JMS-KMB, 2024 WL 1885848
(S.D. Ind. Apr. 30, 2024) ...............................................................2, 7, 22, 24

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
976 F.3d 761, 763 (7th Cir. 2020) ....................................................................2

**Other Authorities**

AM. PSYCH. ASS'N, *APA Resolution on Gender Identity Change
Efforts* (Feb. 2021), https://www.apa.org/about/policy/resolution-
gender-identity-change-efforts.pdf ...................................................................11

AM. PSYCH. ASS'N, *Guidelines for Psychological Practice with
Transgender and Gender Nonconforming People*, 70 AM. PSYCH.
832 (2015), https://www.apa.org/practice/guidelines/
transgender.pdf..................................................................................11, 12, 20

Amit Paley, *National Survey on LGBTQ Youth Mental Health 2020*,
THE TREVOR PROJECT, https://www.thetrevorproject.org/survey-
2020/ (last visited Aug. 15, 2024) ...................................................................18

Amit Paley, *National Survey on LGBTQ Youth Mental Health 2022*,
THE TREVOR PROJECT, https://www.thetrevorproject.org/survey-
2022/assets/static/trevor01_2022survey_final.pdf (last visited Aug.
15, 2024) ...................................................................................8, 13, 14, 18

Arlene Istar Lev, *Transgender Emergence: Understanding Diverse
Gender Identities and Expressions*, NASW FOCUS (Feb. 2006),
https://cdn.ymaws.com/www.naswma.org/resource/resmgr/importe
d/FCE_transgender.pdf.....................................................................................21

Asaf Orr, et al., *Schools in Transition*: *A Guide for Supporting
Transgender Youth in K-12 Schools*, NAT'L EDUC. ASS'N (2015),
http://assets2.hrc.org/files/assets/ resources/Schools-In-
Transition.pdf..................................................................................................9, 19

Ashley Austin et al., *Guidelines for Transgender and Gender Nonconforming (TGNC) Affirmative Education: Enhancing the Climate for TGNC Students, Staff and Faculty in Social Work Education*, COUNCIL ON SOC. WORK EDUC. (2016)..............................................20

Ashley Austin, *Transgender and Gender Diverse Children: Considerations for Affirmative Social Work Practice,* CHILD & ADOLESCENT SOC. WORK J. (2017)................................................................20

*BCSC Mission Statement*, BROWNSBURG CMTY. SCH. CORP., https://www.brownsburg.k12.in.us/about-us/bcsc-welcome/mission-statement (last visited Aug. 15, 2024)............................10, 23

CTRS. FOR DISEASE CONTROL & PREVENTION, *School Connectedness: Strategies for Increasing Protective Factors Among Youth* (2009), https://stacks.cdc.gov/view/cdc/5767 ................................................16

Fed. R. App. P. 29 ................................................................................1

*Gender-Affirming Health Care Saves Lives*, NASW (Mar. 28, 2023), https://www.socialworkers.org/News/News-Releases/ID/2642/Gender-Affirming-Health-Care-Saves-Lives ...................4, 15

Jack Drescher et al., *Position Statement on Discrimination Against Transgender and Gender Variant Individuals*, AM. PSYCHIATRIC ASS'N (July 2018), https://www.psychiatry.org/getattachment/ ad686aa4-8ca9-4a92-b007-cf05a50f8e78/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf ...........................................................................12

Jamie M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, NAT'L GAY AND LESBIAN TASK FORCE & NAT'L CTR. FOR TRANSGENDER EQUAL. (2011), https://www.thetaskforce.org/wp-content/uploads/2019/07/ntds_full.pdf...........................................14

Jason Rafferty, AM. ACAD. OF PEDIATRICS, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 PEDIATRICS 1 (2018), https://publications.aap.org/pediatrics/article/142/4/e20182162/373 81/Ensuring-Comprehensive-Care-and-Support-for?autologincheck=redirected .......................................11, 12, 15, 21

Jody L. Herman et al., *How Many Adults and Youth Identify as Transgender in the United States?*, WILLIAMS INST. (June 2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf........................................................12

Jonathan T. Pryor, *Out in the Classroom: Transgender Student Experiences at a Large Public University*, 56 J. COLL. STUDENT DEV. 440 (2015), https://www.researchgate.net/publication/282221787........................................................9, 18

Joseph G. Kosciw et al., *The 2021 National School Climate Survey*, GLSEN (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf........................................................13

Kasey B. Jackman et al., *Suicidality Among Gender Minority Youth: Analysis of 2017 Youth Risk Behavior Survey Data*, ARCHIVES OF SUICIDE RSCH. (2019) ........................................................8, 13, 15

Kristina R. Olson & Selin Gülgöz, *Early Findings From the TransYouth Project: Gender Development in Transgender Children*, 12 CHILD DEV. PERSPS. 93 (2018) ........................................................12

Maureen D. Connolly et al., *The Mental Health of Transgender Youth: Advances in Understanding*, 59 J. ADOLESCENT HEALTH 489 (2016)........................................................8, 14

