UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

JOHN M. KLUGE, *Plaintiff-Appellant*,

v.

BROWNSBURG COMMUNITY SCHOOL CORPORATION, *Defendant-Appellee*,

Appeal from the United States District Court
for the Southern District of Indiana,
Indianapolis Division
Honorable Jane Magnus-Stinson
Case No. 1:19-cv-02462-JMS-KMB

**Brief of *Amicus Curiae*
Lambda Legal Defense and Education Fund, Inc.
in Support of Defendant-Appellee and Affirmance**

GREGORY R. NEVINS
Lambda Legal Defense and
Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 724-0148
gnevins@lambdalegal.org

NATHAN MAXWELL
Lambda Legal Defense and
Education Fund, Inc.
65 East Wacker Dr. Suite 2000
Chicago, IL 60601
(312) 847-5629
nmaxwell@lambdalegal.org

*Counsel for* Amicus Curiae

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-1942</u>

Short Caption: <u>Kluge v. Brownsburg Community School Corporation</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    <u>Lambda Legal Defense and Education Fund, Inc.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    <u>Lambda Legal Defense and Education Fund, Inc., counsel for Amicus Curiae</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Nathan A. Maxwell</u>      Date: <u>8-16-2024</u>

Attorney's Printed Name: <u>Nathan A. Maxwell</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑   **No** ☐

Address: <u>65 E. Wacker Place, Ste 2000</u>

    <u>Chicago, IL 60601</u>

Phone Number: <u>312-847-5629</u>      Fax Number: <u>855-535-2236</u>

E-Mail Address: <u>nmaxwell@lambdalegal.org</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1942

Short Caption: Kluge v. Brownsburg Community School Corporation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Lambda Legal Defense and Education Fund, Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Lambda Legal Defense and Education Fund, Inc., counsel for Amicus Curiae

(3)  If the party, amicus or intervenor is a corporation:

   i)  Identify all its parent corporations, if any; and

   N/A

   ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Gregory R. Nevins          Date: 8-16-2024

Attorney's Printed Name: Gregory R. Nevins

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: 1 West Court Square, Ste 105

Decatur, GA 30030

Phone Number: 404-724-0148          Fax Number: 855-535-2236

E-Mail Address: gnevins@lambdalegal.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................i

TABLE OF AUTHORITIES.................................................... iii

RULE 29 CONSENT AND DISCLOSURES ...........................................1

STATEMENT OF INTEREST ..................................................1

INTRODUCTION........................................................2

ARGUMENT ...............................................................5

    I.    The *Groff* Court's Title VII analysis of a scheduling accommodation regarding work on the Sabbath has limited application to a requested accommodation that affirmatively disparages and harms third-party non-beneficiaries. .........................................................5

    II.    The district court correctly determined in a "common-sense manner" that the hardship was substantial "in the context of [the] employer's business," which here is educating students. ...............................................9

        a.    This case involves real harm to students, not the resentment of religious accommodations that the *Groff* Court deemed irrelevant. .....................12

        b.    Several Circuits, including the Seventh Circuit, have emphatically rejected accommodations that require employers to abide religious messages that denigrate or demean others. ...........................................22

i

c.   BCSC has persuasively established that the burdens Kluge's requested accommodation would cause students, as well as the potential resulting liability to the School, is an undue burden on the business of the School. ......................................................... 27

CONCLUSION ........................................................................ 29

CERTIFICATE OF SERVICE ................................................. 31

# TABLE OF AUTHORITIES

**Cases**                                                    **Page**

*Anderson v. U.S.F. Logistics (IMC), Inc.,*
   274 F.3d 470 (7th Cir. 2001) ............................................................. 10

*Averett v. Honda of Am. Mfg., Inc.,*
   No. 2:07-CV-1167, 2010 WL 522826 (S.D. Ohio Feb. 9, 2010) ........... 26

*Baz v. Walters,*
   782 F.2d 701 (7th Cir. 1986) ............................................................... 10

*Bostock v. Clayton Cnty., Georgia,*
   590 U.S. 644 (2020) ............................................................................. 14

*Chalmers v. Tulon Co. of Richmond,*
   101 F.3d 1012 (4th Cir. 1996) ...................................................... 17, 25

*EEOC v. Ilona of Hungary, Inc.,*
   108 F.3d 1569  (7th Cir. 1997) ............................................................ 10

*Ervington v. LTD Commodities,* LLC,
   555 F. App'x 615 (7th Cir. 2014) ................................................... 23, 24

*Groff v. DeJoy,*
   600 U.S. 44 (2023) .......................................... 2, 4, 5, 6, 7, 8, 9, 10, 11

*Kluge v. Brownsburg Cmty. Sch. Corp.,*
   64 F.4th 861 (7th Cir. 2023), *vacated on denial of reh'g,*
   No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023) ...................... 4

*Kluge v. Brownsburg Cmty. Sch. Corp.,*
   No. 1:19-CV-02462-JMS-KMB, 2024 WL 1885848
   (S.D. Ind. Apr. 30, 2024) ................................................ 4, 5, 9, 10, 16

*Knight v. Connecticut Dep't of Pub. Health,*
  275 F.3d 156, 168 (2d Cir. 2001) ........................................ 25

*Lee v. Weisman,*
  505 U.S. 577 (1992) ............................................................. 18

*Lusardi v. McHugh,*
  EEOC Appeal No. 0120133395, 2015 WL 1607756 (Apr. 1, 2015) ..... 22

