In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 24-1942

JOHN M. KLUGE,

*Plaintiff-Appellant,*

*v.*

BROWNSBURG COMMUNITY SCHOOL CORPORATION,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-02462-JMS-KMB — **Jane Magnus-Stinson**, *Judge.*

———————————

ARGUED JANUARY 22, 2025 — DECIDED AUGUST 5, 2025

———————————

Before ROVNER, BRENNAN, and ST. EVE, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Brownsburg High School instituted a policy mandating teachers call students by their first names as they appeared in its database. For transgender students who had changed their first names, the database listed their new ones.

John Kluge was a teacher at Brownsburg. He repeatedly objected to the school's name policy on religious grounds.

Kluge believed that calling transgender students names that conflicted with their biological sex encouraged their transgender identities—a sin, in his view. So, he requested an accommodation, which the school granted. Kluge was allowed to call students by only their last names—"like a sports coach," he said.

After one year, a handful of students and teachers, as well as one student's parents, complained to Brownsburg about Kluge's practice. The school rescinded the accommodation, giving Kluge the chance to either call all students by their first names or face termination. Confronted with this choice, he resigned. Kluge then sued the school under Title VII for failing to accommodate his religion.

An employer is required to accommodate an employee's religious practices unless doing so would impose an "undue hardship" on its business. 42 U.S.C. § 2000e(j). At issue is whether the impacts caused by Brownsburg's accommodation of Kluge rise to the level of an undue hardship under *Groff v. DeJoy*, 600 U.S. 447 (2023). Because material factual disputes exist, we reverse the district court's grant of summary judgment to the school on Kluge's accommodation claim and remand for further proceedings.

## I. Background

### A. Factual

#### 1. *The School's Name Policy and Kluge*

Kluge taught orchestra at Brownsburg High School from 2014 to 2018. The school is part of the Brownsburg Community School Corporation, located west of Indianapolis. Kluge was regarded as an exceptional music teacher by many of his

current and former students. He is also a Christian, actively involved in his church's leadership.

Before the start of the 2017–2018 school year, Brownsburg's administration sought to address the "significant challenges" that transgender students face in high school, such as "diminished self-esteem and heightened exposure to bullying." The administration identified what it viewed as a "critical question" of what names teachers should use to address transgender students in class. So, a group of teachers and administrators worked to create a new policy in mid-2017, allowing students to change their first names and pronouns in its "PowerSchool" database—an online platform that, among other things, records enrollees' names. A student could make the change only after providing letters from a parent and healthcare professional regarding the need for the name change. Once the student's information was updated in PowerSchool, teachers were required to use the new name and pronouns.

Brownsburg's new PowerSchool policy conflicted with Kluge's religious beliefs. He believes his religion prevents him from "encourag[ing]" students' transgender identities, which he asserts he would do by calling students names that do not align with their respective biological sexes. Dkt. 120-3 at 10. So, in July 2017, Kluge met with school officials to voice his opposition to the PowerSchool policy. He spoke with Dr. Bret Daghe, Brownsburg's principal, and Dr. Jim Snapp, the school corporation's superintendent. Both told Kluge he had three options. He could comply and use the names in PowerSchool, resign, or be suspended pending termination. After speaking with Kluge's pastor over the phone, Snapp permitted Kluge to take the weekend to think over his options.

The following week, Kluge met with Snapp and Jodi Gordon, the school's human resources director. Kluge proposed a middle ground: that he be allowed to call students by only their last names, avoiding first names and pronouns altogether—"like a sports coach," he said. The two officials at the meeting concluded this was an acceptable alternative. Gordon initialed a document saying, "we agree that John may use last name[s] only to address students." Dkt. 15-1. The document did not include an end date for the accommodation. Additionally, Kluge proposed—and Gordon agreed—that a different Brownsburg staff member would "be responsible for distributing uniforms to [orchestra] students," so he did not need to "giv[e] a man's clothing item to a female student" and vice versa.

### 2. *Evidence the Accommodation Was Disruptive*

Brownsburg's administration received a handful of complaints about Kluge's last-name-only practice during the 2017–2018 school year. The first was an email from Craig Lee, who served as the faculty advisor for the Equality Alliance Club, a student organization that met "on a weekly basis to discuss issues that impact the LGBTQ community." Lee's email to Daghe said that a teacher, without mentioning Kluge expressly, "refuses to call [an anonymous] student by their new name." He suggested there was "a teacher or two that needs to know that it is not ok to disobey the [P]ower[S]chool rule." Lee was unsure what the best next step for the school would be but admitted he was "very biased" on the topic.

Lee also said he conveyed the complaints lodged by two of Kluge's transgender students—Aidyn Sucec and Sam Willis—to Daghe. Specifically, Lee told Daghe and Kathryn Jessup, Brownsburg's assistant superintendent, it was "clear"

that Kluge's last-name-only practice caused the two students "emotional distress" and "harm." One anonymous non-transgender student also told Lee that Kluge's last-name-only practice "made him feel incredibly uncomfortable." That student thought the transgender students "st[ood] out" in orchestra class because "he was fairly certain that all the students knew why Mr. Kluge had switched to using last names." Lee also discussed Kluge's accommodation with three other teachers who did not witness firsthand any of Kluge's classes. He said those teachers "felt very strongly that [the accommodation] was harming students," including those "who would potentially be in" Kluge's class.

Jessup, after receiving the students' complaints relayed by Lee, attended an Equality Alliance Club meeting in the fall of 2017. Four or five students there complained about an anonymous teacher's use of last names only during class, a complaint other students at the meeting "appeared to agree with." Although Kluge again was not mentioned by name, Jessup said it was "certainly implied" that he was the teacher the students discussed. Other than Jessup speaking to a few students at this single Equality Alliance Club meeting, there is no evidence the school administrators spoke with students about the last-name-only practice.

The school also received two complaints from the parent of a transgender student. The first was a letter asking that Kluge refer to the student by his new name and pronouns, asserting that Kluge had not been doing so.[1] The parent also noted that Kluge routinely referred to the student by his last name, "which is ok, but we do wonder if the teacher does this

---

[1] The student's name had not been updated in PowerSchool.

with other students or if it is only" that student. The second was an email a couple of weeks later, alleging that Kluge called the now-male student "Miss" so-and-so. The parent said that Kluge's use of improper gender terminology was "disrespectful and hurtful."

Two other performing arts teachers told Daghe that Kluge's last-name-only practice "was making students uncomfortable" and causing "tension" in the performing arts department. Daghe also received reports from those teachers that students were "bringing the conversations" about the "uncomfortableness" in Kluge's orchestra class to other classes.

Sucec's and Willis's declarations elaborate on the discomfort they felt. Sucec stated that Kluge either referred to him by last name only or "simply nodded or waved in" his direction. Dkt. 22-3 ¶ 12. Kluge's behavior made him "feel alienated, upset, and dehumanized." *Id.* ¶ 13. He "dread[ed] going to orchestra class each day," feeling "uncomfortable every time [he] had to talk to [Kluge] one-on-one." *Id.* He told his mother he planned to drop orchestra class the following school year. *Id.* ¶ 14. Sucec also said he "felt forced to tell" a classmate why Kluge would not say his first name when the classmate asked why Kluge refused to do so. *Id.* ¶ 13.

Willis asserted that Kluge's last-name-only practice "made the classroom environment very awkward." Dkt. 58-1 ¶ 11. He felt he "was being targeted because of [his] transgender identity." *Id.* Both Sucec and Willis said that Kluge occasionally failed to abide by the last-name-only accommodation, calling other students by an honorific, followed by their last name. Dkt. 22-3 ¶ 12; Dkt. 58-1 ¶ 10.

### 3. *Evidence the Accommodation Was Not Disruptive*

Some of the evidence about the last-name-only accommodation's effect on the school is disputed. For instance, Natalie Gain, a violin contract teacher in the performing arts department who worked in Kluge's classroom, "only heard him use last names with the students." Dkt. 52-2 ¶ 7. She "never heard him use gendered language" in the class, and "never heard" any students talking about Kluge's last-name-only practice—firsthand or by rumor. *Id.*

Gain's experience was echoed by some of Kluge's students. Both Lauren Bohrer and Mary Jacobson stated that Kluge never called them by anything other than their last names, nor did they hear him deviate from the practice for any other students. Dkt. 52-3 ¶ 8; Dkt. 52-5 ¶¶ 5–6. Bohrer did not think his last-name-only practice "odd," and never suspected the motivation behind it. Dkt. 52-3 ¶ 9. Bohrer was partnered with a transgender student in orchestra and "never saw" Kluge treat that partner "any differently than" non-transgender students. *Id.* ¶ 11.

Kluge also did not believe there was any tension among the faculty or students, and he did not think any faculty members intentionally avoided him. The performing arts faculty—including two members who purportedly complained about Kluge's practice—still regularly ate lunch together and "seemed to get along great." He denied there was any "animosity from students towards" him. And he expressly disagreed with both of Sucec's assertions that he used anything other than last names in class and that he avoided calling on Sucec. Dkt. 120-3 at 36. Further, Kluge noted his students "performed better than ever" in their orchestra competitions.

Their AP exam scores "were great," and there was strong "participation in the extracurricular programs" he led.

### 4. *The School's Effort to Rescind the Accommodation*

The school's administration reevaluated Kluge's accommodation in response to the complaints received. Daghe initially met with Kluge in December 2017 to inform him that, due to the complaints from students, teachers, and one parent, Kluge's last-name-only accommodation was "not going well." The two met again the next month, when Daghe requested that Kluge resign at the end of the school year. Kluge said the only reason he was asked to resign was due to Daghe's aversion to "the tension and conflict"—tension Kluge did not think existed. But to Kluge, even assuming there were negative reactions from a handful of students and teachers, it was "a sign that [his] faith" was "being effective." Although Daghe asked for a response that day, Kluge deferred any decision until an upcoming faculty meeting, when the school's transgender policies would be discussed further.

At that faculty meeting, Jessup presented a document containing common questions and answers about Brownsburg's policies toward transgender students. Two are relevant here. The first asked what feedback the school had received from students so far. Although the transgender students said they "appreciate teachers who are accepting and supporting of them," they felt "dehumanized by teachers they perceive as not being accepting or who continue to use the wrong pronouns or names." Non-transgender students felt "uncomfortable" when teachers were "not accepting"—such as when teachers "call students by their last name, don't use correct pronouns, [and] don't speak to" or acknowledge the student.

The second asked if teachers were permitted to use the students' last names only. The document said that although Brownsburg had "agreed to [the accommodation] for the 2017–2018 school year," moving forward, teachers must abide by the PowerSchool naming convention. The school emphasized certain "guidance" in a PowerPoint presentation titled "Transgender Considerations": that it was "important" for the faculty to "[c]reat[e] a safe and supportive environment for all students." Dkt. 120-20 at 7.

Kluge then emailed Snapp and Daghe to clarify the discussion from the faculty meeting. He asked if he would have to call students by their PowerSchool names after the school year ended. Kluge was under the impression he would not be obligated to, as the last-name-only accommodation he had agreed to with the school before the year started was not time limited. To discuss his question, Daghe, Gordon, and Kluge met in person.

The administrators told Kluge that in the 2018–2019 school year he must refer to students by their PowerSchool names. Although Kluge reiterated that doing so would conflict with his religious beliefs, the school thought the last-name-only accommodation was unreasonable given some students were "offended by being called by their last name." If Kluge did not commit to calling students by their PowerSchool names, Gordon informed him he would be fired at the end of that school year. Gordon also said that Kluge could submit a resignation letter before then and request that the school not "process" it until the year was over. Kluge interpreted this as the school allowing him to submit a "conditional resignation," which he

would have the power to rescind before the end of the academic year.[2]

Kluge submitted what he thought was his conditional resignation on April 30, 2018. In the letter, he reiterated that his religious beliefs did not allow him to refer to transgender students by their PowerSchool names. He requested that Gordon neither process the resignation "nor notify anyone, including any administration … before May 29, 2018." Gordon agreed.

Not long after submitting the letter, Kluge participated in an awards ceremony to recognize his orchestra students. At that ceremony he called all students by their first and last names, as they appeared in PowerSchool. This is the only occasion on which he referred to transgender students by their chosen first names. Kluge explained he felt it would be "unreasonable and conspicuous" to refer to students by their last names at such a "formal event," as opposed to the classroom setting. He acknowledged that using the transgender students' PowerSchool names was "sinful" to him, yet he thought he was "making a good-faith effort to work within the bounds of" his last-name-only accommodation.

Following the awards ceremony, Kluge set up a meeting with Gordon and Daghe for May 25, 2018, to rescind his conditional resignation. Upon arriving at the meeting, Daghe told Kluge that the administration had everything it needed and they did not need to meet. He could "[g]o back to the high school." So, Kluge sent a letter to Gordon that day telling her

---

[2] Gordon did not think Kluge had the power to rescind his resignation, as Brownsburg's bylaws do not permit an employee to do so. Indiana law also does not permit a government employee to unilaterally rescind a resignation. IND. CODE § 5-8-4-1.

of his intention to withdraw the resignation. But the school treated his resignation effective as of two hours after he sent the letter, locking him out of the building and the school's internal database, as well as posting his position as vacant.