NASW, *Transgender and Gender Nonconforming People* in SOCIAL WORK SPEAKS: NAT'L ASS'N OF SOC. WORKERS POL'Y STATEMENTS 323 (11th ed. 2018)........................................................21

Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 DEVELOPMENTAL PSYCH. 1580 (2010), https://pubmed.ncbi.nlm.nih.gov/20822214/ ........................................................17

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, NAT'L CTR. FOR TRANSGENDER EQUAL. (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ........................................................14

Stanley R. Vance, *The Importance of Getting the Name Right for Transgender and Other Gender Expansive Youth*, 63 J. ADOLESCENT HEALTH 379 (2018), https://www.jahonline.org/article/S1054-139X(18)30335-5/pdf ....................................................................18

Stephen T. Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. ADOLESCENT HEALTH 503 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6165713/pdf/nihms945849.pdf ....................................................................9, 17, 18

*Understanding Transgender People, Gender Identity and Gender Expression*, AM. PSYCHOLOGICAL ASS'N, https://www.apa.org/topics/lgbtq/transgender-people-gender-identity-gender-expression (last updated July 8, 2024)............................................................1

U.S. DEPT. OF EDUC., *Supporting Transgender Youth in School* (June 2021), https://www2.ed.gov/about/offices/list/ocr/docs/ed-factsheet-transgender-202106.pdf ....................................................................21

## I. STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* are the National Association of Social Workers ("NASW") including its Indiana Chapter, the American Academy of Pediatrics ("AAP"), the Indiana Chapter of the American Academy of Pediatrics ("INAAP"), the American Medical Association ("AMA"), and Indiana Youth Group, Inc. ("IYG").[1] All five organizations seek to promote the safe and healthy development of lesbian, gay, bisexual, and transgender[2] ("LGBT") people in schools and communities.

As well-respected national and Indiana-based medical and mental health organizations, as well as a provider of support services to Indiana transgender youth, *amici* seek to offer additional insight regarding the harm that accommodating Plaintiff-Appellant would cause to the health and wellbeing of transgender students, harm that is not adequately addressed in the briefs submitted by the parties to this

---

[1] The parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2). *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici* or their counsel made any monetary contributions intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

[2] "Transgender" is an umbrella term used to describe many identities in which the person's "gender identity, gender expression or behavior does not conform to that typically associated with the sex to which they were assigned at birth." *Understanding Transgender People, Gender Identity and Gender Expression*, AM. PSYCHOLOGICAL ASS'N, https://www.apa.org/topics/lgbtq/transgender-people-gender-identity-gender-expression (last updated July 8, 2024). "Sex . . . assigned at birth[] refers to one's biological status as either male or female, and is associated primarily with physical attributes such as chromosomes, hormone prevalence, and external and internal anatomy." *Id.* Although the term "transgender" can be further subcategorized and also may not encompass all people who are gender non-conforming, for simplicity, this brief uses the term "transgender" to refer to all people who experience a discordance between their gender identity and their sex assigned at birth.

case.  "[A] true friend of the court will seek to add value to our evaluation of the issues presented on appeal," including by "[r]elaying views on legal questions by employing the tools of social science" or "[s]upplying empirical data informing one or another question implicated by an appeal."[3]

Here, *amici*'s brief should be considered because it will add important insight, informed by social science and empirical data, not discussed in detail by the parties. The parties' dispute concerns whether Defendant-Appellee, Brownsburg Community School Corporation ("BCSC"), should have provided Plaintiff-Appellant John Kluge with a religious accommodation to a school policy that required Mr. Kluge to refer to students, including transgender students, by the names listed in the school database.  Using social science and empirical data, *amici* detail the reasons why an accommodation, such as the "Last Names Only Accommodation"[4] proposed by Mr. Kluge, which would permit a teacher to refuse to use transgender students' names and pronouns listed in the school database, would have a significant detrimental effect on the health and wellbeing of BCSC transgender students.  Any such accommodation would actively harm transgender

---

[3] *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 976 F.3d 761, 763 (7th Cir. 2020) (Scudder, J., in chambers) (permitting "additive" amicus briefs).

[4] *See Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 1:19-CV-02462-JMS-KMB, 2024 WL 1885848, at *4 (S.D. Ind. Apr. 30, 2024).

students by failing to affirm their gender identities and otherwise singling out and stigmatizing them.