*Matthews v. Wal-Mart Stores, Inc.,*
  417 F. App'x 552 (7th Cir. 2011) ........................................ 24

*Minkus v. Metro. Sanitary Dist. of Greater Chicago (MSD),*
  600 F.2d 80 (7th Cir. 1979) ................................................. 10

*Peterson v. Hewlett-Packard Co.,*
  358 F.3d 599 (9th Cir. 2004) ......................................... 17, 26

*Ryan v. Dep't of Just.,*
  950 F.2d 458 (7th Cir. 1991) ............................................... 10

*Santa Fe Indep. Sch. Dist. v. Doe,*
  530 U.S. 290 (2000) ............................................................. 18

*Seshadri v. Kasraian,*
  130 F.3d 798 (7th Cir. 1997) ............................................... 10

*Trans World Airlines, Inc. v. Hardison,*
  432 U.S. 63 (1977) ................................................................. 6

*Ulane v. Eastern Airlines,*
  742 F.2d 1081 (7th Cir. 1984) ............................................. 13

*V. v. Vilsack,*
EEOC Doc. No. 2019005478, 2024 WL 1155256
(EEOC Mar. 7, 2024) .......................................................................... 10

*Vaughn v. Vilsack,*
715 F.3d 1001 (7th Cir. 2013) ............................................................. 24

*Walden v. Ctrs. For Disease Control & Prevention,*
669 F.3d 1277 (11th Cir. 2012) ........................................................... 26

*Wilson v. U.S. West. Commc'ns,*
58 F.3d 1337 (8th Cir. 1995) ............................................................... 26

## Statutes
42 U.S.C. § 2000e(j) ..................................................................................6

## Other Authorities
Corina Lelutiu-Weinberger, et al., *The Roles of Gender Affirmation
and Discrimination in the Resilience of Transgender Individuals
in the US,*  46(3-4) *Behavioral Medicine*, 175 (2020) ..........................20

Jaclyn M.W. Hughto, et al.,  *Social and Medical Gender Affirmation
Experiences Are Inversely Associated with Mental Health Problems
in a U.S. Non-Probability Sample of Transgender Adults,*
49(7) Archives of Sexual Behavior,  2635–2647 (2020).......................20

Kasey B. Jackman, et al., *Suicidality among Gender Minority Youth:
Analysis of 2017 Youth Risk Behavior Survey Data,*
25 Archives of Suicide Research 208 (2019).........................................3

Katherine Olson et al., *Mental Health of Transgender Children Who
Are Supported in Their Identities*, 137 Pediatrics 3 (Mar. 2016) .......19

Kevin McLemore, *A Minority Stress Perspective on Transgender Individuals' Experiences with Misgendering*, 3(1) Stigma & Health 53 (Feb. 2018) ........................................................................21

Philipp Chapkovski, *Strike One Hundred to Education One: Measuring the Efficacy of Collective Sanctions Experimentally*, 16(4) PLoSONE 1 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8031421/ .................15

Rebecca H. Bitsko, et al. *Mental Health Surveillance Among Children – United States, 2013 – 2019,* 71 Morbidity and Mortality Weekly Report, Suppl. 2, 1–42 (2022), https://www.cdc.gov/mmwr/volumes/71/su/su7102a1.htm .................19

Sara J. Smith, et al., *The Effects of Contact on Sexual Prejudice: A Meta-Analysis*, 61(3-4) Sex Roles 178 (2009)...................................21

Stephanie Pappas, *Preventing Teen Suicide*, 54 Monitor on Psychology 54 (July/August, 2023), https://www.apa.org/monitor/2023/2023-07-monitor.pdf........................................................................................19

The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People*, (2023), https://www.thetrevorproject.org/survey-2023/05_TREVOR05_2023survey.pdf ...................................................3

The Trevor Project, *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People,* (2024) https://www.thetrevorproject.org/survey-2024/assets/static/TTP_2024_National_Survey.pdf........................3, 19

The Trevor Project, *National Survey on LGBTQ Youth Mental Health 2020* (2020), https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf..........................................................................................2, 3

Tiffany R. Glynn, et al., *The Role of Gender Affirmation in Psychological Well-Being Among Transgender Women*, 3(3) Psychology of Sexual Orientation and Gender Diversity, 336–344 (2016) ...........................20

# RULE 29 CONSENT AND DISCLOSURES

This brief is permitted under Federal Rule of Civil Procedure 29(a)(2) because all parties have consented to its filing.

In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amicus curiae* states:

i.   No party's counsel authored this brief in whole or in part.

ii.  No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.

iii. No person—other than the *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

# STATEMENT OF INTEREST

Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal") is the nation's oldest and largest nonprofit legal organization working for full recognition of the civil rights of lesbian, gay, bisexual, and transgender ("LGBT") people and everyone living with HIV through impact litigation, education, and policy advocacy. Lambda Legal has taken a special interest in supporting religious accommodations for workers who seek to engage in their religious observances and practices, while

1

harming nobody in the process. *See Groff v. DeJoy* United States Supreme Court amicus brief at 2023 WL 2773541 (Mar 30, 2023); *EEOC v. Abercrombie & Fitch* United States Supreme Court amicus brief at 2014 WL 7794003 (Dec. 10, 2014). At the same time, Lambda Legal encourages courts to identify accommodation requests that are made either with intent to harm others, or with casual indifference to likely harmful results. Lambda Legal has thus sought to ensure that courts perform the task mandated in *Groff*: "resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Groff v. DeJoy*, 600 U.S. 447, 471 (2023).