Kluge then attended the school corporation's board meeting in June 2018, which was open to the public. During the public-comment section, Kluge asked the board not to accept his resignation and to reinstate him. After hearing from community members for and against the request, the board accepted Kluge's resignation without further comment, ending Kluge's employment.

### B. Procedural

Kluge sued the school corporation in the Southern District of Indiana. Two of his Title VII claims are relevant here: one for failing to accommodate his religion and another for retaliating against him for engaging in protected religious conduct. *See* 42 U.S.C. § 2000e, et seq.

The parties each moved for summary judgment. Kluge moved on only his religious accommodation claim, while Brownsburg sought summary judgment on both. The district court denied Kluge's motion on the ground that there was a genuine issue of material fact about the sincerity of his religious beliefs, a necessary element of an accommodation claim. *See Adeyeye v. Heartland Sweeteners, LLC,* 721 F.3d 444, 448 (7th Cir. 2013). The court reached this conclusion by relying on evidence of the single time Kluge used transgender students' PowerSchool names during an awards ceremony.

It then turned to Brownsburg's motion, for which the court assumed Kluge had established that his religious beliefs are sincerely held. When this case was first litigated, an

employer was not required to accommodate its employee's religion if doing so imposed "more than a *de minimis* cost." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). The district court concluded that this standard was met, as two transgender students in Kluge's class felt "targeted and uncomfortable," and other students and teachers felt his "behavior was insulting or offensive."

As an independent basis for concluding that the accommodation placed an undue hardship on Brownsburg, the district court discussed the potential for Title IX liability. It cited one of this circuit's cases for the proposition that schools are subject to liability when they discriminate "on the basis of transgender status," which the school purportedly did here by continuing to allow the last-name-only accommodation. *See Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds as recognized by, Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

The court next addressed Kluge's retaliation claim. It granted summary judgment to Brownsburg for two independent reasons. First, it concluded that Kluge did not establish but-for causation between his protected religious activity and the school's decision to terminate him, a required element of an employee's prima facie case. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). Second, even if Kluge had demonstrated a prima facie case of retaliation, he made no effort to show that the school's proffered nondiscriminatory reason was pretextual. *Id.*

Kluge appealed that decision. A divided panel of our court affirmed the religious accommodation issue. *Kluge v. Brownsburg Cmty. Sch. Corp.* (*Kluge I*), 64 F.4th 861 (7th Cir. 2023). The

majority cited evidence that the "transgender students in Kluge's class felt insulted and disrespected," as well as "isolated and targeted." *Id.* at 885. It also relied on reports that anonymous non-transgender students thought the last-name-only practice was "incredibly awkward," which led to discussions about the practice in other classrooms—culminating, the majority thought, in "disruptions to the learning environment." *Id.* at 885–86. Because the majority concluded that the last-name-only accommodation placed an undue hardship on the school's mission, it did not reach the issue of whether the practice also exposed Brownsburg to an unreasonable risk of Title IX liability. *Id.* at 894–95.

The partial dissent would have held there was still a genuine issue of material fact as to whether there existed an undue hardship on the school's educational mission. *Id.* at 916–25 (Brennan, J., concurring in part and dissenting in part). It also would have held that any purported exposure to Title IX liability was "speculative." *Id.* at 915–16.

The panel all agreed, though, that Kluge's retaliation claim must fail. We held that Brownsburg had offered "a legitimate non-discriminatory reason" for the adverse action: the repeated complaints from students and teachers about the last-name-only accommodation. *Id.* at 898 (majority opinion); *id.* at 925 (Brennan, J., concurring in part and dissenting in part); *Robertson*, 949 F.3d at 378. So the burden fell back on Kluge to show that stated reason was pretextual, which he failed to do. *Kluge I*, 64 F.4th at 898–99; *id.* at 925–26 (Brennan, J., concurring in part and dissenting in part).

After our opinion issued, the Supreme Court decided *Groff v. DeJoy*, 600 U.S. 447 (2023). The Court clarified, for Title VII religious accommodation claims, what an employer must

show to establish "undue hardship." Instead of requiring only a "*de minimis* cost," *Hardison*, 432 U.S. at 84, the Court held that employers must demonstrate "a burden [that] is substantial in the overall context of" its business. *Groff*, 600 U.S. at 468. Courts applying the new standard must consider the potential accommodation's "practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 470–71 (internal quotations omitted).

The parties filed supplemental briefing discussing *Groff*'s impact on this case, after which we vacated our previous decision and remanded the case to the district court. The remand was limited to the district court's "apply[ing] the clarified standard to the religious accommodation claim in the first instance." Although under our order the parties had the opportunity to reopen discovery, they declined that invitation.

The parties then each moved for summary judgment. The district court reaffirmed its prior ruling regarding Kluge's religious accommodation claim, even under *Groff*'s heightened standard.[3] The court first concluded that Brownsburg's "business" was "educating all students," which the school asserted it achieved by "foster[ing] a safe, inclusive environment for *all*" students. It continued that "two specific students were affected by" Kluge's accommodation, and that "other students and teachers complained." And last, the "emotional harm" is "likely to be repeated each time a new transgender student joins" Kluge's class.

---

[3] The court also denied Kluge's request to reconsider his retaliation claim, concluding that doing so would exceed the scope of remand. We reach that question *infra* in Section V.

Those factors taken together, the court concluded, established undue hardship as a matter of law. Not "relevant" was the larger orchestra department's success during the 2017–2018 school year, and that other students "did not perceive any problems in" Kluge's classes. To the court, these facts were immaterial because if any number of students are affected, the school is unable "to meet the needs of *all* of its students."

As a second basis for undue hardship, the district court largely reaffirmed its prior decision regarding the risk of Title IX liability faced by the school due to the last-name-only accommodation. Kluge timely appealed.

## II.  Title VII and *Groff*

Under Title VII, an employer cannot "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e-2(a)(1). "Religion" is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). In short, an employer must accommodate its employees' religious beliefs and practices. It is excused from providing an accommodation only if doing so imposes an "undue hardship" on its business.

Accommodation cases follow a burden-shifting framework. To establish a prima facie case, the employee must show: (1) the practice is religious in nature and conflicts with

the employer's requirements; (2) the employee notified his employer of the religious practice; and (3) the need for a religious accommodation was a motivating factor for the adverse employment decision. *Adeyeye*, 721 F.3d at 449; *see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015) (holding that an employer does not need actual knowledge of the accommodation's religious nature). The employee must also show his religious belief is sincerely held. *Adeyeye*, 721 F.3d at 448. If the plaintiff can establish the prima facie case, the burden shifts to the employer to show that any reasonable accommodation would result in undue hardship. *Id.* at 449.

Before *Groff*, an undue hardship was anything that required an employer "to bear more than a *de minimis* cost" to accommodate an employee. *Hardison*, 432 U.S. at 84. For decades, our circuit interpreted this instruction as relieving an employer from providing accommodations if doing so would place anything more than a "slight burden" on its operations. *E.E.O.C. v. Walmart Stores E., L.P.*, 992 F.3d 656, 658 (7th Cir. 2021); *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1997); *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir. 1986). Other circuits were nearly unanimous in this application of *Hardison*'s "*de minimis* cost" language. *See Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 18 (1st Cir. 2024) (collecting cases).

The legal landscape has changed markedly under *Groff*. The Supreme Court clarified that, to be free from accommodating an employee, the "employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470. The Court analyzed both

the terms "undue" and "hardship." *Id.* at 468–69. Even without the "undue" modifier, "a hardship is more severe than a mere burden." *Id.* (collecting dictionary definitions). The addition of "undue" means any "requisite burden, privation, or adversity must rise to an 'excessive' or 'unjustifiable' level." *Id.* at 469. Although the Court declined to offer a bright-line rule in this area, it emphasized that the inquiry is fact specific. Courts must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 470–71 (internal quotations omitted).

Any impact of the accommodation, including effects on coworkers, must affect the overall business. *Id.* at 472. But if the "coworker impacts" arise only from the fellow employees' "dislike of religious practice and expression in the workplace or the mere fact [of] an accommodation," those may not be considered. *Id.* (internal quotations omitted). For, any hardship "attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" *Id. Groff*'s new standard "is more rigorous than previously thought." *Bazinet*, 113 F.4th at 18.

With this background, we turn to whether Brownsburg's last-name-only accommodation imposed an undue hardship on the school.

### III.  Undue Hardship on Brownsburg

Brownsburg argues that Kluge's last-name-only practice imposed on it an undue hardship in two respects. It first asserts that the accommodation interfered with its educational mission. Brownsburg does not argue that the school was

inhibited from generally educating students. Instead, the school contends the accommodation interfered with its "mission" of "fostering a safe, inclusive learning environment for all" students.

This mission was hindered, Brownsburg continues, by "causing student harm" and "disrupting the learning environment." Kluge responds that complaints of offense from only a handful of students and teachers are insufficient to demonstrate an undue hardship on Brownsburg's overall business.

As a second basis for undue hardship, the school posits that the last-name-only accommodation exposed it to an unreasonable risk of Title IX liability. It cites circuit precedent for the proposition that schools are subject to liability any time they "treat[] transgender students differently than other students." By contrast, Kluge asserts that by adhering to the last-name-only practice, he "treated everyone the same," so any liability was at most speculative.

Because this case is before us on summary judgment, we review the district court's decision de novo, construing all conflicts in the evidence and drawing reasonable inferences for the nonmovant. *McDaniel v. Syed*, 115 F.4th 805, 821–22 (7th Cir. 2024). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The district court here ruled on cross-motions for summary judgment. So, when we review its denial of Kluge's summary judgment motion, which it decided on the sincerity issue, the facts are construed in favor of Brownsburg, the nonmovant. When reviewing the grant of

summary judgment to Brownsburg on the undue hardship is-
sue, we construe all facts in favor of Kluge.

### A. Burden on Brownsburg's Mission

We note at the outset that Brownsburg does not rely on a
purported mission of "afford[ing] dignity and empathy to-
ward transgender students," as the district court did. That
mission was nowhere in writing before litigation, and even
after litigation began it was contained only in the assistant su-
perintendent's affidavit. Although neither party offered
thoughts on this topic, it is difficult to see how this post-hoc,
offhand statement qualifies as an official school mission, as it
was neither documented nor adopted by Brownsburg's gov-
erning body. *See* IND. CODE § 20-26-3-5(b)–(c). The same is true
for Brownsburg's "business" as "respecting the legitimate ex-
pectations of [students'] parents and medical providers," on
which the district court relied sua sponte. That purported
mission also was not contained in any official school docu-
ments, including any predating this litigation.[4]

The mission the school submits of "fostering a safe, inclu-
sive learning environment for all" students was written in a

---

[4] The district court also cited cases for the proposition that courts are
ill-equipped to inquire into whether employers' asserted missions are "le-
gitimate." But in none of them was the court asked to evaluate the asserted
missions. Rather, they were accepted as a given. *See, e.g., Anderson v. U.S.F.
Logistics (IMC), Inc.*, 274 F.3d 470, 476–77 (7th Cir. 2001); *Ilona of Hungary,
Inc.*, 108 F.3d at 1576–78. And we disagree that courts lack the institutional
competency to police this boundary, as we are required to and do so in
other contexts. *See, e.g., FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394–
95 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))
(instructing courts, when evaluating associational standing, to ensure any

file, distributed at a faculty meeting, titled "Transgender Considerations."[5] Yet the president of the school corporation, Phil Utterback, said "there was no formal consideration of transgender issues" by the board during the period in question. This mission therefore could not have been "adopted by the governing body of the school corporation," as Indiana law requires. IND. CODE § 20-26-3-5(c); *see also Hopkins v. Indianapolis Pub. Schs.*, 183 N.E.3d 308, 313–14 (Ind. Ct. App. 2022) (discussing the statute). The parties did not raise this issue, though.[6]

The district court should not have sua sponte defined Brownsburg's mission. Instead, Brownsburg must offer proof of its mission pre-dating Kluge's request for accommodation. That proof is subject to development and adversarial testing on remand. For the purpose of this appeal, though, we assume that the mission Brownsburg states of "fostering a safe, inclusive learning environment for all" was validly instituted.

Kluge asserts this mission is not cognizable, as it prevents public schools from serving as "nurseries of democracy" and protecting the "marketplace of ideas." But those statements are derived from out-of-context First Amendment cases that

---

injuries are to "core business activities," rather than "abstract social interests").

[5] This document reads, "[c]reating a safe and supportive environment for all students." Because the differences in wording are slight, we do not dwell on them.