1. <u>National Association of Social Workers</u>. Founded in 1955, NASW is a nonprofit organization and the largest association of professional social workers in the United States with 110,000 members in 55 chapters. NASW develops policy statements on issues of importance to the social work profession, promulgates professional policies, conducts research, publishes professional studies and books, provides continuing education, and promotes and administers the NASW Code of Ethics. Consistent with NASW policy statements, NASW, including its Indiana Chapter, supports full human rights and the end to all public and private discrimination on the basis of gender identity and gender expression, whether actual or perceived, and regardless of assigned sex at birth. The NASW National Committee on LGBT Issues develops, reviews, and monitors NASW programs that significantly affect LGBT individuals, including transgender people. The NASW Code of Ethics for professional social workers requires that all people—including those who are transgender—be afforded the same respect and rights regardless of their gender identification. NASW supports the implementation of nondiscrimination and antibullying policies with specific inclusion of transgender and gender diverse youths and adults in all educational institutions. NASW asserts that "discrimination and prejudice directed against any individuals on the basis of

gender identity or expression are damaging to the social, emotional, psychological, physical and economic well-being of transgender and gender diverse . . . people and society as a whole."[5]

2. <u>The American Academy of Pediatrics</u>.  Founded in 1930, AAP is a national, not-for-profit professional organization dedicated to furthering the interests of child and adolescent health.  Since AAP's inception, its membership has grown to 67,000 primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists who are committed to the attainment of optimal physical, mental, and social health and well-being for infants, children, adolescents, and young adults. Over the past 91 years, AAP has become a powerful voice for child and adolescent health through education, research, advocacy, and the provision of expert advice. Research has shown that adolescents who identify as transgender face significantly higher rates of depression, anxiety, eating disorders, self-harm, and suicide.  Such challenges are often more intense for youth who do not conform to social expectations and norms regarding gender.  AAP thus strives to support laws and policies that foster an inclusive environment for transgender youth.

3. <u>The Indiana Chapter of the American Academy of Pediatrics</u>.  INAAP is a statewide 501(c)(3) nonprofit organization, incorporated in Indiana focusing on

---

[5] *Gender-Affirming Health Care Saves Lives*, NASW (Mar. 28, 2023) [hereinafter "NASW Policy Statement"], https://www.socialworkers.org/News/News-Releases/ID/2642/Gender-Affirming-Health-Care-Saves-Lives.

issues related to the health and well-being of all children in the state. With over 900 pediatrician, pediatric specialist, and advanced practice nurse members throughout the state, INAAP is committed to attaining optimal physical, mental, and social health for all infants, children, adolescents, and young adults. INAAP strives to support laws and policies that foster an inclusive environment for transgender youth.

4. <u>American Medical Association.</u> The AMA is the largest professional association of physicians, residents, and medical students in the United States. Additionally, through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all physicians, residents, and medical students in the United States are represented in the AMA's policy-making process. The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes. The AMA is committed to partnering with public and private organizations dedicated to public health and public policy to improve health among transgender youth and reduce transgender youth suicide. AMA members practice in every medical specialty and in every state, including Indiana.

5. <u>Indiana Youth Group</u>. IYG is a nonprofit organization whose primary mission is to promote the safety and healthy development of LGBT youth in Indiana schools and communities. Among other things, IYG provides services and programs to support the mental health and wellness of LGBT youth, including services and

programs that are offered exclusively to transgender youth. IYG also educates Indiana school officials, parents, and community members about transgender inclusivity and works with Indiana schools to develop school policies requiring school officials to treat students in a manner consistent with the students' gender identity, including name and pronoun usage policies for transgender students. IYG is also responsible for managing the Indiana GSA Network, an association of over 50 youth-led gender sexuality alliances that seek to create safe spaces for LGBT youth and address anti-LGBT harassment and discrimination. At Brownsburg High School, the student-run GSA is known as the "Equality Alliance" and is a member of the Indiana GSA Network. IYG has worked directly with the Brownsburg Equality Alliance and its student members since 2011.

## II. INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici curiae* urge this Court to affirm the District Court's finding that accommodating Mr. Kluge by permitting him to refuse to use transgender students' names and pronouns would cause substantial harm to transgender students and would be inconsistent with BCSC's mission to "foster[] a safe, inclusive learning environment for all students."[6] *Amici* are well-respected national and Indiana-based medical and mental health organizations committed to ensuring that transgender children have access to full educational opportunities, and that their mental and physical wellbeing are protected. Drawing on their experience and expertise in their respective fields, *amici* seek to provide this Court with an empirically grounded view of the exceptional challenges transgender youth face, and the importance of policies that affirm transgender youth's gender identity, including the policy adopted by Defendant-Appellee BCSC, which provides an avenue for transgender students to be called by the names and pronouns that are consistent with their gender identity.

Over the past several decades, academic and medical research has confirmed that transgender youth face severe discrimination in the school environment. In 2022, 37% of transgender youth reported that they had been physically threatened

---

[6] *Kluge*, 2024 WL 1885848, at *1.

or harmed due to their gender identity.[7]  Further, studies have found that transgender students are 1.66 times more likely to be bullied at school than their cisgender peers and 4.15 times more likely to be threatened or injured by a weapon at school than their cisgender peers.[8]

This pervasive discrimination has corrosive effects on transgender young people's mental and physical health and their ability to succeed academically.  For example, research shows that transgender youth are far more likely than their non-transgender peers to experience depression, disordered eating, and self-harm—including attempted suicide.[9]  According to a survey of over 30,000 LGBT young people conducted by the Trevor Project—a nonprofit organization focused on suicide prevention efforts among LGBT youth—nearly one in five transgender youth had attempted suicide in the preceding twelve months of their lives.[10]  This staggering rate reflects a public health crisis that requires urgent attention.