## INTRODUCTION

Transgender youth face severe discrimination in the school environment. Forty percent of transgender students have been physically threatened or harmed due to their gender identity, and they are 1.66 times more likely to be bullied at school than their non-transgender peers.[1] This pervasive discrimination has corrosive effects on

---

[1] The Trevor Project, *National Survey on LGBTQ Youth Mental Health 2020*, at 7 (2020), https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf (hereafter "Trevor Project 2020"); *see also*

transgender young people's mental and physical health and their ability to succeed academically.  Research shows that transgender youth are far more likely than their non-transgender peers to experience depression, eating disorders, and self-harm—including attempted suicide.[2]  A survey of over 40,000 LGBT young people conducted by the Trevor Project—a non-profit organization focused on suicide prevention efforts among LGBT youth—showed that 52% of transgender or nonbinary youth reported considering attempting suicide and 21% had in fact attempted suicide in the preceding twelve months of their lives.[3]  Those staggering rates reflect a public health crisis that requires immediate attention.[4]

---

Kasey B. Jackman, et al., *Suicidality among Gender Minority Youth: Analysis of 2017 Youth Risk Behavior Survey Data*, 25, Archives of Suicide Research 208, 213 tbl.2 (2019).

[2] Trevor Project 2020, at 3.

[3] *Id.* at 2.

[4] Subsequent surveys by The Trevor Project have shown little or no improvement in these statistics. *See* The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People*, at 6 (2023), https://www.thetrevorproject.org/survey-2023/05_TREVOR05_2023survey.pdf  ("Trevor Project 2023") (finding  half of transgender and nonbinary young people seriously considered attempting suicide and nearly 1 in 5 had actually attempted suicide in the past year); and The Trevor Project, *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People,* at 4, (2024)  https://www.thetrevorproject.org/survey-2024/assets/static/TTP_2024_National_Survey.pdf ("Trevor Project 2024") (nearly half had considered attempting suicide, and 14% had attempted suicide).

Such extreme effects on the health and wellbeing of transgender youth should not be ignored. And they were not ignored by this Court, which found previously that the Brownsburg Community School Corporation ("BCSC") had acted lawfully in withdrawing the Last Name Only Accommodation: "[T]he undisputed evidence showed that the practice resulted in genuine harm to students and real disruption to the learning environment."[5] Nor has the district court now ignored such ill effects, observing that even the Plaintiff himself, "does not dispute that refusing to affirm transgender students in their identity can cause emotional harm[.]"[6]

And this focus on harm to students is exactly the correct focus under *Groff,* because it reflects how BCSC is conducting its business, the education of the students. *Groff* demands that courts take a common-sense approach in determining what an "undue hardship" means within the context of the specific business before it—here, a public school. The

---

[5] *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 889 (7th Cir. 2023), *vacated on denial of reh'g*, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023).

[6] *Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 1:19-CV-02462-JMS-KMB, 2024 WL 1885848, at *17 (S.D. Ind. Apr. 30, 2024) (RSA at 35). For ease of reference Amicus adopt the same reference scheme as the Appellees. *See* Appellee's Br., App. II Doc. 61 at 4.

Seventh Circuit's well-established Title VII jurisprudence—as well as that of several other aligned circuits—generally forbids accommodations that would result in this type of disparagement. It should be applied here to recognize the harassment and psychological harm transgender students in Kluge's care suffered as a sufficient reason to rescind the Last Names Only Accommodation.[7]

## ARGUMENT

I.  The *Groff* Court's Title VII analysis of a scheduling accommodation regarding work on the Sabbath has limited application to a requested accommodation that affirmatively disparages and harms third-party non-beneficiaries.

---

[7] The district court made keen observation of Mr. Kluge's true intentions:

> Mr. Kluge himself believed that the Last Names Only Accommodation would result in disruption and indeed was encouraged by it. He explained to Dr. Daghe that far from resigning, he was "encouraged all the more to stay." After all, he believed, his "persecution" was "a sign that [his] faith as witnessed by using last-names-only … was being effective." Quoting from scripture, Mr. Kluge said, "a wide door for effective service has opened to [him], and there are many adversaries." Faced with Mr. Kluge's own statements—"pleading" with the school to avoid going down the "transgender path," seeking to discuss with students their "eternal destination," and hoping to stay because his "persecution" surrounding the Last Names Only Accommodation was being "effective"—complaints from others were hardly necessary.

*Kluge*, 2024 WL 1885848, at *20 (internal citations omitted) (RSA at 40).

An employer may deny an employee's religious-based request for an exemption from a workplace rule or restriction under Title VII only if the exemption results in "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). In *Groff v. DeJoy*, a United States Postal Service ("USPS") employee, Groff, sought to avoid being scheduled for work on Sundays because of his Evangelical Christian beliefs, which required that he rest and worship on Sundays. For a while, the USPS made arrangements to account for Groff refusing to work on Sundays, but throughout this time Groff also received progressive discipline for refusing to work and eventually Groff resigned. He then brought suit under Title VII, alleging that USPS could have accommodated his religious beliefs without incurring any undue hardship. He lost at the district court and before the Third Circuit Court of Appeals. The United States Supreme Court then reversed the Third Circuit and clarified that the "more than a de minimis cost" standard was an erroneous interpretation—a "mistaken view of the holding"—of *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) on which the Third Circuit had relied. *Groff*, 600 U.S. at 471-72.