[6] Our dissenting colleague's concern about a "local franchise of a national ice cream chain" being punished in litigation for inadequate written records is misplaced. *Post*, at 69–70. Indiana public schools may be required by statute to have written missions and policies. The same requirement may not exist for private businesses.

do not dictate what a school's "business" must be for Title VII purposes. Instead, they deal mostly with a public school's inability to suppress students' speech. *See Morse v. Frederick*, 551 U.S. 393 (2007); *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180 (2021); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).

As to student speech, it may be true that "public schools are the nurseries of democracy." *Mahanoy*, 594 U.S. at 190. But the same broad protection for students' speech does not apply with full force to teachers' speech. As government employees, it has been recognized for decades that teachers do not have the same speech protections as students when the former are not speaking "as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016). Further, Kluge does not cite a case, and we have found none, incorporating the statements regarding students' First Amendment rights into teachers' Title VII protections.[7]

To reset, assuming Brownsburg's characterization of its mission, it still has not produced undisputed facts demonstrating an "excessive" or "unjustifiable" hardship on its

---

[7] We also caution against the use of a misleading quotation in a court filing. Kluge cited a Fifth Circuit case, which—with selective alterations—read: "[N]o authority supports the proposition that [Brownsburg] may require … anyone … to refer to gender-dysphoric [students] with pronouns matching their subjective gender identity." Opening Br. at 41 (quoting *United States v. Varner*, 948 F.3d 250, 254–55 (5th Cir. 2020)).

But that case dealt with the ability of federal courts to refer to litigants as they see fit. *Varner*, 948 F.3d at 254–55. It made no mention of Title VII and was otherwise irrelevant to this case.

mission of "fostering a safe, inclusive learning environment for all." *Groff*, 600 U.S. at 469.

Obviously, student safety is of paramount importance, and Brownsburg argues that risking "the safety" of even a few students creates an undue hardship—"whether the school has 100 students or 10,000 students."[8] This is true, but not relevant. The record does not conclusively show that any student's safety was in jeopardy. There were no allegations of threatened physical harm or verbal abuse. The only evidence from students centers on their discomfort. Specifically, that the accommodation made them feel "alienated, upset, and dehumanized," and "made the classroom environment very awkward." Further, Lee said the two students felt "emotional distress and harm."

Even if emotional distress qualifies as an undue hardship, *Groff* requires the employer to prove both that there was a hardship, and that the accommodation caused that hardship. 600 U.S. at 470 (The "employer must show that the burden of granting an accommodation *would result in* substantial increased costs." (emphasis added)). The students' subjective emotional distress is proved by their testimony. That is not disputed.

---

[8] The district court also concluded that any "harm is likely to be repeated each time a new transgender student joins Mr. Kluge's class (or, as the case may be, chooses not to enroll in music or orchestra classes solely because of Mr. Kluge's behavior)." There is no evidence showing the likelihood of repetition, including how many students could be affected in future years. "Hypothetical" evaluations are not relevant to demonstrating undue hardship. *Hebrew v. Tex. Dep't of Crim. Just.*, 80 F.4th 717, 723 (5th Cir. 2023).

Yet whether the accommodation caused the harm is unclear at this point in the litigation. The only fact the parties agree on is that Kluge called students by their last names. There is conflicting evidence whether that act in isolation caused the alleged emotional distress.

The transgender students said it was Kluge's failure to abide by the accommodation and other students' assumptions about the motivation behind it that added to their distress. For instance, when Lee was asked whether the last-name-only practice caused students emotional harm, he replied: "[I]f I was to say yes, that would almost just indicate that it was only the names, him using last names that was causing them harm, but there were other reasons based on his conduct during class that made them upset." Willis elaborated on this, alleging that part of his emotional harm stemmed from Kluge using "gendered pronouns" with other students and calling him "Miss Willis" in class. Sucec similarly alleged that Kluge used other students' gendered honorifics yet avoided doing so for him. And he alleged that Kluge routinely "avoided" him and other transgender students.

But as discussed above, these additional actions, beyond simply calling students by their last names, are disputed. Because of this factual dispute, whether the last-name-only accommodation and Kluge's related actions were the cause of the students' emotional distress is a question for the jury.

Our dissenting colleague contends that, even if the facts relating to emotional distress are unclear, there is no question that the students' distress and purported disruption were reported to the school's administration. And so long as an employer acts in good faith when making an employment

decision, even if on incorrect information, it is shielded from liability. *Post*, at 47–57.

To be sure, this circuit has cautioned courts against acting as "super-personnel department[s]" when reviewing employment decisions. *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 933 (7th Cir. 2020). But none of the cases the dissent cites for this proposition address religious accommodation. Instead, each case concerns a disparate-treatment claim alleging sex, age, disability, or race discrimination. *See post*, at 49. This difference is material: Disparate-treatment claims require at least circumstantial proof of an employer's intent to discriminate, which may be rebutted by the employer offering a "legitimate, nondiscriminatory reason" for an employment action. *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 891 n.3 (7th Cir. 2025) (internal quotation omitted). Once an employer offers that nondiscriminatory reason for the action, a discriminatory motive is no longer presumed.

By contrast, defending against a religious-accommodation claim requires the employer to prove more than just a lack of intentional discrimination. *Smith v. City of Atlantic City*, 138 F.4th 759, 774 (3d Cir. 2025) ("[G]ood faith is not by itself a cure for a" failure to accommodate a religious practice.). A religious-accommodation claim is the only one under Title VII requiring employers to prove an undue hardship stemming from the accommodation. 42 U.S.C. § 2000e(j). Indeed, this subsection is the sole part of the statute that requires employers to affirmatively bear additional cost to accommodate employees; race, color, sex, and national origin have no accommodation requirement. For this reason, it is the employer's burden to prove undue hardship arising from the accommodation, not to merely offer a good-faith—yet

mistaken—reason for taking an adverse employment action.[9] So, contrary to an employer needing to prove only that it had a legitimate, nondiscriminatory reason for discharging an employee, more is required to defend against a failure-to-accommodate claim. To the extent this requires courts to defer less to employers than in disparate-treatment discrimination cases, that is by Title VII's design.[10]

Further, even if the students suffered subjective emotional injury, those injuries must be objectively reasonable to rise to the level of undue hardship. Other areas of education and employment law, including in the Title VII context, routinely require some form of objective harm—not just subjective emotional distress. *See Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 911 (7th Cir. 2020) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)) (objective harm required for Title IX claims); *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1115–16 (7th Cir. 2022) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (same for hostile work environment Title VII claims); *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68–69 (2006) (same for retaliation Title VII

---

[9] This conclusion is bolstered by "the unavailability of a good-faith defense for disparate-impact" claims, where the employer's discriminatory motive is irrelevant. *Briscoe v. City of New Haven*, 654 F.3d 200, 208 n.13 (2d Cir. 2011); *see also Ricci v. DeStafano*, 557 U.S. 557, 583 (2009) (discussing how disparate-impact liability can be imposed even for "unintentional discrimination").

[10] The dissent's hypothetical on this point misses the mark. *Post*, at 53–54. Rather than dispute only the "reports" made to the employer, the pharmacist would need to dispute that he ever failed to fill prescriptions—just as Kluge disputes he ever called students by their first names or gendered honorifics. Without the factual predicate for the hardship in dispute, the dissent's analogy would not hold for this case.

claims); *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) (same for constructive discharge Title VII claims).[11]

Given how many other Title VII claims require an objective showing, it follows that religious-accommodation cases require an employer to demonstrate an objective undue hardship on its business, not one just subjectively perceived. *See, e.g.*, *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 91 (1st Cir. 2025) (employer proved undue hardship when it relied on "objective, scientific information" (quoting *Bragdon v. Abbott*, 524 U.S. 624, 649–50 (1998))). An objective standard "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a [complainant's] unusual subjective feelings." *Burlington N.*, 548 U.S. at 68–69.

The EEOC's guidance in this area also supports the need for an objective inquiry. For instance, the agency's compliance manual states that "[u]ndue hardship requires more than proof that some coworkers complained or are offended by an unpopular religious belief." U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2021-3, Compliance Manual: Religious Discrimination § 12-IV-B-4 (2021). Rather, coworkers must show "that the accommodation would actually

---

[11] These cases lay out what a plaintiff must establish for a Title VII or Title IX claim. Here, obviously, the students themselves are not the claimants. And we do not incorporate those frameworks wholesale, particularly the requirement that any actions be "severe" or "pervasive" to be objectively harmful. *Johnson*, 972 F.3d at 911; *Scaife*, 49 F.4th at 1116; *accord* U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2021-3, Compliance Manual: Religious Discrimination § 12-IV-C-6 (2021) (although coworkers' "subjective offense" is not an undue hardship, an employer need not wait "until the unwelcome behavior becomes severe or pervasive").

infringe on the rights of coworkers or cause disruption of work." *Id.* Coworkers can demonstrate this by asserting the accommodation "infring[es] on coworkers' abilities to perform their duties" or subjects them "to a hostile work environment"—which, as discussed above, is evaluated objectively. *Id.*

Our dissenting colleague believes that an objective standard is inappropriate here. *Post*, at 71. But we do not hold, as our colleague contends, that emotional harms must be "legally actionable" in order to qualify as an undue hardship. *See supra*, n.11. And requiring that emotional harms be objectively reasonable is specific to situations where the employer asserts that those emotional impacts *themselves* are the only undue hardship on "the conduct of its particular business." *Groff*, 600 U.S. at 470. In most other instances, even if the employer alleges subjective emotional harms, there will be further objective consequences—like, as the dissent posits, customers or coworkers "walk[ing] away from the business." *Post*, at 71. Yet those additional downstream consequences are missing in this case.[12]

Construing the evidence in the light most favorable to Kluge, the school introduced nothing to show that a teacher using one's last name resulted in "emotional distress" under an objective standard. *Cf. Whitaker*, 858 F.3d at 1045 (student put forth "two different experts regarding the harm caused to him by the" school's policy). Of course, "[c]ontext matters": A

---

[12] Our dissenting colleague points out that Sucec did not re-enroll in orchestra for the 2018–2019 school year and ultimately left Brownsburg in August 2018. *Post*, at 63, 73. Yet these events occurred after the school had terminated Kluge.

last-name-only accommodation could, given the right set of aggravating circumstances, impose objective emotional distress. *Burlington N.*, 548 U.S. at 69 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)). Theoretical instances could include if Kluge deliberately ignored transgender students in class, or if he broadcast the reason he used last names only.

But there is no undisputed evidence of anything like that happening here. Instead, Kluge expressly disagreed that he avoided calling on Sucec. And Natalie Gain, the teacher who worked in Kluge's classroom and was "often privy to some of the rumors that circulated" among the students, said she did not hear any talk of why Kluge had the accommodation. She was under no impression that his accommodation was "common knowledge." Given these factual disputes, there is insufficient evidence to conclude that calling students by their last names, without more, would inflict emotional harm on a reasonable person. Thus, even assuming Sucec and Willis subjectively felt emotional harm from Kluge's actions, those feelings do not rise to the level of an undue hardship on Brownsburg's purported mission to create a safe and inclusive learning environment for students.

The school also claims the last-name-only accommodation "disrupted the learning environment." If true, we have little doubt that a significant disruption to students' learning is an undue hardship on a school's business. But whether that significant disruption existed is disputed.

Title VII doctrine does not deal often with "disruption" in the public-school context; instead, that issue is handled more commonly through First Amendment claims. *See Tinker*, 393 U.S. at 513 (Student speech can be regulated if it "would

materially and substantially disrupt the work and discipline of the school."). Any disruption is evaluated objectively, requiring "serious consequences" if the speech is permitted, meaning "substantial disruption of or material interference with school activities." *N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022) (first quoting *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204*, 523 F.3d 668, 673 (7th Cir. 2008); and then quoting *Tinker*, 393 U.S. at 514).

Brownsburg has not carried its burden to show undisputed facts of a serious disruption to the learning environment. Although two performing arts teachers, whose testimony is not in the record, had spoken to the administration about students "having discussions about the uncomfortableness" in other classes, there is no hint that those discussions interfered with students' education or the teachers' duties. These two teachers also claimed that the accommodation caused "tension" that interfered with "the overall functioning of the performing arts department." But Kluge expressly disputed that "tension" existed within the department. He instead said that he "g[o]t along great" with those same performing arts faculty who purportedly complained, and he "did not witness any … animosity" from them.

We must also keep in mind that Kluge is entitled to all reasonable inferences at this stage. *McDaniel*, 115 F.4th at 822. It is true that three other teachers—whose testimony is also not in the record—similarly complained to Craig Lee that the accommodation was "harming students," both Sucec and Willis, and "students in general who would potentially be in" Kluge's class. Yet there is no evidence that the three non-performing arts teachers complained to the school's administration, only to Lee. One would expect that if there was a serious

disruption to the learning environment, those teachers would elevate concerns to the school administration, rather than complain only to a colleague with no authority to reprimand Kluge or control his actions.