---

[7] Amit Paley, *National Survey on LGBTQ Youth Mental Health 2022*, THE TREVOR PROJECT 15 [hereinafter "The Trevor Project 2022 National Survey"], https://www.thetrevorproject.org/survey-2022/assets/static/trevor01_2022survey_final.pdf (last visited Aug. 15, 2024).

[8] Kasey B. Jackman et al., *Suicidality Among Gender Minority Youth: Analysis of 2017 Youth Risk Behavior Survey Data*, ARCHIVES OF SUICIDE RSCH. 7 tbl.2 (2019) [hereinafter "Suicidality"].

[9] The Trevor Project 2022 National Survey, *supra* note 7, at 5–10; Suicidality, *supra* note 8, at 8, 11 tbl.4; Maureen D. Connolly et al., *The Mental Health of Transgender Youth: Advances in Understanding*, 59 J. ADOLESCENT HEALTH 489, 494 (2016) [hereinafter "Mental Health of Transgender Youth"].

[10] The Trevor Project 2022 National Survey, *supra* note 7, at 5.

Fortunately, research shows that school environments that support the educational and social needs of transgender students can dramatically reduce these risks. Schools such as Brownsburg High School must prioritize policies that foster an inclusive environment for transgender youth, including policies that ensure that transgender students are called by the names and pronouns that accurately reflect their gender identities. These policies can help alleviate the long-term effects of trauma experienced by such students.

As confirmed by a landmark 2018 study, transgender youth who are able to use names and pronouns consistent with their gender identities experience positive mental health outcomes, including a 29% decrease in reported thoughts of suicide and a 56% decrease in suicide attempts.[11] Further, multiple studies have demonstrated that consistent recognition of transgender students' names and pronouns by educators and school administrators models expectations for the school community and discourages bullying behavior from other students.[12]

---

[11] Stephen T. Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. ADOLESCENT HEALTH 503, 505 (2018) [hereinafter "Chosen Name Use"], https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6165713/pdf/nihms945849.pdf.

[12] *See, e.g.*, Jonathan T. Pryor, *Out in the Classroom: Transgender Student Experiences at a Large Public University*, 56 J. COLL. STUDENT DEV. 440, 442 (2015) [hereinafter "Out in the Classroom"], https://www.researchgate.net/publication/282221787; Asaf Orr, et al., *Schools in Transition*: *A Guide for Supporting Transgender Youth in K-12 Schools*, NAT'L EDUC. ASS'N 22 (2015) [hereinafter "Schools in Transition"], http://assets2.hrc.org/files/assets/resources/Schools-In-Transition.pdf.

For these reasons, the scientific literature supports BCSC's requirement that school employees refer to students by their names and pronouns listed in the "PowerSchool" database, which provides an avenue for transgender students (and indeed all students) to record names and pronouns that affirm their gender identity. Plaintiff-Appellant Kluge, by contrast, sought an accommodation that would have allowed him to refuse to use the names and pronouns listed in PowerSchool, to avoid using transgender students' first names and accurate pronouns.[13]

The empirical data and scientific consensus discussed below demonstrate that any accommodation that would permit Mr. Kluge to refuse to call transgender students by their names and pronouns would significantly harm—and already has harmed—the psychological and emotional well-being of transgender students. These harms directly conflict with BCSC's mission to provide "a secure environment," in which "*all* students" may pursue their "maximum intellectual potential" and "become well-rounded individuals."[14]    Accordingly, *amici* respectfully request that the Court affirm the District Court's finding that Mr. Kluge's requested accommodation would result in an undue hardship to BCSC.

---

[13] Kluge Br. In Support of Mot. Summ. J., Doc. 185 at 4.  In this brief, "Doc." refers to the ECF number of documents filed within the District Court.

[14] *BCSC Mission Statement*, BROWNSBURG CMTY. SCH. CORP. [hereinafter "BCSC Mission Statement"] (emphasis added), https://www.brownsburg.k12.in.us/about-us/bcsc-welcome/mission-statement (last visited Aug. 15, 2024).

## III. ARGUMENT

### A. Transgender Youth Face Severe Discrimination and Serious Physical and Mental Health Risks.

Because transgender people face rampant discrimination and violence, including in school settings, medical and mental health professionals widely recognize that policies affirming a person's gender identity can greatly improve health outcomes.[15]

#### 1. More than One Million Americans, Including over One Hundred Thousand Teenagers, Identify as Transgender.

Gender identity is a person's "deep internal sense of being female, male, a combination of both, somewhere in between, or neither."[16] Transgender people "have a gender identity that is not fully aligned with their sex assigned at birth."[17] People often begin to express and articulate their gender identity as children, at the same time that their school environment plays a vital role in their life and

---

[15] *See, e.g.*, Jason Rafferty, AM. ACAD. OF PEDIATRICS, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 PEDIATRICS 1, 6 (2018) [hereinafter "AAP Policy Statement"], https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for?autologincheck=redirected (reaffirmed in Aug. 2023).