But the Supreme Court stopped well short of finding that Groff that could have been accommodated without the USPS incurring an undue hardship to its business. Instead, the Supreme Court used Groff's challenge as an opportunity to course correct the "undue hardship" standard from *Hardison*, and did so without delving deeply into the particulars of Groff's request or opining much on the merits of his request at all. *Groff*, 600 U.S. at 456 ("[T]his case presents our first opportunity in nearly 50 years to explain the contours of *Hardison*[.]"); *id.* at 473 ("Having clarified the Title VII undue-hardship standard, we think it appropriate to leave the context-specific application of that clarified standard to the lower courts in the first instance.").

Accordingly, the only aspect of the *Groff* decision that is useful to this Court is its clarification of the undue hardship test. The Supreme Court held that examination of an "undue hardship" requires a fact-specific examination of the burden "in the overall context of an employer's business." *Id.* at 468. This holding validates the focus on harm to students, who are BCSC's business.

Nothing in *Groff* undermines this Court's considerable precedent that an employer properly considers the harms caused by

accommodations that affirmatively disparage and harm third-party non-beneficiaries. *Cf. Groff*, 600 U.S. at 472 ("[A]n accommodation's effect on co-workers may have ramifications for the conduct of the employer's business, but a court cannot stop its analysis without examining whether that further logical step is shown in a particular case."). Indeed, *Groff* requires a broad approach in assessing accommodations. A court should "take[] into account all relevant factors in the case at hand"—except one: "a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice" provides no reason to deny an accommodation. 600 U.S. at 470, 472.[8]

The *Groff* Court's reiteration that simple disdain for religious practice is not an acceptable consideration is neither new law nor relevant to the instant case, as the district court did not rule on this basis and Kluge presented no compelling evidence that this was a motivating factor of

---

[8] Kluge argues hostility to his religion existed, but his argument is built on a faulty foundation, factually and legally. His presumption of religious hostility is predicated on his view that the Last Names Only Accommodation was reasonable and the harm that resulted was nonexistent or unimportant. Moreover, Kluge is wrong that "after *Groff*, "adverse ... reactions" to religious practice or accommodation are "off the table." Appellant's Br., App. II Doc. 15 at 37 (quoting *Groff*, 600 U.S. at 472-73 (quotation omitted))." Opposition to an accommodation because, once put in place, it proved unworkable and harmful, is absolutely legitimate under *Groff*.

BCSC's actions. *Groff*, 600 U.S. at 472 ("If bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself.").

II. **The district court correctly determined in a "common-sense manner" that the hardship was substantial "in the context of [the] employer's business," which here is educating students.**

The district court did exactly what the Supreme Court commanded by engaging in a fact-specific examination of the burden to BCSC within the overall context of BCSC's business:

> As the Supreme Court held in *Groff*, analyzing undue hardship must be done in the context of an employer's particular business. And as the Court has explained, that context is BCSC's mission to foster a supportive learning environment for all students. The Court thus analyzes to what extent the Last Names Only Accommodation so undermined BCSC's legitimate mission as to create a substantial increased cost, and hence an undue hardship.

*Kluge,* 2024 WL 1885848, at \*18 (RSA at 36); *see also Groff*, 600 U.S. at 471 ("'[U]ndue hardship' in Title VII means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the commonsense manner that it would use in applying any such test.").

The district court correctly analyzed the *Groff* opinion as including both economic and non-economic costs within the undue hardship analysis, and cited to a "long line of Seventh Circuit authority squarely holding . . . that contradictions to [a business's] legitimate mission are relevant to analyzing undue hardship." RSA at 33-34.[9] The district court is correct that *Groff* removed some costs from consideration but left some non-economic costs "untouched." *Kluge*, 2024 WL 1885848, at *15 (RSA at 31) (citing *Groff*, at 461-62 (in turn citing *Trans World Airlines,* 432 U.S. at 83 n.14 (considering violation of seniority rights, which are non-economic costs and cited favorably by *Groff*)); *also V. v. Vilsack*, EEOC Doc. No. 2019005478, 2024 WL 1155256 at *9 (EEOC Mar. 7, 2024) (applying

---

[9] Citing *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 477 (7th Cir. 2001) (holding that "[a] religious practice that does not actually impose religious beliefs upon others can still be restricted if it impairs an employer's legitimate interests"); *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (analyzing undue hardship with respect to employer's "legitimate concerns for its business" and "legitimate business reasons"); *Seshadri v. Kasraian*, 130 F.3d 798, 800 (7th Cir. 1997) (analyzing religious accommodation claim with respect to employer's "legitimate expectations"); *Ryan v. Dep't of Just.*, 950 F.2d 458, 462 (7th Cir. 1991) (observing that "[l]egal institutions lack the sense of nuance that will tell ... how far the rules may be bent without injur[ing]" [employer's] "mission"); *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir. 1986) (analyzing undue hardship with respect to employer's "established theory and practice"); *Minkus v. Metro. Sanitary Dist. of Greater Chicago (MSD)*, 600 F.2d 80, 84 (7th Cir. 1979) (analyzing undue hardship with respect to employer's "legitimate purpose")).

*Groff* to state that "[u]ndue hardship, however, is not limited to considerations of financial cost. Indeed, Title VII does not refer to 'cost' at all."));

*see also Groff*, 600 U.S. at 475 (2023) (J. Sotomayor, concurring) ("Because the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees.").