In sum, the record contains material factual disputes about whether the accommodation disrupted Brownsburg's learning environment, precluding summary judgment to the school.

An additional point warrants discussion. Kluge reminds us the Court in *Groff* held that any hardship arising solely from "a coworker's dislike of religious practice and expression in the workplace or the mere fact of an accommodation is not cognizable" under Title VII. 600 U.S. at 472 (citation modified). An employer cannot point only "to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice." *Id.*

The complaints, though, were not based on hostility to Kluge's religion. Instead, the complaints Kluge cites all deal with the effects on the two students from Kluge's use of the last-name-only practice.[13] Nowhere do these documents support an inference that the students had a problem with Kluge's religion or "the mere fact [of] an accommodation." *Groff*, 600 U.S. at 472. Instead, the complaints are leveled against the impacts on students and teachers, regardless of

---

[13] The sole evidence Kluge points to on appeal for this point is a news article where Sucec purportedly accused Kluge of "trying to enforce his religious beliefs … on students." Opening Br. at 38. We decline to consider this article as it is not in the record before us. *See Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022) (explaining that this court "will not consider evidence and factual arguments that [litigants] did not present to the district court").

whether the accommodation was for religious or secular reasons.

Yet even though the complaints stem from considerations not deemed "off the table" by *Groff*, there is still a genuine material factual dispute about whether those complaints rose to an undue hardship on the school's educational mission.

### B. Exposure to Title IX Liability

The school argues that, even if the last-name-only accommodation does not unduly burden its mission, it exposes the school to an unreasonable risk of Title IX liability.[14] An employer is not obligated to accommodate an employee if doing so "would place it on the 'razor's edge' of legal liability." *Jackson v. Methodist Health Servs. Corp.*, 121 F.4th 1122, 1127 (7th Cir. 2024) (quoting *Matthews v. Wal-Mart Stores, Inc.*, 417 F. App'x 552, 554 (7th Cir. 2011)); *see also Russo v. Patchogue-Medford Sch. Dist.*, 129 F.4th 182, 186 (2d Cir. 2025) ("[A]n accommodation that would require an employer to violate the law imposes an undue hardship.").

Yet the cases Brownsburg cites to raise a specter of liability are readily distinguishable from this one. For example, in *Whitaker*, the school did not permit a transgender student to use the bathroom that aligned with his new gender. 858 F.3d at 1040–41. Instead, it permitted him to use only the bathroom that aligned with his biological sex, or a gender-neutral one.

---

[14] To our dissenting colleague, because gender dysphoria might qualify as a disability, Brownsburg may also have been exposed to liability under the Rehabilitation Act, 29 U.S.C. § 794(a), and the Americans with Disabilities Act, 42 U.S.C. § 12112(a). *Post*, at 64–67. Yet Brownsburg did not raise disability as a ground for potential liability, so, we need not address it.

*Id.* at 1041–42. But because he was the sole student with access to the gender-neutral restroom, he felt that using it "further stigmatized him." *Id.* at 1042. The court held that "[p]roviding a gender-neutral alternative is not sufficient to relieve the School District from liability." *Id.* at 1050.

But just as important to this case is why the gender-neutral alternative was insufficient: Because the plaintiff was the sole student using that restroom, the school subjected him "to different rules, sanctions, and treatment than non-transgender students." *Id.* at 1049. The district court relied on another case from our circuit that similarly emphasizes differential treatment of transgender students under the guise of a "gender-neutral" alternative. *See A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023).

Viewing the facts in the light most favorable to Kluge—again, as we must at this stage—there was no differential treatment here. The school argues that *Whitaker* and *A.C.* are indistinguishable because "it was obvious" that Kluge used last names only because his class had transgender students. But this rests on a disputed factual premise. Willis stated that most of the orchestra students saw through Kluge's motivation for the accommodation. Yet other evidence showed that students "never suspected" the underlying motivation, and that it was not "common knowledge." Indeed, Sucec's own declaration says that another student asked him why Kluge "wouldn't just say his name." The reasonable inference from this statement is that if the other student already knew the motivation behind Kluge's last-name-only practice, he would not have needed to ask Sucec for that reason. Additionally, there is no elaboration on why Sucec "felt forced to tell" the

other student that Kluge refused to call him Aidyn "because [he's] transgender."

We therefore cannot conclude that Kluge, just by adhering to the last-name-only practice, "treated [transgender students] worse" than their classmates, *A.C.*, 75 F.4th at 772, or subjected them to "increased stigmatization." *Whitaker*, 858 F.3d at 1050. Without those showings, our circuit's precedent that Brownsburg offers is materially different. The accommodation thus did not "place" the school "on the 'razor's edge' of legal liability." *Jackson*, 121 F.4th at 1127 (quoting *Matthews*, 417 F. App'x at 554).

## IV. Religious Sincerity

We now turn to whether the district court correctly denied summary judgment to Kluge based on a genuine dispute over the sincerity of his religious beliefs. Kluge argues the district court erred by putting too much weight on the single instance, at the orchestra awards ceremony, where he called transgender students by their PowerSchool names. The district court concluded this isolated instance created a genuine issue of fact around whether Kluge's religious beliefs were sincerely held.

Sincerity is a delicate inquiry. Our circuit has made clear "that courts should avoid putting themselves in the impossible position of trying to define religious legitimacy and viewpoint sufficiency." *Bube v. Aspirus Hosp., Inc.*, 108 F.4th 1017, 1020 (7th Cir. 2024). Courts do not have the expertise "to evaluate whether particular religious practices or observances are necessarily orthodox or even mandated by an organized religious hierarchy." *Adeyeye*, 721 F.3d at 452.

Employees carry a low burden to establish that they truly hold certain beliefs. A plaintiff must show only that "(1) 'the belief for which protection is sought [is] religious in [the] person's own scheme of things' and (2) that it is 'sincerely held.'" *Id.* at 451 (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978)). Title VII does "not require perfect consistency in observance [or] practice" when deciding whether "a person's belief is sincere." *Id.* at 453. Indeed, a religious adherent can be sincere even if "not scrupulous in his observance." *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012) (citing *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988)).

Here, citing his religious convictions, Kluge voiced his opposition to the PowerSchool policy—both while the school formulated it and as soon as it was implemented. Once the policy became effective, Kluge was faced in July 2017 with the decision to resign, abide by the policy, or be suspended pending termination. Rather than submit to the policy to retain his job, Kluge proffered the last-name-only accommodation as a middle ground.[15]

When, in February 2018, Brownsburg faculty informed Kluge of issues arising from the accommodation, he did not act contrary to his beliefs. Instead, when faced with an ultimatum to either comply with the PowerSchool policy or be

---

[15] At oral argument before us, Kluge posited that the school had the obligation to put forth multiple possible accommodations, yet it entertained only his last-name-only proposal. Oral Arg. at 41:05–41:52. But Kluge did not make this argument in his summary judgment brief after remand or in his opening brief with our court. This point is therefore waived. *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023); *Melino v. Bos. Med. Ctr.*, 127 F.4th 391, 398 (1st Cir. 2025) (treating the same issue as waived).

terminated for the 2018–2019 school year, he submitted what he thought was a conditional resignation letter. Even when attempting to withdraw his resignation, he did so only on the condition that he be permitted to continue the last-name-only practice.

Against this evidence of Kluge's sincerity, the school highlights his use of students' PowerSchool names at the awards ceremony. Kluge responds by pointing to evidence that he called the students by their full names in this setting only as a "good faith effort" to work with the school as part of his accommodation. He thought that calling students by their last names at "such a formal event" would have been "unreasonable and conspicuous." Yet he also maintained that calling transgender students by their PowerSchool names was "sinful."

Given this conflicting evidence, and subject to possible further discovery and motion practice on this issue on remand, a genuine issue of material fact exists regarding Kluge's sincerity. Even though a claimant's sincerity does not hinge on whether he is "scrupulous in his [religious] observance," it would still be premature to take this issue away from the jury. *Grayson*, 666 F.3d at 454. We therefore affirm the district court's denial of Kluge's summary judgment motion on this question.

## V. Retaliation Claim

Because we vacated our entire prior opinion, Kluge's retaliation claim remains open for consideration. In the first appeal, this panel unanimously agreed Kluge had failed to show that Brownsburg's reason for terminating him was pretextual. *Kluge I*, 64 F.4th at 898–99 (majority opinion); *id.* at 925–26

(Brennan, J., concurring in part and dissenting in part).
Brownsburg argued this case under the familiar framework
established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,
802–04 (1973), in its first summary judgment brief. This frame-
work requires plaintiffs alleging retaliation to first demon-
strate a prima facie case of discrimination. Then, the burden
shifts to the employer to "produce evidence" showing "it had
a legitimate non-discriminatory reason for taking the adverse
employment action." *Robertson*, 949 F.3d at 378. If the em-
ployer carries that burden, the plaintiff is then required to
show the stated reason was pretextual. *Id.*

Even assuming Kluge established a prima facie case of dis-
crimination, Brownsburg put forth an adequate nondiscrimi-
natory reason for the adverse employment decision—namely,
the "[c]omplaints from the high school community" about the
last-name-only practice. Kluge then had the burden to show
that this reason was pretextual. But Kluge did not argue,
much less demonstrate, pretext. It was therefore straightfor-
ward for us in the vacated opinion to conclude that Kluge
failed to establish a necessary element of the discrimination
framework the parties used to litigate the claim. So, we af-
firmed the summary judgment decision against him.

Kluge argues we should revisit our previous decision be-
cause *Groff* requires reconsideration of his Title VII retaliation
claim, not just the accommodation claim. Yet during supple-
mental briefing in the previous appeal, Kluge stated that
"*Groff* does not speak to [the] retaliation claim." In that brief,
Kluge argued the retaliation claim should be remanded for
the reasons included in his petition for rehearing—none of
which discussed *Groff*. Kluge's statement therefore qualifies
as a waiver: an "intentional relinquishment or abandonment

of a known right." *Bradley*, 59 F.4th at 895 (quoting *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) (en banc)). And waived issues are not within the scope of remand. *Id.* at 896 (citing *United States v. Husband*, 312 F.3d 247, 250 (7th Cir. 2002)). We accordingly decline to reconsider his retaliation claim.

*     *     *

For the reasons discussed above, we AFFIRM the district court's decision to not revisit Kluge's retaliation claim, and its denial of summary judgment to him based on factual disputes as to his sincerity. Because other factual disputes exist on the undue hardship issue, we REVERSE the district court's grant of summary judgment to Brownsburg and REMAND for further proceedings on that topic consistent with this opinion. We leave it to the district court's discretion whether to reopen discovery on remand.

Rovner, *Circuit Judge*, dissenting. Why won't he just say your name? This was the question Aidyn Sucec's music stand partner posed to him one day in John Kluge's orchestra class. Sucec felt compelled to answer: it was because he was transgender. R. 22-3 ¶ 13.

This exchange epitomizes the problem that confronted Brownsburg. Brownsburg had agreed to let Kluge implement the last-names-only practice as an accommodation to Kluge's professed religious beliefs. From the start, the accommodation as implemented by Kluge was fraught with problems. Although the last-names-only practice was neutral in the abstract, students quickly figured out that the practice was occasioned by the presence of transgender students in Kluge's classroom. The result was that transgender students felt stigmatized, their allies were frustrated and concerned, other teachers repeatedly fielded questions and concerns about the policy, and parents believed that both their decision-making and their children were not being respected. It is undisputed that complaints from all of these quarters were conveyed to Brownsburg. From the school district's point of view, then, the accommodation was harming transgender students and disrupting the learning environment for them, their fellow students, and for teachers. Given the lack of a dispute as to the concerns that were reported to school and district officials, Brownsburg reasonably concluded that the accommodation was a failure and that allowing it to continue presented the risk of legal liability.

In remanding the case for a trial at which the jury will be invited to reassess de novo the evidence that confronted Brownsburg and to decide for itself how credible the concerns reported to Brownsburg were, the court is setting a perilous

precedent for employers. Until today, when confronted with a Title VII employment discrimination claim, we have deferred to an employer's good-faith assessment of how an employee performed in the workplace. Without exception, we have always said that an employer's honest, non-discriminatory assessment of its worker's performance will carry the day, even if it strikes us as wrong-headed. Today the court invites a jury to do what we have always said a federal court will *not* do, which is to sit as a super-personnel department and second-guess the employer's good-faith reasoning. In making employment decisions, at least in the religious-accommodation context, employers will now have to consider not only how successfully an employee is performing his job as modified by a religious accommodation, but how a jury might second-guess its assessment in litigation years down the line. This is an untenable restraint on employers' decision-making.

Today's decision also burdens employers in a second important respect. Brownsburg successfully argued below that Kluge's accommodation proved inconsistent with its mission, which is to provide a supportive learning environment for all of its students. Although the majority accepts this mission for present purposes, it also suggests that evidence of an employer's mission must be limited to policies that are formally documented and adopted prior to any litigation. I think many employers will be surprised to learn that their ability to define their own missions is restricted to formal policies prepared long before an employment dispute arrives in court.