[16] *Id.* at 2 tbl.1; *see also* AM. PSYCH. ASS'N, *APA Resolution on Gender Identity Change Efforts* 1 (Feb. 2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

[17] AM. PSYCH. ASS'N, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PSYCH. 832, 832 (2015) [hereinafter "APA Guidelines"], https://www.apa.org/practice/ guidelines/transgender.pdf. Transgender people differ from non-transgender individuals, whose gender identity aligns with their sex assigned at birth. *Id.*

development.[18]  In the United States, approximately 1.6 million individuals identify as transgender.[19]  Of these, approximately 300,000 are teenagers aged 13 to 17.[20]

The scientific community's understanding of transgender people and gender identity has become more robust and sophisticated over the past two decades.[21] There is now a consensus that being transgender "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."[22] Moreover, medical and mental health professionals recognize that affirming gender identity can significantly improve the well-being of transgender people.[23]  By contrast, transgender people who encounter unsupportive social environments are more likely than the general population to experience health challenges such as depression, anxiety, stress and suicidality.[24]

---

[18] Kristina R. Olson & Selin Gülgöz, *Early Findings From the TransYouth Project: Gender Development in Transgender Children*, 12 CHILD DEV. PERSPS. 93, 93–97 (2018).

[19] Jody L. Herman et al., *How Many Adults and Youth Identify as Transgender in the United States?*, WILLIAMS INST. 1 (June 2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf.

[20] *Id.*

[21] APA Guidelines, *supra* note 17, at 832.

[22] *See, e.g.*, Jack Drescher et al., *Position Statement on Discrimination Against Transgender and Gender Variant Individuals*, AM. PSYCHIATRIC ASS'N (July 2018), https://www.psychiatry.org/getattachment/ad686aa4-8ca9-4a92-b007-cf05a50f8e78/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.

[23] APA Guidelines, *supra* note 17, at 832.

[24] *See* AAP Policy Statement, *supra* note 15, at 3.

**2. Transgender Youth Face Severe Discrimination, Which Threatens Their Education and Physical and Mental Well-Being.**

Unfortunately, the story of transgender youth is one of rampant harassment, discrimination, and violence. In a 2021 study of over 22,000 students, 77.9% of transgender students reported that they were discriminated against at school, compared to 43.4% of cisgender students.[25] Another study found that transgender students are 1.66 times more likely than their non-transgender peers to be bullied at school, 2.43 times more likely to be electronically bullied, and 4.15 times more likely to be threatened or injured with a weapon.[26] Indeed, 37% of transgender youth reported having been physically threatened or harmed due to their gender identity.[27]

This widespread discrimination and violence against transgender students can have serious consequences for their ability to succeed in an educational environment. Studies show that transgender students are more likely to miss school, change schools, or prematurely abandon the educational setting altogether. Indeed, one study reported that 38.3% of transgender students had missed school, while 19.7% had changed schools because of fears for their safety.[28] Another study found that

---

[25] Joseph G. Kosciw et al., *The 2021 National School Climate Survey*, GLSEN 91 (2022) [hereinafter "2021 National School Climate Survey"], https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf.

[26] Suicidality, *supra* note 8, at 7 tbl.2.

[27] The Trevor Project 2022 National Survey, *supra* note 7, at 15.

[28] 2021 National School Climate Survey, *supra* note 25, at 90 fig.3.14.

15% of transgender participants prematurely left educational settings because of harassment.[29]  The experiences of transgender people as adolescents have long-lasting consequences:  a 2015 survey of nearly 28,000 transgender adults found that those who had faced discrimination because of their transgender identity while in school were more likely to have experienced serious psychological distress or to have experienced homelessness later in life.[30]

Due to the challenges of living in a culture in which they are often bullied and marginalized, transgender youth have significantly higher mental and physical health risks compared to the general population.  Studies consistently show that transgender students experience significantly higher rates of depression, disordered eating, and self-harm than their non-transgender peers.[31]  In 2022, the Trevor Project conducted a survey of over 30,000 LGBT youth in the United States, and the results showed that over 60% of transgender youth reported experiencing symptoms of depression and over 75% of transgender youth reported experiencing symptoms of anxiety.[32]

---

[29] Jamie M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, NAT'L GAY AND LESBIAN TASK FORCE & NAT'L CTR. FOR TRANSGENDER EQUAL. 33 (2011), https://www.thetaskforce.org/wp-content/uploads/2019/07/ntds_full.pdf.

[30] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, NAT'L CTR. FOR TRANSGENDER EQUAL. 132 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

[31] Mental Health of Transgender Youth, *supra* note 9.