The district court also correctly made the factual determination that BCSC's business is public education, and that its legitimate mission included "providing a supportive environment for students and respecting the legitimate expectations of their parents and medical providers." RSA at 34. Appellant seeks to denigrate the concerns of transgender students who were victims of Kluge's bad faith application of the Last Names Only accommodation, describing them as only a "few hurt feelings[.]" (Appellant's Br., App. II Doc. 15 at 51.) As shown below, Kluge's actions likely contributed to substantial harms to students' mental health and wellbeing. Minimizing such harms to "a few hurt feelings" demonstrates succinctly Appellant's contempt for his transgender students. It also shows plainly that his actions did have deleterious effects on BCSC's ability to provide a "supportive environment for students" that respected "the

legitimate expectations of their parents and medical providers." *See* RSA at 34. Appellant may not place any value on the safety of transgender students, but BCSC did, and the district court was well within the ambit of *Groff* to do so as well, especially considering that BCSC's mission as a provider of public education demands it.

  a. This case involves real harm to students, not the resentment of religious accommodations that the *Groff* Court deemed irrelevant.

This Court and the lower court were correct in ruling that the Last Names Only Accommodation harmed students. Indeed, it is difficult to dispute the point, given how universal is the custom of calling someone the name they provide, even when the name provided clashes in some way with one's own value system or religious beliefs. One of the most fundamental norms of behavior in our culture is that "My name is John" is followed (usually immediately) by the listener calling the speaker "John." What one never hears is "Says you. I'm going to use another name you absolutely don't want" or "I now need to change my entire ways of addressing all people to an awkward new approach that nobody likes, and everyone quickly will figure out that you motivated the disliked change."

Many people's names reflect conduct that others find contrary to their moral or religious principles. A woman who remarries after divorce and takes her second husband's name is a prominent example.[10] A considerable percentage of Americans identify their religion as one that does not approve of divorce and remarriage; yet, nobody goes around calling a woman who does that by her first husband's name.

In short, the members of the school community who call transgender students by the names these students have entered into school records include those who want to affirm their identity, and those who simply would never dream of calling someone by a name other than the one they provide. And that could include a significant number of people who do not accept their identity; the Federal Reporter is littered with decisions containing offensive language about and rulings against transgender people, but that nevertheless include a familiar footnote explaining, in effect, that the court uses the transgender litigant's preferred name and/or pronouns as a common courtesy. *See, e.g., Ulane v. Eastern*

---

[10] Other examples include a person who takes the last name of their same-sex spouse; a newlywed woman's taking her new husband's name – or not doing so; a woman's reverting to birth name after divorce; people who change their name to a more common name from one that reveals their ethnicity, national origin, or religion; or changing one's name to a Muslim name; changing one's name to reflect one's African heritage or ancestry.

*Airlines*, 742 F.2d 1081, 1082 n.2 (7th Cir. 1984) ("Since Ulane considers herself to be female, and appears in public as female, we will use feminine pronouns in referring to her.") *overruled on the merits* by *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020) (Title VII protects against discrimination on the basis of sexuality or gender identity). An appreciation for what a profound deviation from universal norms it is to refuse to use the name a person provides, illustrates why the harm here was intense and eminently foreseeable.

And the Last Names Only Accommodation, while lacking the obvious cruelty of deliberately using names and pronouns the student specifically and vehemently rejects, has a subtle, pernicious feature that exacerbated the harm. Because Kluge altered his behavior toward all of his students to facilitate his refusal to respect the names of his few transgender students, his conduct resonates as a form of collective punishment. We are all familiar with the collective punishment used by some teachers that takes a form such as, "I am precluded from properly punishing the few students responsible for this misdeed (because nobody has identified them to me), so instead, the whole class will miss recess

today."[11] As things played out here, Kluge's pretense that he could switch to using last names like a football coach served as the cellophane veil that students were sure to see through, revealing his real message: "I am precluded from calling the two transgender students by their birth names and pronouns because of school rules, so instead I will call the whole class by their last names." The transgender students themselves perceived this message, as did some of their classmates. The transgender students "felt like it was their presence that caused Mr. Kluge's behavior, which made them feel isolated and targeted." (RSA at 10). A non-LGBT student, who was "fairly certain that all the students knew why Mr. Kluge had switched to using last names," found the practice "very awkward" because "it made the transgender students in Mr. Kluge's orchestra class stand out." (RSA at 11). Given that the issue here is the withdrawal of an accommodation actually implemented, the actual harm that resulted is

---

[11] A more general definition is "the negative treatment inflicted by authorities or by an outgroup upon an entire social group, in reaction to an offense committed by one or some of its members," with the hope or expectation that the group will regulate or punish its members. *See* Philipp Chapkovski, *Strike One Hundred to Education One: Measuring the Efficacy of Collective Sanctions Experimentally*, 16(4) PLoSONE 1 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8031421/.

the relevant focus, not any perception when proposed that it was "neutral."