Employers may also be surprised to learn that when an employee's religious accommodation has reportedly caused emotional distress or psychological injuries to one or more

coworkers or customers, the employer cannot be confident that its undisputed, good-faith understanding of that harm will be given any deference; rather, it may be left to jurors to judge for themselves whether the injuries are objectively serious enough to be recognized in the *Groff* analysis. *Groff v. DeJoy*, 600 U.S. 447 (2023).

### A.

It is important to recap at the outset a number of key facts which are undisputed. These are facts which were known to Brownsburg and which were the basis for its conclusion that the accommodation it had granted to Kluge did not work in practice.

In the months prior to the start of the 2017-18 school year, the leadership of the school district engaged in a series of discussions about how best to meet the needs of transgender students, after it become known that several transgender students were enrolled as freshmen at Brownsburg High School for the upcoming year. R. 120-1 ¶ 6. Among the leaders participating in those discussions were: Dr. Jim Snapp, District Superintendent; Dr. Kathryn Jessup, Assistant Superintendent; Jodi Gordon, Human Resources Director; and Dr. Bret Daghe, Principal of the high school. R. 120-1 ¶¶ 5–6. The discussions included faculty meetings at which Craig Lee, a high school teacher and advisor to the school's Equality Alliance Club, and Lori Mehrtens, a guidance counselor, educated their colleagues about transgender individuals and how teachers could support their transgender students. R. 15-3 at 2; R. 58-2 at 1–2. The district leaders arrived at what Jessup described as a "firm consensus" that "transgender students face significant challenges in the high school environment, including diminished self-esteem and heightened exposure to

bullying." R. 120-1 ¶ 6. "School leadership also reached the
consensus that these challenges threatened transgender stu-
dents' classroom experience, academic performance, and
overall well-being." R. 120-1 ¶ 6.

The PowerSchool Name Policy emerged from those dis-
cussions as well as from the initial concerns raised by Kluge
and several other teachers about addressing transgender stu-
dents in a manner consistent with their gender identities. *See*
R. 113-5 at 5–6 (Daghe Dep. 30–36); R. 120-1 ¶¶ 7–8; 120-3 at
11–12 (Kluge Dep. 40–44). Among other data, each student's
names, pronouns, and gender markers were recorded in the
school's PowerSchool database. R. 113-3 at 6 (Utterback Dep.
15–17); R. 113-5 at 4 (Daghe Dep. 28–29); R. 120-1 ¶ 7. There-
tofore, Principal Daghe had resisted pressure to make
changes to a student's name in the database, even for
transgender students, but Daghe ultimately agreed that
names and pronouns could be altered if that would address
teachers' concerns about how students were to be addressed
at school. R. 120-3 at 12 (Kluge Dep. 42–43). Pursuant to the
Name Policy, students were to be addressed in a manner con-
sistent with the names and pronouns recorded in Pow-
erSchool. R. 113-5 at 5 (Daghe Dep. 30); R. 120-1 ¶¶ 7–8.
Transgender students could have their names and pronouns
altered in the database, provided that letters were submitted
from a parent and a healthcare provider confirming the need,
not just a student's preference, for the changes. R. 113-5 at 4–
5 (Daghe Dep. 28-31); R. 120-1 ¶ 7. Dr. Jessup identified the
two primary goals that the Name Policy served, from the
school district's perspective:

> First, the practice provided the high school fac-
> ulty a straightforward rule when addressing

students; that is, the faculty need and should only call students by the name listed in PowerSchool. Second, it afforded dignity and showed empathy toward transgender students who were considering or in the process of gender transition. Stated differently, the administration considered it important for transgender students to receive, like any other student, respect and affirmation of their preferred identi[t]y, provided they go through the required and reasonable channels of receiving and providing proof of parental permission and a healthcare professional's approval.

R. 120-1 ¶ 8.

Kluge advised Daghe that his religious beliefs precluded him from complying with the Name Policy, and he ultimately proposed an accommodation that Daghe accepted: Kluge would refer to his students by their last names only, without using gendered honorifics or pronouns. R. 15-1; R. 120-3 at 17–18 (Kluge Dep. 64–65, 68).

Although the last-names-only practice was neutral on its face, some number of students correctly surmised that the trigger for the practice was the presence of transgender students in Kluge's classroom. A non-LGBTQ student in Kluge's orchestra class told Lee he was fairly certain that all students knew why Kluge had switched to using last names only, and in that student's view, the realization made transgender students stand out. R. 58-2 ¶ 9; R. 120-14 at 9 (Lee Dep. 43). Transgender students Sucec and Sam Willis themselves concluded that they were the reason for Kluge's practice and said that it made them feel isolated and targeted. R. 58-2 ¶ 7;

R. 120-14 at 7–8 (Lee Dep. 37–39). Like the other student who spoke with Lee, Willis said most other students knew the reason for the practice. R. 58-1 ¶ 11.

Brownsburg officials were advised by multiple parties that Kluge occasionally departed from the last-names-only practice and used gendered language and/or first names in addressing students. R. 22-3 ¶ 12; R. 58-1 ¶ 10; R. 58-2 ¶ 8; R. 113-4 at 9 (Gordon Dep. 32); R. 120-6 at 7 (Jessup Dep. 43); R. 120-14 at 8–9 (Lee Dep. 41–42). In some instances, transgender students themselves reportedly were mis-gendered by Kluge. R. 58-1 ¶¶ 8–9; R. 58-2 ¶ 8; R. 120-12; R. 120-13 at 2–3; R. 120-14 at 8–9 (Lee Dep. 41–42). For example, Willis averred that Kluge referred to him as "Miss Willis" on several occasions. R. 58-1 ¶ 8.[1] *See also* R. 58-2 ¶ 8; R. 120-14 at 8–9 (Lee Dep. 41–42) (some students perceived that Kluge avoided acknowledging transgender students who raised their hands in class). Although there is a dispute of fact as to whether, in fact, Kluge sometimes departed from the last-names-only practice, it is undisputed that Brownsburg was told that he did. For example, Human Resources Director Gordon testified that Daghe was made aware by both students and staff that Kluge was not uniformly following the

---

[1] These instances allegedly occurred early in the school year, before Willis's first name and pronouns were changed in the PowerSchool system (R. 58-1 ¶ 9); however, using gendered honorifics nonetheless would have been inconsistent with the last-names-only practice. *See* R. 120-3 at 18 (Kluge Dep. 68).

guidelines he had agreed to at the start of the year. R. 113-4 at 9 (Gordon Dep. 32).[2]

Three teachers expressed concern to Lee that the last-names-only practice was harming students, and not just Willis and Sucec. R. 120-14 at 16–17 (Lee Dep. 85–86). Daghe was approached by two additional teachers in the Fine Arts department who conveyed their own complaints about the practice. R. 113-5 at 8–9 (Daghe Dep. 57–58).

After hearing concerns from school counselors that students were experiencing discomfort related to transgender issues in some classes, Dr. Jessup sat in on a meeting of the school's Equality Alliance Club. The meeting was attended by approximately 40 students. Four or five students voiced complaints at that meeting about an unnamed teacher using last names only. (It was the custom in Alliance discussions that teachers being discussed would not be referred to by name; but there is no dispute that the teacher in question was Kluge, as he was the only teacher who had been granted the accommodation of addressing students by their last names only.)

---

[2] Although Kluge testified that he adhered to the last-names-only practice without exception, I think it is worth noting that in a letter to the EEOC investigator, Kluge's counsel stated the following:

> Kluge made a good faith effort to address all students by last names and to never "mis-gender" students. He admits that he may have made occasional mistakes in referring to students he formally called by their first names. But he never intentionally referred to students by a former name. If he made a mistake in accidentally saying "miss" to the student identified in [Brownsburg's] response, it would have been when the student was registered as a female in PowerSchool. …

R. 120-19 at 7.

R. 120-1 ¶ 9. Among the concerns expressed at the meeting were that students felt singled out by the use of their last names, and that "not all students were called by their last names by Mr. Kluge"; staff members had also raised the same concern. R. 120-6 at 7 (Jessup Dep. 43). According to Jessup, the other students present at the meeting appeared to agree with the concerns raised by the students who spoke. R. 120-1 ¶ 9.

Beginning in late August 2017 and continuing throughout the Fall semester, Daghe heard complaints about the last-names-only practice, but he hoped that the concerns would resolve themselves. R. 120-2 ¶¶ 11–14. By December of 2017, however, Daghe had concluded that the accommodation to Kluge was not working. R. 120-2 ¶ 14. He met with Kluge to convey his concerns. R. 112-5 at 7 (Daghe Dep. 50–52).

Kluge has acknowledged that when he met with Daghe on December 17, 2017, Daghe advised him that the accommodation was creating tension among students and faculty, that transgender students reported feeling "dehumanized" by the last-names-only practice, that their friends felt bad for them, that parents had complained about him, that other teachers had expressed concern, and that Kluge was a topic of much discussion at Equality Alliance Club meetings. R. 15-3 at 4–5. Kluge did not accept as true that many students had complained about his last-names-only practice. When he asked Daghe to name the students who had expressed concerns, Daghe had declined; and Daghe's refusal to identify the students caused Kluge to think that Daghe may have been fabricating or exaggerating the extent of the complaints. R. 120-3 at 23 (Kluge Dep. 88–89). As for the tension among students and faculty that Daghe had described, Kluge has testified that

he did not witness any such tension in fact. R. 120-3 at 23 (Kluge Dep. 89). But Kluge also felt that this reported tension was a sign that he should keep working and continue addressing students by their last names only. R. 120-3 at 25 (Kluge Dep. 95–96) ("It was not that I really witnessed this [tension and conflict]. I'm just hearing it from [Daghe] and, I'm telling him if there is tension and conflict, well, that's encouragement that I shouldn't quit but I should continue to pursue neutrality."). In short, although Kluge may dispute that his practice resulted in multiple student complaints and tension among students and faculty, he does not deny that this is what was reported to him by the school principal, which is further confirmation of what school leaders knew and understood at the time.

To sum up, there is no dispute that the Name Policy was an integral part of a considered policy designed to create a supportive learning environment for Brownsburg's transgender students. There is no dispute that Brownsburg nonetheless adopted Kluge's proposed accommodation exempting him from the Name Policy for the 2017-18 school year. There is no dispute that Kluge's last-names-only practice resulted in complaints from transgender students, their friends, teachers, and parents, or that teachers were regularly fielding questions and concerns about the practice. There is no dispute that multiple students reported that they and others attributed Kluge's last-names-only practice to the presence of transgender students in his classroom. There is no dispute that transgender students reported feeling targeted, isolated, and dehumanized as a result of the practice. There is no dispute that some students reported that Kluge occasionally referred to other students by their first names and gendered honorifics or that there were reports some transgendered

students had been mis-gendered by Kluge. It was not just a few students who complained: the four or five students who voiced concerns at the Equality Alliance Club meeting that Dr. Jessup attended appeared to be representative of the approximately 40 students in total who attended that meeting.

Nor is there a dispute that all of this was communicated to Brownsburg leadership (and, ultimately, to Kluge), or that the leadership relied on these reports in deciding to rescind the accommodation and ask Kluge to comply with the PowerSchool Names Policy or resign. Although Kluge disputes the accuracy of some of the points reported to Brownsburg leaders, including whether he ever departed from the last-names-only practice and whether students were aware of the reason for his practice, there is no evidence that the school district is slanting or making up the facts reported to it, and there is no dispute that the Brownsburg leaders believed these reports to be true.

**B.**

Notwithstanding a lack of controversy as to what Brownsburg's leaders were told, and what they in good faith believed, about the detrimental consequences of Kluge's last-names-only practice, the majority concludes that there are disputes as to the underlying facts that require a trial. These include disputes over whether Kluge in fact departed from the last-names-only practice and addressed some students using their first names or gendered honorifics and pronouns, whether many or most students in fact were aware of the reason for the practice, and whether the practice actually resulted in disruption and tension among students and staff. *Ante* at 23, 28–30, 32. Among other questions, the factfinder will have to decide who is more credible: the transgender and other

students who reported that Kluge did not always adhere to the last-names-only practice, or the contract violin teacher and two students who said they did not ever witness Kluge departing from the policy.[3] The court is therefore inviting the factfinder to determine for itself the facts surrounding the last-names-only practice, with no deference to what Brownsburg leaders knew and understood about the practice when they made the decision to rescind the accommodation. In my view, this is a substantial departure from longstanding practice in employment discrimination cases.