[32] The Trevor Project 2022 National Survey, *supra* note 7, at 5–10.

Suicide rates among transgender youth are a public health crisis.  The same survey by the Trevor Project found that 53% of transgender youth seriously considered attempting suicide and 19% had in fact attempted suicide **in the preceding twelve months of their lives**.[33]  Another research study likewise determined that transgender youth were 2.71 times more likely to attempt suicide than other young people.[34]

While these figures are staggering, they are not surprising.  As the AAP has observed, "[y]outh who identify as [transgender] often confront stigma and discrimination, which contribute to feelings of rejection and isolation that can adversely affect physical and emotional well-being."[35]  Similarly, NASW has determined that "discrimination and prejudice directed against any individuals on the basis of gender identity or expression are damaging to the social, emotional, psychological, physical and economic well-being of transgender" people.[36]  The scientific community therefore believes that "[p]olicies and interventions are needed to reduce suicidality among gender minority youth, improve access to mental healthcare, and reduce peer victimization and substance use."[37]

---

[33] *Id.*

[34] Suicidality, *supra* note 8, at 11 tbl.4.

[35] AAP Policy Statement, *supra* note 15, at 3.

[36] NASW Policy Statement, *supra* note 5.

[37] Suicidality, *supra* note 8, at 1.

**B.**     **School Communities like BCSC Should Adopt Policies That Require Respect for Students' Names and Pronouns Consistent with Their Gender Identities.**

In light of the significant challenges that transgender youth face, school communities such as BCSC must prioritize policies that respect and protect the rights of students, including policies that require respect for the names and pronouns that match a student's gender identity.  Numerous studies have found that the simple act of referring to transgender students respectfully by the names and pronouns consistent with their gender identities can significantly improve mental health outcomes and may reduce the risk of suicide.

**1.**     **Using Transgender Students' Names and Pronouns That Accord with Their Gender Identities Improves Physical and Mental Health Outcomes.**

Schools play a major role in children's lives and can have a significant impact on their development and mental health.  The Centers for Disease Control and Prevention has, for example, recognized the importance of "[a] positive school environment . . . characterized by caring and supportive interpersonal relationships; opportunities to participate in school activities and decision-making; and shared positive norms, goals, and values."[38]  It is therefore critical that schools create a

---

[38] CTRS. FOR DISEASE CONTROL & PREVENTION, *School Connectedness: Strategies for Increasing Protective Factors Among Youth* 7 (2009), https://stacks.cdc.gov/view/cdc/5767.

supportive and inclusive environment for transgender students free of discrimination.[39]

A growing body of scientific research has found that policies ensuring that others address students by their appropriate pronouns correlate closely with far lower rates of discrimination, psychological distress, and attempted suicide. For example, the Journal of Adolescent Health published a landmark study in 2018 on the benefits of such policies on transgender youth.[40] Transgender youth who were able to use names and pronouns that affirmed their gender identities in an educational setting, or in one of three other contexts, experienced a 29% decrease in reported thoughts of suicide and a 56% decrease in suicide attempts.[41]

On the basis of those findings, the authors recommended that schools adjust regulations and information systems to respect the names and pronouns of students that accord with their gender identities in records, rosters, and means of identification (i.e., ID cards).[42] As the authors explained, "policies that promote the

---

[39] *See* Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 DEVELOPMENTAL PSYCH. 1580, 1586 (2010), https://pubmed.ncbi.nlm.nih.gov/20822214/ ("Enactment of school policies that specifically prohibit victimization due to LGBT status, gender nonconformity, and other types of bias-related harassment can help reduce negative psychosocial outcomes in LGBT and gender-nonconforming young people.").

[40] *See, e.g.*, Chosen Name Use, *supra* note 11.

[41] *Id.* at 505.

[42] *Id.*

social transition process of gender affirmation among transgender youth, such as chosen name use or access to restrooms consistent with gender identity or presentation, will likely enhance safety and reduce physical and mental health disparities for transgender populations."[43]  Medical professionals have highlighted the value of the 2018 study, noting that it underscores the importance of using gender-affirming names and pronouns to transgender students' mental health.[44]

Other research studies likewise found that requiring the use of appropriate names and pronouns correlates with far lower rates of discrimination, psychological distress, and attempted suicide among transgender youth.[45]  For example, in a case study of transgender students at a large Midwestern university, a transgender student who was referred to by his name and pronouns that matched his gender identity noted that his teachers' recognition of him as male discouraged other students from bullying him.[46]  These studies underscore the positive mental health consequences of ensuring the use of names and pronouns for transgender youth that are consistent with their gender identities, and the necessity for policies that require school

---

[43] *Id.*

[44] Stanley R. Vance, *The Importance of Getting the Name Right for Transgender and Other Gender Expansive Youth*, 63 J. ADOLESCENT HEALTH 379, 379 (2018), https://www.jahonline.org/article/S1054-139X(18)30335-5/pdf.