Indeed, Kluge has made a powerful and straightforward concession that alone justifies judgment in BCSC's favor: "Mr. Kluge does not dispute that refusing to affirm transgender students in their identity can cause emotional harm." (RSA at 35). While nothing more need be said, Kluge did say more, in the period before BCSC implemented the Name Policy:

> Mr. Kluge claimed, religious observers would shirk their obligation "to discourage the harmful and dangerous lie that transgender students are giving themselves regarding their very existence," would "perpetuat[e] [transgender students'] sexual confusion," and would "push[ ] them down a harmful and dangerous path." [Filing No. 112-1 at 22-24.] Mr. Kluge expressed his belief that requiring teachers to "refer to transgender students by their 'preferred pronoun' "instead of their "sexually correct birthnames" would only be "playing along with their psychiatric disorder" and thereby "encourage transgender students in their folly."

*Kluge*, 2024 WL 1885848, at *3 (RSA at 6). Through these statements, Kluge acknowledges the centrality of one's name and pronouns to one's identity, and the powerful effect that either affirming the student or publicly rejecting their identity has on the student's development. Thus,

when Kluge undertook the course of refusing to use the name in school records agreed upon by the student, a parent, and a medical professional, he knew the inevitable unsettling effects on the students was a feature, not a bug.

Thus, Kluge has made powerful concessions about the harm that befell students as a result of his conduct, but defends his behavior based on *his perception* of their best interests or salvation. In notable respects, Kluge appears similar to litigants who have acted towards others in norm-defying ways in the sincere belief that the resulting distress would be offset by the change in behavior they hoped to effect. *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 602 (9th Cir. 2004) (plaintiff posted scriptural passages, that he said, were "intended to be hurtful. [because] you cannot have correction unless people are faced with truth."); *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1021 (4th Cir. 1996) ("Chalmers concedes in the letters themselves that she knew the letters to her co-workers, accusing them of immoral conduct (in the letter to Combs, suggesting that Combs' immoral conduct caused her illness), might cause them distress."). But Kluge's supreme confidence that his position will be vindicated in the hereafter cannot excuse unwelcome,

distressing conduct towards others today. Just as the law precludes an employee from making persistent unwanted sexual advances in the workplace regardless of whether he sincerely believes the recipient of his harassment will come around to accepting him as a partner eventually, the law cannot allow Kluge's behavior based on his subjective assumption that the harm he has caused is outweighed in the afterlife. Instead, at a minimum, actions directed at others that are unwelcome for reasons unrelated to religious animus, should be presumptively unreasonable accommodations.

For this reason, "law reaches past formalism" and allows courts to consider elements such as the susceptibility of students to social pressures (even in situations where they are not strictly required to remain), because "the government may no more use social pressure to enforce orthodoxy than it may use more direct means." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 312 (2000) (quoting *Lee v. Weisman*, 505 U.S. 577 at 578, 594 (1992)).

BCSC's business is public education, and that necessarily incorporates experiences that extend beyond the classroom itself, such as peer socialization, good citizenship, and student mental health and wellbeing.

Young people who experience depression and anxiety are less likely to succeed in school.[12] This is concerning, because as many as 37% of high school aged children experienced symptoms associated with depression and around 14% had experienced problems with anxiety.[13] But the problem is far worse for transgender and nonbinary students, amongst whom 59% experience depression and 71% experience anxiety.[14] Conversely, "transgender children who are supported in their gender identity have developmentally normative levels of depression and only minimal elevations in anxiety, suggesting that psychopathology is not inevitable within this group." Katherine Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics 3 (Mar. 2016); *compare to* Trevor Project Survey 2024 at 26 (transgender and nonbinary

---

[12] Rebecca H. Bitsko, et al. *Mental Health Surveillance Among Children – United States, 2013 – 2019,* 71 Morbidity and Mortality Weekly Report, Suppl. 2, 1–42 (2022), https://www.cdc.gov/mmwr/volumes/71/su/su7102a1.htm ("Children and adolescents who have depression are at higher risk for other mental disorders and health conditions, as well as school problems, difficulty with social relationships, self-harm, and suicide[.]").

[13] *Id.* at Tbls. 6 & 7.

[14] Trevor Project Survey 2024 at 6; *see also* Stephanie Pappas, *Preventing Teen Suicide*, 54 Monitor on Psychology 54 (July/August, 2023), https://www.apa.org/monitor/2023/2023-07-monitor.pdf (showing nearly double the incidence of suicidal ideation and attempts amongst LGBTQ youth as compared to non-LGBTQ youth).

young people are significantly more likely to attempt suicide if they are surrounded by people who do not respect their pronouns); *see also e.g.*, Corina Lelutiu-Weinberger, et al., *The Roles of Gender Affirmation and Discrimination in the Resilience of Transgender Individuals in the US*, 46(3-4) *Behavioral Medicine*, 175, 181 (2020) ("Gender affirmation on a structural and interpersonal level was significantly associated with outcomes on the individual level: higher odds of past-year healthcare engagement and HIV-testing, and lower odds of past-year suicidal ideation and psychological distress."); Tiffany R. Glynn, et al., *The Role of Gender Affirmation in Psychological Well-Being Among Transgender Women*, 3(3) Psychology of Sexual Orientation and Gender Diversity, 336–344 (2016) (affirmation across social, psychological, and medical realms among transgender women is associated with lower depression and higher self-esteem); Jaclyn M.W. Hughto, et al., *Social and Medical Gender Affirmation Experiences Are Inversely Associated with Mental Health Problems in a U.S. Non-Probability Sample of Transgender Adults*, 49(7) Archives of Sexual Behavior, 2635–2647 (2020) ("[S]ocial and medical gender affirmation experiences may be protective against mental health problems in transgender adults.").