Whatever may be distinct about this religious accommodation case, it is at bottom still an employment discrimination case. Kluge alleges he was forced to resign because Brownsburg would not accommodate his sincere religious beliefs, or rather, that Brownsburg would *no longer* accommodate his religious beliefs. Brownsburg initially granted Kluge the very accommodation he requested, and it withdrew the accommodation only after several months of experience with the accommodation proved it unworkable, in the school district's view. Brownsburg's decision to require Kluge either to comply with the Name Policy or resign was based on its understanding of how Kluge implemented the accommodation, how the accommodation affected students, including transgender students, what its other teachers observed to be

---

[3] I am not convinced that the averments of these witnesses that they did not ever hear Kluge address students by their first names or using gendered honorifics actually creates a dispute of fact as to whether he did deviate from the last-names-only policy in these ways, as other students reported to Brownsburg. It is entirely possible that both sets of witnesses were and are being truthful, and that although Kluge sometimes slipped up and called students by their first names or used "Miss" or "Mister" to address them, not everyone noticed it (or were present when it occurred).

the consequences of the policy, the concerns parents had communicated to the school district, and whether the practice was consistent with its mission and the school district's goal of establishing a supportive learning environment for all students, including its transgender students.

In employment discrimination cases, it has been our unswerving practice not to second-guess employers in their assessment of the plaintiff's work. It is routine for a discharged employee to claim that his work performance was good, that any reports of subpar performance on his part were inaccurate, and/or that the employer credited the wrong individuals in deciding to fire him. Such arguments are never successful. *See, e.g., Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 980 (7th Cir. 2004) ("An employee's self-evaluation cannot create an issue of fact about an employer's honest assessment of inadequate performance."). The only question, we say, is whether the employer discharged (or took other adverse action against) the plaintiff for a discriminatory reason. When the employer has articulated a non-discriminatory reason for doing so, only evidence suggesting that the employer's stated rationale for the discharge may be a pretext—i.e., that the employer is lying—is relevant. Evidence that the employer was mistaken or misguided in its assessment (but not dishonest) is thus immaterial and *ir*relevant. *E.g., Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892–93 (7th Cir. 2025); *Hoffstead v. Ne. Ill. Regional Commuter R.R. Corp.*, 132 F.4th 503, 512 (7th Cir. 2025); *Beverly v. Abbott Labs.*, 107 F.4th 737, 746–47 (7th Cir. 2024); *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020); *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006); *Monroe v. Children's Home Ass'n of Ill.*, 128 F.3d 591, 593 (7th Cir. 1997). As we are fond of saying, it is not a court's role to sit as a super-personnel department and to

decide whether an employer's decision to discharge an employee was right or wrong; our one and only task is to decide whether the plaintiff was discharged for an unlawful reason. *E.g.*, *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020) ("We have said time and again (in more than one hundred reported opinions, by our count) that we are not a super-personnel department that will substitute our criteria for an employer's for hiring, promoting, or disciplining employees.").

Now, I certainly agree that when an employer has rejected the possibility of an accommodation from the outset, never tried to implement what the plaintiff proposed, or offered an accommodation that the plaintiff regards as inadequate, the case will be in a different posture. In such a case, there is no history of the plaintiff working under the accommodation and thus no basis for the employer to assess how well the plaintiff performed with the benefit of the accommodation or whether and how the accommodation affected the employer's business. The employer can hypothesize about the likely costs and ramifications of the proposed accommodation, as is typical in such cases, but apart from the employer's predictive judgment as the business owner about the feasibility of the accommodation, there is nothing for a court to defer to in assessing whether the accommodation in question might actually impose a substantial cost on the business. In that setting, both parties will be free to present evidence for and against the workability of the rejected accommodation. And where there are factual disputes as to the potential costs of the accommodation, or the employer has not otherwise convinced the court that those costs qualify as substantial as a matter of law, then a trial may be required. *See, e.g., Adeyeye v. Heartland*

*Sweeteners, LLC*, 721 F.3d 444, 455 (7th Cir. 2013); *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576–77 (7th Cir. 1997).

But here, Kluge's employer adopted the very accommodation he requested, allowed events to play out over a period of four months with the accommodation in place, and rescinded the accommodation only after it had the opportunity to see how well Kluge performed under the accommodation and what effects the accommodation had on his students, his fellow teachers, and on the learning environment generally. Just as it would in making any other employment decision, Brownsburg heard from multiple sources in making these assessments: teachers, staff members, students, and parents. It necessarily had to evaluate the plausibility and relevance of each bit of information reported to it. To the extent accounts conflicted, it had to make credibility judgments. And it had to weigh what it was hearing about Kluge's last-names-only practice in light of its mission as an educational institution, its duty to the students in its care and custody, and its accountability to parents and to the broader community. These were not easy assessments to make, and they were necessarily informed by the experience and expertise of Brownsburg's leadership, the policies it had developed with respect to transgender students, its familiarity with the school's staff and student body, and its history and relationship with the community.

In this context, we owe deference to Brownsburg's understanding of what the costs of the accommodation were. Kluge remains free to argue that these costs do not rise to the level of substantial costs under *Groff*, and the court retains the power to decide whether Kluge or Brownsburg is right on that point. But absent evidence of pretext, the court must

accept the undisputed evidence as to what Brownsburg was told about the consequences of the accommodation and what Brownsburg's articulation of the hardship imposed by that accommodation was. Just as we do not second-guess undisputed accounts of how an employee's work performance was evaluated by his coworkers and supervisors and reported to the decisionmaker, we must not second-guess undisputed reports from an employee's coworkers and superiors (and additionally in this case, from students and parents) regarding how an employee implemented the religious accommodation he was granted and what the consequences of the accommodation were in the workplace. Otherwise, by authorizing the factfinder to determine de novo what the facts confronting the employer were—notwithstanding the lack of a dispute as to what the decisionmaker was advised and understood about the implementation and effects of the accommodation—we are necessarily installing the court as an uber-administrator in the workplace.

Is there a dispute about what information was conveyed to Brownsburg's leadership regarding the accommodation? There is not.

Is there evidence suggesting that Brownsburg's rationale for rescinding the accommodation was pretextual? There is not. (The majority concedes as much in addressing Kluge's retaliation claim. *Ante* at 36.)

Is there evidence suggesting that Brownsburg did not give the accommodation a sufficient chance, or that there was bad faith on Brownsburg's part in the manner in which it implemented the regulation, evaluated the consequences, and decided the accommodation was unworkable? There is not.

Is there evidence that the negative reports Brownsburg heard about the accommodation, or its own evaluation of the accommodation's failure, were tainted by animus towards Kluge's religious beliefs or to religion generally? There is not. (The majority agrees on this point. *Ante* at 30–31.)[4]

Under these circumstances, I submit that there is no role for the factfinder to play with respect to what was reported to Brownsburg or its stated rationale for concluding that the accommodation was unworkable. To invite a jury to determine for itself what the facts confronting Brownsburg were would be to disregard the undisputed accounts of what was communicated to Brownsburg by students, teachers, and parents and constitute a significant departure from our historic approach to employment-discrimination decisions, and make a trial all but inevitable in every such case.

Consider what this will mean. An employer might adopt a plaintiff's proposed religious accommodation, agreeing to give it a chance, but later conclude that the accommodation is unduly burdensome in practice based on reports that the accommodation is adversely affecting coworkers and/or customers. Perhaps a retailer with a brisk weekend business grants a work-schedule accommodation to a Sabbatarian employee, with the expectation that other employees will pick up the slack. In practice, however, store supervisors report that some Sunday shifts have been left understaffed and that multiple employees called upon to take extra Sunday shifts have threatened to quit or have quit. Or perhaps a pharmacy

---

[4] When one parent wrote to school administrators regarding Kluge's refusal to address her son by name, she remarked, "I really don't care what he thinks about transgender issues on a personal level." R. 120-13 at 2.)

accommodates a pharmacist with religious objections to birth control by allowing that pharmacist not to fill (or ring up) birth-control prescriptions, again anticipating that other pharmacy employees will be able to handle the extra work. In practice, however, pharmacy managers report that the accommodation has caused delays in filling some prescriptions and that multiple customers have complained that they experienced lengthy telephone hold times, refill delays, or exasperating wait times while picking up their prescriptions because the accommodated pharmacist refused to serve them; reportedly, a number of these customers have threatened to take their business elsewhere. The employer in good faith relies on these reports to decide that the accommodation is not workable, and when the employee refuses to work without the accommodation, discharges him. When the discharged employee files suit under Title VII for religious discrimination, although he does not dispute what the employer was told about the effects of the accommodation, he tells the court that the reports were wrong: that he heard no complaints and observed no negative consequences from the accommodation, and he has declarations from several coworkers and customers who say that they too never observed any problems with the accommodation or felt inconvenienced by it. Under the court's approach today, that would be sufficient to require a trial, notwithstanding the lack of a dispute as to what the employer knew about the consequences of the accommodation and the lack of any evidence of pretext in the employer's stated rationale for withdrawing the accommodation and discharging the plaintiff.

I understand the majority's point that religious-accommodation claims are different from other Title VII claims in that the employer bears the burden of showing that the

accommodation would have imposed or did impose an undue hardship on its business. But in deciding that an implemented accommodation has proven unworkable in practice, an employer necessarily must rely on the information known to it. To allow a factfinder to second-guess an employer's decision-making years after the fact, based on evidence that may never have been known to the employer, puts employers in an untenable position. In this case, for example, the statements from one teacher and two students that they had never heard Kluge depart from the last-names-only policy were not among the information conveyed to Brownsburg leadership in the Fall of 2017. To the extent one might respond that Brownsburg should have done a more thorough canvasing of its teachers and students before withdrawing the accommodation from Kluge, that too would not avoid the problem. Even if an employer does its absolute best to canvass its employees and customers, it may come up with conflicting reports. If 30 students had told Principal Daghe that Kluge occasionally used "Mr." or "Miss" in addressing students (or sometimes used their first names), and three said they never heard him use anything but last names, was Brownsburg precluded from crediting the 30 over the three?[5] And must a jury be summoned to reconsider Brownsburg's credibility assessments simply because Kluge denies that he ever slipped up and departed from the last-names-only practice? Our existing case law gives clear answers to such questions. I do not understand why this case calls for a different result.

Under the majority's approach today, the court will altogether ignore the undisputed record of what Brownsburg was

---

[5] Particularly, when, as I noted above, *see supra* n.3, such divided reports arguably do not conflict in fact.

told and believed to be true about the manner in which Kluge implemented the religious accommodation and what the consequences of the accommodation were for students, faculty, and staff. Eight years after the events at issue in this case occurred, the parties will be directed to litigate de novo what the facts surrounding the accommodation were, establishing an evidentiary record that is different from the one that confronted Brownsburg when it concluded the accommodation was not working. The jury, in turn, will be invited to determine for itself how Kluge implemented the accommodation, how it affected his students, and how it impacted the learning environment at the high school. Put another way, the jury will find a set of facts that may be different from—indeed, may be wholly contrary to—the facts reported to the Brownsburg leadership and which it believed to be true.  And on that new record, the jury will decide whether the accommodation posed an undue hardship on the school district's business.

In this assessment, what deference will be given to Brownsburg's undisputed understanding that Kluge deviated from the last-names-only policy in practice and sometimes used gendered first names and honorifics in addressing students? None.

What deference will be given to the school district's undisputed understanding that the accommodation caused transgender students to feel targeted, isolated, and dehumanized? None.

What deference will be given to the school district's undisputed understanding that many students, not only transgender students, had expressed concern about the last-names-only practice? None.

And what deference will be given to the undisputed conclusion of school leaders that the type of harm reported by transgender students and observed by others, including teacher and Equality Alliance Club advisor Craig Lee, was a serious harm that compelled them to intervene? None.

Deference, in the absence of pretext, to what an employer understood, relied upon, and articulated as the basis for its conclusion that an accommodation failed in practice does not deprive the court of a role to play here. Again, a court still must decide, under *Groff*, whether the costs an employer has cited were so substantial as to qualify as unduly burdensome. I turn to that question next. But the point I have endeavored to make here is that when there is no dispute what the employer was told and, in good faith, understood about the costs of a religious accommodation, the court ought to begin its *Groff* analysis there, rather than allowing the plaintiff to relitigate the credibility of the information conveyed to the employer. I see nothing in *Groff* that calls for such a marked departure from our approach to employment decisions in other Title VII cases.

## C.

*Groff* asks: Does the accommodation result in "substantial increased costs in relation to the conduct of [the employer's] particular business"? 600 U.S. at 470. In my view, Brownsburg has met its burden in this regard as a matter of law. It allowed Kluge to implement the last-names-only accommodation in his classroom for the Fall term in 2017 before deciding that the accommodation was unworkable in practice and would not be allowed in the following school year. It did that based on undisputed reports of harm to transgender students and

disruption to the learning environment. Given Brownsburg's educational mission, this is sufficient.

*Groff* makes clear that courts must consider the nature and context of the business at issue in assessing the costs of accommodating the plaintiff's religious beliefs. *Id.* at 470–71. As a public school district, Brownsburg is in many ways a unique "business" for purposes of the *Groff* undue-hardship inquiry.