[45] *See* The Trevor Project 2022 National Survey, *supra* note 7, at 23;  Out in the Classroom, *supra* note 12, at 448; *see also* Amit Paley, *National Survey on LGBTQ Youth Mental Health 2020*, THE TREVOR PROJECT, https://www.thetrevorproject.org/survey-2020/ (last visited Aug. 15, 2024).

[46] Out in the Classroom, *supra* note 12, at 448.

employees to support children who are at risk of discrimination and long-term negative psychosocial outcomes.

### 2. The Growing Professional Consensus Requires Schools To Respect Students' Names and Pronouns That Accord with Their Gender Identities.

Along with the scientific data, there is growing consensus among education and mental health professionals that schools should adopt policies that allow transgender students to be referred to by gender-affirming names and pronouns.

For example, the National Education Association ("NEA") has stated that, to prevent and alleviate "the distress that transgender youth often experience, . . . healthcare providers recommend that the child 'socially transition' and live consistently with their gender identity," including by "using names and pronouns in a manner consistent with their identified gender."[47] The NEA found that "[c]onsistently using a transgender student's chosen name and pronouns signals that the speaker is respecting and affirming the transgender student's gender identity. When the speaker is an educator or administrator, using the student's chosen name and pronoun also models and sets expectations for the school community."[48] These simple actions "can have a profound effect on the student's experience."[49]

---

[47] Schools in Transition, *supra* note 12, at 9.

[48] *Id.* at 22.

[49] *Id.*

Other national organizations have echoed the NEA's views. The Council on Social Work Education has encouraged the implementation of "policies and practices [that are] associated with the use of preferred names and pronouns," including policies that allow students to change their name in academic institutions' information systems.[50] The Child and Adolescent Social Work Journal has recognized that "[l]egally changing a child's name to match his/her/their identity and gender presentation can often make the child more comfortable in school, recreation and medical settings where legal names are documented and often called aloud."[51] And guidelines promulgated by the American Psychological Association state that refusing to use the names and pronouns that accord with a transgender person's gender identity, or otherwise failing to support their gender identity, should be viewed as discrimination.[52] Finally, the U.S. Department of Education's guidelines on how best to support transgender youth in school include, "[a]dopting policies that respect all students' gender identities—such as the use [of] the name a student goes

---

[50] Ashley Austin et al., *Guidelines for Transgender and Gender Nonconforming (TGNC) Affirmative Education: Enhancing the Climate for TGNC Students, Staff and Faculty in Social Work Education*, COUNCIL ON SOC. WORK EDUC. 4 (2016).

[51] Ashley Austin, *Transgender and Gender Diverse Children: Considerations for Affirmative Social Work Practice,* CHILD & ADOLESCENT SOC. WORK J. 8 (2017).

[52] APA Guidelines, *supra* note 17, at 838.

by, which may be different from their legal name, and pronouns that reflect a student's gender identity."[53]

*Amici* are among the chorus of educational, medical, and mental health professionals who stress the importance of respecting the gender-affirming names and pronouns of transgender youth. The AAP has found that affirming gender identity of "adolescents with gender dysphoria often reduces the emphasis on gender in their lives, allowing them to attend to other developmental tasks, such as academic success, relationship building, and future-oriented planning."[54]

Similarly, NASW has concluded that referring to transgender clients by "a name and pronoun that most reflects their sense of self can be enormously empowering."[55] NASW thus supports policies that require the "use of respectful address" including "asserted names" and "pronouns" and policies that allow for electronic record systems to "capture asserted names," "pronouns," and "asserted gender identities."[56]

---

[53] U.S. DEPT. OF EDUC., *Supporting Transgender Youth in School* (June 2021), https://www2.ed.gov/about/offices/list/ocr/docs/ed-factsheet-transgender-202106.pdf.

[54] AAP Policy Statement, *supra* note 15, at 6.

[55] Arlene Istar Lev, *Transgender Emergence: Understanding Diverse Gender Identities and Expressions*, NASW FOCUS 12 (Feb. 2006), https://cdn.ymaws.com/www.naswma.org/resource/resmgr/imported/FCE_transgender.pdf.

[56] NASW, *Transgender and Gender Nonconforming People* in SOCIAL WORK SPEAKS: NAT'L ASS'N OF SOC. WORKERS POL'Y STATEMENTS 323, 327–28 (11th ed. 2018).