Allowing a teacher to discard transgender students' identities further discourages interactions that would break down stereotypes, foster understanding about gender identity, and inform students' opinions about equitable treatment. *See*, *e.g.*, Sara J. Smith, et al., *The Effects of Contact on Sexual Prejudice: A Meta-Analysis*, 61(3-4) Sex Roles 178, 179 (2009) (explaining that "positive contact with a member of a negatively stereotyped group can lead to more positive attitudes" toward the group "by, among other things, "giving individuals new information that may challenge stereotypes" about its members).

Because the mental health and wellbeing of students[15] is associated so closely with BCSC's mission, these issues are naturally within the realm of a school's concern and is a serious factor of consideration when assessing school policies. The accommodation sought by Kluge caused

---

[15] Although not raised directly in this case, it is worth noting that while Kluge's actions are particularly harmful to children, they would also be harmful if applied to a fellow teacher who was transgender. When workers refer to a colleague using pronouns or terms that do not match the colleague's gender identity, they may create a hostile environment actionable under Title VII that can cause them depression and anxiety. *See* Kevin McLemore, *A Minority Stress Perspective on Transgender Individuals' Experiences with Misgendering*, 3(1) Stigma & Health 53, 59 (Feb. 2018) (reflecting data that "misgendering is associated with psychological distress," including depression and anxiety.).

real harm to students. BCSC's decision to revoke it was based on concern for student health, and not resentment of Kluge's religious beliefs.

> b. Several Circuits, including the Seventh Circuit, have emphatically rejected accommodations that require employers to abide religious messages that denigrate or demean others.

The principle of non-disparagement is deeply imbedded in workplace religion cases. Courts repeatedly have held that accommodations may not come at the price of demeaning or disparaging co-workers or other non-beneficiaries. The issue in this case involves neither sincere questions about pronouns nor accidental or isolated misgendering. Rather, it recognizes that harassment that expresses disrespect for a person's gender identity is objectively hostile. *See Lusardi v. McHugh*, EEOC Appeal No. 0120133395, 2015 WL 1607756, at *11 (Apr. 1, 2015) ("While inadvertent and isolated slips of the tongue likely would not constitute harassment, under the facts of this case, S3's actions and demeanor made clear that S3's use of a male name and male pronouns in referring to Complainant was not accidental, but instead was intended to humiliate and ridicule Complainant. As such, S3's repeated and intentional conduct

was offensive and demeaning to Complainant and would have been so to a reasonable person in Complainant's position.").

This Court already has answered the question of whether an employer must abide a religious accommodation that causes offense within the workplace or that is used to denigrate or demean co-workers or other third-parties, and the answer is an emphatic no. In *Ervington v. LTD Commodities, LLC*, the plaintiff had a history of expressing her religious beliefs during work hours with captive employees, resulting in her being admonished and advised to only express such personal beliefs during breaks and with willing participants. 555 F. App'x 615, 617 (7th Cir. 2014). Despite the admonitions, the plaintiff handed out bags of candy to her co-workers that included Christian religious pamphlets that negatively depicted Muslims and Catholics. *Ervington*, 555 F. App'x at 617. In response to complaints from other employees, plaintiff was fired. *Id.* She sued, alleging that she was wrongfully discharged in violation of Title VII. This Court ruled against her, finding that her employer was not required to accommodate her religion by allowing her to distribute pamphlets offensive to other employees, and noting also that "Title VII does not prohibit employers from enforcing an antiharassment policy that

defines harassment more broadly than does Title VII." 555 F. App'x at 618 (citing *Vaughn v. Vilsack,* 715 F.3d 1001, 1006–07 (7th Cir. 2013) (Title VII retaliation case)).

In *Matthews v. Wal-Mart Stores, Inc.*, the Plaintiff was fired from her job at Wal-Mart for violating an anti-harassment policy after she told a gay co-worker that "God does not accept gays, they should not 'be on earth,' and they will 'go to hell' because they are not 'right in the head.'" 417 F. App'x 552, 553 (7th Cir. 2011). The Plaintiff sued, claiming her termination was unlawful discrimination against her religious beliefs under Title VII. *Id.* This Court found that, to the extent Plaintiff argued "that Wal–Mart must permit her to admonish gays at work to accommodate her religion, the claim fails" because such an accommodation would force Wal-Mart to relieve some workers from neutral anti-harassment policies, creating an undue hardship on Wal-Mart. *Matthews*, 417 F. App'x at 554 ("[S]uch an accommodation could place Wal–Mart on the 'razor's edge' of liability by exposing it to claims of permitting workplace harassment.").

The Second, Fourth, Eighth, Ninth, and Eleventh Circuits have also emphatically rejected accommodations that require employers to abide religious messages that denigrate, demean, or offend others.

In *Knight v. Connecticut Dep't of Pub. Health*, the Second Circuit held that an accommodation allowing State employees to evangelize while providing services would not be reasonable, because "[p]ermitting appellants to evangelize while providing services to clients would jeopardize the state's ability to provide services in a religion-neutral [manner]." 275 F.3d 156, 168 (2d Cir. 2001) (citing *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1021 (4th Cir. 1996)).

The Fourth Circuit held that an employer was not required to accommodate an employee's request to write letters to co-workers that criticized their personal lives and encouraged them to embrace religion, even if the employee believed such letters were proselytization required by their religious practice. *Id.* ("[W]here an employee contends that she has a religious need to impose personally and directly on fellow employees, invading their privacy and criticizing their personal lives, the employer is placed between a rock and a hard place.")