It bears noting that this case is also different in a key respect from *Groff*. As is typically true in religious-accommodation cases, the plaintiff in *Groff* sought a schedule accommodation that would relieve him from working on his Sabbath—an accommodation to the exercise of his religion which, apart from whatever logistical challenges and expenses it posed to his employer and inconvenience it posed to his coworkers, did not directly implicate the co-workers' own civil rights. Here, by contrast, the religious accommodation at issue brings into play not only Kluge's rights under Title VII, but also the school district's duties to others, both as a custodian of its students and as a representative of its community, as well as the statutory rights of Kluge's students. In this section, I address the school's role vis-à-vis the students and the community; the students' rights I reserve for the following section.

Not only is school attendance compulsory for students, but in contrast to virtually all other employers, a school stands *in loco parentis* with its students. *See Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 979 (Ind. 2002); *Griffin v. Simpson*, 948 N.E.2d 354, 358 (Ind. Ct. App. 2011). As such, a school must take care that its actions do not harm the students entrusted to its custody. In that sense, it does not matter whether a school practice injures one student or many; a practice that jeopardizes the

well-being of a single student can violate the school's obligations to that student even if other students are unharmed and the school overall continues to function effectively. If, pursuant to a religious accommodation, a teacher were ignoring or interacting differently with some students based on their race or ethnicity or religion, with the result that those students felt isolated, targeted, and dehumanized, I cannot imagine we would allow a school to discount their experiences as an insignificant cost of the accommodation. Apart from the "othering" message that the teacher would convey to those students, a school would also have to be concerned about the example the teacher was setting for all students, and the real risk that bullying might ensue. *Cf. Nabozny v. Podlesny*, 92 F.3d 446, 460 (7th Cir. 1996) (agreeing in principle that school defendants could be liable under due process theory to gay student who was bullied by other students, if defendants created a risk of harm or exacerbated an existing one). Recall that the prospect of bullying was one of the factors that Brownsburg took into consideration when formulating its approach to transgender students.

Apart from the duty to their students, school districts also have a duty to their communities, including the parents of school-aged children. School districts often have diverse constituencies that include families for whom English is not their first language, households with limited financial resources, families with different religious faiths and practices, families headed by single or divorced parents, grandparents, or other relatives, families that include disabled children or parents, unsheltered families, families that experience intra- or extra-household violence, and families that include LGBTQ+ parents or children. Schools must serve the needs of all such families and must craft their policies and practices accordingly;

they are accountable to the communities they serve. *See Bd. of Educ., Island Trees Union Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863–64 (1982) (plurality).

In this case, Brownsburg did exactly what one would expect and want a school district to do when it learned that several transgender students would be attending the school as freshmen in the upcoming school year: it identified the particular challenges those students were likely to face and identified steps that would protect and promote the ability of those students to succeed at school. The practices that the district put into place included the Name Policy, which provided that if there were not only a preference but a need to change a transgender student's gender marker, pronouns, and given name, confirmed in writing by both a parent and healthcare provider, then the changes would be recorded in the district's PowerSchool database and teachers and staff would thereafter address the student accordingly. In doing so, the school district was honoring the needs not only of the individual transgender student but the broader community of which the student and his parents and other family members were a part.

Thus, the harm resulting from the accommodation exempting Kluge from the Name Policy was an injury not only to transgender students, but to the careful policy balance the school district struck in honoring the diverse needs of its community members. *Cf. Baz v. Walters*, 782 F.2d 701, 705–08 (7th Cir. 1986) (discharge of Veterans Administration chaplain from facility with a predominantly psychiatric patient population on ground that chaplain's evangelical approach to patient care interfered with his therapeutic duties did not violate Title VII's proscription against religious discrimination).

**D**.

This case also implicates the statutory rights of transgender students who experienced injury as a result of the last-names-only accommodation. Brownsburg had reason to be concerned that if it allowed the accommodation to continue, it could be sued for violating the rights of those students.

As the court recognizes, an employer need not place itself on the "razor's edge" of legal liability in order to accommodate an employee's religious beliefs and practices. *See, e.g.,* *Jackson v. Methodist Health Servs. Corp.*, 121 F.4th 1122, 1127 (7th Cir. 2024) (collecting cases), *pet'n for cert. filed*, No. 24-1169 (U.S. May 14, 2025). In my view, given Brownsburg's experience with Kluge's last-names-only practice, that is exactly what Kluge is asking Brownsburg to do.

Transgender students have rights under multiple statutes that were implicated by Kluge's practice. These include not only Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, but also, potentially, section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* In view of the reports of alienation and stigmatization that its transgender students were experiencing as a consequence of Kluge's last-names-only practice, Brownsburg was right to be concerned that allowing that practice to continue would potentially expose the school district to liability for violating the rights of its transgender students.

Title IX protects students from sex discrimination in any school program that receives federal funding, 20 U.S.C. § 1681(a), and that proscription includes discrimination on

the basis of one's gender identity. *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1047–50 (7th Cir. 2017), *abrogated in part on other grounds by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 768–71 (7th Cir. 2023) (reaffirming *Whitaker*), *cert. denied*, 144 S. Ct. 683 (2024); *but see also D.P. by A.B. v. Mukwonago Area Sch. Dist.*, 140 F.4th 826, 833 (7th Cir. 2025) (recognizing that *Whitaker* represents the law of this circuit but signaling disagreement with it), *vacated and reh'g granted*, 2025 WL 1794428 (7th Cir. June 30, 2025) (sua sponte granting panel rehearing to consider whether *Whitaker* should be overruled in light of *United States v. Skrmetti*, 145 S. Ct. 1816 (2025)). A transgender student who is being treated differently based on his gender identity or who experiences a hostile environment based on that identity thus would have a claim against the school district for sex discrimination. The majority may be downplaying, I think, the isolation, and dehumanization that transgender students Sucec and Willis suffered as a result of Kluge's last-names-only practice, when it suggests that their "discomfort" would not by itself support a hostile environment claim. *Ante* at 22. But an employer does not have to wait until conditions that distress a student give rise to a hostile environment in order to take remedial steps. The injuries that transgender students were reporting were not substantively different from the psychological harms that victims of sexual, racial, and other types of discrimination experience. *See, e.g., United States v. Balistrieri*, 981 F.2d 916, 931 (7th Cir. 1992) (recounting emotional distress experienced by housing discrimination testers). Given those reports, coupled with the reports that Kluge addressed other students by their first names and gendered pronouns, Brownsburg was entitled—perhaps

obligated—to act before circumstances ripened into a legally actionable hostile environment. After all, the primary objective of Title VII is to *avoid* harm; and an employer has a duty to take reasonable measures to prevent and promptly correct harassment before it becomes severe or pervasive. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 805–06 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

One must also have in mind that teachers, as authority figures, are role models for their students, both in a positive and a negative sense. Excellent teachers are often beloved and admired by their students. This may be all the more true in art, music, and performing arts classrooms, which are frequently a refuge for students who are different from or marginalized by their peers. As my colleagues point out, Kluge was regarded as an outstanding teacher by many of his students. To be ignored, dismissed, or disgraced by a such teacher in adolescence may be a wound that a transgender student will bear for their lifetime, particularly when it has been witnessed by an entire class. Sucec avers that he came to dread going to Kluge's class, and he decided not to enroll in orchestra the following year. He transferred out of Brownsburg High School in August 2018. R. 22-3 ¶¶ 13–14, 16. Willis avers:

> Even now, it hurts to think about how Mr. Kluge treated me that year. I have been lucky to have a lot of support from my friends and family, and have tried not to let one person's actions bring me down. But it hurts to think that a teacher—someone I was supposed to look up to—was expressing such a negative opinion of me and trying to control my identity. For a while, I hesitated to come out because I was

> worried that what I was feeling and experienc-
> ing was wrong, or that maybe I was just making
> it up. Mr. Kluge's actions brought all those anx-
> ieties back after I had finally achieved confi-
> dence in myself.

R. 58-1 ¶ 14. *See* James D. Nelson, *Disestablishment at Work*, 134
Yale L. J. 1890, 1937–38 (2025) (noting that misgendering stu-
dents—including the refusal to address transgender students
by their gendered first names and pronouns—can be particu-
larly harmful when carried out by a teacher and in front of
classmates).

Seeing that Kluge would not address transgender stu-
dents by their proper first names and gendered honorifics
might well have encouraged other students to follow the
same practice, heightening the sense of isolation, alienation,
and dehumanization transgender students were experienc-
ing. *See id.* at 1938 ("Part of the work done by misgendering
gender-minority colleagues is to make them more vulnerable
in the future. … Misgendering begets misgendering, as well
as the sort of stigma that leads to exclusion and violence—and
the costs of religious accommodation multiply.")

But Title IX is not the only statutory provision that figures
into the calculus facing Brownsburg; transgender students
may also have a right not to be discriminated against based
on a disability under section 504 of the Rehabilitation Act, 29
U.S.C. § 794(a), and the ADA, 42 U.S.C. § 12112(a). Although
being transgender does not equate with being disabled, it is
by no means unusual for transgender individuals to experi-
ence gender dysphoria—an officially-recognized medical
condition manifesting in a clinically intense and persistent
discomfort with the primary and secondary sex

characteristics of one's sex assigned at birth. Although the ADA, 42 U.S.C. § 12211(b)(1), and the Rehabilitation Act, 29 U.S.C. § 705(20)(F)(i), both exclude from their coverage "gender identity disorders not resulting from physical impairments" from their coverage, gender dysphoria is a distinct condition and as such should not be understood to fall within this exclusion. *Williams v. Kincaid*, 45 F.4th 759, 769 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023).[6]

LGBTQ+ youth (who obviously include transgender students) experience depression, anxiety, and emotional or psychological distress at significantly higher rates than their peers. *See* Manni Jandernoa, Comment, *Prioritizing Student Well-Being: Name and Pronoun Policies in K-12 Schools*, 68 St. Louis U. L.J. 641, 648 (2024). A 2022 survey of 34,000 LGBTQ youths aged 13 to 24 indicates that 60 percent of transgender girls/young women and 69 percent of transgender boys/young men have experienced depression; and 71 percent of transgender girls/young women and 79 percent of transgender boys/young men have experienced anxiety. Most disturbingly, 48 percent of transgender girls/young women,

---

[6] The exclusion for "gender identity disorders" came about in 1990 with the enactment of the ADA. That term has since become outdated. In 2013, the American Psychiatric Association removed the term "gender identity disorder" from the Diagnostic and Statistical Manual of Mental Disorders, or "DSM," and recognized a new diagnosis of "gender dysphoria," which did not exist in 1990. *See Williams*, 45 F.4th at 766–69. The DSM-5 defines "gender dysphoria" as "clinically significant distress or impairment in social, occupational, or other important areas of functioning" associated with, *inter alia*, "[a] marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)." DSM (5th ed. 2013), Table 2.

and 59 percent of transgender boys/young men, reported having considered suicide in the previous year. Amit Paley, *Nat'l Survey on LGBTQ Youth Mental Health*, The Trevor Project, 5–10 (2022), available at https://www.thetrevorproject.org/survey-2022/assets/static/trevor01_2022survey_final.pdf [https://perma.cc/7V3R-WW5S] (visited Aug. 4, 2025).

Providing a safe and supportive learning environment—including one in which a transgender student is addressed in a manner consistent with their gender identity—is widely recognized as key to ensuring that a transgender student has the opportunity to succeed in school: Our amici, the National Association of Social Workers, the American Academy of Pediatrics, the American Medical Association, and the Indiana Youth Group, Inc., have surveyed the research demonstrating that using the names and pronouns comporting with transgender students' gender identities improves physical and mental health outcomes. *See* Brief of Amici Curiae Nat'l Ass'n of Social Workers Including its Indiana Chapter, *et al.*, Seventh Circuit R. 71 at 16–20 (Filed Aug. 16, 2024).[7] Conversely, denying such an environment to a transgender student who is experiencing gender dysphoria or other psychological conditions might well expose a school district to liability for disability discrimination. Again, it is prudent for a

---

[7] This potentially includes the development of an Individualized Education Plan under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, which might include proactive measures including recognizing a student's gender identity and ensuring that teachers, staff, and students address the student appropriately. *See* Asaf Orr and Joel Baum, *Schools in Transition, A Guide for Supporting Transgender Students in K-12 Schools*, 35–56 (2015); available at: https://assets.aclu.org/live/uploads/publications/schools_in_transition_6.3.16.pdf [https://perma.cc/U876-TNVP] (visited Aug. 4, 2025).

school, like any other employer, to anticipate what may be coming down the road and take proactive measures before problems become so severe as to expose it to legal liability.

Brownsburg developed a thoughtful plan to make the learning environment welcoming and supportive for transgender students. It took note of concerns from teachers about how transgender students were to be addressed. The Name Policy came out of these discussions, and that policy also resolved the concerns of all but one such teacher, Kluge. As to Kluge, the school district implemented the accommodation he proposed and rescinded it for the following school year only after several months of trial proved it harmful to transgender students and disruptive to the overall learning environment. Brownsburg's actions are readily understood as striking an appropriate balance between the rights of its transgender students and the rights of its employee.