**C.    Mr. Kluge's Proposed Accommodation Would Result in an Undue Hardship to BCSC Because It Harms the Well-being of Transgender Students.**

Plaintiff-Appellant Kluge sought an accommodation that would allow him to refuse to call transgender students by their gender-affirming first names and pronouns, contrary to the empirical data and expert consensus described above. The District Court correctly concluded that such an accommodation would result in an undue hardship to BCSC because the accommodation would result in psychological and emotional harms to transgender students—and indeed, that it had already caused such harm. In this regard, the District Court found that such an accommodation would directly interfere with BCSC's mission of "educating all students" and "fostering a learning environment of respect and affirmation."[57]

In furtherance of its mission and consistent with the research and sources cited above, BCSC concluded that "transgender students face significant challenges in the high school environment, including diminished self-esteem and heightened exposure to bullying" and that "these challenges threaten transgender students' classroom experience, academic performance, and overall well-being."[58] To address these challenges, BCSC promulgated a policy requiring its employees to address each student using the name listed in the school's "PowerSchool" database, thus

---

[57] *Kluge*, 2024 WL 1885848, at *16 (citation omitted).

[58] Doc. 120-1 at 2; *see also* Doc. 185 at 10.

providing an avenue for transgender students to be recognized by gender-affirming names and pronouns.

Such a policy is supported by the scientific literature, the consensus of medical and mental health professionals, and the recommendations of national organizations such as NASW and AAP. It is also consistent with BCSC's mission, which is to "provide, within a *secure* environment, an engaging, relevant educational program with academic opportunities for *all* students to pursue their maximum intellectual potential" and "[s]ocial and physical opportunities" that will encourage students to "become well-rounded individuals."[59]

An accommodation that would permit Mr. Kluge to refuse to call transgender students by their names and pronouns as reflected in the school database,[60] by contrast, contradicts scientific consensus and poses a direct threat to BCSC's mission. Such an accommodation would fail to affirm transgender students' gender identities and would have the effect of singling out and stigmatizing transgender students, leading to grave physical and mental health risks for these students.

These risks are underscored by the experiences of transgender students at Brownsburg High School, who reported feeling dehumanized, alienated, and targeted as a result of Mr. Kluge's refusal to call them by their gender-affirming

---

[59] BCSC Mission Statement, *supra* note 14 (emphasis added).
[60] Doc. 185 at 4 (describing Mr. Kluge's requested accommodation).

names and pronouns.[61]  A transgender student impacted by efforts to accommodate Mr. Kluge quit extracurricular activities and even withdrew from Brownsburg High School.[62]  These outcomes do not align with BCSC's mission to provide *all* of its students with a secure environment in which they can reach their maximum intellectual potential and become well-rounded individuals.  Accordingly, the District Court correctly concluded that any accommodation of Mr. Kluge that would permit him to refuse to call transgender students by their names and pronouns, as reflected in the school database, would result in an undue hardship to BCSC.

## IV.  CONCLUSION

For the foregoing reasons, *amici* respectfully request that the Court affirm the District Court's Order and Judgment granting BCSC's Motion for Summary Judgment and denying Mr. Kluge's Motion for Partial Summary Judgment.

---

[61] *Kluge*, 2024 WL 1885848, at *5–7, 18–19.
[62] *Id.* at *19, 22.

Dated: August 16, 2024

Respectfully submitted,

*/s/ Kendall T. Burchard*

Kendall T. Burchard*
D. Jean Veta
William R. Isasi
Komal S. Shah
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com
wisasi@cov.com
kshah@cov.com
kburchard@cov.com


*\* Counsel of Record*

*Counsel for the National Association
of Social Workers including its Indiana
Chapter, the American Academy of
Pediatrics, the Indiana Chapter of the
American Academy of Pediatrics, the
American Medical Association, and
the Indiana Youth Group*

25

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.      This document complies with the type-volume limit of Fed. R. App. P.

32(a)(7)(B) and 7th Cir. Rule 29 because, excluding the parts of the document

exempted by Fed. R. App. P. 32(f):

     [**x**] this document contains 5200 words, or

     [ ] this brief uses a monospaced typeface and contains [state the number of ]

     lines of text.

2.      This document complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

     [**x**] this document has been prepared in a proportionally spaced typeface

     using Microsoft Word 2016 in 14-point Times New Roman font, or

     [ ] this document has been prepared in a monospaced typeface using [state

     name and version of word-processing program] with [state number of

     characters per inch and name of type style].

Dated: Aug. 16, 2024            */s/ Kendall T. Burchard*

                                          *Counsel for the National Association of*
                                          *Social Workers and its Indiana Chapter,*
                                          *the American Academy of Pediatrics,*
                                          *the Indiana Chapter of the American*
                                          *Academy of Pediatrics, the American*
                                          *Medical Association, and the Indiana*
                                          *Youth Group*

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2024, I electronically filed the foregoing **BRIEF OF *AMICI CURIAE* NATIONAL ASSOCIATION OF SOCIAL WORKERS AND ITS INDIANA CHAPTER; AMERICAN ACADEMY OF PEDIATRICS; INDIANA CHAPTER OF THE AMERICAN ACADEMY OF PEDIATRICS; AMERICAN MEDICAL ASSOCIATION; AND INDIANA YOUTH GROUP, INC. IN SUPPORT OF DEFENDANT-APPELLEE BROWNSBURG COMMUNITY SCHOOL CORPORATION AND AFFIRMANCE** with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Kendall T. Burchard*