The Eighth Circuit held that an employer was not unreasonable for requiring an employee to cover up a graphic anti-abortion pin while at work, because it was offensive to co-workers. *Wilson v. U.S. West. Commc'ns*, 58 F.3d 1337, 1342 (8th Cir. 1995). The Ninth Circuit found that a company was not required to allow an employee to post discriminatory posters or remove anti-discrimination posters to accommodate plaintiff's anti-gay religious views. *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004).

The Eleventh Circuit found that the Centers for Disease Control and Prevention had qualified immunity when the agency fired a counselor who refused to counsel people in same-sex relationships and who handled one such patient in an insensitive manner. *Walden v. Ctrs. For Disease Control & Prevention*, 669 F.3d 1277 (11th Cir. 2012). Other courts have reached similar conclusions as these. *See, e.g., Averett v. Honda of Am. Mfg., Inc.*, No. 2:07-CV-1167, 2010 WL 522826 (S.D. Ohio Feb. 9, 2010) (not reasonable to accommodate employee's religious practice of expressing that her coworkers were sinful, evil, and deserving of God's punishment).

c. BCSC has persuasively established that the burdens Kluge's requested accommodation would cause students, as well as the potential resulting liability to the School, is an undue burden on the business of the School.

As noted above, there are ample reasons why BCSC should be concerned about the effect of Appellant's anti-transgender expression on students. But beyond the broader social science presented above, BCSC introduced evidence to satisfy the undue burden test, such as numerous complaints it received from students, parents, and teachers in response to the Last Name Only accommodation.[16] The school further received evidence about the specific need to affirm at least two transgender students' identities as part of a treatment plan from their medical providers.[17] One student felt "alienated, upset, and dehumanized" by Kluge's refusal to affirm their gender, and decided first to drop out of orchestra class, and

---

[16] Doc. 120-12 at 2 (letter from parents of transgender student); Doc. 120-13 at 2 (email from parents complaining about Kluge misgendering their child); Doc. 120-14 at 7–8 (36:4-38:3), 11 (50:6-15, 51:7-18, 2:1-6), 13–14 (71:25-72:13, 73:9-18, 74:22-75:7, 77:6-10) (faculty advisor of student club, recounting weekly complaints about Kluge's use of Last Name Only accommodation); Docs. 22-3 at ¶¶ 11-14; 58-1 at ¶¶ 7-16 (declarations from transgender students in Kluge's orchestra class).

[17] Docs. 22-3 at ¶¶ 5-8; 58-1 at ¶¶ 7, 9.

then to leave the school entirely.[18]  The other student—who had known

Kluge for years prior—felt "targeted" and "hurt" by Kluge.[19]

BCSC also provided evidence that the Assistant Superintendent at-

tended a meeting of the school's Equality Alliance Club because of con-

cerns she had heard from counselors.[20] This assistant superintendent

heard for herself four or five different students complain "specifically

about a teacher using only last names to address students," and noted

that it seemed the other students in the group agreed.[21] BCSC also pro-

vided evidence that even students who were not a part of the Equality

Alliance Club were made uncomfortable by Kluge's use of the Last Names

Only accommodation, which "made the transgender students in Mr.

Kluge's class stand out."[22]

Department heads at the school informed the principal that Kluge's

accommodation was creating "tension" and "affecting the overall

---

[18] Doc. 22-3 at ¶ 13-16.

[19] Doc. 58-1 at ¶¶ 11, 15.

[20] Doc. 120-6 at 7-8 (44:8-24).

[21] Doc. 120-1 at ¶ 9.

[22] Doc. 58-2 at ¶ 9.

functioning of the performing arts department."[23] Kluge admitted that these negative effects only "encouraged" him, and that he saw this as proof that his actions were "effective" in the witness of his faith.[24]

These facts, along with others not recounted here, persuasively show that the burden placed on BCSC by Kluge's accommodation was substantially impairing BCSC's ability to carry out its mission by interfering with its ability to educate students (Appellee's Br., App. II Doc. 61 at 34) and unreasonably exposing BCSC to liability (Appellee's Br., App. II Doc. 61 at 43). The district court was justified in disposing of Kluge's claim under the proper Title VII standard.

## CONCLUSION

The district court properly found that an accommodation that targets and disparages third parties could not be granted without undue hardship to the business of the employer.

The Court should affirm the judgment below.

---

[23] Doc. 120-2 at ¶ 13.

[24] Doc. 120-3 at 24 (90:23-91:10); Doc. 15-3 at 5.

Dated: August 16, 2024.        Respectfully submitted,

*/s/ Nathan Maxwell*

NATHAN MAXWELL
Lambda Legal Defense and
   Education Fund, Inc.
65 East Wacker Dr. Suite 2000
Chicago, IL 60601
(312) 847-5629
nmaxwell@lambdalegal.org


GREGORY R. NEVINS
Lambda Legal Defense and
   Education Fund, Inc.
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 724-0148
gnevins@lambdalegal.org

*Attorneys for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief:

(i) complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains **6015** words, including footnotes and excluding the parts of the brief exempted by Rule 32(f)); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Office 365, Version 2405, set in Century Schoolbook 14-point type (12-point type for footnotes).

*/s/ Nathan Maxwell*
Nathan Maxwell


## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Nathan Maxwell*
Nathan Maxwell