**E.**

Although the majority accepts, for purposes of this appeal, Brownsburg's proffered mission of "fostering a safe, inclusive learning environment for all" of its students, it also suggests that the school district is barred from relying on mission-relevant evidence that was not formally considered and adopted by the district's governing body and set forth in official school policies predating the litigation. *Ante* at 19–20. I am concerned that this is inconsistent with how individual schools and school districts make policy decisions in practice and unduly confines the evidence relevant to a school's mission for purposes of the *Groff* analysis.

Providing a safe, inclusive learning environment for all students will inevitably entail many specific decisions as to

different groups of students: students belonging to racial and ethnic minorities, religious students, students with disabilities, students for whom English is a second language, students from low-income or unsheltered families, and LGBTQ+ students, just to name a few; and those decisions will not necessarily be memorialized in policy provisions formally adopted by a school district's governing body. Schools will identify, develop, and exemplify their missions not just through official writings but also through classroom lesson plans, school counseling curricula, faculty and staff meetings, PTA meetings, parent-teacher conferences, in-service training days, school assemblies, and student affinity groups.[8]

Both for school districts and for employers generally, restricting proof of a business "mission" to formal policies adopted prior to the litigation is inconsistent with the way businesses operate. Formal mission statements will nearly always address high-level aspirations that do not and cannot anticipate the many ways in which employers define themselves by addressing the day-to-day demands of the business, including customer needs and preferences, commercial successes and failures, hirings and firings, contracts with vendors and customers, advertising, and the cultivation of goodwill (all of which, if history is our guide, will change and evolve over time). Just as the "law of the shop" emerges from time-

---

[8] I see nothing in Ind. Code § 20-26-3-5(b)-(c) that restricts a school district's cognizable mission or policies to those memorialized in writing and adopted by the district's governing body. Ante at 19–20 & n.6. The statute speaks to policies concerning the manner in which certain school "powers" will be exercised. It does not address nor could it possibly address how a school will articulate its mission or the myriad policy decisions a school must make as to how to address the needs and challenges of particular students

honored workplace customs and practices that are not committed to writing, *see Brown v. Vill. of Oak Park*, 54 F.4th 443, 460 (7th Cir. 2022), an employer's mission will be evidenced in myriad aspects of its business history and practices. Of course, a party may always object to the sufficiency and reliability of mission-related evidence on the grounds that it is unwritten, self-serving, or first identified in litigation; but such objections should go to the weight rather than the admissibility of the evidence. Most employers do not run their businesses as policy archives, and courts should recognize reality in assessing what is and is not relevant evidence of an employer's mission.

Suppose, for example, the local franchise of a national ice cream chain sets up shop in a diverse city neighborhood and cultivates over time a lesbian and gay clientele. An employee who has religious objections to serving gay and lesbian people is granted a religious accommodation by the franchise owner which results in multiple complaints from the lesbian and gay community. (Perhaps LGBTQ customers are repeatedly forced to wait for a willing co-worker to serve them while the accommodated employee steps away, openly ignoring them.) In view of the complaints, the franchise owner decides to rescind the accommodation and thus force the accommodated employee to work without the accommodation or resign. The employee in turn sues the chain under Title VII, contending that withdrawal of the accommodation amounted to religious discrimination. The broad mission statement and "brand" of a national chain are unlikely to reflect the goals, policies, and practices of individual franchises, which might well vary from location to location, depending on the community each franchise serves. Under the majority's approach, the franchise owner might therefore be precluded from offering

testimony that part of the franchise's mission, for *Groff* purposes, was to welcome and serve the LGBTQ+ community.

Likewise, a mom-and-pop business with a history of serving a particular neighborhood community (e.g., Orthodox Jews, Haitian refugees, or Serbian Catholics) might have no formally documented mission beyond "Serving the best coffee in Chicago!" But its business lore might be rich with examples of appreciation and support for that community: buying ads in a community newspaper, sponsoring a sports team, donating to food drives for community members in need, to cite a few examples. I gather that such a business, if sued by an employee whose religious accommodation was withdrawn because that accommodation injured customers from the shop's target community, might also be precluded from presenting such informal proof that its mission included the embrace of that community, however illuminating the evidence might be.

Businesses, public and private, define their missions just as much (if not more so) through their day-to-day actions and decisions as they do through their articles of incorporation, by-laws, and mission statements. Our evidentiary rules should hew to reality.

**F.**

Relying on harassment case law, the majority posits that the psychological harm to co-workers, customers, or students resulting from a religious accommodation must be objective, not just subjective, before it can be recognized as a substantial cost for *Groff* purposes, and the court observes that there is no evidence of objective harm to Brownsburg's transgender

students resulting from the last-names-only policy. *Ante* at 25–28.

I question the propriety of importing the hostile-environment framework into the *Groff* analysis in this way. I appreciate that my colleagues are attempting to distinguish truly substantial costs from costs that are barely more than *de minimus* in cases where a religious accommodation has reportedly caused emotional or psychological injuries to others; but looking to harassment caselaw is not the answer. Sucec and Willis are not the plaintiffs here, and this is not a harassment case. The issue under *Groff* is the substantiality of the harm to the *business*. To be sure, Brownsburg has cited the harms to its transgender students as one of the reasons it found the accommodation to Kluge to be unworkable in practice. But to insist that such harms rise to the level of an actionable legal claim against the employer—whether for harassment or something else—before the harms are cognizable for *Groff* purposes is to hamstring an employer from taking notice of the ways in which a religious accommodation burdens its business. If there is no dispute that a religious accommodation has caused insulted, humiliated, or ignored customers or coworkers to walk away from the business, it should not matter whether or not those customers or coworkers have a potential legal claim of their own against the employer; the damage to the business has already been done. A business ought to be free to honor its mission and protect its goodwill by rescinding an accommodation that it learns is harming those whom it serves; and the harms that are relevant to the *Groff* inquiry are not limited to harms that are legally actionable.

Even assuming that the hostile-environment framework has some relevance here, and the reported harms to

Brownsburg's students must be "objectively" serious in order to qualify as a substantial cost for purposes of *Groff*, Brownsburg could surely regard the harm experienced by its transgender students as an objectively serious harm. The Supreme Court has instructed us to evaluate the objective severity of harassment from the viewpoint of a reasonable person in the position of the individual experiencing the harassment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "[T]that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Id.*

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts … to distinguish between simple teasing or roughhousing … and conduct which a reasonable person in the [target's] position would find severely hostile or abusive

*Id.* at 81-82. To my mind at least, it is not at all difficult to imagine that a reasonable person in the position of a transgender high school student in the early years of their transition might have experienced Kluge's practice as harmful, and severely so. Recall what the Brownsburg leadership was told: transgender students understood that they were the reason for Kluge's last-names-only practice; Kluge's practice in addressing students was inconsistent, which confirmed that they were the object of his practice; Sucec and Willis

themselves felt dehumanized, targeted, and isolated (recall that Sucec did not re-enroll in Kluge's orchestra class the following year and ultimately transferred to another school); and cisgender students and faculty were in turn concerned on their behalf.[9] A reasonable person in the position of a transgender student, knowing what they knew and experiencing what they experienced, could well feel injured by a refusal to address them in a manner consistent with their gender identity, particularly when, as Brownsburg was told, Kluge was addressing cisgender students using gendered honorifics and first names.[10] The school district, in turn, could

---

[9] Lee would later testify that the harm Sucec and Willis were enduring was readily observable in speaking with them about their experiences with the accommodation. "It was just very, very clear at the meetings [of the Equality Alliance Club] how much emotional harm was being caused toward Sam and Aidyn. It was clear for everyone at the meetings just to see how much of an impact it was having on them … . [I]t was so clearly visible that I don't feel like there was anything necessarily to interpret." R. 120-14 at 8 (Lee Dep. 39).

[10] Kluge himself seems to have acknowledged the potential for his practice to injure his students. In reference to the May 2018 orchestra awards ceremony, at which he decided to address all students, including his transgender students, by their first and last names as they appeared in the PowerSchool database, Kluge's lawyer has said:

> [D]uring the orchestra awards ceremony, because of its formal nature, [Kluge] used the full names for students as listed in PowerSchool to address all students as they were receiving their awards—including transgender students—because he was trying to work with the school in only requesting what was reasonable. Kluge thought it unreasonable and conspicuous to address students in such an informal manner [using last names only] at such a formal event, as opposed to the classroom setting where teachers refer to students by last names as a normal form of address.

(continued)

legitimately be concerned that this harm was contrary to the policy it had crafted for transgender students, that their learning environment was not supportive; and that the situation could worsen if not addressed, particularly given Kluge's position as teacher and role model. Brownsburg was not required to wait until the students had an actionable hostile-environment claim before regarding the accommodation as unduly burdensome.

Today's decision presumably means that Sucec and Willis will be brought before the factfinder so that jurors can assess their emotional distress and decide for themselves whether they believe Brownsburg's transgender students were objectively harmed by Kluge's religious accommodation. And what if the jury concludes that they were not? To my mind,

---

Kluge's Christian faith required that he do no harm to his students, and this acquiescence to the administration's position was done solely out of sincerely-held beliefs, and not in agreement with the policy. Otherwise, Kluge would have created a scene that would bring into doubt his stated rationale for usage of last names only.

R. 120-19 at 7. At his deposition, Kluge acknowledged that he read the letter containing this statement and approved his lawyer's submittal of the letter to the EEOC. R. 120-3 at 31–32 (Kluge Dep. 121–22). Indeed, when referencing this section of the letter, both Brownsburg's counsel and Kluge referenced it as Kluge's own statement. R. 120-3 at 33–34 (Kluge Dep. 126, 131). When questioned about his use of the students' full PowerSchool names at the awards ceremony, Kluge testified that it would have been "unreasonable" and "conspicuous" to call students by their last names only in that context. R. 120-3 at 33–34 (Kluge Dep. 126–31). I gather that one of the aspects of the awards ceremony that made it a formal event, in Kluge's view, where he thought it would be unreasonable and potentially harmful to students to call on them by their last names only, was the presence of parents and other community members.

that cannot retroactively undo Brownsburg's undisputed, good-faith assessment that its students were suffering as a result of the last-names-only practice, and that the practice must be ended before the distress resulted in even more serious harm. Would the jury's assessment that the harm was not objectively serious mean that the school district was essentially required to turn away from the distress that, according to Lee's testimony, was palpably obvious from talking to the affected students? *See* n.9, *supra*. Again, allowing a fact-finder to second-guess the extent of the harm confronting an employer when there is no dispute as to what the employer understood and believed places the employer in an impossible position. This is all the more true when the employer, given the nature of its business—be it a school, hospital, nursing home, or airline—owes a duty of care to the individuals it serves.

### G.

Earlier I noted that when Brownsburg formulated a plan to foster a supportive learning environment for its incoming transgender students, it acted exactly as we would expect and hope a school district would. I would add that it did the same when it acceded to the religious accommodation that Kluge requested. Kluge proposed a practice that, albeit awkward, was neutral on its face: he would address all students by their last names only, as if he were an athletic coach. As such, the proposal held out the possibility that Kluge's religious beliefs could be accommodated in such a way that no student, including transgender students, would be harmed.

But after four months' experience with the accommodation in practice, a very different picture emerged. Despite neither Kluge nor Brownsburg having disclosed the genesis of

the last-names-only practice, transgender students (and other students) soon surmised that it was the presence of transgender students in his class that was the reason for Kluge's unusual and solitary practice. Kluge's reported deviations from the practice confirmed that it was transgender students in particular that he did not wish to recognize in a manner consistent with their gender identity. Once that was known, transgender students were injured; complaints were regularly voiced by students (both cisgender and transgender), faculty (who were fielding repeated inquiries and concerns about the practice), and parents (who were concerned that their transgender children were not being treated appropriately in Kluge's classroom). That all of this was reported to Brownsburg's leadership is undisputed. And this was all harm to Brownsburg's business, to the learning environment, and to the day-to-day operations of an educational institution.

Brownsburg, having given Kluge's accommodation adequate time to succeed, reasonably concluded that it had failed in practice. It had an obligation to the students who were being harmed by the policy to stop that harm before it continued to undermine the learning environment for transgender students (and other students) and potentially expose the school district to liability. Given the undisputed facts before us, Brownsburg did not discriminate against Kluge on the basis of his religion. It did what it could do to accommodate Kluge, and it rescinded the accommodation to his religious beliefs only after it proved harmful and disruptive in practice. The consequences of the accommodation were "excessive" and "unjustifiable." *Groff*, 600 U.S. at 469. There is nothing here for

a jury to decide. Brownsburg is entitled to summary judgment, and the district court's judgment should be affirmed.

I respectfully dissent.